UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Armenian Genocide Museum and Memorial, Inc., | Civil File No. _____ |
| Plaintiff, | |
| v. | NOTICE OF REMOVAL |
| The Cafesjian Family Foundation, Inc., 4001 Tamiami Trail, Suite 425 Naples, Forida 34103 | |
| Defendant. | |

**TO:  Plaintiff Armenian Genocide Museum and Memorial, Inc., and its attorneys of record, David T. Case and Bruce H. Nielsen, KIRKPATRICK & LOCKHART PRESTON GATES ELLIS LLP, 1601 K. Street N.W., Washington D.C., 20006.**

Pursuant to 28 U.S.C. § 1441(a) the Cafesjian Family Foundation, Inc. ("CFF") submits this Notice of Removal to remove the civil action now pending in the Superior Court of the District of Columbia.  In support of this Notice of Removal, CFF states:

1.    Plaintiff Armenian Genocide Museum and Memorial, Inc. served CFF with the summons and complaint on June 26, 2007.  (Attached as Exhibit A.)  Removal is effected within 30 days of receipt of the complaint and is therefore timely.

2.    Pursuant to 28 U.S.C. § 1441(a), the United States District Court for the District of Columbia is the federal District Court for the District embracing the place where the action is pending.

3.     This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332 due to the diversity of citizenship of the parties and the requisite amount in controversy.

4.     Plaintiff is a citizen of Washington D.C.  CFF is a citizen of Florida. Complete diversity consequently exists.

5.     The nature of the allegations in the complaint guarantee that the alleged amount in controversy exceeds $75,000, exclusive of fees and costs.

6.     CFF has not been served with any other process, papers, orders or other pleadings in this action.

7.     CFF has served a written notice of the filing of this Notice of Removal on counsel for plaintiff and will cause of a copy of the Notice of Removal to be filed with the Clerk of the Superior Court of the District of Columbia, as required by 28 U.S.C. § 1446(d).

WHEREFORE, CFF removes this action to this Court.

Dated:  July 16, 2007

**HOGAN AND HARTSON LLP**

By: _____

     Ty Cobb (D.C. Bar No. 270736)
     Peter C. Lallas (D.C. Bar No. 495944)
     555 Thirteenth Street, N.W.
     Washington, D.C.  20004-1109
     Telephone:  (202) 637-5600

**AND**

**BRIGGS AND MORGAN, P.A.**

Timothy R. Thornton (Minn. #109630)
Molly M. Borg (Minn. #0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
Telephone:  (612) 977-8400

**ATTORNEYS FOR DEFENDANT
THE CAFESJIAN FAMILY
FOUNDATION**

# EXHIBIT A

*15331*

CA Form 1

# Superior Court of the District of Columbia
## CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001  Telephone: 879-1133

| | |
|---|---|
| Armenian Genocide Museum and Memorial, Inc. | |
| | *Plaintiff* |
| vs. | |
| The Cafesjian Family Foundation, Inc. | |
| | *Defendant* |

Civil Action No. `0003902-07`

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| | |
|---|---|
| David T. Case | |
| Name of Plaintiff's Attorney | By _____ |
| 1601 K Street, N.W. | *Deputy Clerk* |
| Address | |
| Washington, DC 20006 | |
| (202) 778-9000 | Date June 7, 2007 |
| Telephone | |

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(4)-4)/Mar. 93

NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

Exhibit A

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.,  )
                                              )
                    Plaintiff,                )
                                              )        0003902-07
v.                                            )    Civil Action No. _____
                                              )
THE CAFESJIAN FAMILY FOUNDATION, INC.         )    (Calendar _____)
                                              )
                    Defendant.                )
                                              )

COMPLAINT
ACTION INVOLVING REAL PROPERTY

     The Armenian Genocide Museum and Memorial, Inc. ("Plaintiff" or "Armenian Genocide Museum & Memorial"), by and through its undersigned counsel, complains of The Cafesjian Family Foundation, Inc. ("Defendant") claiming any right, title, estate, lien or interest in the real properties described herein that is adverse to the Plaintiff's title to such properties. Plaintiff seeks to: (1) clear a cloud on Plaintiff's title to such properties that was created by Defendant and its corporate officer; (2) have this Court declare that the corporate actions that resulted in the creation of the cloud on title were not duly and properly authorized by the necessary corporate actions on the part of the Armenian Genocide Museum & Memorial and its Board of Trustees and officers and constituted a conflict of interest and breach of fiduciary duty on the part of Defendant and its corporate officer; and (3) have this Court issue an injunction requiring Defendant and its officers to take all action and make all filings necessary to cause the removal of the cloud on Plaintiff's title to the real properties at issue.

For its complaint in this action, Plaintiff states as follows:

A. **The Parties**

1.      Plaintiff is duly organized under the laws of the District of Columbia as a nonprofit corporation in order to own and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide, in which the Ottoman Empire forcibly deported and systematically massacred over 1.5 million innocent Armenians. Plaintiff's address in the District of Columbia is c/o Armenian Assembly of America, 1140 19th St. NW, Suite 600, Washington D.C. 20036.

2.      On information and belief, Defendant is organized under the laws of the State of Florida as a nonprofit corporation and has an address at 4001 Tamiami Trail North, Suite 425, Naples, FL 34103.

B. **Jurisdiction**

3.      This Court has jurisdiction over this action pursuant to D.C. Code §§ 11-921(a). The real properties at issue herein are situated in the District of Columbia.

C. **Facts and Basis for Relief**

    Subject Properties

4.      The real properties at issue herein ("Properties") have the following street addresses, all located in the District of Columbia:

        A.      1334-36 G Street NW.

        B.      1338 G Street NW.

        C.      1340 G Street NW.

        D.      1342 G Street NW.

        E.      619 14th Street NW.

- 2 -

<u>The Armenian Assembly</u>

5.    The Armenian Assembly of America ("Armenian Assembly") is a District of Columbia non-profit corporation with its principal place of business at 1140 19th Street NW, Suite 600, Washington, D.C. 20036.  The Armenian Assembly is the premier Armenian-American advocacy group in the United States and has several missions including, but not limited to, acting as a sponsor for Armenian-American interests to public policy makers and the public in the United States, providing resources and opportunities for Armenian-Americans in the American democratic process, undertaking research, education and advocacy for universal affirmation of the Armenian Genocide, enhancing relationships between the United States and Armenia, and securing effective collaboration among Armenian-American organizations to accomplish its articulated goals.

6.    As one part of its goal of preserving and learning from the lessons of the Armenian Genocide[1], beginning in the 1990's, the Armenian Assembly began investigating the idea of constructing a permanent museum and memorial to the victims and survivors of the Armenian Genocide.  The Armenian Assembly explored possible sites for such a museum and memorial in Washington, D.C. and solicited and received donations from the Armenian-

---

[1] Among the various endeavors of the Armenian Assembly in pursuing its goal of affirmation of the Armenian genocide, which is the most elemental event in Armenian history, the Armenian Assembly has sought the enactment of legislation affirming the historical fact of the Armenian Genocide, as well as seeking resolutions that United States foreign policy reflects appropriate understanding of the Armenian Genocide.  In addition, the Armenian Assembly has filed an amicus curiae brief in U.S. District Court in Massachusetts (*Griswold v. Driscoll*) opposing attempts by Turkish interests to insert denialist opinions in curriculum in the Massachusetts public schools, and it has sponsored extensive public educational efforts about the lessons of the Armenian Genocide.

American community for the purpose of establishing and constructing the museum and memorial.[2]

Grant Agreement Between Defendant and the Armenian Assembly

7.      In furtherance of its goals and purposes, the Armenian Assembly entered into a Grant Agreement dated November 1, 2003 ("Grant Agreement") with Defendant. Pursuant to the Grant Agreement, Defendant agreed to grant the Armenian Assembly a total of $17,850,000 for the purpose of assisting in the purchase the Properties and establishment of the Armenian Genocide Museum & Memorial. A copy of the Grant Agreement is attached hereto as Exhibit A.

8.      Pursuant to the Grant Agreement, the Armenian Assembly created the Armenian Genocide Museum & Memorial as a new, independent corporate entity. The Armenian Genocide Museum & Memorial was created and exists to do, among other things, the following: to own, operate and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

9.      In furtherance of their purposes and goals, the Armenian Assembly and the Armenian Genocide Museum & Memorial entered into a Transfer Agreement dated as of November 1, 2003 ("Transfer Agreement"). Pursuant to the Transfer Agreement, the Armenian

---

[2] One of those solicited in 1997 was Gerard L. Cafesjian, who is President and CEO of Defendant, and who until that time had not been a member of the Assembly and apparently was unaware of the Armenian Assembly's search for a site for a museum and memorial in Washington D.C.

Assembly transferred to Plaintiff, *inter alia*, the entirety of Defendant's grants to Plaintiff under the Grant Agreement. Also pursuant to the Transfer Agreement, the Armenian Assembly transferred to the Armenian Genocide Museum & Memorial the Property located at 619 14th Street, NW, and the Armenian Genocide Museum & Memorial acquired the other Properties from third parties, one of which, on information and belief, is an affiliate of Defendant. A copy of the Transfer Agreement is attached hereto as Exhibit B.

<u>Plaintiff's Corporate Structure and By-Laws</u>

10.    Plaintiff is governed by a Board of Trustees ("Board of Trustees") as provided in Plaintiff's Articles of Incorporation ("Articles") and By-Laws ("By-Laws"), a copy of each of which is attached hereto as Exhibits C and D, respectively.

11.    The Articles provide that Plaintiff's "affairs . . . shall be managed and controlled by the Board of Trustees." <u>See</u> Ex. C at Art. VII.A.

12.    The By-Laws provide that the Board of Trustees "shall manage and direct [Plaintiff's] funds and investments." <u>See</u> Ex. D at § 2.9.

13.    The By-Laws provides that the composition of the Board of Trustees and the number of votes exercisable by the members of the Board of Trustees are based on contributions made by donors to the Armenian Genocide Museum & Memorial. At present, there are six total votes on the Board of Trustees, and Defendant controls three of the six votes.

14.    The By-Laws state that one-half of the aggregate eligible Board of Trustees votes constitute a quorum at any properly convened Board of Trustees meeting. <u>See</u> Ex. D at § 2.6. The By-Laws also set strict notice requirements that must be followed to properly convene a meeting of the Board of Trustees: "Notice of the time and place of meetings of the Board of Trustees shall be delivered personally or communicated ... to each Trustee....

- 5 -

Meeting notices ... shall be transmitted no less than five (5) and not more than thirty (30) days prior to the date of the meeting." See Ex. B at § 2.14.

15.    Mr. John J. Waters, Jr. serves as the Secretary/Treasurer of the Armenian Genocide Museum & Memorial and, on information and belief, he also serves as Vice President of Defendant.

Unauthorized Execution and Recordation of a Memorandum

16.    On information and belief, on October 23, 2006, without a meeting of the Board of Trustees having been properly noticed, and without a properly noticed meeting of the Board of Trustees having been held at which the matter could have been discussed, Mr. John J. Waters, Jr. executed, purportedly as an authorized officer of both Plaintiff and Defendant, a Memorandum of Agreement Reserving Rights ("Memorandum") purportedly between Plaintiff and Defendant. A copy of the Memorandum is attached hereto as Exhibit E.

17.    On information and belief, on or about October 27, 2006, and again without a meeting of the Board of Trustees having been properly noticed, and without a properly noticed meeting of the Board of Trustees having been held at which the matter could have been discussed, Mr. Waters caused the Memorandum to be filed and recorded in the official records of the Recorder of Deeds for the District of Columbia ("Recorder of Deeds").

18.    Because no meeting of the Board of Trustees was properly noticed, and because no properly noticed meeting of the Board of Trustees was held, at which the Board of Trustees authorized Mr. Waters to execute the Memorandum on behalf of Plaintiff or to have the Memorandum filed and recorded with the Recorder of Deeds on behalf of Plaintiff, Mr. Waters did not have the authority to execute the Memorandum on behalf of Plaintiff or to file and record the Memorandum with the Recorder of Deeds on behalf of Plaintiff.

- 6 -

19.    On information and belief, the unauthorized execution and subsequent unauthorized filing and recordation of the Memorandum with the Recorder of Deeds has created a cloud on Plaintiff's title to the Properties in that, among other things, title insurance companies would not provide title insurance coverage with respect to the Memorandum in any title insurance policy that may be issued with respect to the Properties.

20.    Members of the Board of Trustees of Plaintiff who were not aware of the unauthorized execution and filing and recordation of the Memorandum at the time of their occurrence have, upon learning of such actions, demanded that Defendant cause such actions to be rescinded and cause the Memorandum be removed from the land records of the District of Columbia.  To date, Defendant has not complied with such demand.

21.    Plaintiff brings this action to (a) clear this cloud on its title to the Properties, (b) have this Court declare that the corporate actions that resulted in the execution and recordation of the Memorandum and the creation of the could on title were not duly and properly authorized by the necessary corporate action on the part of the Armenian Genocide Museum & Memorial and its Board of Trustees and officers and constituted a conflict of interest and breach of fiduciary duty on the part of Defendant and its corporate officer, and (c) have this Court issue an injunction requiring Defendant and its officers to cooperate with the Armenian Genocide Museum & Memorial in taking all action and make all filings necessary to cause the removal of the cloud on Plaintiff's title to the Properties.

**D. Prayer for Relief**

WHEREFORE, Plaintiff requests judgment as follows:

1.     A decree of this Court that clears the cloud on Plaintiff's title to the Properties through the removal of the Memorandum from the land records of the District of Columbia maintained by the Recorder of Deeds.

2.     A declaration by this Court that the execution of the Memorandum on behalf of the Armenian Genocide Museum & Memorial, and its subsequent recordation with the Recorder of Deeds, were not duly and properly authorized by the appropriate corporate action on the part of the Armenian Genocide Museum & Memorial and constitute a conflict of interest and breach of fiduciary duty on the part of Defendant and its corporate officer, and that such unauthorized execution and recordation are, therefore, of no force and effect.

3.     An injunction requiring Defendant to cooperate, and to cause its corporate officers to cooperate, with the Armenian Genocide Museum & Memorial in taking all actions and making all filings necessary to effect the removal of the Memorandum from the land records of the District of Columbia as maintained by the Recorder of Deeds.

Respectfully submitted,

David T. Case (No. 384062)
Bruce H. Nielson (No. 414440)
KIRKPATRICK & LOCKHART PRESTON GATES
ELLIS LLP
1601 K St., N.W.
Washington, D.C. 20006
Tel.: (202) 778-9000
Fax: (202) 778-9100

Counsel for Plaintiff

- 8 -

EXHIBIT A

CONFIDENTIAL

 **ARMENIAN ASSEMBLY OF AMERICA**
50 NORTH LA CIENEGA BLVD. • SUITE 202 • BEVERLY HILLS, CA 90211 • (310) 360-0091 • FAX (310) 360-0094

November 1, 2003

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

     Re:    <u>Grant Agreement</u>

Dear Mr. Cafesjian:

    Thank you for your very generous grants to support the Armenian Assembly of
America, Inc. (the "Assembly"). The purpose of this letter (the "Agreement") is to set
forth the terms and conditions of the grants, as described below (the "Grants"), from you,
Gerard L. Cafesjian ("GLC"), and The Cafesjian Family Foundation (the "Foundation";
and together with GLC, the "Grantor"), to the Assembly for the purposes of establishing
the Armenian Genocide Museum and Memorial (the "AGM&M"). If this Agreement
correctly sets forth your understanding with respect to the subject matter hereof, please
indicate your agreement by countersigning below and returning the executed original
Agreement to the Assembly. The enclosed duplicate original of the Agreement is for
your records.

**SECTION 1  First Grant.**

  1.1    <u>Amount of First Grant</u>. The Grantor shall grant the Assembly $4,000,000 in
accordance with the terms of this Agreement (the "First Grant"). This amount
is in addition to the $1,000,000 delivered to the Assembly on or about
February 16, 2000 by the Vanguard Charitable Endowment Program –
Cafesjian Family Foundation Charitable Trust, as directed by GLC as donor
advisor to said Trust.

  1.2    <u>Use of First Grant</u>. The Assembly shall use First Grant funds solely: (i) to
purchase the property at 14th and G Streets, N.W., Washington, D.C., known
as the National Bank of Washington Building (the "First Grant Property"); (ii)
to pay for any transaction costs related to the purchase of the First Grant
Property; and (iii) for the installation of a Memorial as described in Section
3.2 of this Agreement.

National Headquarters: 122 C Street, N.W., Suite 350, Washington, DC 20001 (202) 393-3434  Fax (202) 638-4904
Yerevan Office: 19 Republic Square, Room 105, 375010 Yerevan, Armenia  374 (2) 15-10-60  Fax 374 (2) 15-10-59
Stepanakert Office: 28 Azatamartikner Street, Stepanakert, NKR

1.3    Payment of First Grant. The Foundation shall have made First Grant funds available in the following manner:

(A)    the Foundation transmitted $1,000,000 to the Assembly on February 4, 2000; *[handwritten] per taken to DOA onterest*

(B)    the Foundation transmitted $1,500,000 to the Assembly on or before the closing date for the purchase of the First Grant Property, which was on or about February 16, 2000; and

(C)    the Grantor shall transmit $1,500,000 to the Assembly at such time as mutually agreed to by the parties to fund the purchase and installation of the Memorial described in Section 3.2 of the Agreement.

## SECTION 2  Second Grant

2.1    Amount of Second Grant. The Grantor shall grant the Assembly $12,850,000 in accordance with the terms of this Agreement (the "Second Grant").

2.2    Use of Second Grant. The Assembly shall use Second Grant funds solely to purchase the four parcels of real estate located at 1334-36, 1338, 1340, and 1342 G Street, N.W., Washington, D.C. (collectively, the "Second Grant Property") and for any related transaction costs.

2.3    Payment of Second Grant. The Grantor shall make Second Grant funds available in the following manner:

(A)    the Grantor shall transmit $6,700,000 to the Assembly on or before the closing date for the purchase of 1334-36 G Street, which is November 4, 2003, of which the Assembly shall use approximately $6,500,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs;

(B)    the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1338 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs;

(C)    the Grantor shall transmit $800,000, to the Assembly on or before the closing date for the purchase of 1340 G Street, of which the Assembly shall use approximately $750,000 to pay the current owner of 1340 G Street an amount equal to the current owner's current cost basis in 1340 G Street and shall use the remaining amount to pay any related transaction costs;

(D)    the Grantor shall transmit seven annual payments of $150,000 each to the Assembly on or before the March due date of each of the seven

2

annual payments (the "Annual Payments") of $150,000 owed or to be owed by the Assembly under the 1340 G Street contract of deed currently held by the current owner of 1340 G Street and to be assumed by the Assembly (the "Contract of Deed"), which the Assembly shall use to pay the Annual Payments;

(E)     the Grantor shall transmit $1,500,000 to the Assembly on or before the due date of the final balloon payment (the "Balloon Payment") of $1,500,000 owed or to be owed by the Assembly under the Contract of Deed, which the Assembly shall use to pay the Balloon Payment; and

(F)     the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1342 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs.

SECTION 3   General Conditions and Covenants.

3.1     Use of the Grant Property.

(A)     The First Grant Property and the Second Grant Property (together, the "Grant Property") may only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc. (the "Plans"), and subject to any leases in place at the time of the acquisition of the Grant Property by the Assembly with respect to all or a portion of the Grant Property (and with respect to which the Assembly shall take any necessary steps to terminate such leases as soon as possible, subject to the terms of such leases and applicable law, and shall not consent to any renewals or extensions).

(B)     If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:

(i)     in the event any portion of the Grants has not been funded, this Agreement terminates; and

(ii)    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.

3.2     Memorial. The Assembly shall:

3

(A)  make available in the Grant Property space acceptable to the Foundation for a memorial commemorating the Armenian Genocide (the "Memorial"), which is expected to occupy no less than 1,200 square feet of floor space or no less than 40,000 cubic feet, shall have the necessary structural support and ready access to adequate external lighting and a design for which has yet to be determined by the Foundation;

(B)  cooperate with the design firms, artists and others selected by the Foundation to design and ensure the successful completion of the Memorial;

(C)  permit the Foundation to participate in all material decisions regarding the Memorial;

(D)  operate and maintain the Memorial in perpetuity without alteration (ordinary wear and tear excepted) except as approved in advance by the Foundation in writing;

(E)  be solely responsible for the costs of maintaining the Memorial; and

(F)  name the Memorial the "Gerard L. Cafesjian Memorial" or another name approved by the Foundation in writing.

3.3  Use of Grant Funds.  The Assembly shall use Grant funds only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

3.4  Private Foundation Grants.  The Assembly may not use any portion of the Grants that have been received from the Foundation to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

3.5  Financial Records.  The Assembly shall maintain financial records regarding the use of the Grants consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

3.6  Reports and Records.

(A)  Until completion of the AGM&M and operation of the completed facility for 12 months, the Assembly shall provide written reports to the Grantor at least quarterly.

(B)  Such reports shall include details on:

(i)  the amount and nature of the expenditures made from the Grant; and

4

(ii)    the progress made in acquiring, designing, renovating, and utilizing the Grant Property and completing the AGM&M.

(C)    In such reports, an officer of the Assembly shall certify its compliance with the terms and conditions of this Agreement.

(D)    The Assembly shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the Grant Property and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

3.7    <u>No Other Rights or Obligations</u>.  Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence the Assembly's use of any funds provided in accordance with this Agreement.

3.8    <u>No Further Grants Required</u>.  It is expressly understood that by making these Grants the Grantor has no obligation to provide additional funding to the Assembly for the AGM&M or for any other purpose.

3.9    <u>Breach by the Assembly</u>.

(A)    If the Assembly fails to use the Grants solely for the purposes set out in this Agreement or if the Assembly fails to satisfy any of the conditions of this Agreement, Grantor is released from any remaining obligation under this Agreement to provide funds or property to the Assembly.

(B)    If the Assembly uses any portion of the Grants either for a purpose other than those set out in this Agreement or for a purpose other than those described in Section 501(c)(3) of the Code, as amended, the Assembly shall repay the portion of the Grants so spent to Grantor, plus interest.

(C)    The remedies set out in this Section 3.9 are in addition to any other remedies that may be available to the Grantor at law or equity.

SECTION 4  Conditions Related to the Assembly.

The Grantor's obligation to make the Grants is subject to the following conditions:

4.1    <u>Total Grants and Pledges</u>.  On or before October 30, 2003, the Assembly must have received actual grants or firm pledges to support the AGM&M, including the Grants, totaling at least $20,000,000.  Any grant or pledge that can only be used for the post opening operation or for an endowment for the future

operation of the AGM&M may not be considered for purposes of satisfying this condition.

4.2    **Tax-Exempt Status.**  The Assembly must be a tax-exempt organization described in Section 501(c)(3) of the Code, and may not be a private foundation within the meaning of Section 509(a) of the Code.

4.3    **Tax Status Documentation.**  The Assembly shall deliver to the Grantor a copy of its IRS determination letter and such other documentation reasonably requested by the Grantor, including without limitation evidence that the Grants and the other contributions expected in connection with the AGM&M, including those described in Section 4.1 of this Agreement, have not caused the Assembly to be treated as a private foundation.

4.4    **Evidence of Satisfaction.**  The Assembly has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

## SECTION 5  Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grants is subject to the following conditions:

5.1    **New Nonprofit Corporation.**  On or before October 30, 2003, a new, independent entity described in Section 501(c)(3) of the Code, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), must be created by the Assembly and the Foundation, with the costs borne by AGM&M, Inc.

5.2    **Governance of AGM&M, Inc.**

(A)    AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

(B)    Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of the Transfer Agreement described in Section 5.3 of this Agreement), except that the Assembly shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by the Assembly to AGM&M, Inc.

(C)    In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

(D)    In recognition of its efforts in establishing the AGM&M, the

6

Assembly is included as a Major Donor and has the right to appoint a voting member of the AGM&M, Inc. Board of Trustees.

(E)    Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless otherwise specified in the Articles or Bylaws of the corporation.

(F)    Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees. Each subsequent successor Trustee has the rights of a Trustee.

(G)    The initial Board of Trustees of AGM&M, Inc. consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

5.3    Transfer Agreement.

(A)    On or before November 1, 2003, the Assembly shall have entered into a pledge agreement with AGM&M, Inc. (the "Transfer Agreement"), under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.

(B)    The Transfer Agreement will oblige AGM&M, Inc. to honor all of the existing donor requirements at time of transfer, or in the alternative, to obtain donor consent to the transfer and any modification of donor terms.

(C)    Under the Transfer Agreement, AGM&M, Inc. must assume and agree to comply with the obligations of the Assembly under this Agreement relating to the Memorial.

5.4    Promissory Note.

(A)    The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000.

(B)    The new note must be interest free and mature on December 31, 2005.

(C)    If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.

5.5    Armenian National Institute. On or before November 1, 2003, the Assembly

7

shall assign its right to appoint Trustees of the Armenian National Institute to AGM&M, Inc.

**SECTION 6  Representations by the Assembly.**

The Assembly hereby represents and warrants to the Grantor as follows:

6.1    <u>Tax Status</u>. The status of the Assembly as an organization described in Section 501(c)(3) of the Code, and as an organization that is not a private foundation within the meaning of Section 509(a) of the Code is in full force and effect and there is, to the Assembly's knowledge, no IRS reexamination of such status pending or threatened.

6.2    <u>Organization</u>. The Assembly is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

6.3    <u>Power</u>. The Assembly has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grants.

6.4    <u>Actions</u>. All actions required to be taken by the Assembly to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

6.5    <u>Authorization</u>. This Agreement has been duly and validly authorized by all necessary action of the Assembly and constitutes, when executed, a valid and binding obligation of the Assembly.

6.6    <u>Furtherance of Charitable Purposes</u>. The acquisition, renovation, and utilization of the Grant Property is solely in furtherance of the Assembly's stated charitable purposes.

**SECTION 7  General Provisions.**

7.1    <u>Notice</u>.

(A)    Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)    upon personal delivery, if delivered by hand; or

(ii)    three days after the date of deposit in the U.S. mail, postage prepaid; or

8

(iii)     on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

(B)   Notice sent in accordance with Section 7.1(A) of this Agreement must be addressed as follows:

(i)     If to Grantor:

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax:  612-359-8994

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax:  612-359-8994

(ii)    If to the Assembly:

Armenian Assembly of America, Inc.
122 C Street, NW
Suite 350
Washington, DC 20001
Fax:  202-393-9012

(C)   Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 7.1.

7.2   Governing Law.  This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

7.3   Assignments.  This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and the Assembly and are not assignable or transferable to any other person, firm or corporation without the consent of the other party, except that the Assembly may assign its rights and obligations under this Agreement to any entity that succeeds to all or substantially all of the Assembly's business and assets or as set out in Section 5.3 of this Agreement.

7.4   Headings.  The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

9

7.5    <u>Entire Agreement</u>.

(A)    This Agreement represents the entire agreement between the Grantor and the Assembly concerning the Grants and all previous agreements, whether written or oral, are superseded by it.

(B)    This Agreement may be modified or waived only by a written agreement between the Grantor and the Assembly.

(C)    The Assembly acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*(Signatures on next page.)*

Thank you again for your generous grant to support the Armenian Assembly of America.

Sincerely,

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____
    Hirair S. Hovnanian
    Chairman of the Board of Trustees

By: _____
    Peter Vosbikian
    Chairman of the Board of Directors

Accepted and agreed to as of the date of this Agreement by:

THE CAFESJIAN FAMILY FOUNDATION

By: _____     Date: NOV. 1, 2003
    Gerard L. Cafesjian
    President and CEO

GERARD L. CAFESJIAN .

    _____     Date: nov. 1, 2003

11

EXHIBIT B



# TRANSFER AGREEMENT

This Transfer Agreement (this "Agreement") is made as of November 1, 2003, by and between:

Armenian Assembly of America, Inc. (the "Grantor"), a District of Columbia nonprofit corporation; and

Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), a District of Columbia nonprofit corporation.

## BACKGROUND

In order to complete the building of the Armenian Genocide Museum and Memorial (the "AGM&M"), the Grantor desires to transfer all of its real property, pledges, cash, and other assets acquired for the purpose of building the AGM&M to AGM&M, Inc. under the terms and conditions set out in this Agreement.

The parties, therefore, agree as follows:

## TERMS

SECTION 1  Grant.

  1.1  <u>Nature of Grant</u>.

   (A)  The Grantor shall contribute to AGM&M, Inc., all of its rights, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Grantor and/or held by the Grantor for the development, renovation, and construction of the AGM&M, as detailed on <u>Schedule A</u> (the "Grant").

   (B)  Copies of all outstanding grant agreements between the Grantor and its donors relating to the AGM&M are attached to this Agreement as <u>Exhibits A-X</u>.

   (C)  The approximate aggregate value of the Grant is $27,784,901. Within this aggregate estimate the value of the real property is $7,250,000.00; the value of the pledges as of October 30, 2003, is $19,422,044; and the value of cash and other assets on hand is approximately $669,528.

  1.2  <u>Other Rights and Obligations Transferred</u>.

   (A)  AGM&M, Inc. must honor all of the Grantor's donor requirements existing at time of transfer, or in the alternative, obtain donor consent

1

to the transfer and any modification of donor terms.

    (B)    Without limiting Section 1.2(A) of this Agreement, AGM&M, Inc. assumes and agrees to comply with the Grantor's obligations relating the memorial commemorating the Armenian Genocide under the agreement between Grantor and Gerard L. Cafesjian and The Cafesjian Family Foundation attached to this Agreement as Exhibit A.

    (C)    The Grantor hereby assigns to AGM&M, Inc. the Grantor's right to appoint Trustees of the Armenian National Institute, Inc.

    (D)    If at the time this Agreement is executed the promissory note executed by Grantor in favor of the The Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant.

1.3    <u>Use of Grant</u>.  AGM&M, Inc. shall use the Grant solely to develop, construct and operate the AGM&M.

1.4    <u>Transfer of Grant</u>.

    (A)    The Grantor shall begin to transfer the assets that compose the Grant upon the execution of this Agreement.

    (B)    The Grantor shall diligently undertake to complete the transfer of all titles, obtain all consents or other permissions, and otherwise act to effect the completion of the Grant.

## SECTION 2   General Conditions and Covenants.

2.1    <u>Use of Grant Funds</u>.  AGM&M, Inc. shall use the Grant only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

2.2    <u>Private Foundation Grants</u>.  AGM&M, Inc. may not use any portion of the Grant that has been received from a private foundation, as defined by Section 509(a) of the Code, to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

2.3    <u>Financial Records</u>.  AGM&M, Inc. shall maintain financial records regarding the use of the Grant consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

2.4    <u>Reports and Records</u>.

(A) Until completion of the AGM&M and operation of the completed facility for 12 months, AGM&M, Inc. shall provide written reports to the Grantor at least quarterly.

(B) Such reports shall include details on:

(i) the amount and nature of the expenditures made from the Grant; and

(ii) the progress made in acquiring, designing, renovating, and utilizing the Property and completing the AGM&M.

(C) In such reports, an officer of AGM&M, Inc. shall certify its compliance with the terms and conditions of this Agreement.

(D) AGM&M, Inc. shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the real property portion of the Grant and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

2.5 **Access to Public Spaces.** Upon written and reasonable notice, AGM&M, Inc. shall provide Grantor with access to the public spaces within the AGMM free of charge at least six times annually for tours, dinners or other events consistent with the nature of the AGMM in the sole judgment of the AGM&M, Inc., each not lasting longer than six hours, all costs of such events to be borne by Grantor. Grantor shall not have the right to assign, lease or otherwise transfer this right to any other entity or person. This right of access shall expire if Grantor ever ceases to be an organization described in Section 501(c)(3) of the Code.

2.6 **Narrative.** Grantor and AGM&M, Inc. shall use their best efforts to jointly prepare a narrative on the creation of the AGMM (the "Narrative") for approval by both Grantor and AGM&M, Inc. Upon approval by both Grantor and AGM&M, Inc. and completion of the AGMM, AGM&M, Inc. shall permanently and prominently memorialize the Narrative within the AGMM. AGM&M, Inc. shall include the Narrative or a condensed version thereof in all major publications and public presentations of AGM&M, Inc. that reference the creation of the AGMM.

2.7 **No Other Rights or Obligations.** Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence AGM&M, Inc.'s use of the Grant provided in accordance with this Agreement.

SECTION 3   Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grant is subject to the following conditions:

3.1    Tax-Exempt Status.  AGM&M, Inc. must be a tax-exempt organization
described in Section 501(c)(3) of the Code, as amended, and may not be a
private foundation within the meaning of Section 509(a) of the Code.

3.2    Tax Status Documentation.  AGM&M, Inc. shall deliver to the Grantor a copy
of its IRS application for recognition of exemption (when prepared), its IRS
determination letter (when received), and such other documentation
reasonably requested by the Grantor.

3.3    Evidence of Satisfaction.  AGM&M, Inc. has provided evidence to the
Grantor in a form reasonably acceptable to the Grantor that the Assembly is in
the process of satisfying the terms and conditions of this Agreement.

3.4    Governance of AGM&M, Inc.

(A)    AGM&M, Inc. must be controlled by a Board of Trustees (the "Board
of Trustees") appointed by individuals and organizations that
contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or
any predecessor in interest.

(B)    Each Major Donor is entitled to receive one seat on the Board of
Trustees and one vote for each $5,000,000 contributed to AGM&M,
Inc. (whether directly or as a result of this Agreement), except that the
Grantor shall only accept one seat on the Board of Trustees and one
vote regardless of the amount contributed by Grantor to AGM&M,
Inc.

(C)    In recognition of her important and significant early contribution to the
project, Anoush Mathevosian is included as a Major Donor and voting
member of the AGM&M, Inc. Board of Trustees.

(D)    In recognition of its efforts in establishing the AGM&M, the
Assembly is included as a Major Donor and a voting member of the
AGM&M, Inc. Board of Trustees.

(E)    Decisions of the AGM&M, Inc. Board of Trustees require an 80%
vote to carry, unless otherwise specified in the Articles or Bylaws of
the corporation.

(F)    Each individual Major Donor may appoint both successors to the
Board of Trustees and successors to his or her right to appoint
successors to the Board of Trustees.  Each subsequent successor
Trustee has the rights of a Trustee.



(G)   The initial Board of Trustees of AGM&M, Inc., consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

## SECTION 4   Representations by AGM&M, Inc.

AGM&M, Inc. hereby represents and warrants to the Grantor as follows:

4.1   <u>Tax Status</u>. AGM&M, Inc. is an organization described in Section 501(c)(3) of the Code and an organization that is not a private foundation within the meaning of Section 509(a) of the Code, and AGM&M, Inc. shall apply by November 30, 2003 to the Internal Revenue Service for recognition of this status.

4.2   <u>Organization</u>.  AGM&M, Inc. is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

4.3   <u>Power</u>. AGM&M, Inc. has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grant.

4.4   <u>Actions</u>. All actions required to be taken by AGM&M, Inc. to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

4.5   <u>Authorization</u>. This Agreement has been duly and validly authorized by all necessary action of AGM&M, Inc. and constitutes, when executed, a valid and binding obligation of AGM&M, Inc..

4.6   <u>Furtherance of Charitable Purposes</u>. The receipt and use of the Grant pursuant to this Agreement is solely in furtherance of AGM&M, Inc.'s stated charitable purposes.

## SECTION 5   General Provisions.

5.1   <u>Notice</u>.

(A)   Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)   upon personal delivery, if delivered by hand; or

(ii)   three days after the date of deposit in the U.S. mail, postage prepaid; or

(iii)    on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

(B)    Notice sent in accordance with Section 5.1(A) of this Agreement must be addressed us follows:

(i)    If to AGM&M, Inc.:

c/o The Cafesjian Family Foundation, Inc.
15 South Fifth Street
Suite 900
Minneapolis, MN 55402
Fax: 612-359-8994

(ii)    If to the Grantor:

Armenian Assembly of America, Inc.
122 C Street, NW
Suite 350
Washington, DC 20001
Fax: 202-383-9012

(C)    Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 5.1.

5.2    **Governing Law.** This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

5.3    **Dispute Resolution.** Any disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in force.

5.4    **Assignments.** This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and AGM&M, Inc. and are not assignable or transferable to any other person, firm or corporation without the consent of the other party.

5.5    **Headings.** The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

5.6    **Entire Agreement**

(A)    This Agreement represents the entire agreement between the Grantor

and AGM&M, Inc. concerning the Grant and all previous agreements, whether written or oral, are superseded by it.

(B)   This Agreement may be modified or waived only by a written agreement between the Grantor and AGM&M, Inc.

(C)   AGM&M, Inc. acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*[Signatures on next page.]*

IN WITNESS WHEREOF, the parties hereto have caused this Transfer Agreement to be duly executed as of the day and year first above written.

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____     Date: _Nov 1 2003_
Chairman of the Board of Trustees

By: _____     Date: _NOV. 1, 2003_
Peter Voskibian
Chairman of the Board of Directors

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

By: _____     Date: _Nov 1, 2003_
John J. Waters, Jr.
Secretary and Treasurer

8

TRANSFER AGREEMENT

Schedule A

Transferred Assets

(See attached.)

TRANSFER AGREEMENT

Exhibit A

Grant Agreement with [_____]

(See attached.)

# EXHIBIT C

# ARTICLES OF INCORPORATION

## OF

## ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

To:  Department of Consumer and Regulatory Affairs
Business Regulation Administration
Corporations Division
Washington, D.C.

THE UNDERSIGNED, all of whom are natural persons of the age of eighteen years or more, acting as incorporators of a corporation pursuant to the District of Columbia Nonprofit Corporation Act hereby adopt the following Articles of Incorporation:

### ARTICLE I.  NAME

The name of the Corporation is the Armenian Genocide Museum and Memorial, Inc. (the "Corporation").

### ARTICLE II.  DURATION

The period of duration of the Corporation is perpetual.

### ARTICLE III.  ADDRESS

The address of the Corporation's registered office in the District of Columbia is Armenian National Institute, 122 C Street NW, Suite 360, Washington, DC  20001.  The name of the Corporation's registered agent at such address is Rouben Adalian.

## ARTICLE IV. PURPOSE

A.    The Corporation is a nonprofit organization organized and operated exclusively for charitable, educational, and other purposes beneficial to social welfare within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). All references to sections of the Code include the corresponding provision of any subsequent federal tax law. Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

B.    In furtherance of these purposes, the Corporation shall have all powers granted to a corporation under the District of Columbia Nonprofit Corporation Act and the power to do all things necessary, proper, and consistent with maintaining its tax-exempt status under section 501(c)(3) of the Code.

C.    No part of the net earnings of the Corporation shall inure to the benefit of or be distributed to any trustee, employee or other individual, partnership, estate, trust or corporation having a personal or private interest in the Corporation. Compensation for services actually rendered and reimbursement for expenses actually incurred in attending to the affairs of the Corporation shall be limited to reasonable amounts. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence

Page 2 of 7

legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

D.    Notwithstanding any other provisions of these Articles, the Corporation shall not carry on any activity not permitted to be carried on by (a) a corporation exempt from federal income tax under section 501(c)(3) of the Code, or (b) a corporation, contributions to which are deductible under section 170(a) and (c)(2) of the Code.

## ARTICLE V. MEMBERS

The Corporation shall have no members.

## ARTICLE VI. BOARD OF TRUSTEES

The Board of Directors of the Corporation shall be referred to as the Board of Trustees. The manner of election or appointment to the Board of Trustees shall be as provided in the By-Laws of the Corporation.

## ARTICLE VII. REGULATION OF INTERNAL AFFAIRS

A.    The affairs of the Corporation shall be managed and controlled by the Board of Trustees.

B.    The initial By-Laws shall be adopted by the Board of Trustees, which may alter, amend or repeal the By-Laws or adopt new By-Laws.

C.    In the event of the dissolution or final liquidation of the Corporation:

Page 3 of 7

1.    None of the property of the Corporation nor any proceeds thereof shall be distributed to or divided among any of the trustees or officers of the Corporation or inure to the benefit of any individual.

2. .    After all liabilities and obligations of the Corporation have been paid, satisfied and discharged, or adequate provision made therefor, all remaining property and assets of the Corporation shall be distributed to one or more organizations organized and operated exclusively for religious, charitable, scientific, literary, educational or social welfare purposes, provided that such organizations shall be exempt from federal income taxes by reason of section 501(c)(3) of the Code, and subject to any additional restrictions imposed by the By-Laws of the Corporation.

3.    The private property of the trustees or officers of the Corporation shall not be subject to payment of corporate debts to any extent whatever.

## ARTICLE VIII.  PRIVATE FOUNDATION RULES

The Corporation shall at all times be organized and operated so as to qualify as an organization that is not a private foundation, as defined in section 509(a) of the Code. If, however, at any time, the Corporation shall be classified as a private foundation under federal tax laws, then at such time or times the Corporation shall be subject to the following restrictions:

1.    The Corporation shall not engage in any act of self-dealing as defined in section 4941(d) of the Code.

2. '   The Corporation shall make distributions for each taxable year at such time and in such manner so as not to become subject to the tax on undistributed income imposed by section 4942 of the Code.

Page 4 of 7

3.    The Corporation shall not retain any excess business holdings as defined in section 4943(c) of the Code.

4.    The Corporation shall not make any investments in such manner as to subject it to tax under section 4944 of the Code.

5.    The Corporation shall not make any taxable expenditures as defined in section 4945(d) of the Code.

## ARTICLE IX. TRUSTEES

The number of Trustees may be increased or decreased from time to time by the Board of Trustees, but shall in no event be less than three (3). The names and addresses of the persons who shall serve as initial Trustees until their successors are elected and qualify, are:

| NAME | ADDRESS |
|------|---------|
| Gerald L. Cafesjian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Hirair S. Hovnanian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Anoush Mathevosian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Robert A. Kaloosdian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |

## ARTICLE X. INCORPORATORS

The name and addresses of the incorporators are as follows:

| NAME | ADDRESS |
|------|---------|
| Kristen M. Gurdin | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| Sharon P. Light | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |
| Lloyd H. Mayer | Caplin & Drysdale, Chartered<br>One Thomas Circle, NW<br>Washington, DC 20005 |

IN WITNESS WHEREOF, we, the undersigned, being the Incorporators hereinabove named, do hereby affirm under penalties of perjury that these Articles are our act and deed, and the facts herein stated are true and, accordingly, we have executed these Articles this _____ day of _____, 2003.

Kristen M. Gurdin

Sharon P. Light

Lloyd H. Mayer

DISTRICT OF COLUMBIA     ) 
                          )   SS:
                          )

I, _____, a Notary Public in and for the District of Columbia, do hereby certify that Kristen M. Gurdin, Sharon P. Light and Lloyd H. Mayer whose names are signed to the foregoing Articles of Incorporation of Armenian Genocide Museum and Memorial, Inc., bearing the date of _____, 2003, personally appeared before me in said District, the said persons being personally well known to me as the persons who executed the said Articles of Incorporation, and each acknowledged the same to be his or her act and deed.

                                           _____
                                           Notary Public

J

**EXHIBIT D**

# BY-LAWS

## OF

## ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

### ARTICLE I ....

### EFFECT, NAME, PURPOSES, POLICY AND RELATED MATTERS

**Section 1.1. General.** These By-Laws shall become effective as of October 30, 2003.

**Section 1.2. Name and Purpose.** The Corporation shall conduct its programs and activities under the name of the Armenian Genocide Museum and Memorial. The Corporation is organized exclusively for educational purposes. Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

**Section 1.3. Policy.** The Corporation, its Trustees, officers, and employees shall ever be mindful of the pluralistic character of the Armenian community world-wide, and the worth of its institutions and organizations.

**Section 1.4. Location.** The principal office of the Corporation shall be located in the District of Columbia Metropolitan area. The Trustees, by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, may change the location of the principal office from time to time to any other place within the United States of America. The Trustees, by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, may open and operate other offices of the Corporation in the United States and abroad. The Corporation shall have and continuously maintain in the District of Columbia a registered office and a registered agent whose business office is identical with such registered office, as required by the District of Columbia Nonprofit Corporation Act. The address of the registered office and the identity of the registered agent may be changed from time to time by the Board of Trustees.

**Section 1.5. Fiscal Year.** The fiscal year of the Corporation shall, unless otherwise decided by the Trustees, end on December 31 of each year.



## ARTICLE II

## BOARD OF TRUSTEES

Section 2.1. Members. The Corporation shall have no members.

Section 2.2. Board of Trustees. The Board of Trustees of the Corporation shall serve as the Board of Directors of the Corporation for purposes of the District of Columbia Nonprofit Corporation Act.

Section 2.3. Number and Election. The Board of Trustees shall consist of not less than three (3) nor more than fifteen (15) members. At no time, however, shall the total number of votes exercised by the Board of Trustees exceed fifteen (15), even if the Board of Trustees has not reached its maximum size authorized under these By-Laws.

Section 2.4. Initial Trustees. The initial Trustees shall be the Trustees of the Corporation serving as such as of the date of the adoption of these By-Laws. The term of office of an initial Trustee shall be perpetual. Each donor that elected an initial Trustee (as identified by the initial Trustees in the unanimous written consent in lieu of the organization meeting of the Board of Trustees of the Corporation) (an "Initial Donor") shall appoint a successor within thirty (30) days of the adoption of these By-Laws to serve as Trustee should the initial Trustee be-unable to serve for any reason. If an Initial Donor fails to appoint such a successor, the initial Trustee elected by that Initial Donor shall be automatically removed from the Board of Trustees effective thirty-one (31) days after the adoption of these By-Laws, but shall be automatically reinstated to the Board of Trustees if and when the Initial Donor appoints a successor to that Trustee. Each Initial Donor shall have the same rights as donors described in Section 2.5 of these By-Laws with respect to the initial Trustee elected by the Initial Donor and the successors to that initial Trustee, including the right, if an Initial Donor makes contributions to the Corporation in excess of $5 million, to elect an additional Trustee for each $5 million increment above the initial $5 million in contributions by that Initial Donor or to grant to the Trustee previously elected by that Initial Donor the right to exercise as many additional votes as the donor has contributed whole increments of $5 million above the initial $5 million in contributions by that Initial Donor.

Section 2.5. Additional Trustees. Additional Trustees shall be elected to the Board of Trustees according to the following procedure:

Each contribution of $5 million to the Corporation entitles the donor to elect one Trustee to the Board of Trustees, provided:

(1) the Board of Trustees has accepted the contribution on behalf of the Corporation by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present; and

Page 2 of 10

(2) the donor has appointed a successor to the Trustee elected by the donor to serve on the Board of Trustees should that Trustee be unable to serve for any reason,

until such time as the total number of votes exercised by the Board of Trustees reaches fifteen (15).

When the Corporation has accepted multiple $5 million contributions from a single donor, the donor may either elect one Trustee for each $5 million increment or elect one Trustee who shall exercise as many votes as the donor has contributed whole increments of $5 million. The donor must appoint a successor or successors to the Trustee or Trustees at the time of election.

An individual donor may elect himself or herself as a Trustee or appoint himself or herself as a successor.

An institutional donor shall retain the right to elect Trustees and to appoint successors in perpetuity, which rights, and the right to pass these rights to successor institutions, shall pass to any institution that the governing body of the institutional donor designates as its successor. If an institutional donor dissolves or otherwise ceases to exist without having designated a successor, the institutional donor's rights shall expire. A Trustee elected by such an institutional donor before the expiration of the donor's right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor or successors appointed by such an institutional donor prior to the expiration of the donor's right to appoint one or more successors shall succeed to the Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

An individual donor may appoint an individual or an institution to succeed to the donor's right to elect one or more Trustees, to appoint one or more successors, and, if the person appointed to succeed to these rights is an individual, to appoint an individual or institution to succeed to all of these rights. If the person so appointed is an institution, the immediately preceding paragraph of this section 2.5 shall apply with respect to the donor's rights as if the appointed institution was an institutional donor. If an individual donor or an individual appointed to succeed to the donor's rights fails to appoint such an individual or institution, the donor's rights shall expire on the death of the individual holding those rights or the declaration by a court of legal incompetence of the individual holding those rights. A Trustee elected by such an individual before the expiration of the right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor to that Trustee position appointed by such an individual prior to the expiration of the right to appoint that successor shall succeed to that Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

The term of office of a Trustee shall be perpetual. However, the donor or the individual or institution that has succeeded to the donor's rights may remove the elected Trustee and elect a new Trustee or appoint a different successor at any time, with or without cause.

All elections of Trustees, appointments of successors to Trustees and appointments of successors to a donor's rights must be in writing and delivered to the Chairman, the President, the Secretary or the Executive Director of the Corporation to be effective. Any such election or appointment shall take effect on the date of receipt of such election or appointment or at any later time therein specified, and the acceptance of such election or appointment shall not be necessary to make it effective.

If the position of a successor to a Trustee becomes vacant for any reason, and the donor who has the right to appoint that successor fails to do so within thirty (30) days of that position becoming vacant, the Trustee for whom the successor position is vacant shall be automatically removed from the Board of Trustees effective thirty-one (31) days after that successor position becomes vacant but shall be automatically reinstated to the Board of Trustees if and when that donor appoints a successor to that Trustee.

If a Trustee position becomes vacant for any reason and remains vacant for a continuous period of three (3) years, then the donor who has the right to elect that Trustee and to appoint the successor to that Trustee, and, in the case of an individual donor, to appoint an individual or institution to succeed to these rights, shall lose all of his, her or its rights with respect to that Trustee position and the vote(s) associated with that Trustee position shall expire.

Section 2.6.  Quorum.  Persons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called.  If less than a quorum of Trustees is present at a meeting, a majority of Trustees present may adjourn the meeting without further notice.

Section 2.7.  Action by Vote.  Unless otherwise provided herein or in the Articles of Incorporation, all questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present.

Section 2.8.  Action by Writing.  Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting if all Trustees then in office consent to the action in writing and the written consents are filed with the records of meetings of Trustees. Such consents shall be treated for all purposes as votes at a meeting.

Section 2.9.  Powers and Duties.  The Board of Trustees shall meet from time to time and not less than twice yearly, shall manage and direct the Corporation's funds and investments, shall review the programs and affairs of the Corporation, and shall generally have and exercise all powers of the Trustees except such powers as are expressly prohibited to it by law, at all times in furtherance of the policy and purposes of the Corporation. Without limiting the generality of the foregoing, they shall elect their officers, expand their numbers, examine the

budget, and to the extent approved, provide and allocate funds necessary to carry out the programs reflected therein.

Section 2.10.  **Committees.**  The Board of Trustees may organize, appoint and supervise one or more committees, including an Executive Committee, and may delegate to any such committee any or all of their powers which may be delegated by law. The members of any committees shall remain in office at the pleasure of the Board of Trustees.

Section 2.11.  **Other Appointments.**  The Board of Trustees may from time to time designate certain persons or groups of persons as benefactors, patrons, contributors, advisors, friends, or otherwise of the Corporation or with such other titles, upon such terms, for such periods and with such qualifications as they may deem appropriate. Such persons shall serve in an honorary capacity and shall in such capacity have no right to notice of or to vote at any meeting of the Trustees, shall not be considered for the purposes of establishing a quorum, and shall have only such rights or responsibilities as the Board of Trustees may designate from time to time.

Section 2.12.  **Meetings.**  An annual meeting of the Board of Trustees shall be held at a time to be determined by the Board of Trustees, and at such place as the Board shall determine to conduct such business as may properly come before the meeting. Regular meetings of the Board of Trustees may be held at such places and at such times as the Board shall determine. Special meetings of the Board of Trustees may be called by or at the request of the Chairman and the President and shall be called by the Secretary or his or her designee at the request of Trustees who are authorized to exercise one-half of the votes exercisable by the Trustees then in office. The person or persons authorized to call such special meetings may fix any place as the place for holding such meeting.

Section 2.13.  **Telephonic Meetings.**  A Trustee may participate in any meeting of the Board of Trustees or any meeting of any committee of the Board by means of conference telephone or by any means of communication by which all persons participating in the meeting are able to hear one another, and such participation shall constitute presence in person at the meeting.

Section 2.14.  **Notice.**  Notice of the time and place of meetings of the Board of Trustees shall be delivered personally or communicated by mail, telegram, facsimile or email to each Trustee, charges prepaid, addressed to him or her at his or her address as shown by the records of the Corporation. Meeting notices, delivered by any method, shall be transmitted no less than five (5) and not more than thirty (30) days prior to the date of the meeting. Whenever any notice is required to be given to any Trustee under the provisions of these By-Laws or the Articles of Incorporation, or by the District of Columbia Nonprofit Corporation Act, a written waiver thereof signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Presence at a meeting without objection also constitutes a waiver of notice. Neither the business to be transacted at, nor the purpose of, any annual, regular or special meeting of the Board need be specified in the

notice of such meeting or any waiver of notice, unless specifically required by law, the Articles of Incorporation, or these By-Laws.

Section 2.15. Officers, Agents and Employees.  The Board of Trustees shall elect from time to time by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, from among its members, a Chairman, a President, one or more Vice Chairmen, a Treasurer and a Secretary.  The Trustees may elect such other officers, if any, as they may from time to time determine, and such other officers need not be Trustees.  The Trustees may also have such agents, if any, as they may appoint.  Any two (2) or more offices, except those of President and Secretary, may be held by the same person at the same time.  Any officer may resign at any time by giving written notice to the Board of Trustees or the President. Any such resignation shall take effect on the date of receipt of such notice unless another date is specified therein, and, unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.  Any officer elected by the Board of Trustees may be removed, with or without cause, by the Board of Trustees whenever, in its judgment, the best interests of the Corporation would be served thereby.  Any such removal shall be without prejudice to the contract rights, if any, of the person so removed.  The Executive Director shall be appointed by the Board of Trustees and shall be the chief executive officer of the Corporation.  With the consent of the Board of Trustees, the Executive Committee, or the designee of either the Board or the Executive Committee, the Executive Director shall sign all deeds, contracts and other documents in the name of the Corporation, and shall have the general power to carry on negotiations of any and every character in the name of the Corporation.  The Executive Director shall perform such other duties as assigned by the Board of Trustees or the Executive Committee.  The Executive Director shall, among other things, supervise the employees and the hiring of employees.  The Executive Director shall be a non-voting ex-officio member of all committees, except the Nominating Committee, if one exists.

Section 2.16. Duties of Officers.  Each officer shall have the duties usual to his office unless otherwise prescribed by the Board of Trustees and shall serve for one year and until his or her successor is elected and qualified, unless another term is prescribed by the Board of Trustees. The Chairman or, in his or her absence, the President shall preside at all meetings of the Trustees.

Section 2.17. Resignation and Removal.  Each Trustee shall hold office for the term which is provided for him or her in these By-Laws, or until his or her earlier death, resignation or removal.  Removal can occur by a vote of the Board of Trustees, as herein described, or by the donor or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors.

Any Trustee may be removed without cause by the unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote.

Any Trustee may resign his or her office at any time at any time by giving written notice to the Board of Trustees, the Chairman or the Secretary. Any such resignation shall take effect on the date of receipt of such notice or at any later time therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

Upon removal by a vote of the Trustees or upon the resignation or death of a Trustee, the appointed successor to that Trustee shall become a Trustee. The donor, or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Upon removal by the donor, or by the individual or institution that has succeeded to an. donor's rights to elect one or more Trustees and appoint one or more successors, the appointed successor to that Trustee shall become a Trustee, unless the donor, or the individual or institution that has succeeded to the donor's rights, has elected a Trustee to replace that Trustee immediately upon removal. If the appointed successor becomes the Trustee, the donor, or the individual or institution that has succeeded to the donor's rights, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Section 2.18. Endowment Fund. The Trustees may from time to time establish, hold, invest and administer such endowment fund or funds to be collectively designated the "Armenian Genocide Museum and Memorial Endowment Fund", upon such terms and conditions as the Board of Trustees may from time to time deem advisable. Except as otherwise required by law, only the "net income" therefrom as hereafter defined shall be applied to the programs and activities of the Corporation and the principal of such funds shall be preserved. As used herein, "net income" shall mean the fair value of the assets of the Fund over the sum of the contributions to the fund, whether such contributions are made by donors to the Corporation or by the Board of Trustees from other funds of the Corporation, with each contribution increased by any increase in the Consumer Price Index-All Urban Consumers (CPI-U), published by the Bureau of Labor Statistics, U.S. Department of Labor, or any successor to CPI-U adopted by the Bureau of Labor Statistics, from the date of its contribution to the Fund, calculated as of December 31 of each calendar year. Any such endowment fund or funds may be given such designations as the Board of Trustees may from time to time determine, including, without implied limitation, a designation which will commemorate any donor or person, place, event or entity designated by any donor.

## ARTICLE III

## MISCELLANEOUS

Section 3.1. Rules of Order. Robert's Rules of Order Revised shall govern in matters of parliamentary procedure not otherwise prescribed by law, the Articles of Incorporation, or these By-Laws.

Section 3.2.  Amendments.  Unless otherwise provided herein or in the Articles of Incorporation and with reasonable prior written notice, amendments to these By-Laws or to the Articles of Incorporation shall be approved by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present. The affirmative vote of all Trustees then in office shall be required to amend the Purpose (Section 1.2) and Dissolution (Section 3.4) clauses of these By-Laws or the Purposes (Article IV) and Dissolution (Paragraph C of Article VII) clauses of the Articles of Incorporation.

Section 3.3.  Prohibited Activities.  Notwithstanding any other provision of these By-Laws, there shall not be carried on any activities or conduct not permitted to a corporation exempt from Federal Income Tax under Section 501(c)(3) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law or (b) to a Corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law. No part of the net earnings shall inure to the benefit of, or be distributable to, the Trustees, officers or others except that the Trustees shall be authorized and empowered, if they so elect, to pay to Trustees, officers or others reasonable compensation for service rendered and to make payments and distribution in furtherance of the purposes set forth in these By-Laws. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

Section 3.4.  Dissolution.  In the event this Corporation is terminated, all endowment funds and net assets of the Corporation shall be transferred to one or more corporations or entities designated by the Board of Trustees as successors to the Corporation, or such one or more Eligible Institutions (as hereinafter defined) as one or more permanent endowment funds to support such Permissible Purposes (as hereinafter defined) and upon such terms and conditions as the Trustees shall determine by a unanimous affirmative vote of all Trustees then in office.  As used herein, Eligible Institutions shall mean those charitable/educational institutions located in the United States which then have and maintain active programs that promote greater awareness of the Armenian Genocide and/or promote educational and charitable programs that benefit the citizens of the Republic of Armenia.  Presently such designated Eligible Institutions are the Armenian Assembly of America, the Armenian General Benevolent Union, the Cafesjian Family Foundation, the H. Hovnanian Foundation, the Robert Aram and Marianne Kaloosdian and Stephen P. & Marian Mugar Endowed Chair of Armenian Genocide Studies at Clark University, provided that each recipient must be an organization that is described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any subsequent federal tax law.  As used herein, Permissible Purposes shall be the specific purposes listed in the third sentence of Section 1.2 of these By-Laws.

Section 3.5.  Interpretation.  Any ambiguity in these By-Laws or any question requiring interpretation of these By-Laws shall be resolved by the Board of Trustees, whose determination shall be binding and conclusive.



# ARTICLE IV

## INDEMNIFICATION AND INSURANCE

**Section 4.1. Indemnification and Insurance.** Unless otherwise prohibited by law or sections 4.3 and 4.4 of these By-Laws, the Corporation shall indemnify any Trustee or officer of the Corporation, any former Trustee or officer of the Corporation, or any person who may have served at its request as a trustee, director or officer of another corporation or entity, whether for profit or not for profit, and may, by resolution of the Board of Trustees, indemnify any employee or agent of the Corporation against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit or proceeding (whether actual or threatened, civil, criminal, administrative or investigative, including appeals) in which he or she is or may be made a party by reason of having been such Trustee, officer, person, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters as to which he or she shall be adjudged in such claim, action, suit or proceeding to be guilty of a criminal offense or liable to the Corporation for damages arising out of his or her own negligence or misconduct in the performance of a duty to the Corporation. Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees; costs and disbursements; and judgments, fines, and penalties against, and amounts paid in settlement by such Trustee, officer, person, employee or agent. The Corporation may advance expenses to, or where appropriate may itself, at its expense, undertake the defense of, any such Trustee, officer, person, employee or agent; provided, however, that such Trustee, officer, person, employee or agent shall undertake to repay or to reimburse such expense if it should be ultimately determined that he or she is not entitled to indemnification under this Section. The provisions of this Article shall be applicable to claims, actions, suits or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof. The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such Trustee, officer, person, employee or agent may be entitled under any statute, By-Law, agreement, vote of the Board of Trustees or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

**Section 4.2. Insurance.** The Board of Trustees may authorize the purchase of insurance on behalf of any person against any liability asserted against or incurred by him which arises out of such person's status as a Trustee, officer, employee or agent of the Corporation or out of a person's having served at the request of the Corporation as a trustee, director or officer of another corporation or entity or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

**Section 4.3. Limitation.** In no case, however, shall the Corporation indemnify, reimburse or insure any person for any taxes imposed on such individual under chapter 42 of the Internal Revenue Code of 1986, as now in effect or as may hereafter be amended ("the Code"). Further, if at any time the Corporation is deemed to be a private foundation within the meaning of Section 509 of the Code then, during such time, no payment shall be made under this Article if

Page 9 of 10

such payment would constitute an act of self-dealing or a taxable expenditure, as defined in Section 4941(d) or Section 4945(d), respectively, of the Code.

Section 4.4. Severability. If any part of this Article shall be found in any action, suit or proceeding to be invalid of ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

I certify that the foregoing Bylaws of ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. were approved and adopted for the Corporation by its Board of Trustees by unanimous consent effective on October 30, 2003, and that they are currently in effect.

Secretary of the Corporation

10/30/03
Date

Page 10 of 10

# EXHIBIT B



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL INC
Vs.                                              C.A. No.        2007 CA 003902 B
THE CAFESJIAN FAMILY FOUNDATION INC
### INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

Chief Judge Rufus G. King, III

Case Assigned to: Judge MARY A TERRELL
Date:   June 7, 2007
Initial Conference: 9:15 am, Friday, September 14, 2007
Location:  Courtroom 219
           500 Indiana Avenue N.W.
           WASHINGTON, DC 20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Caio.doc

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Armenian Genocide Museum and Memorial, Inc. | The Cafesjian Family Foundation, Inc. |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

David T. Case
Kirkpatrick & Lockhart Preston Gates LLP
1601 K. Street, NW
Washington, DC 20006
(202) 778-9000

ATTORNEYS (IF KNOWN)

Ty Cobb
Peter C. Lallas
Hogan & Hartson LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ◉ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### ○ A. Antitrust

☐ 410 Antitrust

### ○ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ◉ E. General Civil (Other) OR ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☒ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.  Habeas Corpus/ 2255** | ○ **H.  Employment Discrimination** | ○ **I.  FOIA/PRIVACY ACT** | ○ **J.  Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.  Labor/ERISA (non-employment)** | ○ **L.  Other Civil Rights (non-employment)** | ○ **M.  Contract** | ○ **N.  Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding    ◉ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

28 U.S.C. § 1332

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint    JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  July 16, 2007    SIGNATURE OF ATTORNEY OF RECORD  _(signature)_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.