**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| The Armenian Genocide Museum and Memorial, Inc.<br><br>Plaintiff,<br><br>v.<br><br>The Cafesjian Family Foundation, Inc., John J. Waters, Jr., Gerard L. Cafesjian, and John J. Waters, Sr.<br><br>Defendants. | Civil File No. 1:07-cv-01259 (CKK)<br><br>**Status Hearing: November 3, 2008 (9:00 a.m.)** |

**[PROPOSED] SECOND AMENDED COMPLAINT**
**ACTION INVOLVING REAL PROPERTY**

The Armenian Genocide Museum and Memorial, Inc. ("Plaintiff" or "AGM&M"), by and through its undersigned counsel, complains of The Cafesjian Family Foundation, Inc. ("CFF") or its officers, John J. Waters, Jr. ("Waters Jr.") and Gerard L. Cafesjian ("Cafesjian") claiming any right, title, estate, lien or interest in the real properties described herein that is adverse to the Plaintiff's title to such properties, and further complains that CFF, Waters, Cafesjian, and John J. Waters, Sr. ("Waters Sr.") (collectively referred to herein as "Defendants"), through their actions and omissions, have caused injury to Plaintiff as described below.  Plaintiff seeks to: (1) quiet title to such properties and have this Court declare that Plaintiff has sole and exclusive title to such properties; (2) clear any cloud on Plaintiff's title to such properties that has been created by Defendants; including the cloud created by Defendants' filing of a *lis pendens* with regard to such properties; (3) have this Court issue an injunction requiring Defendants to take all action and make all filings necessary to cause the removal of any cloud they have placed on Plaintiff's title to the real properties at issue and prohibiting Defendants from placing any other encumbrances on the properties;  (4) have this Court declare

that, by assisting Waters Jr. and Cafesjian in filing an *ultra vires* Memorandum of Agreement Reserving Rights which resulted in a cloud on the AGM&M's title to such properties, Waters Sr. breached his fiduciary duty to AGM&M and caused AGM&M to sustain substantial damages; (5) have this Court declare that Defendants CFF and Cafesjian's reversionary rights under the Grant Agreement dated November 1, 2003 are unenforceable as a matter of law; and (6) have this Court award Plaintiff damages incurred as a result of Defendants' actions further described herein, including without limitation attorneys fees and costs incurred in having to bring this action, damages incurred due to the resulting delay in the development of the museum and memorial about the Armenian Genocide, and damages incurred as a result of the filing of the Memorandum of Agreement Reserving Rights and *lis pendens* further described herein, including difficulty and expense in securing insurance and financing related to the properties at issue.

For its complaint in this action, Plaintiff states as follows:

A.    <u>**The Parties**</u>

1.    Plaintiff is duly organized under the laws of the District of Columbia as a nonprofit corporation in order to own and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide, in which the Ottoman Empire forcibly deported and systematically massacred over 1.5 million innocent Armenians.  Plaintiff's address in the District of Columbia is c/o Armenian Assembly of America, 1140 19th St. NW, Suite 600, Washington D.C. 20036.

2.    On information and belief, CFF is organized under the laws of the State of Florida as a nonprofit corporation and has an address at 4001 Tamiami Trail North, Suite 425, Naples, FL 34103.

3.      On information and belief, Waters Jr. is an officer of CFF, a former officer and current Trustee of AGM&M on behalf of CFF, and is a resident of Minnesota.

4.      On information and belief, Cafesjian is President and Director of CFF, a former officer and former Trustees of AGM&M on behalf of CFF, and is a resident of Florida.

5.      On information and belief, Waters Sr. is a resident of Minnesota and an attorney who has, in the past, provided legal services to AGM&M.

**B.      Jurisdiction**

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The real properties at issue herein are situated in the District of Columbia.

**C.      Facts and Basis for Relief**

Subject Properties

7.      The real properties at issue herein ("Properties") have the following street addresses, all located in the District of Columbia:

        A.      1334-36 G Street NW.

        B.      1338 G Street NW.

        C.      1340 G Street NW.

        D.      1342 G Street NW.

        E.      619 14th Street NW.

The Armenian Assembly

8.      The Armenian Assembly of America ("Assembly") is a District of Columbia non-profit corporation with its principal place of business at 1140 19th Street NW, Suite 600, Washington, D.C. 20036.  The Assembly is the premier Armenian-American advocacy group in the United States and has several missions including, but not limited to, acting as a sponsor for Armenian-American interests to public policy makers and the public in the United States,

providing resources and opportunities for Armenian-Americans in the American democratic process, undertaking research, education and advocacy for universal affirmation of the Armenian Genocide, enhancing relationships between the United States and Armenia, and securing effective collaboration among Armenian-American organizations to accomplish its articulated goals.

9.     As one part of its goal of preserving and learning from the lessons of the Armenian Genocide[1], beginning in the 1990's, the Assembly began investigating the idea of constructing a permanent museum and memorial to the victims and survivors of the Armenian Genocide.   The Assembly explored possible sites for such a museum and memorial in Washington, D.C. and solicited and received donations from the Armenian-American community for the purpose of establishing and constructing the museum and memorial.

10.     In or around late 1999, a possible site for the museum was identified at the National Bank of Washington Building at 14th and G Streets, N.W. (619 14th Street, NW), Washington, D.C. (the "Bank site").

11.     In order to fund the purchase of the Bank site, the Assembly sought specific major donations and pledges from various sources.  One of those donations was from Defendant Cafesjian, the President and Director of Defendant CFF.

---

[1] Among the various endeavors of the Assembly in pursuing its goal of affirmation of the Armenian genocide, which is the most elemental event in Armenian history, the Armenian Assembly has sought the enactment of legislation affirming the historical fact of the Armenian Genocide, as well as seeking resolutions that United States foreign policy reflects appropriate understanding of the Armenian Genocide.  In addition, the Armenian Assembly has filed an amicus curiae brief in U.S. District Court in Massachusetts (*Griswold v. Driscoll*) opposing attempts by Turkish interests to insert denialist opinions in curriculum in the Massachusetts public schools, and it has sponsored extensive public educational efforts about the lessons of the Armenian Genocide.

12. Cafesjian subsequently acquired several lots adjacent to the Bank site. He subsequently agreed to provide funds to the Assembly which were to be used for the purpose of allowing the AGM&M to purchase the adjacent lots. The transfer of the lots was contingent on the Assembly agreeing to create AGM&M as a separate non-profit entity.

<u>Grant and Transfer Agreement Between Defendant CFF and the Assembly</u>

13. On November 1, 2003, the Assembly executed a Grant Agreement with CFF and Cafesjian, which was drafted at the direction of Defendant Waters Jr. <u>See</u> Grant Agreement at <u>Exhibit 1</u> attached hereto. The Grant Agreement memorialized the donations made by Cafesjian for the museum project, defining them as "the Grant Property," and set forth terms for the donations, including the terms discussed below.

14. The Grant Agreement contains the following reversionary provision regarding "the Grant Property."

> **(B) If the Grant Property is not developed prior to December 31, 2010 in accordance with [Plans to be approved by AGM&M's Board of Trustees], or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:**
>
> **i.      in the event any portion of the Grants has not been funded, this Agreement terminates; and**
>
> **ii.      to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant property.**

<u>See</u> Grant Agreement at Section 3.1(B).

15. Section 3.1(B) of the Grant Agreement clearly put Cafesjian, who was subsequently in control of the operations of AGM&M for many years, in the position of being able to force the reversion of his donations simply by doing nothing to establish the museum on a

timely basis or by creating a conflict with the other members of the Board of Trustees. Moreover, as AGM&M, and not Cafesjian or CFF, will have borne the taxes and other costs associated with the properties during the interim, and as the properties have appreciated in value during the intervening time period, if the time requirement is not met and the properties are returned to CFF, CFF will receive a significant windfall at the direct expense of AGM&M.

16.    As required by the Grant Agreement, the Assembly and AGM&M also entered into a Transfer Agreement, attached hereto as <u>Exhibit 2</u>, pursuant to which the Assembly transferred to AGM&M, *inter alia*, the entirety of CFF and Cafesjian's grants to Plaintiff under the Grant Agreement.

17.    The Transfer Agreement was also drafted per Waters Jr.'s instruction and was executed by Waters Jr. on behalf of AGM&M.

18.    At the time of the execution of the Transfer Agreement, the only real property held by the Assembly for the museum project was the Bank site.

19.    Pursuant to the requirements of the Grant Agreement and the Transfer Agreement, the Assembly subsequently transferred all right, title and interest in the Bank site to AGM&M, as well as all of its other donations, pledges, and other assets acquired for the purpose of building the museum.

20.    The Assembly subsequently transferred to AGM&M funds received from CFF and/or Cafesjian after the execution of the Transfer Agreement, for use in purchasing the other four adjacent properties (1334-36 G Street N.W.; 1338 G Street N.W.; 1340 G Street N.W.; and 1342 G Street N.W.).

21.     Upon information and belief, Waters Sr. acted as attorney for AGM&M during some or all of the transactions related to the acquisition of the adjacent properties by AGM&M. See Email from John Waters Sr. dated October 29, 2003, attached hereto as Exhibit 3.

22.     Upon information and belief, the fair market value of the Properties has appreciated substantially since they were acquired by AGM&M in 2003.  Thus, the value of the Properties now substantially exceeds the value of the Grant funds.

Plaintiff's Corporate Structure and By-Laws

23.     Plaintiff is governed by a Board of Trustees ("Board of Trustees") as provided in Plaintiff's Articles of Incorporation ("Articles") and By-Laws ("By-Laws"), a copy of each of which is attached hereto as Exhibit 4 and 5, respectively.

24.     The Articles provide that Plaintiff's "affairs . . . shall be managed and controlled by the Board of Trustees."  Articles at VII.A.

25.     The By-Laws provide that the Board of Trustees "shall manage and direct [Plaintiff's] funds and investments."  By-Laws at § 2.9.

26.     Under the AGM&M By-Laws, each Initial Trustee, including CFF, is entitled to exercise one trustee vote. Id. at § 2.4.   In addition, for each additional $5,000,000.00 contributed to AGM&M, initial or subsequent Donors are entitled to elect additional Trustees, or to confer additional votes to their existing Trustees.  Id. § 2.5.  The election of additional Trustees (or votes for Trustees) is contingent upon each $5,000,000.00 contribution being accepted by the Board of Trustees "on behalf of [AGM&M] by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present."  Id.  Absent a ratification of a purported contribution, none of the initial Trustees are entitled to have more than one vote.

27.     Upon information and belief, none of the current Trustees of AGM&M have more than one vote, as no vote ratifying additional contributions has ever taken place.

28.     The By-Laws state that one-half of the aggregate eligible Board of Trustees votes constitute a quorum at any properly convened Board of Trustees meeting.  See id. at § 2.6.  The By-Laws also set strict notice requirements that must be followed to properly convene a meeting of the Board of Trustees:  "Notice of the time and place of meetings of the Board of Trustees shall be delivered personally or communicated … to each Trustee….  Meeting notices … shall be transmitted no less than five (5) and not more than thirty (30) days prior to the date of the meeting."  See id. at § 2.14.

29.     Under the organizing documents for AGM&M, CFF is an Initial Donor of AGM&M and therefore entitled to appoint a Trustee to the Board of Trustees of AGM&M.  Waters Jr. is currently that Trustee.

Unauthorized Execution and Recordation of a Memorandum of Agreement

30.     On October 23, 2006, without a meeting of the Board of Trustees having been properly noticed, and without a properly noticed meeting of the Board of Trustees having been held at which the matter could have been discussed, Waters Jr. executed, purportedly as an authorized officer of both Plaintiff and CFF, a Memorandum of Agreement Reserving Rights ("Memorandum") purportedly between Plaintiff and CFF.  A copy of the Memorandum is attached hereto as Exhibit 6.

31.     In his sworn Answers to Interrogatories dated April 23, 2008, attached hereto as Exhibit 7, Waters Jr. reported that, prior to the execution and filing of the Memorandum, Waters Jr. consulted with both Cafesjian and Waters Sr.; the latter had previously represented AGM&M in connection with the acquisition of the adjacent properties by AGM&M.

32.     On information and belief, on or about October 27, 2006, and again without a meeting of the Board of Trustees having been properly noticed, and without a properly noticed meeting of the Board of Trustees having been held at which the matter could have been discussed, Waters Jr. caused the Memorandum to be filed and recorded with the Recorder of Deeds for the District of Columbia ("Recorder of Deeds").

33.     Because no meeting of the Board of Trustees was properly noticed, and because no properly noticed meeting of the Board of Trustees was held, at which the Board of Trustees authorized Waters Jr. to execute the Memorandum on behalf of Plaintiff or to have the Memorandum filed and recorded with the Recorder of Deeds on behalf of Plaintiff, Waters Jr. did not have the authority to execute the Memorandum on behalf of Plaintiff or to file and record the Memorandum with the Recorder of Deeds on behalf of Plaintiff.

34.     Members of the Board of Trustees of Plaintiff who were not aware of the unauthorized execution and filing and recordation of the Memorandum at the time of their occurrence have, upon learning of such actions, demanded that Defendants cause such actions to be rescinded and cause the Memorandum be removed from the land records of the District of Columbia.  Defendants refused.

35.     Because the unauthorized execution and subsequent unauthorized filing and recordation of the Memorandum with the Recorder of Deeds created a cloud on Plaintiff's title to the Properties, and because Defendants refused to remove the Memorandum, Plaintiff was required to initiate this lawsuit on June 7, 2007.

<u>Belated Removal of the Memorandum and Filing of the *Lis Pendens*</u>

36.     On July 16, 2008, well over a year after this case had been initiated, and after numerous pleadings had been filed and discovery undertaken, Waters Jr. recorded a release of the Memorandum.[2]

37.     On June 26, 2008, Defendants filed a Notice of Pendency of Action (*Lis Pendens*) with the Recorder of Deeds ("Lis Pendens").

38.     Per Defendants' Suggestion of Mootness filed on July 17, 2008, the *Lis Pendens* "provide[s] notice, on the public record, of the reversionary interest CFF holds over the properties in question."  Suggestion of Mootness, Document No. 37, at 4.

39.     As a result of the filing of the *Lis Pendens*, there continues to be a cloud on Plaintiff's title to the Properties.  Accordingly, Plaintiff continues to suffer damages, including without limitation damages associated with the delay in the development of the museum caused by Defendants' actions, and damages associated with additional costs required to secure financing, insurance, and other items necessary for the development of the museum.

40.     In pleadings filed before the District Court for the District of Minnesota (Docket No. 07-cv-2079) in a separate matter in which Defendants CFF and Cafesjian sought, *inter alia*, rescission of the Grant Agreement, Defendants CFF and Cafesjian conceded that, as a matter of law, they were not entitled to seek return of the funds or property directly from AGM&M, the owner of the properties, stating "CFF can make no contractual claims against AGM&M" and

---

[2] In Defendants' Suggestion of Mootness filed in this matter on July 17, 2008, Defendants assert that the Memorandum was no longer necessary as Defendants could now secure the *lis pendens* as a result of the Plaintiff's filing of a separate action in this court (Docket No. 08-cv-255) on February 15, 2008.  Defendants fail to acknowledge that over five months passed between the filing of the other matter and Waters Jr.'s release of the Memorandum, during which time Defendants engaged in months of discovery in this case and attempted to dismiss the other action, resulting in enormous legal fees and costs incurred by Plaintiff in this action.

"must rely upon the Assembly to take whatever action regarding the real estate that would be required to satisfy any relief that might be awarded." *Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss*, Document No. 30, at 27, 31 attached hereto as Exhibit 8.

41.     In its Order dismissing the above-noted case on jurisdictional grounds, the District Court of Minnesota adopted the Report and Recommendation of Magistrate Judge Graham, which construed Defendants' request for "restitution of the donations" under the Grant Agreement as a request for return of "the money [Defendants] donated," not return of the properties. See Report and Recommendation, Docket No. 07-cv-2079, Document No. 48, at 16, attached hereto as Exhibit 9; see also Order dated March 31, 2008, Document No. 63 (adopting Report and Recommendation), attached hereto as Exhibit 10. Defendants did not dispute this characterization. See *Plaintiffs' Objections to Magistrate Judge's Report and Recommendations*, Docket No. 07-cv-2079, Document No. 50, attached hereto as Exhibit 11.

## COUNT ONE

### (Breach of Fiduciary Duty – Waters Jr. and Cafesjian)

42.     Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 – 41, above.

43.     As former officers and former and current Trustees of the AGM&M, Defendants Waters Jr. and Cafesjian have a fiduciary duty to AGM&M.

44.     Waters Jr. and Cafesjian's deliberate execution and filing of the Memorandum was *ultra vires* and constituted a breach of their fiduciary duty to AGM&M.

45.     As a direct and proximate result of Defendants' filing of the Memorandum, the Plaintiff has incurred substantial damages, including without limitation fees and costs

necessitated by the filing and litigation of this action, and damages related to the delay in the development of the museum cause by the filing of the Memorandum, as financing, insurance, and other items necessary for the construction and completion of the museum were delayed or made more costly.

46.    Upon information and belief, Cafesjian and Waters Jr. were aware that the filing of the *Lis Pendens* would continue to result in the delay and obstruction of the museum project, and would cause substantial damage to AGM&M.

47.    The filing of the *Lis Pendens* constitutes a breach of Cafesjian and Waters Jr.'s fiduciary duty to AGM&M.

48.    As a direct and proximate result of Cafesjian and Waters Jr.'s filing of the *Lis Pendens*, AGM&M has incurred substantial and foreseeable damages, including without limitation the fees and costs incurred as a result of this action, damages incurred due to the resulting delay in the development of the museum, and damages related to additional difficulty in securing insurance and financing related to the Properties.

## COUNT TWO

### (Breach of Fiduciary Duty – Waters Sr.)

49.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 – 48, above.

50.    As Waters Sr. represented AGM&M in connection with the acquisition of the properties by AGM&M, and apparently in connection with the recording of the Memorandum as well, he has an attorney-client relationship and a fiduciary duty to AGM&M.

51.    Upon information and belief, Waters Sr. was aware that the execution and recording of the Memorandum would harm AGM&M, but nevertheless assisted Waters Jr. with

the filing of the Memorandum, failed to advise any independent member of the Board of Trustees of AGM&M of either the execution or the recording of the Memorandum, and failed to take reasonable steps to protect AGM&M's interests with respect to the Properties.

52.    As a direct and proximate result of Waters Sr. providing assistance to Waters Jr. with the filing of the Memorandum, failing to advise any independent member of the Board of Trustees of AGM&M of either the execution or the recording of the Memorandum, and failing to take reasonable steps to protect AGM&M's interests with respect to the Properties, the AGM&M has incurred substantial and foreseeable damages, including without limitation the fees and costs incurred as a result of this action, damages incurred due to the resulting delay in the development of the museum, and damages related to additional difficulty in securing insurance and financing related to the Properties.

## COUNT THREE

### (Declaration as to Non-Enforceability of Grant Agreement Reversionary Clause)

53.    Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 – 52, above.

54.    In light of Defendants' actions, including their repeated and continuing attempts to delay progress on the museum through the filing of the Memorandum and the *Lis Pendens*, Defendants have no right to enforce the reversionary clause in the Grant Agreement.

55.    As the current value of the Properties now exceeds the amount of the Grant funds provided by Defendants CFF and Cafesjian, and as Defendants are current or former officers and fiduciaries of AGM&M, they are prohibited as a matter of law from extracting a windfall profit from AGM&M, particularly where, as here, the profit would be the result of their own actions in delaying the development of the museum.

56.     As Defendants have breached their duty to act in good faith with respect to their obligations under the Grant Agreement, and have in fact breached the Grant Agreement and actively thwarted the intent and purpose of the Grant Agreement by attempting to force the reversion of the adjacent lots to Defendants by causing delay to the museum development, the reversion provision of the Grant Agreement is unenforceable as a matter of law.

57.     Wherefore, Plaintiffs seek a declaratory judgment that the reversion provision of the Grant Agreement is unenforceable as a matter of law.  In the alternative, Plaintiffs seek a declaration that Defendants' rights under the reversionary clause are limited to the value of the monetary donations that were made.

## COUNT FOUR

### Quiet Title and Removal of *Lis Pendens*

58.     Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1 – 57, above.

59.     Defendants have asserted that they have a right, title or interest in the Properties that is adverse to Plaintiff's interest.

60.     Defendants have conceded in other proceedings that they have no current contractual or other rights with respect to the Properties, and Defendants failed to dispute the Minnesota District Court's conclusion that the only restitution that could be sought under the reversionary clause was monetary, and not the return of the Properties.

61.     Moreover, as Defendants have breached their duty to act in good faith with respect to their obligations under the Grant Agreement, and have in fact breached the Grant Agreement and actively thwarted the intent and purpose of the Grant Agreement by attempting to

force the reversion of the adjacent lots to Defendants, the reversion provision of the Grant Agreement is unenforceable as a matter of law.

62.    Wherefore, Plaintiff seeks a declaration of this Court that the Defendants, and all other persons unknown, have no right, title, estate, lien or interest in the Properties described in the complaint and that Plaintiff has sole right, title and interest in the Properties.

63.    Wherefore, Plaintiff seeks an Order (a) removing the *Lis Pendens* with respect to the Properties, (b) requiring Defendants to cooperate, and to cause any corporate officers or agents of CFF to cooperate, with the AGM&M in taking all actions and making all filings necessary to effect the removal of the *Lis Pendens* from the land records of the District of Columbia as maintained by the Recorder of Deeds, and (c) enjoining Defendants from placing any encumbrances, lien or other cloud on the Properties.

**D.    <u>Prayer for Relief</u>**

WHEREFORE, Plaintiff requests judgment as follows:

1.    A declaration of this Court that the Defendants, and all other persons unknown, have no right, title, estate, lien or interest in the Properties described in the complaint and that Plaintiff has sole right, title and interest in the Properties.

2.    A decree of this Court that clears the cloud on Plaintiff's title to the Properties through the removal of the *Lis Pendens* from the land records of the District of Columbia maintained by the Recorder of Deeds, and requiring Defendants to cooperate, and to cause any corporate officers or agents of CFF to cooperate, with the AGM&M in taking all actions and making all filings necessary to effect the removal of the *Lis Pendens* from the land records of the District of Columbia as maintained by the Recorder of Deeds;

3.      An injunction prohibiting Defendants from placing any other encumbrances, lien or other cloud on the Properties;

4.      A declaration by this Court that the reversionary provision in the Grant Agreement dated November 1, 2003 by and between Defendants CFF and Cafesjian and the Assembly is unenforceable as a matter of law;

5.      A decree of this Court that awards the AGM&M damages, punitive damages, interest, reasonable attorneys' fees, costs and other appropriate relief, including without limitation damages incurred due to the resulting delay in the development of the museum, and damages related to additional difficulty and expense in securing insurance and financing related to the Properties;

6.      Such other relief as the Court deems just and equitable.

Respectfully submitted,

Dated:  July 23, 2008          **K&L GATES LLP**

By:      /s/  David. T. Case
         David T. Case (D.C. Bar No. 384062)
         Bruce Nielson (D.C. Bar No. 414440)
         1601 K Street, N.W.
         Washington, D.C. 20006
         Tel:  (202) 778-9000
         Fax:  (202) 778-9100

         AND

           /s/  Arnold R. Rosenfeld
         Arnold R. Rosenfeld (MA Bar No. 428860)
         Naoka E. Carey (MA Bar No. 655312)
         One Lincoln Street
         Boston, MA 02111
         Tel: (617) 261-3155
         Fax: (617) 261-3175

**COUNSEL FOR PLAINTIFF**

# EXHIBIT 1

CONFIDENTIAL

 ARMENIAN ASSEMBLY OF AMERICA

50 NORTH LA CIENEGA BLVD. • SUITE 202 • BEVERLY HILLS, CA 90211 • (310) 360-0091 • FAX (310) 360-0094

November 1, 2003

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103

Re:    Grant Agreement

Dear Mr. Cafesjian:

Thank you for your very generous grants to support the Armenian Assembly of America, Inc. (the "Assembly"). The purpose of this letter (the "Agreement") is to set forth the terms and conditions of the grants, as described below (the "Grants"), from you, Gerard L. Cafesjian ("GLC"), and The Cafesjian Family Foundation (the "Foundation", and together with GLC, the "Grantor"), to the Assembly for the purposes of establishing the Armenian Genocide Museum and Memorial (the "AGM&M"). If this Agreement correctly sets forth your understanding with respect to the subject matter hereof, please indicate your agreement by countersigning below and returning the executed original Agreement to the Assembly. The enclosed duplicate original of the Agreement is for your records.

SECTION 1  First Grant.

1.1    Amount of First Grant. The Grantor shall grant the Assembly $4,000,000 in accordance with the terms of this Agreement (the "First Grant"). This amount is in addition to the $1,000,000 delivered to the Assembly on or about February 16, 2000 by the Vanguard Charitable Endowment Program – Cafesjian Family Foundation Charitable Trust, as directed by GLC as donor advisor to said Trust.

1.2    Use of First Grant. The Assembly shall use First Grant funds solely: (i) to purchase the property at 14th and G Streets, N.W., Washington, D.C., known as the National Bank of Washington Building (the "First Grant Property"); (ii) to pay for any transaction costs related to the purchase of the First Grant Property; and (iii) for the installation of a Memorial as described in Section 3.2 of this Agreement.

1.3    Payment of First Grant. The Foundation shall have made First Grant funds
available in the following manner:

(A)    the Foundation transmitted $1,000,000 to the Assembly on February 4,
2000;    *Per letter to DDA ark-ment*

(B)    the Foundation transmitted $1,500,000 to the Assembly on or before
the closing date for the purchase of the First Grant Property, which
was on or about February 16, 2000; and

(C)    the Grantor shall transmit $1,500,000 to the Assembly at such time as
mutually agreed to by the parties to fund the purchase and installation
of the Memorial described in Section 3.2 of the Agreement.

## SECTION 2    Second Grant.

2.1    Amount of Second Grant. The Grantor shall grant the Assembly $12,850,000
in accordance with the terms of this Agreement (the "Second Grant").

2.2    Use of Second Grant. The Assembly shall use Second Grant funds solely to
purchase the four parcels of real estate located at 1334-36, 1338, 1340, and
1342 G Street, N.W., Washington, D.C. (collectively, the "Second Grant
Property") and for any related transaction costs.

2.3    Payment of Second Grant. The Grantor shall make Second Grant funds
available in the following manner:

(A)    the Grantor shall transmit $6,700,000 to the Assembly on or before the
closing date for the purchase of 1334-36 G Street, which is November
4, 2003, of which the Assembly shall use approximately $6,500,000 to
pay the purchase price and shall use the remaining amount to pay any
related transaction costs;

(B)    the Grantor shall transmit $1,400,000 to the Assembly on or before the
closing date for the purchase of 1338 G Street, of which the Assembly
shall use approximately $1,350,000 to pay the purchase price and shall
use the remaining amount to pay any related transaction costs;

(C)    the Grantor shall transmit $800,000, to the Assembly on or before the
closing date for the purchase of 1340 G Street, of which the Assembly
shall use approximately $750,000 to pay the current owner of 1340 G
Street an amount equal to the current owner's current cost basis in
1340 G Street and shall use the remaining amount to pay any related
transaction costs;

(D)    the Grantor shall transmit seven annual payments of $150,000 each to
the Assembly on or before the March due date of each of the seven

2

annual payments (the "Annual Payments") of $150,000 owed or to be owed by the Assembly under the 1340 G Street contract of deed currently held by the current owner of 1340 G Street and to be assumed by the Assembly (the "Contract of Deed"), which the Assembly shall use to pay the Annual Payments;

(E)    the Grantor shall transmit $1,500,000 to the Assembly on or before the due date of the final balloon payment (the "Balloon Payment") of $1,500,000 owed or to be owed by the Assembly under the Contract of Deed, which the Assembly shall use to pay the Balloon Payment; and

(F)    the Grantor shall transmit $1,400,000 to the Assembly on or before the closing date for the purchase of 1342 G Street, of which the Assembly shall use approximately $1,350,000 to pay the purchase price and shall use the remaining amount to pay any related transaction costs.

SECTION 3  General Conditions and Covenants.

3.1    Use of the Grant Property.

(A)    The First Grant Property and the Second Grant Property (together, the "Grant Property") may only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc. (the "Plans"), and subject to any leases in place at the time of the acquisition of the Grant Property by the Assembly with respect to all or a portion of the Grant Property (and with respect to which the Assembly shall take any necessary steps to terminate such leases as soon as possible, subject to the terms of such leases and applicable law, and shall not consent to any renewals or extensions).

(B)    If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:

(i)    in the event any portion of the Grants has not been funded, this Agreement terminates; and

(ii)    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.

3.2    Memorial. The Assembly shall:

3

(A)    make available in the Grant Property space acceptable to the Foundation for a memorial commemorating the Armenian Genocide (the "Memorial"), which is expected to occupy no less than 1,200 square feet of floor space or no less than 40,000 cubic feet, shall have the necessary structural support and ready access to adequate external lighting and a design for which has yet to be determined by the Foundation;

(B)    cooperate with the design firms, artists and others selected by the Foundation to design and ensure the successful completion of the Memorial;

(C)    permit the Foundation to participate in all material decisions regarding the Memorial;

(D)    operate and maintain the Memorial in perpetuity without alteration (ordinary wear and tear excepted) except as approved in advance by the Foundation in writing;

(E)    be solely responsible for the costs of maintaining the Memorial; and

(F)    name the Memorial the "Gerard L. Cafesjian Memorial" or another name approved by the Foundation in writing.

3.3    Use of Grant Funds.  The Assembly shall use Grant funds only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

3.4    Private Foundation Grants.  The Assembly may not use any portion of the Grants that have been received from the Foundation to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

3.5    Financial Records.  The Assembly shall maintain financial records regarding the use of the Grants consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

3.6    Reports and Records.

(A)    Until completion of the AGM&M and operation of the completed facility for 12 months, the Assembly shall provide written reports to the Grantor at least quarterly.

(B)    Such reports shall include details on:

(i)    the amount and nature of the expenditures made from the Grant; and

4

(ii)    the progress made in acquiring, designing, renovating, and utilizing the Grant Property and completing the AGM&M.

(C)    In such reports, an officer of the Assembly shall certify its compliance with the terms and conditions of this Agreement.

(D)    The Assembly shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the Grant Property and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

3.7    No Other Rights or Obligations. Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence the Assembly's use of any funds provided in accordance with this Agreement.

3.8    No Further Grants Required. It is expressly understood that by making these Grants the Grantor has no obligation to provide additional funding to the Assembly for the AGM&M or for any other purpose.

3.9    Breach by the Assembly.

(A)    If the Assembly fails to use the Grants solely for the purposes set out in this Agreement or if the Assembly fails to satisfy any of the conditions of this Agreement, Grantor is released from any remaining obligation under this Agreement to provide funds or property to the Assembly.

(B)    If the Assembly uses any portion of the Grants either for a purpose other than those set out in this Agreement or for a purpose other than those described in Section 501(c)(3) of the Code, as amended, the Assembly shall repay the portion of the Grants so spent to Grantor, plus interest.

(C)    The remedies set out in this Section 3.9 are in addition to any other remedies that may be available to the Grantor at law or equity.

SECTION 4    Conditions Related to the Assembly.

The Grantor's obligation to make the Grants is subject to the following conditions:

4.1    Total Grants and Pledges. On or before October 30, 2003, the Assembly must have received actual grants or firm pledges to support the AGM&M, including the Grants, totaling at least $20,000,000. Any grant or pledge that can only be used for the post opening operation or for an endowment for the future

5

operation of the AGM&M may not be considered for purposes of satisfying this condition

4.2 <u>Tax-Exempt Status</u>.  The Assembly must be a tax-exempt organization described in Section 501(c)(3) of the Code, and may not be a private foundation within the meaning of Section 509(a) of the Code.

4.3 <u>Tax Status Documentation</u>.  The Assembly shall deliver to the Grantor a copy of its IRS determination letter and such other documentation reasonably requested by the Grantor, including without limitation evidence that the Grants and the other contributions expected in connection with the AGM&M, including those described in Section 4.1 of this Agreement, have not caused the Assembly to be treated as a private foundation.

4.4 <u>Evidence of Satisfaction</u>.  The Assembly has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

## SECTION 5 Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grants is subject to the following conditions:

5.1 <u>New Nonprofit Corporation</u>.  On or before October 30, 2003, a new, independent entity described in Section 501(c)(3) of the Code, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), must be created by the Assembly and the Foundation, with the costs borne by AGM&M, Inc.

5.2 <u>Governance of AGM&M, Inc.</u>

(A) AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

(B) Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of the Transfer Agreement described in Section 5.3 of this Agreement), except that the Assembly shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by the Assembly to AGM&M, Inc.

(C) In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

(D) In recognition of its efforts in establishing the AGM&M, the

6

Assembly is included as a Major Donor and has the right to appoint a voting member of the AGM&M, Inc. Board of Trustees.

(E)     Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless otherwise specified in the Articles or Bylaws of the corporation.

(F)     Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees. Each subsequent successor Trustee has the rights of a Trustee.

(G)     The initial Board of Trustees of AGM&M, Inc. consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

5.3     Transfer Agreement.

(A)     On or before November 1, 2003, the Assembly shall have entered into a pledge agreement with AGM&M, Inc. (the "Transfer Agreement"), under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.

(B)     The Transfer Agreement will oblige AGM&M, Inc. to honor all of the existing donor requirements at time of transfer, or in the alternative, to obtain donor consent to the transfer and any modification of donor terms.

(C)     Under the Transfer Agreement, AGM&M, Inc. must assume and agree to comply with the obligations of the Assembly under this Agreement relating to the Memorial.

5.4     Promissory Note.

(A)     The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000.

(B)     The new note must be interest free and mature on December 31, 2005.

(C)     If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.

5.5     Armenian National Institute. On or before November 1, 2003, the Assembly

7

shall assign its right to appoint Trustees of the Armenian National Institute to AGM&M, Inc.

SECTION 6  Representations by the Assembly.

The Assembly hereby represents and warrants to the Grantor as follows:

6.1 <u>Tax Status</u>. The status of the Assembly as an organization described in Section 501(c)(3) of the Code, and as an organization that is not a private foundation within the meaning of Section 509(a) of the Code is in full force and effect and there is, to the Assembly's knowledge, no IRS reexamination of such status pending or threatened.

6.2 <u>Organization</u>. The Assembly is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

6.3 <u>Power</u>. The Assembly has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grants.

6.4 <u>Actions</u>. All actions required to be taken by the Assembly to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

6.5 <u>Authorization</u>. This Agreement has been duly and validly authorized by all necessary action of the Assembly and constitutes, when executed, a valid and binding obligation of the Assembly.

6.6 <u>Furtherance of Charitable Purposes</u>. The acquisition, renovation, and utilization of the Grant Property is solely in furtherance of the Assembly's stated charitable purposes.

SECTION 7  General Provisions.

7.1 <u>Notice</u>.

(A) Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i) upon personal delivery, if delivered by hand; or

(ii) three days after the date of deposit in the U.S. mail, postage prepaid; or

8

(iii) on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

(B) Notice sent in accordance with Section 7.1(A) of this Agreement must be addressed as follows:

(i) If to Grantor:

The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax: 612-359-8994

Gerard L. Cafesjian
c/o The Cafesjian Family Foundation
4001 Tamiami Trail North, Suite 425
Naples, FL 34103
Fax: 612-359-8994

(ii) If to the Assembly:

Armenian Assembly of America, Inc.
122 C Street, NW
Suite 350
Washington, DC 20001
Fax: 202-383-9012

(C) Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 7.1.

7.2 Governing Law. This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

7.3 Assignments. This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and the Assembly and are not assignable or transferable to any other person, firm or corporation without the consent of the other party, except that the Assembly may assign its rights and obligations under this Agreement to any entity that succeeds to all or substantially all of the Assembly's business and assets or as set out in Section 5.3 of this Agreement.

7.4 Headings. The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions.

9

7 5    <u>Entire Agreement.</u>

    (A)   This Agreement represents the entire agreement between the Grantor and the Assembly concerning the Grants and all previous agreements, whether written or oral, are superseded by it.

    (B)   This Agreement may be modified or waived only by a written agreement between the Grantor and the Assembly.

    (C)   The Assembly acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*{Signatures on next page.}*

Thank you again for your generous grant to support the Armenian Assembly of America.

Sincerely,

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____
Hirair S. Hovnanian
Chairman of the Board of Trustees

By: _____
Peter Voskibian
Chairman of the Board of Directors

Accepted and agreed to as of the date of this Agreement by:

THE CAFESJIAN FAMILY FOUNDATION

By: _____     Date: ___Nov. 1, 2003___
Gerard L. Cafesjian
President and CEO

GERARD L. CAFESJIAN

_____     Date: ___Nov. 1, 2003___

11

# EXHIBIT 2

CONFIDENTIAL

## TRANSFER AGREEMENT

This Transfer Agreement (this "Agreement") is made as of November 1, 2003, by and between.

Armenian Assembly of America, Inc. (the "Grantor"), a District of Columbia nonprofit corporation; and

Armenian Genocide Museum and Memorial, Inc. ("AGM&M, Inc."), a District of Columbia nonprofit corporation.

## BACKGROUND

In order to complete the building of the Armenian Genocide Museum and Memorial (the "AGM&M"), the Grantor desires to transfer all of its real property, pledges, cash, and other assets acquired for the purpose of building the AGM&M to AGM&M, Inc. under the terms and conditions set out in this Agreement

The parties, therefore, agree as follows:

## TERMS

### SECTION 1  Grant.

1.1  <u>Nature of Grant</u>

(A)  The Grantor shall contribute to AGM&M, Inc., all of its rights, title, and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Grantor and/or held by the Grantor for the development, renovation, and construction of the AGM&M, as detailed on <u>Schedule A</u> (the "Grant").

(B)  Copies of all outstanding grant agreements between the Grantor and its donors relating to the AGM&M are attached to this Agreement as <u>Exhibits A-X</u>.

(C)  The approximate aggregate value of the Grant is $27,784,901. Within this aggregate estimate the value of the real property is $7,250,000.00; the value of the pledges as of October 30, 2003, is $19,422,044; and the value of cash and other assets on hand is approximately $669,528.

1.2  <u>Other Rights and Obligations Transferred</u>.

(A)  AGM&M, Inc. must honor all of the Grantor's donor requirements existing at time of transfer, or in the alternative, obtain donor consent

1

to the transfer and any modification of donor terms

(B)     Without limiting Section 1.2(A) of this Agreement, AGM&M, Inc. assumes and agrees to comply with the Grantor's obligations relating the memorial commemorating the Armenian Genocide under the agreement between Grantor and Gerard L. Cafesjian and The Cafesjian Family Foundation attached to this Agreement as Exhibit A.

(C)     The Grantor hereby assigns to AGM&M, Inc. the Grantor's right to appoint Trustees of the Armenian National Institute, Inc.

(D)     If at the time this Agreement is executed the promissory note executed by Grantor in favor of the The Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory Note or the Replacement Promissory Note, whichever is still outstanding, shall be transferred to AGM&M, Inc. as part of the Grant

1.3     Use of Grant.  AGM&M, Inc. shall use the Grant solely to develop, construct and operate the AGM&M.

1.4     Transfer of Grant.

(A)     The Grantor shall begin to transfer the assets that compose the Grant upon the execution of this Agreement.

(B)     The Grantor shall diligently undertake to complete the transfer of all titles, obtain all consents or other permissions, and otherwise act to effect the completion of the Grant

SECTION 2   General Conditions and Covenants.

2.1     Use of Grant Funds.  AGM&M, Inc. shall use the Grant only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

2.2     Private Foundation Grants.  AGM&M, Inc. may not use any portion of the Grant that has been received from a private foundation, as defined by Section 509(a) of the Code, to pay for an attempt to influence legislation within the meaning of Section 4945(e) of the Code.

2.3     Financial Records.  AGM&M, Inc. shall maintain financial records regarding the use of the Grant consistent with generally accepted accounting practices and shall provide the Grantor access to those records upon request.

2.4     Reports and Records.

(A)    Until completion of the AGM&M and operation of the completed facility for 12 months, AGM&M, Inc. shall provide written reports to the Grantor at least quarterly.

(B)    Such reports shall include details on:

        (i)    the amount and nature of the expenditures made from the Grant; and

        (ii)    the progress made in acquiring, designing, renovating, and utilizing the Property and completing the AGM&M.

(C)    In such reports, an officer of AGM&M, Inc. shall certify its compliance with the terms and conditions of this Agreement.

(D)    AGM&M, Inc. shall maintain complete records of receipts and expenditures relating to and the acquisition, design, and renovation of the real property portion of the Grant and the construction of the AGM&M for at least four years after the Grant has been expended, and such records must be made available to the Grantor through its representatives for inspection and copying at all reasonable times.

2.5    <u>Access to Public Spaces</u>. Upon written and reasonable notice, AGM&M, Inc. shall provide Grantor with access to the public spaces within the AGMM free of charge at least six times annually for tours, dinners or other events consistent with the nature of the AGMM in the sole judgment of the AGM&M, Inc., each not lasting longer than six hours, all costs of such events to be borne by Grantor. Grantor shall not have the right to assign, lease or otherwise transfer this right to any other entity or person. This right of access shall expire if Grantor ever ceases to be an organization described in Section 501(c)(3) of the Code.

2.6    <u>Narrative</u>. Grantor and AGM&M, Inc. shall use their best efforts to jointly prepare a narrative on the creation of the AGMM (the "Narrative") for approval by both Grantor and AGM&M, Inc. Upon approval by both Grantor and AGM&M, Inc. and completion of the AGMM, AGM&M, Inc. shall permanently and prominently memorialize the Narrative within the AGMM. AGM&M, Inc. shall include the Narrative or a condensed version thereof in all major publications and public presentations of AGM&M, Inc. that reference the creation of the AGMM.

2.7    <u>No Other Rights or Obligations</u>. Beyond the rights and obligations specifically stated in this Agreement, Grantor disclaims any legal right to control or otherwise influence AGM&M, Inc.'s use of the Grant provided in accordance with this Agreement.

SECTION 3  Conditions Related to AGM&M, Inc.

The Grantor's obligation to make the Grant is subject to the following conditions:

3.1    Tax-Exempt Status   AGM&M, Inc. must be a tax-exempt organization described in Section 501(c)(3) of the Code, as amended, and may not be a private foundation within the meaning of Section 509(a) of the Code.

3.2    Tax Status Documentation.  AGM&M, Inc. shall deliver to the Grantor a copy of its IRS application for recognition of exemption (when prepared), its IRS determination letter (when received), and such other documentation reasonably requested by the Grantor.

3.3    Evidence of Satisfaction.  AGM&M, Inc. has provided evidence to the Grantor in a form reasonably acceptable to the Grantor that the Assembly is in the process of satisfying the terms and conditions of this Agreement.

3.4    Governance of AGM&M, Inc.

   (A)   AGM&M, Inc. must be controlled by a Board of Trustees (the "Board of Trustees") appointed by individuals and organizations that contribute $5,000,000 or more ("Major Donors") to AGM&M, Inc. or any predecessor in interest.

   (B)   Each Major Donor is entitled to receive one seat on the Board of Trustees and one vote for each $5,000,000 contributed to AGM&M, Inc. (whether directly or as a result of this Agreement), except that the Grantor shall only accept one seat on the Board of Trustees and one vote regardless of the amount contributed by Grantor to AGM&M, Inc.

   (C)   In recognition of her important and significant early contribution to the project, Anoush Mathevosian is included as a Major Donor and voting member of the AGM&M, Inc. Board of Trustees.

   (D)   In recognition of its efforts in establishing the AGM&M, the Assembly is included as a Major Donor and a voting member of the AGM&M, Inc. Board of Trustees.

   (E)   Decisions of the AGM&M, Inc. Board of Trustees require an 80% vote to carry, unless other wise specified in the Articles or Bylaws of the corporation.

   (F)   Each individual Major Donor may appoint both successors to the Board of Trustees and successors to his or her right to appoint successors to the Board of Trustees. Each subsequent successor Trustee has the rights of a Trustee.

(G)     The initial Board of Trustees of AGM&M, Inc., consists of: Anoush Mathevosian, Hirair S. Hovnanian, Robert A. Kaloosdian, and Gerard L. Cafesjian.

## SECTION 4   Representations by AGM&M, Inc.

AGM&M, Inc. hereby represents and warrants to the Grantor as follows:

4.1    Tax Status. AGM&M, Inc. is an organization described in Section 501(c)(3) of the Code and an organization that is not a private foundation within the meaning of Section 509(a) of the Code, and AGM&M, Inc. shall apply by November 30, 2003 to the Internal Revenue Service for recognition of this status.

4.2    Organization. AGM&M, Inc. is a nonprofit corporation, duly organized, validly existing and in good standing under the laws of the District of Columbia.

4.3    Power. AGM&M, Inc. has full power to enter into this Agreement, to agree to its obligations hereunder, and to accept the Grant.

4.4    Actions. All actions required to be taken by AGM&M, Inc. to enter into this Agreement and to perform its obligations hereunder have been duly and properly taken.

4.5    Authorization. This Agreement has been duly and validly authorized by all necessary action of AGM&M, Inc. and constitutes, when executed, a valid and binding obligation of AGM&M, Inc..

4.6    Furtherance of Charitable Purposes. The receipt and use of the Grant pursuant to this Agreement is solely in furtherance of AGM&M, Inc.'s stated charitable purposes.

## SECTION 5   General Provisions.

5.1    Notice.

(A)    Any notice, request, report, instruction, or other document to be given under this Agreement by any party to the other parties must be in writing and is deemed effective:

(i)    upon personal delivery, if delivered by hand; or

(ii)    three days after the date of deposit in the U.S. mail, postage prepaid; or

       (iii)    on the next business day, if sent by prepaid overnight courier service or facsimile transmission.

  (B)    Notice sent in accordance with Section 5.1(A) of this Agreement must be addressed as follows:

       (i)    If to AGM&M, Inc :

           c/o The Cafesjian Family Foundation, Inc.
           15 South Fifth Street
           Suite 900
           Minneapolis, MN 55402
           Fax: 612-359-8994

       (ii)    If to the Grantor:

           Armenian Assembly of America, Inc.
           122 C Street, NW
           Suite 350
           Washington, DC 20001
           Fax: 202-383-9012

  (C)    Any party may change the address to which notices are to be sent by providing notice of such change of address to the other parties in the manner described in this Section 5.1.

5.2    Governing Law. This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

5.3    Dispute Resolution. Any disputes arising under this Agreement must be settled exclusively by binding arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in force.

5.4    Assignments. This Agreement and the rights and obligations of the parties hereunder are personal to the Grantor and AGM&M, Inc. and are not assignable or transferable to any other person, firm or corporation without the consent of the other party.

5.5    Headings. The subject headings used in this Agreement are included for purposes of reference and convenience only and may not affect the construction or interpretation of any of its provisions

5.6    Entire Agreement.

  (A)    This Agreement represents the entire agreement between the Grantor

and AGM&M, Inc. concerning the Grant and all previous agreements, whether written or oral, are superseded by it.

(B)    This Agreement may be modified or waived only by a written agreement between the Grantor and AGM&M, Inc.

(C)    AGM&M, Inc. acknowledges that it is not relying on any representation of the Grantor, except as set forth in this Agreement, and that no representations the Grantor may have made in the past survive.

*{Signatures on next page.}*

IN WITNESS WHEREOF, the parties hereto have caused this Transfer Agreement to be duly executed as of the day and year first above written.

ARMENIAN ASSEMBLY OF AMERICA, INC.

By: _____     Date: _Nov  /  2003_
    Hirair S. Hovnanian
    Chairman of the Board of Trustees

By: _____     Date: _NOV. 1, 2003_
    Peter Vosbikian
    Chairman of the Board of Directors

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

By: _____     Date: _Nov 1, 2003_
    John J. Waters, Jr.
    Secretary and Treasurer

8

# EXHIBIT 3

Subject:
1334-36 G Street Closing Documents
From:
<Jjwatersatty@aol.com>
Date:
Wed, 29 Oct 2003 14:53:01 -0500
To:
Fries.joseph@arentfox.com
CC:
john.waters@glcenterprises.com, bcampbell@familiesusa.org,
rpollack@familiesusa.org, tps@wexfordfinancial.com,
landmarktitle@erols.com, landmarkrav@erols.com

Joe,

I have reviewed the documents that you e-mailed to me yesterday and today.

1.    I have been using the incorrect name for the Armenian Genocide Museum
and Memorial, Inc.  Therefore, I have changed all the documents to reflect
the correct name:  the iArmenian Genocide Museum and Memorial, Inc.i  If
you note any other documents that I have missed in this change with regard
to that name, please let me know.

2.  I have confirmed that John, Jr. will sign as Secretary/Treasurer of the
Armenian Genocide Museum and Memorial, Inc.  Where appropriate, I have
added his signature line to the documents.

3.  Next, I have deleted the month of October as the execution date for the
documents.  This will allow us flexibility in effecting the transaction.

I look forward to any changes, corrections or comments with regard to the
changes.

John Sr.


NOTICE:  This electronic mail transmission may contain an attorney-client
communication that is privileged at law.  It is not intended for
transmission to, or receipt by, any unauthorized persons.  If you have
received this electronic mail transmission in error, please delete it from
your system without copying it, and notify the sender by reply e-mail or by
calling 952-883-0882, so that our address record can be corrected.

JJW10.29 Assignmt of Intangible.doc

Content-Description:

CFF/WATERS 02265

.

# EXHIBIT 4

ARTICLES OF INCORPORATION

OF

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

To:    Department of Consumer and Regulatory Affairs
Business Regulation Administration
Corporations Division
Washington, D.C.

THE UNDERSIGNED, all of whom are natural persons of the age of eighteen years or

more, acting as incorporators of a corporation pursuant to the District of Columbia Nonprofit

Corporation Act hereby adopt the following Articles of Incorporation:

### ARTICLE I.  NAME

The name of the Corporation is the Armenian Genocide Museum and Memorial, Inc.

(the "Corporation").

### ARTICLE II.  DURATION

The period of duration of the Corporation is perpetual.

### ARTICLE III.  ADDRESS

The address of the Corporation's registered office in the District of Columbia is

Armenian National Institute, 122 C Street NW, Suite 360, Washington, DC  20001.  The name

of the Corporation's registered agent at such address is Rouben Adalian.



AGMM06548

## ARTICLE IV.  PURPOSE

A.      The Corporation is a nonprofit organization organized and operated exclusively for charitable, educational, and other purposes beneficial to social welfare within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").  All references to sections of the Code include the corresponding provision of any subsequent federal tax law.  Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

B.      In furtherance of these purposes, the Corporation shall have all powers granted to a corporation under the District of Columbia Nonprofit Corporation Act and the power to do all things necessary, proper, and consistent with maintaining its tax-exempt status under section 501(c)(3) of the Code.

C.      No part of the net earnings of the Corporation shall inure to the benefit of or be distributed to any trustee, employee or other individual, partnership, estate, trust or corporation having a personal or private interest in the Corporation.  Compensation for services actually rendered and reimbursement for expenses actually incurred in attending to the

Page 2 of 8

AGMM06549

affairs of the Corporation shall be limited to reasonable amounts. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

D.       Notwithstanding any other provisions of these Articles, the Corporation shall not carry on any activity not permitted to be carried on by (a) a corporation exempt from federal income tax under section 501(c)(3) of the Code, or (b) a corporation, contributions to which are deductible under section 170(a) and (c)(2) of the Code.

## ARTICLE V. MEMBERS

The Corporation shall have no members.

## ARTICLE VI. BOARD OF TRUSTEES

The Board of Directors of the Corporation shall be referred to as the Board of Trustees. The manner of election or appointment to the Board of Trustees shall be as provided in the By-Laws of the Corporation.

## ARTICLE VII. REGULATION OF INTERNAL AFFAIRS

A.       The affairs of the Corporation shall be managed and controlled by the Board of Trustees.

Page 3 of 8

AGMM06550

B.    The initial By-Laws shall be adopted by the Board of Trustees, which may alter, amend or repeal the By-Laws or adopt new By-Laws.

C.    In the event of the dissolution or final liquidation of the Corporation:

1.    None of the property of the Corporation nor any proceeds thereof shall be distributed to or divided among any of the trustees or officers of the Corporation or inure to the benefit of any individual.

2.    After all liabilities and obligations of the Corporation have been paid, satisfied and discharged, or adequate provision made therefor, all remaining property and assets of the Corporation shall be distributed to one or more organizations organized and operated exclusively for religious, charitable, scientific, literary, educational or social welfare purposes, provided that such organizations shall be exempt from federal income taxes by reason of section 501(c)(3) of the Code, and subject to any additional restrictions imposed by the By-Laws of the Corporation.

3.    The private property of the trustees or officers of the Corporation shall not be subject to payment of corporate debts to any extent whatever.

### ARTICLE VIII.  PRIVATE FOUNDATION RULES

The Corporation shall at all times be organized and operated so as to qualify as an organization that is not a private foundation, as defined in section 509(a) of the Code.  If, however, at any time, the Corporation shall be classified as a private foundation under federal tax laws, then at such time or times the Corporation shall be subject to the following restrictions:

AGMM06551

1.    The Corporation shall not engage in any act of self-dealing as defined in section 4941(d) of the Code.

2.    The Corporation shall make distributions for each taxable year at such time and in such manner so as not to become subject to the tax on undistributed income imposed by section 4942 of the Code.

3.    The Corporation shall not retain any excess business holdings as defined in section 4943(c) of the Code.

4.    The Corporation shall not make any investments in such manner as to subject it to tax under section 4944 of the Code.

5.    The Corporation shall not make any taxable expenditures as defined in section 4945(d) of the Code.

## ARTICLE IX.  TRUSTEES

The number of Trustees may be increased or decreased from time to time by the Board of Trustees, but shall in no event be less than three (3).  The names and addresses of the persons who shall serve as initial Trustees until their successors are elected and qualify, are:

| NAME | ADDRESS |
| --- | --- |
| Gerald L. Cafesjian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Hirair S. Hovnanian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |

AGMM06552

| | |
|---|---|
| Anoush Mathevosian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |
| Robert A. Kaloosdian | c/o The Armenian Genocide Museum and Memorial, Inc. 122 C Street, N.W., Suite 360 Washington, DC 20001 |

### ARTICLE X. INCORPORATORS

The name and addresses of the incorporators are as follows:

| NAME | ADDRESS |
|---|---|
| Diara M. Holmes | Caplin & Drysdale, Chartered One Thomas Circle, NW Washington, DC 20005 |
| Sharon P. Light | Caplin & Drysdale, Chartered One Thomas Circle, NW Washington, DC 20005 |
| Lloyd H. Mayer | Caplin & Drysdale, Chartered One Thomas Circle, NW Washington, DC 20005 |

AGMM06553

IN WITNESS WHEREOF, we, the undersigned, being the Incorporators hereinabove named, do hereby affirm under penalties of perjury that these Articles are our act and deed, and the facts herein stated are true and, accordingly, we have executed these Articles this 29th day of October , 2003.

_Diara M. Holmes_
Diara M. Holmes

_Sharon P. Light_
Sharon P. Light

_Lloyd H. Mayer_
Lloyd H. Mayer

AGMM06554

DISTRICT OF COLUMBIA       ) SS:

I, _Jeanne G Katz_, a Notary Public in and for the District of Columbia, do hereby certify that Diara M. Holmes, Sharon P. Light and Lloyd H. Mayer whose names are signed to the foregoing Articles of Incorporation of Armenian Genocide Museum and Memorial, Inc., bearing the date of _October 29_, 2003, personally appeared before me in said District, the said persons being personally well known to me as the persons who executed the said Articles of Incorporation, and each acknowledged the same to be his or her act and deed.

Notary Public

JEANNE G. KATZ
Notary Public of District of Columbia
My Commission Expires December 14, 2007

Page 8 of 8

# EXHIBIT 5

BY-LAWS

OF

ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.

ARTICLE I

EFFECT, NAME, PURPOSES, POLICY AND RELATED MATTERS

Section 1.1.  General.  These By-Laws shall become effective as of October 30, 2003.

Section 1.2.  Name and Purpose.  The Corporation shall conduct its programs and activities under the name of the Armenian Genocide Museum and Memorial. The Corporation is organized exclusively for educational purposes.  Specifically, the Corporation will further educational purposes through its activities, which will include, but are not limited to, the following: to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide; to commemorate, remember, study, and interpret the particular and universal lessons of the Armenian Genocide and related issues, including those of contemporary significance; to secure universal affirmation of the Armenian Genocide; to support the prevention of genocide; and to present permanent, rotating, and traveling exhibits, as well as memorial and public programs, in furtherance of these purposes.

Section 1.3.  Policy.  The Corporation, its Trustees, officers, and employees shall ever be mindful of the pluralistic character of the Armenian community world-wide, and the worth of its institutions and organizations.

Section 1.4.  Location.  The principal office of the Corporation shall be located in the District of Columbia Metropolitan area.  The Trustees, by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, may change the location of the principal office from time to time to any other place within the United States of America.  The Trustees, by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, may open and operate other offices of the Corporation in the United States and abroad. The Corporation shall have and continuously maintain in the District of Columbia a registered office and a registered agent whose business office is identical with such registered office, as required by the District of Columbia Nonprofit Corporation Act.  The address of the registered office and the identity of the registered agent may be changed from time to time by the Board of Trustees.

Section 1.5.  Fiscal Year.  The fiscal year of the Corporation shall, unless otherwise decided by the Trustees, end on December 31 of each year.

ARTICLE II

BOARD OF TRUSTEES

Section 2.1. Members. The Corporation shall have no members.

Section 2.2. Board of Trustees. The Board of Trustees of the Corporation shall serve as the Board of Directors of the Corporation for purposes of the District of Columbia Nonprofit Corporation Act.

Section 2.3. Number and Election. The Board of Trustees shall consist of not less than three (3) nor more than fifteen (15) members. At no time, however, shall the total number of votes exercised by the Board of Trustees exceed fifteen (15), even if the Board of Trustees has not reached its maximum size authorized under these By-Laws.

Section 2.4. Initial Trustees. The initial Trustees shall be the Trustees of the Corporation serving as such as of the date of the adoption of these By-Laws. The term of office of an initial Trustee shall be perpetual. Each donor that elected an initial Trustee (as identified by the initial Trustees in the unanimous written consent in lieu of the organization meeting of the Board of Trustees of the Corporation) (an "Initial Donor") shall appoint a successor within thirty (30) days of the adoption of these By-Laws to serve as Trustee should the initial Trustee be unable to serve for any reason. If an Initial Donor fails to appoint such a successor, the initial Trustee elected by that Initial Donor shall be automatically removed from the Board of Trustees effective thirty-one (31) days after the adoption of these By-Laws, but shall be automatically reinstated to the Board of Trustees if and when the Initial Donor appoints a successor to that Trustee. Each Initial Donor shall have the same rights as donors described in Section 2.5 of these By-Laws with respect to the initial Trustee elected by the Initial Donor and the successors to that initial Trustee, including the right, if an Initial Donor makes contributions to the Corporation in excess of $5 million, to elect an additional Trustee for each $5 million increment above the initial $5 million in contributions by that Initial Donor or to grant to the Trustee previously elected by that Initial Donor the right to exercise as many additional votes as the donor has contributed whole increments of $5 million above the initial $5 million in contributions by that Initial Donor.

Section 2.5. Additional Trustees. Additional Trustees shall be elected to the Board of Trustees according to the following procedure:

Each contribution of $5 million to the Corporation entitles the donor to elect one Trustee to the Board of Trustees, provided:

(1) the Board of Trustees has accepted the contribution on behalf of the Corporation by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present; and

(2) the donor has appointed a successor to the Trustee elected by the donor to serve on the Board of Trustees should that Trustee be unable to serve for any reason,

until such time as the total number of votes exercised by the Board of Trustees reaches fifteen (15).

When the Corporation has accepted multiple $5 million contributions from a single donor, the donor may either elect one Trustee for each $5 million increment or elect one Trustee who shall exercise as many votes as the donor has contributed whole increments of $5 million. The donor must appoint a successor or successors to the Trustee or Trustees at the time of election.

An individual donor may elect himself or herself as a Trustee or appoint himself or herself as a successor.

An institutional donor shall retain the right to elect Trustees and to appoint successors in perpetuity, which rights, and the right to pass these rights to successor institutions, shall pass to any institution that the governing body of the institutional donor designates as its successor. If an institutional donor dissolves or otherwise ceases to exist without having designated a successor, the institutional donor's rights shall expire. A Trustee elected by such an institutional donor before the expiration of the donor's right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor or successors appointed by such an institutional donor prior to the expiration of the donor's right to appoint one or more successors shall succeed to the Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

An individual donor may appoint an individual or an institution to succeed to the donor's right to elect one or more Trustees, to appoint one or more successors, and, if the person appointed to succeed to these rights is an individual, to appoint an individual or institution to succeed to all of these rights. If the person so appointed is an institution, the immediately preceding paragraph of this section 2.5 shall apply with respect to the donor's rights as if the appointed institution was an institutional donor. If an individual donor or an individual appointed to succeed to the donor's rights fails to appoint such an individual or institution, the donor's rights shall expire on the death of the individual holding those rights or the declaration by a court of legal incompetence of the individual holding those rights. A Trustee elected by such an individual before the expiration of the right to elect one or more Trustees shall continue to serve as a Trustee until the earlier of his or her death, resignation or removal, and the successor to that Trustee position appointed by such an individual prior to the expiration of the right to appoint that successor shall succeed to that Trustee position for which he or she was appointed successor, but no further successors to that position shall be appointed and the vote or vote(s) associated with that Trustee position shall expire upon the earlier of the death, resignation or removal of the last person eligible to hold that Trustee position.

The term of office of a Trustee shall be perpetual. However, the donor or the individual or institution that has succeeded to the donor's rights may remove the elected Trustee and elect a new Trustee or appoint a different successor at any time, with or without cause.

All elections of Trustees, appointments of successors to Trustees and appointments of successors to a donor's rights must be in writing and delivered to the Chairman, the President, the Secretary or the Executive Director of the Corporation to be effective. Any such election or appointment shall take effect on the date of receipt of such election or appointment or at any later time therein specified, and the acceptance of such election or appointment shall not be necessary to make it effective.

If the position of a successor to a Trustee becomes vacant for any reason, and the donor who has the right to appoint that successor fails to do so within thirty (30) days of that position becoming vacant, the Trustee for whom the successor position is vacant shall be automatically removed from the Board of Trustees effective thirty-one (31) days after that successor position becomes vacant but shall be automatically reinstated to the Board of Trustees if and when that donor appoints a successor to that Trustee.

If a Trustee position becomes vacant for any reason and remains vacant for a continuous period of three (3) years, then the donor who has the right to elect that Trustee and to appoint the successor to that Trustee, and, in the case of an individual donor, to appoint an individual or institution to succeed to these rights, shall lose all of his, her or its rights with respect to that Trustee position and the vote(s) associated with that Trustee position shall expire.

Section 2.6.  Quorum.  Persons representing one-half of the aggregate eligible votes shall constitute a quorum at any meeting of the Board of Trustees duly called.  If less than a quorum of Trustees is present at a meeting, a majority of Trustees present may adjourn the meeting without further notice.

Section 2.7.  Action by Vote.  Unless otherwise provided herein or in the Articles of Incorporation, all questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present.

Section 2.8.  Action by Writing.  Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting if all Trustees then in office consent to the action in writing and the written consents are filed with the records of meetings of Trustees. Such consents shall be treated for all purposes as votes at a meeting.

Section 2.9.  Powers and Duties.  The Board of Trustees shall meet from time to time and not less than twice yearly, shall manage and direct the Corporation's funds and investments, shall review the programs and affairs of the Corporation, and shall generally have and exercise all powers of the Trustees except such powers as are expressly prohibited to it by law, at all times in furtherance of the policy and purposes of the Corporation. Without limiting the generality of the foregoing, they shall elect their officers, expand their numbers, examine the

budget, and to the extent approved, provide and allocate funds necessary to carry out the programs reflected therein.

Section 2.10. Committees. The Board of Trustees may organize, appoint and supervise one or more committees, including an Executive Committee, and may delegate to any such committee any or all of their powers which may be delegated by law. The members of any committees shall remain in office at the pleasure of the Board of Trustees.

Section 2.11. Other Appointments. The Board of Trustees may from time to time designate certain persons or groups of persons as benefactors, patrons, contributors, advisors, friends, or otherwise of the Corporation or with such other titles, upon such terms, for such periods and with such qualifications as they may deem appropriate. Such persons shall serve in an honorary capacity and shall in such capacity have no right to notice of or to vote at any meeting of the Trustees, shall not be considered for the purposes of establishing a quorum, and shall have only such rights or responsibilities as the Board of Trustees may designate from time to time.

Section 2.12. Meetings. An annual meeting of the Board of Trustees shall be held at a time to be determined by the Board of Trustees, and at such place as the Board shall determine to conduct such business as may properly come before the meeting. Regular meetings of the Board of Trustees may be held at such places and at such times as the Board shall determine. Special meetings of the Board of Trustees may be called by or at the request of the Chairman and the President and shall be called by the Secretary or his or her designee at the request of Trustees who are authorized to exercise one-half of the votes exercisable by the Trustees then in office. The person or persons authorized to call such special meetings may fix any place as the place for holding such meeting.

Section 2.13. Telephonic Meetings. A Trustee may participate in any meeting of the Board of Trustees or any meeting of any committee of the Board by means of conference telephone or by any means of communication by which all persons participating in the meeting are able to hear one another, and such participation shall constitute presence in person at the meeting.

Section 2.14. Notice. Notice of the time and place of meetings of the Board of Trustees shall be delivered personally or communicated by mail, telegram, facsimile or email to each Trustee, charges prepaid, addressed to him or her at his or her address as shown by the records of the Corporation. Meeting notices, delivered by any method, shall be transmitted no less than five (5) and not more than thirty (30) days prior to the date of the meeting. Whenever any notice is required to be given to any Trustee under the provisions of these By-Laws or the Articles of Incorporation, or by the District of Columbia Nonprofit Corporation Act, a written waiver thereof signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Presence at a meeting without objection also constitutes a waiver of notice. Neither the business to be transacted at, nor the purpose of, any annual, regular or special meeting of the Board need be specified in the

notice of such meeting or any waiver of notice, unless specifically required by law, the Articles of Incorporation, or these By-Laws.

Section 2.15. Officers, Agents and Employees. The Board of Trustees shall elect from time to time by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present, from among its members, a Chairman, a President, one or more Vice Chairmen, a Treasurer and a Secretary. The Trustees may elect such other officers, if any, as they may from time to time determine, and such other officers need not be Trustees. The Trustees may also have such agents, if any, as they may appoint. Any two (2) or more offices, except those of President and Secretary, may be held by the same person at the same time. Any officer may resign at any time by giving written notice to the Board of Trustees or the President. Any such resignation shall take effect on the date of receipt of such notice unless another date is specified therein, and, unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective. Any officer elected by the Board of Trustees may be removed, with or without cause, by the Board of Trustees whenever, in its judgment, the best interests of the Corporation would be served thereby. Any such removal shall be without prejudice to the contract rights, if any, of the person so removed. The Executive Director shall be appointed by the Board of Trustees and shall be the chief executive officer of the Corporation. With the consent of the Board of Trustees, the Executive Committee, or the designee of either the Board or the Executive Committee, the Executive Director shall sign all deeds, contracts and other documents in the name of the Corporation, and shall have the general power to carry on negotiations of any and every character in the name of the Corporation. The Executive Director shall perform such other duties as assigned by the Board of Trustees or the Executive Committee. The Executive Director shall, among other things, supervise the employees and the hiring of employees. The Executive Director shall be a non-voting ex-officio member of all committees, except the Nominating Committee, if one exists.

Section 2.16 Duties of Officers. Each officer shall have the duties usual to his office unless otherwise prescribed by the Board of Trustees and shall serve for one year and until his or her successor is elected and qualified, unless another term is prescribed by the Board of Trustees. The Chairman or, in his or her absence, the President shall preside at all meetings of the Trustees.

Section 2.17. Resignation and Removal. Each Trustee shall hold office for the term which is provided for him or her in these By-Laws, or until his or her earlier death, resignation or removal. Removal can occur by a vote of the Board of Trustees, as herein described, or by the donor or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors

Any Trustee may be removed without cause by the unanimous affirmative vote of the Trustees present at a meeting where a quorum is present, not counting the vote or votes of the Trustee whose removal is the matter to be voted upon with respect either to the existence of a quorum or to the unanimity of the vote.

Any Trustee may resign his or her office at any time at any time by giving written notice to the Board of Trustees, the Chairman or the Secretary. Any such resignation shall take effect on the date of receipt of such notice or at any later time therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective.

Upon removal by a vote of the Trustees or upon the resignation or death of a Trustee, the appointed successor to that Trustee shall become a Trustee. The donor, or the individual or institution that has succeeded to the donor's rights to elect one or more Trustees and appoint one or more successors, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Upon removal by the donor, or by the individual or institution that has succeeded to an donor's rights to elect one or more Trustees and appoint one or more successors, the appointed successor to that Trustee shall become a Trustee, unless the donor, or the individual or institution that has succeeded to the donor's rights, has elected a Trustee to replace that Trustee immediately upon removal. If the appointed successor becomes the Trustee, the donor, or the individual or institution that has succeeded to the donor's rights, shall appoint a new successor to replace that Trustee should he or should be unable to serve for any reason.

Section 2.18. Endowment Fund. The Trustees may from time to time establish, hold, invest and administer such endowment fund or funds to be collectively designated the "Armenian Genocide Museum and Memorial Endowment Fund", upon such terms and conditions as the Board of Trustees may from time to time deem advisable. Except as otherwise required by law, only the "net income" therefrom as hereafter defined shall be applied to the programs and activities of the Corporation and the principal of such funds shall be preserved. As used herein, "net income" shall mean the fair value of the assets of the Fund over the sum of the contributions to the fund, whether such contributions are made by donors to the Corporation or by the Board of Trustees from other funds of the Corporation, with each contribution increased by any increase in the Consumer Price Index- All Urban Consumers (CPI-U), published by the Bureau of Labor Statistics, U.S. Department of Labor, or any successor to CPI-U adopted by the Bureau of Labor Statistics, from the date of its contribution to the Fund, calculated as of December 31 of each calendar year. Any such endowment fund or funds may be given such designations as the Board of Trustees may from time to time determine, including, without implied limitation, a designation which will commemorate any donor or person, place, event or entity designated by any donor.

## ARTICLE III

### MISCELLANEOUS

Section 3.1. Rules of Order. Robert's Rules of Order Revised shall govern in matters of parliamentary procedure not otherwise prescribed by law, the Articles of Incorporation, or these By-Laws.

Section 3.2. Amendments. Unless otherwise provided herein or in the Articles of Incorporation and with reasonable prior written notice, amendments to these By-Laws or to the Articles of Incorporation shall be approved by a unanimous affirmative vote of the Trustees present at a meeting where a quorum is present. The affirmative vote of all Trustees then in office shall be required to amend the Purpose (Section 1.2) and Dissolution (Section 3.4) clauses of these By-Laws or the Purposes (Article IV) and Dissolution (Paragraph C of Article VII) clauses of the Articles of Incorporation.

Section 3.3. Prohibited Activities. Notwithstanding any other provision of these By-Laws, there shall not be carried on any activities or conduct not permitted to a corporation exempt from Federal Income Tax under Section 501(c)(3) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law or (b) to a Corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 as amended or any corresponding provision of any future United States Internal Revenue Law. No part of the net earnings shall inure to the benefit of, or be distributable to, the Trustees, officers or others except that the Trustees shall be authorized and empowered, if they so elect, to pay to Trustees, officers or others reasonable compensation for service rendered and to make payments and distribution in furtherance of the purposes set forth in these By-Laws. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting, to influence legislation (except as permitted by section 501(h) of the Code, if applied to the Corporation) and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of or in opposition to any candidate for public office.

Section 3.4. Dissolution. In the event this Corporation is terminated, all endowment funds and net assets of the Corporation shall be transferred to one or more corporations or entities designated by the Board of Trustees as successors to the Corporation, or such one or more Eligible Institutions (as hereinafter defined) as one or more permanent endowment funds to support such Permissible Purposes (as hereinafter defined) and upon such terms and conditions as the Trustees shall determine by a unanimous affirmative vote of all Trustees then in office. As used herein, Eligible Institutions shall mean those charitable/educational institutions located in the United States which then have and maintain active programs that promote greater awareness of the Armenian Genocide and/or promote educational and charitable programs that benefit the citizens of the Republic of Armenia. Presently such designated Eligible Institutions are the Armenian Assembly of America, the Armenian General Benevolent Union, the Cafesjian Family Foundation, the H. Hovnanian Foundation, the Robert Aram and Marianne Kaloosdian and Stephen P. & Marian Mugar Endowed Chair of Armenian Genocide Studies at Clark University, provided that each recipient must be an organization that is described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any subsequent federal tax law. As used herein, Permissible Purposes shall be the specific purposes listed in the third sentence of Section 1.2 of these By-Laws.

Section 3.5. Interpretation. Any ambiguity in these By-Laws or any question requiring interpretation of these By-Laws shall be resolved by the Board of Trustees, whose determination shall be binding and conclusive.

ARTICLE IV

INDEMNIFICATION AND INSURANCE

Section 4.1. Indemnification and Insurance. Unless otherwise prohibited by law or sections 4.3 and 4.4 of these By-Laws, the Corporation shall indemnify any Trustee or officer of the Corporation, any former Trustee or officer of the Corporation, or any person who may have served at its request as a trustee, director or officer of another corporation or entity, whether for profit or not for profit, and may, by resolution of the Board of Trustees, indemnify any employee or agent of the Corporation against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit or proceeding (whether actual or threatened, civil, criminal, administrative or investigative, including appeals) in which he or she is or may be made a party by reason of having been such Trustee, officer, person, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters as to which he or she shall be adjudged in such claim, action, suit or proceeding to be guilty of a criminal offense or liable to the Corporation for damages arising out of his or her own negligence or misconduct in the performance of a duty to the Corporation. Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, counsel fees and other fees; costs and disbursements; and judgments, fines, and penalties against, and amounts paid in settlement by such Trustee, officer, person, employee or agent. The Corporation may advance expenses to, or where appropriate may itself, at its expense, undertake the defense of, any such Trustee, officer, person, employee or agent; provided, however, that such Trustee, officer, person, employee or agent shall undertake to repay or to reimburse such expense if it should be ultimately determined that he or she is not entitled to indemnification under this Section. The provisions of this Article shall be applicable to claims, actions, suits or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof. The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such Trustee, officer, person, employee or agent may be entitled under any statute, By-Law, agreement, vote of the Board of Trustees or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

Section 4.2. Insurance. The Board of Trustees may authorize the purchase of insurance on behalf of any person against any liability asserted against or incurred by him which arises out of such person's status as a Trustee, officer, employee or agent of the Corporation or out of a person's having served at the request of the Corporation as a trustee, director or officer of another corporation or entity or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

Section 4.3. Limitation. In no case, however, shall the Corporation indemnify, reimburse or insure any person for any taxes imposed on such individual under chapter 42 of the Internal Revenue Code of 1986, as now in effect or as may hereafter be amended ("the Code"). Further, if at any time the Corporation is deemed to be a private foundation within the meaning of Section 509 of the Code then, during such time, no payment shall be made under this Article if

Page 9 of 10

such payment would constitute an act of self-dealing or a taxable expenditure, as defined in Section 4941(d) or Section 4945(d), respectively, of the Code.

Section 4.4. Severability. If any part of this Article shall be found in any action, suit or proceeding to be invalid of ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

I certify that the foregoing Bylaws of ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC. were approved and adopted for the Corporation by its Board of Trustees by unanimous consent effective on October 30, 2003, and that they are currently in effect.

Secretary of the Corporation

10/30/03
Date

# EXHIBIT 6

 

MEMORANDUM OF AGREEMENT
RESERVING RIGHTS

This Memorandum of a Transfer Agreement ("Memorandum") is made and entered into as of October 23, 2006 and is executed by Armenian Genocide Museum and Memorial, Inc., a District of Columbia Nonprofit Corporation ("AGM&M") and The Cafesjian Family Foundation, Inc., a Florida Nonprofit Corporation ("CFF").

WHEREAS, pursuant to a Letter Agreement dated as of November 1, 2003 executed by the Armenian Assembly of America, Inc., a District of Columbia Nonprofit Corporation ("Assembly") in favor of the CFF (the "Letter Agreement") the Assembly agreed, among other things, to undertake the development of certain real properties situated in the District of Columbia ("Development Obligations") which properties are described in Exhibit A attached hereto and incorporated herein as if set forth herein in full (the "Properties"); and

WHEREAS, the Letter Agreement provided for the reservation of certain reversionary rights in the CFF in the event that the Assembly failed to perform the Development Obligations; and

WHEREAS, pursuant to a Transfer Agreement dated as of November 1, 2003 executed by the AGM&M and the Assembly, the AGM&M agreed, among other things, to undertake the Development Obligations of the Assembly; and

WHEREAS, the AGM&M and the CFF desire to execute this memorandum and record it among the land records of the District of Columbia, in order to provide notice of the Development Obligations contained in the Transfer Agreement.

NOW, THEREFORE, in consideration of the premises, the terms of the Transfer Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    This Memorandum is solely for recording purposes, and shall not be construed to, alter, modify, limit amend or supplement the Transfer Agreement in any respect. The recordation of this Memorandum is in lieu of, and shall have the effect of, recording the Transfer Agreement.

2.    Reference is hereby made to the Transfer Agreement for all the other terms, provisions and conditions of the Transfer Agreement.

3.    The recitals above are made apart of this Memorandum as if fully restated in this paragraph 3.

[Signature Page to Follow]

- 1 -

400375035



IN WITNESS WHEREOF, the AGM&M and the CFF have duly executed this Memorandum of Transfer Agreement on this 23rd day of October 2006.

AGM&M          Armenian Genocide Museum and Memorial, Inc.
A District of Columbia Nonprofit Corporation

By _____
            John J. Waters, Jr., Secretary/Treasurer

CFF             The Cafesjian Family Foundation, Inc.
A Florida Nonprofit Corporation

By _____
            John J. Waters, Jr., Vice President

STATE OF MINNESOTA    )
                        ) ss.
COUNTY OF HENNEPIN    )

On this 23rd day of October 2006, before me, _Don Kovacovch_, a notary public, personally appeared **John J. Waters, Jr.** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed the within instrument as Secretary/Treasurer on behalf of Armenian Genocide Museum and Memorial, Inc., a District of Columbia Nonprofit Corporation.

STATE OF MINNESOTA    )
                        ) ss.
COUNTY OF HENNEPIN    )

On this 23rd day of October 2006, before me, _Donl Kovacovich_, a notary public, personally appeared **John J. Waters, Jr.** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed Vice President on behalf of The Cafesjian Family Foundation, Inc., a Florida Nonprofit Corporation.

_____
        Notary Public

DONALD ANTHONY KOVACOVICH
Notary Public-Minnesota
My Commission Expires Jan 31, 2010

My commission expires: _____

- 2 -

400375035

Doc# 2008146263 Fees:$40.00
10/27/2008   1:57PM Page: 4
Filed & Recorded In Official Records of
WASH DC RECORDER OF DEEDS LARRY TODD

EXHIBIT A

TO MEMORANDUM OF AGREEMENT

Legal Description of the Property located at 1334-36 G Street, District of Columbia, Property #: 0253 0817:

All that certain lot or parcel of land together with all improvements thereon located and being in the City of Washington in the District of Columbia and being more particularly described as follows:

Part of Original Lot numbered Seventeen (17) in Square numbered Two Hundred Fifty-three (253), described as follows: BEGINNING at the Northwest corner of said lot; thence East on the South line of "G" Street, 36.90 feet; thence South 113 feet 8 ½ inches to a 30 foot alley; thence West on the North line of said alley 36.90 feet; thence North 113 feet 8 ½ inches to the place of beginning.

NOTE: At the date hereof the above described property is designated on the Records of the Assessor for the District of Columbia for assessment and taxation purposes as Lots numbered Eight Hundred Seventeen (817) and Eight Hundred Eighteen (818) in Square numbered Two Hundred Fifty-three (253).

Legal Description of the Property located at 1342 G Street, District of Columbia, Property #: 0253 0053:

Lot numbered Fifty-three (53) in Harry Wardman and Thomas P. Bones Subdivision of lots in Square numbered Two Hundred and Fifty-three (253) as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 64 at Folio 46.

RECORDING
SURCHARGE                34.00
                         6.50

400375035

-3-

After Recording Return To:
John Waters
15 S. Fifth St #900
Minneapolis MN 55402

Legal Description of the Property located at 1340 G Street, District of Columbia, Property #: 0253 0054:

> Lot Numbered Fifty-four (54) in Harry Wardman and Thomas P. Bones Subdivision of lots in Square Two Hundred Fifty-three (253) as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 64 at Folio 46.

Legal Description of the Property located at 1338 G Street, District of Columbia, Property #: 0253 0055:

> Lot numbered Fifty-five (55) in Harry Wardman and Thomas P. Bones (previously recorded deed incorrectly shows Thomas *F*. Bones) Subdivision of lots in Square numbered Two Hundred and Fifty-three (253) as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 64 at Folio 46.

Legal Description of the Property located at 619 14th Street NW, District of Columbia, Property #: 0253 0067:

> Lot numbered Sixty-seven (67), in Square numbered Two-Hundred Fifty-Three (253), in subdivision made by "619 14[th] Street, NW Limited Partnership," as per plat recorded in Liber 191 at Folio 165 of the Records of the Officer of the Surveyor for the District of Columbia.
>
> Being all the same property as contained in that deed dated February 1, 1993 and recorded February 8, 1993 as Instrument No. 9490, wherein the property was known for assessment and taxation purposes as Lots 833 and 45 in Square 253.

400375035

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Armenian Genocide Museum and Memorial, Inc.,

        Plaintiff,

    v.

The Cafesjian Family Foundation, Inc. and John J. Waters,

        Defendants.

Civil File No. 07-1259 (CKK)

**DEFENDANT JOHN J. WATERS, JR.'S ANSWERS TO FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO 1:** Identify all individuals who were involved in preparing the responses to these Interrogatories and all documents that were reviewed in connection with, relied upon or relate to these Interrogatories or your responses to these interrogatories.

    **ANSWER:** John J. Waters, Jr.; counsel for defendants.

**INTERROGATORY NO 2:** Identify and describe any and all communication you had with AGM&M, CFF, Cafesjian, or any other person or entity regarding the Memorandum, including without limitation the execution and recording of same, including the date of each communication, the individual(s) with whom you had such communication, the form of such communication (e.g., letter, email, phone call, in-person meeting, etc.) and a description of the content of such communication.

    **ANSWER:** Objection – this Interrogatory seeks information protected by the attorney-client and work product privileges. Subject to and without waiving these objections, Waters and Cafesjian orally communicated with one another regarding the Memorandum on two or three occasions in October 2006.

**INTERROGATORY NO 3:** Identify and describe any and all communication you had with AGM&M, CFF, Cafesjian, or any other person or entity regarding the Grant Agreement, including the date of each communication, the individual(s) with whom you had such communication, the form of such communication (e.g., letter, mail, phone call, in-person meeting, etc.) and a description of the content of such communication.

**ANSWER:** Objection – this Interrogatory is overly broad, unduly burdensome, and seeks information protected by the attorney-client and work product privileges. Subject to and without waiving these objections, communications regarding the Grant Agreement first began in early 2000 among Cafesjian and Waters and Assembly representatives, including Hirair Hovnanian. An initial letter grant agreement was executed by Cafesjian on February 21, 2000 and accepted by the Assembly. Negotiations for the Grant Agreement executed on November 1, 2003 began in early 2002 and were among Cafesjian and Waters and Assembly representatives. These communications were oral and written. Pursuant to Rule 33(d), please see documents produced.

**INTERROGATORY NO 4:** Identify and describe any and all communication you had with AGM&M, CFF, Cafesjian, or any other person or entity regarding the disputed properties, including the date of each communication, the individual(s) with whom you had such communication, the form of such communication (e.g., letter, mail, phone call, in-person meeting, etc.) and a description of the content of such communication.

**ANSWER:** Objection – this Interrogatory is overly broad, unduly burdensome, and seeks information protected by the attorney-client and work product privileges. Subject to and without waiving these objections, Waters had oral and written communications with the previous owners of the grant properties regarding the acquisition of the grant properties by TomKat, LP. Waters and Cafesjian had oral and written communications with Assembly representatives regarding the grant properties. Pursuant to Rule 33(d), please see documents produced.

**INTERROGATORY NO 5:** For each of the disputed properties, identify and describe in detail the following:

a) The date and manner in which the property was acquired or purchased by AGM&M, including without limitation the identity of the individuals who negotiated the purchase on behalf of AGM&M as well as the identities of the individuals who negotiated the purchase on behalf of the seller of the property;

b) The amount of the most recent purchase price and the manner by which such price was calculated, including the identity of the individual who calculated the price;

c) The person or entity that currently holds title to the property;

d) Any other persons or entities that you allege have an interest in the property and a description of the nature and extent of such interest;

e) To the extent you allege that an entity or person other than AGM&M has an interest in the property, the factual basis for such assertion; and

f) The current fair market value of the property.

## ANSWER:

a) *See* Grant Agreement, attached to amended complaint as Exhibit A, and Transfer Agreement, attached to amended complaint as Exhibit B. AGM&M representatives considered and approved AGM&M's acquisition of the grant properties. Pursuant to Rule 33(d), see documents bates stamped CFF/Waters 2804-2857; see also documents produced.

b) *See* Grant Agreement, attached to amended complaint as Exhibit A, and Transfer Agreement, attached to amended complaint as Exhibit B. The purchase price of the National Bank building for the most recent transfer from the Assembly to AGM&M was negotiated by and between Assembly representatives and AGM&M representatives, including Waters. The purchase prices of the four adjacent properties for the most recent conveyance by TomKat, LP were negotiated among Cafesjian and CFF, in coordination with TomKat and its representative, Waters, and Assembly representatives. The Assembly subsequently transferred the opportunity to take title to the grant properties and the Grant Agreement obligations to AGM&M as authorized by AGM&M representatives and the Transfer Agreement. The purchase price for each grant property was the amount initially expended by TomKat to acquire or contract to acquire the property, plus closing and property holding costs. Pursuant to Rule 33(d), see documents bates stamped CFF/Waters 2804-2857; see documents produced.

c) AGM&M holds title to the following properties: (1) former National Bank of Washington building; (2) 1334-36 G Street NW; (3) 1338 G Street; and (4) 1342 G Street. The fifth property located at 1340 G Street was acquired pursuant to a Contract for Deed which is held by the Ana Sherman Revocable Trust. The deed is currently held in escrow for AGM&M. Pursuant to Rule 33(d), see documents bates stamped CFF/Waters 2804-2857; see documents produced.

d) *See* Grant Agreement, attached to amended complaint as Exhibit A, and Transfer Agreement, attached to amended complaint as Exhibit B. As provided in the Grant Agreement, Cafesjian and CFF retain a reversionary interest in all five grant properties. Because the grant properties are owned by a non-profit organization, the public may also have an interest in the grant properties. The Ana Sherman Revocable Trust also retains an interest in the property located at 1340 G Street until the Contract for Deed is satisfied.

e) *See* Grant Agreement, attached to amended complaint as Exhibit A, and Transfer Agreement, attached to amended complaint as Exhibit B. The money donated by Cafesjian and CFF to enable AGM&M to acquire the grant properties was subject to the various conditions as specified in the Grant Agreement. If these conditions are not satisfied, the properties are subject to reversion pursuant to the terms of the Grant Agreement. Because the property located at 1340 G Street is being acquired pursuant to a Contract for Deed, failure to make payments as required may result in the property's return to the Ana Sherman Revocable Trust.

f) CFF has no responsive information in its possession.

**INTERROGATORY NO 6:** Identify and describe in detail the circumstances surrounding your execution of the Memorandum, including without limitation:

a) The date you executed the Memorandum;

b) The names of all persons you spoke with regarding the execution of the Memorandum both before and after the execution;

c) The identities of any persons who were present when you authorized the Memorandum; and

d) To the extent you allege that you received from AGM&M or its affiliates, subsidiaries, employees, servants, agents, officers, parents, Trustees, and representatives authorization for you to execute the Memorandum, the precise manner and nature of any authorization that you allege you received, including without limitation the identity of the person or entity who authorized the execution, the date such authorization was provided, the manner in which such authorization was provided, and a detailed description of the authorization itself.

**ANSWER:**

a) *See* Memorandum.

b) Waters spoke with John Waters, Sr. and Cafesjian before and after the Memorandum was executed.

c) The Memorandum was authorized pursuant to the Unanimous Written Consent in Lieu of the Organization Meeting of the Board of Trustees of Armenian Genocide Museum and Memorial, Inc., dated October 30, 2003.

d) *See* Unanimous Written Consent in Lieu of the Organization Meeting of the Board of Trustees of Armenian Genocide Museum and Memorial, Inc., dated October 30, 2003.

**INTERROGATORY NO 7:** Identify and describe in detail the circumstances surrounding your recording of the Memorandum with the District of Columbia Registry of Deeds, including without limitation:

a) The date you recorded the Memorandum;

b) The names of all persons you spoke with regarding the recording of the Memorandum both before and after the execution;

c) The identities of any persons who were present when you recorded the Memorandum; and

d) To the extent you allege that you received from AGM&M or its affiliates, subsidiaries, employees, servants, agents, officers, parents, Trustees, and representatives authorization for you to record the Memorandum, describe the precise manner and nature of any authorization that you allege you received, including without limitation the person or entity who authorized the recording, the date such authorization was provided, the manner in which such authorization was provided, and a detailed description of the authorization itself.

**ANSWER:**

a) *See* Memorandum.

b) Waters spoke with Grant Berning at Landmark Title before and after the recording of the Memorandum.

c) Waters has no responsive information in his possession.

d) *See* Answer to Interrogatory No. 6(d).

**INTERROGATORY NO 8:** Please identify and state separately for each and every person whom you expect to call as a witness at the trial of this action the following:

a) the full name, residential address, business address and field of each such witness;

b) the subject matter on which each such witness is expected to testify;

c) the substance of the facts and opinions to which each such witness is expected to testify.

**ANSWER:**

a) (1)     John J. Waters, Jr.; Business Address:  15 South Fifth Street, Suite 900, Minneapolis, MN 55402; Waters will testify fact witness.

(2)     Gerard L. Cafesjian; Business Address: 15 South Fifth Street, Suite 900, Minneapolis, MN 55042; Cafesjian will testify as a fact witness.

(3)     Ross Vartian; Business Address:   1518 K. Street NW, Suite M, Washington D.C. 20005; Vartian will testify as a fact witness.

Additional witnesses may be identified in accord with the Court's scheduling order.

b) Waters, Cafesjian and Vartian will testify regarding the claims against defendants and defendants' counterclaim against AGM&M.

c) Each witness has personal knowledge of the facts at issue in this dispute.

**AS TO ANSWERS:**

_____

John J. Waters, Jr.

Subscribed and sworn before me
This ___ day of April, 2008

_____

Notary Public

**AS TO OBJECTIONS:**
Dated:  April 23, 2008

BRIGGS AND MORGAN, P.A.

By: _____
    Timothy R. Thornton (#109630)
    Molly M. Borg (#0331922)
    2200 IDS Center
    80 South Eighth Street
    Minneapolis, MN  55402-2157
    (612) 977-8400

AND

HOGAN AND HARSTON LLP

Ty Cobb (DC Bar No. 270736)
Peter C. Lallas (D.C. Bar No. 384062)
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Tel:  (202) 637-5600

ATTORNEYS FOR DEFENDANTS

Additional witnesses may be identified in accord with the Court's scheduling order.

b) Waters, Cafesjian and Vartian will testify regarding the claims against defendants and defendants' counterclaim against AGM&M.

c) Each witness has personal knowledge of the facts at issue in this dispute.

**AS TO ANSWERS:**

_____
John J. Waters, Jr.

Subscribed and sworn before me
This 24th day of April, 2008

_Becky L. Nelson_
Notary Public

> BECKY L. NELSON
> Notary Public
> Minnesota
> My Commission Expires January 31, 2010

**AS TO OBJECTIONS:**
Dated: April 23, 2008

**BRIGGS AND MORGAN, P.A.**

By:_____
    Timothy R. Thornton (#109630)
    Molly M. Borg (#0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2157
(612) 977-8400

**AND**

**HOGAN AND HARSTON LLP**

Ty Cobb (DC Bar No. 270736)
Peter C. Lallas (D.C. Bar No. 384062)
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Tel: (202) 637-5600

**ATTORNEYS FOR DEFENDANTS**

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerard L. Cafesjian and The Cafesjian
Family Foundation, Inc.,

Plaintiffs,

v.

Armenian Assembly of America, Inc.,

Defendant.

Civil File No. 07-2079 (JNE/JGG)

**PLAINTIFFS' MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANT'S MOTIONS TO
DISMISS**

## INTRODUCTION

Armenian Assembly of America, Inc.'s ("Assembly") multiple motions ignore the confines of Rule 12 and are replete with factual aspersions that go beyond the four corners of the complaint, as well as the bounds of candor. Many of the supposedly supporting proffers are demonstrably false and obviously intended to concoct a self-serving, anecdotal record.

Instead of relying on the pleadings, as required by Rule 12, the Assembly challenges Gerard L. Cafesjian and The Cafesjian Family Foundation, Inc.'s complaint with almost 50 pages of briefs and even more documentation attached to "evidentiary" affidavits. In an attempt to flee from litigation in this forum, the Assembly disavows contractual obligations and reaches beyond the pleadings to argue that the complaint is

legally deficient. Accepting the allegations[1] in the complaint as true, the Court must conclude that viable claims have been stated and that this is the appropriate forum for resolution of these claims.

As the complaint explains, in more amicable times the Assembly and Cafesjian engaged in a series of charitable transactions with the purpose of promoting Armenian causes and remembering the Armenian Genocide. When the Assembly and Cafesjian parted ways, the memorial project foundered.

To acquire the initial project site, Cafesjian had donated millions of dollars and loaned another one-half million. The promissory note the Assembly issued to memorialize the debt had a short term and a Minnesota forum selection clause. Cafesjian later committed to making other grants that would enable the Assembly to secure more property for the museum and memorial. These contributions were conditioned upon the making of a new Assembly note. Inexplicably, the replacement note was never issued, and the original loan was never repaid. This lawsuit seeks to redress the Assembly's contractual breach and to rescind the agreement that called for the new note.

Rather than owning up to contractual commitments, jurisdictional consents, and the moral obligations, with which a supposedly eleemosynary organization would be expected to abide, the Assembly raises a flurry of technical defenses intended to exploit Cafesjian generosity and to disavow Assembly duties. The spuriousness of this stratagem

---

[1]    If the Court converts the Assembly's Rule 12 motions to motions for summary judgment, plaintiffs request that the Court withhold the resolution of the motions pending discovery. *See* Rule 56(f) Affidavit of Timothy R. Thornton.

is exposed by the Assembly's inability or refusal to comply with Rule 12 procedures, which limit such challenges to the legal sufficiency of the pleadings. As filed, the Assembly's motion mocks the Rule 12 process and the local rule page limitations. The sharp tactics to which the Assembly resorts must be repudiated so that this action can proceed to the merits.

## BACKGROUND

### A.    The Parties

This dispute arises out of a contractual relationship between two non-profit corporations and the significant donations that were made in furtherance of those organizations' charitable purposes.

The Cafesjian Family Foundation, Inc. ("Foundation") is a non-profit corporation that was established to engage in, assist with, and contribute to charitable, religious, scientific, and educational activities and projects. (Waters Aff. ¶ 3.) The Foundation is particularly dedicated to the support and promotion of the Armenian community. (*Id.*) The Foundation's six-person board of directors is composed of Gerard Cafesjian, Cleo Cafesjian, Father Dennis Dease, Dennis Doyle, Megan Doyle, and John Waters. (*Id.* ¶ 4.)

Gerard and Cleo Cafesjian are residents of Florida but retain a home in Minnesota. (*Id.* ¶ 5.) Before retiring to Florida, the Cafesjians lived in Ramsey County where Gerard worked for West Publishing Company and the two raised their family. Dease is the president of the University of St. Thomas; the Doyles live in Minnesota. (*Id.*) John Waters is a long-time Minnesota resident. (*Id.* ¶ 2.)

Both Cafesjian and Waters conduct Foundation business in Minnesota. (*Id.* ¶¶ 1, 6.) The Foundation conducts substantial business operations in Minneapolis. (*Id.* ¶ 6.) Most Foundation correspondence is directed to its Minnesota office. (*Id.*) Approximately seven people, who reside in Minnesota, perform work on behalf of the Foundation in Minnesota. (*Id.* ¶ 7.)

The Assembly is a non-profit organization whose stated purpose is the strengthening of relations between the United States and Armenia and the promotion of Armenia's democratic development and economic prosperity. (*Id.* ¶ 10; *id.* Ex. A.) In furtherance of those purposes, the Assembly solicits donations and other charitable contributions from around the country and drums up support among national, state and local governments, organizations, and constituents. (*Id.* ¶ 10; *id.* Ex. A.)

**B.    Minnesota Contacts**

The conduct of Assembly business has significant Minnesota ramifications. Contributing members reside in almost every state including Minnesota. (*Id.* ¶ 11; *id.* Ex. A.) There are at least eight Minnesota Assembly Trustees and approximately 100 Minnesota affiliate members. (*Id.* ¶ 11.) New members are solicited through the Assembly's website – as well as by telephone, U.S. Mail and in person. (*Id.*) Many of these communications and others have gone to members who reside and do business in Minnesota. (*Id.*; *see also* Matossian Aff. ¶¶ 5-8.) Assembly activists include Foundation directors Gerard and Cleo Cafesjian and John Waters. (Waters Aff. ¶ 9, 12.) The Cafesjians are Assembly Life Trustees. (*Id.* ¶ 12.) The Foundation is a significant financial supporter of the Assembly. (*Id.* ¶ 13.) Gerard Cafesjian is a long time

Assembly officer and board member; John Waters, the Foundation's Secretary and Treasurer and Vice President, has also been on the Assembly board for years. (*Id.* ¶ 9; *see also id.* ¶ 1.)

The Assembly's lobbying arm – the Armenian American Action Committee ("ARAMAC") – encourages Armenian-Americans to influence Congressional representatives on legislation and policies. (*Id.* Ex. A at 12-14.) Through briefings, community forums, regional conferences and other means, the Assembly educates and empowers activists regarding key issues. (*Id.*) A paramount political initiative is the Armenian Caucus. (*Id.*) The Armenian Caucus enlists legislators who support a resolution affirming the Armenian Genocide and other pro-Armenian legislative agendas. (*Id.*) Through ARAMAC, the Assembly lobbies congressional representatives in every state. (*Id.*)

Two Minnesotans are Assembly advocacy state chairs. (Matossian Aff. ¶ 4.) These Assembly volunteers, Lou Ann Matossian and Aram Desteian, perform work for the Foundation. (Waters Aff. ¶¶ 7-8.) Both reside and work in Minnesota. (*Id.*; Matossian Aff. ¶ 2.) Matossian advances Assembly causes by organizing and attending meetings, soliciting members and participating in phone calls and other Assembly activities. (Matossian Aff. ¶¶ 6, 8.) All of these undertakings take place in Minnesota. (*Id.* ¶¶ 5, 7.) In fact, the bulk of Matossian and Desteian's work on behalf of the Assembly is conducted from the Foundation's Minnesota office. (*Id.*)

In addition to these continuous and significant Minnesota contacts, the Assembly has aggressively solicited support from Minnesota residents and has had extensive dealings with Foundation representatives in Minnesota:

- In 1997, Assembly Trustees Hirair Hovnanian and Robert Kaloosdian traveled to Minnesota to visit with Cafesjian and the Foundation. (Waters Aff. ¶ 15.) This meeting was convened to introduce the Armenian supporters to each other and their respective organizations and to discuss their visions for an Armenian museum and memorial. (*Id.*) The meeting was at Cafesjian's Minnesota home. (*Id.*)

- In 1998, Assembly staff visited Minnesota to meet with Minnesota activists. Assembly Congressional Relations director Bryan Ardouny came from Washington D.C. and met with the Foundation, participated in community forums and interacted with local constituents. (*Id.* Ex. B.)

- In 1998, Cafesjian and the Foundation began working with the Assembly to explore the development of an Armenian Genocide museum and memorial. The parties assessed locations, financing and other details. Communications between the Assembly in D.C. and Cafesjian and the Foundation in Minnesota were ongoing for years. (*Id.* ¶ 16.)

- Throughout 1999, Assembly staff exchanged various written and oral communications with Foundation directors who were in Minnesota to solicit donations for media advertising and endowment campaign support. (*Id.* ¶ 17.)

- In November 1999, Cafesjian and the Foundation pledged over $1 million to the Assembly in support of a $15 million capital campaign. The pledge was funded in three equal payments in 1999, 2000 and 2001; these undertakings were orchestrated from Minnesota. (*Id.* Ex. C; *id.* ¶ 18.)

- In August 2001, Assembly Grassroots Director Nancy Yerian Hiteshue traveled to Minnesota to meet with local activists, elected officials and Assembly staff. During her weeklong Minnesota visit, she conferred with Matossian and Waters as well as U.S. House of Representative members from Minnesota. (*Id.* Ex. D.)

- From 1999 through 2003, the Assembly worked with Cafesjian and the Foundation to secure Minnesota congressional delegation participation in the Armenian Caucus. (*Id.* ¶ 20; *id.* Exs. D, E, F, G.) Various written and oral communications supporting this effort were received and generated by

the Foundation and Cafesjian in Minnesota. (*Id.* ¶ 20.) The parties also continued memorial development efforts. (*Id.*)

- In August 2005, Assembly Grassroots Director Hiteshue came to Minnesota to meet with Minnesota lawmakers and other Assembly members to encourage and solicit legislative support. (*Id.* Ex. H.) The Assembly representatives also met with Matossian at the Foundation's offices. (*Id.*; *see also* Matossian Aff. ¶ 8.)

- On August 20, 2005, the Assembly held a Midwest Regional Issue Briefing and Advocacy Workshop at the St. Sahag Armenian Church in St. Paul. Assembly members from Minnesota and Washington D.C. attended. (*Id.* Ex. H.)

On top of these Minnesota contacts, the Assembly frequently corresponds with Cafesjian, Waters, and the Foundation's Minnesota office about donations and other events. (*See id.* ¶ 16.) These communications are conveyed to Minnesota by e-mail, fax, telephone, and other correspondence. (*Id.*)

## C.    **The Contracts**

After Cafesjian had been induced to become active in Assembly affairs, the Assembly and Cafesjian together with his Foundation (collectively, "CFF") collaborated to identify potential locations for an Armenian museum and memorial. (Compl. ¶ 9.) In January 2000, the Assembly advised CFF about a potential site. (Waters Aff. ¶ 19.) CFF provided the leadership and development team to secure the property. (*Id.*) Ultimately CFF agreed to contribute $3,500,000 and to loan an additional $500,000 so that the Assembly could acquire the property and close the deal. (Compl. Ex. B; *see also* Waters Aff. ¶ 19.)

This $500,000 loan was evidenced by a March 17, 2000 promissory note that was payable on May 1, 2000. The promissory note contains the following forum selection stipulation:

> AT THE OPTION OF THE PAYEE, THIS NOTE MAY BE ENFORCED IN ANY FEDERAL COURT OR MINNESOTA STATE COURT SITTING IN HENNEPIN COUNTY, MINNESOTA, AND THE MAKER CONSENTS TO THE JURISDICTION AND VENUE OF ANY SUCH COURT AND WAIVES ANY ARGUMENT THAT THE VENUE IN SUCH FORUMS IS NOT CONVENIENT. IF THE MAKER COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS NOTE, THE PAYEE AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE DESCRIBED, OR, IF SUCH TRANSFER CANNOT BE ACCOMPLISHED, UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.

(Compl. Ex. A (emphasis in original).) In addition to choosing this venue the promissory note is governed by Minnesota law. (*Id.*) The note has never been paid. (Compl. ¶¶ 11-15.)

After the real estate was acquired, plans for the museum progressed. (*See generally* Compl. Ex. B.) On November 1, 2003, CFF and the Assembly entered into the Grant Agreement. (*Id.*) Pursuant to that contract, CFF committed to make significant charitable contributions to the Assembly for the purpose of creating the Armenian

Genocide Museum and Memorial.[2]    (*Id.*)    The Grant Agreement conditions CFF's

donations on Assembly contractual compliance.  (*Id.*)  Section 5.4 specifies:

> 5.4.    Promissory Note.
>
> (A)    The Assembly <u>must</u> issue a new promissory note (the
> "Promissory Note") to replace the promissory note issued on
> March 17, 2000 by the Assembly in favor of the Foundation
> in the amount of $500,000.
>
> (B)    The new note <u>must</u> be interest free and mature on
> December 31, 2005.
>
> (C)    If the Promissory Note is still outstanding at the time
> the Transfer Agreement is executed, it must be transferred to
> AGM&M, Inc. as part of the transfer of the Assembly's
> assets.

(*Id.*. Ex. B § 5.4 (emphasis added).)

The Grant Agreement provides recourse in the event of Assembly non-

performance.  (*Id.* § 3.)  If the grant property is not developed by December 31, 2010,

CFF is entitled to terminate and at its "sole discretion" revert either the funds or property

granted pursuant to the agreement.  (*Id.* § 3.1.)  Further, "if the Assembly fails to satisfy

any of the conditions of this Agreement, [CFF] is released from any remaining obligation

under this Agreement to provide funds or property to the Assembly."  (*Id.* § 3.9.)  CFF's

obligations under the Grant Agreement are also conditioned on AGM&M's agreement to

---

[2]    The Armenian Genocide Museum and Memorial, Inc. ("AGM&M") is a non-
profit corporation that was incorporated on October 24, 2003.  AGM&M exists for the
singular purpose of establishing and developing a museum and memorial dedicated to the
Armenian Genocide.  (*See generally* Compl. Ex. B § 5.)

"assume and agree to comply with the obligations of the Assembly under this Agreement relating to the Memorial." (*Id.* § 5.3(C).)

CFF ultimately donated in excess of $14 million for the AGM&M project. (Compl. ¶ 12.) The Grant Agreement calls for the contributions at issue in this case to be made to the Assembly, not directly to AGM&M. (*See id.* Ex. B.)

After securing CFF's pledge, the Assembly executed the Transfer Agreement with AGM&M. (*See id.* Ex. B § 5.) That contract calls for the Assembly to transfer real property, pledges, cash and other assets acquired from CFF to AGM&M. (*Id.*) The Transfer Agreement provides that AGM&M shall "honor all of [CFF's] requirements at time of transfer." (*Id.* § 5.3(B).)

Neither Cafesjian nor the Foundation are parties to the Transfer Agreement or any other contract with AGM&M. Instead the Assembly conveyed CFF's Grant Agreement donations to AGM&M. (*See generally* Compl. Ex. B § 5.) The promissory note that the Assembly issued to CFF was supposed to transfer from the Assembly to AGM&M. (*Id.* § 5.4(C).) There is no evidence that the replacement note required by the Grant Agreement was ever issued, much less transferred. (*Id.* ¶¶ 13-14.)

## D.    This Litigation

As time passed CFF and the Assembly disagreed over the development of the AGM&M as well as the most effective means of championing Armenian causes. CFF and the Assembly tried to resolve their differences without success. The Assembly's continued refusal to acknowledge its contractual obligations forced CFF to pursue this

action. (*See generally* Compl. ¶¶ 11-15.)  The purpose and intent of the Grant Agreement having been hopelessly frustrated, CFF has no choice but to undo the transaction.

### ARGUMENT

## I.    JURISDICTION AND VENUE ARE PROPER

The Assembly disingenuously denies contacts with Minnesota and insists that venue is improper.   Assembly moving papers, however, fail to mention that the organization, in fact, consented to jurisdiction <u>and</u> venue, and waived any argument to the contrary.   Even without that stipulation, the Assembly has carried on repeated and documented contacts with CFF and Minnesota about which the moving papers are silent. The propriety of resolving this dispute in Minnesota is clear.

To defeat a lack of personal jurisdiction motion, the plaintiff need only to make a prima facia case.   That showing can be accomplished by affidavits, exhibits and other evidence.  *See Romak USA, Inc. v. Rich,* 384 F.3d 979, 983 (8th Cir. 2004).   The plaintiff enjoys the benefit of all doubts.   *Id.*   Factual conflicts must be resolved in favor of retaining jurisdiction.   *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 412 (Minn. 1992); *see also Hammann v. 1-800 Ideas.com, Inc.*, 455 F. Supp. 2d 942, 963-64 (D. Minn. 2006).

The Minnesota long-arm statute confers personal jurisdiction over non-resident defendants to the maximum extent permitted by due process.  *Marquette Nat'l Bank of Minneapolis v. Norris*, 270 N.W.2d 290, 294 (Minn. 1978); *Valspar Corp.*, 495 N.W.2d at 410-11 (if jurisdiction is proper under the federal constitution, "the requirements of the [Minnesota] long-arm statute will necessarily be met also").   The singular issue is

whether due process allows this Court to exercise jurisdiction over the Assembly. *See Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387-88 (8th Cir. 1995). If personal jurisdiction lies, then venue is proper. 28 U.S.C. § 1391; *see, e.g., Dakota Indus. Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1392 (8th Cir. 1991).

### A.    The Assembly Consented to Jurisdiction

A defendant can consent to personal jurisdiction regardless of forum contacts. *See Dominium Austin Partners, LLC v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001). "[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court." *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964); *see also Burger King v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) ("because the personal jurisdiction requirement is a waiveable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court" (internal quotations omitted)). "Consent is an independent traditional basis for personal jurisdiction and thus precludes any need to engage in such an analysis of a defendant's contacts with the forum." *ELA Med., Inc. v. Arrhythmia Mgmt. Assocs., Inc.*, No. 06-3580, 2007 WL 892517, *3 (D. Minn. Mar. 21, 2007) (Borg Aff. Ex. I).

"Due process is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause." *Dominium Austin Partners, LLC*, 248 F.3d at 726. Forum selection clauses are generally enforceable – unless the provision is invalid or enforcement would be unreasonable and unjust. *M/S*

*Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *see also Burger King*, 471 U.S. at 472, n.14.

The Assembly purposefully subjected itself to this Court's jurisdiction: "the maker <u>consents</u> to the jurisdiction and venue of [any federal court or Minnesota state court sitting in Hennepin County] and waives any argument to the contrary." (Compl. Ex. A. (emphasis added).)  The forum selection provision encompasses all disputes "<u>arising directly or indirectly</u> from the relationship created by" the promissory note. (*Id.* (emphasis added).)

The claims in this litigation unquestionably arise out of "the relationship created by" the promissory note – the complaint alleges that the Assembly failed to comply with the terms of the promissory note, failed to reissue a replacement promissory note and as a result denied CFF the benefit of the promissory note. (Compl. ¶¶ 10-24.)  Accordingly, this dispute falls squarely within the broad scope of the note's forum selection clause.

The distributorship agreement at issue in *Knutson v. Rexair, Inc.* bound the parties to a similarly broad forum selection provision. 749 F. Supp. 214, 217 (D. Minn. 1990). The clause applied to "[a]ny cause of action, claim, suit or demand by Plaintiff, allegedly arising from or related to the terms of this agreement <u>or the relationship of the parties</u>." *Id.* at 215-16.  The plaintiff subsequently sued under the Minnesota Franchise Act – not the distributor agreement.  The defendant responded by objecting to litigation of a non-contractual cause of action in Minnesota.  *Id.* at 216.  Judge Devitt concluded that the "plaintiff's claim arises directly from the parties' business relationship"; therefore the

broad forum selection clause governed. *Id.* at 217.[3] Jurisdictional consent was effected even though the plaintiff had not sought to enforce the agreement containing the forum selection provision. *See id.* The consent encompassed disputes arising out of the parties' relationship, not just disputes over the agreement: the litigation must therefore be venued as agreed. *See id.*

Like *Knutson*, CFF's claims arise "directly or indirectly" from the relationship created by the promissory note; accordingly, the broad forum selection clause controls. The heart of this dispute – namely, the Assembly's failure to issue a new promissory note to replace the March 17, 2000 note – manifestly arises directly or indirectly from the relationship created by the note.

Not even the Assembly challenges the validity of the forum selection stipulation: such clauses are presumptively valid. *See, e.g., M/S Bremen*, 407 U.S. at 9-10. And enforcement of the forum selection provision cannot be said to be unjust. "Since it may be assumed that parties consider the inconvenience of the forum at the time they enter a contract, it is incumbent on the party seeking to escape his contract to show that proceeding in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Dominium Austin Partners, LLC*, 248 F.3d at 727 (internal quotations omitted).

---

[3]     The forum selection clause in *Knutson* designated Michigan as the proper forum. 749 F. Supp. at 217. Since the plaintiff's claims fell within the broad scope of the forum selection clause, Michigan courts had proper jurisdiction. *Id.*

Not only did the Assembly consent to litigation in Minnesota, the Assembly's numerous and repeated contacts with this state justify the exercise of personal jurisdiction. While the attorneys, witnesses and evidence may have to travel, such factors are not sufficiently inconvenient to vitiate forum selection agreements. *See id.* The Assembly waived all personal jurisdiction and inconvenient venue objections. Accordingly, the resolution of this dispute must take place as specified by the promissory note.

**B.**      **The Assembly's more than sufficient contacts with Minnesota**

The Assembly could be haled into this Court even in the absence of consent. Due process allows jurisdiction to be exercised whenever a defendant has sufficient minimum contacts with the forum state so as not to offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "Sufficient contacts exist when the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Digi-Tel Holdings, Inc. v. Proteq Telecomms. Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Being haled in to the courts of a state must be reasonably anticipated when there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475. "[P]arties who reach beyond one state and create continuing relationships and obligations with citizens of another state are subject to

regulation and sanctions in the other State for the consequences of their activities." *Id.* at 473 (internal quotations omitted).

A five-factor test determines the reach of personal jurisdiction: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum; (3) the relation of the cause of action with these contacts;[4] (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties." *Digi-Tel Holdings, Inc.*, 89 F.3d at 522-23. The first three factors are the primary considerations and should be assessed together; the last two are secondary. *Id.* at 523.

The Assembly's contacts with Minnesota must be viewed "in the aggregate, not individually." *Northrup King Co.*, 51 F.3d at 1387-88. Contacts are sufficient to afford personal jurisdiction when there is a combination of a business relationship with a resident of the forum state, ongoing communications with the forum state and visits to the forum state. *Id.* at 1385-86 (foreign defendants' visits to Minnesota combined with extensive communications justified the exercise of personal jurisdiction); *Palucci v. William Morris Agency, Inc.*, 952 F. Supp. 1335, 1340 (D. Minn. 1997) (in the absence of visits, "numerous telephone calls, mailings and facsimiles" by Maryland defendant

---

[4]    This factor distinguishes whether jurisdiction is specific – arising from or related to the defendant's actions within the forum state – or general – referring to the power of the state to adjudicate any cause of action involving a particular defendant. *Digi-Tel Holdings, Inc.,* 89 F.3d at 522, n. 4. The Assembly's contacts with Minnesota have both general and specific personal jurisdiction implications. The Assembly generally does business in Minnesota, and the Assembly specifically dealt with the transactions that give rise to this litigation in Minnesota.

concerning biography of a Minnesota plaintiff justified the exercise of personal jurisdiction).

The aggregate of the Assembly's contacts with CFF and Minnesota fully satisfy the first three factors of the minimum contacts test. The Assembly solicits donations and recruits members in Minnesota. Assembly membership comprises numerous Minnesota residents – including Foundation principals and representatives. Minnesota citizens and lawmakers are actively encouraged to support Assembly causes. The Assembly organizes meetings, conferences, and other activities in Minnesota. The Assembly's two Minnesota state chairs do work for the Foundation and conduct activities on behalf of the Assembly from the Foundation's offices.

Assembly officials and board members have traveled to Minnesota and met with the Foundation on various occasions over the last ten years. The Assembly has repeatedly entreated the Foundation and Cafesjian for contributions through correspondence, email and telephone calls that were received in Minnesota. Cafesjian and the Foundation have worked closely with the Assembly to develop an Armenian memorial. The agreements and donations at issue in this litigation were in large part solicited, formulated and negotiated from Minnesota. These contacts are not fortuitous or attenuated; the Assembly's Minnesota dealings are purposeful, systematic, and continuous.

In *Pecoraro v. Sky Ranch for Boys, Inc.*, fewer and more insignificant contacts were sufficient to withstand an attack upon personal jurisdiction. 340 F.3d 558, 562 (8th Cir. 2003). The plaintiff, a Nebraska resident, was allegedly sexually abused while

attending a boys ranch in South Dakota. *Id.* The plaintiff sued the ranch and its funding foundation. *Id.* The foundation challenged the Nebraska federal court's assertion of personal jurisdiction. *Id.* The court concluded that the two fundraising events conducted in Nebraska around the time the cause of action arose coupled with ongoing minimal fundraising activity – a mere 31 requests for contributions from Nebraska residents over a two year period – were "of such a nature, quality, and quantity as to constitute sufficient minimum contacts under the Due Process Clause." *Id.*

Assembly contacts are considerably more frequent and substantial than the activities found to be sufficient in *Pecoraro*. The Assembly's fundraising efforts are repeatedly targeted within Minnesota, and through local volunteers the Assembly continuously conducts operations and promotes Assembly causes in Minnesota.

Importantly, the Assembly and CFF are connected by these systematic contacts. In fact, unlike in *Pecoraco*, the very interaction between the parties that gives rise to this litigation largely took place in Minnesota. Simply put the abuse, for which redress is sought in this case, did not occur in Washington D.C. Further the Assembly's consent to jurisdiction in this forum precludes the argument that litigation in Minnesota could be a surprise or unjust. Jurisdiction over the Assembly comports with due process.

The remaining minimum contacts factors support that conclusion. Minnesota has a strong interest in enforcing contracts as written by the parties: the note expressly contemplated a Minnesota forum. *See, e.g., Airtel Wireless, LLC v. Montana Elecs. Co.,* 393 F. Supp. 2d 777, 784-85 (D. Minn. 2005) ("Minnesota courts routinely enforce [forum selection] clauses and [] there is no public policy in Minnesota that contravenes

the enforcement of such a clause"). The convenience of the parties also favors this forum: the Foundation has an office in Minnesota; its directors and functionaries reside in Minnesota; and these representatives have specific knowledge of the Assembly's activities and operations in Minnesota.

Assembly protests about inconvenience cannot carry the day. *Dominium Austin Partners, LLC*, 248 F.3d at 727 (no inconvenience even if witnesses and attorneys have to travel); *Airtel Wireless, LLC,* 393 F. Supp. 2d at 785 (defendants cannot complain about inconvenience of forum in which they freely agreed to litigate). In any event, "because modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activities, it usually will not be unfair to subject him to the burdens of litigation in another forum for disputes relating to such activity." *Burger King*, 471 U.S. at 474 (internal quotations omitted). The Assembly frequently travels to Minnesota to promote its agenda and to importune for donations. These ventures are not oppressively inconvenient for the Assembly; litigating here would be no more so. The exercise of personal jurisdiction over the Assembly fully complies with the requirements of due process.

### C.    Venue is Proper

The Assembly insists that dismissal is required pursuant to Rule 12(b)(3) because venue is improper under 28 U.S.C. § 1391. This argument discounts the presumptive weight that must be afforded to the plaintiff's forum choice. *See*, *e.g.*, *Reid-Walen v. Hansen*, 933 F.2d 1390, 1396 (8th Cir. 1991); *United Mortgage Corp. v. Plaza Mortgage Corp.*, 853 F. Supp. 311, 315 (D. Minn. 1994). The Assembly consented to this forum

and waived any right to challenge venue. (Compl. Ex. A); s*ee ELA Med., Inc.* 2007 WL 892517 at *5. When the parties "have contractually agreed to a particular venue, Section 1391 is irrelevant." *ELA Med., Inc.*, 2007 WL 892517 at *5 (concluding venue was proper); *see also Lyon Fin. Serv. Inc. v. Nowobilska Med. Ctr., Ltd.,* No. 05-1820, 2005 WL 3526682, *7 (D. Minn. Dec. 22, 2005) (venue governed by forum selection clause) (Borg Aff. Ex. J).

Besides that since the Court has personal jurisdiction over the Assembly, venue is proper pursuant to 28 U.S.C. § 1391. *See Dakota Indus. Inc.,* 946 F.2d at 1392; *Raymedica, Inc. v. Stoy*, No. 01-1841, 2002 WL 31185916, * 6 (D. Minn. Sept. 30, 2002) (because plaintiff made prima facie showing of jurisdiction, venue in Minnesota was proper) (Borg Aff. Ex. K). The Assembly's improper venue motion is dead on arrival.

## II.    NO STATUTE OF LIMITATIONS BAR

Without discovery or any vetting of evidence, the Assembly pronounces CFF's claims to be time-barred. "Because statute of limitations issues often depend on contested questions of fact . . . the court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Potts v. Howard Univ.*, 240 F.R.D. 14, 17 (D.D.C. 2007); *see also Varner v. Peterson Farms*, 371 F.3d 1011, 1016 (8th Cir. 2004). A statute of limitations Rule 12 motion request can be countenanced only if the complaint, on its face, is time-barred. *Potts*, 240 F.R.D. at 17; *Varner*, 371 F.3d at 1016. If a reasonable person could disagree about the date on which the cause of action accrued, dismissal is not warranted. *See Potts*, 240 F.R.D. at 17.

"General principles of contract law dictate that a plaintiff's right of action normally accrues when the contract is first breached." *Nat'l R.R. Passenger Corp. v. Lexington Ins. Co.*, 357 F. Supp. 2d 287, 293 (D.D.C. 2005).[5] "A party is not in breach of a contract until its performance is due." *Id.* When a contract is silent regarding the time for performance, performance does not become due until a reasonable time has passed. *See R.A. Weaver and Assoc., Inc. v. Haas and Haynie Corp.*, 663 F.2d 168, 175-76, n.57 (D.C. Cir. 1980) (rule of reasonableness controls when time for contractual performance is not specified).

The conduct that constitutes cause-of-action accrual is a question of law, but the actual date on which cause-of-action accrual occurred is a question of fact. *See Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 770-71 (D.C. 1998). In this case, reasonable minds could readily disagree about the due date for performance under the Grant Agreement.

The Assembly contends that any claim for breach must have accrued on November 1, 2003 because the Assembly was obligated to issue a replacement promissory note, "if ever," prior to the execution of the Transfer Agreement. Assembly Br. at 17. In fact, however, the Grant Agreement simply provides that "The Assembly must issue a new promissory note to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000." (Compl. Ex. B § 5.4(A).) The Grant Agreement does not require the replacement note to be

---

[5]     The Grant Agreement is governed by D.C. law.

issued by a date certain; rather the Assembly merely promised to issue a replacement promissory note to CFF that would be due and payable on December 31, 2005.

Since the Assembly could have waited until the end of 2005 to issue a replacement note, CFF's cause of action could not have accrued until December 31, 2005 – when the Assembly failed to perform by the only date designated in § 5.4(B) of the contract. *See Phelps v. Herro*, 137 A.2d 159, 163 (Md. 1957) ("if the action had been brought after the neglect or refusal to give the note, but before its maturity date, the cause of action would not then have accrued and the suit would have been prematurely brought"); *see also Werber v. Atkinson*, 84 A.2d 111 (D.C. 1951) (unless the party seeking relief has been damaged, any action is premature).

The course of conduct between the contracting parties confirms that the time for performance could not have been in November 2003. The Assembly declined to make a replacement note at the time of Transfer Agreement implementation; CFF voiced no objection to the new note not being issued in November 2003.

Further CFF could suffer no damages until after the replacement promissory note's maturity date. Interest was not being charged, so at any time before December 31, 2005, the Assembly could have lived up to the bargain without injury to CFF by simply issuing a replacement note. Hence, the soonest that CFF could have been harmed and the Assembly could have breached was December 31, 2005. This lawsuit was started on

April 27, 2007 – well within the three year statute of limitations. The allegations of the complaint establish that the statute of limitations does not foreclose this lawsuit.[6]

## III.    CFF DID NOT AGREE TO ARBITRATE

The Assembly rationalizes that since the Transfer Agreement obligates the Assembly and AGM&M to arbitrate, CFF and the Assembly must likewise arbitrate this dispute. This contention defies the unambiguous language of the promissory note and Grant Agreement as well as the clear mandate of the United States Supreme Court.

"Ordinarily, arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Air Line Pilots Assoc. v. Miller*, 523 U.S. 866, 876 (1998). "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995); *see also DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 28 (D.D.C. 2002); *Nitro Distrib., Inc. v. Alticor, Inc.*, 453 F.3d 995, 999 (8th Cir. 2006). Importantly, "arbitration is a matter of consent, not of coercion." *Keymer v. Mgmt. Recruiters, Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999).

---

[6]    The Assembly alternatively argues that any claim for breach of the promissory note is also time-barred. The Assembly contends that the promissory note was due and payable on May 1, 2000 requiring any claim to have been brought by May 1, 2006. The Grant Agreement, however, calls for the note's maturity date to be extended until December 31, 2005 – all replacement promissory note terms (including the forum selection provision) would have remained the same. Thus any claim for breach of the replacement promissory note is within the six year statute of limitations prescribed by Minnesota law. At the very least CFF was denied receipt of a promissory note for which recourse could have been sought until 2011.

CFF never agreed to arbitrate anything with the Assembly. Neither the promissory note nor the Grant Agreement contain any reference to alternative dispute resolution. In fact, the promissory note specifies that Minnesota law governs and that Minnesota courts shall resolve disputes; the Grant Agreement only provides that District of Columbia law governs. (Compl. Ex. B § 7.2.) The Grant Agreement is silent about venue and arbitration is never mentioned. Hence, the unambiguous terms of the contracts do not evidence an agreement to arbitrate disputes between the Assembly and CFF.

Ignoring the law and the language of the agreements, the Assembly contends that the Transfer Agreement somehow subjects CFF to arbitration. Unlike the Grant Agreement, the Transfer Agreement – to which AGM&M and the Assembly are the only signatories – mandates that D.C. law applies and that the parties shall submit "[a]ny disputes arising under" that contract to binding arbitration. (Rosenfeld Aff. Ex. 4 §§ 5.2; 5.3.) This lawsuit pertains solely to the Assembly's obligations to CFF pursuant to the promissory note and the Grant Agreement. The Transfer Agreement is not implicated by the complaint. In fact, CFF could not invoke the Transfer Agreement. In their transfer transaction the Assembly and AGM&M agreed that the "rights and obligations of the parties hereunder are personal to [the Assembly] and AGM&M, Inc. and are not assignable or transferable to any other person, firm or corporation without the consent of the other party." (*Id.* § 5.4.) Thus the Transfer Agreement prohibits the transfer of arbitration rights or obligations to CFF. Since CFF never agreed to arbitrate, requiring arbitration would be a matter of coercion not consent. *Keymer*, 169 F.3d at 504.

CFF as a non-signatory to the Transfer Agreement cannot be compelled to arbitrate. Generally, entities who are not parties to an arbitration agreement are not obligated to arbitrate. *DSMC, Inc.*, 273 F. Supp. 2d at 28. Again defying well established authority, the Assembly suggests that since the Grant Agreement mentions the Transfer Agreement, the Transfer Agreement is some how "incorporated by reference" so as to bind CFF to arbitration. But a contract's "mere mentioning" of another agreement does not constitute incorporation by reference. *See Jenisio v. Ozark Airlines, Inc. Retirement Plan for Agent & Clerical Employees*, 187 F.3d 970, 973 (8th Cir. 1999) (the "mere mentioning of the pension plan in the CBA does not constitute incorporation by reference"); *Air Line Pilots Assoc., Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 94 (D.C. Cir. 1988) ("An explicit incorporation by reference is a far cry from the 'mere mentioning'" of the contract).

While the Grant Agreement mentions the Transfer Agreement, nothing in the former incorporates the latter by reference. More importantly, the Grant Agreement provides for the application of D.C. law, but the contract is conspicuously silent regarding arbitration. This drafting difference reveals that when arbitration was the desired means for resolving disputes, the Assembly knew how to contract for that result. The failure of the Grant Agreement to provide for arbitration ends the debate over dispute resolution procedures.

Since CFF never agreed to arbitrate, imposing such an obligation would have serious constitutional ramifications. The Seventh Amendment guarantees CFF's right to a trial by jury. Yet lacking any indication of waiver, the Assembly would deny CFF that

fundamental right and require CFF to forego trial by jury in the forum to which the Assembly consented. Such an artifice cannot be indulged.

## IV.    AGM&M IS NOT A NECESSARY OR INDISPENSABLE PARTY

The Assembly unilaterally ordains AGM&M to be a necessary and indispensable party requiring dismissal of the entire action for CFF's failure to join. The Assembly – not AGM&M – asserts that complete relief cannot be afforded in AGM&M's absence and that without AGM&M's joinder, the Assembly would be subject to multiple or inconsistent obligations to CFF and AGM&M. These contentions are belied by the unambiguous terms of the Grant Agreement.

### A.    AGM&M is not a necessary party

Rule 19(a) provides that a party is "necessary" to a suit if (1) in the person's absence complete relief cannot be afforded; or (2) a person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in the person's absence may (a) impede or impair the person's ability to protect that interest or (b) leave the persons already parties subject to substantial risk of incurring double, multiple, or otherwise inconsistent judgments. Fed. R. Civ. P. 19(a); *Mille Lacs Band of Chippewa Indians v. State of Minnesota*, 853 F. Supp. 1118 (D. Minn. 1994). Rule 19(a) focuses on the "relief between the parties and not on the speculative possibility of further litigation between a party and an absent person." *LLC Corp. v. Pension Benefit Guar. Corp.*, 703 F.2d 301, 305 (8th Cir. 1983).

CFF's claims are solely premised on the express contractual obligations between CFF and the Assembly. AGM&M is not a party to the promissory note or the Grant

Agreement: CFF's contractual causes of action only lie against the Assembly. Lacking a contractual relationship with AGM&M, CFF can make no contractual claim against AGM&M. In particular, the count seeking to collect CFF's $500,000 loan to the Assembly does not implicate AGM&M.

A note is a note. The only note maker was the Assembly, and no negotiable instrument reflecting a $500,000 debt to CFF was ever physically transferred from the Assembly to AGM&M. Further, CFF never consented to AGM&M's substitution as the maker of the apparently non-existent note so as to discharge Assembly debt obligations.

Besides that, the Grant Agreement subjects the Assembly to various conditions and covenants and delineates the redress available to CFF in the event of Assembly default. The Grant Agreement provides that if the museum and memorial is not developed prior to December 31, 2010, then the Grant Agreement terminates – in which event at CFF's "sole discretion," the donated funds or real estate shall revert. (Compl. Ex. B § 3.1.) The contract goes on to state that "if the Assembly fails to satisfy any of the conditions of this Agreement, [CFF] is released from any remaining obligation under this agreement to provide funds or property to the Assembly." (*Id.* § 3.9.)

The Grant Agreement neither affords CFF any cause of action against AGM&M nor conditions CFF's recourse against the Assembly on the protection of rights that AGM&M might have attained. Importantly, AGM&M's interests are not impaired by its absence from this litigation; AGM&M's rights vis-à-vis the Assembly are defined by the Transfer Agreement. AGM&M's rights against the Assembly are derivative of the Assembly's obligations to CFF. The relationships are so closely aligned that there is no

reason to believe that the Assembly would not adequately represent the mutual interests of both entities. *See Rochester Methodist Hosp. v. Travelers Ins. Co.,* 728 F.2d 1006, 1016 (8th Cir. 1984) (absent party's ability to protect its interest was not impaired in a medicare dispute between hospital and insurance company because absent party's interest paralleled hospital's interest).

If CFF recovers damages, the Assembly can pay the monies owed and thereafter invoke arbitration with AGM&M to sort out respective obligations. If rescission of the Grant Agreement is ordered, the Assembly could only return those properties over which it has control. Depending on the ultimate outcome a damages award representing rescission or an order for the Assembly to seek return of the grant properties from AGM&M – through arbitration if necessary – could be appropriate. Alternatively the Assembly may exercise sufficient control over AGM&M to effect a cooperative return of the properties that are already subject to CFF's reversionary rights. This litigation, the Trustees failure to approve a museum and memorial plan, and the Assembly's lack of meaningful support for the project make it highly unlikely that the museum and memorial will be developed by 2010 when the Foundation's reversionary rights are realized. Thus there is no reason for AGM&M to continue to hold the properties and incur carrying costs.

All of this, however, awaits the litigation of this dispute on the merits. In sum, AGM&M is not a necessary party to this lawsuit.[7] *Id.* (if party is not necessary, then inquiry under Rule 19 "is at an end").

## B.    AGM&M is not an indispensable party

Even if AGM&M were a necessary party, AGM&M is not indispensable under Rule 19(b). The court must determine, in good conscience and equity, whether AGM&M is an indispensable party and should consider whether (1) AGM&M would be prejudiced as an absent party; (2) the court can afford protective provisions in the judgment to lessen any prejudice to AGM&M; (3) a sufficient remedy can be awarded to CFF; and (4) CFF

---

[7]    Regardless, AGM&M is subject to the jurisdiction of this Court and if necessary, could be joined. AGM&M consented to this Court's jurisdiction. Under the Transfer Agreement AGM&M agreed to "honor all of [CFF's] requirements existing at the time of transfer" and to comply with Assembly's obligations under the Grant Agreement. (Compl. Ex. B § 5.3.) AGM&M thus agreed to promissory note terms that mandate litigation in this forum. AGM&M also has sufficient minimum contacts with Minnesota to warrant the exercise of personal jurisdiction. AGM&M's operations are controlled by the Board of Trustees. John Waters is the CFF-appointed AGM&M Trustee. (Waters Aff. ¶ 21.) Waters controls half of the Trustee votes and resides and does business in Minnesota. (*Id.* ¶¶ 2, 21.) From Minnesota, he participates in meetings, telephone calls, and other activities on AGM&M's behalf. (*Id.* ¶ 21.) He also performs most of his AGM&M Trustee activities in Minnesota. (*Id.*) Cafesjian is the former chairman of AGM&M and Waters was the Secretary and Treasurer of AGM&M. (*Id.* ¶ 22.) Waters and Cafesjian performed their AGM&M officer duties in Minnesota. (*Id.*) Waters participated in meetings, executed documents, and performed other AGM&M obligations while in Minnesota. (*Id.*) These facts, in the aggregate, demonstrate that AGM&M transacts business in Minnesota sufficient to confer personal jurisdiction over AGM&M. *See Digi-Tel Holdings, Inc.*, 89 F.3d at 522-23; *see also Garber v. Jack's Corn Crib,* No. 4-86-740, 1988 WL 74280, 7 (D. Minn. July 18, 1988) (an individual's actions performed as corporate officer may be used to subject the corporation to jurisdiction). (Borg Aff. Ex. L.)

would have an adequate remedy if the action is dismissed for failure to join an indispensable party. Fed. R. Civ. P. 19(b).

The *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.* court concluded that a party is not "indispensable" simply because that party's rights under a separate contract may be affected by pending litigation. 564 F.2d 816, 820 (8th Cir. 1977). A jeweler had executed a written lease that prohibited the shopping center from renting space to another jewelry store. *Id.* at 817. The landlord subsequently entered into a lease with another jewelry store; the original tenant sued. *Id.*

The court rejected the argument that the new jeweler was an indispensable party, explaining that even if the new leasehold was terminated as a result of the lawsuit, the new tenant nevertheless retained "all of its rights under its Lease Agreement" with the landlord. *Id.* at 819. Also inconsistent judgments could not be attributed to the new tenant's absence from the proceedings, but rather to the shopping center's voluntary execution of two conflicting lease agreements. *Id.*

Finally, the court was influenced by the district court's decision to "afford[] [the new tenant] an opportunity to intervene in order to protect any interest it might have in the outcome of the litigation," and the new tenant's choice "not to do so." *Id.* As a result, the competing jeweler was not an indispensable party.

For the same reasons AGM&M is not an indispensable party. AGM&M would not be prejudiced by its absence in this litigation – AGM&M retains all its rights against the Assembly under the Transfer Agreement. The risk of inconsistent judgments is not

attributable to AGM&M's absence from the litigation, but rather from the Assembly's dual obligations pursuant to the Grant Agreement and the Transfer Agreement.

Importantly CFF cannot obtain sufficient relief if this action is dismissed. CFF's contractual claims lie against the Assembly; any dispute resolution that might be necessary for the Assembly to honor its contractual obligations would be between the Assembly and AGM&M – which they have expressly agreed to arbitrate. CFF is not a party to the Transfer Agreement and must rely upon the Assembly to take whatever action regarding the real estate that would be required to satisfy any relief that might be awarded.

Finally, any concern that AGM&M may have about the outcome of this litigation can be alleviated by intervention. CFF would not object to a validly authorized joinder of AGM&M in this litigation. Under the circumstances, AGM&M is not an indispensable party, and the Assembly can not use AGM&M's orchestrated absence from these proceedings to avoid accountability.

## V.    THE COMPLAINT STATES A COGNIZABLE CLAIM

As a catch-all argument the Assembly proclaims that the complaint fails to state a claim upon which relief can be granted. According to the Assembly, the Grant Agreement can only be construed one of two ways, and under either interpretation, CFF's claims fail as a matter of law. The Assembly goes on to argue that any purported Assembly breach is not "material," and thus CFF is not entitled to relief. Finally, the Assembly propounds that the remedy of rescission is unjustified. These specious contentions alone demonstrate the sufficiency of CFF's claims.

A complaint need only state factual allegations that "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, – U.S. –, 127 S.Ct. 1955, 1964-65 (2007). A Rule 12(b)(6) motion to dismiss does not test whether the plaintiff will ultimately prevail on the merits, but only whether the complaint properly states a claim. *See* Fed. R. Civ. P. 12(b)(6). In deciding such a motion, the court must accept all of the factual allegations as true and draw all reasonable inferences in the non-movant's favor. *See Turner v. Holbrook,* 278 F.3d 754, 757 (8th Cir. 2002). A breach of contract claim need only allege that a contract existed, that plaintiff performed, that defendant breached the agreement, and that plaintiff suffered damages as a result of the breach. *See SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1180 (D. Minn. 2003) (discussing sufficiency of allegations in breach of contract action).

The complaint unquestionably asserts all of the requisite elements:  CFF and the Assembly entered into contracts (Compl. ¶¶7, 9, 16); CFF loaned the money and made the donations pursuant to those agreements (*id.* ¶ 12); the Assembly neither issued a replacement note nor repaid the original debt (*id.* ¶¶ 17-18); and CFF was damaged by the Assembly's non-performance (*id.* ¶¶ 18-20). *SL Montevideo Tech. Inc.,* 292 F. Supp. 2d at 1180. Tellingly, the Assembly does not challenge whether CFF's claims as pled are recognized by law – which is the purpose of a Rule 12(b)(6) motion. *Id.* Rather, the Assembly questions whether CFF's claims have sufficient evidentiary support – such "inquiry is for another day" and not appropriate for Rule 12(b)(6) treatment. *See*, *e.g.*, *MedCam, Inc. v. JDS Uniphase Corp.*, No. 06-1509, 2006 WL 2095434, *3 (D. Minn.

July 27, 2006) (denying Rule 12 motion when challenge was premised on sufficiency of evidence) (Borg Aff. Ex. M).

When litigation is at an early stage – as in this case – a "plaintiff should have the opportunity to develop their breach of contract claims." *See Pratika Design & Projectos LTDA v. Marvin Lumber & Cedar Co.*, No. 06-957, 2007 WL 1582710, *2 (D. Minn. May 30, 2007) (Borg Aff. Ex. N). Dismissal now would be premature. *See id.* The face of the complaint demonstrates that CFF has stated valid claims for relief. Nothing more is required. *Bramlet v. Wilson*, 495 F.2d 714, 716 (8th Cir. 1974) ("The question, therefore, is whether in the light most favorable to the plaintiff, the complaint states any valid claim for relief.").

The Assembly's argument about its admitted Grant Agreement breach not being material is fatuous. On one hand, the Assembly contends that it has fully complied with its contractual obligations, and on the other the Assembly insists that any failure to issue a replacement promissory note is not a material breach. This duplicitous argument by itself establishes a fact question. And how can the non-payment of one-half million dollars not be material? The Assembly apparently has as little regard for this amount of money as it does for contractual commitments. But in return for the Assembly's promise to issue a new note, CFF made real estate donations of over $14 million.

The Grant Agreement specifies that CFF's obligation to make these contributions is "subject" to various conditions – one of those express conditions was the Assembly's issuance of a replacement promissory note with a maturity date of December 31, 2005. (*See* Compl. Ex. B § 5.4.) Whether the Assembly's failure to issue a replacement note

constitutes a material breach of the Grant Agreement exceeds the scope of a Rule 12(b)(6) inquiry. "Whether a particular breach of a contract is material is a classic issue of fact." *3511 13th Street Tenants' Ass'n v. 3511 13th Street, N.W. Residences, LLC*, 922 A.2d 439 (D.C. 2007); *see also America v. Preston*, 468 F. Supp. 2d 118, 125 (D.D.C. 2006) (materiality of breach is for the jury to determine). If the Assembly is correct about the original note being time barred, then the failure to issue a new note by December 31, 2005 prejudiced CFF to the tune of $500,000. The argument that such an injury would not be material cannot be taken seriously.

Going beyond the four corners of the complaint, the Assembly references tax returns and financial statements purportedly showing a transfer of the $500,000 obligation from the Assembly to AGM&M. But the Grant Agreement did not call for a book entry or some other means of debt acknowledgment. Instead, the Assembly promised to issue a "new note" with a December 31, 2005 maturity date. (Compl. Ex. B § 5.4(B).)

The Uniform Commercial Code defines promissory notes. *See* Minn. Stat. § 336.3-104. The definition is specific, and the form that a negotiable instrument must take is well established. *See id.* A document containing certain terms and capable of being physically negotiated is required. *See id.* § 336.3-201 et seq. A debt acknowledgement is not a note. *Id.*; *id.* § 336.3-104. Yet a note is what the Grant Agreement called for.

Creating a book entry or reflecting an obligation on a tax return does not equate with the making of a promissory note. For all the paper the Assembly has inappropriately

dumped into these motions, which the Rule restricts to the pleadings, a promissory note with a December 31, 2005 maturity date is no place to be found. If the Assembly performed Grant Agreement obligations, then where is the note? And if the note was transferred to AGM&M, as the Assembly contends, then where is the paperwork conveying the note to AGM&M and what happened to the physical instrument? Without evidence of a note complying with Minn. Stat § 336.3-104, the Assembly's breach of the Grant Agreement cannot be gainsaid.

Finally, the Assembly argues that the complaint must be dismissed because Grant Agreement rescission would be inappropriate. At this stage of the proceedings, a plaintiff may set forth alternative claims for relief, and the court should not, on a motion to dismiss, conclude that the various remedies are unavailable. Fed. R. Civ. P. 8(e); *Klayman v. Judicial Watch, Inc.,* No. 06-670, 2007 WL 140978, *15 (D.D.C. Jan. 17, 2007) *vacated in part on other grounds on reconsideration* 2007 WL 1034936 (D.D.C. Apr. 3, 2007) (Borg Aff. Ex. O). "The Court is bound to credit [CFF's] allegations on a motion to dismiss" and even if the equitable remedy of rescission may prove unnecessary, such a determination is not appropriate on a Rule 12 motion. *Id.* CFF's complaint survives the Assembly's 12(b)(6) challenge.

## VI.   THE ASSEMBLY'S UNSEEMLY PROCEDURAL TACTICS

The Assembly has engaged in blatant "motion splitting." Local Rule 7.1(c) limits each party to 12,000 words of motion practice. D. Minn. L.R. 7.1(c); *Carlson Mktg. Group, Inc. v. Royal Indemnity Co.*, No. 04-CV-3368, 2006 WL 2917173, *1 (D. Minn. Oct. 11, 2006) (Borg Aff. Ex. P). In lieu of one Rule 12 motion, the Assembly patently

violated the spirit of this local mandate. *Carlson Mktg. Group, Inc*., 2006 WL 2917173 at *1 (the court "will not accept [this] kind of 'motion splitting" that contravenes "the spirit" of L.R. 7.1). The Assembly's dual motions contain a combined total of 11,879 words – leaving a nominal 121 words for reply. Rather than succinctly stating the argument or foregoing any meaningful reply, the Assembly unilaterally bent the rules and filed two Rule 12 motions. The Assembly's east coast lawyers undoubtedly expect to double up on reply.

As a general rule, a party may not divide objections or claims into several motions when relief can be granted upon one. *Carlson Mktg. Group, Inc.*, 2006 WL 2917173 at *2; 56 Am. Jur. 2D Motions, Rules and Orders § 9 (2007); *see also* "Magistrate Judge Jeanne J. Graham, Practice Points and Preferences" ("Magistrate Judge Graham strongly discourages the use of procedural devices, such as filing a motion for each count of a complaint, in order to gain additional briefing space.") (Borg Aff. Ex. Q). A Rule 12 motion – particularly on a two count complaint – is not so complex of an undertaking as to require multiple motion practice. This Court is more than capable of addressing a litigant's motion to dismiss in a single memorandum. The local rules are "the lawyer's compass" and "are not to be considered as mere guides or Heloise's helpful hints to the practice of law, but rather precise rubrics that are to be read and followed." *Wichard v. Specialty Rest. Corp*., 220 F.R.D. 439, 442 (D. Md. 2004) (citations omitted).

This District does not recognize motions to strike memorandums and affidavits. *See Carlson Mktg., Inc.*, 2006 WL 2917173 at *2. Accordingly the Assembly's reply brief must be limited to 121 words. *See, e.g., Minnesota Towers, Inc. v. City of Duluth*,

No. 04-5068, 2005 WL 1593044, *6 n.1 (D. Minn. July 1, 2005) (failure to comply with Local Rules constitutes sanctionable conduct) (Borg Aff. Ex. R); *Welker Bearing Co., v. PHD, Inc.*, No. 06-13345, 2007 WL 1647878, *1 (E.D. Mich. June 4, 2007) (striking plaintiff's dual summary judgment motions and instructing plaintiff to refile as one consolidated motion within the prescribed page limits so that court could avoid prospect of duplicative sets of response and reply briefs) (Borg Aff. Ex. S); *Liberti v. Walt Disney World, Co.*, 912 F. Supp. 1494, 1500 (M.D. Fla. 1995) (admonishing defendant for filing more than one motion to circumvent the page limit requirements).

Blatant violations of local directives cannot be tolerated. If Boston lawyers deign to practice before this Court, they must comply with the Local Rules and refrain from double barrel motion gamesmanship.

## CONCLUSION

The Assembly has pulled every imaginable procedural trick to elude contractual accountability and this forum – but the Assembly's shotgun arguments defy the boundaries of Rule 12 by reaching outside the pleadings and attempting to concoct a factual record brimming with misleading and self-serving evidence. The complaint passes Rule 12 muster. The Assembly's motions must be denied.

Dated:  August 3, 2007                **BRIGGS AND MORGAN, P.A.**


By:   s/Timothy R. Thornton
    Timothy R. Thornton (#109630)
    Molly M. Borg (#0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS
GERARD L. CAFESJIAN AND THE
CAFESJIAN FAMILY FOUNDATION**

# EXHIBIT 9

(

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Gerard L. Cafesjian, et al.,                                    Civil No. 07-cv-2079 (JNE/JJG)

        Plaintiffs,

                                  **REPORT**
                                   **AND**
v.                                                             **RECOMMENDATION**

Armenian Assembly of America, Inc.,

        Defendant.

       This is a breach of contract case brought by a benefactor seeking the return of his donations. It is before the Court on the Defendant's Motions to Dismiss based on: 1) lack of personal jurisdiction (Fed. R. Civ. P. 12(b)(2)); 2) improper venue (Rule 12(b)(3)); 3) failure to state a claim (Rule 12(b)(6)); and 4) failure to join a party under Rule 19 (Rule 12(b)(7)).[1]  It was referred to this Court pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.  *See* Docket No. 17.  For the reasons set forth below, the Court recommends dismissal of this matter without prejudice for nonjoinder pursuant to Fed. R. Civ. P. 12(b)(7).

**I.    BACKGROUND**

      **A.    The Parties**

       Plaintiff Gerard L. Cafesjian ("Cafesjian") is a World War II veteran, former Minnesota resident, and retired West Publishing executive. Cafesjian now lives in Naples, Florida, and maintains a home in Minnesota. *See Complaint*, ¶ 1; *Affidavit of John J. Waters, Jr.*, ¶ 5.

       Cafesjian is a significant contributor to Armenian causes. In 1996, he established the Cafesjian

---

      [1]Defendant brought two motions. Its first motion (Doc. No. 11) is based on its failure to state a claim (12(b)(6)) and failure to join (12(b)(7)) arguments. The second motion (Doc. No. 14) is based on its personal jurisdiction (12(b)(2)) and venue (12(b)(3)) arguments.

Family Foundation ("CFF"), also a Plaintiff in this action. *See Waters Aff.*, ¶ 3. The CFF is a Florida non-profit with its principal place of business in Naples, Florida. *Complaint*, ¶ 2. The CFF also has an office in Minneapolis, Minnesota. *Affidavit of Lou Ann Mattosian,* ¶ 1. The CFF is dedicated to the advancement of Armenian causes. *Waters Aff.*, ¶¶ 3, 10.

Defendant Armenian Assembly of America, Inc. (the "Assembly") is a District of Columbia non-profit, with its principal place of business in Washington D.C. *Complaint*, ¶ 3. The Assembly has no offices or employees in Minnesota. *Affidavit of Robert A. Kaloosdian,* ¶ 3.[2] The Assembly describes itself as the foremost Armenian-American advocacy group in the United States. *Id.*, ¶ 4. Its missions include interacting with public policymakers; enhancing relations between the United States and Armenia; and research, education, and advocacy for universal affirmation of the Armenian Genocide. *Id.*[3]

## B.    The Museum Project

In the 1990's the Assembly began exploring the idea of creating a museum dedicated to the victims and survivors of the Armenian Genocide. *Kaloosdian Aff.*, ¶ 5. This required the Assembly to seek substantial donations towards the construction of the museum, and eventually it contacted Cafesjian. *Id.*, ¶ 7. The initial meeting between Cafesjian and the Assembly occurred in 1997 at Cafesjian's Minnesota residence. *Id.*; *Waters Aff.*, ¶ 15.

Cafesjian, CFF, and the Assembly subsequently worked together to develop the museum idea. *Waters Aff.*, ¶ 16. In March 1999, Cafesjian pledged over $1 million to support the Assembly's museum

---

[2]The Kaloosdian Affidavit is attached as Exhibit 1 to the Affidavit of Arnold R. Rosenfeld.

[3]As described by the Armenian National Institute, the Armenian Genocide refers to atrocities committed against Armenians during the government of the Young Turks from 1915 to 1918 in the Ottoman Empire. *See* <http://www.armenian-genocide.org/genocidefaq.html>.

2

endowment campaign. *Id.*, ¶ 18.

In 2000, the Assembly identified a historic location in Washington D.C., the National Bank of Washington Building located near the nation's Capitol, as a possible site for the museum. *Kaloosdian Aff.*, ¶ 8.    Cafesjian contributed $3,500,000 to the Assembly to help purchase the building and loaned an additional $500,000 to assist with the purchase. *Waters Aff.*, ¶ 19.  The $500,000 loan was evidenced by a promissory note executed by the Assembly in favor of CFF. *Complaint*, Ex. A.

Cafesjian and CFF then became increasingly more involved in the museum's development. Cafesjian purchased four additional parcels of property adjacent to the National Bank site to expand the project. *Kaloosdian Aff.*, ¶ 10.  He also made additional donations to the museum project.  All told, Cafesjian's donations to the project totaled more than $14 million. *Complaint*, ¶ 12.

Some of Cafesjian's contributions are encompassed by a November 1, 2003 Grant Agreement between the Assembly, Cafesjian, and the CFF. *Complaint*, Ex. B.

## C.    Armenian Genocide Museum and Memorial, Inc.

Cafesjian's interest in the museum project did not end with his donations.   Eventually he requested the organization of a new entity dedicated to the development and construction of the museum.  Thus, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") was born as a D.C. nonprofit corporation. *Kaloosdian Aff.*, ¶¶ 10-11.  Cafesjian was one of the trustees of the new corporation. *Id.*

On November 1, 2003, the same date the Grant Agreement between Cafesjian, CFF, and the Assembly was executed, a Transfer Agreement was executed between the Assembly and AGM&M for the purpose of transferring the Assembly's assets with respect to the museum project to the AGM&M. *Rosenfeld Aff.*, Ex. 4.

3

**D.    The Legal Agreements**

Three legal documents underpin the parties' obligations in this case: 1) the March 17, 2000 Promissory Note between CFF and the Assembly; 2) the November 1, 2003 Grant Agreement between Cafesjian, CFF, and the Assembly; and 3) the November 1, 2003 Transfer Agreement between AGM&M and the Assembly.

**1.    The Promissory Note**

The March 17, 2000 Promissory Note between CFF and the Assembly states that it shall be payable in full on May 16, 2000, just two months after it was executed. *Complaint*, Ex. A. It contains a Minnesota forum selection clause stating:

> At the option of the payee [CFF], this note may be enforced in any federal court or Minnesota state court sitting in Hennepin County, Minnesota, and the maker [Assembly] consents to the jurisdiction and venue of any such court and waives any argument that the venue in such forums is not convenient. If the maker [Assembly] commences any action in another jurisdiction or venue under any tort or contract theory arising directly or indirectly from the relationship created by this note, the payee [CFF] at its option shall be entitled to have the case transferred to one of the jurisdictions and venues above described, or, if such transfer cannot be accomplished under applicable law, to have such case dismissed without prejudice.

*Id.* (original in allcaps).

**2.    The Grant Agreement**

The November 1, 2003 Grant Agreement between Cafesjian, CFF, and the Assembly states that it governs various donations Cafesjian and CFF made to the Assembly. It specifically addresses the Promissory Note between CFF and the Assembly, stating:

4

5.4     Promissory Note.

(A)     The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000.

(B)     The new note must be interest free and mature on December 31, 2005.

(C)     If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to the AGM&M, Inc. as part of the transfer of the Assembly's assets.

*Complaint*, Ex. B, p. 7.

The Grant Agreement references the Transfer Agreement, stating, inter alia:

On or before November 1, 2003, the Assembly shall have entered into a pledge agreement with AGM&M, Inc. (the "Transfer Agreement"), under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.

*Id.*

The Grant Agreement contains a choice of law provision stating:

7.2     Governing Law.     This Agreement must be governed by and construed in accordance with the laws of the District of Columbia (the "District") applicable to contracts to be fully performed within the District, without reference to the District's choice-of-law rules.

*Rosenfeld Aff.*, Ex. 5, p. 9.[4]

### 3.     The Transfer Agreement

The November 1, 2003 Transfer Agreement between AGM&M and the Assembly (but not

---

[4]The Grant Agreement attached to the Complaint is missing pages 9 and 10. The complete Grant Agreement can be found at Rosenfeld Affidavit, Exhibit 5.

Cafesjian or CFF) generally requires the Assembly to transfer its assets held for the development and

construction of the museum to AGM&M.

With regard to the March 17, 2000 Promissory Note between CFF and the Assembly, the

Transfer Agreement states:

> If at the time this Agreement is executed the promissory note executed by Grantor [the
> Assembly] in favor of The Cafesjian Family Foundation on March 17, 2000 in the amount
> of $500,000 (the "Promissory Note") or any promissory note issued to replace the
> Promissory Note (the "Replacement Promissory Note") is still outstanding, the Promissory
> Note or the Replacement Promissory Note, whichever is still outstanding, shall be
> transferred to AGM&M, Inc. as part of the Grant.

*Rosenfeld Aff.*, Ex. 4, p. 2.

The Transfer Agreement contains a District of Columbia choice of law provision identical to the

one in the Grant Agreement. *Id.*, p. 6.

It also contains an arbitration provision stating:

> 5.3    <u>Dispute Resolution</u>.  Any disputes arising under this Agreement must be settled
> exclusively by binding arbitration in Washington, D.C. in accordance with the
> Commercial Arbitration Rules of the American Arbitration Association then in
> force.

*Id.*

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(2) – Personal Jurisdiction

To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff need only make a prima

facie showing of personal jurisdiction over the defendant. *Digi-Tel Holdings, Inc. v. Proteq Telecomms.*

*(PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996). When considering whether personal jurisdiction exists, the

court may consider matters outside the pleadings. *Stevens v. Redwing*, 146 F.3d 538, 543 (8th Cir. 1998)

(quoting *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)) ("the court may inquire, by affidavits or otherwise, into the facts as they exist"). When determining whether the plaintiff has made a prima facie showing of personal jurisdiction, the Court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in her favor. *See Digi-Tel*, 89 F.3d at 522.

### B.    Rule 12(b)(6) - Failure to State a Claim

When considering a Rule 12(b)(6) motion, the Court assumes all facts alleged in the complaint as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). All reasonable inferences from the complaint must be drawn in favor of the nonmoving party. *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996), *cert. denied*, 519 U.S. 1149 (1997). While the complaint need not contain "detailed factual allegations," *see* Fed. R. Civ. P. 8(a)(2), it must supply "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1964-1965 (2007) (citation omitted). Rather, the  facts set forth in the complaint must be sufficient to "nudge ... claims across the line from conceivable to plausible." *Id.* at 1974. While the complaint's factual allegations must, therefore, rise above speculation and suspicion, a court should not dismiss for failure to state a claim merely because it disbelieves those allegations or considers them doubtful. *Id.* at 1965.

### C.    Rule 12(b)(7) - Failure to Join a Rule 19 Party

In analyzing a Rule 12(b)(7) motion to dismiss for failure to join a party under Rule 19, courts accept as true all of the pleader's well-pleaded factual allegations and draw all reasonable inferences in her favor. *See* Baicker-McKee, Janssen, Corr, FEDERAL CIVIL RULES HANDBOOK, Rule 12(b)(7), p. 381 (2007) (citation omitted). The court may rely on affidavits and other evidence outside the pleadings in making its determination. Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1359, vol.

7

5C, p. 68 (2004) ("The district judge is not limited to the pleadings.") (citing *Young v. Garrett*, 149 F.2d

223, 225 n.1 (8th Cir. 1945); *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 480 n.4 (7th Cir.

2001)) (other citations omitted).

## III.    ANALYSIS

The Assembly asserts a raft of Rule 12 legal arguments in support of dismissal.  As further

discussed below, only the Rule 12(b)(7) failure to join a party argument survives.

### A.    Personal Jurisdiction (Rule 12(b)(2))

The Assembly argues under Fed. R. Civ. P. 12(b)(2) that the Court lacks personal jurisdiction over

it, a non-profit incorporated under the laws of, and with its principal place of business in, the District of

Columbia.

#### 1.    Promissory note forum selection clause

Cafesjian maintains that the Minnesota forum selection clause contained in the promissory note

between CFF and the Assembly evidences the Assembly's consent to Minnesota jurisdiction.  A party's

valid consent to jurisdiction obviates the need to engage in further personal jurisdiction analysis. *Dominium*

*Austin Partners, LLC v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001); *ELA Med., Inc. v. Arrhythmia*

*Mgmt. Assocs., Inc.*, No. 06-3580 (JNE/SRN), 2007 WL 892517, *3 (D. Minn. Mar. 21, 2007).

While the Minnesota forum selection clause clearly reflects the Assembly's consent to Minnesota

jurisdiction for a suit enforcing the promissory note, this is not such a suit.  The Complaint seeks redress

for breach of the Grant Agreement, not the promissory note.  While the Complaint references the

promissory note, both of its two counts are expressly predicated on breach of the Grant Agreement.

Specifically, Cafesjian and CFF allege that the Assembly breached the Grant Agreement, not the

8

promissory note, by failing to issue a replacement promissory note as the Grant Agreement requires. *See Complaint*, ¶¶ 16-18, 22 ("The November 1, 2003 Grant Agreement obligated the Assembly to issue a new promissory note.... The Assembly has yet to issue the replacement note. This non-performance materially breached the Grant Agreement.") ("The Assembly violated this implied duty of good faith and fair dealing by failing to issue a replacement promissory note to Cafesjian.").

The Grant Agreement contains no forum selection clause, but only a choice of law (District of Columbia) clause. Because this is not a suit to enforce the note, the note's forum selection clause does not apply. *Dunne v. Libbra*, 330 F.3d 1062, 1064 (8th Cir. 2003) (following "cardinal rule" of contract interpretation that contract's plain language must be given its ordinary meaning to find forum selection clause inapplicable).

Cafesjian argues that this action is, minimally, indirectly related to the promissory note, triggering language in the note's forum selection clause stating that actions "arising directly or indirectly from the relationship created by this note," are encompassed by the clause. However, Cafesjian's selective parsing of the clause's language is unpersuasive. A full reading of the clause indicates that it is triggered only when the note's *maker* (the Assembly) commences action. It states:

> If the *maker* [Assembly] commences action in another jurisdiction or venue under any tort or contract theory arising directly or indirectly from the relationship created by this note, the payee [CFF] at its option shall be entitled to have the case transferred to one of the jurisdictions or venues above described....

*Complaint*, Ex. A (emphasis added). This is not an action by the note's maker. This language is,

9

therefore, inapplicable.[5]

2.    **Minimum contacts**

Cafesjian argues that Assembly has subjected itself to both specific and general Minnesota personal

jurisdiction by visiting Minnesota, soliciting donations in Minnesota, and recruiting and maintaining

Minnesota members.

Cafesjian's allegations do not support the exercise of specific personal jurisdiction, even when

viewed in a light most favorable to him. The Grant Agreement, the Complaint's basis, has at its core

property and donations located in Washington D.C. *Complaint*, Ex. B.[6]  The museum that was the goal

of the Grant Agreement was to be located in Washington D.C. *Id.* The Grant Agreement is expressly

controlled by District of Columbia law. *Id.*, p. 9.   Assembly is a District of Columbia resident. *Id.*, ¶ 3.

Cafesjian is a Florida resident and CFF's primary place of business is in Florida. *Complaint*, ¶¶ 1, 2. The

Court, therefore, finds little, if any, Minnesota connection to the Grant Agreement underlying this lawsuit.

Although the parties first met in Minnesota, and Cafesjian vaguely states through Mr. Waters'

Affidavit that some of his pledge activity was "orchestrated from the Foundation's Minnesota office,"

_____

[5]The Court recognizes the disharmony between allowing Minnesota jurisdiction where Assembly commences suit in another jurisdiction arising indirectly from the note and disallowing Minnesota jurisdiction where CFF brings an action arising indirectly from the note. This, however, is how the parties struck their bargain, and the Court must hold them to it. Moreover, it is possible that Cafesjian opted not to sue directly on the note, which matured in May 2000, because of statute of limitations concerns. Any such strategic choice does not entitle him to the benefit of the forum selection clause in an agreement he is not suing to enforce.

[6]Assembly states that the Grant Agreement was also executed in the District of Columbia. *Memorandum of Points and Authorities in Support of Defendant the Armenian Assembly of America's Motion To Dismiss for Lack of Personal Jurisdiction and Improper Venue*, p. 17. It does not, however, support this statement with affidavit testimony, so the Court has not relied on it in its personal jurisdiction analysis.

10

*Waters Aff.*, ¶ 18, the record contains no detail regarding any Minnesota connection to the pledges underlying the Grant Agreement. Cafesjian, therefore, has not shown a prima facie case of sufficient Minnesota contact with respect to the transactions at issue in the Complaint. *See Johnson v. Woodcock*, 444 F.3d 953, 956 (8th Cir.), *cert. denied*, 127 S. Ct. 217 (2006) (party cannot establish prima facie case of personal jurisdiction through conclusory allegations).

The existence of general personal jurisdiction over the Assembly is a closer question. Assembly members traveled to Minnesota on numerous occasions to solicit funds, Assembly has Minnesota members and volunteers, and Assembly targets Minnesotans for solicitations. *See Matossian Aff.*, ¶¶ 4, 5, 6, 8; *Waters Aff.*, ¶¶ 10, 11, 15. Cafesjian's affidavits regarding this activity are not particularly detailed. For example, the Court does not know how many visits Assembly members made to Minnesota, the percentage of its members that are Minnesotans, how often and in what way it solicits Minnesota members, and whether it has held fund-raising events in Minnesota. However, given that all doubts must be resolved in Cafesjian's favor in this procedural posture, the Court finds that he has made a prima facie case of general personal jurisdiction over Assembly. *See Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (exercise of personal jurisdiction appropriate where foreign nonprofit conducted fund-raising and held two fund-raising events in forum state); *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 931 F. Supp. 592, 595-595 (N.D. Ill. 1996) (exercising personal jurisdiction over foreign nonprofits based, in part, on fund-raising activities in forum state).

**B.    Venue (Rule 12(b)(3))**

Assembly also moves to dismiss for improper venue under 28 U.S.C. § 1391. If personal jurisdiction exists at the commencement of an action, venue is proper under Section 1391. 28 U.S.C. §

11

1391(c).    Because Cafesjian has made a prima facie showing of personal jurisdiction, venue is proper in

Minnesota. *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1392 (8th Cir. 1991)

(where prima facie showing of Minnesota personal jurisdiction made, venue proper in Minnesota);

*Raymedica, Inc. v. Stoy*, Civ. No. 01-1841 (JRT/FLN), 2002 WL 31185916, *6 (D. Minn. Sep. 30,

2002) (same).

### C.    Failure to State a Claim (Rule 12(b)(6))

Assembly makes three arguments that Cafesjian's suit should be dismissed for failure to state a

claim upon which relief can be granted.  None of them warrants dismissal.

### 1.    Arbitration clause

Assembly asserts that the Transfer Agreement's arbitration clause requires that this dispute be

arbitrated, rather than litigated.

As a threshold matter, a Rule 12(b)(6) analysis is confined to the pleadings, materials embraced

by the Complaint or exhibits thereto, matters of public record, and orders. *Porous Media Corp. v. Pall

Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  The Transfer Agreement is none of these things.  The

Complaint is based on the Grant Agreement, references the promissory note, and attaches both as exhibits.

It is not, however, based on, nor does it mention or attach, the Transfer Agreement.  The Court, therefore,

cannot interpret the Transfer Agreement's provisions, including its arbitration clause,  in this procedural

posture. *Id.*

Even if the Court could consider the merits of the arbitration clause's applicability, it would not

warrant dismissal.  Cafesjian and CFF are not parties to the Transfer Agreement, which is between

Assembly and the AGM&M.  Additionally, the Transfer Agreement's arbitration clause expressly states

12

that it governs "disputes arising under this Agreement." Cafesjian's suit arises under the Grant Agreement, not the Transfer Agreement. This makes sense, as Cafesjian is a not a party to it.

Although arbitration of disputes is generally favored, a party who is not a signatory to an arbitration agreement cannot be compelled to arbitrate. *Air Line Pilots Assoc. v. Miller*, 523 U.S. 866, 876 (1998); *Nitro Dist., Inc. v. Alticor, Inc.* 453 F.3d 995, 999 (8th Cir. 2006); *DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 28 (D.D.C. 2002). *See also Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999) ("[A]rbitration is a matter of consent, not of coercion."). Cafesjian and CFF are not parties to the Transfer Agreement, and, therefore, cannot be forced to arbitrate under its terms.[7]

### 2.    Statute of limitations

Assembly also seeks a ruling that Cafesjian's suit is time-barred. It argues that Cafesjian's cause of action seeking issuance of a replacement promissory note accrued on or before November 1, 2003. It reasons that the Grant Agreement required Assembly to issue a replacement note before the execution of the Transfer Agreement on November 1, 2003. Using this date, Assembly argues the action is time-barred under the applicable District of Columbia statute of limitations. *See* D.C. Stat. § 12-301(7) (actions on a "simple contract" must be brought within three years).[8]

———————————————

[7]Assembly's argument that the Grant Agreement incorporates the terms of the Transfer Agreement by reference is unpersuasive. Although the Grant Agreement references the Transfer Agreement, it does not expressly incorporate it by reference. *See Jenisio v. Ozark Airlines, Inc.*, 187 F.3d 970, 973 (8th Cir. 1999) (merely mentioning another agreement does not constitute incorporation by reference); *Air Line Pilots Assoc., Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 94 (D.C. Cir. 1988) (same).

[8]The parties agreed in the Grant Agreement that District of Columbia law governs the interpretation of that Agreement, and it is, therefore, appropriate to apply that law. *See Schwan's Sales Enterprises., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 596 (8th Cir. 2007) ("Minnesota courts generally recognize and apply choice-of-law clauses in contracts requiring the application of a foreign state's law.").

This argument fails. The Grant Agreement did not require the replacement note to be issued on or before November 1, 2003. Rather, it does not specify a date for the issuance of the replacement note. Thus, a fact issue exists regarding when the cause of action accrued making dismissal inappropriate at this early stage. *See R.A. Weaver and Assoc., Inc. v. Haas and Haynie Corp.*, 663 F.2d 168, 175-76, n.57 (D.C. Cir. 1980); *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 770-71 (D.C. 1998).

The Assembly also argues that any action to enforce the promissory note is time-barred. The Court need not reach this argument as this action is one to enforce the Grant Agreement, not the note.

### 3.    Merits

The Assembly seeks dismissal of Cafesjian's Complaint on the merits based on its argument that the Transfer Agreement transferred the promissory note to AGM&M, discharging the Assembly's obligation under the Grant Agreement to issue a replacement note. Resolution of this argument is premature.

The Grant Agreement requires the Assembly to issue a "new promissory note (the *"Promissory Note"*) to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the Foundation in the amount of $500,000." *Complaint*, Ex. B, p. 7. (emphasis added). The Grant Agreement then addresses only the transfer of any new promissory note, not the original note, stating: "If the *Promissory Note* [i.e. the new promissory note] is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets." *Id.*

Thus, the Grant Agreement indicates only that any *new* promissory note was subject to transfer via the Transfer Agreement. Since Assembly never issued a new note, no note could have transferred to AGM&M under the Grant Agreement's plain language.

14

The Transfer Agreement, unlike the Grant Agreement, clearly states that either the original note or

a new note would transfer:

> If at the time this Agreement is executed the promissory note executed by Grantor in favor
> of the Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the
> "Promissory Note") or any promissory note issued to replace the Promissory Note (the
> "Replacement Promissory Note") is still outstanding, the Promissory Note or the
> Replacement Promissory Note, whichever is still outstanding, shall be transferred to
> AGM&M, Inc. as part of the Grant.

*Rosenberg Aff.*, Ex. 4, p. 2. Thus, the Grant Agreement and the Transfer Agreement are at odds with

respect to the transfer of the original promissory note.

Reconciliation of the ambiguities created by these two contracts is inappropriate at this early

juncture. *E.g., Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*, 794 F. Supp. 434, 435 (D.D.C.

1993); *Swift & Co. v. Elias Farms*, Civil Nos. 05-2775, 05-2776, 05-2777 (PAM/JJG), 2007 WL

1364691, *7 (D. Minn. May 9, 2007) (slip op.) (citing *Housing and Redev. Auth. of Chisholm v.

Norman*, 696 N.W.2d 329, 337 (Minn. 2005); *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn.

1990)). This is particularly so because the Transfer Agreement is not even embraced by the four corners

of the Complaint, and is thus not properly considered on this motion.

### D.    Failure to Join a Party Under Rule 19 (Rule 12(b)(7))

Assembly argues that the lawsuit should be dismissed because Cafesjian failed to join AGM&M,

a necessary party under Rule 19. It further argues that because AGM&M is not subject to personal

jurisdiction in Minnesota, this suit should be dismissed without prejudice.

Rule 19 provides the relevant framework for analyzing a Rule 12(b)(7) motion to dismiss. Rule

19(a) asks two questions: 1) whether joinder of the absent party is required; and, if so; 2) whether the party

is subject to service of process and can be joined without defeating the court's jurisdiction.

### 1.     Whether joinder is required

Rule 19(a) sets forth the factors to be considered in determining whether an absent party's

presence is required, stating:

> **Persons to be joined if feasible.**  A person who is subject to service of process and
> whose joinder will not deprive the court of jurisdiction over the subject matter of the action
> shall be joined as a party in the action if (1) in the person's absence complete relief cannot
> be accorded among those already parties, or (2) the person claims an interest relating to
> the subject of the action and is so situated that the disposition of the action in the person's
> absence may (i) as a practical matter impair or impede the person's ability to protect that
> interest or (ii) leave any of the persons already parties subject to a substantial risk of
> incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed
> interest.

AGM&M's joinder is required under Rule 19(a) because, in its absence, complete relief cannot

be accorded among those already parties.  Cafesjian seeks "[r]escission of the Grant Agreement and

restitution of all donations made pursuant to that agreement." *Complaint*, ¶ 27.  In other words, he wants

the money he donated returned.  Pursuant to the Transfer Agreement, AGM&M now possesses that

money. *Kaloosdian Aff.*, ¶ 14.  The Court cannot order the complete relief Cafesjian seeks, therefore,

without AGM&M in the litigation.

Persons or entities such as AGM&M that possess disputed fruits of a contract must be joined

under Rule 19(a).  For example, in *Denkmann Associates v. International Paper Co.*, 132 F.R.D. 168,

172 (M.D. La. 1990), the court held that complete relief could not be provided to the parties before the

court where the plaintiff sought contract rescission which included restoration of timberland owned by a

non-party.  Similarly, in *In re U.S. ex rel. Hall*, 825 F. Supp. 1422, 1429-1430 (D. Minn. 1993), the

court dismissed an Indian tribe action seeking rescission of a contract with outside vendors where non-party

Indian tribes could not be joined. The court stated, "No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." (quotation omitted). *Id.* at 1430.

This case differs from contract cases where courts have held that an entity that is not a party to a contract underlying the litigation, but is merely affected by it, need not be joined under Rule 19. Although the absent parties in such cases were impacted by the litigation, they did not possess property or money directly implicated by the litigated contract as AGM&M does here. *See e.g., Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.*, 564 F.2d 816, 819-820 (8ᵗʰ Cir. 1977); *Davis Cos.*, 268 F.3d at 484.

If Cafesjian's suit sought only to force Assembly to execute a replacement promissory note, rather than rescission of his donations, a different Rule 19(a) determination may have been warranted. Arguably that type of a suit would affect AGM&M, but not require its presence. Here, however, where AGM&M actually holds the money Cafesjian seeks, the suit cannot go forward without it.

## 2.    **Personal and subject matter jurisdiction**

Because AGM&M should be part of the action, the Court can order its joinder if it is subject to service of process and if its presence will not defeat the Court's subject matter jurisdiction. Fed. R. Civ. P. 19(a). This Court's diversity jurisdiction would not be defeated by AGM&M's joinder. It is a District of Columbia corporation with its principal place of business in Washington D.C. As such, its presence in the suit as a defendant would not defeat complete diversity, and the parties do not argue otherwise.

The parties do, however, dispute whether AGM&M is subject to personal jurisdiction in Minnesota. Assembly argues that AGM&M, a District of Columbia corporation, has no significant ties to

17

Minnesota and that the donations and museum activities giving rise to the Complaint all took place in

Washington D.C.  Cafesjian responds that John Waters, an AGM&M Trustee, lives in Minnesota and

transacted some of AGM&M's business from Minnesota.

While Waters lives in and sometimes transacts business from Minnesota, the record does not reflect

that the transactions at issue in the Complaint, i.e. the alleged breach of the Grant Agreement by failure to

issue a replacement promissory note, took place here such that the exercise of specific jurisdiction is

appropriate.  The record does not reflect that Waters was connected in any way to the Grant Agreement

or Assembly's alleged failure to abide by it.

Waters' performance of some of AGM&M's work from his Minnesota home does not confer

general personal jurisdiction.  An agent's decision to work from home in the forum state generally does not

bind an entity to personal jurisdiction in that state where the purpose of the arrangement is merely for the

agent's personal convenience. *See Lucachick v. NDS Americas, Inc.*, 169 F. Supp. 2d 1103, 1107 (D.

Minn. 2001) (holding that personal jurisdiction in Minnesota was lacking where Minnesota home office was

employee's "personal choice"); *Adams v. Riverview Healthcare Ass'n*, No. A3-02-135, 2003 WL

1456442, \*3 (D.N.D. March 17, 2003) (employee's personal choice to work from home insufficient basis

for assertion of personal jurisdiction).

Moreover, unlike Assembly, the record does not reflect any AGM&M fundraising or membership

activity occurring in Minnesota.  Thus, the basis for finding a prima facie case of general personal

jurisdiction over Assembly is simply not present with AGM&M.

Minnesota does not have a strong interest in providing a forum here.  *See Stanton v. St. Jude*

*Medical, Inc.*, 340 F.3d 690, 694 (8th Cir. 2003) (discussing five-factor personal jurisdiction test,

18

including the fourth factor, the interest of the forum state in providing relief for its residents). The parties

seeking the forum, Cafesjian and CFF, are both Florida residents. Additionally, it does not appear to be

particularly convenient for anyone else involved in the litigation, many, if not most, of whom are in

Washington, D.C. *See id.* (also discussing fifth factor in personal jurisdiction analysis, the convenience of

the parties).

The Court, therefore, concludes that Cafesjian has not made a prima facie showing of personal

jurisdiction over AGM&M, precluding its joinder under Rule 19(a).

### 3.     Whether this action should proceed without AGM&M

Because the Court has determined that AGM&M cannot be joined, Rule 19(b) requires an

analysis of whether the litigation can continue in its absence. Four factors are relevant to this analysis: "first,

to what extent a judgment rendered in the person's absence might be prejudicial to the person or those

already parties; second, the extent to which by protective provisions in the judgment, by the shaping of relief

or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the

person's absence will be adequate; and fourth, whether the plaintiff will have an adequate remedy if the

action is dismissed for nonjoinder." Fed. R. Civ. P. 19(b).

Application of these factors here dictates dismissal of this action for AGM&M's nonjoinder.

AGM&M holds the money underlying this dispute. The relief Cafesjian seeks cannot be ordered without

AGM&M in the lawsuit. A judgment cannot be shaped to lessen this prejudice. Moreover, Cafesjian can

bring this suit elsewhere, as dismissal is without prejudice. The Court is aware that CFF has already filed

suit in the United States District Court for the District of Columbia against Assembly and AGM&M based

on the same relationships at issue here. *See Cafesjian Family Foundation, Inc. v. Armenian Genocide*

*Museum and Memorial, Inc., et al.*, 1:07-cv-01746-RWR (D.D.C. filed Sep. 28, 2007). Moreover, AGM&M has filed its own District of Columbia suit against CFF also arising out of the same issues present here. *See Armenian Genocide Museum and Memorial, Inc. v. Cafesjian Family Foundation, Inc.*, 1:07-cv-1259-CKK (D.D.C. filed July 16, 2007). Cafesjian's ability to seek a remedy in another forum, therefore, is not foreclosed by this Court's recommendation that the action be dismissed without prejudice for nonjoinder.

## IV.   CONCLUSION

Cafesjian and CFF bring this action seeking the return of money originally donated to the Assembly and later transferred to AGM&M. Because AGM&M holds the money the Plaintiffs seek, this action cannot go forward without it. AGM&M is not subject to personal jurisdiction in Minnesota. The Court, therefore, recommends dismissal of this action without prejudice for nonjoinder pursuant to Fed. R. Civ. P. 12(b)(7).

## V.   RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

   A.   Assembly's Motion to Dismiss based on lack of personal jurisdiction (Rule 12(b)(2)) and improper venue (Rule 12(b)(3)) (Doc. No. 14) be DENIED.

   B.   Assembly's Motion to Dismiss based on failure to state a claim (Rule 12(b)(6)) and failure to join a party under Fed. R. Civ. P. 19 (Rule 12(b)(7)) (Doc. No. 11) be DENIED IN PART as to the portion of its motion based on Rule 12(b)(6) and GRANTED IN PART as to the portion of its motion based on Rule 12(b)(7).

C.     This action be DISMISSED WITHOUT PREJUDICE.

Dated this 23rd day of October 2007.

s/ Jeanne J. Graham

_____

JEANNE J. GRAHAM
United States Magistrate Judge

## NOTICE

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **November 5, 2007**. A party may respond to the objections within ten days after service. Any objections or responses filed under this rule shall not exceed 3,500 words. The District Court shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit. Unless the parties stipulate that the District Court is not required, under 28 U.S.C. § 636, to review a transcript of the hearing in order to resolve all objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.

# EXHIBIT 10

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerard L. Cafesjian, et al.,

       Plaintiffs,

v.                                     Civ. No. 07-2079 (JNE/JJG)
                                          ORDER

Armenian Assembly of America, Inc.,

       Defendant.

This case is before the Court on a Report and Recommendation issued by the Honorable

Jeanne J. Graham, United States Magistrate Judge, on December 23, 2007. The Magistrate

Judge recommended that Defendant's motions to dismiss be granted to the extent they are based

on failure to join a necessary and indispensable party under Fed. R. Civ. P. 19 and denied to the

extent they are based on other grounds. Plaintiffs objected to the recommendation, and

Defendant has responded to their objections. The Court has conducted a de novo review of the

record. *See* D. Minn. LR 72.2(b). Based on that review, the Court adopts the Report and

Recommendation. Therefore, IT IS ORDERED THAT:

1.     Plaintiff's request for leave to file a motion for an evidentiary hearing [Docket No. 60] is DENIED.

2.     Defendant's Motion to Dismiss based on lack of personal jurisdiction and improper venue [Docket No. 14] is DENIED.

3.     Defendant's Motion to Dismiss based on failure to state a claim and failure to join a necessary and indispensable party [Docket No. 11] is DENIED as to the portion of the motion based on Fed. R. Civ. P. 12(b)(6) and GRANTED as to the portion of the motion based on Fed. R. Civ. P. 12(b)(7).

    4.    This action is DISMISSED WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  March 31, 2008

                  s/  Joan N. Ericksen       
                  JOAN N. ERICKSEN
                  United States District Judge

# EXHIBIT 11

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Gerard L. Cafesjian and The Cafesjian Family Foundation, Inc., | Civil File No. 07-2079 (JNE/JJG) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION** |
| The Armenian Assembly of America, Inc., | |
| Defendant. | |

## INTRODUCTION

Pursuant to Local Rule 72.2, Plaintiffs Gerard L. Cafesjian and the Cafesjian Family Foundation ("CFF") object to the October 23, 2007 Report and Recommendation ("R&R") of Magistrate Judge Jeanne Graham.  Specifically, the R&R recommended dismissal pursuant to Fed. R. Civ. P. 19 for failure to join the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") as a necessary and indispensable party.  R&R at 15-20.  This conclusion is unsupported by the evidence and contrary to law.

## BACKGROUND

**A.     This Lawsuit**

This dispute arises out of contractual obligations between the parties and the significant donations that Cafesjian and CFF made to the Armenian Assembly of America, Inc. ("Assembly").[1]  Together, the parties had hoped to create and develop a

---

[1]     The facts of this case are detailed in Plaintiffs' Memorandum of Law in Opposition to Defendant's Motions to Dismiss.  *See* Clerk Doc. No. 30.

museum and memorial for the benefit and commemoration of the Armenian people in Washington D.C. To acquire the initial site for the project, Cafesjian donated $3.5 million and loaned an additional $500,000 – interest free – to the Assembly. To memorialize the debt, the Assembly issued a promissory note to CFF and Cafesjian.

The parties' vision for a museum and memorial soon outgrew the boundaries of the single parcel, and development at that location was complicated by National Historic Register restrictions. Cafesjian and CFF therefore committed to making other grants to acquire more real estate. To that end, the parties executed the Grant Agreement. (*See* Compl. Ex. B.) This agreement conditions Cafesjian and CFF's performance on Assembly contractual compliance and provides recourse in the event of Assembly breach.

Specifically, "if the Assembly fails to satisfy any of the conditions of this Agreement, [CFF and Cafesjian are] released from any remaining obligation under this Agreement to provide funds or property to the Assembly." (*Id.* §3.9.) Furthermore, if the grant property is not developed by December 31, 2010 pursuant to a plan approved by the AGM&M board of trustees, then CFF and Cafesjian are entitled to terminate the Grant Agreement and revert either the donated funds or the property purchased with these contributions. (*Id.* §3.1.) Finally, the Grant Agreement conditioned Cafesjian and CFF's obligations upon the Assembly making a new note to evidence the $500,000 loan. (*Id.* §5.4.) There is no dispute that the replacement note was never issued, and the original note was never repaid.

Because all concerned realized the Assembly was ill-suited to undertake a project of this nature, the Grant Agreement called for the creation of a separate entity, the

AGM&M, to establish and develop the museum and memorial. After securing Cafesjian and CFF's pledge – $16.85 million in total – the Assembly executed the Transfer Agreement with AGM&M. Pursuant to that agreement, the Assembly would transfer the real property, pledges, cash and other assets acquired for the benefit of the museum and memorial project to AGM&M. Neither Cafesjian nor CFF are parties to the Transfer Agreement or any other contract with AGM&M.

**B.    The R&R**

The R&R recommends dismissal without prejudice pursuant to Rule 19. The Magistrate Judge reasoned that AGM&M is a necessary party because "property or money directly implicated by the litigated contract" was in AGM&M's possession and that joinder would not be feasible because personal jurisdiction over AGM&M is lacking. R&R at 17. The R&R went on to conclude that AGM&M was an indispensable party and that this litigation could not proceed in AGM&M's absence. *Id.* at 19-20.

## ARGUMENT

**I.    STANDARD OF REVIEW**

When a magistrate judge issues a report and recommendation, "[t]he district judge may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b). The district judge must "make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection has been made." *Id.*; *see also* D. Minn. L.R. 72.2(b). This Court should modify the R&R because AGM&M is not a necessary or indispensable party under Fed.

R. Civ. P. 19. And regardless, AGM&M can be joined because this Court has both subject matter and personal jurisdiction.

## II.    AGM&M IS NOT A NECESSARY PARTY

A party is "necessary" if "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) a person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a). Magistrate Judge Graham failed to conduct a comprehensive Rule 19(a) analysis and instead surmised that because AGM&M may possess property or funds which were the subject of the Grant Agreement, complete relief could not be accorded in AGM&M's absence.

### A.    Rule 19(a)(1)

AGM&M's non-joinder from this litigation would not prevent this Court from granting complete relief between the Cafesjian interests and the Assembly. Rule 19(a)(1) is only concerned with entities that are already parties to the lawsuit. Fed. R. Civ. P. 19(a)(1) (a party is necessary only if in that party's absence "complete relief cannot be accorded *among those already parties*") (emphasis added). Plaintiffs' claims against the Assembly are exclusively based on the specific contractual obligations between the two parties. Lacking privity, plaintiffs have not and could not assert a contractual cause of action against AGM&M for the Assembly's breach.

If plaintiffs prevail against the Assembly, the Assembly could only be required to pay monies owed or return real estate that can be conveyed. The Assembly could not be compelled to revert property over which the Assembly cannot exercise control. And the relief award by definition would not encompass assets that the Assembly could not deliver.[2] Although there could be further litigation or arbitration between the Assembly and AGM&M regarding possession of the Grant properties, Rule 19(a)(1) focuses only on the relief accorded among actual parties to the litigation. *See LLC Corp. v. Pension Benefits Guar. Corp.*, 703 F.2d 301, 305 (8th Cir. 1983) (Rule 19(a) focuses on the "relief between the parties and not on the speculative possibility of further litigation between a party and an absent person"); *see also Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377 (2d Cir. 2006). AGM&M is not a necessary party under Rule 19(a)(1).

B. **Rule 19(a)(2)**

AGM&M's interests will not be impaired by being absent from this lawsuit. *See* Fed. R. Civ. P. 19(a)(2)(i). "It is not enough under Rule 19(a)(2)(i) for a third party to have an interest, even a very strong interest, in the litigation. Nor it is enough for a third party to be adversely affected by the outcome of the litigation." *Mastercard Int'l Inc.*, 471 F.3d at 387. The harm the non-party suffers must be caused not by the pendency of the lawsuit but rather by the non-party's absence from the lawsuit. *Id.* Any purported

---

[2]    The Assembly has over $21 million in assets and an endowment fund in excess of $20 million. (*See* Waters Aff. Ex. A at 18-21.)

harm that AGM&M might suffer would be the result of the Assembly's failure to perform contractual obligations – not AGM&M's absence from this litigation. Simply "because the outcome of this case may impact a separate contract involving a different party" does not make AGM&M a necessary party. *See id.*; *see Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center*, 564 F.2d 816, 820 (8th Cir. 1977).

Proceeding without AGM&M would not impair or impede AGM&M from protecting its interests. AGM&M's rights vis-à-vis the Assembly are defined by the Transfer Agreement. These rights are derivative of the Assembly's obligations to the Cafesjian interests and thus closely aligned with the Assembly's interests. AGM&M would not make arguments different from the Assembly to defend against plaintiffs' claims.

In fact, because of this alignment, AGM&M and the Assembly have joined forces by demanding arbitration in a related litigation against the Cafesjian interests. *See, e.g., Waters et al. v. AGM&M et al.*, Civil File No. 07-4212 JNE/SRN(D. Minn.). The assertions and relief sought in the arbitration petition – as well as their chosen counsel – are identical for both entities. Hence, the Assembly is already protecting the mutual interests of both parties. *See Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1016 (8th Cir. 1984) (absent party's ability to protect its interests was not impaired in a medicare dispute between hospital and insurance company because absent party's interest paralleled hospital's interest).

The Assembly would not be subject to inconsistent obligations without AGM&M's joinder. The critical Rule 19(a)(2)(ii) concern is the substantial risk of

inconsistent obligations caused by the nonparty's absence. Fed. R. Civ. P. 19(a)(2)(ii). The Assembly's purported risk of multiple obligations – to the Cafesjian interests and to AGM&M – is not the result of AGM&M's absence from the lawsuit. Rather, any peril in which the Assembly finds itself is the result of contractual non-compliance. AGM&M's presence in this lawsuit would not remedy the Assembly's undisputed failure to issue a replacement note.

Regardless of whether AGM&M is present in this lawsuit, AGM&M and the Assembly can litigate their dispute pursuant to their contract – an agreement to which neither CFF nor Cafesjian are parties – in the event the relief ultimately afforded implicates the Grant properties. AGM&M would not be able to relitigate a finding that the Assembly breached the Grant Agreement – that issue has nothing to do with AGM&M.

The R&R relies on *In re U.S. ex rel. Hall* to justify dismissal. 825 F. Supp. 1422, 1429-30 (D. Minn. 1993). The facts of *Hall* are clearly distinguishable. The *Hall* plaintiffs – non-parties to the contracts at issue – filed suit to challenge contracts between Indian tribes and outside merchants and vendors. *Id.* at 1424. The contracts were said to be void for failure to comply with federal law. *Id.* at 1424-25. "Because the absent Indian tribes [were] parties to the challenged contracts, their interest in the validity of the contracts would be directly affected by the judgment the plaintiffs seek." *Id.* at 1428 (emphasis added). Hence it was Indian tribes' status as parties to the contract being litigated that made the tribes necessary parties under Rule 19(a)(i). If there had been no

contractual privity the non-joinder of the tribes would not have had Rule 19(a) ramifications. This distinction renders *Hall* inapposite.

Reliance on *Denkmann Assoc. v. Int'l Paper Co.*, 132 F.R.D. 168 (M.D. La. 1990) is equally misplaced. In *Denkmann*, the original signatories assigned their contractual rights to other parties. The suit, between two assignees to the contract, accused a subsequent assignee of breach but did not name that assignee as a party. The nonparty assignee was deemed to be a necessary party. Unlike *Denkmann*, CFF's claims are against the Assembly for the Assembly's breach of the Grant Agreement. *Denkmann* is neither controlling nor probative.

AGM&M is neither a party to nor accused of breaching the Grant Agreement – the contract that is the subject matter of this litigation. Because AGM&M is not a necessary party under Rule 19(a), no further inquiry is required. *See Rochester Methodist Hosp.*, 728 F.2d at 1016.

### C.    AGM&M is Subject to the Court's Jurisdiction

Even if AGM&M were a necessary party, this Court has personal jurisdiction. Due process allows jurisdiction to be exercised whenever a defendant has sufficient minimum contacts with the forum state so as not to offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). "Sufficient contacts exist when the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Digi-Tel Holdings, Inc. v. Proteq Telecomms. Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996) (quotation and citation omitted). A party must reasonably anticipate being haled into the forum state when there

is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Plaintiffs need only establish a prima facie case of jurisdiction. *Digi-Tel Holdings, Inc.*, 89 F.3d at 522.

As a threshold matter, this exact issue is before the Court in a related matter, *Waters et al. v. AGM&M et al.*, 07-4212(JNE/SRN). That case is scheduled for an evidentiary hearing. A front and center issue in that proceeding will be personal jurisdiction over AGM&M. The evidence presented will demonstrate that the exercise of personal jurisdiction comports with due process. Accordingly, plaintiffs request that the Court defer any ruling regarding personal jurisdiction until after the evidence regarding AGM&M's contacts with this forum has been vetted.

But regardless, the record already before the Court – much of it coming from Assembly submissions – demonstrates that jurisdiction lies. AGM&M's contacts with Minnesota are both continuous and systematic and directly related to this dispute.

The Assembly and the Cafesjian interests cooperatively incorporated AGM&M. Following AGM&M's creation, Cafesjian was appointed Chairman and President and John Waters was appointed Secretary and Treasurer of AGM&M. (*See* Rosenfeld Aff. Ex. 6 at 2.) Both performed substantially all of their AGM&M officer duties in Minnesota. (*See* Waters Aff. ¶¶21-22.)

In recognition of the significant donations to the Assembly for the benefit of the AGM&M – monies that were derived from Cafesjian's employment in Minnesota at West Publishing – CFF was designated as permanent AGM&M trustee. (*See* Compl. Ex.

B §5.2(G).)  For three years Cafesjian served as the CFF-designated trustee on the AGM&M board.  Most of his CFF Trustee activities were performed from Minnesota.  In late 2006, John Waters, a longtime Minnesota resident, assumed the CFF-designated AGM&M trustee duties.  Waters performed nearly all of his AGM&M trustee duties from Minnesota – by participating in trustee meetings, telephone calls, and other activities. (Waters Aff. ¶¶21-22.)

The Assembly's affidavits also assert that AGM&M's Minnesota contacts are systematic and continuous and related to this dispute.  "Between November 1, 2003 and the fall of 2006, the AGM&M was effectively operated, managed, and in fact, controlled by Cafesjian and John J. Waters, Jr. (Rosenfeld Aff. Ex. 1 ¶15.)  "Cafesjian and Waters hired consultants, searched for and selected an architect and a design plan for the AGM&M, and advised us they were contacting potential donors for the museum."  (*Id.*)[3] The Kaloosdian Affidavit goes on to maintain that Waters, CFF and Cafesjian have taken "numerous actions . . . on behalf of [AGM&M]."  (*Id.* ¶19.)

Reflecting those undertakings on behalf of AGM&M, AGM&M's corporate records were stored in Minnesota, AGM&M's bookkeeping activities were performed in Minnesota by Minnesota residents, and correspondence to AGM&M was directed to Minnesota.  (Supplemental Waters Aff. ¶¶3, 6-7, 9.)  CFF's Minnesota staff provided administrative and organizational support to AGM&M.  (*Id.* ¶¶5, 8)  The leadership of AGM&M was directed by Cafesjian and Waters from Minnesota.  (*Id.* ¶4-5, 10.)  From

---

[3]     Plaintiffs deny that they selected an architect and design plan for AGM&M.

its incorporation until late 2006, AGM&M was managed, organized, and facilitated from CFF's Minnesota offices. (*Id.*) "[O]n behalf of AGM&M," Cafesjian and Waters performed substantially all of these AGM&M duties from Minnesota. (*Id.*; Waters Aff. ¶¶21, 22.)

These continuous and systematic contacts – which are purportedly derived from the Grant Agreement – demonstrate that this Court has personal jurisdiction over AGM&M.[4] A nonresident corporate entity has contacts with a forum state for purposes of personal jurisdiction through its authorized representatives – namely, its employees, agents, directors, and officers. *Int'l Shoe, Inc.*, 326 U.S. at 316.

> Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact . . . it is clear that unlike an individual its 'presence' . . . can be manifested only by activities carried on in its behalf by those who are authorized to act for it. . . . [T]he terms 'present' or 'presence' are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process.

*Id.* at 316-17; *see also Garber v. Jack's Corn Crib*, No. 4-86-740, 1988 WL 74280, * 7 (D. Minn. July 18, 1988) (an individual's actions performed as a corporate officer may be used to subject the corporation to jurisdiction).[5]

---

[4]     AGM&M's contacts with Minnesota arise from the transactions that gave rise to this lawsuit and from AGM&M's general business operations. Both general and specific personal jurisdiction exists.

[5]     Both *Adams v. Riverview Healthcare Association* and *Lucachick v. NDS Americas, Inc.*, cited in the R&R, are distinguishable. In *Adams*, North Dakota jurisdiction did not lie over a Minnesota employer simply because the employer allowed the plaintiff employee to work from North Dakota 20% of the time. No. A3-02-135, 2003 WL

The actions of Cafesjian, Waters, and CFF in Minnesota – as officers, Trustees and agents who have acted "on behalf of" AGM&M – are sufficient to satisfy the requirements of due process. The Assembly's own evidence establishes those contacts. The Assembly cannot argue, on one hand that Cafesjian and Waters "controlled" AGM&M, and then maintain on the other hand that AGM&M's contacts with Minnesota are insufficient when the controlling activities, about which the Assembly complains, were performed on AGM&M's behalf in Minnesota. AGM&M is subject to this Court's jurisdiction.[6]

## III.    AGM&M IS NOT AN INDISPENSABLE PARTY

Even if AGM&M were a necessary party over which personal jurisdiction is lacking, AGM&M is not a Rule 19(b) indispensable party. Indispensable party turns on whether (1) AGM&M would be prejudiced as an absent party; (2) the court can afford protective provisions in the judgment to lessen any prejudice to AGM&M; (3) a

---

1456442 (D.N.D. Mar. 17, 2003). In *Lucachick*, jurisdiction was improper because the plaintiff employee's "residence was the only connection between the employment contract and Minnesota." 169 F. Supp. 2d 1103, 1106 (D. Minn. 2001). Unlike both of these cases, AGM&M's business was conducted from and AGM&M's headquarters were located at CFF's Minnesota office. Minnesota residents performed work for AGM&M, and the leadership and operation of AGM&M were directed from Minnesota. This is not incidental or sporadic contact with Minnesota like in *Adams* or *Lucachick*. Rather AGM&M's existence and function emanated from Minnesota for most of the entity's life.

[6]     Minnesota is a convenient forum. CFF operates substantial business operations in Minnesota, Waters lives in Minnesota and Cafesjian lives in Minnesota for five months of each year. (Waters Aff. ¶¶2, 5-8.) The Assembly travels to Minnesota. (*See id.* Exs. B-H.) Assembly volunteers reside in Minnesota. (*Id.* ¶¶6-8.) And, because AGM&M was managed and operated out of Minnesota for three years, many of the witnesses who performed these AGM&M activities are located in Minnesota. (*Id.*)

sufficient remedy can be awarded to CFF; and (4) CFF would have an adequate remedy if the action were dismissed for failure to join an indispensable party. Fed. R. Civ. P. 19(b).

AGM&M would not be prejudiced by being left out of this litigation – it has its own contractual rights and obligations vis-à-vis the Assembly pursuant to the Transfer Agreement. Cafesjian and CFF can be accorded a sufficient remedy; their recourse is defined by the terms of the Grant Agreement to which AGM&M is not a party. The Court can subject the Assembly to whatever redress is warranted by the contractual breach and is possible based upon the assets that the Assembly can control.

In contrast, if this action is dismissed, CFF would have no adequate remedy. The two actions pending in the District of Columbia are not related to the Assembly's obligations under the Grant Agreement or the promissory note. To the contrary, the lawsuit by AGM&M against CFF pertains to a lien on the property – not to the Assembly's obligations under the Grant Agreement. *See AGM&M v. The Cafesjian Family Foundation*, File No. 07-1259(D.D.C.).

The lawsuit filed by the Cafesjian interests on behalf of AGM&M is a derivative action alleging that some AGM&M trustees and the Assembly have breached their fiduciary duties. *See Cafesjian Family Foundation, Inc. v. Armenian Genocide Musuem & Memorial, Inc., et al.*, File No. 07-1746(D.D.C.). As a derivative action any recovery achieved would be for the benefit of AGM&M. Nothing in that litigation implicates the

Assembly's Grant Agreement obligations.[7]  In short, AGM&M is not an indispensable

party under Rule 19(b).

## CONCLUSION

Magistrate Judge Graham erroneously concluded that AGM&M was a necessary

and indispensable party that could not be joined.   AGM&M is neither necessary nor

indispensable.   Regardless, AGM&M's extensive contacts with Minnesota through its

agents, who, according to the Assembly controlled AGM&M, subject AGM&M to suit in

this jurisdiction.   The Court must overrule the R&R and deny defendants' motions to

dismiss.

Dated:  November 5, 2007               **BRIGGS AND MORGAN, P.A.**


By:   s/ Timothy R. Thornton
Timothy R.  Thornton (#109630)
Molly M.  Borg (#0331922)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
(612) 977-8400

**ATTORNEYS FOR PLAINTIFFS**

---

[7]     This case will undoubtedly wind up in this District even if it is dismissed.  If the complaint is transported to D.C. the Assembly and AGM&M will counterclaim which would invoke the forum selection clause of the promissory note, mandating transfer to this Court.  See R&R at 9-10, n. 5.