**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Armenian Genocide Museum and Memorial, Inc., <br><br> *Plaintiff*, <br><br> v. <br><br> The Cafesjian Family Foundation, Inc.; John J. Waters, Jr.; Gerard L. Cafesjian, and John J. Waters, Sr. <br><br> *Defendants*. | Civil File No. 1:07-cv-01259 (CKK) <br><br> <u>**ORAL ARGUMENT REQUESTED**</u> <br><br> Status hearing: August 27, 2008 (10:30 AM) |

**DEFENDANTS THE CAFESJIAN FAMILY FOUNDATION, INC.,
JOHN J. WATERS, JR., AND GERARD L. CAFESJIAN'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Defendants The Cafesjian Family Foundation, Inc., John J. Waters, Jr., and Gerard L. Cafesjian respectfully move this Court for an Order dismissing Counts One, Three, and Four of Plaintiff Armenian Genocide Museum and Memorial's ("AGM&M") Second Amended Complaint.[1] AGM&M has failed to plead facts upon which relief for these claims could be granted, and so they should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

This motion is based on this Motion, the Memorandum in Support, the pleadings filed in this matter, and other such arguments as the Court deems proper.

---

[1] Count Two of the complaint does not raise any claims against the Defendants filing this motion.

Dated:  August 15, 2008                    Respectfully submitted,

                                           /s/ Thomas F. Cullen
                                           Thomas F. Cullen (D.C. Bar No. 224733)
                                           Nancy Berardinelli-Krantz (admitted *pro hac vice*)
                                           JONES DAY
                                           51 Louisiana Avenue, N.W.
                                           Washington, D.C.  20001-2113
                                           Telephone:  (202) 879-3939
                                           Facsimile:   (202) 626-1700
                                           tfcullen@jonesday.com
                                           nbkrantz@jonesday.com

                                           *Counsel for Defendants The Cafesjian Family*
                                           *Foundation, Inc., John J. Waters, Jr., and Gerard*
                                           *L. Cafesjian*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| The Armenian Genocide Museum and Memorial, Inc., <br><br> *Plaintiff,* <br><br> v. <br><br> The Cafesjian Family Foundation, Inc.; John J. Waters, Jr.; Gerard L. Cafesjian, and John J. Waters, Sr. <br><br> *Defendants.* | Civil File No. 1:07-cv-01259 (CKK) <br><br> **ORAL ARGUMENT REQUESTED** <br><br><br> Status hearing: August 27, 2008 (10:30 AM) |

**MEMORANDUM OF POINTS AND AUTHORITY IN SUPPORT OF DEFENDANTS THE CAFESJIAN FAMILY FOUNDATION, INC., JOHN J. WATERS, JR., AND GERARD L. CAFESJIAN'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

Thomas F. Cullen (D.C. Bar No. 224733)
Nancy Berardinelli-Krantz (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700
tfcullen@jonesday.com
nbkrantz@jonesday.com

*Counsel for Defendants The Cafesjian Family Foundation, Inc., Gerard L. Cafesjian, and John J. Waters, Jr.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................................................... ii

BACKGROUND ....................................................................................................... 2

ARGUMENT .......................................................................................................... 5

I.    AGM&M HAS NOT ALLEGED A BREACH OF FIDUCIARY DUTY BY MR.
      CAFESJIAN AND MR. WATERS, JR., OR ANY LEGALLY-COGNIZABLE
      DAMAGES FLOWING FROM SUCH A BREACH. ...................................................... 5

      A.    Neither the Recordation of Memorandum of Agreement Nor the Filing of
            the *Lis Pendens* Breached Any Fiduciary Duties, As CFF Had a Right to
            Provide Notice of Its Substantive Interest and Protect that Interest In the
            Context of AGM&M's Attempt to Void It. ................................................... 6

            1.    No Fiduciary Duties Were Breached by the Filing of the
                  Memorandum of Agreement. .............................................................. 9

            2.    The Recordation of the *Lis Pendens* Breached No Fiduciary Duty. ........ 10

      B.    The Recordation of the Memorandum of Agreement and the *Lis Pendens*
            Caused No Legally-Cognizable Damages to AGM&M. ................................... 11

II.   THE REVERSIONARY CLAUSE IS VALID AND ENFORCEABLE ......................... 13

III.  REMOVAL OF THE *LIS PENDENS* WOULD BE IMPROPER. ................................. 16

      A.    AGM&M's Claim that CFF "Conceded" that It Has No Reversionary
            Interest, Based on Selectively-Edited, Out-of-Context Quotes in a Brief
            Filed in a Different Suit Is Absurd and Should Be Summarily Rejected. ........... 16

      B.    Given that CFF's Conceded Reversionary Rights Have Not Been Waived,
            And Remain Subject to Challenge in Case No. 08-255, Removal of the *Lis
            Pendens* is Improper as a Matter of Law. ................................................... 18

CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Associates Financial Services of America, Inc. v. District of Columbia,
689 A.2d 1217 (D.C. 1997) ...................................................................................9, 11, 12

Baker v. Henderson,
150 F. Supp. 2d 13 (D.D.C. 2001) ........................................................................5

Bell Atlantic Corp. v. Twombly,
127 S. Ct. 1955 (2007).........................................................................................5

Bostic v. District of Columbia,
906 A.2d 327 (D.C. 2006) ....................................................................................5

*Bothmann v. Harrington,
458 So. 2d 1163 (Fla. Dist. Ct. App. 1984) ........................................................12

*Day v. Avery,
548 F.2d 1018 (D.C. Cir. 1976) ..........................................................................11

Dean v. Kellogg,
68 N.E.2d 898 (Ill. 1946) .....................................................................................8

Dewsnup v. Timm,
502 U.S. 410 (1992)............................................................................................14

E.E.O.C. v. St. Francis Xavier Parochial Sch.,
117 F.3d 621 (D.C. Cir. 1997).............................................................................5

Ellipso, Inc. v. Mann,
541 F. Supp. 2d 365 (D.D.C. 2008) ....................................................................14

*Friends of Tilden Park, Inc. v. District of Columbia,
806 A.2d 1201 (D.C. 2002) ..............................................................................6, 9

Garcia v. U.S.,
996 F.Supp. 39 (D.D.C. 1998) .............................................................................6

*Heck v. Adamson,
941 A.2d 1028 (D.C. 2008) ...........................................................................10, 19

In re ASI Reactivation, Inc.,
934 F.2d 1315 (4th Cir. 1991) .............................................................................8

*In re Idella M. Fee Revocable Trust,
    142 S.W.3d 837 (Mo. Ct. App. 2004)............................................................12

Kamen v. International Brotherhood of Electric Workers,
    505 F. Supp. 2d 66 (D.D.C. 2007)................................................................5

*Matheson v. Harris,
    572 P.2d 861 (Idaho 1977)............................................................................12

*Michigan National Bank & Trust Co. v. Morren,
    487 N.W.2d 784 (Mich. Ct. App. 1992).......................................................12

Paul v. Judicial Watch, Inc,
    543 F. Supp. 2d 1 (D.D.C. 2008)..............................................................6, 11

*Pers Travel, Inc. v. Canal Square Associates,
    804 A.2d 1108 (D.C. 2002).........................................................................14

*Peters v. Riggs National Bank, N.A.,
    942 A.2d 1163 (D.C. 2008).........................................................................14

Rogers v. Pitt,
    535 F. Supp. 2d 29 (D.D.C. 2008)..............................................................13

*State Department of Transport & Development v. Jacob,
    483 So. 2d 592 (La. 1986)..........................................................................9, 11

*Storetrax.com, Inc. v. Gurland,
    915 A.2d 991 (Md. 2007)...........................................................................7, 10

Western Inn Corp. v. Heyl,
    452 S.W.2d 752 (Tex. Civ. App. 1970).........................................................8

*Willens v. 2720 Wisconsin Avenue Cooperative Association, Inc.,
    844 A.2d 1126 (D.C. 2004)........................................................................6, 9

Williams v. Central Money Co.,
    974 F. Supp. 22 (D.D.C. 1997)....................................................................15

**STATUTES**

*D.C. Code § 42-1207 ......................................................................................10, 19

**MISCELLANEOUS**

19 C.J.S. Corporations § 562 (2007)....................................................................11

The Second Amended Complaint in this matter was filed by the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") only *after* the relief requested in the First Amended Complaint had been fully satisfied, and only days after a Suggestion of Mootness was filed. As might be expected of such a document, hastily filed in a transparent attempt to keep this case alive, it is much ado about nothing.

The allegations of this case have always been a footnote to a larger dispute that is pending before this Court in Case No. 08-255. Among the issues in Case No. 08-255 is an attempt by AGM&M to invalidate a reversionary interest held by Gerard L. Cafesjian and The Cafesjian Family Foundation ("CFF") on five AGM&M properties in Washington, D.C. Because that dispute plainly affects Mr. Cafesjian and CFF's property interest, they filed a *lis pendens* in that matter, as they are statutorily entitled to do. Not only is this unobjectionable, it is the necessary and exclusive means of providing notice of a pending action in the District.

In its Second Amended Complaint, however, AGM&M continues to challenge Mr. Cafesjian and CFF's mere provision of *notice* of the reversion, even though the challenged notice has been withdrawn. It seeks damages for the recordation of the withdrawn notice and the *lis pendens*, even though AGM&M owes the substantive obligation and, hence, the consequences of that obligation, with or without procedurally-proper notice. Finally, AGM&M seeks to have the Court lift the *lis pendens* even though the dispute over the property in Case No. 08-255 remains pending and, as such, no authority permits its removal. As such, Defendants CFF, Mr. Cafesjian, and John J. Waters, Jr. submit this Memorandum of Points and Authority in Support of their Motion to Dismiss Counts One, Three, and Four of AGM&M's Second Amended Complaint for failure to state a claim.[1]

---

[1] Count Two does not raise any claims against the Defendants filing this Memorandum.

## BACKGROUND

This matter is one of several pending cases which ultimately involve a dispute among three nonprofit corporations—CFF, the Armenian Assembly of America, Inc. ("the Assembly"), and AGM&M—with respect to the development of a Washington, D.C. museum and memorial dedicated to commemorating the Armenian Genocide.  In 1997, the Assembly persuaded Gerard L. Cafesjian—a former Executive Vice-President of West Publishing, founder of CFF, and supporter of Armenian causes—to pledge financial support for the museum and memorial.  (2d Am. Compl. ¶¶ 4, 11-12.)

This support included a donation which helped the Assembly purchase property to be used for the museum and memorial.  The first donation of $4 million, supplemented with a loan, helped the Assembly to purchase the National Bank of Washington building located at 14th and G Streets, N.W.  (*Id.* ¶¶ 10-11; Ex. 1 § 1.1-1.2, 5.4.)  In the second donation, CFF pledged $12.85 million towards the purchase of additional adjacent properties, located at 1334-36, 1338, 1340, and 1342 G Street, N.W.  (*Id.* ¶ 12; Ex. 1 §§ 2.1-2.2.)  These donations were made pursuant to a Grant Agreement, which contained several conditions of relevance here.  (*Id.* ¶ 13.)

*First*, CFF and the Assembly were required to, and did, create AGM&M as the non-profit entity that would operate the planned museum and memorial.  (*Id.* ¶ 1, Ex. 1 § 5.1.)  The Grant Agreement also required the Assembly to enter into an agreement with AGM&M whereby it would transfer "all of its right, title, and interest" in assets and pledges contributed to the Assembly for the museum and memorial project.  (*Id.* Ex. 1 § 5.3(A).)

*Second*, the Assembly agreed that the five properties (collectively, the "Grant Property") could only be used as part of the museum and memorial, subject to "Plans" "approved by the Board of Trustees of [AGM&M,] Inc."  (*Id.* Ex. 1 § 3.1(A).)  Further, the Grant Agreement gave Mr. Cafesjian and CFF (collectively "the Grantor" in the parlance of the Grant Agreement) a

reversionary interest in the five properties, providing that "[i]f the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans," then "at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds *or transfer to the Grantor the Grant Property*." (*Id.* ¶ 14, Ex. 1 at pmbl. & § 3.1(B) (emphasis added).)

     *Third*, following AGM&M's creation, the Assembly and AGM&M executed the Transfer Agreement called for in the Grant Agreement. (*Id.* ¶ 16.) Pursuant to the Transfer Agreement, the Assembly transferred "all of its rights, title, and interest in and to all case, pledges, real property, tangible property, intangible property, and other assets contributed to the [Assembly] and/or held by the [Assembly] for the development, renovation, and construction" of the museum and memorial. (*Id.* ¶ 19, Ex. 2 § 1.1(A).) AGM&M, in exchange, agreed to "honor all of the [Assembly's] donor requirements existing at the time of transfer" and specifically "assume[d] and agree[d] to comply with the [Assembly's] obligations" under the Grant Agreement. (*Id.* Ex. 2 § 3.1(A)-(B).) As noted, one of the Assembly's obligations under the Grant Agreement was to "transfer to [CFF and Mr. Cafesjian] the Grant Property" if the conditions in the Grant Agreement were not met by December 31, 2010. (*Id.* Ex. 1 § 3.1(B).)

     **The Present Lawsuit.** As described in the pending Suggestion of Mootness (Dkt. No. 37), the present lawsuit started as a minor chapter in the larger dispute between Mr. Cafesjian and Hirair Hovnanian, another trustee of AGM&M who, along with his allies, has blocked Mr. Cafesjian from moving forward with developing a proper museum and memorial project for several years, and has since effectively blocked CFF and Mr. Cafesjian from participating in AGM&M entirely. The First Amended Complaint in this action contained only a single allegation—that Mr. Water's execution and recordation, on October 23, 2006, of a Memorandum

of Agreement Reserving Rights was *ultra vires* because it was not authorized by AGM&M.  (*See* Dkt. No. 26.)  That complaint sought only injunctive and declaratory relief, and sought to have the Memorandum of Agreement removed from the record, but it did not challenge the underlying substantive reversion which CFF and Mr. Waters had given notice of.  (*Id.* at 7-8.)

By contrast, in Case No. 08-255, the Assembly and AGM&M had asked that the reversionary interest be declared unenforceable, and in response, CFF's newly-retained counsel filed a *lis pendens* in that action.  (Case No. 08-cv-00255-CKK, Dkt. No. 1 ¶ 147 (D.D.C.); 2d Am. Compl. ¶ 36 n.2.)  Because the *lis pendens* protected Mr. Cafesjian and CFF's reversionary interest against sale to a *bona fide* third party purchaser, the Memorandum became redundant, and in an effort to streamline the multiple lawsuits, CFF released the Memorandum.  (2d Am. Compl. ¶ 36 n.2.)  It then filed a Suggestion of Mootness, which is still pending.

Despite the fact that the release of the Memorandum fully satisfied the relief requested in the First Amended Complaint, AGM&M responded with a proposed Second Amended Complaint in a transparent attempt to keep the present suit alive. (Dkt. No. 38.)  The Second Amended Complaint sought, for the first time, damages from the alleged *ultra vires* filing of the Memorandum of Agreement, and added several additional and/or duplicative claims as well. (*See* Dkt. No. 43 at 3-4.)  At a status conference with the Court, CFF agreed not to oppose the new claims, but in its Reply in Support of Mootness, argued that the damages claim arising out of the allegedly *ultra vires* filing of the Memorandum of Agreement could not be maintained based on AGM&M's post-mootness amendment.  (*Id.* at 7-11.)  Defendants The Cafesjian Family Foundation, Mr. Cafesjian, and Mr. Waters, Jr. now file this Motion to Dismiss the Second Amended Complaint for failure to state a claim.

## ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of any complaint that fails to state a claim upon which relief may be granted.  Dismissal for failure to state a claim under Rule 12(b)(6) is appropriate where the factual allegations do not "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."  *Id.* at 1964-65.  Although this Court "must treat the complaint's factual allegations -- including mixed questions of law and fact -- as true, drawing all reasonable inferences in the plaintiff's favor", it "need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations."  *Kamen v. Int'l Bhd. of Elec. Workers*, 505 F. Supp. 2d 66, 71 (D.D.C. 2007) (citations omitted).  When reviewing a Motion to Dismiss, the court may consider "the facts alleged in the complaint, any documents . . . attached to or incorporated in the complaint, and matters of which . . . judicial notice [may be taken]."  *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997) (citation omitted).  Judicial notice may be taken for "laws, statutes, and other matters of public record," *see Bostic v. District of Columbia*, 906 A.2d 327, 332 (D.C. 2006), including court records.  *Baker v. Henderson*, 150 F. Supp. 2d 13, 15 (D.D.C. 2001).

## I.    AGM&M HAS NOT ALLEGED A BREACH OF FIDUCIARY DUTY BY MR. CAFESJIAN AND MR. WATERS, JR., OR ANY LEGALLY-COGNIZABLE DAMAGES FLOWING FROM SUCH A BREACH.

Count One of the Second Amended Complaint alleges that Cafesjian and Waters Jr. breached a fiduciary duty they owed to AGM&M (1) by filing the now-defunct Memorandum of Agreement (the "Memorandum"); and (2) because CFF's attorney filed a *lis pendens* related to Case No. 08-cv-0255.  In the District of Columbia, breach of fiduciary duty sounds in tort,

*Garcia v. U.S.*, 996 F.Supp. 39, 43 (D.D.C. 1998), and "[t]o state a claim for breach of fiduciary

duty, a plaintiff must allege facts sufficient to establish the following: (1) defendant owed

plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) to the extent plaintiff seeks

compensatory damages-the breach proximately caused an injury." *Paul v. Judicial Watch, Inc*,

543 F. Supp. 2d 1, 5-6 (D.D.C. 2008).  As described below, AGM&M's fiduciary duty claim

should be dismissed because, first, the filing of these documents did not constitute a breach of

fiduciary duties, and second, even if it did, AGM&M suffered no legally cognizable injury.

**A.    Neither the Recordation of Memorandum of Agreement Nor the Filing of the *Lis Pendens* Breached Any Fiduciary Duties, As CFF Had a Right to Provide Notice of Its Substantive Interest and Protect that Interest In the Context of AGM&M's Attempt to Void It.**

The District of Columbia has little specific law on fiduciary duties applicable to

nonprofits, but it has applied the same rules as are applicable to for-profit corporations—namely,

that "managers of a nonprofit corporation's affairs . . . 'owe their fiduciary duties to the

corporation'" and "'must act in the utmost good faith' . . . [and] manage the corporation solely in

its best interest." *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201,

1210 (D.C. 2002) (citations omitted).  As a part of this duty, the fiduciary must not "use[] his or

her corporate office to promote, advance or effectuate a transaction between the corporation and

[himself]" when "that transaction is not substantively fair to the corporation." *Willens v. 2720

Wisconsin Ave. Coop. Ass'n, Inc.*, 844 A.2d 1126, 1136 & n.13 (D.C. 2004) (citations and

internal quotations omitted).

It is well-established, however, that there is no prohibition against a director or officer

holding a substantive interest against the corporation he serves, and there is no breach of

fiduciary duty when he exercises the rights under that interest.  Here, Mr. Cafesjian and CFF

hold such a substantive right, and thus may act as any other lienholder could, without breaching a

duty.  The case of *Storetrax.com, Inc. v. Gurland*, 915 A.2d 991 (Md. 2007) is instructive.  There, a corporation claimed that its officer breached fiduciary duties when, once "removed as an employee of the corporation, [he] filed suit against the corporation in order to enforce severance pay provisions of his employment agreement, pursued summary judgment by default after the corporation failed to file a timely answer, and sought to enforce his money judgment, over the corporation's opposition, by attaching the bank account of the corporation."  *Id.* at 994.

The Maryland Supreme Court disagreed.  It noted that it was "unable to locate any general rule of law forbidding a director from becoming a creditor of his or her corporation in the manner pursued here.  Nor could we find any rule of law prohibiting generally a corporation's director from enforcing his or her claims against the corporation grounded on the director's fiduciary relationship with the corporation."  *Id.* at 1005.  To the contrary, the Court held that

> When a director or other corporate officer loans money to a corporation, or advances money for use of the company, or otherwise becomes a creditor of the corporation . . . *he or she ought to have the same rights, as the same remedies, to enforce his or her claim, as any other creditor,* and his or her rights in these respects are as extensive as those of a creditor who is not a corporate officer. He or she may sue the corporation as a creditor just as if he or she were not a director, and may secure a preference, where the corporation is not insolvent, by issuing attachment or garnishment.

*Id.* at 1005 (internal punctuation marks, emphasis, and citations omitted).  Moreover, the Court held that "to accept literally the reasoning that [defendant] violated a fiduciary duty to the corporation merely because he failed to relinquish a legal interest at the corporation's request would mean that a corporation effectively could prohibit any director from suing the corporation of which he or she is a board member because the director would be obligated to cease pursuing his or her legal rights if the corporation requested it.  *That is not the law of this or any state, nor should it be.*"  *Id.* at 1010 (emphasis added).  Other courts have reached similar conclusions,

stretching back for decades. *See, e.g.*, *In re ASI Reactivation, Inc.*, 934 F.2d 1315, 1321 (4th Cir. 1991) (finding that once an insider has made a loan to an entity, it is not *per se* inequitable for an insider to assert his rights as a lien holder); *Western Inn Corp. v. Heyl*, 452 S.W.2d 752, 759 (Tex. Civ. App. 1970) ("Texas courts have considered and approved the action of an officer or director in loaning money to his corporation, taking corporate property as security therefor, and subsequently foreclosing on his security."); *Dean v. Kellogg*, 68 N.E.2d 898, 901 (Ill. 1946) ("A corporation may legally borrow money of its officer or stockholder, and the latter may legally enforce his loan.").

Here, AGM&M relies solely on the execution and recording of the Memorandum and the filing of the *lis pendens* to support its claims for breach of fiduciary duty.  (2d Am. Compl. ¶¶ 42-52.)  Neither of these actions, however, is legally sufficient to support a breach of fiduciary duty claim.  As AGM&M's Second Amended Complaint concedes, the Grant Agreement between CFF and the Assembly provided CFF and Mr. Cafesjian with a substantive reversionary interest in the five properties at issue—a right which was part of the series of transactions which led to AGM&M's very creation.  (*Id.* ¶ 13.)  Moreover, that Grant Agreement also required the Assembly to enter into a Transfer Agreement with the newly-formed AGM&M, whereby AGM&M voluntarily agreed to all of the obligations of the Grant Agreement, including the obligation to transfer the five properties to CFF, if the conditions of the Grant were not met.  (*Id.* Ex. 1 at § 5.3; Ex. 2 § 1.2.)  Thus, Mr. Cafesjian and CFF (1) had a substantive lien on the properties, and (2) were entitled to take all actions that any other lienholder had, despite the fact that Mr. Cafesjian and CFF's officer John Waters, Jr. were on the AGM&M's board.  The consequences of these facts are two-fold.

1.    No Fiduciary Duties Were Breached by the Filing of the Memorandum of Agreement.

*First*, with respect to the Memorandum of Agreement, it is clear that, like any other lienholder, that CFF had a right to record its interest and thereby give notice to third parties, *and* that as such, even assuming that the Memorandum of Agreement was improper, it had no effect on the actual substantive obligations that AGM&M owed to CFF.

It is well-established that recordation of a property interest does not affect substantive rights; it is merely a procedural device that provides constructive notice of property rights to third parties. *See Assocs. Fin. Servs. of Am., Inc. v. District of Columbia*, 689 A.2d 1217, 1222 (D.C. 1997) (holding that lack of recordation does not affect property rights against parties with "actual" or "inquiry" notice ); *State Dep't of Transp. & Development v. Jacob*, 483 So. 2d 592, 595-96 (La. 1986) ("[R]ecordation does not purport to be and is not itself the source of rights.  A recorded purchase from the legal owner transfers ownership to the purchaser, not because of the recordation, but because of the purchase.") (internal quotation marks omitted; citing authorities).

Here, CFF holds a reversionary interest against AGM&M as a consequence of the Grant and Transfer Agreements, both of which were bargained for and freely entered into.  The recordation of the Memorandum of Agreement had no substantive effect on AGM&M which AGM&M had not already agreed to accept when signing the Transfer Agreement, and thus the filing of the Memorandum of Agreement by CFF's officer Waters, Jr. was not "unfair" to AGM&M—after all, AGM&M *did owe the obligation* referred to in the Memorandum, and had no right to hide it.  *See Friends of Tilden Park,* 806 A.2d at 1210; *Willens*, 844 A.2d at 1136 & n.13.  Indeed, AGM&M makes no allegation that the Memorandum of Agreement was unfair or contained any inaccuracies regarding the fact that the obligation was owed.  Moreover, as shown *supra* at Part II.B, any error by Waters, Jr. in executing the Memorandum of Agreement was

effectively harmless, as CFF plainly had a right to provide notice of its interest to third parties without AGM&M's countersignature, and could have done so through other means apart from the Memorandum of Agreement itself (including, but not limited to, providing direct notice to potential purchasers of the Grant Properties.)  As AGM&M makes no allegation that recording or executing the Memorandum of Agreement breached a legally-cognizable duty, it has failed to meet the necessary burden to continue with the Breach of Fiduciary Duty claims.

<div align="center">2.    <u>The Recordation of the <em>Lis Pendens</em> Breached No Fiduciary Duty.</u></div>

For largely the same reasons, CFF's filing of a *lis pendens* in Case No. 08-cv-0255, in response to AGM&M's attempt to void the reversionary interest there, is not a breach of Mr. Cafesjian's or Mr. Waters, Jr.'s fiduciary duties as a matter of law.  As recently explained by the District of Columbia Court of Appeals, D.C. Code § 42-1207 provides that a party to a pending action which "affect[s] the title to or assert[s] a mortgage, lien, security interest, or other interest in real property situated in the District of Columbia" is "*entitled . . . to file a notice of lis pendens.*"  *Heck v. Adamson*, 941 A.2d 1028, 1029-30 (D.C. 2008) (original emphasis omitted). Indeed, the Court noted that other "informal, makeshift arrangement[] . . . [are] no substitute for the statutory protection that *lis pendens* is meant to afford plaintiffs."  *Id.* at 1031.  Given that Mr. Cafesjian and CFF hold a reversionary interest in the properties at issue, and given that AGM&M filed an action challenging that interest in real property, CFF was entitled to file a *lis pendens* just as any other lienholder; the fact that Mr. Cafesjian was a former trustee of AGM&M is legally irrelevant.  *Storetrax.com,* 915 A.2d at 1005-10.

Indeed, the breach of fiduciary duty claims against Mr. Waters and Mr. Cafesjian fail for the additional reasons that (1) Mr. Waters, Jr., although still an AGM&M Trustee, did not sign the *lis pendens* nor are any facts alleged indicating that he authorized or filed it himself, and (2) because Mr. Cafesjian had already resigned from AGM&M by the time the *lis pendens* was filed,

<div align="center">-10-</div>

meaning that he no longer owed AGM&M duties as a matter of law. *See, e.g.*, 19 C.J.S.

*Corporations* § 562 (2007) ("After a director or officer of a corporation ceases to be such, he or

she occupies no relation to it of trust or confidence and deals with it thereafter like any other

stranger."); *see also Judicial Watch, Inc.*, 543 F. Supp. 2d at 6. (dismissing plaintiff's breach of

fiduciary duty claim "without moving beyond prong one of the analysis: existence of a fiduciary

duty"); (*see also* Dkt. No. 42 ¶ 3; Dkt. No. 37-2 Ex. A; Case No. 08-cv-01746-RWR, Dkt. No.

14-2 Ex. 3.) As such, the complaint fails to state a claim against Waters, Jr., because he was not

alleged to have been involved with the *lis pendens*, and fails to state a claim against Mr.

Cafesjian, as he no longer owed AGM&M a duty. This claim must be dismissed.

### B.    The Recordation of the Memorandum of Agreement and the *Lis Pendens* Caused No Legally-Cognizable Damages to AGM&M.

In order to state a claim for breach of fiduciary duty, a party must also show that the

alleged breach caused the Plaintiff's injury. *Day v. Avery*, 548 F.2d 1018, 1029 n.56 (D.C. Cir.

1976) ("the breach of a fiduciary relationship is not actionable unless injury accrues to the

beneficiary or the fiduciary profits thereby") (internal citation omitted). Thus, AGM&M's

breach of fiduciary duty claims against Mr. Cafesjian and Mr. Waters, Jr. also fail because they

have not alleged any legally cognizable damages. Simply put, because AGM&M is burdened by

the *substantive* reversionary interest, AGM&M is not entitled to damages based on a party's

mere provision of *notice* of that obligation, even if the notice was procedurally improper.

As explained above, the recordation of a property interest is merely a procedural device

intended to give third parties notice of the claim. It is the contractual agreement, however, which

establishes the property rights and imposes the obligation upon the burdened landowner. *See*

*Assocs. Fin. Servs.*, 689 A.2d at 1222; *State Dep't of Transp. & Development*, 483 So. 2d at 595-

96. Recordation, therefore, does not add any additional substantive burdens to the affected

property; it merely gives notice of the interest to parties who do not already know (*i.e.*, those without actual notice) and who have no reason to suspect (*i.e.*, those without inquiry notice), thus protecting the interest from being lost to a *bona fide* purchaser without knowledge. *Assocs. Fin. Servs.*, 689 A.2d at 1222.

Thus, as a matter of common sense, a landowner who grants a substantive property interest to another should not be allowed to claim damages from the act of recordation, even if procedurally improper, for the recordation itself imposes no burden for which the landowner is not already obligated. Numerous courts have reached this conclusion, and thus bar damages claims based on the recordation of then-valid substantive property rights. *See, e.g., In re Idella M. Fee Revocable Trust*, 142 S.W.3d 837, 842 (Mo. Ct. App. 2004) (rejecting damages for improper recordation, despite Plaintiff's alleged ownership, when "[a]t the time she filed the deed . . . she was a record owner"); *Michigan Nat'l Bank & Trust Co. v. Morren*, 487 N.W.2d 784, 786 (Mich. Ct. App. 1992) (rejecting damages for recordation of mortgage interest when, "although defendants recorded their mortgage interest after plaintiffs purchased the property, there is no indication in the record that defendants' mortgage lien is invalid in any way."); *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. Dist. Ct. App. 1984) (drawing a "distinction . . . between an improper filing in a procedural sense, and a wrongful filing in a substantive sense. Only the latter will support an action for" damages related to a wrongful lien); *cf. Matheson v. Harris*, 572 P.2d 861, 864 (Idaho 1977) (rejecting damages for unilateral recordation of a "notice" describing the existence of signed and accepted contract, even though the contract was held, after the fact, to be invalid).

These authorities compel the rejection of any damages claim by AGM&M here. CFF holds a valid reversionary interest in the five properties identified in the Memorandum of

Agreement, which AGM&M agreed to honor when it assumed the Assembly's obligations under the Grant Agreement. Even assuming that the Memorandum of Agreement *itself* was invalid—which it was not—AGM&M cannot claim to be damaged simply because third parties had *notice* of the obligations that AGM&M already owed. And the filing of the *lis pendens* in Case No. 08-255 was plainly authorized by statute, as a direct consequence of AGM&M's attempt to strip Mr. Cafesjian and CFF of their bargained-for right. *See supra* at Part I.A.2. Simply put, AGM&M has no right to damages because it wishes to hide its valid, binding obligations from third parties.

## II.    THE REVERSIONARY CLAUSE IS VALID AND ENFORCEABLE

AGM&M also seeks relief in the form of a declaration that Mr. Cafesjian and CFF's reversionary interests in the five properties should be declared invalid, thus freeing AGM&M of its obligations while depriving Mr. Cafesjian and CFF of the conditions which led him to donate nearly $15 million dollars for AGM&M's activities. This requested relief is identical to a claim AGM&M made in Case No. 08-255 (*see* Case No. 08-cv-00255-CKK (D.D.C.), Dkt. No. 1 ¶ 147), which is also before this Court on the merits. There is no need for this entirely duplicative claim, especially where it only serves to keep alive an otherwise defunct complaint; as such, the Court should just dismiss this Count without prejudice to its advancement in Case No. 08-255. *See, e.g.*, *Rogers v. Pitt*, 535 F. Supp. 2d 29, 33 (D.D.C. 2008).

Even were the Court not inclined to simply dismiss this entirely duplicative claim without prejudice, however, it is plain, based solely on the allegations made in the Second Amended Complaint, that the request for declaratory relief fails to state a claim and should be dismissed.[2] Specifically, the only factual allegations that allegedly support such relief—the "delay" caused by CFF's exercise of its right, as a lienholder, to record notice of the reversion and to file a *lis*

---

[2] Defendants reserve the right to challenge the sufficiency of this claim in the context of the allegations in Case No. 08-255 as well; however, Defendants takes no position on that matter here as it is not now before the Court.

*pendens* in response to AGM&M's attempt to void that interest—do not themselves state any

legally cognizable harm. *See supra* at Part I. Moreover, the Second Amended Complaint is does

not contain any of the allegations which might lead a court to declare a contractual provision

unenforceable. To the contrary, the Second Amended Complaint's allegations establish that

AGM&M must honor the obligations it freely accepted when signing the Transfer Agreement.

The District of Columbia Court of Appeals has held that "in the absence of fraud, duress,

or mistake, one who signs a contract which he had an opportunity to read and understand is

bound by its provisions unless enforcement of the agreement should be withheld because the

terms of the contract are unconscionable." *Pers Travel, Inc. v. Canal Square Assocs.,* 804 A.2d

1108, 1110 (D.C. 2002) (internal citations omitted). AGM&M, however, does not allege that the

clause in the Grant Agreement providing for the reversionary interest is unconscionable, nor

could it. Such a showing requires a party to allege both that the burdened party "lacked a

meaningful choice in entering the contract *and* that the contract terms unreasonably favor" the

benefited party. *See also Peters v. Riggs Nat'l Bank, N.A.,* 942 A.2d 1163, 1168 (D.C. 2008)

(emphasis added). Moreover, "courts are generally reluctant to disturb the contractual terms

negotiated by sophisticated parties." *Ellipso, Inc. v. Mann*, 541 F. Supp. 2d 365, 372 (D.D.C.

2008) (internal citations omitted).

Here, AGM&M has not made any allegations necessary to support a finding that the

reversionary clause is unenforceable.[3] Nor can it. It certainly could not dispute that the

---

[3] AGM&M appears to argue that the Reversionary Interest is invalid because the Grant Properties have increased in value. (2d Am. Compl. ¶¶ 15, 55.) This allegation is both puzzling and without merit. When the Grant Agreement and Transfer Agreements were signed, any reasonable party would have understood that the value of the property might increase over time. The fact that this has allegedly occurred was neither unforeseen nor outside the contemplation of the parties, and cannot reasonably be considered an unanticipated "windfall." To the contrary, AGM&M would receive a windfall if the reversion were destroyed based on the mere increase in property values. *Cf. Dewsnup v. Timm,* 502 U.S. 410, 417 (1992) (noting that an increase in property value "rightly accrues to the benefit of the creditor, not to the benefit of the debtor" and that holding otherwise could give debtor a "windfall").

Armenian Assembly of America, which negotiated the Grant Agreement, was a sophisticated entity which had a choice in whether to enter into the agreement. (2d Am. Compl. ¶¶ 8-9, 11-13.) It was Mr. Cafesjian's decision to provide the Grant which led to AGM&M's very creation, (*id.* ¶ 12) and AGM&M cannot thus deny that its execution of the Transfer Agreement, which allowed the newly-formed AGM&M to receive all the donations earmarked by Mr. Cafesjian and CFF, was likewise the freely-made decision of a sophisticated party (and, indeed, a decision made by the same individuals who agreed upon the Grant Agreement itself). (*See id.* ¶¶ 13-16.) Thus, while AGM&M certainly complains that it is "unfair" that is has to revert the properties back to CFF and Mr. Cafesjian should it fail to live up to the obligations of the Grant Agreement, its complaints ring hollow as a matter of law. AGM&M's own allegations show that (1) the Assembly freely agreed to provide the reversionary interest, form AGM&M, and enter into the Transfer Agreement, in exchange for nearly $15 million of donations, and (2) that AGM&M likewise agreed to accept the obligations of the Grant Agreement in exchange for receiving those donations itself. There are no grounds for declaring that reversion invalid.

Moreover, AGM&M's attempt to void the reversion should be dismissed as unripe, as the "claim of common law unconscionability appears to apply only defensively, for example, as a response to an attempt to enforce a contract." *Williams v. Central Money Co.*, 974 F. Supp. 22, 28 (D.D.C. 1997). Here, AGM&M has over two years in which to fulfill the obligations of the Grant Agreement, and if AGM&M were to immediately reverse its own improper actions, and allow Mr. Cafesjian his contractual right to participate in all material decisions regarding the museum and memorial (pursuant to a plan which uses all five properties for the museum, as required by the Grant Agreement), then the conditional reversion might not come to pass. Based

on the allegations of this complaint, however, the Court should not, at this time, wade into the issue of whether the reversion is void, before it is clear that the reversion will take effect.

## III.    REMOVAL OF THE *LIS PENDENS* WOULD BE IMPROPER.

In Count Four of the Complaint, AGM&M asks this Court to remove the *lis pendens* from the District of Columbia's land records, alleging that Defendants "conceded" that they have no rights with respect to the properties.  This is blatantly false, as AGM&M's own exhibits demonstrate.  Rather, the allegations of the complaint demonstrate that Mr. Cafesjian and CFF hold a reversionary interest in the properties, and thus, as discussed *supra*, CFF was statutorily *entitled* to file the *lis pendens* to protect that interest.  Having filed it there, the *lis pendens* may not be dismissed until the litigation over the validity of the reversionary interest has been concluded.  In other words, because Case No. 08-255 remains pending, the *lis pendens* remains valid and AGM&M's claim should be dismissed as a matter of law.

### A.    AGM&M's Claim that CFF "Conceded" that It Has No Reversionary Interest, Based on Selectively-Edited, Out-of-Context Quotes in a Brief Filed in a Different Suit Is Absurd and Should Be Summarily Rejected.

As an initial matter, AGM&M's claim that CFF "conceded" that it has no right to enforce its reversionary interest (2d Am. Compl. ¶¶ 40-41, 60) is utterly baseless and, sadly, represents another example of the misleading representations that AGM&M's counsel have made to this Court.  (*See* Dkt. No. 43 at 10 & n.1 (listing several other examples).)  The opposition to the motion to dismiss (Exhibit 8 to the Second Amended Complaint) was filed in the District of Minnesota by CFF and Mr. Cafesjian against the Assembly—not AGM&M—for *the Assembly's* breach of the Grant Agreement and breach of the covenant of good faith and fair dealing arising out of the Grant Agreement.  (Ex. A ¶¶ 16-18, 21-22.)  That lawsuit did not involve the reversionary interest; rather, it argued that the Assembly failed to issue a promissory note to CFF,

as called for in the Grant Agreement, and sought damages and rescission of the Grant Agreement as relief.  (*Id.* at 25-27.)

The opposition to the motion to dismiss itself was in response to the Assembly's argument that AGM&M was an indispensable party that needed to be joined.  (Ex. B)  In its opposition, CFF merely argued that AGM&M was not an indispensable party because CFF's suit only sought relief from the Assembly under the Grant Agreement (which AGM&M did not itself sign).  In that context, CFF properly noted that "[t]he *Grant Agreement* neither affords CFF any cause of action against AGM&M nor conditions CFF's recourse against the Assembly on the protection of rights that AGM&M might have attained."  (2d Am. Compl. Ex. 8 at 27 (emphasis added).)  Likewise, CFF's statement regarding its need to "rely upon the Assembly to take whatever action regarding the real estate that would be required to satisfy any relief that might be awarded" was made in this same context: arguing that, in a suit *against the Assembly* for rescission of the Grant Agreement, that any order that *the Assembly* return the properties would require them to deal directly with AGM&M pursuant to the Transfer Agreement.  (*Id.* at 31.)  Though AGM&M now seeks to rip these statements out of context, a simple perusal of their own Exhibit 8 shows that CFF never disclaimed its ability to sue AGM&M directly under the Transfer Agreement under a third-party beneficiary or related theory; indeed, CFF plainly indicated that it could do so, as "[u]nder the Transfer Agreement AGM&M agreed to 'honor all of [CFF's] requirements existing at the time or transfer' and to comply with Assembly's obligations under the Grant Agreement."  (2d Am. Compl. Ex. 8 at 29 n.7.)  Nor did CFF claim that it was not entitled to benefit from the reversionary interest; to the contrary, CFF expressly noted that AGM&M held "the properties that are already subject to CFF's reversionary rights" which would vest in 2010.  (*Id.* at 28.)

Finally, AGM&M claims that CFF lost its right to enforce its reversionary interest against AGM&M because, in her report and recommendation, the magistrate judge stated the following: "Cafesjian seeks '[r]escission of the Grant Agreement and restitution of all donations made pursuant to that agreement.' In other words, he wants the money he donated returned." (*Id.* Ex. 10, at 16.) To even state AGM&M's claim is to show its absurdity. As noted, CFF's Minnesota complaint only sought relief against the Assembly, and AGM&M was not a party to the dispute. As the opinion indicates, the magistrate was not ruling on the sufficiency of the reversionary clause, let alone on Mr. Cafesjian and CFF's ability to enforce that right against a *different* party (AGM&M) under a *different* set of claims than what was then at issue. Rather, she was making a set of procedural rulings not affecting the merits. Thus, the magistrate's characterization, plainly *dicta* even in the context of the very case she was deciding, cannot, under any notion of justice or due process, be considered a binding ruling that destroyed CFF's property rights *sub silentio*.

AGM&M's attempts to conjure up some sort of waiver argument, based on selectively-edited, out-of-context quotes in litigation on different claims against a different party, must fail as a matter of law and equity. As described below, the failure of this baseless argument means that CFF retains an interest in the property, and as such, AGM&M's request that the Court lift the *lis pendens* in Case No. 08-255 while it is still pending, must be dismissed.

**B.    Given that CFF's Conceded Reversionary Rights Have Not Been Waived, And Remain Subject to Challenge in Case No. 08-255, Removal of the *Lis Pendens* is Improper as a Matter of Law.**

As described above, AGM&M's Second Amended Complaint and the attached exhibits demonstrate that CFF and Mr. Cafesjian hold a reversionary interest in the properties at issue, and indeed, AGM&M seems to concede that the right exists, if only as a means to try to eliminate it. (*See, e.g.,* 2d Am. Compl. ¶ 57.) As such, its request for removal of the *lis pendens* is plainly improper as a matter of law. As noted, in the District of Columbia, a party who has an

interest in land that may be affected by a pending lawsuit is *entitled* to file a *lis pendens*, and no

lesser substitute will suffice.  (*See supra* at Part I.)  Given that CFF has such an interest, and that

its interest is challenged in Case No. 08-255, it is plain that CFF had a right to file the *lis pendens*,

and there is no legal authority for its removal prior to the conclusion of that case.

     The statute which entitles a party to file a *lis pendens* describes only two circumstances in

which a *lis pendens* should be released:

- "If judgment is rendered in the action or proceeding against the party who filed the notice of the pendency, the judgment shall order the cancellation and release of the notice at the expense of the filing party as part of the costs of the action or proceeding."  D.C. Code § 42-1207(d); and

- "a notice of the pendency of an action or proceeding is filed for recordation and the debt or other relief for which the action or proceeding was brought is satisfied, it shall be the duty of the prevailing party to file for recordation a release of the notice of pendency of the action or proceeding within 30 days after the satisfaction"  *Id.* § 42-1207(e).

     Otherwise, the Court of Appeals has identified only one other circumstance when a court

*might* be permitted to remove a *lis pendens*: where the party filing the *lis pendens* fails to state a

claim for relief, but even then, the Court suggested that "[it] might well be justified in concluding

that, before judgment is rendered in the action or proceeding, the trial court enjoys no authority

to order cancellation of a *lis pendens* notice."  *Heck*, 941 A.2d at 1030-31.

     None of these circumstances are present here.  There has been no judgment in Case No.

08-255, and the relief sought in that case has not otherwise been satisfied, ruling out any

statutory avenue to *lis pendens* removal.  Furthermore, it is *AGM&M* that challenged the

reversionary interest, and Mr. Cafesjian and CFF have a valid claim that they should be entitled

to retain the benefit of the reversionary interest, thus removing the only potential ground for

judicial removal of the notice.

In short, the *lis pendens* was properly filed, as of right, to protect Mr. Cafesjian and

CFF's reversionary interest in the properties while this dispute is pending. AGM&M has no

right to cause that statutory protection to be lifted, thereby effectively arrogating onto itself the

power to unilaterally destroy CFF's property rights by selling the properties to a *bona fide*

purchaser. Its claim for removal of the *lis pendens* must be dismissed.

## CONCLUSION

Despite its transparent effort to keep a moot case alive by filing new and different claims

in its Second Amended Complaint, AGM&M's new allegations fail to pass muster. AGM&M

agreed to accept the conditional obligation to transfer the five properties to Mr. Cafesjian and

CFF, and having been given that right, Mr. Cafesjian and CFF (through its officers) were entitled

to provide notice of it. Moreover, even assuming, *arguendo*, that the method of notice was

improper, AGM&M suffered no legally cognizable damages as a result. As such, the breach of

fiduciary duty claims must be dismissed. And, as described above, the claims seeking a

declaration of the invalidity of the reversion and the lifting of the *lis pendens* must similarly fail.


Dated:  August 15, 2008                        Respectfully submitted,

                                               /s/  Thomas F. Cullen_____
                                               Thomas F. Cullen (D.C. Bar No. 224733)
                                               Nancy Berardinelli-Krantz (admitted *pro hac vice*)
                                               JONES DAY
                                               51 Louisiana Avenue, N.W.
                                               Washington, D.C.  20001-2113
                                               Telephone:  (202) 879-3939
                                               Facsimile:   (202) 626-1700
                                               tfcullen@jonesday.com
                                               nbkrantz@jonesday.com

                                               *Counsel for Defendants The Cafesjian Family
                                               Foundation, Inc., Gerard L. Cafesjian, and John J.
                                               Waters, Jr.*

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Gerard L. Cafesjian and The Cafesjian
Family Foundation, Inc.,

        Plaintiffs,

v.

Armenian Assembly of America, Inc.,

        Defendant.

Civil File No. ___07CV2079 PAM JSM___

**COMPLAINT**

**JURY TRIAL DEMANDED**

Gerard L. Cafesjian and The Cafesjian Family Foundation, Inc. (collectively "Cafesjian") complain against Armenian Assembly of America, Inc. as follows:

## PARTIES

1.    Gerard L. Cafesjian is a citizen of Florida.

2.    The Cafesjian Family Foundation, Inc. is a Florida non-profit corporation with its principal place of business at 4001 Tamiami Trail, Suite 425, Naples, Florida, 34103.

3.    The Armenian Assembly of America, Inc. is a District of Columbia non-profit corporation, with its principal place of business at 1140 19th Street NW, Suite 600, Washington, DC, 20036.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332: citizenship is diverse; and the amount in controversy exceeds $75,000.

5.    By written consent, this Court has personal jurisdiction over the Assembly.

SCANNED

APR 2 6 2007

U.S. DISTRICT COURT MPLS

EXHIBIT A

6.    For the same reason, venue is proper.

## FACTUAL BACKGROUND

7.    On March 17, 2000, the Assembly issued a $500,000 promissory note to Cafesjian. (Ex. A attached.)

8.    Minnesota law governs note validity, construction and enforceability. The note specifies that any federal court or state court sitting in Hennepin County, Minnesota shall have jurisdiction to enforce the note. (*Id.*)

9.    On November 1, 2003, Cafesjian and the Assembly entered into a Grant Agreement (Exhibit B attached) pursuant to which Cafesjian agreed to make significant charitable donations to the Assembly for the purpose of creating the Armenian Genocide Museum and Memorial ("AGM&M").

10.    Section 5 of the Grant Agreement conditions Cafesjian's obligation to make such grants upon performance by others, including the Assembly. In particular, Section 5.4 provides as follows:

> 5.4.    Promissory Note.
>
> (A)    The Assembly must issue a new promissory note (the "Promissory Note") to replace the promissory note issued on March 17, 2000 by the Assembly in favor of [Cafesjian] in the amount of $500,000.
>
> (B)    The new note must be interest free and mature on December 31, 2005.
>
> (C)    If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.

(*Id.*)

11.     The March 17, 2000 promissory note has neither been paid for nor forgiven.

12.     Cafesjian performed all Grant Agreement obligations, contributing over $14,000,000 toward development of the AGM&M.

13.     The Assembly never issued a promissory note to replace the original $500,000 note as required by Section 5.4 of the Grant Agreement.

14.     The Assembly now denies the validity and enforceability of the March 17, 2000 note.

15.     The Assembly's failure to issue a new promissory note has damaged Cafesjian.

## COUNT I:  BREACH OF CONTRACT

16.     The November 1, 2003 Grant Agreement obligated the Assembly to issue a new promissory note to Cafesjian in the amount of $500,000 to replace the promissory note originally issued on March 17, 2000.

17.     The Assembly has yet to issue the replacement note.

18.     This non-performance materially breached the Grant Agreement.

19.     As a direct result of this breach, Cafesjian has been damaged in excess of $500,000.

EXHIBIT A

20.    Because of the Assembly's material failure to perform, the Grant Agreement should be rescinded, and all donations made pursuant to the Grant Agreement should be restituted to Cafesjian.

## COUNT II:  BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

21.    The Assembly implicitly covenanted to act fairly, in good faith and in a nondiscriminatory manner towards Cafesjian and to refrain from actions and inactions that would injure Cafesjian's rights or unjustifiably hinder Cafesjian's performance of the Grant Agreement.

22.    The Assembly violated this implied duty of good faith and fair dealing by failing to issue a replacement promissory note to Cafesjian.

23.    This breach of duty interfered with Cafesjian's performance and rights under the Grant Agreement so as to deny them the benefits of the Grant Agreement. Further this inaction injured Cafesjian causing their AGM&M aspirations and hopes to be frustrated.

24.    As a direct and proximate result, Cafesjian has been damaged in excess of $500,000 and is entitled to rescission of the Grant Agreement and restitution of all donations made pursuant to that agreement.

WHEREFORE, Cafesjian requests the following relief:

25.    A declaration that the Assembly materially breached the Grant Agreement as well as the implied covenant of good faith and fair dealing;

EXHIBIT A

26.    Damages in an amount in excess of $500,000;

27.    Rescission of the Grant Agreement and restitution of all donations made

pursuant to that agreement; and

28.    The award of attorneys' fees, pre-judgment and post-judgment interest,

costs and disbursements.

Dated:  April 26, 2007                    **BRIGGS AND MORGAN, P.A.**

By: _____
       Timothy R. Thornton (#109630)
       Molly M. Borg (#0331922)
       2200 IDS Center
       80 South Eighth Street
       Minneapolis, MN  55402-2157
       (612) 977-8400

**ATTORNEYS FOR PLAINTIFFS
GERARD L. CAFESJIAN AND THE
CAFESJIAN FAMILY FOUNDATION**

EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Gerard L. Cafesjian and The Cafesjian Family Foundation,<br><br>    Plaintiffs,<br><br>  vs.<br><br>The Armenian Assembly of America,<br><br>    Defendant. | Civil File No. 07-2079 (JNE/JJG) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT THE ARMENIAN ASSEMBLY OF AMERICA'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AND FAILURE TO JOIN A NECESSARY PARTY

The Armenian Assembly of American ("the Assembly"), through its counsel,

submits this Memorandum of Points and Authorities in support of its Motion to Dismiss

Plaintiffs Gerard L. Cafesjian ("Cafesjian") and the Cafesjian Family Foundation

("CFF")'s Complaint pursuant to Fed. R. Civ. P. 12(b)(7) and 12(b)(6).

## I.  INTRODUCTION

This action arises from a dispute between the Assembly and a donor, Gerard L.

Cafesjian ("Cafesjian"), who took control of an Assembly initiated project to build an

Armenian Genocide Museum, failed to manage or develop it successfully, and now

brings this lawsuit against the Assembly on a Note that was transferred, along with

significantly appreciated real estate, to another non-profit corporation, the Armenian

Genocide Museum and Memorial, Inc. ("AGM&M"), all at Cafesjian's insistence.  He

now seeks rescission of all his donations to AGM&M, which include the Note itself.

In the late 1990s, the Assembly, the premier educational and advocacy organization of Armenian-Americans in the United States, began developing a permanent museum and memorial to the victims and survivors of the Armenian Genocide ("the museum"). After learning of the Assembly and the museum from Assembly members, Cafesjian became interested in the project. When the Assembly located a property in Washington D.C. for the museum ("the Bank site"), they purchased it with the assistance of Cafesjian and another donor. Cafesjian then urged the Assembly to expand the scope of the project, with assurances that he would provide or secure the financial backing required for his grandiose plans.

In 2003, at Cafesjian's insistence, a new organization, the AGM&M, was created, to which was donated the Bank site as well as four abutting properties Cafesjian had purchased through his company. Cafesjian, with the assistance of one of his employees, John J. Waters ("Waters"), assumed nearly total control of the project, all the while assuring AGM&M and the Assembly that he was committed to seeing the project through to its completion. Unfortunately, Cafesjian and Waters operated AGM&M for three years without accomplishing real substantive steps toward the actual construction of the Museum. Cafesjian failed to secure additional donor funding, failed to adequately report on his activities as President and Chairman of AGM&M, and backed a controversial architectural "vision" for the museum itself. When faced with reasonable inquiries into his management of the project, Cafesjian rejected the input of the other AGM&M Trustees and demanded that the AGM&M return all of his donations, including the real estate. This despite the fact that in the three years they were in control, Cafesjian and

Waters spent down and encumbered many of the assets donated to the museum project.

When AGM&M refused to yield to Cafesjian's unreasonable demands, Cafesjian filed

this action against the Assembly, seeking damages far in excess of the amounts he had

donated and rescission of the Grant Agreement, all on the basis of an alleged failure of

the Assembly to transfer to AGM&M a Promissory Note that, based on conversations

with Cafesjian, both the AGM&M and the Assembly had understood would be forgiven.

Even assuming all facts in the Complaint are true, the Plaintiffs' Complaint must

be dismissed:

    (1) pursuant to Fed. R. Civ. P. 12(b)(7), as Cafesjian and CFF

          (a) improperly named the Assembly as a Defendant in this action and

          (b) failed to join the AGM&M, a necessary party under Fed.R.Civ.P.

          19(a) and an indispensable party who cannot be joined under 19(b);

    (2) because the Plaintiffs are barred from seeking the relief requested by

          (a) the applicable statutes of limitations; and

          (b) the arbitration provisions governing the transfer of interests from the

               Assembly to AGM&M, and because, given the complexity of the

               factual background and the claims likely to be asserted by the parties

               and AGM&M, abritration is the most appropriate forum for this

               dispute; and

    (3) pursuant to Fed. R. Civ. P. 12(b)(6), as the complaint fails to allege facts

which, even if proven, would demonstrate that the Assembly breached the terms of the

Grant Agreement, and as the relief requested by the Plaintiffs is not permitted under applicable law.

## II.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The Assembly is a District of Columbia non-profit corporation with its principal place of business at 1140 19th Street NW, Suite 600, Washington, D.C. 20036. The Assembly is the premier Armenian-American advocacy group in the United States. Its missions include, but are not limited to, promoting Armenian-American interests to public policy makers and the public, providing resources and opportunities for Armenian-Americans in the American democratic process, undertaking research, education and advocacy for universal affirmation of the Armenian Genocide, enhancing relationships between the United States and Armenia, and securing collaboration among Armenian-American organizations. See Affidavit of Robert A. Kaloosdian (hereinafter "Kaloosdian Aff."), attached at Exhibit 1, at ¶ 4.

In order to preserve and establish a location where Americans could learn from the lessons of the Armenian Genocide, the Assembly began investigating the construction of a permanent museum to the victims and survivors of the Armenian Genocide ("the museum"). See id. at ¶ 5. The Assembly explored sites for the museum in Washington, D.C. and solicited donations from the Armenian-American community for the purpose of establishing and constructing the museum. See id.

In approximately January of 2000, the Assembly identified a possible site for the museum at the National Bank of Washington Building in Washington, D.C. ("the Bank site"). See id. at ¶ 8. This site was in a desirable location near the White House and

offered an opportunity for significant stature for the museum. See id. Once this site was

identified, the Assembly sought donations and pledges from various sources to fund the

purchase. It successfully raised most of the initial funds, primarily from two significant

donors: Anoush Mathevosian, and Cafesjian, through the Cafesjian Family Foundation

(CFF), (the plaintiffs in this case). See id.

In order to finalize the funding needed for the purchase of the property, on March

17, 2000, the CFF issued a Promissory Note to the Assembly in the amount of $500,000

("the Note"), attached at Exhibit 2. See also Kaloosdian Aff. at ¶ 9. By its terms, the

Note was interest free and "payable in full on May 16, 2000." Based on discussions with

Cafesjian, it was the Assembly's understanding that this Note subsequently was to be

forgiven. See Kaloosdian Aff. at ¶ 9.

Over the next three years, the Assembly continued to pursue the development of

the museum. Cafesjian, who had conditioned his financial support for the purchase of the

Bank site on the inclusion of a "Gerard L. Cafesjian Memorial" at the museum site,

actively encouraged the Assembly to expand the scope of the project. See id. at ¶ 10.

While acknowledging that his goals for the project would be costly, Cafesjian assured the

Assembly that he was committed to providing or securing funding for the expanded

project. Id. Cafesjian simultaneously acquired four lots adjacent to the Bank site through

his company, TomKat, which were eventually donated to AGM&M. Id. Eventually,

Cafesjian adamantly insisted that a new non-profit organization, the AGM&M, be created

to handle the development and operation of the museum and memorial. Id.

- 5 -


On October of 2003, AGM&M was incorporated as a District of Columbia not-for-profit corporation and the first Trustees of AGM&M were selected: Cafesjian, Ms. Mathevosian, Hirair Hovnanian ("Hovnanian"), another significant donor and the current Chair of the Board of Trustees of the Assembly, and Robert A. Kaloosdian ("Kaloosdian"), the Assembly delegate to the Board of Trustees (hereinafter referred to as "the Trustees"). See id. at ¶ 11. The Trustees enacted By-Laws of AGM&M (attached at Exhibit 3) and selected officers, including Cafesjian (President) and Waters (Secretary and Treasurer).[1] Cafesjian then insisted on several other steps, see Kaloosdian Aff. at ¶ 13-15, which, in retrospect, appear to be very self-serving.

First, on November 1, 2003, at Cafesjian's insistence, the Assembly executed with AGM&M a "Transfer Agreement" for the purpose of transferring "all of its real property, pledges, cash, and other assets acquired for the purpose of building AGM&M." See Transfer Agreement attached at Exhibit 4. The Transfer Agreement, which was drafted by Cafesjian's attorneys, see Kaloosdian Aff. at ¶ 14, was executed by Waters on behalf of AGM&M.

Simultaneously with the execution of the Transfer Agreement, the Assembly executed a Grant Agreement with Cafesjian. See Grant Agreement between Assembly and Cafesjian, attached at Exhibit 5. Under the terms of the Grant Agreement, which also was drafted by Cafesjian's attorneys (see Kaloosdian Aff. at ¶ 13), the Assembly was

---

[1] Under the AGM&M By-Laws, see Exhibit 2, only Trustees can hold office as Secretary or Treasurer. At Cafesjian's insistence, Waters, a long time employee of Cafesjian who is an officer of other Cafesjian entities, was appointed as Secretary and Treasurer even though it was contrary to AGM&M By-Laws.

required to transfer the Note to AGM&M upon the execution of the Transfer Agreement

(i.e. on November 1, 2003). The Grant Agreement provisions regarding the Note state as

follows:

> **5.4** **Promissory Note**
>
> **(A)** **The Assembly must issue a new promissory note (the "Promissory Note" to replace the promissory note issued on March 17, 2000 by the Assembly in favor of the [Cafesjian Family] Foundation in the amount of $500,000.**
>
> **(B)** **The new note must be interest free and mature on December 31, 2005.**
>
> **(C)** **If the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets.**[2]
>
> **[Emphasis supplied.]**

The Grant Agreement is incorporated by reference in the Transfer Agreement, and

sets forth the following specific requirements for the terms of the Transfer Agreement.

> **5.3** **Transfer Agreement**
>
> **(A)** **On or before November 1, 2003, the Assembly shall have entered into a pledge Agreement with AGM&M, Inc. (the "Transfer Agreement") under the terms of which the Assembly shall transfer to AGM&M, Inc. all of its right, title and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the Assembly and/or held by the Assembly for the development, renovation, and construction of the AGM&M.**

---

[2] The last provision of Section 5.4 of the Grant Agreement is ambiguous, as it is unclear whether the Transfer Agreement was to transfer the Assembly's obligations under the Note to AGM&M, or the CFF's rights as payee under the Note.

**(B)    The Transfer Agreement will oblige AGM&M, Inc. to honor all of the existing donor requirements at the time of transfer, or in the alternative, to obtain donor consent to the transfer and any modification of donor terms.**

**(C)    Under the Transfer Agreement, AGM&M Inc. must assume and agree to comply with the obligations of the Assembly under this Agreement relating to the Memorial.**

Finally, under the terms of the Grant Agreement, Cafesjian reserved certain rights

to the grant property as follows:

**(B) If the Grant Property is not developed prior to December 31, 2010 in accordance with [Plans to be approved by the AGM&M Board of Trustees], or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plains, then:**

**i.    in the event any portion of the Grants has not been funded, this Agreement terminates; and**

**ii.    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant property.[3]**

See Grant Agreement at Section 3.1(B).

Pursuant to the requirements of the Grant Agreement and the Transfer Agreement,

the Assembly subsequently transferred all right, title and interest in the Bank site to the

AGM&M, as well its other donations and assets acquired for the purpose of building the

museum.

---

[3] This provision effectively gave Cafesjian the power to force the reversion of his donations simply by doing nothing to establish the museum on a timely basis or by creating a conflict with the other members of the Board of Trustees.

Between November 1, 2003 and the fall of 2006, the AGM&M was managed and controlled by Cafesjian and Waters.[4]  See Kaloosdian Aff. at 15.  They hired consultants, selected an architect and design for the AGM&M, and purportedly contacted potential donors for the museum.  Id.  Waters also filed annual non-profit organization income tax returns for AGM&M in 2003, 2004, and 2005 ("the tax returns"), attached at Exhibit 7.

Both Cafesjian and Waters repeatedly confirmed, in their capacity as officers of AGM&M, that the Note had been effectively transferred to the AGM&M.  For example, each of the tax returns filed and signed by Waters on behalf of AGM&M reported that a loan in the amount of $500,000 was due to an officer, director, trustee or key employee of the company.  See id.  The explanatory note stated as follows:

> **On November 1, 2003, Cafesjian, a board member of the Armenian Genocide Museum and Memorial, Inc. (AGM&M) advanced funds to the AGM&M for its establishment and organization.  The original amount of the note was $500,000.  $500,000 is still outstanding, and will be paid back with 0% interest.**

See id. at Statement 3.  CFF confirmed that the obligation on the Note was transferred to AGM&M via tax returns filed on behalf of CFF in 2004, attached at Exhibit 8, which show the discharge of the Note due from the Assembly and the inception of a Note due from AGM&M.

---

[4] Pursuant to a "Consent" executed by AGM&M's initial trustees, Cafesjian and Waters had authority as officers to "effectuate the purchase of [the properties held by TomKat] and to take such other action as deemed necessary . . . to effect such transactions."  See Consent attached at Exhibit 6.  Waters was also authorized "to negotiate grant agreements that further the charitable purposes of the [AGM&M]."  See id.  The power was expressly limited and did not include the right to encumber assets of AGM&M or enter into contractual relationships absent Board approval.

In the winter of 2006, the non-Cafesjian Trustees inquired of Cafesjian and Waters whether an unusual and potentially controversial design proposal for the museum would be feasible in light of the District of Columbia's stringent zoning and permitting requirements.  See Kaloosdian Aff. at ¶ 16.  As a result of these and other inquiries regarding his plans for the museum, Cafesjian became contemptuous of the other members of the Board of Trustees of the AGM&M. Id. at ¶ 17.  In light of Cafesjian's reversionary interest in the properties and attendant conflict of interest in completing the museum project, the other Trustees began investigating Cafesjian and Water's management of the project.  It soon became apparent that little progress had been made on the museum's development plan and that Cafesjian had not consulted with, or even informed, the other Trustees of numerous actions he and Waters had taken on behalf of AGM&M, including without limitation the hiring (and termination) of a business consultant.[5] See Kaloosdian Aff. at ¶ 16-19.

On May 24, 2006, Cafesjian's attorney, William Brody ("Brody"), sent a certified letter to the non-Cafesjian Trustees asserting, on behalf of Cafesjian, that there were two competing and irreconcilable visions of the AGM&M among the trustees. See Letter dated May 24, 2006, attached at Exhibit 11.  Brody suggested that Cafesjian proposed to end his involvement with AGM&M, resign as trustee, and prospectively renounce his

---

[5] The consultant has indicated that AGM&M has a large outstanding debt purportedly incurred as a result of the development of a business plan for the museum.  See Letter dated May 31, 2007 from Deborah Devedjian, attached at Exhibit 9.  Other liabilities incurred as a result of Cafesjian and Waters mismanagement include a tax liability resulting from their failure to take necessary steps to commence development of the museum, resulting in the properties being identified as abandoned. See Exhibit 10.

rights to appoint trustees or serve as trustee. Id. Brody referred to the $500,000 loan

from the CFF "to AGM&M" (not the Assembly), and stated that if Cafesjian terminated

his involvement in AGM&M, he would expect the loan to be repaid. Id. He alluded to

the controlling Grant Agreement and confirmed that if the various properties had not

been developed by 2010, Cafesjian expected that the properties or the funds to acquire

the properties would be "returned to CFF." Id.

In response to the Brody letter, Hovnanian and Kaloosdian requested from

Cafesjian copies of AGM&M financial reports, meeting minutes, and legal documents

including deeds and contractual obligations. See Kaloosdian Aff. at ¶ 19. On August 2,

2006, Kaloosdian responded to the Brody letter on behalf of himself, Hovnanian, and

Mathevosian. See Letter dated August 2, 2006, attached at Exhibit 12. After denying

that there were two competing visions, Kaloosdian noted that Cafesjian had acted as the

project leader, had unilaterally engaged the architect, and had hired a business consultant

without interference. Id. They asked Cafesjian to continue with the project with his

vision and their support of that vision. Id.; see also Kaloosdian Aff. at ¶ 20.

In response, Brody sent another letter on August 29, 2006, confirming Cafesjian's

terms for terminating his involvement in the AGM&M. See Letter dated August 29,

2006, attached at Exhibit 13. The tone of this letter left no doubt that Cafesjian, faced

with a challenge to his unilateral control of the project, intended to dissolve the AGM&M

and reacquire the properties. As the properties had appreciated in value significantly

during the intervening time period, the other Trustees realized that Cafesjian could now

profit by his involvement in the museum project, at the expense of the AGM&M and the

Assembly, and to the great detriment of the museum and memorial project. <u>See</u>
Kaloosdian Aff. at ¶ 21.

On September 13, 2006, Cafesjian sent a letter resigning as President and
Chairman of the Board of Trustees of AGM&M (but not as a Trustee). Cafesjian
indicated that Waters intended to resign as secretary and treasurer of AGM&M and
would transfer all administrative functions to the Board of Trustees. <u>See</u> Letter of Gerard
Cafesjian dated September 13, 2006, attached at <u>Exhibit 14</u>.

On October 23, 2006, without a properly noticed meeting of the Board of Trustees
having been held at which the matter could have been discussed, Waters executed a
Memorandum of Agreement Reserving Rights ("Memorandum") ostensibly between
AGM&M and CFF. In the Memorandum, Waters identified himself as an officer of both
the AGM&M and CFF. On or about October 27, 2006, and again without a properly
noticed meeting of the AGM&M Board of Trustees having been held, Waters caused the
Memorandum to be recorded with the Recorder of Deeds for the District of Columbia.
<u>See</u> Memorandum of Agreement Reserving Rights, attached at <u>Exhibit 15.</u>  By recording
the Memorandum, Waters encumbered the title to the grant properties and put a cloud on
the title of all the AGM&M properties. His actions were solely in the interests of CFF
and adverse to the interests of the AGM&M, and in violation of his fiduciary duties to the
AGM&M. Waters' recording of the Memorandum was without notice to or authorization
from the Trustees of AGM&M. <u>See</u> Kaloosdian Aff. at ¶ 24-25.

On January 12, 2007, upon learning of the multiple acts of self-dealing and
conflicts of interest committed by Cafesjian and Waters, the Assembly Board of Trustees

voted to suspend both Cafesjian and Waters from the Assembly's Board for non-

compliance with the Assembly's Conflict of Interest policy. Neither Cafesjian nor

Waters has disputed the conflicts of interest or their failure to comply with the

Assembly's Conflict of Interest policy. On April 26, 2007, Cafesjian and CFF filed the

instant action.

### III.    LEGAL ARGUMENT

#### A.    Introduction

The Complaint asserts two claims, both of which pertain to alleged violations of

the terms of the Grant Agreement: (1) breach of contract and (2) breach of the implied

covenant of good faith and fair dealing. In addition, Plaintiffs seek the following relief:

(1) a declaration that the Assembly materially breached the Grant Agreement and the

implied covenant of good faith and fair dealing; (2) damages in an amount "in excess of

$500,000"; (3) rescission of the Grant Agreement and "restitution" of all donations made

pursuant to that Agreement; and (4) the award of attorneys' fees, pre-judgment and post-

judgment interest, costs and disbursements.

In ruling on a Motion to Dismiss, a district court must accept the allegations

contained in the complaint as true, and all reasonable inferences from the complaint must

be drawn in favor of the non-moving party. Crumpley-Patterson v. Trinity Lutheran

Hosp., 388 F.3d 588, 590 (8th Cir. 2004) (internal citations omitted). A motion to dismiss

should be granted if it appears beyond doubt that the plaintiff can prove no set of facts to

warrant a grant of relief. Katun Corp. v. Clarke, 484 F.3d 972, 975 (8th Cir. 2007)

(internal citations omitted). In this case, as Plaintiffs have failed to name a necessary and

indispensable part (AGM&M), and as the facts alleged in the Complaint, even if proven, do not permit the relief requested, the case must be dismissed.

## B.    Dismissal Based on Failure to Name a Necessary Party Pursuant to Fed.R.Civ.P. 19 (Fed R. Civ.P. 12(b)(7)

As Plaintiffs have failed to join AGM&M and this Court lacks personal jurisdiction over AGM&M, and since there are alternative venues in which the Plaintiffs can and should assert their claims, the Complaint must be dismissed pursuant to Fed.R.Civ.P. 12(b)(7) and Fed.R.Civ.P. 19(b).[6]

The relief sought by the Plaintiffs includes without limitation a demand for all funds due under the Note, "restitution" of donations made to the Assembly and transferred to AGM&M pursuant to the Transfer Agreement, and recission of the Grant Agreement.   As the Note (and any obligations thereunder) passed to the AGM&M upon the execution of the Transfer Agreement, and as the AGM&M is the recicipent of all of the other donations made by Cafesjian, the AGM&M is a necessary and indispensable party to these proceedings.

Fed.R.Civ.P. 19(a) provides for the joinder of necessary parties as follows:

> **(a) <u>Persons to Be Joined if Feasible</u>.  A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may**

---

[6] It is likely that AGM&M was not joined since it would raise issues of conflict of interest and breach of fiduciary duty on the part of Cafesjian and Waters.

> **(i) as a practical matter impair or impeded the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.**

Fed. R. Civ. P. 19(a).

In this case, AGM&M is both the real party in interest and a necessary party as all of the Assembly's interests and obligations under the Note passed to AGM&M upon the execution of the Transfer Agreement. See Pay Tel Systems, Inc. v. Seiscor Technologies, Inc., 850 F.Supp. 276, 278 (S.D.N.Y.,1994)(" Where complete assignments have been made, the assignee is the real party in interest and a necessary party under Fed.R.Civ.P. 19."). Without admitting that there is any obligation to pay the Note, even assuming Cafesjian's interpretation of the Grant Agreement is correct, AGM&M now holds the obligation to pay the Note, if such an obligation exists, and is the recipient of all of the donations that Cafesjian now seeks to rescind. Accordingly, AGM&M is a necessary party as (i) AGM&M's presence is required for complete relief, (ii) the rights of AGM&M would be impaired if the claims pertaining to the Note were resolved without it, and (iii) the Assembly could be subject to multiple or inconsistent obligations to AGM&M and Cafesjian if the case proceeds without AGM&M.

Fed.R.Civ.P. 19(b) provides for the dismissal of actions where the joinder of a necessary and indispensable party is required under Rule 19(a), but such person cannot be made a party.

> **(b) Determination by Court Whenever Joinder Not Feasible. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine**

- 15 -

> **whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.**

Fed.R.Civ.P. 19(b). The AGM&M is a District of Columbia non-profit corporation with virtually no contacts with, or connection to, Minnesota. Given the claims asserted, it is unlikely to be subject to the personal jurisdiction of this Court and it is therefore unlikely that the AGM&M can be made a party to this action. Because the relief requested by Plaintiffs would result in the complete rescission of the Grant Agreement and, accordingly, all of the donations made by Cafesjian to the AGM&M, AGM&M is an indispensable party under Rule 19(b). Any partial rescission of the Grant Agreement or monetary relief awarded to the Plaintiffs would substantially prejudice AGM&M, as its future ability to develop the museum, or to even function, would be jeopardized. See In re U.S. ex rel. Hall, 825 F.Supp. 1422, 1428-1429 (D.Minn.,1993) (where partial rescission or monetary relief requested by the plaintiffs would substantially prejudice the interests of non-party Indian tribes by disrupting their existing commercial relationships and jeopardizing future commercial transactions and relationships, dismissal pursuant to Fed.R.Civ.P. 19(b) was appropriate). Moreover, a judgment in favor of the Plaintiffs would impose conflicting obligations on the Assembly, which has continuing

- 16 -

obligations to AGM&M under the Transfer Agreement.  Finally, the Plaintiffs have an alternative and more suitable forum in which to resolve their disputes: arbitration in the District of Columbia that involves all of the necessary parties.[7]  Accordingly, Fed.R.Civ.P. 19(b) requires the dismissal of the Complaint with prejudice.

### C.    Dismissal Based on Statute of Limitations

Cafesjian and CFF are also barred from seeking relief under the Grant Agreement based on the Assembly's alleged failure to issue a Replacement Promissory Note, as under the District of Columbia statute of limitations, actions to enforce a contract expire three years from the time the right to maintain the action accrues.  D.C. Stat. § 12-301(6).[8]  Under the terms of the Grant Agreement, the Assembly was to issue a Replacement Promissory Note, if ever, prior to the November 1, 2003 execution of the Transfer Agreement.  Grant Agreement at Section 5.4.  Thus, to the extent the Assembly was obligated to and failed to issue the new Note, the cause of action accrued on or before November 1, 2003 and therefore became barred by the statute of limitations on November 1, 2006.  Cafesjian and CFF filed the instant action on May 1, 2007, six months after the statute of limitations had expired.

To the extent CFF seeks through this action to enforce the terms of the Note, CFF is barred from enforcing the Note under both District of Columbia and Minnesota law.

---

[7] In fact, arbitration in the District of Columbia is specifically provided for in the Transfer Agreement.  The applicability of the arbitration provisions set forth in the Transfer Agreement is discussed in greater detail at Section III-C, below.

[8] As the Grant Agreement was not executed as a sealed instrument, D.C. Stat. § 12-301(6) and not D.C. Stat. § 12-301(7) applies.

As noted above, the applicable time period to bring suit under a contract in the District of Columbia is three years, and the applicable time to sue under a note is six years after the date that the note is due and payable. D.C. Stat. 28:3-118. Under Minnesota law, the statute of limitations for actions to enforce a promissory note is six years. Minn. Stat. Ann. § 541.05. The cause of action on a note accrues on the date the note becomes due and payable. Nelson v. Hacking, 225 Minn. 125, 128, 29 N.W. 888, 890 (1947); Chase Nat. Bank of City of New York v. Burg, 32 F. Supp. 230, 232 (D.C. Minn. 1940). Any action not brought within six years of the date a note becomes due and payable is time barred. Id.

As noted above, the Note became due and payable on May 1, 2000. Accordingly, in order to enforce the note, CFF was required to file an action by May 1, 2006. The instant action was not commenced until May 1, 2007. Accordingly, CFF is barred from seeking to enforce the Note by virtue of the statute of limitations and the Complaint should be dismissed with prejudice.

### D.    The Plaintiffs Are Barred From Seeking Relief in this Court by the Transfer Agreement's Arbitration Clause

Assuming Plaintiffs' interpretation of the Grant Agreement is correct, all of the Assembly's rights and obligations under the Note passed to AGM&M. The Transfer Agreement, as drafted by Cafesjian and his attorneys, requires that any disputes arising under the Transfer Agreement be settled "exclusively by binding arbitration." See Transfer Agreement at § 5.3. The Grant Agreement incorporates by reference the Transfer Agreement. The Transfer Agreement attaches and incorporates by reference the

EXHIBIT B

Grant Agreement, and was signed by Waters on behalf of AGM&M. Accordingly, the instant dispute falls within the arbitration provision set forth in the Transfer Agreement.

In determining whether to enforce an arbitration agreement, the Court must consider "(1) whether there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement." Faber v. Menard, Inc., 367 F.3d 1048, 1052 (8th Cir.2004). In general, Courts are required to err on the side of enforcing arbitration provisions. See Seibert v. Amateur Athletic Union of U.S., Inc., 422 F.Supp.2d 1033, 1038-1039 (D.Minn. 2006) ("Both state and federal governments have strong policies favoring arbitration."); see generally 9 U.S.C. § 1 et seq. (Federal Arbitration Act).

In this case, Cafesjian executed the Grant Agreement, which requires the Assembly to transfer the Note to AGM&M and which requires the Assembly to execute a Transfer Agreement with AGM&M to accomplish the transfer of the Note, thereby incorporating by reference the Transfer Agreement. The Transfer Agreement was executed per Cafesjian's express instructions and contains a binding arbitration provision. Thus, a valid arbitration agreement exists. In order to enforce the Grant Agreement or secure any of the relief requested by the Plaintiffs, the Assembly is required to make demands on AGM&M under the Transfer Agreement. Accordingly, the instant dispute falls within the terms of the arbitration provision of the Transfer Agreement and the Plaintiffs' claims should be dismissed or stayed pending the outcome of such arbitration.

EXHIBIT B

**E.  Dismissal Based on Failure to State a Claim Upon Which Relief Can Be Granted (Fed R. Civ.P. 12(b)(6))**

While the Plaintiffs assert that the Assembly breached the terms of the Grant Agreement and violated the duty of good faith and fair dealing in failing to issue a Replacement Promissory Note, the allegations set forth in the Complaint, even if proven, fail to support such claims.

As an initial matter, the language in the Grant Agreement pertaining to the Note is ambiguous, as it is unclear whether the Assembly's obligations as payor, or the CFF's rights as payee, are to pass to the AGM&M upon the execution of the Transfer Agreement. The Grant Agreement states only that "[i]f the Promissory Note is still outstanding at the time the Transfer Agreement is executed, it must be transferred to AGM&M, Inc. as part of the transfer of the Assembly's assets." Grant Agreement at Section 5.4. As the language indicates an intent to transfer "assets" to AGM&M, a logical reading of the provision could be that Cafesjian intended to transfer his (or CFF's) rights as payee to AGM&M as part of the grant he was making pursuant to the Grant Agreement. If the AGM&M is, in fact, the successor in interest to CFF, then neither CFF nor Cafesjian has any remaining right to seek payment on the Note and the case should be dismissed.

If, however, the Grant Agreement is construed as requiring the Assembly to transfer its obligation under the Note to AGM&M, then the Assembly has fully complied with its obligations under the Grant Agreement and no breach of contract (or breach of the duty of good faith and fair dealing) has occurred. The Assembly executed the

Transfer Agreement with AGM&M on November 1, 2003, as required by the Grant

Agreement.  The Transfer Agreement transferred the Note and any existing obligations

thereunder to AGM&M.

The Transfer Agreement, which was drafted by Cafesjian and his attorneys, states

as follows:

> **(D)  If <u>at the time this Agreement is executed</u> the promissory note executed by Grantor [the Assembly] in favor of the Cafesjian Family Foundation on March 17, 2000 in the amount of $500,000 (the "Promissory Note") or any promissory note issued to replace the Promissory Note (the "Replacement Promissory Note") is still outstanding, <u>the Promissory Note or the Replacement Promissory Note</u>, <u>whichever is still outstanding</u>, shall be transferred to AGM&M as part of the Grant.**
>
> **[Emphasis supplied.]**

<u>See</u> Transfer Agreement at § 1.2(D).   The parties clearly contemplated that in the

event that no replacement Note was issued, the Note would be transferred as is to the

AGM&M.

Cafesjian was aware of the execution of the Transfer Agreement, both because he

was acting as President of AGM&M at the time of the execution of the Transfer

Agreement, and because his agent, Waters, signed the Transfer Agreement on behalf of

AGM&M. He was also aware that the Transfer Agreement was executed simultaneously

with the Grant Agreement, and required the immediate transfer of the Note regardless of

whether a Replacement Note had been issued.

The transfer of the Assembly's obligations under the Note was confirmed by

Waters, an officer of the Cafesjian Family Foundation, via tax returns he signed which

reported the note as a liability of AGM&M.  See Exhibit 7 at Statement 3.  CFF also

recognized that the Assembly no longer had any obligations under the Note, reporting to

the IRS in 2004 that all obligations of the Assembly had been discharged and that the

AGM&M had assumed an identical obligation.  See Exhibit 8.

The Assembly's transfer of the Note to AGM&M (along with the other donations

made by Cafesjian) was done at the express request of Cafesjian per the Grant

Agreement.  The transfer of the Note and other assets fully discharged the Assembly's

obligations under the Grant Agreement with respect to the Note.  The Grant Agreement,

by its terms, acknowledged the possibility that a Replacement Note could or would not be

issued prior to the execution of the Transfer Agreement, and required the Assembly to

transfer the Note to AGM&M under the Transfer Agreement by no later than November

1, 2003, regardless of whether a Replacement Promissory Note had been issued as of that

date.

As Cafesjian was aware in November 2003 that the Note had been transferred to

AGM&M pursuant to the Grant and Transfer Agreements, he cannot now, nearly four

years later, seek to rescind the entire Grant Agreement.  Cummings v. Jack Hurwitz, Inc.

204 A.2d 332 (D.C. App., 1964) (a party seeking to rescind a contract must do so within

a reasonable time after discovery of facts justifying the rescission).  See also Rogers v.

Garland, 8 Mackey 24 (D.C.D.C. 1890) (if a contract has been partially performed, the

plaintiff may not recover benefits that the defendants may have received therefrom); see

also  Northern Pacific Railway Co. v. United States, 70 F.Supp. 836, 865 (D.Minn. 1946)

(refusing to rescind contract when party "proceeded for a long period of time under the

contract"). Accordingly, Cafesjian's Complaint must be dismissed for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6).

District of Columbia courts[9] have repeatedly confirmed that they will not rescind a contract unless there is a material breach that "defeats the very essence of the contract and serves to defeat the object of the parties." Country Club Associates Ltd Partnership v. F.D.I.C., 918 F.Supp. 429 (D.D.C. 1996); see also Travis v. Travis, 203 A.2d 173 (D.C. App. 1964). Whether a breach is "material" or whether a contract has been substantially performed depends on several factors, including the extent to which the plaintiff will be deprived of the benefit which he reasonably expected under the contract or can be compensated for same, the extent to which the defendant will suffer forfeiture, the likelihood that the defendant will cure his failure, taking account of all the circumstances, and the extent to which the behavior of the defendant comports with standards of good faith and fair dealing. America v. Preston, 468 F. Supp. 2d 118, 125 (D.D.C. 2006).

In this case, the alleged breach by the Assembly does not constitute a material breach or substantial failure in the performance of the Grant Agreement. The Assembly has substantially complied with the terms of the Grant Agreement, including, to the extent possible, the provisions relating to the Note. Nothing in the allegations set forth in the Complaint supports the assertion that the Assembly has been anything other than diligent in its efforts to comply with the Grant Agreement. Rather, it is apparent that Cafesjian, and not the Assembly, has breached the duty of good faith and fair dealing, as

---

[9] As indicated above, by agreement of the parties, the Grant Agreement is to be construed under District of Columbia law.

he now seeks to inappropriately profit from real estate and other transactions which he represented were conducted for charitable purposes, and which were entered into by the Assembly and AGM&M at his insistence and request.

The purpose of the Grant Agreement was to permit the creation and development of the museum project. Such purpose has not been thwarted in any way by the alleged failure of the Assembly to issue the Replacement Note. Most importantly, Cafesjian's presumably charitable intent in funding the museum project, and the anticipated benefits from same, continue to be possible, provided that Cafesjian himself does not thwart the hopes to construct and operate the museum.

Where, as here, the parties cannot be returned to their original, pre-contract positions, rescission is inappropriate. Friedman v. Kennedy, 40 A.2d 72, 74 (D.C. Mun. App. 1944). No return to the status-quo is possible as four years have passed in which substantial financial investments were made by the Assembly and AGM&M in reliance on such donations, investments that were made with the active encouragement of Cafesjian and in reliance on his assurances that he would continue to support the project. The relief requested by Cafesjian would effectively bankrupt the AGM&M and end the hopes for an Armenian Genocide museum. As the Assembly has substantially complied with its obligations under the Grant Agreement, and as Cafesjian's request for rescission of the Grant Agreement is not permitted under applicable law, the Complaint must be dismissed with prejudice pursuant to Fed.R.Civ.P. 12(b)(6).

WHEREFORE, the Assembly respectfully requests that the Court: (1) dismiss Plaintiffs' Complaint, with prejudice, for failure to join a necessary party pursuant to

EXHIBIT B

Fed.R.Civ.P. 19 and/or for failure to state a claim upon which relief can be granted

and/or; and (2) grant such other relief as the Court deems just and necessary.

Respectfully submitted,

BASSFORD REMELE

Dated: June 14, 2007          By:  s/ Charles E. Lundberg
                                   Charles E. Lundberg (License #6502X)
                                   DongWook Kim (License #0386811)
                                   33 South Sixth Street, Suite 3800
                                   Minneapolis, Minnesota 55402-3707
                                   (612) 333-3000

                                   And

                                   Kirkpatrick & Lockhart Preston Gates Ellis LLP

                                   Arnold R. Rosenfeld (Mass. #428860)
                                   State Street Financial Center
                                   One Lincoln Street
                                   Boston, MA 02111
                                   (617) 951-9125

                                   Attorneys for Defendant, The Armenian Assembly
                                   of America

EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Gerard L. Cafesjian and The
Cafesjian Family Foundation,

Plaintiff(s)

v.

The Armenian Assembly of
America,

Defendant(s)

**LR 7.1(c) WORD COUNT
COMPLIANCE CERTIFICATE
REGARDING DEFENDANT'S
MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS FOR FAILURE
TO STATE A CLAIM**

Civil File No. 07-2079 (JNE/JJG)

---

I, DongWook Kim, certify that Defendant's Memorandum in Support of its Motion to Dismiss
for Failure to State a Claim and Failure to Join a Necessary Party complies with Local Rule
7.1(c).

I further certify that, in preparation of this memorandum, I used Microsoft Office Word Version
2003, and that this word processing program has been applied specifically to include all text,
including headings, footnotes, and quotations in the following word count.

I further certify that the above referenced memorandum contains 6,595 words.

Date:  June 14, 2007

s/ DongWook Kim
DongWook Kim
(License #0386811)
Bassford Remele P.A.
33 South Sixth Street, Suite 3800
Minneapolis, Minnesota  55402-3707
(612) 333-3000

ATTORNEY FOR DEFENDANT