UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| The Armenian Genocide Museum and Memorial, Inc.<br><br>              Plaintiff,<br><br>v.<br><br>The Cafesjian Family Foundation, Inc., John J. Waters, Jr., Gerard L. Cafesjian, and John J. Waters, Sr.<br><br>              Defendants. | Civil File No. 1:07-cv-01259 (CKK) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO DEFENDANTS THE CAFESJIAN FAMILY FOUNDATION, INC.,
JOHN J. WATERS, JR., AND GERARD L. CAFESJIAN'S MOTION
TO DISMISS THE SECOND AMENDED COMPLAINT**

David T. Case (D.C. Bar No. 384062)
Bruce Nielson (D.C. Bar No. 414440)
**K&L GATES LLP**
1601 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 778-9000
Fax: (202) 778-9100

*-and-*

Arnold R. Rosenfeld (MA Bar No. 428860)
Naoka E. Carey (MA Bar No. 655312)
**K&L GATES LLP**
One Lincoln Street
Boston, MA 02111
Tel: (617) 261-3155
Fax: (617) 261-3175

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| TABLE OF AUTHORITIES | | ii |
| I. | BRIEF FACTUAL BACKGROUND | 1 |
| | A. The Museum Project | 1 |
| | B. Incorporation of AGM&M | 2 |
| | C. The Grant Agreement | 3 |
| | D. The Transfer Agreement | 5 |
| | E. Cafesjian and Waters, Jr. Breach their Fiduciary Duties to AGM&M | 5 |
| |     1. The Unauthorized Memorandum of Agreement Reserving Rights and its Belated Release | 5 |
| |     2. Defendants' Filing of the *Lis Pendens* | 8 |
| II. | ARGUMENT | 9 |
| | A. The Execution and Recordation of the Unauthorized Memorandum and the Subsequent *Lis Pendens* Constitute a Breach of Cafesjian's and Waters, Jr.'s Fiduciary Duties to AGM&M | 10 |
| |     1. Cafesjian and Waters Jr. Fail to Exhibit Honesty and Good Faith | 13 |
| |     2. Cafesjian and Waters Jr. Fail to Strike a "Proper Balance" Among AGM&M's, Cafesjian's and Waters Jr.'s Interests | 14 |
| | B. Defendants' Conduct Constitutes a Breach of the Implied Covenant of Good Faith and Fair Dealing | 15 |
| | C. Defendants Cafesjian's and Waters Jr.'s Self-Serving Conduct Harmed AGM&M, the Very Non-Profit Corporation They Were Charged With Protecting | 16 |
| III. | CONCLUSION | 17 |

# TABLE OF AUTHORITIES

## CASES

*4934, Inc. v. District of Columbia Department of Employment Services*,
 605 A.2d 50 (D.C. 1992) ............................................................................................... 15

*Board of Directors of the Washington City Orphan Asylum v. Board of Trustees of the Washington City Orphan Asylum*, 798 A.2d 1068 (D.C. 2002) ......................................... 11

*Federal Election Commission v. GOPAC, Inc.*,
 871 F. Supp. 1466 (D.D.C.1994) .................................................................................... 10

*First Md. Finance Services Corp. v. District-Realty Title Insurance Corp.*,
 548 A.2d 787 (D.C.1988) ............................................................................................... 12

*Friends of Tilden Park, Inc. v. District of Columbia*,
 806 A.2d 1201 (D.C. 2002) ...................................................................................... 11, 12

*Jackson v. District of Columbia*,
 537 F. Supp. 2d 173 (D.D.C. 2008) ................................................................................ 10

*Krieger v. Fadley*,
 211 F.3d 134 (D.C. Cir. 2000) ........................................................................................ 10

*Lu v. Zurich American Insurance Co.*,
 115 Fed. Appx. 613, 2004 WL. 2538199, No. 03-2082 (4th Cir. Nov. 10, 2004) ............ 17

*S.E.C. v. Banner Fund International*,
 211 F.3d 602 (D.C. Cir. 2000) ........................................................................................ 15

*Stern v. Lucy Webb Hayes National Training School for Deaconesses and Missionaries*,
 381 F. Supp. 1003 (D.D.C. 1974) ............................................................................. 11-14

*Storetrax.com, Inc. v. Gurland*,
 915 A.2d 991 (Md. 2007) ......................................................................................... 13, 14

*Swierkiewicz v. Sorema N.A.*,
 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002) .................................................... 10

The Armenian Genocide Museum and Memorial, Inc. ("Plaintiff or "AGM&M"), submits this Memorandum of Points and Authorities in Opposition to Defendants The Cafesjian Family Foundation, Inc. ("CFF"), John J. Waters, Jr. ("Waters, Jr."), and Gerard L. Cafesjian's ("Cafesjian") Motion to Dismiss Counts One, Three and Four of the Second Amended Complaint ("Motion to Dismiss").  For the reasons set forth below, this Court should deny Defendants' Motion to Dismiss.

I.      **BRIEF FACTUAL BACKGROUND**

   A.      **The Museum Project**

In the 1990s, the Armenian Assembly of America ("Assembly"), the premier Armenian-American advocacy group in the United States, began investigating the idea of constructing a permanent museum and memorial to the victims and survivors of the Armenian Genocide, in which the Ottoman Empire forcibly deported and systematically massacred over 1.5 million innocent Armenians.  Second Am. Compl. ¶¶ 1, 8, 9.  The Assembly began to explore possible sites for the museum and solicit donations from the Armenian-American community for the purpose of establishing and constructing the museum and memorial.  *Id*. ¶ 9.

In or around late 1999, a possible site for the museum was identified at the National Bank of Washington Building at 14th and G Streets, N.W., Washington D.C. (the "Bank Site").  *Id*. ¶ 10.  In order to fund the purchase of the Bank Site, the Assembly sought specific major donations and pledges from various sources.  *Id*. ¶ 11.  One of those donations was from the Defendant Cafesjian, the President and Director of Defendant CFF.  *Id*.  In early 2000, the Assembly purchased the Bank Site with donations primarily from Anoush Mathevosian, a prominent Armenian-American philanthropist, and Defendant Cafesjian (through his personal foundation CFF).  *Id*. ¶¶ 9, 11.

1

Subsequent to the Assembly's purchase of the Bank Site, Cafesjian, who had acquired several lots adjacent to the Bank Site (the "Properties") insisted that a new non-profit entity, AGM&M, independent of the Assembly, be established to solicit funds, plan for, and operate the museum. Second Am. Compl. ¶ 12. Cafesjian offered to transfer the Properties to the new entity by providing funds to the Assembly, which were to be used to purchase the Properties, contingent on the Assembly's agreement to create AGM&M as a separate non-profit entity. *Id.*

B. **Incorporation of AGM&M**

In October of 2003, AGM&M was incorporated as a District of Columbia non-profit corporation. *Id.* ¶ 1. AGM&M's principal objective is to build, manage, and maintain a permanent museum and memorial commemorating the Armenian Genocide. *Id.* at ¶ 1; Exhibit 4 at Art. IV.[1] AGM&M is governed by a Board of Trustees as provided in its Articles of Incorporation ("Articles") and By-Laws. *Id.* ¶ 23. Specifically, the Articles and By-Laws provide that AGM&M's "affairs . . . shall be managed and controlled by the Board of Trustees." Second Am. Compl. ¶¶ 23, 24. All questions to be decided by the AGM&M Board of Trustees are to be determined by an eighty (80) percent affirmative vote of the Trustees present at a meeting where a quorum is present. *Id.* ¶ 28; Exhibit 5 at § 2.7.

The By-Laws and Articles provide for the appointment of initial trustees, specific criteria for the election of additional trustees, the exercise of and entitlement to trustee votes, and requirements to convene a properly noticed meeting of the Board of Trustees. *See id.* ¶ 26; Exhibit 4 at IX; Exhibit 5 §§ 2.4-2.6, 2.14. Under AGM&M's By-Laws, each Initial Trustee is entitled to exercise one trustee vote. *Id.* ¶ 26. In addition, for each $5,000,000.00 contributed to AGM&M, initial or subsequent donors are entitled to elect additional Trustees, or to confer

---

[1] Unless otherwise specifically noted, references contained herein to "Exhibit __" refer to the Exhibits to the Second Amended Complaint.

2

additional votes to their existing Trustees.  *Id.*  The election of additional Trustees (or votes for Trustees) is contingent upon each $5,000,000.00 contribution being accepted by the Board of Trustees "on behalf of [AGM&M] by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present."  *Id.*  Absent a ratification of a purported contribution, none of the Initial Trustees are entitled to have more than one vote.  *Id.*  At present, none of the current Trustees of AGM&M has more than one vote, as no vote ratifying additional contributions has ever taken place.  Second Am. Compl. ¶ 27.

Pursuant to the Articles and By-Laws, CFF is an Initial Donor of AGM&M and, therefore, is entitled to appoint a Trustee to the Board of Trustees of AGM&M.  *Id*. ¶ 29.  CFF appointed Waters, Jr. to serve as a Trustee on CFF's behalf.  *Id.*

    **C.**    **The Grant Agreement**

On November 1, 2003, the Assembly, CFF and Cafesjian executed a Grant Agreement, which was drafted at the direction of Defendant Waters Jr.  *Id.* ¶ 13.  The Grant Agreement set forth the manner and terms under which Cafesjian would donate certain funds to AGM&M, including funds to purchase the Properties, and the terms under which the Assembly would donate its previously acquired funds and assets to AGM&M.  *Id.* ¶¶ 13-20.

The Grant Agreement memorialized the donations made by Cafesjian for the museum project, defining them as "Grant Property."  *Id.* ¶ 13.  Under the terms of the Grant Agreement, certain Grant Property donated by CFF and Cafesjian is subject to a reversionary provision.  Second Am. Compl. ¶ 14.  Specifically, the Grant Agreement provides as follows:

> (B) If the Grant Property is not developed prior to December 31, 2010 in accordance with [Plans to be approved by the AGM&M Board of Trustees], or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:

> i.     in the event any portion of the Grants has not been funded, this Agreement terminates; and
>
> ii.     to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant property.

*Id.* ¶ 14.

      Section 3.1(B) of the Grant Agreement put Cafesjian, who was subsequently in control of the operations of AGM&M for many years, in the position of being able to force the reversion of his donations simply by doing nothing to establish the museum on a timely basis or by creating a conflict with the other members of the Board of Trustees. *Id.* ¶ 15. Indefensibly, and to the other Trustees' and AGM&M's dismay, Cafesjian and Waters, Jr. took advantage of the inherent conflict of interest created by this provision and their trusted positions as Trustees and officers of AGM&M, s*ee, e.g., id.* ¶¶ 14, 15, 30-39, 42-48, by engaging in a deliberate course of conduct to delay the museum project in an effort to wrongfully profit from the alleged reversionary clause – at the direct expense of AGM&M, to the great detriment of the museum and memorial project, in breach of their duties of good faith and fair dealing, and in direct contravention of their fiduciary obligations to AGM&M. *See id.*

      Since AGM&M acquired the Properties in 2003, AGM&M (not Cafesjian or CFF) has expended significant sums of money for the taxes and other costs associated with the Properties. *Id.* ¶¶ 15, 22. Moreover, the fair market value of the Properties has appreciated substantially since they were acquired by AGM&M in 2003. *Id.* ¶ 22. Thus, the value of the Properties now substantially exceeds the value of the Grant funds. Accordingly, if the time requirement set forth in the Grant Agreement is not met and the properties must be returned to CFF, CFF will receive a significant windfall at the direct expense of AGM&M. Second Am. Compl. ¶ 15. Any such

4

"reversion" would be a direct result of Cafesjian's and Waters Jr.'s deliberate breach of their duty of good faith and fair dealing, as well as their fiduciary obligations to AGM&M and CFF.

  **D.** **The Transfer Agreement**

At Cafesjian's insistence, and as required by the Grant Agreement, the Assembly and AGM&M entered into a Transfer Agreement, which was drafted according to Waters Jr.'s instructions, and was executed by Waters Jr. on behalf of AGM&M. *Id.* ¶ 17. Pursuant to the Transfer Agreement, the Assembly transferred to AGM&M, *inter alia*, the grants CFF and Cafesjian pledged to AGM&M under the Grant Agreement. *Id.* ¶ 16. At the time of the execution of the Transfer Agreement, the only real property held by the Assembly for the museum project was the Bank Site. *Id.* ¶ 18. Pursuant to the requirements of the Grant Agreement and the Transfer Agreement, the Assembly subsequently transferred all right, title and interest in the Bank Site to AGM&M, as well as all of its other donations, pledges, and other assets acquired for the purpose of building the museum. *Id.* ¶ 19. The Assembly subsequently transferred to AGM&M funds received from CFF and/or Cafesjian after the execution of the Transfer Agreement, for use in purchasing the four adjacent properties (1334-36 G Street N.W.; 1338 G Street N.W.; 1340 G Street N.W.; and 1342 G Street N.W.). *Id.* ¶ 20. Waters Sr. acted as the attorney for both CFF and AGM&M in the transactions related to the acquisition of the adjacent properties by AGM&M. Second Am. Compl. ¶ 21.

  **E.** **Cafesjian and Waters, Jr. Breach their Fiduciary Duties to AGM&M**

    **1.** **The Unauthorized Memorandum of Agreement Reserving Rights and its Belated Release**

Between November 1, 2003 and the fall of 2006, AGM&M was operated and managed by Cafesjian, serving as President, and Waters Jr., serving as acting Secretary/Treasurer. *Id.* ¶¶ 3-4, Exhibit 6. In the summer of 2006, after the other Trustees' informed Cafesjian and Waters'

5

of their concerns regarding their management of the project, Cafesjian abruptly informed the other Board members that he intended to seek the immediate return of donations he had made to AGM&M, even if such actions meant the "liquidation" of the museum project. *See* Statement of Material Facts in Supp. of Pl.'s Mot. for Summ. J. (Document No. 30, attachment 1) at ¶¶ 51-54. The other Trustees, hoping to avoid further delay in the project, urged Cafesjian to continue with the project with his vision. *Id.* ¶ 53. On September 13, 2006, Cafesjian sent a letter to the other Trustees of AGM&M, announcing his resignation as a Trustee and giving notice that Waters, his employee, also intended to resign as acting Secretary/Treasurer. *Id.* ¶ 56. Over a month later, on October 23, 2006, while purporting to serve as an authorized officer of both AGM&M and CFF (despite Cafesjian having given notice of Waters Jr.'s intent to relinquish his duties), Waters Jr. unilaterally executed a document, purportedly between AGM&M and CFF, to hold back certain self-serving rights in the museum Properties (hereinafter referred to as the "Memorandum of Agreement Reserving Rights" or "Memorandum"). Second Am. Compl. ¶ 30. Despite, and in direct contravention of, the clear directives of AGM&M's Articles and By-Laws, Waters Jr. executed the Memorandum without properly noticing a meeting of the Board of Trustees, and without holding a properly noticed meeting of the Board of Trustees at which the matter could have been discussed. *Id.* ¶ 23-30. The day following his execution of the Memorandum, Waters Jr. participated in a telephonic AGM&M Trustee's meeting. During the meeting, Waters Jr. failed to advise the other Trustees of the existence of the Memorandum and, in fact, failed to provide any notice of his apparent conflict of interest. Rather, Waters Jr. merely confirmed a previous request to resign (which was originally conveyed to the Trustees by Cafesjian) as acting Secretary/Treasurer. Approximately four days later, despite the formal termination of his role as acting Secretary/Treasurer and again without the knowledge or consent of AGM&M's

disinterested Trustees, Waters Jr. caused the Memorandum to be filed and recorded with the District of Columbia Recorder of Deeds. *Id.* ¶¶ 32, 34.

Prior to executing and recording the Memorandum, purportedly on behalf of AGM&M and CFF, rather than discussing or advising the AGM&M disinterested Trustees at a properly noticed meeting of the Board of Trustees, Waters Jr. consulted Waters Sr. (an attorney for Cafesjian) and Cafesjian himself. *Id.* ¶¶ 30-31. Waters Jr. *never* consulted or informed the disinterested AGM&M Trustees before he executed and recorded the Memorandum. *Id.* ¶ 33. As such, Waters Jr. did not have authority to execute the Memorandum on behalf of AGM&M or to file and record the Memorandum with the Recorder of Deeds on behalf of AGM&M. *Id.*

Upon learning of Waters Jr.'s unauthorized executing, filing and recording of the Memorandum, the disinterested members of the Board of Trustees demanded that Defendants cause such actions to be rescinded and cause the Memorandum to be removed from the land records of the District of Columbia. Second Am. Compl. ¶ 34. Defendants refused. *Id.* Then, finally, on July 16, 2008, well over a year after AGM&M initiated the instant case, and only after numerous pleadings had been filed and discovery undertaken, during which he admitted to acting without authority in filing the Memorandum, Waters Jr. recorded a release of the Memorandum. *Id.* ¶ 36.

By recording the Memorandum, Waters Jr. created a significant cloud on AGM&M's title to the Properties. *Id.* ¶ 35. Waters Jr. knowingly and intentionally took these unauthorized steps (with Cafesjian's knowledge) despite the clear directives of AGM&M's By-Laws, Waters Jr.'s fiduciary obligations to AGM&M and CFF, and the consequent detrimental effect that such actions would, and continue to, have on AGM&M. *See, e.g., id.* ¶¶ 42-48. Moreover, it is apparent from the circumstances surrounding the execution of the Memorandum that

Defendants' actions were calculated to thwart progress on the museum, thereby increasing the likelihood that CFF and its President, Cafesjian, would unjustly benefit from their involvement in the museum project. *See, e.g., id.* ¶¶ 15, 22, 30-36. AGM&M is seeking redress for the unlawful breaches committed by its officers and Trustees (Cafesjian and Waters, Jr.); it is not seeking to hide the obligations set forth in the Grant Agreement from an innocent third party, as the Defendants allege. *See* Def. Mem. at 9.

On January 11, 2007, Cafesjian and Waters were suspended, without objection, from the Assembly's Board of Trustees for non-compliance with the Assembly's Conflict of Interest policies. *See* Statement of Material Facts in Supp. of Pl.'s Mot. for Summ. J. (Document No. 30, attachment 1), at ¶ 69. On April 26, 2007, Cafesjian and CFF filed a Complaint against the Assembly in the United States District Court for the District of Minnesota (Docket No. 07 cv 2079), seeking, *inter alia*, rescission of the Grant Agreement and restitution of all donations made pursuant to that Agreement. Several other related lawsuits followed in the United States District Courts for the District of Minnesota and District of Columbia. *Id.* ¶ 70. Indeed, in one of those lawsuits, *Cafesjian Family Foundation et al. v. Armenian Genocide Museum & Memorial et al.,* Civil File No. 07-1746 (D. D.C.), the Defendants actively sought an injunction to effectively halt all progress on the museum project. *See* Plaintiff's Application for Preliminary Injunction (Civil File No. 07-1746, Document 14).

      **2.**      **Defendants' Filing of the *Lis Pendens***

Prior to recording the release of the Memorandum, on June 26, 2008, Defendants filed a Notice of Pendency of Action (*Lis Pendens*) with the Recorder of Deeds ("*Lis Pendens*"), allegedly to provide "notice, on the public record, of the reversionary interest CFF holds over the properties in question." Second Am. Compl. ¶¶ 37, 38 (quoting Suggestion of Mootness, Document No. 37 at 4). The *Lis Pendens* serves to further Cafesjian's and Waters Jr.'s unethical

8

and unprincipled conduct as fiduciaries of AGM&M and CFF, particularly their efforts to thwart the intent of the Grant Agreement to build the museum, and force the reversion of the grant Properties. *Id.* ¶¶ 36-41, 61. Thus, even though the Memorandum now has been removed, as a result of the filing of the *Lis Pendens*, there continues to be a cloud on AGM&M's title to the Properties. *Id.* ¶ 39. The encumbrance on AGM&M's title has caused significant damage to AGM&M including, but not limited to, the delayed development of the museum, lost contributions (including the loss of a $10 million dollar donation), additional financing costs, increased insurance costs and increased taxes. *Id.*

Accordingly, on July 23, 2008, AGM&M filed a proposed Second Amended Complaint and a Motion to Amend, which Motion was allowed on August 1, 2008. The Second Amended Complaint seeks an order to (1) quiet title to the five parcels of real property located in the District of Columbia that AGM&M acquired for the purpose of building the museum ("Properties"); (2) clear any cloud on AGM&M's title to the Properties created by Defendants, including the cloud created by Defendants' filing of a *lis pendens*; (3) direct Defendants to cause the removal of any cloud they have placed on AGM&M's title to the Properties; (4) enjoin Defendants from placing any additional encumbrances on the Properties; (5) find that Waters Jr. and Cafesjian breached their fiduciary duties to AGM&M;[2] and (6) declare that CFF and Cafesjian's alleged reversionary rights under the Grant Agreement dated November 1, 2003 are unenforceable as a matter of law. *Id.* at 1, 15-16 (Introduction and Prayers for Relief ¶¶ 1-6).

## II.  ARGUMENT

Based on the foregoing allegations, Defendants contend that AGM&M has failed to adequately plead a cause of action based on Waters, Jr.'s and Cafesjian's breach of their

---

[2] AGM&M also seeks a declaration that Waters Sr. breached his fiduciary duty. This Count is not at issue in the instant Motion to Dismiss.

fiduciary duties to AGM&M. In addition, Defendants contend that AGM&M has failed to state a claim entitling it to a declaration that Cafesjian and CFF's reversionary interests are unenforceable as a matter of law. Lastly, Defendants contend that removal of the *Lis Pendens* in Case No. 08-255 would be improper as a matter of law.

In its Second Amended Complaint, AGM&M sets forth sufficient allegations to give the Defendants fair notice of the claims against them and the grounds upon which they rest. *See Krieger v. Fadley*, 211 F.3d 134, 136-37 (D.C. Cir. 2000) (stating factual detail not necessary to survive motion to dismiss for failure to state a claim). By setting forth a set of facts consistent with the allegations, AGM&M established a plausible entitlement to relief as is required to defeat Defendants motion to dismiss. *See Federal Election Commission v. GOPAC, Inc.*, 871 F. Supp. 1466, 1470 (D.D.C. 1994) (denying motion to dismiss because complaint could fairly be construed to permit proof of ultimate fact even though not specifically alleged); *Jackson v. District of Columbia*, 537 F. Supp. 2d 173,176 (D.D.C. 2008) (setting forth standard for Rule 12(b)(6) motion to dismiss). AGM&M is not required to plead all the elements of a *prima facie* case or "plead law or match facts to every element of a legal theory." *Krieger*, 211 F.3d at 136 (internal quotation marks and citation omitted); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14, 122 S. Ct. 992, 152 L.Ed.2d 1 (2002) (discussing rules for assessing sufficiency of complaint). Accordingly, this Court must deny Defendants' Motion to Dismiss and allow the parties to proceed with discovery.

    **A.**    **The Execution and Recordation of the Unauthorized Memorandum and the Subsequent *Lis Pendens* Constitute a Breach of Cafesjian's and Waters, Jr.'s Fiduciary Duties to AGM&M**

The Second Amended Complaint alleges a pattern of deceit by Cafesjian and Waters Jr. that rises to the level of bad faith. Both Cafesjian and Waters Jr. "failed to perform their duties [as officers and trustees of AGM&M] honestly, in good faith, and with a reasonable amount of

diligence and care." *See Stern v. Lucy Webb Hayes Nat'l Training School for Deaconesses and Missionaries*, 381 F. Supp. 1003, 1015 (D.D.C. 1974) (discussing fiduciary duties owed to charitable corporation). The facts alleged in the Second Amended Complaint demonstrate that the Defendant Trustees, Cafesjian and Waters Jr., breached both their fiduciary and legal duties to AGM&M, a charitable corporation. *See Board of Directors of the Washington City Orphan Asylum v. Board of Trustees of the Washington City Orphan Asylum*, 798 A.2d 1068, 1075 (D.C. 2002) (discussing charitable corporation's duty to devote trust property to the charitable purpose for which nonprofit is organized).

The insidiousness of Cafesjian's and Waters Jr.'s conduct is evidenced by the manner in which Waters Jr. executed and recorded the Memorandum and subsequent *Lis Pendens* filed in reference to case No. 08-cv-255. As detailed above, after consulting with Cafesjian and while purporting to serve as an authorized officer of both AGM&M and CFF, Waters Jr. executed and recorded the Memorandum without notice of a meeting and without the authorization of the Trustees of AGM&M. By executing and recording the Memorandum, Cafesjian and Waters Jr. sought to advance Cafesjian's interests at the direct expense of AGM&M, which constitutes a blatant violation of their fiduciary duties to AGM&M. *See Stern*, 381 F. Supp. at 1015; *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1210 (D.C. 2002) (discussing director of nonprofit corporation s' fiduciary duty to act in the utmost good faith); *Board of Directors of the Washington City Orphan Asylum v. Board of Trustees of the Washington City Orphan Asylum*, 798 A.2d 1068 (D.C. 2002) (stating that trustees of nonprofit corporation are fiduciaries in performing their trust duties).

Waters Jr.'s subsequent filing of the *Lis Pendens* in place of the unauthorized Memorandum, also without the vote or approval of the other Trustees, merely serves to

exacerbate Cafesjian's and Waters Jr.'s breach and AGM&M's damages. The *Lis Pendens* is being used by the Defendants to further their scheme to force the reversion of Cafesjian's donations – not to protect innocent third parties, as intended by the *lis pendens* doctrine. *See First Md. Fin. Servs. Corp. v. District-Realty Title Ins. Corp.*, 548 A.2d 787, 791 (D.C.1988) (stating *lis pendens* provides constructive notice of pending litigation involving real property interests). Looking at the pattern of the Defendants conduct, it is readily apparent that the Defendants are actively taking steps intended to delay the development of the Grant Property. The *Lis Pendens* is an obvious and undisguised attempt to obstruct the museum project at AGM&M's expense.

Cafesjian and Waters Jr. failed to take the appropriate, and necessary, steps to protect AGM&M's interests, failed to provide full disclosure of the potential conflicts of interest to the disinterested trustees and deliberately failed to disclose their acts of mismanagement and self-dealing. Indeed, Cafesjian and Waters' subsequently compounded their conflicts of interest by initiating lawsuits against the AGM&M in both Minnesota and the District of Columbia,[3] again calculated to cause delay and thwart the corporate purpose of AGM&M, namely the formation of the museum and memorial. *See, e.g.,* Second Am. Compl. ¶ 40; *Cafesjian Family Foundation et al. v. Armenian Genocide Museum & Memorial et al.,* Civil File No. 07-1746 (D. D.C.). At a minimum, such conduct amounts to a breach of Cafesjian's and Waters Jr.'s duty of good faith and a breach of their fiduciary obligations to AGM&M. *Compare Stern*, 381 F. Supp. at 1013-1016; *see Friends of Tilden Park, Inc.*, 806 A.2d at 1210.

---

[3] The District of Columbia lawsuit was initiated by Cafesjian Family Foundation (CFF), Cafesjian's private foundation, which is controlled by Cafesjian and managed by Waters.

12

**1.    Cafesjian and Waters Jr. Fail to Exhibit Honesty and Good Faith**

In making their argument for dismissal, Defendants attempt to gloss over the very essence of AGM&M's claims, arguing that Cafesjian and Waters Jr. had the right to act "like any other lienholder." Defendants Mem. 9.  Specifically, Defendants contend that *Storetrax.com, Inc. v. Gurland*, 915 A.2d 991 (Md. 2007) implies that a director or officer can hold a "substantive interest against the corporation he serves, and there is no breach of fiduciary duty when he exercises the rights under that interest." Defendants Mem. at 6.  Thus, Defendants argue neither Cafesjian nor Waters Jr. breached a fiduciary duty because they "were entitled to take all actions that any other lienholder" could have taken. *Id.* at 8.

The Defendants' reliance on *Storetrax.com* is misplaced.  The fallacy in Defendants' *Storetrax.com* argument is that Cafesjian and Waters Jr. were not just "any other lienholder[s]" as the Defendants claim.  While the Grant Agreement created certain substantive obligations between AGM&M and Cafesjian, those rights did not abrogate Cafesjian's and Waters Jr.'s fiduciary duties to AGM&M.  Their fiduciary duties to AGM&M are not "intermittent or occasional, but instead 'the constant compass by which all'" of Cafesjian's and Waters Jr.'s actions must be guided. *Storetrax.com,* 915 A.2d at 1001.  In fact, conspicuously absent from Defendants' Motion is any acknowledgment of "the principle that the trustee of a charitable [corporation] should always avoid active participation in a transaction in which he or a corporation with which he is associated has a significant interest." *See Stern*, 381 F. Supp. at 1016.  As such, the fact that Cafesjian and Waters Jr. were Trustees and Officers of a non-profit corporation, namely AGM&M, sets the standard by which their conduct must be measured; and their positions as fiduciaries of AGM&M are <u>not</u> legally irrelevant as Defendants argue.  Defendants Mem. at 8-10; s*ee Stern*, 381 F. Supp. at 1013 (stating directors of charitable corporations are required to demonstrate honesty and good faith).

### 2. Cafesjian and Waters Jr. Fail to Strike a "Proper Balance" Among AGM&M's, Cafesjian's and Waters Jr.'s Interests

Moreover, the Defendants calculatingly fail to acknowledge, because it is harmful to their argument, that the Court's holding in *Storetrax.com,* actually illustrates and highlights Cafesjian's and Waters Jr.'s breaches in this case. In *Storetrax.com,* the Court's holding was premised on a safe harbor provision governing interested director transactions. The Court found that a "transaction is not a breach of the interested director's fiduciary obligations to the corporation <u>as long as the interested director informs the corporation and its directors of the conflicting interests and gives the board an opportunity to approve the transaction, i.e., protect the corporation's interests</u>." *Id.* at 1003 (emphasis added). Cafesjian's and Waters Jr.'s complete lack of notice to AGM&M makes the present case distinguishable from *Storetrax.com* and illustrates their blatant failure to fulfill their fiduciary obligations to act in AGM&M's best interests.

In *Storetrax.com*, the officer with the conflict of interest took affirmative steps to strike "the proper balance between [defendant's] claimed legal right . . . while, at the same time, requiring him also to fulfill his fiduciary obligation to act in [the company's] best interests." *Id.* at 1004. Here, not only did Cafesjian and Waters Jr. fail to strike a "proper balance," they acted in total disregard of AGM&M's interests while purportedly acting on its behalf. In fact, Cafesjian and Waters Jr. acted covertly, without fair notice to AGM&M. *See Storetrax.com, Inc.* 915 A.2d at 1007. Cafesjian and Waters Jr. failed to make any disclosure to the other Trustees concerning the execution of the Memorandum, the recordation of the Memorandum or the filing of the *Lis Pendens*. In fact, Cafesjian and Waters Jr. did not make any effort to identify and/or explain their intent to pursue their legal rights before recording the Memorandum or filing the *Lis Pendens*. It can be logically inferred from the unscrupulous conduct detailed in the Second

14

Amended Complaint that Cafesjian and Waters Jr. used their positions of responsibility with AGM&M and CFF with the intent to enrich themselves at the expense of AGM&M and the museum project. Such conduct amounts to self-dealing, mismanagement and a complete disregard for the obligations placed upon the trustees and officers of a non-profit corporation. Accordingly, as more fully set forth in Counts One, Three and Four of the Amended Complaint, Cafesjian and Waters Jr. breached their duties of loyalty, fair dealing and candor to AGM&M.

> **B.  Defendants' Conduct Constitutes a Breach of the Implied Covenant of Good Faith and Fair Dealing**

As detailed above, Cafesjian's and Waters Jr.'s repeated and continued attempts to delay progress on the museum, the filing of the unauthorized Memorandum and the filing of the *Lis Pendens,* all were calculated to thwart full performance of the Grant Agreement. Defendants not only acted in bad faith, but with a reckless indifference to the rights of AGM&M. It can reasonably be inferred from the facts alleged in the Second Amended Complaint that Cafesjian and Waters Jr. intended to frustrate the purpose of the Grant Agreement by attempting to force the reversion of the adjacent lots, thereby denying AGM&M any benefit under the Grant Agreement.

The Defendants actions were not compatible with the notions of good faith and fair dealing, and therefore, Defendants' unilateral breach of the Grant Agreement should render the Reversionary Clause unenforceable as a matter of law. As a matter of equity, Defendants should not be able to reap any benefit from their inequitable conduct. *See S.E.C. v. Banner Fund Internat'l*, 211 F.3d 602, 617 (D.C. Cir. 2000) (discussing Court's ability to exercise its equitable power of disgorgement over property causally related to wrongdoing); *4934, Inc. v. District of Columbia Dept. of Employment Services*, 605 A.2d 50, 55 (D.C. 1992) (retaining benefit which in justice and equity belongs to another constitutes unjust enrichment). At present, the fair

15

market value of the property substantially exceeds the value of the Grant funds. Accordingly, if the time requirement set forth in the Grant Agreement is not met due to Cafesjian's and Water's Jr.'s unlawful conduct, and the properties are returned to CFF, CFF will receive a significant windfall at the direct expense of AGM&M.

### C. Defendants Cafesjian's and Waters Jr.'s Self-Serving Conduct Harmed AGM&M, the Very Non-Profit Corporation They Were Charged With Protecting

As set forth in the Second Amended Complaint, AGM&M suffered significant losses as a result of Cafesjian's and Waters Jr.'s breach of their fiduciary duties, duty of loyalty and the Grant Agreement. Defendants *ultra vires* and deceptive filing of the Memorandum as well as Defendants' refusal, despite over a year of litigation, to release the cloud on title caused by the Memorandum, have delayed the museum's progress and precipitated the instant, costly litigation. Defendants strenuously opposed any efforts to remove the Memorandum, asserted frivolous Counterclaims against the Plaintiff and engaged in extensive discovery with AGM&M, until Waters, Jr. finally admitted, in an answer to an Interrogatory, that he acted without authority when he filed the Memorandum. In addition, Cafesjian's and Waters Jr.'s subsequent filing of the *Lis Pendens* served to, and continues to, compound Cafesjian's and Waters Jr.'s breach of fiduciary duties and the resultant harm to AGM&M.

The encumbrances on AGM&M's title as well as the litigious conduct of Cafesjian and Waters have caused significant damage to AGM&M including, but not limited to, the delayed development of the museum, lost contributions (including the loss of a $10 million dollar donation), additional financing costs, increased insurance costs and increased taxes due to the delay in the development of the museum.[4] Taking the allegations in the Second Amended

---

[4] As the museum is not yet completed, the properties are, to date, ineligible to receive a non-profit designation which would permit them to be taxed at a lower tax rate.

16

Complaint as true and construing them in the light most favorable to AGM&M, AGM&M has sufficiently plead facts to support its claims for declaratory, injunctive and equitable relief, as well as compensatory and punitive damages.  *See Lu v. Zurich American Ins. Co.,* 115 Fed. Appx. 613, 618-19, 2004 WL 2538199, No. 03-2082 (4th Cir. Nov. 10, 2004) (finding plaintiff stated a claim for damages because plaintiff alleged sufficient facts to entitle him to potential compensatory damages of more than one dollar).  Accordingly, this Court should deny Defendants' Motion to Dismiss.

### III.   CONCLUSION

For the foregoing reasons, this Court should deny Defendants Motion to Dismiss the Second Amended Complaint and allow the parties the opportunity to proceed with discovery.

Dated:  August 29, 2008                      Respectfully submitted,

**K&L GATES LLP**
By:      /s/  David. T. Case
David T. Case (D.C. Bar No. 384062)
Bruce Nielson (D.C. Bar No.  414440)
1601 K Street, N.W.
Washington, D.C. 20006
Tel:  (202) 778-9000
Fax:  (202) 778-9100

*-and-*

   /s/  Arnold R. Rosenfeld
Arnold R. Rosenfeld (MA Bar No. 428860)
Naoka E. Carey (MA Bar No. 655312)
One Lincoln Street
Boston, MA 02111
Tel: (617) 261-3155
Fax: (617) 261-3175

COUNSEL FOR PLAINTIFF

17