## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ARMENIAN GENOCIDE MUSEUM AND MEMORIAL, INC.,<br><br>                Plaintiff,<br><br>v.<br><br>THE CAFESJIAN FAMILY FOUNDATION, INC., JOHN J. WATERS, JR., GERARD L. CAFESJIAN, JOHN J. WATERS, SR.,<br><br>                Defendants. | Civil File No. 1:07-cv-01259 (CKK)<br><br><br><br>**Oral Argument Requested** |

## THE CAFESJIAN DEFENDANTS' RESPONSE TO PLAINTIFFS STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS
## (D.C.—1)

Dated: August 17, 2009

JOHN B. WILLIAMS
(D.C. Bar No. 257667)
WILLIAM G. LAXTON, JR.
(D.C. Bar No. 982688)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Counsel for The Cafesjian Family Foundation, Mr. Gerard L. Cafesjian, Mr. John J. Waters, Jr., TomKat LP

**THE CAFESJIAN DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS IN D.C.—1**

Pursuant to Local Civil Rules 7(h) and 56.1 of the Rules of the United States District Court for the District of Columbia, The Cafesjian Family Foundation ("CFF"), Mr. Gerard L. Cafesjian (Mr. Cafesjian), and Mr. John J. Waters, Jr. (Mr. Waters) (collectively defendants), hereby submit in opposition to the Armenian Genocide Museum and Memorial, Inc.'s (the "Museum"), the Armenian Assembly of America's (the "Assembly"), and Mr. Hirair Hovnanian's (Mr. Hovnanian) (collectively plaintiffs) Opposition to Motion for Partial Summary Judgment this Response to Plaintiffs' Statement of Additional Material Facts.

**GENERAL OBJECTION**

Defendants object generally to plaintiffs' Statement of Additional Material Facts to the extent that many of plaintiffs' statements are argumentative paragraphs that misstate and mischaracterize the evidence and ignore the record in the case, rather than objective statements of undisputed fact. Additionally, defendants object generally to plaintiffs' Statement to the extent that many of plaintiffs' assertions are immaterial and irrelevant to the matters at issue in this case.

**DEFENDANTS' SPECIFIC RESPONSES TO PLAINTIFFS' ALLEGED MATERIAL FACTS NOT IN DISPUTE**

74.    Between November 1, 2003 and the fall of 2006, AGM&M was operated and managed by Cafesjian and Waters Jr., as President and acting Secretary and Treasurer, respectively **(see September 11, 2007 Affidavit of Robert A. Kaloosdian, Plaintiff s SMF Exhibit 4 at ¶ 16).** During this time, Cafesjian personally spent *no more than 40-50 hours per year* working on the museum project **(see AGM&M Tax returns for 2004 and 2005, at Part V, Supp. Nagle Aff. at Exhibits 7-8).**

**Disputed.**

Defendants object to this statement because it is inaccurate and misleading.  Defendants dispute plaintiffs' characterization of Mr. Waters, Jr. as being an "acting" officer of the Museum. This statement is not supported by the authorities cited and therefore is misleading.  The Unanimous Written Consent, signed by all Trustees of the Museum, identifies Mr. Waters, Jr. as the Secretary and Treasurer of the Museum.  (Defendants' Motion for Summary Judgment, ("Defs.' Mot. Summ. J.") Ex. 4, page 2).  Defendants also object to this statement to the extent it implies a lack of involvement by the other members of the Board of Trustees.  Defendants refer to plaintiffs' statement of material fact number 15 in support of their Motion for Summary Judgment in this case, stating that the Museum's "affairs…shall be managed and controlled by the Board of Trustees."  (Defs.' Mot. Summ. J.  Ex. 2, AGMM Articles of Incorporation, at §VII.A).  Mr. Rouben Adalian testified that "the Board always functioned by consensus." (Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, Docket No. 121, ("Defs.' Opp."), Ex. H, Adalian Dep. 205:12:13, April 28, 2009).

The tax returns for AGM&M for 2004 and 2005 estimate hours spent by all trustees and officers on the formal business of the museum, such as attending meetings and participating in conference calls.  The tax returns show that each of the Trustees' estimated time is identical for those years.  (Plaintiffs' Response to Defendants' Statement of Material Facts, Docket No. 116, ("Pls.' Resp. to Defs.' SMF"), Ex. 7-8 at Part V).  The tax returns do not reflect the countless hours spent by Mr. Cafesjian and, in particular, his staff on the day-to-day management, operation and planning for the Museum, all of which, in additional to office space and other operating support, was contributed by Cafesjian at no cost to the Museum.  (Pls.' Resp. to Defs.' SMF, ¶24).

75.    During this time, Cafesjian and Waters Jr. used the museum project as a tool for their own campaign of self-aggrandizement and self promotion, undertaking business ventures in Armenia involving many businesses ranging from cable television to banking and real estate **(see Waters Jr. Tr. at 64:14-22; 43:5-44:19, Supp. Nagle Aff. at Exhibit 1).**

**Disputed.**

Defendants object to this statement because it is inaccurate and unsupported by the

authority cited.  The testimony plaintiffs cite as authority for this "statement of fact" is a portion

of Mr. Waters, Jr.'s testimony in which he describes some of the entities related to the Cafesjian

Family Foundation.  (Plaintiffs' Brief in Opposition to Defendants' Motion for Summary

Judgment, Docket No. 117 ("Pls.' Opp."), Supp. Nagle Aff. at Ex. 1 and Ex. 16, Waters, Jr. Dep.

64:14-22; 43:5-44:19).  The other accusations in this statement of fact are false and completely

unsupported by the evidence in this case.  Mr. Cafesjian, a former senior executive of West

Publishing, is a noted businessman and philanthropist.  (Defs.' Mot. Summ. J., Ex. 1, Waters Aff.,

¶4).  Both individually and through the Cafesjian Family Foundation, he supports numerous

charities and programs, primarily focused on providing assistance to Armenia and the Armenian

people.  *Id.*  The Museum is but one of those programs.  The Armenian community often

recognizes Mr. Cafesjian for his philanthropy.  At the Assembly's 2002 fall gala in Philadelphia

the Assembly gave Mr. Cafesjian the Assembly's Man of the Year Award based on his

philanthropic activities, including his support of the Museum, the Assembly, and his many

program related investments in Armenia.  (Defendants' Statement of Material Facts in Support of

Motion for Summary Judgment, Docket No. 107-2, "Defs.' SMF"), Ex. 51, CFF_ETAL00899).

76.    In addition to failures addressed above, Cafesjian and Waters Jr. failed to make necessary repairs to the Properties **(see Waters Jr. 30(b)(6) Tr. at 214:8-217:4, Supp. Nagle Aff. at Exhibit 1).**

**Disputed.**

Defendants object to this statement because it is inaccurate, unsupported by the authority cited and at odds with the evidence in this case.  Defendants object to plaintiffs' reference to "failures addressed above" as unintelligible without any reference or citation.  Defendants also object that no part of the testimony cited by the plaintiffs supports their characterization of repairs as "necessary."  Mr. Waters, Jr. testified that "nothing other than emergency repairs was ever authorized nor was there money in the budget to perform those activities."  (Supp. Nagle. Aff. Ex. 1, Waters, Jr. Dep. 216:15-18, June 19, 2009).  Further, Mr. Waters, Jr. testified that the Museum planned to demolish the adjacent buildings and there was an effort to minimize expenditures on repair costs for the buildings.  (Defs.' SMF ¶69).  In October of 2003, Concord Partners noted that although there was water infiltration in the buildings adjacent to the National Bank of Washington, "[w]ater infiltration is not a concern at these properties because the intent is to demolition them."  (Defs.' Mot. Summ. J, Ex. 69, CFF_ETAL08695, at pg. 2).  Without citation to any evidence, plaintiffs dispute that there was a plan to demolish the buildings, but admit that there was an intention to do so.  (Pls.' Resp. to Defs.' SMF, ¶69).

77.    Defendants admit to entering into various contracts on AGM&M s behalf, none of which were approved by the Board **(see Cafesjian Parties Answers to Interrogatories, Supp. Nagle. Aff. at Exhibit 39).**

**Disputed.**

Defendants object to this statement because it is inaccurate, unsupported by the authority cited and at odds with the evidence in this case.  Nothing in the evidence cited supports plaintiffs' allegation that the agreements were entered without Board approval.  All contracts entered into and expenditures made under Mr. Cafesjian's chairmanship were authorized.  (Defs.' SMF ¶67).

5

78.    Cafesjian and Waters, Jr. moved significant funds between CFF and the AGM&M without any notice to or authority from the Board of Trustees **(see E. Hovnanian Tr. at 45:14-71:8, Supp. Nagle Aff. at Exhibit 3).**

**Disputed.**

        Defendants object to this statement because it is inaccurate, unsupported by the authority cited and at odds with the evidence in this case.  Nothing in the evidence cited supports this assertion.  Ms. Hovnanian testified that she did not know why the Museum transferred money to TomKat in March of 2004.  (Defs.' Mot. Summ. J. Ex. 101, E. Hovnanian Dep. 55:7-57:10, May 20, 2009).  Payments from the Museum to TomKat were pursuant to the transfer of properties under the Grant Agreement.  (Defs.' SMF ¶68).  All of the transfers, including financial details, were fully documented by sale and purchase agreements and or assignment agreements.  *Id.*  The amounts transferred equaled TomKat's original purchase price in third party transactions plus TomKat's direct carrying costs since those transactions.  *Id.*  Further, Mr. Cafesjian and CFF transferred to the Museum funds in excess of the transfers to TomKat.  *Id.*  These transactions were authorized by the Unanimous Written Consent.  *Id.*  All of the property purchases were recorded in the accounting records of the Museum.  *Id.*

79.    Cafesjian and Waters Jr. failed to make a mortgage payment as required under the Grant Agreement, abandoning AGM&M in the Fall of 2006 with the debt unpaid **(see Deposition Testimony of Rouben Adalian ( Adalian Tr. at ) at 307:9-309:6, Supp. Nagle Aff. at Exhibit 40).**

**Disputed.**

        Defendants object to this statement because it is inaccurate, unsupported by the authority cited and at odds with the evidence in this case.  The testimony of Mr. Adalian in no way supports this assertion.  (Supp. Nagle Aff. Ex. 40, Adalian Dep.).  Mr. Adalian merely testifies that he believed there was a mortgage (which is not a mortgage but actually an installment sales

contract) on one of the properties.  *Id.* at 308:8-9.  The property at 1340 G Street is being

acquired per an installment sales contract.  (AGMM02887, attached hereto as Exhibit 2).  That

contract has been assumed by the Museum.  (AGMM02939, attached hereto as Exhibit 3).  Per

the Grant Agreement, the grant property at 1340 G Street was transferred to the Museum in 2003.

(Defs.' Mot. Summ. J., Ex. 6, at §2.3).  Per the Grant Agreement, GLC/CFF make a series of

annual grant payments to the Museum.  (Defs.' Mot. Summ. J., Ex. 6, §2.3).  All of the

installment sales payments have been made.  All of the installment sales payments have been

made.  In 2007, the annual grant payment was sent to the Assembly (payable to the Museum and

for the benefit of the Museum), but the Assembly has decided not to cash the check.  (Supp.

Nagle Aff. Ex. 39, at pg. 10).  In 2008 and 2009, CFF made its annual grant payments directly to

the holder of the installment sales contract on behalf of and for the benefit of the Museum.

(AGMM31973-31976, attached hereto as Exhibit 4, AGMM32545, attached hereto as Exhibit 5).

In addition, Mr. Cafesjian has never abandoned the Museum and has never lost interest in the

Museum project.  (Defs.' Opp., Ex. II, Cafesjian Aff., ¶12).


80.     Cafesjian utterly abandoned the museum project; Cafesjian has no idea if he even served
as Chairman from November 1, 2003 into 2006 and doesn't remember serving in that role **(see
Cafesjian Tr. at 230:24-231:8, Supp. Nagle Aff. at Exhibit 5).** When asked about details
vital to the museum project, Cafesjian was unaware and repeatedly indicated his desire to not be
involved, despite his role as President and the fiduciary duties related to such a role **(id.).** He was
not involved in how AGM&M expended its funds **(see Cafesjian Tr. At 239:23-240:6, Supp.
Nagle Aff. at Exhibit 5).** He d[id] not recall whether he dealt with budgets or was involved in
efforts to take care of the Properties. **(see Cafesjian Tr. at 240:7-22, Supp. Nagle Aff. at
Exhibit 5).**

**Disputed.**

       Defendants object to this statement because it is misleading, inaccurate, unsupported by

the authority cited and at odds with the evidence in this case.  Mr. Cafesjian has never abandoned

the Museum and has never lost interest in the Museum project.  (Defs.' Opp., Ex. II, Cafesjian

Aff., ¶12). Contrary to the plaintiffs' assertion, Mr. Cafesjian never indicated a "desire not to be involved" with the Museum. (Supp. Nagle Aff. Ex. 5, Cafesjian Dep. 230:24-231:8). For three years Mr. Cafesjian put forth proposals for the development of the Museum, only to be blocked by the Hovnanian trustees. (Defs.' SMF ¶¶22-43).

81.    When Cafesjian resigned from his position as Chairman on September 13, 2006, he left AGM&M with no cash and over $200,000 in debt. **(see September 15, 2006 Unpaid Bills Detail, Supp. Nagle Aff. at Exhibit 41; see also Defendants SMF Exhibit 45; E. Hovnanian Tr. 52:15-53:11, Supp. Nagle Aff. at Exhibit 3).**

**Disputed in part.**

Defendants object to this statement because it is misleading and inaccurate. Mr. Cafesjian did not leave the Museum in September 2006, but merely resigned as Chairman. (Defs.' Mot. Summ. J., Ex. 54, AGMM02477). At the time of his resignation, the Museum had over $500,000 in cash, funds held by the Assembly for the benefit of the Museum. The shortage of money available to the Museum in its primary operating account is attributable to the Assembly's refusal to transfer that money to the Museum per the terms of the Transfer Agreement, Mr. Hovnanian not funding his pledge to the Museum, and the Hovnanian trustees blocking Mr. Cafesjian's efforts to start a fundraising plan. (Defs.' SMF ¶¶43-47; ¶¶39-41).

82.    After several years and little progress, other members of the AGM&M Board of Trustees began questioning Cafesjian and Waters Jr. regarding the progress of the museum project. In response to their inquiries regarding his plans for the museum and memorial, Cafesjian became contemptuous of the other members of AGM&M Board of Trustees and unexpectedly indicated, through counsel, that he intended to abandon the museum project and seek immediate return of the Grant Property **(see Plaintiff s SMF Exhibit 4 at ¶ 19; Letter from Gerard L. Cafesjian, through counsel, to the other members of the AGM&M Board of Trustees, dated May 24, 2006, Supp. Nagle Aff. at Exhibit 26).**

**Disputed.**

Defendants object to this statement as inaccurate, misleading and unsupported by the evidence cited. Nothing in the sources cited by plaintiffs supports this statement. The

Hovnanian Trustees did nothing but block the Museum's progress. (Defs.' SMF ¶48).

Defendants object to the plaintiffs' use of settlement materials in their statement of material facts

and their pleadings. (Defs.' Opp., Ex. I, AGMM01753). The May 24, 2006, letter written by

Mr. Cafesjian's lawyer was sent to the other Trustees as a settlement proposal. (Defs.' Opp., Ex.

II, Cafesjian Aff., at ¶15). Accordingly, this letter is not relevant and plaintiffs cannot use this

letter as evidence per Rule 408 of the Federal Rules of Evidence. Notwithstanding this general

objection, defendants object to plaintiffs' mischaracterization of the terms of the settlement offer.

Defendants refer to that letter as to the actual terms of Mr. Cafesjian's settlement offer. (Defs.'

Opp., Ex. I).


83.    Specifically, the May 24, 2006 letter indicated that competing visions for AGM&M had
emerged and, despite never having asked for a vote on any AGM&M related matters, that the
Board was in deadlock. The letter stated that Cafesjian had concluded that the differences among
the trustees were irreconcilable and sought (i) to terminate his involvement with the museum
project; (ii) to secure payment of an allegedly outstanding $500,000 note; and (iii) a return of the
properties at 1334-36 G Street, 1338 G Street, 1340 G Street, and 1342 G Street, as of his exit
from AGM&M in 2006, not at the end of 2010 as contemplated in the Grant Agreement (**see id.).**

**Disputed.**

Defendants object to this statement as inaccurate, misleading and unsupported by the

evidence cited. Nothing in the sources cited by plaintiffs supports this statement's commentary

on defendants "never having asked for a vote." The Hovnanian Trustees did nothing but block

the Museum's progress. (Defs.' SMF ¶48). Defendants object to the plaintiffs' use of settlement

materials in their statement of material facts and their pleadings. (Defs. Opp., Ex. I,

AGMM01753). The May 24, 2006, letter written by Mr. Cafesjian's lawyer was sent to the other

Trustees as a settlement proposal. (Defs.' Opp., Ex. II, Cafesjian Aff., at ¶15). Accordingly, this

letter is not relevant and plaintiffs cannot use this letter as evidence per Rule 408 of the Federal

Rules of Evidence. Notwithstanding this general objection, defendants object to plaintiffs'

mischaracterization of the terms of the settlement offer.  Defendants refer to that letter as to the

actual terms of Mr. Cafesjian's settlement offer.  (Defs.' Opp., Ex. I).


84.     The AGM&M Board received this letter and absorbed it with shock. After an
unsuccessful attempt to obtain clarification regarding Cafesjian s intentions by way of a
telephone conference with Cafesjian s lawyer and Waters Jr., and after carefully considering its
contents, Robert A. Kaloosdian, an AGM&M Board member, responded to Cafesjian on behalf
of the trustees to whom the letter had been sent. The Board s response stated unequivocally that
[t]here have not been two competing visions and asked that Cafesjian *carry on to bring the
project to fruition in accordance with his concept.* **(see Plaintiff s SMF Exhibit 4 at ¶ 21;
Kaloosdian Tr. at 153:22-154:23, Supp. Nagle Aff. at Exhibit 10; Cafesjian Tr. at 294:9-
295:19, Supp. Nagle Aff. at Exhibit 5; Letter from Kaloosdian, on behalf of himself,
Mathevosian and Hovnanian, to Gerard L. Cafesjian, through counsel, dated August 2,
2006, Supp. Nagle Aff. at Exhibit 42;).**

**Disputed in part.**

        Defendants object to this statement as inaccurate, incomplete, misleading and

unsupported by the evidence cited.  Defendants object to thee plaintiffs' use of settlement

materials in their statement of material facts and their pleadings.  These materials are not relevant

and plaintiffs cannot use them as evidence per Rule 408 of the Federal Rules of Evidence.

Notwithstanding this general objection, defendants object to plaintiffs' mischaracterization of the

terms of the settlement discussions.  Mr. Cafesjian testified that the Museum Trustees' alleged

offer for him to "proceed with his vision for the museum" was "not a sincere letter" and the

Hovnanian led Trustees "made that very clear."  (Defs.' Opp., Ex. J, Cafesjian Dep. 294:20-295:7,

May 5, 2009).  Defendants also state that the August 2, 2006, letter states that the Hovnanian

Trustees stated that they were willing "to effect a complete separation on mutually agreeable

terms which will not derogate from the successful realization of the project."  (Supp. Nagle Aff.

at Exhibit 5; Letter from Kaloosdian, on behalf of himself, Mathevosian and Hovnanian, to

Gerard L. Cafesjian, through counsel, dated August 2, 2006, Supp. Nagle Aff. at Exhibit 42).

85.    On August 29, 2006, the other Board members received Cafesjian's response, which entirely ignored their request that Cafesjian proceed with his vision and, instead, set forth the terms of his desired termination of involvement with AGM&M. This third document sought (i) to terminate his involvement with the museum project; (ii) to secure payment of an allegedly outstanding $500,000 note; (iii) an *immediate* return of the appreciated properties at 1334-36 G Street, 1338 G Street, 1340 G Street, and 1342 G Street; and (iv) termination of Cafesjian's obligations under previous pledges to AGM&M. Id. Cafesjian even went so far as to suggest the liquidation of the museum **(see Plaintiff s SMF Exhibit 4 at ¶ 23; Letter from Gerard L. Cafesjian, through counsel, to the other members of the AGM&M Board of Trustees, dated August 29, 2006, Supp. Nagle Aff. at Exhibit 43).**

**Disputed in part.**

Defendants object to this statement as inaccurate, misleading and unsupported by the evidence cited.  Defendants object to the plaintiffs' use of settlement materials in their statement of material facts and their pleadings.  (Defs.' Opp., Ex. K, AGMM02443).  The August 29, 2006, letter written by Mr. Cafesjian's lawyer was sent to the other Trustees as a settlement proposal.  (Defs.' Opp., Ex. II, Cafesjian Aff., at ¶15).  Accordingly, this letter is not relevant and plaintiffs cannot use this letter as evidence per Rule 408 of the Federal Rules of Evidence.  Notwithstanding this general objection, defendants object to plaintiffs' mischaracterization of the terms of the settlement offer.  Defendants refer to that letter as to the actual terms of Mr. Cafesjian's settlement offer.  (Defs.' Opp., Ex. K, AGMM02443).

86.    On April 26, 2007, Cafesjian and CFF filed a Complaint against the Assembly in the United States District Court for the District of Minnesota (Docket No. 07 cv 2079), seeking, *inter alia*, rescission of the Grant Agreement and restitution of all donations made pursuant to that Agreement **(see Complaint filed in 07-2079 (D. Minn.), Supp. Nagle Aff. at Exhibit 44)**

**Disputed in part.**

Defendants object to the extent that the statement is incomplete and therefore misleading. The lawsuit mentioned in this statement sought a declaration that the Assembly had breached the Grant Agreement and damages for the failure to reissue the Promissory Note or repay the

$500,000 loan as required by the Grant Agreement.  (MN-1 Complaint, Docket No. 1, Case No.

08-cv-1744).

87.    The complaint relied on the alleged failure of the Assembly to reissue a $500,000
promissory note to CFF **(see id.).**

       **Disputed in part.**

Defendants object to the extent that the statement is inaccurate and misleading.  The

Assembly has failed to reissue the Promissory Note.  (Defs.' SMF ¶5).  Mr. Cafesjian and CFF

made repeated demands to the Assembly and the Museum to either repay the $500,000 loan or

reissue the Promissory Note as required by the Grant Agreement.  (Defs.' SMF ¶57).  The

Assembly and the AGM&M Trustees refused to reissue the note, repay the loan, or acknowledge

the validity of the obligation.  (Defs.' SMF ¶57).

88.    The District Court for the District of Minnesota ultimately dismissed the case for failure
to join a necessary party, AGM&M, and for lack of jurisdiction **(see Order of Dismissal,
Supp. Nagle Aff. at Exhibit 45).**

**Disputed in part.**

Defendants object to the extent that the statement is inaccurate.  The Minnesota District

Court did not dismiss the case for lack of jurisdiction.  (*see* Order of Dismissal, Supp. Nagle Aff.

at Exhibit 45). The dismissal without prejudice in that case was appealed, although the appeal

was subsequently withdrawn by defendants in the effort to consolidate the litigation in one

jurisdiction.

89.    In light of the aforementioned lawsuit, the Assembly, along with AGM&M, filed an
Arbitration Demand with the American Arbitration Association, seeking to arbitrate the dispute
in accordance with the terms of the Transfer Agreement **(see Arbitration Demand, Supp. Nagle
Aff. at Exhibit 46; see also Transfer Agreement, Defendants SMF Exhibit 5,
at § 5.3).**

**Disputed in part.**

Defendants object that this statement is unsupported by the authority cited and incorrect. There is nothing in the authority cited supporting the assertion that the cause of the arbitration demand was the "aforementioned lawsuit." Defendants state that whether the dispute was to be arbitrated under the terms of the Transfer Agreement or not was the subject of litigation in the United States District Court for the District of Minnesota. *see ¶*91 *infra*.

Further, defendants state that the arbitration demand and the subsequent lawsuits filed by the Museum were not and have not been properly authorized by the Museum Board of Trustees. (Defs.' Opp., at 25-28).

90.    On September 28, 2007, through a complaint verified by Waters Jr. and filed purportedly on behalf of AGM&M, CFF filed another lawsuit against AGM&M and others seeking to [e]njoin AGM&M from any further development of the museum and memorial. **(see Complaint filed in 07-1746 (D. D.C.), Supp. Nagle Aff. at Exhibit 47).**

**Disputed in part.**

Cafesjian defendants object to the extent that the statement is incomplete and therefore misleading. The Complaint referred to in this statement sought to "enjoin [the Museum] from any further development of the museum and memorial *without proper Trustee notice, participation, and approval*." (Case No. 07-CV-1746-CKK (D.D.C) Dkt. No. 1, at 15 (emphasis added)). CFF has a right to participate in Museum development decisions. (Def.s' Mot. Summ. J., Ex. 6, Cafesjian Grant Agreement, at §3.1, Ex. 3, AGM&M By-laws, at §2.7).

91.    On October 10, 2007, Defendants filed yet another lawsuit to enjoin arbitration of the dispute, asserting that the arbitration provision of the Transfer Agreement did not apply to them **(see Complaint filed in 07-4212 (D. Minn.), Supp. Nagle Aff. at Exhibit 48).**

**Disputed in part.**

Cafesjian defendants object that this statement is inaccurate, misleading, and mischaracterizes the facts.  Defendants object to the plaintiffs' use of the phrase "yet another" to the extent it implies that any of the lawsuits filed in this dispute were inappropriate.  Defendants object to the plaintiffs' characterization of the lawsuit and refer to the Complaint in that case for an accurate recitation of what the defendants asserted in that case.  (*see* Complaint filed in 07-4212 (D. Minn.), Supp. Nagle Aff. at Exhibit 48).

92.    In mid-2008, Defendants withdrew the Memorandum and filed a *lis pendens* **(see *Lis Pendens*, Supp. Nagle Aff. at Exhibit 49).**

**Not Disputed.**

93. Up to and including 2009, Defendants have refused to lift the encumbrances so that work on the museum can proceed **(see February 6, 2009 Minutes, Supp. Nagle Aff. At Exhibit 28).**

**Disputed.**

Cafesjian defendants object that this statement as inaccurate and contrary to the evidence in this case.  Defendants object to the plaintiffs' use of the word "encumbrance" to the extent this is a reference to either the MOA or the *lis pendens*.  The properties were encumbered by the development obligations and the Reversionary interest in the Grant and Transfer Agreements. (Defs.' Mot. Summ. J., Ex. 6, Cafesjian Grant Agreement, at §3.1; Ex. 5, Transfer Agreement §1.2; Ex. 67, Nida Dep. 44:17-45:1).  Defendants further state that the Reversionary Clause does not impede work on the Museum.  The Museum was intended to consist of a renovated National Bank of Washington, along with new construction covering the four adjacent properties.  (Defs.' Mot. Summ. J., Ex. 1, Waters Aff.,  ¶ 47).  Mr. Vartian testified that there was "unanimous opinion of all [Museum Trustees] that [the Museum] should be of a certain budget, and it should include all of the properties in the entire footprint."  (Defs.' Mot. Summ. J., Ex. 107, Vartian Dep.

14

94:9-13, April 23, 2009).  The funds for development were to come from existing and future

donations.  (Ex. 1, Waters Aff.,  ¶ 47).  The Museum Board has never authorized the sale or

mortgage of the properties.  *Id.*

94.     Defendants formed USAPAC in December 2006 **(see USAPAC Launch Press Release, Supp. Nagle Aff. at Exhibit 50).**

**Not disputed.**

95.     Ross Vartian, Rob Mosher, and Emil Sanamyan, each former Assembly employees became employees of USAPAC and USAPAC has disparaged and competed with the Assembly **(see Vartian Tr. at 12:19-23; 218:14-220:5, Supp. Nagle Aff. at Exhibit 35; see also Defendants SMF Exhibit 58, p. 1).**

**Disputed in part.**

        Defendants object that this statement is incorrect and unsupported by the authority cited.

There is no evidence that "USAPAC has disparaged and competed with the Assembly."  Even

the authority cited by plaintiffs acknowledges that the allegation of "disparagement" is hearsay.

(Defs.' Mot. Summ. J., Ex. 58, p. 1.).  Defendants further state that USAPAC was launched to

augment the existing Armenian advocacy organizations and not to compete with the Assembly.

(Defs.' Mot. Summ. J., Waters Aff. ¶80.).  Further, notice of the formation of USAPAC was

given to the Assembly prior to its formation in a letter received and acknowledged by the

Assembly, by Mr. Hovnanian as Chairman.

96. The creation of USAPAC was not disclosed to Assembly management under the conflict of interest policy **(see Cafesjian Tr. 72:5-8, Supp. Nagle Aff. at Exhibit 5).**

**Disputed in part.**

        Defendants object that this statement is incomplete and potentially misleading.  Mr.

Cafesjian testified that he did not disclose USAPAC under the conflict of interest policy because

"[it] was meant to be supplementary [to the Assembly]."  (Supp. Nagle Aff., Ex. 5, Cafesjian Tr.

72:5-8.).

97.    Since responsibility for the management of the museum and memorial project has shifted
to the other Trustees who Cafesjian disparaged, substantial progress has been made toward
completion of the museum **(see August 3, 2008 Affidavit of Rouben Adalian ( Adalian Aff. at
¶ -- ), Supp. Nagle Aff. at Exhibit 51).**

**Disputed.**

Defendants object that this statement is inaccurate, irrelevant, and misleading.  Mr.

Cafesjian has never disparaged the other Trustees, and nothing in the authority cited states

otherwise.  Defendants further state that the Museum "progress" is being conducted by a

committee that is improperly wielding the powers of the Museum Board of Trustees.  No vote

was ever taken to authorize the formation of the Committee, or to give the Committee any power

whatsoever.  (Defs.' Mot. Summ. J., Ex. 32, May 7, 2007 Meeting Transcript).  The Committee

is not in compliance with the requirement under D.C. law that such a committee "shall consist of

2 or more directors."  (D.C. Code § 29-301.99 (2006); Defs.' Mot. Summ. J., Ex. 34, Museum

Brochure; Pls.' Opp., Ex. 51, Adalian Aff., at ¶5).  Also, the Board is not supervising its actions

as required by D.C. Law. (Defs.' Mot. Summ. J., Ex. 29, H. Hovnanian Dep. at 100:4-11,  Defs.'

Opp., Ex. AA, H. Hovnanian Dep. at 103:21-25; 260:13-19; 176:20-22).  Any "progress" of the

Museum since the resignation of Mr. Cafesjian as Chairman is illusory.  The "plans" being

touted by the plaintiffs are concept development plans for turning the National Bank of

Washington alone into the Museum.  The architecture group that the Museum has allegedly hired

is the same group selected by Mr. Cafesjian and the Assembly in 2000 when the project was

limited to the National Bank of Washington.  (*see* Adalian Dep. 276:6-277:3 April 28, 2009,

attached hereto as Exhibit 9).  As Mr. Adalian testified, virtually all developmental activities of

the Museum have come to a standstill.  (Ex. 9, Adalian Dep. 278:5-279:6; Defs. Mot. Summ. J.,

Ex. 100, 304:6-12, April 28, 2009).

98.    AGM&M has contracted with a nationally recognized architectural firm, a nationally
recognized museum design firm, and a nationally recognized project management firm **(Id. at ¶¶
8-10).**

**Disputed.**

Defendants object that this statement is inaccurate, irrelevant, and misleading.  The

Museum has not properly contracted with anyone as the Trustees have not been informed of or

approved these actions.  (Defs.' Opp., Ex. II, Cafesjian Aff. ¶17).  The committee is improperly

wielding the powers of the Museum Board of Trustees.  No vote was ever taken to authorize the

formation of the Committee, or to give the Committee any power whatsoever.   (Defs.' Mot.

Summ. J., Ex. 32, May 7, 2007 Meeting Transcript).  The Committee is not in compliance with

the requirement under D.C. law that such a committee "shall consist of 2 or more directors."

(D.C. Code § 29-301.99 (2006); Defs.' Mot. Summ. J., Ex. 34, Museum Brochure; Pls.' Opp., Ex.

51, Adalian Aff., at ¶5).  Also, the Board is not supervising its actions as required by D.C. Law.

(Defs.' Mot. Summ. J., Ex. 29, H. Hovnanian Dep. at 100:4-11,  Defs.' Opp., Ex. AA, H.

Hovnanian Dep. at 103:21-25; 260:13-19; 176:20-22).  Any "progress" of the Museum since the

resignation of Mr. Cafesjian as Chairman is illusory.  The "plans" being touted by the plaintiffs

are concept development plans for turning the National Bank of Washington alone into the

Museum.  The architecture group that the Museum has allegedly hired is the same group selected

by Mr. Cafesjian and the Assembly in 2000 when the project was limited to the National Bank of

Washington.  (*see* Adalian Dep. 276:6-277:3 April 28, 2009,  attached hereto as Exhibit 9).  As

Mr. Adalian testified, virtually all developmental activities of the Museum have come to a

standstill. (Ex. 9, Adalian Dep. 278:5-279:6; Defs. Mot. Summ. J., Ex. 100, 304:6-12, April 28, 2009).

99.     It has received approval of its plans for the museum from the Historic Preservation Review Board, created a master plan for the museum, collected multiple collections of genocide memorabilia and artifacts for display, received a donation of a major research library, and entered into cooperative agreements with other museums holding collections of Armenian genocide artifacts **(Id. at ¶¶ 13-36; see also April 11, 2008 Approval Letter from the Historic Preservation Review Board, Supp. Nagle Aff. at Exhibit 52). ).**

**Disputed in part.**

Defendants object that this statement is inaccurate, irrelevant, and misleading. The committee is improperly wielding the powers of the Museum Board of Trustees. No vote was ever taken to authorize the formation of the Committee, or to give the Committee any power whatsoever. (Defs.' Mot. Summ. J., Ex. 32, May 7, 2007 Meeting Transcript). The Committee is not in compliance with the requirement under D.C. law that such a committee "shall consist of 2 or more directors." (D.C. Code § 29-301.99 (2006); Defs.' Mot. Summ. J., Ex. 34, Museum Brochure; Pls.' Opp., Ex. 51, Adalian Aff., at ¶5). Also, the Board is not supervising its actions as required by D.C. Law. (Defs.' Mot. Summ. J., Ex. 29, H. Hovnanian Dep. at 100:4-11, Defs.' Opp., Ex. AA, H. Hovnanian Dep. at 103:21-25; 260:13-19; 176:20-22). Further, the Historic Preservation Review Board gave approval for the "concept for renovation" of the National Bank of Washington. (Supp. Nagle Aff., at Ex. 52, pg. 1). No "plan" was presented or approved. *Id.* Any "progress" of the Museum since the resignation of Mr. Cafesjian as Chairman is illusory. The "plans" being touted by the plaintiffs are concept development plans for turning the National Bank of Washington alone into the Museum. The architecture group that the Museum has allegedly hired is the same group selected by Mr. Cafesjian and the Assembly in 2000 when the project was limited to the National Bank of Washington. (*see* Adalian Dep. 276:6-277:3 April

28, 2009, attached hereto as Exhibit 9). As Mr. Adalian testified, virtually all developmental activities of the Museum have come to a standstill. (Ex. 9, Adalian Dep. 278:5-279:6; Defs. Mot. Summ. J., Ex. 100, 304:6-12, April 28, 2009).

100.    AGM&M management also has launched a website and initiated a public relations campaign about the museum **(see Adalian Aff. at ¶¶ 37-44).**

**Disputed.**

Defendants object that this statement is irrelevant and inaccurate. The actions referenced are the result of the work of a committee that is improperly wielding the powers of the Museum Board of Trustees. No vote was ever taken to authorize the formation of the Committee, or to give the Committee any power whatsoever. (Defs.' Mot. Summ. J., Ex. 32, May 7, 2007 Meeting Transcript). The Committee is not in compliance with the requirement under D.C. law that such a committee "shall consist of 2 or more directors." (D.C. Code § 29-301.99 (2006); Defs.' Mot. Summ. J., Ex. 34, Museum Brochure; Pls.' Opp., Ex. 51, Adalian Aff., at ¶5). Also, the Board is not supervising its actions as required by D.C. Law. (Defs.' Mot. Summ. J., Ex. 29, H. Hovnanian Dep. at 100:4-11, Defs.' Opp., Ex. AA, H. Hovnanian Dep. at 103:21-25; 260:13-19; 176:20-22). Any "progress" of the Museum since the resignation of Mr. Cafesjian as Chairman is illusory. The "plans" being touted by the plaintiffs are concept development plans for turning the National Bank of Washington alone into the Museum. The architecture group that the Museum has allegedly hired is the same group selected by Mr. Cafesjian and the Assembly in 2000 when the project was limited to the National Bank of Washington. (*see* Adalian Dep. 276:6-277:3 April 28, 2009, attached hereto as Exhibit 9). As Mr. Adalian testified, virtually all developmental activities of the Museum have come to a standstill. (Ex. 9, Adalian Dep. 278:5-279:6; Defs. Mot. Summ. J., Ex. 100, 304:6-12, April 28, 2009).

101.    Finally, AGM&M has commenced the rehabilitation of, and developed a plan for, the maintenance and repair of the properties (**id. at ¶¶ 45-48).**

**Disputed.**

Defendants object that this statement is irrelevant and inaccurate.  The actions referenced are the result of the work of a committee that is operating without Board approval or authorization.  No vote was ever taken to authorize the formation of the Committee, or to give the Committee any power whatsoever.  (Defs.' Mot. Summ. J., Ex. 32, May 7, 2007 Meeting Transcript).  The Committee is not in compliance with the requirement under D.C. law that such a committee "shall consist of 2 or more directors."  (D.C. Code § 29-301.99 (2006); Defs.' Mot. Summ. J., Ex. 34, Museum Brochure; Pls.' Opp., Ex. 51, Adalian Aff., at ¶5).   Also, the Board is not supervising its actions as required by D.C. Law. (Defs.' Mot. Summ. J., Ex. 29, H. Hovnanian Dep. at 100:4-11,  Defs.' Opp., Ex. AA, H. Hovnanian Dep. at 103:21-25; 260:13-19; 176:20-22).  Any "progress" of the Museum since the resignation of Mr. Cafesjian as Chairman is illusory.  Any "progress" of the Museum since the resignation of Mr. Cafesjian as Chairman is illusory.  The "plans" being touted by the plaintiffs are concept development plans for turning the National Bank of Washington alone into the Museum.  The architecture group that the Museum has allegedly hired is the same group selected by Mr. Cafesjian and the Assembly in 2000 when the project was limited to the National Bank of Washington.  (*see* Adalian Dep. 276:6-277:3 April 28, 2009,  attached hereto as Exhibit 9).  As Mr. Adalian testified, virtually all developmental activities of the Museum have come to a standstill.  (Ex. 9, Adalian Dep. 278:5-279:6; Defs. Mot. Summ. J., Ex. 100, 304:6-12, April 28, 2009).

102.    Donations, totaling over $12 million, were lost as a result of the Memorandum and ongoing litigation (**see E. Hovnanian Tr. at 227:10-230:25; 233:3-237:11; 207:8-208:14, Supp. Nagle Aff. at Exhibit 3; see also Donation Documents, Supp. Nagle Aff. at 53-56).** Pledge agreements were sent to individuals but donations were never secured (**id.).**

20

**Disputed.**

Defendants object to the statement as not supported by the authorities cited, inaccurate and misleading.  The testimony of Ms. Hovnanian, the letter from a potential donor's lawyer, and the musings of an individual regarding the intentions and decisions of potential donors are all hearsay testimony and cannot be used as support in a motion for summary judgment.  (Supp. Nagle Aff., Ex. 3, E. Hovnanian Tr. at 227:10-230:25; 233:3-237:11; 207:8-208:14).  Blank donor forms offer no evidence to support this statement.  (Supp. Nagle Aff. at 53-56).  Further, Mr. Krikorian testified that these donations were not lost, but have merely been postponed. (Defs.' Opp., Ex. R, Krikorian Dep 279:2-280:13, May 13, 2009.).  Mr. Adalian testified that it is "self evident" that the economic downturn of 2008 contributed to the Museum's lack of fund raising.  (Defs.' Opp., Ex. S, Adalian Dep.  265:10-19, April 28, 2009).

103.     Assembly membership dropped as a result of the ongoing litigation and bad press, resulting in decreased member donations (**see Assembly Revenue Spreadsheet, Supp. Nagle Aff at Exhibit 57).**

**Disputed.**

Defendants object to the statement as not supported by the authorities cited, inaccurate and misleading.  Defendants do not dispute that the spreadsheet cited indicates that the Assembly's membership and revenues have decreased since 2005.  Mr. Krikorian testified that "there is a natural accretion of people who drop off every year unrelated to Mr. Cafesjian and began well before Mr. Cafesjian ever got involved."  (Krikorian Dep. 128:25-129:4, attached hereto as Exhibit 6).  Mr. Krikorian further testified that the Assembly has "not undergone th[e] exercise" of determining the source of the Assembly's drop off in membership donations.  (*Id.* at 129:16-24.)

104.    Significant repairs had to be undertaken to remedy issues which had been ongoing with the properties for many years but that Cafesjian and Waters Jr. had neglected **(see April 19, 2004 Property Issues Chart, Supp. Nagle Aff. at Exhibit 58; see also Adalian Aff. at ¶¶ 45-48, Supp. Nagle Aff. at Exhibit 51).**

**Disputed.**

Defendants object that this statement is inaccurate, misleading, and at odds with the evidence in this case.  During Mr. Cafesjian's tenure as chairman of the Museum, there was an effort to minimize expenditures on repair costs for the buildings.  (Defs.' SMF ¶69).  In October of 2003, Concord Partners noted that although there was water infiltration in the buildings adjacent to the National Bank of Washington, "[w]ater infiltration is not a concern at these properties because the intent is to demolition them."  (Defs.' Mot. Summ. J. Ex. 69, CFF_ETAL08695, at pg. 2).  Indeed, the costs identified by plaintiffs are not even repair costs; they are capitalized costs, and are recorded as such on the books of the Museum.  (Defs.' Mot. Summ. J., Ex. 24, Museum General Ledger, AGMM32549, Ex. 25, Krikorian Dep. 162, June 5, 2009).  Defendants also object to the extent this statement implies a lack of involvement or responsibility by the other members of the Board of Trustees during the tenure of Mr. Cafesjian as chairman.  Cafesjian defendants refer to plaintiffs statement of material fact number 17 in DC-1, 15 in DC-3, and 17 in DC-4, stating that the Museum's "affairs…shall be managed and controlled by the Board of Trustees."  (Defs.' Mot. Summ. J., Ex. 2, §VII.A.).  Likewise, Mr. Rouben Adalian testified that "the Board always functioned by consensus."  (Defs.' Opp., Ex. H, Adalian Dep. 205:12-13, April 28, 2009).

105.    The existence of the lien on AGM&M s properties and the ongoing litigation made financing impossible **(see Nida Tr. 30:21-31:10, Supp. Nagle Aff. at Exhibit 30).**

**Disputed.**

Defendants object to this statement because it is inaccurate and misleading.  The

Museum Board has never authorized the financing of the properties.  (Defs.' Mot. Summ. J., Ex.

1, Waters Aff., ¶47).  Further, the evidence in this case demonstrates that a single source of

financing has been approached, but the development obligations and the reversionary interest in

the Grant and Transfer agreements led to a breakdown in the attempt to secure financing.  (Defs.'

Mot. Summ. J., Ex. 67, Nida Dep. 44:17-45:1).  There is no evidence beyond this of the

Museum's "ability" to secure financing.  Mr. Thomas Nida asked the Museum's planning

committee for a legal opinion regarding the litigation and the MOA, which would have permitted

the financing discussions to go forward.  (Nida Dep. 30:6-33:1, June 26, 2009, attached hereto as

Exhibit 7; AGMM09393, attached hereto as Exhibit 8).  Representatives of the planning

committee told Mr. Nida that Mr. Krikorian would be providing such a letter, but Mr. Nida never

received this letter and the Museum's financing talks with United Bank then stalled.  (Nida Dep.

30:6-33:1, June 26, 2009, attached hereto as Exhibit 7; AGMM09393, attached hereto as Exhibit

8).

106.    In addition to these damages, AGM&M has also been unable to enter into any long term
leases as a result of this litigation and other breaches of fiduciary duty by the Defendants, which
is demonstrated by Defendants recent attempt to prohibit such leasing **(see July 21, 2009 Letter
from Defendants Counsel, Supp. Nagle Aff. at Exhibit 59).**

**Disputed.**

Defendants object to this statement because it is inaccurate and misleading.  The Board of

Trustees of the Museum has never authorized leasing of any of the Museum property.  (*see* Pls.'

Resp. to Defs.' SMF, ¶21).  The letter cited as authority for this statement is a letter dated July 21,

2009, from defendants' counsel to plaintiffs' counsel.  This letter in no way supports the notion

that defendants have breached fiduciary duties to the Museum.  As stated in the letter, the

Museum has obligations to develop all five Grant Properties and a "long term" lease on one of

the properties conflicts with the express terms of the Grant Agreement.  (Defs.' Mot. Summ. J.,

Ex. 6, Cafesjian Grant Agreement, at §3.1(A)).  Defendants also note that the letter plaintiffs

point to as authority for this statement was sent to protest the Museum's improper leasing of one

of the buildings to the Assembly.

107.    Defendants conduct has also jeopardized the tax status of both AGM&M and the
Assembly as public charities, which has created additional liabilities **(see V. Krikorian 30(b)(6)
Tr. 191:8-192:7, Supp. Nagle Aff. at Exhibit 24).**

**Disputed.**

Defendants object to this statement because it is inaccurate, speculative, and not

supported by the authority cited.  Mr. Krikorian's musings about possible tax consequences are

hypothetical and completely speculative.  Plaintiffs have no support for their statement that there

are "additional liabilities."

108.    Plaintiffs s Supplemental Answers to Defendants First Set of Interrogatories set forth a
list of alleged damages, with estimated quantifications **(see Plaintiffs Supplemental Answers to
Defendants First Set of Interrogatories, dated May 19, 2009, Supp. Nagle Aff. at Exhibit
60).**

**Disputed in part.**

Defendants object to this statement because it is irrelevant, cumulative, inaccurate, and

does not have any evidentiary support.  Defendants do not dispute that the Plaintiffs'

Supplemental Answers to Defendants First Set of Interrogatories set forth a list of alleged

damages and purports to provide estimated quantifications.  Defendants refer to pages 36-37 of

their Summary judgment brief in Case 08-cv-0255 which disputes each and every item identified

on the plaintiffs' alleged damages chart.