**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ARMENIAN GENOCIDE MUSEUM AND
MEMORIAL, INC.,

    Plaintiff,

      v.

THE CAFESJIAN FAMILY
FOUNDATION, INC., *et al.*,

    Defendants.

Civil Action No. 07-1259 (CKK)

**MEMORANDUM OPINION**
(March 9, 2010)

This case arises out of a very bitter and very unfortunate dispute between Plaintiff The

Armenian Genocide Museum & Memorial, Inc. ("AGM&M") and Defendants The Cafesjian

Family Foundation, Inc. ("CFF"), John J. Waters Jr. ("Waters Jr."), John J. Waters Sr. ("Waters

Sr.), and Gerard L. Cafesjian ("Cafesjian") (collectively, "Defendants"), relating to the

construction of an Armenian genocide museum and memorial in Washington, D.C.  Although the

parties have reportedly expended significant time attempting to resolve their disputes, they

continue to press forward with any and all grievances against each other in this and two other

cases currently pending before this Court.  In the above-captioned case, AGM&M has asserted

claims for breach of fiduciary duty against Waters Jr., Waters Sr., and Cafesjian for their

involvement in the filing of a Memorandum of Agreement that recorded a reversionary interest

held by Cafesjian and CFF in certain properties owned by AGM&M, as well as the filing of a *lis*

*pendens*.  Plaintiff also seeks declaratory and injunctive relief relating to CFF and Cafesjian's

reversionary interest, which exists pursuant to a series of agreements between AGM&M, CFF,

Cafesjian, and the Armenian Assembly of America.  CFF and Waters Jr. have filed a

counterclaim asserting that the filing of this lawsuit was an ultra vires act by AGM&M.

Currently pending before the Court in this action are a series of motions for summary

judgment.  AGM&M has filed a [104] Motion for Partial Summary Judgment regarding its

claims for breach of fiduciary duty against Waters Jr. and Cafesjian (Count I of the Second

Amended Complaint) and against Waters Sr. (Count II), as well as the sole Counterclaim.

Waters Sr. has filed a [105] Motion for Summary Judgment regarding the sole claim against him

for breach of fiduciary duty (Count II).  Waters Jr., Cafesjian, and CFF (collectively, the

"Cafesjian Defendants") have filed a [107] Motion for Summary Judgment as to all counts.  The

parties have each filed oppositions and replies regarding these motions, and they are now ripe for

adjudication.  Also pending before the Court is a [111] Motion to Compel the Production of

Documents, filed by AGM&M and other parties in the related actions, which were consolidated

for purposes of discovery only.[1]  The Court shall address that motion in a separate opinion.

For the reasons explained below, the Court shall DENY the parties' motions for summary

judgment with respect to: (1) Count I of the Second Amended Complaint for breach of fiduciary

duty against Waters Jr. and Cafesjian; (2) Count III of the Second Amended Complaint for

declaratory relief regarding the enforceability of the reversion clause in the Grant Agreement; (3)

Count IV of the Second Amended Complaint seeking quiet title and removal of the *lis pendens*;

and (4) the Counterclaim for relief based on an alleged ultra vires act.  The Court shall GRANT

---

[1] The related cases pending before this Court are *The Armenian Assembly of America, Inc. v. Cafesjian*, Civil Action No. 08-255, and *Waters v. Armenian Genocide Museum & Memorial, Inc.*, Civil Action No. 08-1254.  The issues raised in these related cases shall be addressed separately by the Court.

2

Waters Sr.'s motion for summary judgment regarding Count II of the Second Amended

Complaint.

## I. BACKGROUND

The following facts are drawn from the summary judgment record assembled by the

parties and the parties' statements of material facts that are not in dispute.[2]

A.      *The Armenian Assembly of America and the Origins of the AGM&M*

The Armenian Assembly of America (the "Assembly") is an Armenian-American

advocacy group that is incorporated in the District of Columbia as a non-profit corporation.  Pl.'s

Stmt. ¶ 5.  In the mid-1990s, the Assembly received a pledge from Anoush Mathevosian, an

Armenian-American philanthropist, for the purpose of constructing a permanent museum to the

victims and survivors of the Armenian genocide.[3]  Pl.'s Stmt. ¶ 6.  Ms. Mathevosian's pledge

was initially for $3.0 million but was subsequently raised to $3.5 million.  Defs.' Resp. Stmt. ¶

---

[2] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1 when resolving motions for summary judgment).  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case).  The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [67] Order at 2 (Feb. 6, 2009).  Thus, in many instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by an opposing party, in which case the Court may cite the opposing party's response to the statement ("Resp. Stmt.").  The Court shall also cite directly to evidence in the record, where appropriate.

[3] According to Plaintiff, "[t]he Armenian genocide refers to the more than one and one half million Armenians who perished as a result of the deliberate and systematic destruction of the Armenian population by the Ottoman Turkish government between 1915 and 1923."  Pl.'s Opp'n at 1.  Plaintiff claims that the Armenian genocide "is the single most important event that defines the identity of the Armenian people, including Armenian-Americans."  *Id.*

6.[4]  Encouraged by Ms. Mathevosian's generosity, the Assembly began exploring possible sites

for the museum in Washington, D.C., and solicited donations from the Armenian-American

community for the purpose of establishing and constructing the museum.  Pl.'s Stmt. ¶ 7.  In

2000, the Assembly identified a possible site for the museum at the National Bank of

Washington building (the "Bank Building") at 14th and G Streets, N.W. (619 14th Street, N.W.),

Washington, D.C., located just a few blocks away from the White House.  Pl.'s Stmt. ¶ 8.

At some point in the late 1990s, Cafesjian became involved with the Assembly's efforts

to create an Armenian genocide museum.[5]  With the help of donations from Cafesjian (through

CFF), the Assembly purchased the Bank Building in early 2000.  Pl.'s Stmt. ¶ 8.  As part of the

Bank Building transaction, which involved both grants and loans from CFF, the Assembly

executed a promissory note to CFF for $500,000.[6]  *See* Cafesjian Defs.' Br., Ex. 71 (3/23/00

Letter from Assembly to Cafesjian) at 1; Pl.'s Br., Ex. 4 (R. Kaloosdian Aff.) ¶ 9.  According to

Robert Kaloosdian, a founding member and long-time officer and Trustee of the Assembly, the

Assembly eventually came to understand that this note would be forgiven.  *See* Pl.'s Br., Ex. 4

---

[4] Although Waters Sr. and the Cafesjian Defendants filed separate briefs and separate responses to Plaintiff's statement of undisputed material facts, their objections and responses are, for the most part, substantively identical.  Therefore, the Court shall use "Defs.' Resp. Stmt." to incorporate all Defendants' responses, and the Court shall use "Waters Sr.'s Resp. Stmt." or "Cafesjian Defs.' Resp. Stmt." to refer to each party's separate responses, where appropriate.

[5] Nearly all of the facts surrounding Cafesjian's subsequent involvement with the Assembly are disputed by the parties.

[6] Although Ms. Mathevosian had pledged $3.5 million for the Bank Building, she was unable to tender the money at the time of the purchase.  To effectuate the purchase, Cafesjian/CFF gave the Assembly a $4 million interest-free bridge loan.  When Ms. Mathevosian came through with her pledge, the Assembly repaid Cafesjian $3.5 million and issued a promissory note for the remaining $500,000.  *See* Waters Sr.'s Stmt. ¶ 6; Pl.'s Resp. Stmt. ¶ 6; Cafesjian Defs.' Br., Ex. 71.

4

(R. Kaloosdian Aff.) ¶ 9.  Defendants, however, dispute this.  *See* Defs.' Br., Ex. 1 (Waters Jr.

Aff.) ¶ 86.  CFF and the Assembly also agreed to include a memorial named after Cafesjian as

part of the museum project.  *See* Defs.' Br., Ex. 71.

Subsequent to the purchase of the Bank Building, Cafesjian, through an affiliated entity

called The TomKat Limited Parternship ("TomKat LP"), acquired several lots adjacent to the

Bank Building.  Pl.'s Stmt. ¶ 9.  Cafesjian ultimately decided to donate these lots to the museum

project.[7]  Cafesjian wanted the museum project to be run by an independent entity, and the

Assembly eventually decided to create one.  Pl.'s Stmt. ¶ 10; Cafesjian Defs.' Resp. Stmt. ¶ 10.[8]

In October 2003, the Armenian Genocide Museum & Memorial, Inc. ("AGM&M") was

incorporated as a District of Columbia nonprofit corporation.  Pl.'s Stmt. ¶ 11.  AGM&M was

established for the purpose of constructing, owning, operating, and maintaining a permanent

museum and memorial to the victims and survivors of the Armenian genocide.  Pl.'s Stmt. ¶ 2.

The Articles of Incorporation and By-Laws of AGM&M were ratified and adopted,

respectively, pursuant to a Unanimous Written Consent of the Initial Trustees of AGM&M

---

[7] Plaintiff contends that Cafesjian initially intended to use these sites for his own contemporary art museum.  *See* Pl.'s Stmt. ¶ 9.  Cafesjian conceded at deposition that he briefly considered creating an art museum as part of the museum project in order to attract more people, but he testified that the purpose of acquiring the properties was to give the museum a larger footprint.  *See* Pl.'s Br., Ex. 5 (G. Cafesjian Dep. Tr.) at 148-52.

[8] There is a dispute in the record as to the origin of the idea for an independent entity came from.  Defendants argue that it was Hirair Hovnanian, Chairman of the Assembly's Board of Trustees, rather than Cafesjian, who proposed that the museum be run by an independent entity.  *See* Waters Sr.'s Resp. Stmt. ¶ 10; Cafesjian Defs.' Resp. Stmt. ¶ 10.  Regardless of where the idea came from, however, the record clearly shows that Cafesjian ultimately favored an independent entity and, as explained below, conditioned his gifts on the creation of such an independent entity.  *See* Pl.'s Br., Ex. 5 (G. Cafesjian Dep. Tr.) at 168 ("Yes, I wanted independent strcuture, not connected or affiliated with any political or politically oriented group, advocacy group.")

executed on October 30, 2003.  Pl.'s Stmt. ¶ 14.  The parties agree that these three documents—the Articles, the By-Laws, and the Unanimous Written Consent—govern the operation of and organization of AGM&M.  Pl.'s Stmt. ¶ 15.  Pursuant to the By-Laws and Articles, AGM&M has no members.  Pl.'s Stmt. ¶ 16.  The Articles provide that AGM&M's "affairs shall be managed and controlled by the Board of Trustees."  Pl.'s Stmt. ¶ 17.  The Board of Trustees serves as the Board of Directors for purposes of the D.C. Non-Profit Corporations Act.  Pl.'s Stmt. ¶ 19.

Under the Articles of Incorporation, there were four initial Trustees: Cafesjian, Hirair Hovnanian, Anoush Mathevosian, and Robert Kaloosdian.  *See* Pl.'s Br., Ex. 1 (Articles of Incorporation of AGM&M) (hereinafter, "Articles").  Each initial Trustee was designated as a representative of one of the four major initial donors to AGM&M: CFF (designating Cafesjian), Hirair Hovnanian (designating himself), Anoush Mathevosian (designating herself), and the Assembly (designating Kaloosdian).  *See* Pl.'s Br., Ex. 7 (Unanimous Written Consent) (hereinafter, "UWC") at 1-2.  Pursuant to the By-Laws, the terms of these initial Trustees is perpetual, and each initial donor may appoint successor Trustees in the event that the initial Trustees are no longer able to serve.  *See* Pl.'s Br., Ex. 6 (By-Laws) § 2.4.  A donor may elect one Trustee for every $5 million contributed to AGM&M (or elect a single Trustee to control as many votes as the donor has contributed in multiples of $5 million).  *Id.* § 2.5.  Unless otherwise provided in the By-Laws or the Articles, all questions are to be decided by an 80% vote of the Trustees at a meeting where a quorum is present.  *Id.* § 2.7.  Persons representing one-half of the aggregate eligible votes constitute a quorum at a duly-called meeting of the Board of Trustees.  *Id.* § 2.6.  The By-Laws also establish notice requirements that must be followed to properly

convene a Board meeting: Trustees much each be given personal notice of the time and place of the meeting at least five, and no more than thirty, days in advance.  Pl.'s Stmt. ¶ 21.

As of October 31, 2003, Cafesjian became the Chairman and President of AGM&M and Waters Jr. became the Secretary and Treasurer of AGM&M.  Pl.'s Stmt. ¶¶ 23-24.  Hirair Hovnanian became Vice Chairman of AGM&M.  *See* UWC at 2.

B.       *The Grant Agreement & Transfer Agreement*

On November 1, 2003, the Assembly executed a Grant Agreement with CFF and Cafesjian.[9]  Pl.'s Stmt. ¶ 25; *see* Pl.'s Br., Ex. 11 (Grant Agreement).  The Grant Agreement is signed by Hirair Hovnanian and Peter Voskibian on behalf of the Assembly and by Cafesjian on behalf of himself and CFF.  *See* Grant Agreement at 11.  The Grant Agreement memorialized CFF/Cafesjian's $3.5 million donation to the Assembly in 2000 for the purchase of the Bank Building (the "First Grant").  It states that the Assembly shall use the First Grant funds solely to purchase the Bank Building, pay any related transaction costs, and construct the "Gerard L. Cafesjian Memorial," which is described in section 3.2 of the Grant Agreement.  *See* Grant Agreement §§ 1.2, 3.2.  The Grant Agreement also memorialized a second donation (the "Second Grant") of $12.85 million for the purchase of four parcels of real estate surrounding the Bank Building: 1334-36, 1338, 1340, and 1342 G Street, N.W., Washington, D.C. (the "Adjacent Properties").  *See id.* § 2.2.  These are the properties that Cafesjian had purchased through TomKat LP.  *See* Defs.' Br. at 10.  Collectively, the Bank Building and the Adjacent Properties shall be referred to as the "Grant Property" or "the Properties."

_____

[9] Although AGM&M disputes some of the circumstances under which the Grant Agreement arose, it is significant that AGM&M does not dispute the fact that it executed the agreement.  *See* Pl.'s Stmt. ¶ 25.

The Grant Agreement also describes several conditions imposed on the use of the grant funds. First, the Grant Agreement provides that the Grant Property "may only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees of Armenian Genocide Museum & Memorial, Inc. (the 'Plans') . . . ." *See* Grant Agreement § 3.1.[10]  Second, the Grant Agreement contains a termination and reversion clause:

> If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:
>
> (i)     in the event any portion of the Grants has not been funded, this Agreement terminates; and
>
> (ii)    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.[11]

Grant Agreement § 3.1(B).  The Agreement states that the Assembly is in breach if it fails to use the Grants solely for the purposes set out in the Agreement or if it fails to satisfy any of the conditions set forth in the Agreement. *Id.* § 3.9.  One of the conditions related to the Assembly was that it must have received "actual grants or firm pledges to support the AGM&M, including the Grants [from CFF/Cafesjian], totaling at least $20,000,000." *Id.* § 4.1.

In addition, the Grant Agreement conditions the gift of funds on the creation of AGM&M, Inc. as a separate entity. *See* Grant Agreement § 5.1.  The Grant Agreement calls for the Assembly to enter into a "Transfer Agreement" with AGM&M, Inc. whereby the Assembly

---

[10] As used in the Grant Agreement, "AGM&M" refers to the museum project rather than the independent corporation.

[11] The Grant Agreement defines the "Grantor" as Cafesjian and CFF, collectively.  *See* Grant Agreement at 1.

would transfer to AGM&M all of its "right, title, and interest" in assets and pledges contributed for the museum and memorial project. *Id.* § 5.3. The Grant Agreement calls for the Transfer Agreement to oblige AGM&M to honor all of the existing donor requirements at the time of transfer and to assume and agree to comply with the Assembly's obligations relating to the construction of the Cafesjian memorial. *Id.*

The Grant Agreement also provides that the Assembly "must issue a new promissory note . . . to replace the promissory note issued on March 17, 2000 by the Assembly in favor of [CFF] in the amount of $500,000." Grant Agreement § 5.4(A). If the promissory note is still outstanding when the Transfer Agreement is executed, the Agreement requires it to be transferred to AGM&M as part of the transfer of the Assembly's assets. *Id.* § 5.4(C). The Grant Agreement also contains a merger clause stating that the Grant Agreement represents the entire agreement between CFF/Cafesjian and the Assembly. *See id.* § 7.5.

On November 1, 2003, the Assembly and AGM&M entered into the Transfer Agreement. *See* Pl.'s Br., Ex. 12 (Transfer Agreement). The Transfer Agreement provides that the Assembly shall contribute to AGM&M all of its rights, title, and interest to all assets contributed to the Assembly or held by the Assembly for the development, renovation, and construction of the museum and memorial project—valued at approximately $28 million. *See* Transfer Agreement § 1.1. As part of the Transfer, AGM&M must honor all of the Assembly's donor requirements existing at the time of transfer (or obtain donor consent to modification of any terms). *Id.* § 1.2(A). The Transfer Agreement explicitly states that AGM&M "assumes and agrees to comply with the [Assembly's] obligations relating to the memorial commemorating the Armenian Genocide under the [Grant Agreement]," which was attached as an exhibit. *Id.* § 1.2(B). The

AGM&M also agreed to use the assets "solely to develop, construct, and operate the AGM&M." *Id.* § 1.3.

Subsequent to the execution of the Grant and Transfer Agreements, AGM&M entered into various agreements with TomKat LP, the Assembly, and a third party seller to obtain title to the Adjacent Properties.  Pl.'s Stmt. ¶ 32.  AGM&M claims that Waters Sr. was retained by Waters Jr. to perform legal services regarding the transfer of properties.  *See* Pl.'s Stmt. ¶ 33. Waters Sr. admits that he was retained by Waters Jr. but asserts that he represented TomKat LP, not AGM&M, with respect to the transfer of title to the Properties.  *See* Waters Sr.'s Resp. Stmt. ¶ 33; Pl.'s Br., Ex. 14 (Waters Sr.'s Answers to Interrogatories) at 6-7.  Following the completion of the property transactions, Waters Sr. was not engaged to represent CFF, Cafesjian, TomKat LP, or Waters Jr. with regard to their interaction with others associated with AGM&M until 2006.  Waters Sr. Stmt. ¶ 44.

C.    *Governance of AGM&M by Cafesjian*

The AGM&M Board of Trustees held its first meeting in New York on June 9, 2004. Cafesjian Defs.' Stmt. ¶ 28.  The meeting was attended by Messrs. Hovnanian, Cafesjian, Kaloosdian, Waters Jr., and Mr. Rouben Adalian (on behalf of Ms. Mathevosian).  *Id.*  At the meeting, there was a review of the Museum formation documents, a property and financial report, and two proposals: (1) the selection of an architect, and (2) the selection of an executive director.  *Id.*  The parties dispute what happened at this meeting, although it is clear that no architect or executive director was selected by the Board.  *See* Cafesjian Defs.' Stmt. ¶ 29; Pl.'s Resp. Stmt. ¶ 29.  Messrs. Hovnanian and Kaloosdian expressed some skepticism about the architect proposals that were put forward at the meeting, but Plaintiff contends that the proposals

were never put up for a vote.  *See* Cafesjian Defs.' Stmt. ¶ 29; Pl.'s Resp. Stmt. ¶ 29.

The second AGM&M Board of Trustees meeting was held in New York on February 10, 2005.  Cafesjian Defs.' Stmt. ¶ 30.  This meeting had the same attendees as the first meeting, and the agenda for the meeting was: (1) a financial and property status report; (2) selection of an executive director; (3) selection of an architect; and (4) an ANI status report[12] by Mr. Adalian. *Id.*  The parties also dispute what transpired at this meeting, although the record indicates that Edgar Papazian, a young Armenian architect, gave a presentation to the Board about his vision for the project.  *See* Cafesjian Defs.' Stmt. ¶ 31; Pl.'s Resp. Stmt. ¶ 31.  Some of the Board members were highly critical of Mr. Papazian's proposals for the museum.  *See* Cafesjian Defs.' Stmt. ¶ 31; Pl.'s Resp. Stmt. ¶ 31.  Mr. Kaloosdian suggested that the proposed design was too aggressive and might not satisfy zoning or historic preservation regulations, saying "it looked as if a dirigible had crashed into a building."  *See* Pl.'s Opp'n, Ex. 10 (R. Kaloosdian Dep. Tr.) at 93-95.  There is a dispute as to whether the Board also discussed the possibility of having a competition to select a world-class architect.  *See* Cafesjian Defs.' Stmt. ¶ 32; Pl.'s Resp. Stmt. ¶ 32.  No architect was selected by the Board at this meeting.  The Board did approve retaining the services of one executive director candidate, Ms. Deborah Devedjian, although the details about her engagement and what was disclosed to the Board about it are disputed by the parties. *See* Cafesjian Defs.' Stmt. ¶ 33; Pl.'s Resp. Stmt. ¶ 33.

A third Board meeting was held on July 26, 2005.  Cafesjian Defs.' Stmt. ¶ 34.  Ms.

---

[12] "ANI" refers to the Armenian National Institute.  ANI was formed as a subsidiary of the Assembly.  *See* Pl.'s Br., Ex. 4 (R. Kaloosdian Aff.) ¶ 2.  Pursuant to the Grant Agreement, the Assembly assigned its right to appoint ANI's Trustees to AGM&M.  *See* Grant Agreement § 5.5.  ANI thus became a subsidiary of AGM&M, and all of the assets of ANI were transferred from the Assembly to AGM&M.  Pl.'s Br., Ex. 4 (R. Kaloosdian Aff.) ¶ 15.

Devedjian gave a presentation to the Board regarding her business plan for the Museum, in which

she proposed calling it "The Bank of Moral Courage."  *See* Defs.' Br., Ex. 26 (Business Plan).

Several Trustees were put off by the name proposed by Ms. Devedjian as well as her proposed

budget.  *See* Pl.'s Opp'n, Ex. 10 (R. Kaloosdian Dep. Tr.) at 103-08; Pl.'s Opp'n, Ex. 5 (G.

Cafesjian Dep. Tr.) at 255 ("I would be embarrassed by a name like that.").  The parties dispute

whether Ms. Devedjian was re-engaged to continue her consulting.  *See* Cafesjian Defs.' Stmt. ¶

36; Pl.'s Resp. Stmt. ¶ 36.  However, the record shows that Ms. Devedjian ultimately billed

AGM&M for additional work performed after the July 2005 meeting.  *See* Pl.'s Opp'n, Ex. 22

(filed under seal) (Letter from Devedjian to AGM&M Re: Outstanding Payments).

On September 9, 2005, Waters Jr. emailed the Board of Trustees requesting a meeting at

the end of September to reach agreement on the scope, budget, management, and timing for the

next phase of development.  Cafesjian Defs.' Stmt. ¶ 35.  Mr. Hovnanian replied that he did not

believe it was necessary to attend a meeting to discuss these details: "I have not been involved in

those things up to this point and have expressed a desire not to be involved with them.  I continue

my support and belief in this project."  Cafesjian Defs.' Stmt. ¶ 36; Cafesjian Defs.' Br., Ex. 27

(9/12/2005 Email from H. Hovnanian).  Mr. Hovnanian has testified that his involvement in the

museum project was limited to approving or disapproving the final concept and then soliciting a

large donation from a multi-billionaire.  Cafesjian Defs.' Stmt. ¶ 37.  No Board meeting was held

in the fall of 2005.  *Id.* ¶ 36.

In February 2006, Cafesjian sent a memo to Messrs. Hovnanian, Kaloosdian, and Adalian

stating that his goal was to push the project forward.  Cafesjian Defs.' Stmt. ¶ 38.  Cafesjian

proposed to start by approaching targeted major donors and endorsed the selection of Papazian as

the project design architect.  *Id.*  Cafesjian called for the Board to have its fourth meeting on April 25, 2006.  *Id.* ¶ 39.  The proposed agenda for the meeting included: (1) a fundraising campaign consisting of a "Phase I" $75 million "quiet" campaign from major donors and then a "Phase II" $75 million worldwide public fundraising campaign; (2) a proposed structure for AGM&M during its development phase; an "Honorary Committee Prospect List"; (4) a senior staff recruiting plan; and (5) the selection of Mr. Papazian as the design architect.  *Id.*  Waters Jr. circulated this agenda with accompanying materials, including a financial overview for 2005 and 2006.  *Id.*

During the April 2006 meeting, the Board discussed Ms. Devedjian's demand for payment for additional work that she had performed regarding the business plan for the Museum. *Id.* ¶ 40.  The Board also discussed Mr. Papazian's proposed design: Messrs. Hovnanian and Kaloosdian criticized the plans and thought they would turn off potential donors.  *Id.* ¶ 41. Cafesjian responded by noting that Messrs. Hovnanian and Kaloosdian had the votes to block the selection of Papazian, and that if they were against it, it would not happen.  *Id.*  There was no decision taken on how to proceed in selecting an architect.  *Id.*  During the meeting, Mr. Hovnanian "inquired about a likely fallback position in the event Phase I targets were not reached."  *Id.* ¶ 42.  Mr. Kaloosdian "proposed considering the renovation of the bank building as one option."  *Id.*  Testimony in the record indicates that there was an "impasse" between Cafesjian and the other Trustees regarding the proper budget for the Museum.  *Id.*

Mr. Adalian testified that by May 2006 "it was becoming apparent that there were issues at the Board level."  Cafesjian Defs.' Stmt. ¶ 50.  Mr. Kaloosdian testified that in the summer of 2006, the relationship among the Board members was "disintegrating."  *Id.*  Ms. Mathevosian

13

testified that there were arguments between Cafesjian on the one hand and Messrs. Hovnanian and Kaloosdian on the other. *Id.* On May 24, 2006, Cafesjian sent a letter, through counsel, to the other three Board members stating that

> the problem has been one of two competing visions for AGM&M neither of which has commanded a consensus among the Trustees. His [Cafesjian's] has been a more ambitious, more expensive and, almost certainly, a more controversial vision. It is certainly a vision more difficult to achieve. The other, and doubtless more readily attainable solution, is to confine the effort to the existing National Bank of Washington building with the view that the purposes of AGM&M are best accomplished by the opening of the Museum sooner rather than later.

*See* Pl.'s Opp'n, Ex. 26 (5/24/2006 Letter from William J. Brody to Trustees) at 1. The letter goes on to state that the problem of competing visions has been exacerbated by the voting arrangements on the Board which require an 80% affirmative vote before taking action. *See id.* at 2. The letter proposes that Cafesjian end his involvement with AGM&M, resigning as a Trustee and renouncing his right to appoint future Trustees. *See id.* The letter further suggests that if Cafesjian were to resign, he would expect AGM&M to repay the $500,000 debt that is outstanding and that the Adjacent Properties would revert to him since they would not be needed for the scaled-back Museum. *Id.* The provisions in the Grant Agreement regarding the Bank Building would remain unchanged, but Cafesjian would eliminate any requirement that AGM&M build a memorial. *See id.* at 2-3.

On August 2, 2006, Robert Kaloosdian responded to Cafesjian's counsel on behalf of the other Trustees. *See* Pl.'s Opp'n, Ex. 42 (8/2/2006 Letter from R. Kaloosdian to William J. Brody). In the letter, Mr. Kaloosdian states that "[i]n all candor, we were quite surprised to receive the letter and Mr. Cafesjian's assertion of two competing visions for AGM&M. There have not been two competing visions." *Id.* at 1. The letter asserts that Cafesjian has acted as the

14

chief executive officer of the Museum project and that the other Trustees encouraged that.  *Id.*
The letter asserts that the other Trustees did not object to Mr. Cafesjian's engagement of an
architect or other plans and "at no time stood in the way of any of his decisions."  *Id.*  The letter
expressed support for Cafesjian's vision, despite some concerns about its cost, and urged
Cafesjian to withdraw his attempt to separate from AGM&M.  *Id.* at 1-2.  On August 26, 2006,
Cafesjian's counsel responded.  *See* Pl.'s Opp'n, Ex. 43 (8/26/2006 Letter from W. Brody to the
other Trustees).  The letter disagreed with many of the facts stated by the Trustees and reaffirmed
Cafesjian's desire to part ways with AGM&M.  *Id.*  The letter restated the terms proposed in the
earlier letter for Cafesjian's departure, and proposed as an alternative that AGM&M simply be
liquidated.  *Id.* at 2.  The letter also stated that because of AGM&M's financial situation,
Cafesjian would no longer be advancing AGM&M funds to cover expenses.  *Id.*

Cafesjian resigned his position as President and Chairman of AGM&M on September 13,
2006.  Pl.'s Stmt. ¶ 23.  However, he remained a Trustee until May 2, 2007.  Cafesjian Defs.'
Stmt. ¶ 51.  Cafesjian's resignation letter indicated that Waters Jr. intended to resign as
Secretary/Treasurer as soon as the Board of Trustees identified a successor.  *See* Pl.'s Br., Ex. 9
(9/13/2006 Letter from Cafesjian to the other Trustees) at 1.

    D.    *The Memorandum of Agreement and the* Lis Pendens

On October 23, 2006, Waters Jr. executed a Memorandum of Agreement Reserving
Rights ("MOA") between AGM&M and CFF.  *See* Pl.'s Br., Ex. 21 ("MOA").  The MOA
explains that pursuant to the Grant Agreement, "the Assembly agreed, among other things, to
undertake the development of certain real properties situated in the District of Columbia
('Development Obligations') which properties are described in Exhibit A attached hereto . . . ."

15

MOA at 1.  The properties listed in Exhibit A are the Bank Building and the Adjacent Properties.

MOA at 3-4.  The MOA further explains that the Grant Agreement "provided for the reservation

of certain reversionary rights in the CFF in the event that the Assembly failed to perform the

Development Obligations."  MOA at 1.  The MOA goes on to explain that pursuant to the

Transfer Agreement, "AGM&M agreed, among other things, to undertake the Development

Obligations of the Assembly."  *Id.*  The MOA states that "the AGM&M and the CFF desire to

execute this memorandum and record it among the land records of the District of Columbia, in

order to provide notice of the Development Obligations contained in the Transfer Agreement."

*Id.*  Waters Jr. signed the MOA for both parties, in his capacity as Secretary/Treasurer for

AGM&M and in his capacity as Vice President of CFF.  *See id.* at 2.  Waters Jr. sent the

executed MOA to the District of Columbia Recorder of Deeds on October 23, 2006, and it was

recorded on October 27, 2006.  *See id.* at 3; Pl.'s Stmt. ¶ 52.

Cafesjian testified that he had directed Waters Jr. execute the MOA and record it.  *See*

Pl.'s Br., Ex. 5 (G. Cafesjian Dep. Tr.) at 303.  Waters Jr. engaged Waters Sr. on behalf of CFF

to assist with preparation of the MOA.  *See* Waters Sr. Stmt. ¶ 47.  Waters Sr. secured a form

document that could be used to draft the MOA, reviewed relevant documents, and drafted the

necessary legal descriptions for the MOA based on information sent to him by Waters Jr.  *See*

Pl.'s Stmt. ¶ 49; Waters Sr.'s Resp. Stmt. ¶ 49.  The day after Waters Jr. executed the MOA, he

attended a meeting of the Board of Trustees.  Pl.'s Stmt. ¶ 58.  Waters Jr. never informed the

other members of the Board of his actions regarding the MOA.  *Id.* ¶ 59.

On April 26, 2007, Cafesjian and CFF filed a complaint against the Assembly in the

United States District Court for the District of Minnesota seeking, *inter alia*, rescission of the

Grant Agreement and restitution of all donations made.  Pl.'s Add'l Stmt. ¶ 86.  Cafesjian and

CFF sought a declaration that the Assembly had breached the Grant Agreement and sought

damages for the failure to reissue the promissory note or repay the $500,000 loan as required by

the Grant Agreement.  Cafesjian Defs.' Add'l Resp. Stmt. ¶ 86.  This case was ultimately

dismissed by the court for failure to join a necessary party, AGM&M.  *See* Pl.'s Opp'n, Ex. 45

(Order of Dismissal).

On May 1, 2007, notice of a May 7, 2007, AGM&M Board of Trustees meeting was

issued, with items on the agenda including the authorization of a planning, development, and

building committee for the Museum.  Pl.'s Stmt. ¶ 68.  The next day, Cafesjian tendered his

resignation from the AGM&M Board of Trustees and appointed Waters Jr. to act as CFF's

designated Trustee in his place.  On May 7, 2007, the Board of Trustees convened a meeting,

with Waters Jr. present by telephone.  Pl.'s Stmt. ¶ 70.  At the meeting, a discussion occurred

regarding whether or not Cafesjian and CFF's conduct in filing the action against the Assembly

in Minnesota, as well as Waters Jr.'s actions in executing and recording the MOA, had created a

conflict of interest and breach of fiduciary duty which prohibited Waters Jr. and/or CFF from

participating in the discussions or voting on proposals for going forward with the development of

the museum.  Pl.'s Stmt. ¶ 71.  Waters Jr. declined to answer many questions about this subject.

*Id.* ¶ 72.  The details surrounding what occurred at this meeting are hotly disputed by the parties.

However, it is clear that at some point during the meeting, Waters Jr. disconnected the phone,

and the remaining Trustees proceeded with the meeting without him.

In addition to the April 26, 2007, lawsuit filed by Cafesjian and CFF in the District of

Minnesota against the Assembly regarding the $500,000 promissory note, *see* Pl.'s Opp'n, Ex.

17

44, the record indicates that there have been five other lawsuits filed arising out of disputes over the museum.  This action was filed in the Superior Court of the District of Columbia on June 7, 2007, and removed to this Court on July 16, 2007.  On September 28, 2007, CFF filed a derivative lawsuit in this District against AGM&M, the Assembly, and the other Trustees to enjoin AGM&M from developing the museum without participation by trustees from CFF.  *See* Pl.'s Opp'n, Ex. 47.  On October 10, 2007, the Cafesjian Defendants and TomKat LP filed a lawsuit in the District of Minnesota against AGM&M and the Assembly to enjoin arbitration of the parties' disputes.  *See* Pl.'s Opp'n, Ex. 48.  On February 15, 2008, the Assembly and AGM&M filed the second of three related actions in this Court against the Cafesjian Defendants and TomKat LP, raising many issues similar to this action.  The third related action was filed by the Cafesjian Defendants and TomKat LP against AGM&M and the Assembly on February 13, 2008, and subsequently transferred to this Court.

In mid-2008, Defendants withdrew the MOA and filed a *lis pendens*.  Pl.'s Add'l Stmt. ¶ 92; Pl's Opp'n, Ex. 49 (*lis pendens*).  The *lis pendens* gives notice of the related action filed on February 15, 2008, seeking declaratory judgment regarding Cafesjian and CFF's reversionary interest in the Properties.

## II.  LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery [if any] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  All underlying facts and inferences are analyzed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the non-moving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory assertions offered without any factual basis for

support do not satisfy an opponent's burden to set forth "affirmative evidence" showing a genuine issue for trial. *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham*, 813 F.2d at 1241).

## III.  DISCUSSION

Plaintiff claims in Count I of the Second Amended Complaint that Cafesjian and Waters Jr. breached their fiduciary duties to AGM&M by executing and recording the MOA and *lis pendens* in bad faith, delaying further progress on the museum project.[13]  In Count II, Plaintiff claims that Waters Sr. represented AGM&M in the transfer of the Properties and that he therefore owed a fiduciary duty to AGM&M that he breached by assisting in the drafting of the MOA.  Counts III and IV pertain to the equitable relief that may be appropriate if AGM&M is found to have been injured by a breach of fiduciary duty.  In the Counterclaim, CFF and Waters Jr. claim that the filing of this lawsuit was unauthorized by the Board of Trustees and therefore must be enjoined.  Because at least one party has moved for summary judgment on every claim, the Court shall address each of these claims in turn.

### A.    Breach of Fiduciary Duty by Cafesjian and Waters Jr.

Plaintiff contends that it is entitled to summary judgment on this claim because, it argues, the undisputed facts show that (1) Cafesjian and Waters Jr. owed a fiduciary duty to AGM&M at all relevant times; (2) the execution and recordation of the MOA was unauthorized,

---

[13] The Court previously granted summary judgment in favor of Defendants on the claim that Cafesjian breached his fiduciary duties by filing the *lis pendens*.  *See Arm. Genocide Museum & Memorial, Inc. v. Cafesjian Fam. Found., Inc.*, 595 F. Supp. 2d 110, 117-18 (D.D.C. 2009).  The record shows that Cafesjian resigned as a Trustee on May 2, 2007, before the *lis pendens* was filed.  *See* Pl.'s Stmt. ¶ 22.  AGM&M has not moved for summary judgment with respect to Waters Jr.'s alleged breach of fiduciary duties from filing the *lis pendens*.

impermissible as a matter of law, not in the best interests of AGM&M, and not undertaken in good faith; and (3) as a result of Cafesjian and Waters Jr.'s actions, AGM&M has suffered significant delays in the progress of building the museum, lost donations from potential donors, and had difficulty securing financing and insurance.  *See* Pl.'s Mem. P. & A. Supp. Mot. for Part. Summ. J. ("Pl.'s Br.") at 14-23.  By contrast, Waters Jr. and Cafesjian argue that they are entitled to summary judgment because (1) the MOA and *lis pendens* were filed in order to protect AGM&M's interests by preventing the Adjacent Properties from being sold off in contravention of the Grant and Transfer Agreements; (2) the MOA and *lis pendens* were not unfair to AGM&M as a matter of law because they merely informed third parties of existing obligations; (3) Waters Jr. no longer owed any fiduciary duty when the *lis pendens* was filed because he had been effectively shut out as a Trustee; and (4) AGM&M cannot show that it suffered any damages as a result of the filing of the MOA or the *lis pendens*.  *See* Cafesjian Defs.' Mem. P. & A. Supp. Mot. for Summ. J. ("Cafesjian Defs.' Br.") at 30-36.

To establish its claim for breach of fiduciary duty, AGM&M must show that (1) Cafesjian and Waters Jr. owed AGM&M a fiduciary duty; (2) Cafesjian and Waters Jr. breached that duty; and (3) the breach was a proximate cause of an injury to AGM&M.  *See Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 5-6 (D.D.C. 2008).  The parties agree that Cafesjian and Waters Jr. owed a fiduciary duty to AGM&M as members of the Board of Trustees when the MOA was filed.  *See* Cafesjian Defs.' Br. at 31.  The parties disagree, however, about whether Waters Jr. remained a valid Trustee when the *lis pendens* was filed.  *See* Pl.'s Mem. P. & A. Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") at 25-27.  The parties also vigorously dispute whether the filing of the MOA and the *lis pendens* constituted a breach of their fiduciary duty to AGM&M and whether

AGM&M suffered any injury as a result.  The Court shall examine each of these issues in turn.

1.  Waters Jr.'s Status as a Trustee When the *Lis Pendens* Was Filed

Waters Jr. contends that he did not owe a fiduciary duty to AGM&M when the *lis pendens* was filed on June 25, 2008, because he was precluded from having any further involvement in the museum after the May 2007 Board of Trustees meeting and was therefore effectively terminated as a Trustee.  *See* Cafesjian Defs.' Br. at 35.  He supports this claim with his own affidavit and with deposition testimony from the Executive Director of the Museum, Rouben Adalian, who confirms that Waters Jr. was not permitted to have any voice in the affairs of the museum after May 7, 2007.  *See* Defs.' Br., Exs. 1 (Waters Jr. Aff.) ¶ 91, 63 (R. Adalian Dep. Tr.) at 231.  However, Plaintiff has identified evidence in the record showing that Waters Jr. held himself out to be a Trustee after the May 2007 meeting.  For example, on August 3, 2007, in an affidavit filed in the U.S. District Court for the District of Minnesota, Waters Jr. swore under oath that he was the CFF-appointed Trustee for AGM&M.  *See* Pl.'s Opp'n, Ex. 29 (Aug. 3, 2007, Waters Jr. Aff.) ¶ 21.  On February 6, 2009, Waters Jr. participated in an AGM&M Board of Trustees meeting where he claimed he was attending in his capacity as the designated Trustee of CFF and Cafesjian, and no one disputed this assertion.  *See* Pl.'s Opp'n, Ex. 28 (filed under seal) (Feb. 6, 2009, Meeting Minutes) at 2.  And as late as April 6, 2009, Waters Jr. asserted through counsel that he remained a valid CFF-appointed Trustee.  *See* Pl.'s Opp'n, Ex. 31 (Apr. 6, 2009, Letter) at 1.

Although the existence of a legal duty to a plaintiff is usually a question of law, "[w]hether the parties were acting within the scope of a fiduciary relationship is a question of fact for the jury to decide."  *C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 271 (D.D.C.

2009).  The factual evidence in the record is sufficient to enable a reasonable jury to conclude

that Waters Jr. was a valid Trustee after May 2007 and thus continued to have a fiduciary

relationship with the corporation.  Moreover, Waters Jr. has provided no legal authority for the

proposition that being excluded from certain museum planning activities constitutes a

termination of Waters Jr.'s fiduciary role.  Accordingly, the Court shall not enter summary

judgment for Waters Jr. on the issue of whether a fiduciary duty existed when the *lis pendens* was

filed.

        2.      <u>The MOA and *Lis Pendens* and the Fiduciary Duty Owed to AGM&M</u>

The parties have articulated diametrically opposing theories as to how the filing of the

MOA and *lis pendens* did or did not constitute a breach of fiduciary duty to the corporation as a

matter of law.  Under Plaintiff's theory, Cafesjian and Waters Jr. furtively inserted the reversion

clause into the Grant Agreement without informing the other parties to the transactions,

mismanaged AGM&M's affairs by failing to make progress on the development of the Museum,

and filed the MOA and *lis pendens* without authorization from the Board, knowing that it would

cause even further delays in the development of the Museum, increasing the likelihood that

Cafesjian/CFF would be able to invoke their reversionary interest in the Grant Property and make

a windfall profit.  The Cafesjian Defendants contend that the reversion clause in the Grant

Agreement was fully disclosed, negotiated, and signed by the parties, that the delays in

development stemmed entirely from disagreements among the Board of Trustees, and that the

MOA and *lis pendens* could not possibly have been unfair to AGM&M because their only effect

was to inform third parties of AGM&M's existing obligations under the Grant and Transfer

Agreements.  The parties have cited to numerous facts in the record to support their theories, and

the Court must determine, for each contested issue, whether genuine issues of material fact exist and whether either party is entitled to judgment as a matter of law.

At the outset, the Court must settle the parties' dispute over the scope of the fiduciary duties owed by officers and directors in a District of Columbia nonprofit corporation. Cafesjian and Waters Jr. contend that the Grant and Transfer Agreements preempt any fiduciary duties allegedly inconsistent with them. *See* Cafesjian Defs.' Opp'n at 6-8. They argue that principles of contract preempt fiduciary principles, citing *Sonet v. Timber Co. L.P.*, 722 A.2d 319 (Del. Ch. 1998), and *Coleman v. Taub*, 638 F.2d 628 (3d Cir. 1981). In *Sonet*, the Delaware Court of Chancery held that in a limited partnership, "principles of contract preempt fiduciary principles where the parties to a limited partnership have made their intentions to do so plain" in the partnership agreement. *See* 722 A.2d at 322. In *Coleman*, the Third Circuit held that under Delaware law, minority stockholders may contract away their "additional interest" in corporate participation, which gives rise to a fiduciary duty requiring majority stockholders to have a valid business purpose for engaging in a merger that freezes out those minority stockholders. *See* 638 F.2d at 635-36. Cafesjian and Waters Jr. rely on these cases and academic commentary to support their view that the Agreements supersede any fiduciary duties that would otherwise apply.

The Court agrees with Plaintiff, however, that *Sonet*, *Coleman*, and the other authorities cited by Cafesjian and Waters Jr. are neither controlling nor persuasive. The law of the District of Columbia law, not Delaware, applies to this action. *See* Restatement (Second) of Conflicts of Law § 309 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation . . . .") Because this

case involves the duties owed by the directors and officers of a D.C. nonprofit corporation to that corporation, case law involving limited partnerships or the fiduciary duties owed to minority shareholders and creditors is not relevant.  As this Court explained in its February 5, 2009, Memorandum Opinion, both Cafesjian and Waters Jr. were required, as members of AGM&M's Board of Trustees, to "act in the utmost good faith, and this good faith forbids placing [themselves] in a position where [their] individual interest clashes with [their] duty to the corporation."[14]  *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1210 (D.C. 2002) (quoting Fletcher Cyc. Corp. § 837.50).  Cafesjian and Waters Jr. were also obligated to "manage the corporation solely in its best interest [and] not as a vehicle for promoting their personal beliefs or causes."  *Id.*  "The duty of loyalty is transgressed when a corporate fiduciary, whether director or officer, uses his or her corporate office to promote, advance or effectuate a transaction between the corporation and such person, and that transaction is not substantively fair to the corporation."  *Willens v. 2720 Wis. Ave. Co-Op. Ass'n, Inc.*, 844 A.2d 1126, 1136 n.13 (D.C. 2004) (quoting Fletcher Cyc. Corp. § 837.60, p. 184) (quotation marks omitted).

While Cafesjian and Waters Jr. (as an agent of Cafesjian or CFF) have a right to protect CFF and Cafesjian's lienholder interests even though they may also be fiduciaries of AGM&M, those lienholder interests do not give them license to actively undermine the ability of AGM&M to operate as it was intended.  *See, e.g.*, *Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 994, 1004, 1008 (Md. 2007) (holding that a director did not breach his fiduciary duties by, among other things, filing a lawsuit against the corporation and seeking summary judgment by default, but

---

[14] This duty also extends to Cafesjian and Waters Jr. in their capacity as officers of the corporation.  *Pyne v. Jamaica Nutrition Holdings Ltd.*, 497 A.2d 118, 131 (D.C. 1985).  Waters Jr. served as an officer before he became CFF's designated Trustee in May 2007.

explaining that the director had to strike "the proper balance between [his] claimed legal right . . . [and] fulfill[ing] his fiduciary obligation to act in [the corporation's] best interests," which he did in part by giving notice that the litigation was imminent and advising the corporation on how it could avoid the litigation).  Directors of a nonprofit corporation breach their fiduciary duties by, among other things, "fail[ing] to perform [their] duties honestly, in good faith, and with a reasonable amount of diligence and care.  *Stern v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses & Missionaries*, 381 F. Supp. 1003, 1015 (D.D.C. 1974).

The Cafesjian Defendants contend that, by accepting CFF and Cafesjian's conditional gifts (as memorialized by the Grant and Transfer Agreements), AGM&M became bound by fiduciary duties of care and obedience to follow the donors' wishes.  *See* Cafesjian Defs.' Opp'n at 8-10.  Thus, the Cafesjian Defendants argue that AGM&M had a *fiduciary* obligation to ensure that the Grant Property would be developed into a museum and memorial by 2010, and they argue that the MOA was filed in furtherance of this obligation, ensuring that the Grant Property was not misused or sold off in contravention of the donors' intent.  However, the donors memorialized their gift in a contract, and it is unclear why AGM&M's duties under the Grant and Transfer Agreements would be anything other than contractual.  Indeed, Defendants filed their first lawsuit against AGM&M in Minnesota based on a breach of contract theory.  Defendants cite no case law (from the District of Columbia or elsewhere) to support their theory that AGM&M's acceptance of a conditional gift gives rise to fiduciary responsibilities.  Instead, they rely entirely on the views of one academic who asserts that trust-like duties arise when a charitable corporation accepts a restricted gift.  Cafesjian Defs.' Opp'n at 8-9.  Without more, the Court is not persuaded that Cafesjian's and Waters Jr.'s actions in executing and filing the MOA

26

were compelled by some sort of fiduciary obligation to Cafesjian and CFF.[15]

Having set forth the scope of the fiduciary duties owed by Cafesjian and Waters Jr., the Court must now wade through the parties' arguments that the undisputed facts establish the existence of a breach *vel non*.

> a.      Authorization for the execution and recordation of the MOA.

Plaintiff first contends that Cafesjian and Waters Jr. breached their fiduciary duties by executing and filing the MOA without proper authorization from the Board of Trustees. *See* Pl.'s Br. at 16-18. Cafesjian and Waters Jr. claim that their actions were in fact authorized by the Unanimous Written Consent agreement (the "UWC") signed by the initial Trustees as of October 30, 2003, as well as by a blanket authorization from one Trustee, Mr. Hovnanian. *See* Defs.' Opp'n at 12-15; Pl.'s Br., Ex. 7 (UWC).

The UWC provides general authority for the officers of AGM&M to "execute such other documents and take such further actions as may be necessary or advisable to carry out the purposes of the . . . resolutions" contained in the UWC. *See* UWC at 4. The Cafesjian Defendants claim that Waters Jr. had authority to record the MOA under resolutions pertaining to the "Purchase of Real Estate" and the "Negotiation of Grant Agreements."[16]  *See id.* at 3. The "Purchase of Real Estate" section of the UWC states:

---

[15] AGM&M suggested in its Reply that the Cafesjian Defendants' claims based on Delaware law and academic commentary were frivolous in violation of the Federal Rules of Civil Procedure or the Rules of Professional Conduct. *See* Pl.'s Reply at 5 n.6. The Court granted leave for the Cafesjian Defendants to file a Surreply to rebut this allegation. *See* [132] Cafesjian Defs.' Surreply. The Court finds that any allegation of frivolousness is completely unwarranted.

[16] Because Cafesjian resigned as Chairman and President of AGM&M before the MOA was filed, the UWC could not have given him authority to direct Waters Jr. to file the MOA.

> RESOLVED, FURTHER: that the actions of the Chairman and Secretary/Treasurer of the Corporation in negotiating the purchase of the real property located at 1334-36 G Street, 1338 G Street, 1340 G Street and 1342 G Street from The TomKat Limited Partnership, the Armenian Assembly of America, Inc., and Families U.S.A., Inc., is hereby ratified and approved, and the Secretary/Treasurer of the Corporation is hereby authorized and directed to enter into and execute any and all documents necessary to effect the purchase of the aforesaid properties from The TomKat Limited Partnership, the Armenian Assembly of America, Inc., and Families U.S.A., Inc., and to take such other action as deemed necessary or desired to effect such transactions.

UWC at 3.  Waters Jr. argues that the execution and recordation of the MOA falls into the category of "such other action as deemed necessary or desired to effect such transactions."  *See* Cafesjian Defs.' Opp'n at 13.  According to Waters Jr., he filed the MOA after recognizing that during the transfer of the Grant Properties, the development obligations and reversionary interests had not been recorded, believing that public notification of those interests would protect AGM&M's interests.  *See* Cafesjian Defs.' Br., Ex. O (Waters Jr. Dep. Tr.) at 205-06.  However, Waters Jr. could not have relied on the "Purchase of Real Estate" section for authority because the purchase of the properties was completed in late 2003 and early 2004, and therefore the filing of the MOA in 2006 could not have been "necessary or desired to effect" their purchase.

The "Purchase of Real Estate" section provides AGM&M's officers with the authority to effect the purchase of the Grant Property.  AGM&M executed purchase and sale agreements and recorded its interest in the Adjacent Properties in 2003 and 2004.  Waters Jr. contends that these real estate transactions were not simply purchases; they were purchases pursuant to a conditional gift from Cafesjian and CFF.  *See* Cafesjian Defs.' Opp'n at 13.  However, Cafesjian and CFF were not parties to the purchases, and their reversionary interest in the properties arose not from the purchase transactions themselves but from the Grant and Transfer Agreements.  Although the

development obligations and the reversionary interest may have been critical conditions for

Cafesjian/CFF's decision to give money for the museum project, the recording of those

conditions would not have been necessary or desired to effect the purchase of the property.

Indeed, Cafesjian/CFF's reversionary interest in the Grant Property (as opposed to the grant

funds actually donated to purchase them) could not have ripened until the Grant Property was

actually purchased.  Thus, the execution and recording of the MOA related only to the conditions

in the Grant and Transfer Agreements, which were separate transactions from the purchases

themselves.  Therefore, the "Purchase of Real Estate" section of the UWC could not have

provided Waters Jr. with the authority to file the MOA.  In addition, the "Purchase of Real

Estate" section only authorizes transactions relating to the four Adjacent Properties, but the

MOA also refers to restrictions on the Bank Building.  Thus, this part of the UWC could not have

provided Waters Jr. with complete authority to file the MOA.

> The "Negotiation of Grant Agreements" provision of the UWC states as follows:
>
> RESOLVED, FURTHER: that the actions of the Secretary/Treasurer of the Corporation in negotiating grant agreements with the Donors and with the [Assembly] are hereby ratified and approved, and the Secretary/Treasurer of the Corporation is hereby authorized and directed to negotiate grant agreements that further the charitable purposes of the Corporation and are consistent with any existing grant agreements between the Donors and the [Assembly] as long as such agreements provide no more than incidental benefits such as naming rights to the Donors, and to enter into and execute any and all related documents and to take such other action as deemed necessary or desired[.]

UWC at 3.  The Cafesjian Defendants claim that Waters Jr. had authority to file the MOA under

this section because it is an action deemed necessary or desired to effectuate the Grant

Agreement and Transfer Agreement.  AGM&M considers this to be a "puzzling proposition"

because, in its view, the MOA's only purpose is to cloud title to the Grant Properties, and the

Grant Agreement and Transfer Agreement "did not include any right to record encumbrances." Pl.'s Reply at 12.  However, the Cafesjian Defendants' position is that the MOA merely recorded obligations that were created in the first instance by the Grant Agreement and the Transfer Agreements.  Thus, the question of whether those agreements allow for the recordation of future encumbrances is inapt, and nothing in the agreements precludes recordation of the obligations contained therein.  Similarly, AGM&M's contention that the MOA goes beyond the authority provided by this paragraph because it confers "more than incidental benefits such as naming rights to the Donors" is misguided; the MOA did not confer such benefits, the Grant and Transfer Agreements did.  Because a jury could reasonably conclude that the MOA falls within the scope of the "Negotiation of Grant Agreements" authorization contained in the UWC, Plaintiff's motion for summary judgment on this basis shall be denied.

b.      The MOA as a self-interested transaction.

Plaintiff next contends that the MOA was a business transaction between AGM&M, a corporation to which Cafesjian and Waters Jr. owed fiduciary duties, and CFF, a corporation in which Cafesjian and Waters Jr. had substantial interests.  *See* Pl.'s Br. at 19-20.  Under District of Columbia law, directors of nonprofit corporations must not engage in self-interested transactions and must disclose potential conflicts of interest to the persons charged with approving such transactions.  *See Lucy Webb*, 381 F. Supp. at 1015.  Plaintiff contends that Waters Jr. and Cafesjian breached their fiduciary duties by engaging in such a self-interested transaction and failing to inform the Board of any significant reasons why the transaction might not be in AGM&M's best interests.  Again, however, the MOA purports to reflect obligations that already existed between AGM&M and CFF, so the MOA did not necessarily create

"clashing interests" between Cafesjian and AGM&M.  Although Plaintiff considers the MOA to be a self-dealing transaction, it could be construed by a reasonable jury as the consummation of the Grant Agreement and Transfer Agreement.  Under this latter view, the filing of the MOA is not impermissible as a matter of law because AGM&M has already agreed, through the Transfer Agreement, to accept the obligations memorialized in the MOA.  Thus, the alleged failure of Waters Jr. to inform the Board of the MOA—which may be authorized by the Unanimous Written Consent, as explained above—does not necessarily constitute a breach of Waters Jr.'s duty of loyalty to AGM&M.  Therefore, summary judgment is not appropriate on this basis.

        c.        Bad faith in the execution and recordation of the MOA.

Plaintiff next contends that the evidence clearly shows that the MOA was not filed in good faith and was not in AGM&M's best interests.  A fiduciary breaches his duty to the corporation if he fails to perform his duties honestly and in good faith.  *Friends of Tilden Park*, 806 A.2d at 1210.  Plaintiff points to the fact that Waters Jr. executed the MOA while he was planning to resign as Secretary and Treasurer of AGM&M, *see* Pl.'s Stmt. ¶¶ 52, 58,[17] that Waters Jr. never informed the Board of his actions, *see* Pl.'s Stmt. ¶¶ 58-59, and that Cafesjian testified at deposition that the purpose of the MOA was to "protect myself," "to prevent it from being sold out from under me," and "to protect what was mine, according to the agreement that we had," *see* Pl.'s Stmt. ¶ 46.  Plaintiff also contends that the MOA on its face creates a benefit for CFF to the detriment of AGM&M.  This self-interested motive is apparent, Plaintiff contends,

_____

[17] Plaintiff actually contends that Waters Jr. announced his resignation the day after he executed the MOA, *see* Pl.'s Stmt. ¶ 58, but the record only indicates that according to Cafesjian's resignation letter, Waters Jr. would resign when the Board identified his successor.  *See* Defs.' Resp. Stmt. ¶ 58.  In any event, Waters Jr.'s intent to resign was clear during the time he executed the MOA.

from Cafesjian's May 26, 2006, letter from his counsel to the Trustees proposing that he

terminate his involvement with AGM&M and recover the Adjacent Properties.[18]  This evidence

may support an inference that Cafesjian and Waters Jr. acted in their own interest to the

exclusion of AGM&M's in executing and filing the MOA.

However, Defendants view the record differently.  Cafesjian and Waters Jr. claim that

they filed the MOA because they learned that two of the Trustees, Messrs. Hovnanian and

Kaloosdian, "indicated an intent to renege on the Grant and Transfer Agreements" by scaling

back the plans for the museum, using only the Bank Building and selling off three of the

Adjacent Properties.  *See* Cafesjian Defs.' Opp'n at 9.  The Grant Agreement contains language

requiring the Adjacent Properties to be used for the museum project, and Cafesjian and Waters

Jr. contend that the MOA was in the best interests of the museum because a larger-scale project

was what had been agreed upon initially by the Trustees.  *See* Pl.'s Br., Ex. 1 (Waters Jr. 30(b)(6)

Dep. Tr.) at 30-33; Cafesjian Defs.' Br., Ex. 112 (Waters Jr. Dep. Tr.) at 206-07.  As Cafesjian

explained at his deposition, "the whole idea of [the MOA], after all, was to save the museum, the

whole project.  If something was sold out from under that big footprint that we had agreed to,

then it ruins everything."  *See* Pl.'s Br., Ex. 5 (G. Cafesjian Dep. Tr.) at 308.  There is also

evidence in the record beyond Cafesjian's and Waters Jr.'s testimony that supports this view.

AGM&M.  *See, e.g.*, Cafesjian Defs.' Br., Ex. 107 (R. Vartian Dep. Tr.) at 94 ("Ultimately, the

---

[18] Defendants suggest that this letter (and the subsequent correspondence) is inadmissible under Federal Rule of Evidence 408 because it was sent by Cafesjian's counsel in the context of settlement negotiations.  However, Rule 408 does not apply unless there is actually a claim in dispute between the parties, and at the time of this correspondence, it was not apparent that AGM&M had or would assert any claim against Cafesjian.  The May 26, 2006, letter can only be construed as a proposal by Cafesjian to modify the existing contractual agreements between the parties, and Rule 408 does not exclude such evidence.

group decided to accept the contributions of the additional buildings, embrace the larger budget, and proceed . . . . [A]t some point it was the unanimous opinion of all of them that . . . it should include all of the properties in the entire footprint."); Cafesjian Defs.' Br., Ex. 37 (26 April 2006 Board of Trustees Meeting Minutes) at 2-3 ("Hovnanian inquired about a likely fallback position in the event Phase I targets were not reached.  Kaloosdian proposed considering renovation of the bank building as one option.  Cafesjian advised that should funds raised prove insufficient to proceed, the additional properties would revert back to him.")  The record is replete with evidence of disputes between Cafesjian and the other Trustees over the scope of the museum project.  The fact that Cafesjian acknowledged his own reversionary interest in the Grant Property does not necessarily mean that he acted in bad faith.

"As a general proposition, 'whether a director or officer has properly discharged his or her duty of loyalty is a question of fact to be determined in each case in view of all of the circumstances.'" *Willens v. 2720 Wis. Ave. Co-Op. Ass'n, Inc.*, 844 A.2d 1126, 1136 (D.C. 2004) (quoting Fletcher Cyc. Corp. § 837.60, p. 186).  Ultimately, a jury may or may not credit Cafesjian's and Waters Jr.'s explanation for their conduct, and it is the jury's role to weigh the evidence in the record and determine which party's version of events is more credible.  The record contains disputed issues of material fact that preclude the award of summary judgment for either party on the issue of breach.

3.     Proximate Cause and Damages

Cafesjian and Waters Jr. (as well as Waters Sr.) contend that even if they did breach a fiduciary duty by filing the MOA and *lis pendens*, they are entitled to summary judgment because AGM&M has suffered no damages as a proximate result of those actions.  "To establish

33

proximate cause, the plaintiff must present evidence from which a reasonable juror could find

that there was a direct and substantial causal relationship between the defendant's breach of the

standard of care and the plaintiff's injuries and that the injuries were foreseeable." *Convit v.

Wilson*, 980 A.2d 1104, 1125 (D.C. 2009).  Proximate cause is ordinarily a question of fact for

the jury. *Id.* at 1126.  "[I]n order to survive a motion for summary judgment based on the

asserted insufficiency of proof of damages, 'a plaintiff need not, at this stage, show the amount of

damages; he is obligated only to show that they exist and are not entirely speculative.'" *Cormier

v. D.C. Water & Sewer Auth.*, 959 A.3d 658, 667 (D.C. 2008) (quoting *Rafferty v. NYNEX Corp.*,

744 F. Supp. 324, 331 n.26 (D.D.C. 1990)).  Damages are speculative if the uncertainty concerns

the fact of damages rather than the amount. *Id.* (citing *Carroll v. Phila. Hous. Auth.*, 650 A.2d

1097, 1100 (Pa. Commw. Ct. 1994)).  Here, Cafesjian and Waters Jr. contend that the damages

allegedly suffered by AGM&M stem not from the filing of the MOA or *lis pendens* but from the

preexisting reversionary interest that the MOA and *lis pendens* disclosed to third parties.  Thus,

they are attacking AGM&M's basis for asserting any damages at all.

In its Second Amended Complaint, AGM&M alleges that "[a]s a direct and proximate

result of Defendants' filing of the [MOA], [AGM&M] has incurred substantial damages,

including without limitation fees and costs necessitated by the filing and litigation of this action,

and damages related to the delay in the development of the museum cause [sic] by the filing of

the [MOA], as financing, insurance, and other items necessary for the construction and

completion of the museum were delayed or made more costly."  Sec. Am. Compl. ¶ 45.

AGM&M makes a similar allegation with respect the filing of the *lis pendens*, including

"damages related to additional difficulty in securing insurance and financing related to the

Properties." *Id.* ¶ 48.  In its opposition to Cafesjian and Waters Jr.'s motion for summary

judgment, AGM&M more specifically identifies its damages: "(1) AGM&M has suffered

significant delays in the development of the museum; (2) potential donors have decided against

donating to AGM&M, donations which would have totaled over $12 million; (3) AGM&M has

been unable to secure financing and has had difficulty securing insurance; (4) significant

resources have been diverted for purposes of addressing this litigation; and (5) AGM&M has

been unable to enter into any long term leases as a result of this litigation and other breaches of

fiduciary duty by the Defendants, which is demonstrated by Defendants' recent attempt to

prohibit such leasing."  Pl.'s Opp'n at 27-28.  AGM&M supports these assertions with citations

to evidence in the record.  AGM&M also claims that its knowledge of other potential damages

has been limited by Defendants' failure to fulfill their discovery obligations, as described in the

motion to compel that is also pending before this Court.

    At this preliminary stage, AGM&M has identified evidence in the record sufficient to

permit a jury to conclude that the filing of the MOA proximately caused some injury to

AGM&M.  If Waters Jr. and Cafesjian acted in bad faith in recording the MOA, a jury could

reasonably conclude that they caused AGM&M to take actions such as this lawsuit to remove the

MOA from the land records.  There is testimony in the record that indicates that the MOA

created additional obstacles to raising funds from wealthy donors.  *See, e.g.*, Pl.'s Br., Ex. 29

(filed under seal) (V. Krikorian Dep. Tr.) at 275 ("**[**--------------------------------------------------------

----------------**REDACTED**-----------------------------------------------------------**]**").  Although the

record also indicates that other factors may have caused AGM&M to lose donations, a reasonable

jury could conclude that the filing of the MOA was a substantial factor contributing to

AGM&M's inability to raise the funds necessary to develop the Museum.  Accordingly, summary judgment shall not be granted on the issue of lack of injury or insufficient damages.

        B.       *Breach of Fiduciary Duty by Waters Sr.*

AGM&M and Waters Sr. have each filed motions for summary judgment on Count II of the Second Amended Complaint related to Waters Sr.'s alleged breach of fiduciary duty. AGM&M argues that the record clearly shows that Waters Sr. represented AGM&M in connection with the transfer of the Grant Property to AGM&M and thus had a fiduciary duty to the corporation, which he subsequently violated by taking actions adverse to AGM&M in assisting in the preparation of the MOA.  Waters Sr. argues that he never represented AGM&M in connection with the transfer of property or otherwise and therefore owed no duty to AGM&M with respect to his subsequent involvement with the MOA three years later.  Moreover, Waters Sr. argues that even if he did owe AGM&M a duty arising from an attorney-client relationship, the facts clearly show that he did nothing to breach that duty.

        "Attorneys unquestionably stand in a fiduciary relationship to their clients for matters related to their legal representation of their clients." *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 75 n.10 (D.D.C. 1998).  To determine whether an attorney has breached a duty to his client, courts often look to the rules of professional conduct and disciplinary rules applicable to the practice of law.  *See id.* at 75.  "The existence of an attorney-client relationship is an issue to be resolved by the trier of fact and is predicated on the circumstances of each case." *In re Lieber*, 442 A.2d 153, 156 (D.C. 1982).  A written agreement or the payment of fees is not necessary to create an attorney-client relationship.  *Id.*  "All that is required . . . is that the parties, explicitly or by their conduct, manifest an intention to create the

attorney/client relationship." *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996) (quoting *Nolan v. Foreman*, 665 F.2d 738, 739 n.3 (5th Cir. 1982).

      1.    Waters Sr.'s Involvement in the Transfer of Property to AGM&M

Waters Sr. became involved in the transfer of property to AGM&M through his son, Waters Jr., who was at all relevant times an officer of entities controlled or owned by Cafesjian, including CFF and TomKat LP.  Waters Sr.'s Stmt. ¶ 25-26.  Waters Sr. claims that in 1999 or 2000, Cafesjian authorized Waters Jr. to engage Waters Sr. to advise these entities on matters relevant to his areas of expertise, such as real estate law.  *Id.* ¶¶ 25, 27.[19]  Waters Sr. was not engaged to assist with the Assembly's acquisition of the Bank Building in 2000 or TomKat LP's acquisition of the first three lots comprising the Adjacent Properties.  *Id.* ¶¶ 7, 9.  However, Waters Sr. did become involved with TomKat LP's efforts to purchase the fourth lot adjacent to the Bank Building—the "Families, USA Building."  *Id.* ¶ 11.  Waters Sr. claims that he represented TomKat LP in this transaction.  *Id.*  Waters Sr. also claims that he was engaged by Waters Jr. in 2003 to represent TomKat LP in connection with the transfer of title to the Grant Property but was not retained to represent AGM&M during this transaction.  *See id.* ¶¶ 28-30, 32.  AGM&M concedes that Waters Jr. did not explicitly ask Waters Sr. to enter into an attorney-client relationship with AGM&M but argues that by helping to transfer title to AGM&M, Waters Sr. performed legal services for AGM&M, thus creating an attorney-client relationship.  *See* Pl.'s Resp. Stmt. ¶¶ 30, 32.

_____

[19] AGM&M disputes this and several other of the facts described in this paragraph of the opinion.  *See* Pl.'s Resp. Stmt. ¶¶ 7, 9, 11, and 27.  However, these facts are supported by evidence in the record, and AGM&M has not come forward with any record evidence to rebut them.

AGM&M contends that there is evidence in the record that would permit a reasonable

finder of fact to conclude that Waters Sr. had an attorney-client relationship with AGM&M.

First, there is some documentary evidence that suggests that Waters Sr. was involved in the

drafting of AGM&M's organizational documents. *See* Pl.'s Resp. Stmt. ¶ 14; Pl.'s Opp'n, Exs.

2-13 (filed under seal). These documents show that Waters Sr. was copied on correspondence

between Waters Jr. and other attorneys involved in the incorporation and that in at least one

instance, Waters Sr. suggested changes to the Unanimous Written Consent agreement. *See* Pl.'s

Opp'n, Exs. 2-13 (filed under seal). Second, AGM&M did not have separate counsel with regard

to the transfer of the Grant Property.[20] *See* Pl.'s Stmt. ¶ 34. Third, on at least one occasion,

Waters Sr. was paid for legal services with funds from an AGM&M account. *See* Pl.'s Stmt. ¶

35; Pl.'s Br., Ex. 17 (AGM&M check to Waters Sr.).[21] Fourth, TomKat LP was not a party to the

acquisition of the Bank Building, so Waters Sr. could not have been representing TomKat LP

with respect to the transfer of that property to AGM&M. *See* Pl.'s Stmt. ¶ 37.[22] Fifth, at least

---

[20] Waters Sr. suggests that lawyers from Caplin & Drysdale, who represented AGM&M with respect to its incorporation, may have advised AGM&M with respect to the transfer of title. *See* Waters Sr.'s Resp. Stmt. ¶ 34. However, the record is unclear on this point; Waters Jr. testified that [--------------------------------------------------------------**REDACTED**----------------------- --------------------------------------------]. *See* Waters Sr.'s Br., Ex. 7 (filed under seal) (Waters Jr. 30(b)(6) Dep. Tr.) at 168-69.

[21] Waters Sr. contends that this was simply a mistake by Waters Jr. *See* Waters Sr.'s Resp. Stmt. ¶ 35; Waters Sr.'s Br., Ex. 7 (filed under seal) (Waters Jr. 30(b)(6) Dep. Tr.) at 170-71.

[22] Waters Sr. does not dispute this fact but notes that the Second Amended Complaint does not contain any allegations regarding Waters Sr.'s involvement in the transfer of the Bank Building. *See* Waters Sr.'s Resp. Stmt. ¶ 37. Even so, this fact is relevant to the question of who Waters Sr. was representing in the entire transaction.

one document identifies Waters Sr. as counsel for AGM&M.  *See* Pl.'s Stmt. ¶ 41.[23]  These facts,

along with others in the record, could enable a reasonable finder of fact to conclude that Waters

Sr. was representing both TomKat LP and AGM&M in the transfer of title transaction.

However, the facts in the record would not permit a reasonable finder of fact to conclude

that Waters Sr. represented AGM&M in connection with the Grant and Transfer Agreements.

The only evidence cited by AGM&M for this proposition are a series of notes and emails

exchanged between Waters Jr., Waters Sr., and various other parties leading up to the

incorporation of AGM&M and closings on the title transfers.  *See* Pl.'s Resp. Stmt. ¶¶ 22, 24;

Pl.'s Opp'n, Exs. 2-13 (filed under seal).  Of these documents, only three purport to involve the

Grant or Transfer Agreements: (1) [------------------------------------------------------------------------

-----------------------------------------------------**REDACTED**---------------------------------------------

------------------------------------------------------------------------------------------------------------------

----------------]; (2) [---------------------------------------------------------------------------------------

-----------------------------------**REDACTED**------------------------------------------------------------

---------------------------------------]; and (3) handwritten notes from Waters Sr. [-----------------------

-------------------------------------**REDACTED**------------------------------------------------------].  *See* Pl.'s

Opp'n, Exs. 2, 3, 13.  Plaintiff provides no context for these documents to explain how they

supposedly show that Waters Sr. was involved in the drafting or negotiation of the agreements on

behalf of AGM&M.  Moreover, there is uncontroverted evidence in the record that shows that

AGM&M was represented by other attorneys, including Caplin & Drysdale, with respect to the

---

[23] Waters Sr. contends that this letter was drafted by a third party who mistakenly assumed that Waters Sr. had provided legal representation to AGM&M.  *See* Waters Sr.'s Resp. Stmt. ¶ 41.

drafting and negotiation of the Grant and Transfer Agreements.  *See* Waters Sr.'s Br., Ex. 2 (filed

under seal) (Waters Jr. Dep. Tr.) at 175-76, 188; Waters Sr.'s Br., Ex. 7 (filed under seal)

(Waters Jr. 30(b)(6) Dep. Tr.) at 98, 132, 166-67.  On this record, it would be pure speculation

for a jury to conclude that Waters Sr.'s attorney-client relationship extended to the drafting or

negotiation of the Grant and Transfer Agreements.  Indeed, although AGM&M purports to

dispute this in its response to Waters Sr.'s statement of material facts that are not in dispute, it

only argues in its briefs that Waters Sr. represented AGM&M with respect to the transfer of title

to the Grant Property.  *See, e.g.*, Pl.'s Br. at 23-25.

2.    Waters Sr.'s Continuing Duty to AGM&M

AGM&M contends that because Waters Sr. acted as counsel for AGM&M in the

acquisition of the Grant Property in 2003, he owed a continuing duty to AGM&M under the

Rules of Professional Conduct.[24]  D.C. Rule of Professional Conduct 1.9 provides: "A lawyer

who has formerly represented a client in a matter shall not thereafter represent another person in

the same or a substantially related matter in which that person's interests are materially adverse

to the interests of the former client unless the former client gives informed consent."  AGM&M

contends that the filing of the MOA was a "substantially related matter" in which AGM&M's

interests were "materially adverse" to the interests of CFF, whom Waters Sr. was representing.

For purposes of Rule 1.9, matters are substantially related "if they involve the same transaction

or legal dispute or if there is otherwise is a substantial risk that confidential factual information

---

[24] The parties agree that the District of Columbia Rules of Professional Conduct apply despite the fact that Waters Sr. performed his work in Minnesota because the Minnesota and D.C. Rules are substantively identical and there is no "true conflict" between them.  *See* Waters Sr.'s Br. at 25; Pl.'s Br. at 26 n.4.

as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  D.C. R. Prof'l Conduct 1.9, Comment [3].  The scope of a matter depends on the facts of a particular transaction, and the lawyer's involvement in a matter can be a question of degree.  *See id.*, Comment [2].  "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."  *Id.*

Plaintiff views Waters Sr.'s involvement in the filing of MOA as a clear shift in loyalty, arguing that "[i]n 2003, Waters Sr. worked *for AGM&M to acquire clear title to the Properties*; in 2006, Waters Sr. worked *for Waters Jr. and CFF to cloud AGM&M's title to the Properties*."  Pl.'s Opp'n at 17.  But as the Court explained *supra*, the filing of the MOA merely recorded preexisting obligations under the Grant and Transfer Agreements, documents with respect to which Waters Sr. did not represent AGM&M.  Plaintiff's characterization of events improperly conflates the Grant and Transfer Agreements with the acquisition and transfer of property; in fact, they were separate transactions.  Waters Sr. did not help AGM&M acquire *clear* title to the Properties in 2003—he merely helped AGM&M acquire title.  And Waters Sr. did not work to *cloud* title in 2006—he merely helped to record an encumbrance to which AGM&M had already agreed in 2003.  Waters Sr.'s prior representation of AGM&M was limited to facilitating the transfer of the Properties, and it simply cannot be said that Waters Sr. "changed sides" in that matter by helping Waters Jr. to draft the MOA.  The record clearly demonstrates that Waters Sr. provided distinct services with respect to each transaction, and there is no risk that Waters Sr. learned confidential information about AGM&M from the transfer of the Properties that would have advanced CFF's position with respect to the MOA.  Therefore, Waters Sr.'s actions did not

violate D.C. Rule of Professional Conduct 1.9.

Curiously, AGM&M argues for the first time in its opposition brief that Waters Sr. also may have violated Rule 1.7, which governs conflicts of interest among *current* clients, suggesting that Waters Sr. was representing both AGM&M and CFF when he assisted with the filing of the MOA in 2006.  *See* Pl.'s Opp'n Br. at 15-16.  That argument is inconsistent with AGM&M's motion for partial summary judgment, in which AGM&M claimed that it was a *former* client of Waters Sr. owed duties under Rule 1.9, not a current client owed duties under Rule 1.7.  *See* Pl.'s Br. at 25-26.  However, AGM&M provides no additional facts to support its new argument that Waters Sr. was engaged to represent AGM&M with respect to the MOA.  In fact, the evidence in the record clearly shows that Waters Sr. was engaged on behalf of CFF and that Waters Sr. had done no work relating to AGM&M since the transfer of the Properties in 2003.  *See* Waters Sr.'s Stmt. ¶¶ 44, 47.  AGM&M has failed to cite any evidence in the record to the contrary in accordance with LcvR 56.1.  *See* Pl.'s Resp. Stmt. ¶¶ 44, 47.  Therefore, no reasonable jury could conclude that Waters Sr. had an attorney-client relationship with AGM&M with respect to the MOA, and thus there is no need to consider Waters Sr.'s conduct through the lens of Rule 1.7. The Court notes, however, that the principles of adverseness in Rules 1.7 and 1.9 are the same. *See* D.C. Rule of Prof'l Conduct 1.9, Comment [1].

AGM&M also contends that Waters Sr. breached his fiduciary duty to AGM&M by failing to seek written authority from the Board of Trustees before providing advice to Waters Jr. regarding the MOA.  *See* Pl.'s Opp'n at 19-20.  However, this argument fails for the same reason that Waters Sr.'s conduct does not violate Rule 1.9.  The duty owed a former client is not the same as a duty owed a current client, and attorneys may represent clients whose interests are

adverse to former clients as long as they are not in the same or substantially related matter. Thus, because Waters Sr. was representing CFF in a different transaction from his prior representation of AGM&M, he did not have an obligation to inform the AGM&M Board of Trustees about any possible adverse interests.

Finally, AGM&M argues that its claim against Waters Sr. does not rely entirely on a violation of the Rules of Professional Conduct but is based instead on the general common law principles of breach of fiduciary duty: existence of a fiduciary relationship, breach of such a duty, and proximate causation of injury. *See* Pl.'s Opp'n at 22. However, the standard for a common law fiduciary duty owed by an attorney to a client is heavily influenced by the ethical rules governing the practice of law. *See Hendry v. Pelland*, 73 F.3d 397, 401 (D.C. Cir. 1996). Consequently, AGM&M unsurprisingly devotes nearly all of its briefing to attempting to establish that Waters Sr.'s conduct violated the ethics rules. While it is generally true that lawyers owe their clients the highest fiduciary duty of loyalty, AGM&M was, at most, a former client when Waters Sr. assisted with the MOA. Construing the facts most favorably to AGM&M, no reasonable jury could conclude that Waters Sr. breached a fiduciary duty to AGM&M. Accordingly, the Court shall enter summary judgment in favor of Waters Sr. on Count II of the Second Amended Complaint.

> C.  *Count III: Declaration as to Non-Enforceability of Grant Agreement Reversion Clause*

The Cafesjian Defendants move for summary judgment on Count III of the Second Amended Complaint, which seeks a declaration that the Grant Agreement's reversion clause is unenforceable. AGM&M contends that the Cafesjian Defendants have no right to enforce the

reversion clause because they have repeatedly sought to delay progress on the museum; the Grant

Property is now more valuable than the grant funds provided to purchase them, which would

provide Defendants with a windfall profit; and they have acted in bad faith, breaching the Grant

Agreement by attempting to force the reversion of the Adjacent Properties by causing delay to the

museum development.  *See* Sec. Am. Compl. ¶¶ 54-56.  Defendants assert that the reversion

clause is enforceable as a matter of law because: (1) the record shows that Defendants have not

thwarted the progress of the museum; (2) the filing of the MOA and *lis pendens* breached no duty

and thus provide no basis for reformation of the Grant Agreement; (3) any increase in the value

of the Grant Property is irrelevant; (4) AGM&M has unclean hands; and (5) the reversion clause

is a central component of the Grant Agreement than cannot be deleted on its own.  *See* Cafesjian

Defs.' Br. at 36-42.  In response, AGM&M contends that there are genuine issues of material fact

that preclude the award of summary judgment on Count III.

The Court has already stated above that there are genuine issues of material fact relating

to whether Cafesjian and Waters Jr.'s conduct constituted a breach of fiduciary duty.  Because

reformation of the Grant Agreement might provide an equitable remedy for such a breach, if

proved at trial, the award of summary judgment is not appropriate on that basis.  However, the

Court must consider whether the doctrine of unclean hands or other equitable considerations

would preclude such relief.

1.    Unclean Hands

Defendants contend that AGM&M is estopped from challenging the reversion clause in

the Grant Agreement because AGM&M has itself violated numerous aspects of the Grant

Agreement.  *See* Cafesjian Defs.' Br. at 40-41.  Under the unclean hands doctrine, courts have

44

discretion to deny equitable relief to a party who has not "acted fairly and without fraud or deceit as to the controversy at issue." *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 82 (D.D.C. 2008).  Specifically, Defendants contend that AGM&M has breached the Grant Agreement by failing to repay the $500,000 promissory note, improperly excluding CFF from participating in the development planning of the museum, delegating significant Board authority to an improperly formed committee, failing to include a memorial in the proposed plans for the museum, and removing CFF as an initial donor and stripping CFF of its right to appoint Trustees.  *See* Cafesjian Defs.' Br. at 41.[25]  AGM&M disputes these contentions and provides specific citations to evidence in the record that supports its view that it has not breached the Grant Agreement.  *See* Pl.'s Opp'n at 37-38.  The Court need not dissect all of the conflicting evidence cited by the parties in order to determine that there are disputed issues of material fact that preclude the award of summary judgment on this issue.  Unclean hands is an equitable doctrine committed to the Court's discretion, and the Court declines to exercise its discretion on the basis of the present evidentiary record.

> 2.     The Importance of the Reversion Clause in the Grant Agreement

Defendants argue that it would be improper for the Court to strike the reversion clause from the Grant Agreement without rescinding the entire contract.  "Where one term in an agreement is unenforceable on grounds of public policy, 'a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the

---

[25] Defendants also argue that "plaintiffs" have breached the Grant Agreement by refusing to transfer assets held by the Assembly.  *See* Cafesjian Defs.' Br. at 41.  However, this was an obligation of the Assembly under the Grant Agreement, and it is not clear whether AGM&M accepted this obligations as part of the Transfer Agreement.

performance as to which the agreement is unenforceable is not an essential part of the agree

exchange.'" *Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 107-08 (D.D.C. 2004)

(quoting Restatement (Second) of Contracts § 184(1) (1981)).  Defendants argue that if the

reversion clause is unenforceable, the rest of the Grant Agreement must also be unenforceable

because the reversion clause was an essential part of the bargain between the parties.  *See*

Cafesjian Defs.' Br. at 41-42.  Thus, Defendants argue that AGM&M's equitable remedy must be

rescission rather than reformation.

Plaintiff first argues that the reversion clause cannot be a central part of the Grant

Agreement because the stated purpose of the Grant Agreement is to encourage the development

of the five properties (i.e., the Bank Building and the Adjacent Properties) into the museum.

However, as the donor providing the funds to acquire the properties, Cafesjian/CFF certainly had

a right to insist that his gift not be squandered by delay and thereby provide an incentive for

development in the form of a reversion clause.  This is not a necessarily a "significant diversion

of interests," as AGM&M contends.  *See* Pl.'s Opp'n at 30.  Plaintiff further argues that the facts

in the record show that the reversion clause was not extensively discussed or negotiated by the

parties before its adoption, and therefore it could not have been critically important to the Grant

Agreement.  *See id.* at 30-33.  For example, Plaintiff points out that Mr. Hovnanian, a signatory

to the Grant Agreement, claims to have never known it contained a reversion clause.  *See* Pl.'s

Opp'n, Ex. 2 (H. Hovnanian Dep. Tr.) at 138-40.  Defendants dispute that the Assembly was not

made aware of the reversionary interest during the contract negotiations.  However, neither party

explains how these facts are relevant to the legal question at issue, i.e., whether the reversion

clause is an essential part of the agreement such that it cannot be severed.  Although Defendants

46

do cite the *Booker* case noted above in support of their motion, they fail to conduct a meaningful

legal analysis to support their contention that the reversion clause was essential.  Plaintiff fails to

cite any legal authority whatsoever.  Because the parties have not thoroughly briefed the legal

bases for their positions, because there are disputed facts in the record regarding the negotiation

of the Grant Agreement, and because the determination of appropriate equitable relief ultimately

depends on the outcome of Plaintiff's claims for breach of fiduciary duty, the Court shall deny

the Cafesjian Defendants' motion for summary judgment with respect to Count III of the Second

Amended Complaint.

       D.      *Count IV: Quiet Title and Removal of the Lis Pendens*

Count IV of the Second Amended Complaint seeks a declaration to quiet title, removal of

the *lis pendens* on the properties at issue, and an injunction to prevent Defendants from making

any further efforts to cloud the title on the properties.  Should AGM&M ultimately prevail on

Counts I and III of the Second Amended Complaint, the relief requested by this claim may be

entirely appropriate.  The Court finds that it is premature to consider dismissal of Count IV,

which may or may not constitute an appropriate remedy depending on the resolution of disputed

issues of material fact at trial.  Accordingly, the Court shall deny the Cafesjian Defendants'

motion for summary judgment regarding Count IV of the Second Amended Complaint.

       E.      *Counterclaim*

In its Amended Counterclaim against AGM&M, CFF contends that the filing of this

lawsuit was an *ultra vires* act because neither CFF nor Waters Jr. (as CFF's designated Trustee)

received notice of any meeting of the Board of Trustees to consider or approve any such lawsuit,

and CFF did not vote to approve any such lawsuit.  *See* [27] Answer to Am. Compl. & Countercl.

¶¶ 20-22.  CFF thus claims that the decision to file this lawsuit was "improper, unfair and ultra vires under common law" and under D.C. Code § 29-301.06.  *See id.* ¶ 23.  AGM&M has moved for summary judgment on the Counterclaim on the basis that the facts clearly demonstrate that the lawsuit was property authorized and that it is not improper or unfair as a matter of law. According to AGM&M, this lawsuit was authorized by the Board of Trustees at the May 7, 2007, meeting when it voted to authorize the Buildings and Operations Committee to remove the lien and take any other actions necessary to develop the Museum.  *See* Pl.'s Br. at 28.  CFF makes four arguments in its opposition brief, and the Court shall address each in turn.

First, CFF contends that the Board of Trustees was required to authorize any lawsuit by at least an 80% affirmative vote, and because Waters Jr. did not vote in favor of filing any lawsuit, it could not have been authorized by the Board.  However, it is well settled that "the vote an interested director cannot be counted to make up a majority vote necessary to pass a resolution of the board of directors" of a corporation.  3 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 936.  Because Waters Jr. certainly has a personal interest at stake in litigation accusing him of a breach of fiduciary duty, he cannot claim that his vote was critical to Board authorization for this lawsuit.  Moreover, the By-Laws actually state that the required vote is 80% of the Trustees present at a meeting where a quorum is present, and a quorum consists of person representing half the eligible votes on the Board.  *See* By-Laws, §§ 2.6, 2.7.  Thus, the Board could have taken action without Waters Jr. if only the three other Trustees were present and they all voted in support of a measure.

Second, CFF contends that the Building and Operations Committee cannot authorize lawsuits without specific involvement from the Board.  Citing *Stern v. Lucy Webb Hayes*

*National Training School for Deaconesses and Missionaries*, 381 F. Supp. 1003 (D.D.C. 1974),

CFF argues that the Board may delegate decisions to a committee only "so long as all directors

assume the responsibility for supervising such committees by periodically scrutinizing their

work. . . . Total abdication of the supervisory role . . . is improper . . . ."  381 F. Supp. at 1013-14.

CFF contends that the Board was not actively engaged in supervising the Building and

Operations Committee, and therefore its actions were invalid.  *See* Cafesjian Defs.' Opp'n at 26.

CFF points to testimony from Mr. Hovnanian, who stated that he was not involved in the

Committee's planning and that he was generally unaware of what its plans were.  *See* Cafesjian

Defs.' Opp'n, Ex. AA (H. Hovnanian Dep. Tr.) at 100, 103, 206.  However, the fact that one

Trustee who is not on the Committee is generally unaware of its actions does not indicate that the

delegation of duties was improper.  AGM&M's By-Laws specifically permit the Board of

Trustees to "organize, appoint and supervise one or more committees . . . and may delegate to

any such committee any or all of their powers which may be delegated by law."  *See* By-Laws §

2.9.  Moreover, *Lucy Webb* does not address the extent to which a Board may delegate its

authority—it stands only for the proposition that an individual director may breach his fiduciary

duty through the total abdication of supervision over delegated authority.  *See* 381 F. Supp. at

1014.  Thus, the Building and Operations Committee was authorized to take whatever actions

were properly delegated to it without specific involvement from the Board.

Third, CFF argues that the Committee never actually authorized the filing of any lawsuit.

CFF claims that the first meeting of the Committee occurred on August 27, 2007, which was

months after this action was initially filed, and the minutes from the various Committee meetings

do not reflect any involvement in litigation.  *See* Cafesjian Defs.' Opp'n, Ex. EE (filed under

seal) (Committee meeting minutes).  AGM&M's only response to this argument is to claim that

the lack of meeting minutes does not prove that the Committee did not authorize the lawsuit.  *See*

Pl.'s Reply at 19.  That may be true, but as the movant, AGM&M has the burden of showing that

there are no genuine issues of material fact.  Neither party has identified evidence in the record

that precisely explains how this lawsuit was authorized.  Therefore, the Court shall deny

AGM&M's motion for summary judgment as to the Counterclaim.  Accordingly, the Court need

not address the parties' arguments regarding CFF's fourth contention that all of the Committee's

actions are *ultra vires* because the Committee was improperly created.

## IV.  CONCLUSION

The Court finds that there are genuine issues of material fact regarding whether Waters Jr.

and Cafesjian acted in bad faith in filing the MOA.  The Court also finds that based on the

limited duty owed by Waters Sr. to AGM&M, no reasonable jury could conclude that his

involvement with the MOA constituted a breach of fiduciary duty.  Because Counts III and IV

pertain to the equitable relief that may be appropriate if a jury finds that Waters Jr. or Cafesjian

breached their duties to AGM&M, the Court finds that it is inappropriate to rule on them at the

summary judgment stage.  Finally, with respect to the Counterclaim, the Court finds that

AGM&M has failed to show that there are no genuine issues of material fact regarding the

authorization of this litigation by AGM&M.

//

//

//

//

For the reasons set forth above, the Court shall DENY Plaintiff's [104] Motion for Partial Summary Judgment, GRANT Waters Sr.'s [105] Motion for Summary Judgment, and DENY the Cafesjian Defendants' [107] Motion for Summary Judgment as to all counts.  An appropriate Order accompanies in this Memorandum Opinion.

Date: March 9, 2010

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge