# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ARMENIAN ASSEMBLY OF
AMERICA, INC. *et al.*,

    Plaintiffs/Counter-Defendants,

     v.

GERARD L. CAFESJIAN *et al.*,

    Defendants/Counter-Plaintiffs.

Civil Action Nos. 07-1259, 08-255,
08-1254 (CKK)

## MEMORANDUM OPINION
(January 26, 2011)

*"Who, after all, speaks today of the annihilation of the Armenians?"*

These chilling words are said to have been spoken by Adolf Hitler in 1939 in reference to
the largely successful efforts by the Ottoman Turkish government to eliminate the Armenian
population living on its historic homeland during the World War I era, known today as the
Armenian Genocide.[1]  Beginning around the year 2000, a group of dedicated individuals agreed
to organize their efforts to build a museum in Washington, D.C. devoted to the understanding
and memorialization of the Armenian Genocide.  Unfortunately, that end goal was about all they
could agree on, and after seven years of internal debate and struggles over the size and scope of
the project, relations between the parties broke down completely, resulting in litigation that led to
the three above-captioned cases.  The parties to these actions are The Armenian Assembly of
America, Inc. (the "Assembly"), Armenian Genocide Museum & Memorial, Inc. ("AGM&M"),

---

[1] The use of the term "genocide" to describe the atrocities that befell the Armenians
between 1915 and 1923 is not without controversy, but the parties in this case agree that it is
appropriate.  The Court has relied on the parties' stipulated facts, and therefore the Court's use of
the term "genocide" is not intended to express any opinion on the propriety of that label.

Gerard L. Cafesjian ("Cafesjian"), John J. Waters Jr. ("Waters"), and The Cafesjian Family Foundation, Inc. ("CFF"). On March 9, 2010, this Court issued a series of rulings granting-in-part and denying-in-part the parties' various motions for summary judgment. *See Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 691 F. Supp. 2d 132 (D.D.C. 2010); *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20 (D.D.C. 2010); *Waters v. Armenian Genocide Museum & Mem'l, Inc.*, 692 F. Supp. 2d 57 (D.D.C. 2010).[2] The parties subsequently agreed to consolidate these cases for a single trial by the court without a jury. *See* Joint Stip. to Nonjury Trial, ECF No. [102]; Stip. of Consolidation, ECF No. [108].[3]

Based on the parties' proposals during pretrial hearings, the Court ordered the parties to file consolidated complaints and answers with specific factual allegations supporting their remaining claims and counterclaims in the three cases. The Assembly and AGM&M (collectively, "Plaintiffs") filed their Consolidated Complaint (hereinafter, "Complaint"), which alleges that Cafesjian and Waters each breached their fiduciary duties to AGM&M (Count One) and to the Assembly (Count Two), that Cafesjian breached his duty of good faith and fair dealing to the Assembly (Count Three), and that Cafesjian and Waters each misappropriated trade secrets of the Assembly (Count Four). *See generally* Consol. Compl. (hereinafter, "Compl."), ECF No. [109]. Cafesjian, Waters, and CFF (collectively, "Defendants") filed their Streamlined Answer and Counterclaims, which asserts claims for breach of contract against the Assembly (Count I) and AGM&M (Count II), breach of implied covenant of good faith and fair dealing against the

---

[2] In the course of these rulings, the Court dismissed as parties John J. Waters Sr., The TomKat Limited Partnership, and Hirair Hovnanian.

[3] For convenience, the Court shall refer only to docket entries in Civil Action No. 08-255.

Assembly (Count III) and AGM&M (Count IV), third-party beneficiary against AGM&M (Count V), unjust enrichment against the Assembly and AGM&M (Count VI), and indemnification against AGM&M (Count VII). *See* Streamlined Countercls. (hereinafter, "Countercls."), ECF No. [104]; Answer to Consol. Compl., ECF No. [141]. Before trial, the parties also filed proposed conclusions of law. *See* Defs.' Proposed Conclusions of Law, ECF No. [144] (hereinafter, "Defs.' Concls."); Pls.' Proposed Conclusions of Law, ECF No. [145] (hereinafter, "Pls.' Concls.").

A bench trial commenced on November 9, 2010. Plaintiffs called thirteen witnesses and introduced deposition testimony from five additional witnesses. Defendants called eight witnesses and introduced deposition testimony from one additional witness. To avoid having witnesses testify twice (once during Plaintiffs' case and once during Defendants' case), the parties agreed that Defendants could cross-examine Plaintiffs' witnesses beyond the scope of direct examination. At the close of Plaintiffs' case-in-chief, Defendants orally moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c). Plaintiffs also moved orally for judgment on partial findings at the close of Defendants' case-in-chief. After hearing brief argument, the Court took those motions under advisement.[4] Plaintiffs did not present any evidence in rebuttal to Defendants' case. The trial concluded with closing arguments on the twelfth trial day, November 29, 2010. There were 453 exhibits admitted into evidence, 282 marked as Plaintiffs' exhibits ("PX-") and 171 marked as Defendants' Exhibits ("DX-"). *See*

---

[4] Ultimately, the Court exercised its discretion and declined to enter judgment prior to the close of the evidence. *See* Fed. R. Civ. P. 52(c).

Amended Exhibits Entered During Trial: Nov. 9-24, 2010.[5] At the request of the Court, the parties did not file proposed findings of fact or revised conclusions of law after trial. However, Defendants did file a [190] Notice of Untruthful Testimony of Plaintiffs' Witnesses summarizing what they perceived to be inconsistencies in the testimony presented by Plaintiffs, to which Plaintiffs filed a [191] Response. The Court has placed no special weight on these filings and has made its own conclusions with respect to the credibility of the witnesses.

This memorandum opinion contains the Court's findings of fact and conclusions of law. In making the findings enumerated below, the Court has relied on the testimony of the witnesses, the exhibits admitted into evidence, and the record as a whole. The Court has not relied on any exhibits that were not admitted into evidence or testimony that was stricken from the record at trial. In addition, the Court has considered only the legal arguments made by the parties on the record during the course of the trial, in the pleadings, or in the proposed conclusions of law.

## I. INTRODUCTION

*A.      Preliminary Observations*

Before the Court proceeds with a recitation of the facts, a few preliminary comments are in order. The factual record in this case is voluminous, and the Court has reviewed every exhibit admitted and reviewed the transcripts of each witness's testimony. The key events relevant to this dispute occurred over a period of approximately eight years leading up to the filing of the first lawsuit and continued while the parties were in litigation. Although the parties strongly

---

[5] Following the trial, the parties provided the Court with a list of the exhibits that they agree were admitted into evidence, and the Court has relied on this document. Although some additional exhibits were discussed at various points during the trial, the Court has not relied on any exhibits that are not on the list of admitted exhibits agreed on by the parties. The Court notes that there is an error on the admitted exhibit list, as PX-364 is listed twice.

disagree about what motivated them to take certain actions, the facts of what actually occurred are largely undisputed.  However, because context is critical to understanding the relationships between the parties and the reasons for their actions (or their inaction), the Court has endeavored to make its findings of fact as specific and detailed as possible.

Several key witnesses were unable to recall specific details from the meetings and events that gave rise to the claims in these lawsuits.  In some cases, the witnesses were unable to remember *any* details from such meetings or events.  To a certain extent, these witnesses' lack of memory is unsurprising.  After all, the events took place between four and ten years ago, and the Court is also mindful of the fact that several of these witnesses are octogenarian.  However, in many instances, lack of memory appeared to be driven more by convenience than cognition.  Some witnesses were unable to recall their attendance at critical meetings even when presented with written records of the actions they took.  Some witnesses could recall in detail events that were favorable to them (or unfavorable to their opponents) but were hazy about similar events that were unfavorable to them (or favorable to their opponents).  Additionally, most of the witnesses who testified at trial are biased in some manner, either because they have a financial stake in the outcome of the trial or because their reputation has been called into question by the allegations raised in this litigation.  The Court considers all of this as a factor in assessing the credibility of the witnesses.

Because of concerns about the reliability of some of the witnesses' testimony, the Court relies heavily on the admitted exhibits to document what transpired at the time.  With the exception of a few exhibits that were admitted only for a limited purpose, the parties have largely waived objections as to the authenticity of or hearsay contained in the vast array of emails,

letters, meeting notes, minutes, and other records admitted during the trial.[6]  Although there are

some minor inconsistencies and a few major ones in the documentary evidence submitted, the

Court finds that the exhibits are generally the best evidence of what occurred because most of

them were created at the same time as the events they describe or shortly thereafter.  Therefore,

in the face of a conflict between the exhibits and witness testimony, the Court has sided more

often with the story told by the exhibits.  With a few exceptions, however, the inconsistencies are

not great, and more often the testimony corroborates the other evidence in the record.

One witness whose testimony is not reflected in the factual narrative below is that of

Defendants' expert in corporate governance, Robert Krasne.  Plaintiffs objected to Mr. Krasne's

testimony before trial, and the Court deferred ruling on Plaintiffs' motion *in limine* until trial.

Following voir dire of Mr. Krasne, the Court ruled that he was qualified to testify as an expert on

issues of corporate governance.  *See* 11/19 PM Tr. at 4.  However, the Court noted that as the

finder of fact, it would determine how much weight to give his testimony.  After hearing his

testimony in light of the record as a whole, the Court finds that Mr. Krasne's testimony does not

aid the Court in understanding the evidence or in determining any fact in issue.  Accordingly, the

Court has given no weight to Mr. Krasne's testimony and has not relied on it in any manner.

Having set forth those preliminary issues, the Court shall now relate in narrative form the

story underlying the claims in this litigation.  The Court shall begin by describing the parties and

---

[6] A number of exhibits were admitted into evidence without any explanation or discussion
provided by a sponsoring witness.  To the extent these exhibits are self-explanatory, the Court
has considered them on par with the other exhibits in the record.  The Court has placed somewhat
less weight on exhibits that require more of a foundation to be relevant.  For example, the record
includes the general ledgers of several organizations in various tax years.  The Court has relied
on these exhibits only to the extent that witnesses testified about their relevance or counsel made
a specific argument relating to them.

the other key individuals who play major roles in the drama that unfolded at trial. The Court

shall then lay out the factual background in a predominantly chronological fashion, grouping

together incidents relating to particular claims. Then, the Court shall review in detail each of the

claims and counterclaims asserted based on the facts credited by the Court. After setting forth

the Court's legal conclusions, the Court shall address the issue of remedies.

   *B.  Cast of Characters - the Parties and Key Individuals*

  Below is an introductory description of all the major players in the story; these

individuals and organizations appear continuously throughout the period of events relevant to

this litigation. The evidence cited below is credited by the Court as undisputed and/or

uncontroverted.

  The Armenian Assembly of America (the "Assembly") was formed in 1972 as a charity

for the purpose of undertaking educational, cultural and advocacy efforts in support of human

rights and genocide prevention of concern to the Armenian American community, and it remains

so to this day. Stip. Facts[7] ¶ 1. The Assembly is a District of Columbia non-profit corporation

classified by the Internal Revenue Service as tax-exempt pursuant to § 501(c)(3) of the Internal

Revenue Code. *Id.*

  Hirair Hovnanian ("Hovnanian") is one of the founders of the Assembly and has served

as the Chairman of the Assembly's Board of Trustees since the mid-1970s. *See* 11/9 AM Tr. at

53-55. Hovnanian began working as a builder and property developer in 1958 and continues to

operate his successful business in New Jersey, California, and Florida. *Id.* at 51-52. Hovnanian

---

   [7] Citations to "Stip. Facts" refer to the Undisputed/Stipulated Facts enumerated in the parties' Joint Pretrial Statement filed on September 27, 2010, ECF No. [132].

now lives in New Jersey and focuses mostly on commercial property development. *Id.*

Hovnanian has devoted much of his time and resources to Armenian causes, raising money for

the people of Armenia and building four factories there to manufacture building supplies. *Id.* at

56-57. Hovnanian has contributed approximately $50 million to the Assembly over the past 35

years. *Id.* at 57-58. Hovnanian's investments in Armenia are strictly charitable in nature, and he

has refused on principle to take any profits from his activities in Armenia. *Id.* at 58-59. His

grandfather's entire family perished during the Armenian Genocide, except for his father, and

Hovnanian has a deep personal connection to that aspect of Armenian history. *Id.* at 60.

Robert Aram Kaloosdian ("Kaloosdian") is another one of the founders of the Assembly.

11/10 AM Tr. at 133. He is now eighty years old and semi-retired from the practice of law,

living in Massachusetts. *Id.* at 132-33. He has held a variety of leadership positions within the

Assembly and is currently a member of the Assembly's Board of Trustees. *Id.* at 133-34.

Kaloosdian serves as Chairman of the Board of Governors for the Armenian National Institute

("ANI"), which was established in 1997 as an entity dedicated to the study, research, and

affirmation of the Armenian Genocide. *Id.* at 135; Stip. Facts ¶¶ 15-16. ANI was initially

formed as a subsidiary of the Assembly and is classified by the IRS as a tax-exempt entity under

§ 501(c)(3) of the Internal Revenue Code. Stip. Facts ¶ 2.

Dr. Rouben Adalian ("Adalian") is the director of the Armenian National Institute. 11/15

PM Tr. at 86. He has a doctorate in history from the University of California, Los Angeles,

specializing in the history of Armenia, the Middle East, and the Caucasus. *Id.* at 87. Through his

position at ANI, Dr. Adalian has extensively researched the Armenian Genocide and worked to

document its history. 11/15 PM Tr. at 90.

8

Anoush Mathevosian ("Mathevosian") is an Armenian American philanthropist who has devoted much of her time and money to the Assembly. She currently resides in New York. Stip. Facts ¶ 10. Her grandfather was killed in the genocide, and her father was deported to Persia, where Mathevosian was born. Mathevosian Dep. Tr. at 8-9. Her family's suffering in the genocide left Mathevosian with a deep emotional scar. *Id.* at 9. Beginning in 2003, Mathevosian suffered a series of health problems, including a collapsed lung, a heart attack, and a stroke. Mathevosian Dep. Tr. at 69.

The Armenian Genocide Museum & Memorial, Inc. ("AGM&M") was formed in October 2003 as a non-profit corporation in the District of Columbia. Stip. Facts ¶ 3. AGM&M was established for the purpose of constructing, owning, operating, and maintaining a permanent museum and memorial devoted to the victims and survivors of the Armenian Genocide. *Id.* AGM&M is classified by the IRS as tax-exempt under § 501(c)(3) of the Internal Revenue Code. *Id.* ¶ 4. The initial members of the Board of Trustees for AGM&M were Hovnanian, Kaloosdian, Mathevosian, and Gerard L. Cafesjian.

Gerard L. ("Gerry") Cafesjian was born in 1925 in Brooklyn, New York to immigrants from Armenia and Constantinople. *See* DX-305.[8] Cafesjian's father came to America after the rest of his family was killed in the genocide. *Id.* After serving in the Navy in World War II, Cafesjian received a degree in economics from Hunter College and a law degree from St. John's University. *Id.* In 1952, Cafesjian began a 44-year career with West Publishing and was very successful. *Id.* In 1996, West Publishing was acquired by the Thompson Corporation, and

_____

[8] DX-305 contains a biographical video prepared by Cafesjian for presentation at an Assembly awards gala held in October 2002. Plaintiffs stipulated that the contents of that video may be accepted by the Court as if it were testimony directly from Cafesjian. 11/19 AM Tr. at 8.

Cafesjian sold his shares in the company and retired. *Id.* Cafesjian received between $250-300 million for his stock in West, and he turned his attention to philanthropic pursuits. Cafesjian Dep. Tr. at 23. One of Cafesjian's areas of interest is art—he had created an art program while working at West and he is a collector of contemporary art, particularly glass sculpture. *See* DX-305. He founded the Gerard L. Cafesjian Pavilion at the Scottsdale Museum of Contemporary Art, which houses some of his collection. *Id.*

Cafesjian also became interested in Armenian causes upon retiring from West. Cafesjian and his family donated $30 million to establish The Cafesjian Family Foundation, Inc. ("CFF") in 1996. 11/15 PM Tr. at 14; DX-305. Cafesjian is the founder and president of CFF, and CFF is a non-profit corporation organized under Florida law. Stip. Facts ¶¶ 6-7. CFF was founded to help Armenians around the world, particularly those located in Armenia, and its primary focus is economic development. DX-305. CFF invests in a number of programs in Armenia through various subsidiaries. CFF's projects include the development of solar and wind energy in Armenia with the aim of establishing energy independence for the country, building a professional and independent media, fostering the development of high-tech industry, and developing real estate. *Id.* As of 2002, CFF employed over 400 people in Armenia. *Id.* CFF is funded almost entirely by the Cafesjian family, with contributions made as needed for charitable or tax planning purposes. 11/15 PM Tr. at 14. Between 2003 and 2006, CFF's general account balance was typically less than $1 million. 11/15 PM Tr. at 13-14.

Cafesjian's various enterprises are coordinated through GLC Enterprises, Inc. ("GLC"), which has been described as a "family office" based in Minnesota. 11/15 AM Tr. at 22. Both CFF and GLC are governed by the same individuals. Cafesjian Dep. Tr. at 24. From 1996 to

2000, Cafesjian controlled between five and twenty companies, and Cafesjian later had as many as thirty-five companies. 11/15 AM Tr. at 20-21. Nearly all of these companies (except for CFF and an entity called the Cafesjian Museum Corporation) were for-profit entities, many doing business in Armenia. *Id.* at 21-30. Although operated as for-profit entities, Cafesjian does not earn any profits from these businesses. 11/18 PM Tr. at 16; 11/19 AM Tr. at 64. Rather, Cafesjian reinvests the profits in the businesses to foster job creation and sustainable economic development in Armenia. 11/18 PM Tr. at 16; 11/19 AM Tr. at 64. CFF has invested approximately $50 million in various enterprises in Armenia. In addition, Cafesjian has invested approximately $43 million to develop the Cafesjian Center for the Arts in Armenia's capital city of Yerevan. 11/18 PM Tr. at 15.

Cafesjian has devoted most of his time since retirement to CFF, but he does not involve himself in the "nitty-gritty" details of day-to-day management. 11/19 AM Tr. at 66, 68. Instead, he relies on his right-hand man, John Waters Jr. ("Waters"). John Waters attended Georgetown University and got an MBA from the University of Minnesota. 11/15 AM Tr. at 8-9. Waters met Cafesjian while working at West Publishing. *Id.* A few months after Cafesjian left West, he hired Waters to do some consulting work for him. *Id.* at 15. Although not of Armenian descent, Waters became aware of Armenian issues in college through a friend who took him to a genocide recognition rally at the White House; the experience resonated with Waters because his father had served as a linguist officer in Turkey, and Waters was born in Istanbul. *Id.* at 16.

Waters became an employee of GLC in late 1996. 11/15 AM Tr. at 19. Ultimately, Waters became Vice President of both GLC and CFF. *Id.* at 20. In those roles, it was Waters's job to take any action as directed by Cafesjian, and Waters became involved in every Cafesjian

enterprise between 1996 and his departure from the Cafesjian organization in March 2009. *Id.* at 20-21; 11/24 AM Tr. at 23. Waters was responsible for acting on Cafesjian's behalf in managing, operating, and implementing each of Cafesjian's personal investments. 11/15 AM Tr. at 30. Cafesjian described Waters's job as being his "personal assistant, something bordering on, but not quite, alter ego, pretty much what I wanted him to do." Cafesjian Dep. Tr. at 106. Waters's duties required him to travel to Armenia between 50 and 60 times over the course of his employment with Cafesjian. 11/15 AM Tr. at 32. Waters testified that he believed at all times that he owed his highest duty of loyalty to Cafesjian. 11/24 AM Tr. at 70.

Ross Vartian ("Vartian") has worked in support of Armenian causes for nearly his entire career. After being discharged from the Army after service in Vietnam, Vartian earned a degree from Michigan State University and accepted a job as the founding principal for an ethnic day school in Detroit. 11/19 PM Tr. at 70. After five years in that position, the Assembly hired him in 1979 for the number-two position in their Washington, D.C. office. *Id.* at 71. Shortly thereafter, Vartian was elevated to the position of Executive Director. *Id.* He continued to work for the Assembly until 2005. Vartian is now retired, lives in Michigan, and serves on the board of directors for CFF. *Id.* at 70.

Van Krikorian ("Krikorian") is the Chairman, CEO, and General Counsel of Global Gold Corporation. 11/17 AM Tr. at 141. He attended college at George Washington University and earned his law degree from Georgetown. *Id.* Krikorian first became involved with the Assembly in 1977 as a college intern, and he has been involved ever since. *Id.* at 141-42. He has served on

the Assembly's Board of Directors[9] since at least 1993, and he served as Chairman from 1998 to 2002, after which he remained on the executive committee. *Id.* at 142. Krikorian is also a life trustee of the Assembly. *Id.*

## II. FACTUAL BACKGROUND

*A.     Initial Interest in an Armenian Genocide Museum*

The Armenian Genocide is widely recognized as the first genocide of the 20th century. Stip. Facts ¶ 13. Of the estimated 2.1 million Armenians living in the Ottoman Empire on the eve of World War I, approximately 1.5 million were killed, and hundreds of thousands more were deported. *Id.*; 11/15 PM Tr. at 88-89. During this period the Armenian people were subjected to deportation, expropriation, forced conversion, abduction, torture, massacre, and starvation. Stip. Facts ¶ 13. This historical tragedy is the single most resonant occurrence in modern Armenian culture. *Id.* ¶ 14. Armenians worldwide seek to ensure that the Armenian Genocide experience will never be forgotten. *Id.* Beginning in the 1990s, the Assembly decided that a museum would be a mark of respect that could both pay homage to the victims and survivors of the genocide and educate Americans about what happened to the Armenian population before, during, and after World War I. *Id.*

On or about April 1, 1996, Hirair Hovnanian made a pledge of about $1.6 million to establish the Armenian National Institute for the study, research, and affirmation of the Armenian Genocide. Stip. Facts ¶ 15; 11/9 AM Tr. at 60. ANI began its operations on or about April 1, 1997. Stip. Facts ¶ 16. Dr. Rouben Adalian was hired to be the director of ANI. Dr. Adalian

---

[9] The Assembly's Board of Directors was a lesser policymaking body than the Board of Trustees; the two boards were ultimately merged around 2006.

explained that "affirmance" of the genocide is an important goal of the Armenian community because the Turkish government, among others, has denied that there was a genocide. 11/15 PM Tr. at 89-90.

Inspired by Hovnanian's pledge, Anoush Mathevosian decided in 1996 to pledge $3 million to be used for the purpose of constructing a permanent museum in Washington, D.C. dedicated to the victims and survivors of the Armenian Genocide. Stip. Facts ¶ 17; 11/9 AM Tr. at 60-61. In 1996, the Assembly began to explore properties in Washington, D.C. that would be suitable for a museum. Stip. Facts ¶ 18. The search was focused on double-townhouse-type properties with roughly 10,000 square feet. 11/19 PM Tr. at 72.

Around this same time, Cafesjian was independently planning to build a memorial to the Armenian Genocide. 11/19 PM Tr. at 72. When Cafesjian heard about the creation of ANI, he had Waters contact Rouben Adalian to find out more about the project. Stip. Facts ¶ 20. Cafesjian and Waters met with Adalian in New York on April 30, 1997, and Adalian informed them of the plans to build a museum. Stip. Facts ¶ 21; PX-4. Cafesjian expressed an interest in potentially associating his planned memorial with the museum project. Stip. Facts ¶ 21; 11/19 PM Tr. at 72; PX-4. Because he had not been involved in the Assembly, Cafesjian invited Hovnanian, Kaloosdian, and Adalian to meet with him and Waters at Cafesjian's home in Minnesota, where they discussed the Assembly's advocacy efforts and the museum project. Stip. Facts ¶ 23; 11/10 AM Tr. at 142-45; 11/15 AM Tr. at 38-39; PX-8. Cafesjian officially joined the Assembly as a trustee in August 1998, and Waters was designated as an Associate Trustee based on Cafesjian's gift of $25,000 on his behalf. *See* PX-262; Stip. Facts ¶ 25. At that point in time, Cafesjian and Waters continued to search separately for a location for a memorial. *See* PX-

13; Stip. Facts ¶ 24.  In April 1999, Cafesjian pledged $1,050,000 to the Assembly and was designated a life trustee.  *See* DX-192.

B.    *The Acquisition of the National Bank of Washington Building*

In or about late 1999, the Assembly identified the National Bank of Washington, located at 619 14th Street, NW, Washington, D.C., as a possible site for the museum.  Stip. Facts ¶ 26.  Although it was much larger than the properties they had been looking at to date, everyone involved in the search was impressed by the National Bank of Washington building (the "Bank Building").  11/19 PM Tr. at 72-73; 11/22 AM Tr. at 72-73.  The Bank Building has a prime location—just blocks from the White House—and its exterior and part of the interior have been designated as historic landmarks in the D.C. Inventory of Historic Sites and the National Register of Historic Places.  Stip. Facts ¶ 26.  The property on which the Bank Building is located also includes a vacant back lot which would allow for the construction of an annex.

In or about January 2000, Tom Kevorkian, then-Chief Operating Officer for the Assembly, sent a package of documents to Cafesjian and Waters regarding the Bank Building and other potential sites for the project.  Stip. Facts ¶ 27.  Cafesjian was very interested in the Bank Building, and he dispatched Waters to do due diligence on the property.  *See* PX-38; 11/19 PM Tr. at 73.  Because there was another buyer who had likely submitted an offer, they had to act expeditiously to secure the property.  11/15 AM Tr. at 45-46.  Waters worked with Tom Kevorkian to arrange the purchase.  *Id.* at 46-47.  Cafesjian agreed to donate $3.5 million to the Assembly to create a consolidated location at which the genocide museum, the genocide memorial, and offices for ANI could be located.  Stip. Facts ¶ 28; DX-12.  Anoush Mathevosian agreed to increase her pledge to $3.5 million to acquire the property.  Stip. Facts ¶ 28; PX-16.

15

The Assembly closed on the Bank Building on February 16, 2000, purchasing the building for $7.25 million. Stip. Facts ¶ 29. The funds for the purchase were comprised of a $3.5 million pledge from Mathevosian, a $2.5 million grant from CFF, and a $1 million grant from Cafesjian's Vanguard Charitable Endowment Program - Cafesjian Family Foundation Charitable Trust. *Id.* ¶ 30. Because Mathevosian could not access funds in sufficient time to wire them to the Assembly prior to the closing, CFF provided the Assembly with a $4 million interest-free bridge loan to cover Mathevosian's pledge and to complete the transaction. *Id.* ¶ 31. On March 8, 2000, after the Assembly had received Mathevosian's pledged donation, the Assembly repaid CFF $3.5 million by wire transfer. *Id.* On March 17, 2000, the Assembly executed a promissory note produced by and for the benefit of CFF for the remaining $500,000. Stip. Facts ¶ 32; PX-115. The note was interest-free and payable in full on May 16, 2000. Stip. Facts ¶ 32; PX-115. The note also contained a Minnesota choice-of-law provision. *See* PX-115.

The parties agreed that as a condition of Cafesjian's donation of funds for the purchase of the Bank Building, the Assembly was required to include a memorial named after Cafesjian as part of the project. Stip. Facts ¶ 33; DX-12. On March 30, 2000, the Assembly sent Cafesjian a letter confirming his donations and its obligation to build a memorial. Stip. Facts ¶ 34; PX-111. The letter noted that Cafesjian's proposed design for the memorial had not been finalized but that his concept consisted of "a walk-in, contemplative, chapel-like space, with interior walls of native Armenian stone and a glass sculpture by Stanislav Libensky as the focal point." PX-111. The memorial was expected to take up approximately 1200 square feet of floor space and 40,000 cubic feet of overall volume. *Id.* The Assembly agreed to cooperate with the design firm or artist chosen by CFF to complete the memorial. *Id.* The anticipated completion date for the

project was March 2002, and CFF agreed to make contributions to the Assembly to finance the memorial.  *Id.*

The Assembly's letter also confirmed that the Assembly would form a planning and development committee for the project.  PX-111.  The planning committee was to be responsible for establishing the vision for the project; for preparing and adopting a site redevelopment plan to address the design, development, renovation, potential expansion, and initial utilization of the property; and for adopting and executing a contribution and endowment program to fund the completion of the project and the operation of the property, the museum, and the memorial.  *Id.*  The committee was to be comprised of one representative from CFF, Anoush Mathevosian (or her designated representative), the Chairmen of the Assembly's Board of Trustees and Board of Directors and ANI's Board of Governors, and any person who agreed to donate $1 million or more to the project.  *Id.*  The letter explained that decisions of the committee, "in accordance with the Assembly's and ANI's history, shall be by consensus."  *Id.*

Because of the size of the Bank Building (34,000 sq. ft) and the property on which it sits, it was contemplated that the Assembly and ANI would move out of their existing offices when their lease expired in March 2002 and occupy space on the new site.  *See* PX-111; 11/22 PM Tr. at 87.  Accordingly, it was agreed that the development of suitable office space on the property would be a priority.  PX-111.  Ross Vartian, then-Executive Director for the Assembly, testified at trial that in retrospect, they were naïve to think that the museum, the memorial, and offices for the Assembly and ANI could all be housed within the Bank Building.  11/22 AM Tr. at 114.

After the closing, on February 28, 2000, Anoush Mathevosian wrote a letter to the Assembly restating the purpose of her pledge, which she dedicated to her parents.  *See* PX-110.

17

The letter stated that the purpose of her gift was to foster the development of an Armenian Genocide museum with educational exhibits, and Mathevosian expressed her desire that the Bank Building be used solely for the Assembly, ANI, the museum, and the memorial. *Id.* She wrote:

> To be certain that future generations remain true to the intent of our donations, it should be clear that no changes will be made to the purpose and usage of the Museum; that no mortgages are taken against the property and that the Museum's perpetuation is not jeopardized as such or encumbered in any way; and that there will be no subsequent changes to the name of the museum.

*Id.* At her deposition, Mathevosian explained that she wanted to ensure that they paid for the property in full so that it would not be mortgaged or sold in the future. Mathevosian Dep. Tr. at 14-15. Mathevosian asked that these understandings be incorporated into the permanent records of the organization. PX-110. However, there is no evidence that Mathevosian's expressed desires were ever formally incorporated by the Assembly into a binding obligation. Mathevosian testified that Hovnanian agreed to her conditions, but she did not recall whether he had done so orally or in writing. Mathevosian Dep. Tr. at 16-17. John Waters testified that he did not see Mathevosian's letter until several years later, in late 2003. 11/15 AM Tr. at 49.

      C.    *Acquisition of the Properties Adjacent to the Bank Building*

Once the Bank Building was acquired by the Assembly, Cafesjian began to acquire property adjacent to the Bank Building. John Waters testified that it was typical for Cafesjian to look at adjacent properties when acquiring real estate. 11/22 PM Tr. at 92. Cafesjian considered several possibilities with respect to these properties, initially planning to use them to build a contemporary art museum called the Cafesjian Contemporary Art Museum. *Id.*; 11/19 PM Tr. at 95; Cafesjian Dep. Tr. at 151. Cafesjian thought that an art museum co-located with the

genocide museum would draw more visitors. Cafesjian Dep. Tr. at 151; 11/19 PM Tr. at 95-96. Ultimately, that plan was abandoned when Cafesjian decided to build a contemporary art museum in Yerevan, Armenia. 11/22 PM Tr. at 92-93. At that point, Cafesjian decided to donate the properties to the Assembly for the purpose of expanding the footprint of the museum project. *Id.*

Ultimately, Cafesjian acquired four parcels adjacent to the Bank Building: (1) 1342 G Street, NW; (2) 1340 G Street, NW; (3) 1338 G Street, NW; and (4) 1334-36 G Street, NW (collectively, the "Adjacent Properties"). Each of the properties was acquired in an arms-length transaction by one of Cafesjian's entities, TomKat Limited Partnership ("TomKat"). 11/23 AM Tr. at 35; Stip. Facts ¶ 36. TomKat executed an agreement to purchase 1338 G Street for $1.2 million on March 10, 2000 and closed on May 15, 2000. Stip. Facts ¶ 37. TomKat purchased 1342 G Street for $1.2 million on March 16, 2000 and closed on September 30, 2000. *Id.* ¶ 38. On October 24, 2000, TomKat entered into an Installment Purchase and Sale Agreement to purchase 1340 G Street for a total of $3 million. *Id.* ¶ 39. Under the installment agreement, payments of $150,000 are due each year for a period of ten years, with a final balloon payment of $1.5 million due in March 2011. *Id.*; 11/19 AM Tr. at 55. The property was owned by the Ana Sherman Revocable Trust, and the deed is being held in escrow until the final payment is made. 11/23 AM Tr. at 41-42; DX-624N. The final adjacent property, 1334-46 G Street, NW, also known as the "Families U.S.A." building, was acquired later by TomKat, which purchased the building from a third-party seller for $6.5 million in September 2003. Several of the Adjacent Properties were taken subject to leases.

D.    *Initial Efforts to Develop the Museum - Museum Planning Committee*

As opposed to the previous sections, where the facts were largely undisputed and/or uncontroverted, the findings made below increasingly reflect the Court's credibility determinations and weighing of conflicting evidence in the record.

The Armenian American community was euphoric about the acquisition of the Bank Building.  11/19 PM Tr. at 73.  However, the real work in creating an Armenian Genocide museum and memorial lay ahead.  A planning committee was formed to develop the museum project.[10]  The planning committee was a somewhat fluid body; there were about a dozen different individuals who became involved to varying degrees in the planning of the museum.  *See* 11/15 AM Tr. at 57.  The committee included both Assembly leadership and staff, including Hirair Hovnanian, Anoush Mathevosian, Gerry Cafesjian, Robert Kaloosdian, Van Krikorian, John Waters, Rouben Adalian, Tom Kevorkian, and Ross Vartian.  11/19 PM Tr. at 74-75.  Ultimately, any decision made by the planning committee had to be approved by the Assembly.  11/15 AM Tr. at 57.  The planning committee was chaired by Hirair Hovnanian.  *Id.*; 11/18 PM Tr. at 45; 11/19 PM Tr. at 74; DX-14.  The planning committee largely operated by consensus, and there were rarely any formal votes taken.  11/22 PM Tr. at 98-99.  According to John Waters, any decision that was approved by Hovnanian was adopted on behalf of the Assembly, whereas decisions he did not agree with did not move forward.  *Id.* at 99.  At trial, Hovnanian testified incredibly that he did not recall being chair of the planning committee or having any involvement in the early development of the museum, apart from attendance at a few occasional meetings for

---

[10] It is unclear from the record whether the planning committee was formally established in accordance with all of the terms of the Assembly's March 30, 2000 letter to Cafesjian.

which he did not prepare.  11/9 AM Tr. at 112-15.  In fact, Hovnanian testified that prior to

November 2003, he "had nothing to do with this project.  Absolutely zero."  *Id.* at 125.  The

Court finds this testimony not credible in light of the extensive evidence in the record of

Hovnanian's involvement during this period.

The planning committee held its first meetings in March and April of 2000.  *See* DX-13;

DX-14; DX-15; DX-16.  During those meetings, the committee discussed potential uses of the

property, budgetary issues, and a six-month work plan.  DX-13; 11/19 PM Tr. at 75.  At a

meeting on April 12, 2000, the committee approved three proposals drafted by Van Krikorian:

(1) a use plan for the Bank Building whereby the first floor would be commercial/mixed use, the

second and third floors would house the museum with an archway to the memorial, and the

fourth floor would be used as offices for the Assembly and ANI; (2) a fundraising campaign to

raise $40 million for building and endowment; and (3) creation of a Project Manager staff

position to manage the project.  11/19 PM Tr. at 75-76; DX-15; DX-16.

The planning committee met again on May 4, 2000.  *See* DX-17.  John Waters and Tom

Kevorkian gave a presentation at this meeting providing an overview of the project, including a

discussion of the budget, space limitations, needs of the various stakeholders, and a proposed

timeline.  *See* PX-347; 11/15 AM Tr. at 59-63.  The plans at this time called for the museum to

be ready for move-in by March 2002 and open to the public by April 2002.  *See* PX-347.  Waters

also reported on the status of the negotiations over the first three adjacent properties.  *See* DX-17;

PX-347.  Hirair Hovnanian raised the issue of fundraising and suggested the creation of a

Founders Circle with the goal of locating up to four individuals who could bequest $10 million to

the project. DX-17.[11] The committee also agreed that vision statements should be created for ANI, the Assembly, and the museum project, which had been designated as the Armenian Genocide Museum and Memorial. *Id.* John Waters and Tom Kevorkian were tasked with conducting the search for a project manager and were expected to recommend candidates for final interviews by the end of May 2000. *Id.* They began this process, but it was not completed by month's end. 11/15 AM Tr. at 68.

On July 13, 2000, Kevorkian and Waters wrote a confidential memorandum to the planning committee entitled "Immediate Decisions." *See* DX-19. "[W]e are concerned with the pace of our deliberations," they wrote. *Id.* "Specific actions are required throughout the next 45 days to ensure we continue in a coordinated fashion." *Id.* They asked the committee to complete the vision statements discussed during the May meeting, approve a draft job description for the Project Coordinator staff position, hear presentations from project management firms, and form a capital campaign subcommittee. *Id.* In light of the anticipated costs of hiring professionals, the outstanding promissory note of $500,000 to CFF, and an account balance of $155,000, Kevorkian and Waters wrote that "our cash position becomes paramount." *Id.* They proposed that the committee hold a two-day meeting during August to discuss these issues. *Id.*[12]

Without dedicated staff to shepherd the project along, the pace of the project remained deliberate. By the end of 2000, the Assembly had agreed to employ a full-time staffer. Ross

---

[11] Hovnanian testified that he did not recall this. 11/9 AM Tr. at 120.

[12] When asked about this memorandum during trial, Hovnanian testified that he did not know who Tom Kevorkian was and that he did not know what the planning committee was, saying "It's Greek to me." 11/9 AM Tr. at 126-27. As noted above, Tom Kevorkian was the Assembly's Chief Operating Officer at the time.

Vartian, the Assembly's long-serving Executive Director, volunteered for the position, and on January 3, 2001, he became the Director of Planning for the museum project. Stip. Facts ¶ 41; 11/19 PM Tr. at 79. Vartian believed that his working relationships with the key stakeholders could help the planning committee build consensus. *Id.* at 79-80. In his new position, Vartian began consulting widely within the Armenian community of professionals and within the community of museum experts in Washington to acquire as much information as possible about the museum planning process. *Id.* at 80. On January 10, 2001, Vartian drafted a memorandum outlining an agenda and a set of goals for the museum project to achieve in the first quarter of 2001. *See* PX-344. This document was sent to Hirair Hovnanian's daughter Edele, who was chairing an advisory committee of professionals consulting on the museum project.[13] *See id.* Vartian noted that there was not yet any consensus from the planning committee on how to proceed with the selection of professional consultants and contractors. *Id.* Vartian also indicated that there had been a discussion by the planning committee about potentially hiring a "name" architect to draw attention to the project, but Cafesjian had expressed concerns about the added costs and other potential negatives such as the loss of creative control over the project. *Id.*[14] Vartian indicated that this issue needed to be resolved as soon as possible in order to stay on the project timeline, which at this point called for the museum to be opened in April 2004. *Id.* Vartian's memorandum also indicated that there were estimated expenses for 2001 of at least $225,000 (excluding any further obligations), yet there were no unobligated funds to cover pre-

[13] Unless otherwise noted, all references to "Hovnanian" are to Hirair Hovnanian.

[14] The Court notes that there is other evidence in the record suggesting that Cafesjian supported the hiring of a "name" architect. *See* 11/16 AM Tr. at 49-50; DX-623N. The committee ultimately decided not to follow this approach.

construction operating costs, and the Assembly's promissory note to CFF was still outstanding. *Id.*

After a few months of consulting with experts and other professionals who gave him free advice, Ross Vartian prepared an executive summary to be presented to the museum advisory committee on March 3, 2001. *See* DX-22. Vartian had drafted a preliminary mission statement for the museum project and assembled various cost estimates for the building. *Id.* At this point, it was assumed that the Bank Building would be co-developed with the three adjacent properties acquired by Cafesjian. *See id.* Vartian proposed an "aggressive" timeline with a museum opening date in April 2004. *Id.* The advisory committee did not believe that an April 2004 opening was feasible. *See* PX-125.

Vartian revised the timeline to reflect an April 2006 opening and forwarded a summary of his materials to the planning committee in advance of their combined meeting with the ANI Board of Governors in Boca Raton, Florida on March 16, 2001. *See* PX-125. Vartian indicated in his summary that he believed the project would require at least $32 million to prepare for the opening and an additional $40 million endowment to fund operations. *Id.* Based on the advice he had received from other experts and consultants, Vartian believed that it would be easier to use the earnings on an endowment to fund operating costs than to rely directly on donations. 11/19 PM Tr. at 85-86. At the planning committee meeting, Vartian's presentation was cut short when Hirair Hovnanian saw the cost estimates. *Id.* at 88-89. Hovnanian thought these figures were far too high and believed that the upper limit for the project should be closer to $15 million. *Id.*; 11/23 AM Tr. at 47-48. According to Waters, Hovnanian criticized Vartian and his daughter Edele for the budget, and Edele left the meeting upset, ending the discussion. 11/23 AM Tr. at

47-48.  There was also discussion at this meeting about the process of choosing an architect to design the new buildings to be attached to the Bank Building.  11/19 PM Tr. at 86-87.  Hirair Hovnanian had been told by one large charitable foundation that it might be willing to make a significant donation to the project if a "name" architect like Frank Gehry could be attracted to the project.  *See* PX-125.  The planning committee, including Ross Vartian, was in favor of this idea because the planning committee members believed that the project would be more marketable.  11/19 PM Tr. at 86-87.  The committee also discussed the issue of how to allocate space in the Bank Building and the new construction on the Adjacent Properties among the museum, memorial, art museum, and offices for ANI and the Assembly.  *See* DX-25.  However, the committee did not reach any agreements about the allocation of space.  11/19 PM Tr. at 89-90.

The following week, Ross Vartian wrote a memorandum to Edele Hovnanian.  "By any measure," he wrote, "the ANI Board of Governors/AGMM Planning Committee meeting was a disappointment."  DX-26.  Vartian said he had not anticipated some of the negative reactions to the information he had prepared.  *Id.*  Vartian was disappointed because the committee's inability to reach agreement on major issues meant that progress would be delayed.  11/19 PM Tr. at 90.  Vartian indicated that the project needed a feasibility study conducted to determine the options for developing the space available.  DX-26.  Vartian was also concerned about the lack of agreement over the role ANI should play in developing the museum.  *Id.*

Following the meeting, Vartian worked on a proposal to seek expert opinion on space utilization options, refine the budget for 2001, and propose a scope of work to define an exhibit storyline.  *See* DX-28.  Vartian spoke with John Waters about allocating space in the Adjacent Properties, but Waters indicated that Cafesjian's plans for them were too tentative at that point to

make any definitive decisions. DX-26. In early April, Ross Vartian, Rouben Adalian, and John Waters met with four firms that were invited to submit proposals for a space utilization/feasibility study: (1) Martinez & Johnson, an architecture firm that had prior familiarity with the Bank Building, (2) Leo Daly, another architecture firm, (3) Gallagher & Associates, an exhibit design firm, and (4) Concord Partners, a property development firm. *See* DX-28. In a memorandum to the planning committee dated April 9, 2001, Vartian wrote that during the next four months, he expected to, *inter alia*: (1) have a space utilization/feasibility study on the best development option for the properties acquired by the Assembly and Cafesjian; (2) obtain approvals for the scope of work for ANI; and (3) obtain approvals for the initial major donor campaign and the first round of community outreach. *See* DX-28.

On or about May 22, 2001, Edele Hovnanian resigned all of her positions with the Assembly, including her role as Assembly Treasurer and chair of the advisory committee. "I don't know if this letter will shock you or not," she wrote, "but I have been thinking about something for a very long time and now feel strongly that it is the right time to announce it." DX-29. Addressing the aging leadership of the Assembly, she wrote, "I believe the Assembly no longer is the progressive, forward thinking, dynamic organization is [sic] was for so long and that it is being held together by the talent and dedication of you all and that its future, without you, is destined toward a slow demise." *Id.* She criticized the Assembly for failing to transition the organization to the leadership of a new generation and indicated that the Assembly would have to change before she could return. *Id.* She added that "[a]s far as the museum [is concerned], I think this brief experience really just highlighted the internal problems we have and at this point see no value I can add in ensuring this project is successful." *Id.* Edele Hovnanian ultimately did

become active again in the Assembly, but the record does not reflect precisely when this occurred, and she did not have an active role in museum affairs going forward.[15] 11/19 PM Tr. at 92. Ross Vartian was disappointed by Edele Hovnanian's resignation, as was John Waters. *Id.* at 91; 11/23 AM Tr. at 49. Vartian agreed with her assessment of the Assembly and the museum project. 11/19 PM Tr. at 92. From this point forward, Waters became more heavily involved in the planning committee. 11/22 AM Tr. at 82.

On June 25, 2001, Ross Vartian sent a memorandum to the planning committee entitled "Action Items." *See* DX-30A. The memorandum outlined nine issues that needed review and action by the committee, including decisions about the structure of the project, the space utilization/feasibility study, the scope of ANI's work, the revised budget, the hiring of professionals, and fundraising. *Id.* Vartian described this memorandum as "an example of rethinking the project, working on what was doable and presenting it to the members of the Museum Planning Committee." 11/19 PM Tr. at 93. Vartian proposed streamlining the structure by eliminating the advisory committee and bringing the key decision-makers under one group so that decisions could be made more expeditiously. *Id.* at 94; DX-30A.

A few days later, Vartian emailed Robert Kaloosdian about dedicating part of the museum to other 20th century genocides and genocide prevention in the 21st century. *See* DX-31. Vartian thought this would be a "public relations bonanza," and he cited it as a reason to push for "the maximum physical footprint as we consider development options." *Id.* Vartian forwarded this email to Waters, writing, "I am trying to use every opportunity to enlarge the

---

[15] Somewhat remarkably, Hirair Hovnanian testified that he did not recall his daughter serving on any advisory committee or resigning from the Assembly. 11/9 AM Tr. at 13-14, 17, 22.

vision of the AGMM." *Id.*

The next planning committee discussion occurred in the context of a meeting of the Consultative Group, a high-level body within the Assembly, on June 27, 2001. *See* DX-32 at 1.[16] Hovnanian, Kaloosdian, and Krikorian were in attendance, along with several other Assembly members; staff did not participate. *Id.* Cafesjian and Waters participated in the discussion by phone because they were not members of the Consultative Group and thus not privy to the rest of the discussions about Assembly business. *Id.*; 11/15 AM Tr. at 74-76. This was the source of some tension between Cafesjian and Hovnanian because Cafesjian wanted to become more active in the Assembly's affairs but was not yet part of the leadership, and Hovnanian made a comment during the meeting that Cafesjian should have attended in person. 11/15 AM Tr. at 74-76; DX-32 at 3.

During the meeting, they discussed the space allocation issues between the Adjacent Properties and the Bank Building, such as a joint entrance between what at that point was to be the Cafesjian art museum and the Bank Building. DX-32 at 2-4. Cafesjian thought that a joint entrance was critical to the success of both and that they should be viewed as a single project with two separate users with common interests. *Id.* at 3. Waters indicated that Cafesjian had already initiated a competition for architects for the Cafesjian art museum. *Id.* Hovnanian felt that uncertainty about the Cafesjian art museum plans was holding up progress on the genocide museum, saying "without a footprint from G[erry] Cafesjian, we are stymied on how to proceed." *Id.* Waters said that Cafesjian's vision for the project had grown and that he was concerned

---

[16] Because many exhibits are not paginated (and many others are paginated only by lengthy Bates numbers), all page references for exhibits shall be to the sequential pages of the document (i.e., "1" for the first page, "2" for the second page, etc.).

about making the genocide museum as relevant as possible. *Id.* at 3. This statement may have caused some tension; the minutes indicate that Cafesjian and Waters were "trying to avoid an 'us' versus 'them' mentality." *Id.* at 3-4. Hovnanian indicated that they could not move forward until they knew how the common entrance was to be utilized and said that the "ball is in Cafesjian's court." *Id.* at 4. After Cafesjian and Waters hung up the phone, the others continued their discussion. *See id.* One of the attendees, Carolyn Mugar, questioned the idea of a "joint project" and noted that there was no relationship between the Cafesjian art museum and the genocide museum. *Id.* The group agreed that it should be considered a cooperative project, not a joint project. *Id.* Hovnanian commented that he "want[ed Cafesjian] to be close." *Id.* The group also agreed that a development plan was needed, but there was no agreement on whether to proceed with a development plan before hiring architects and designers. *Id.*

Shortly after this meeting, Cafesjian decided that he would build his art museum in the Armenian capital of Yerevan rather than on the Adjacent Properties. Cafesjian and Waters discussed the issue and agreed to donate the Adjacent Properties to be used for the genocide museum project. 11/23 AM Tr. at 53-54. Waters discussed this decision informally with Ross Vartian, but no official proposal was made to the Assembly until October 15, 2001, when Cafesjian wrote a letter to Hovnanian outlining the terms of a proposed grant of the three properties that had been acquired. *Id.* at 54; PX-327. This letter was the first in a series of draft grant agreements that would ultimately be exchanged between Cafesjian and the Assembly. The letter proposed that Cafesjian and/or CFF donate $5.8 million to the Assembly to purchase the properties from TomKat. *See* PX-327 at 2-3. The proposed grant agreement would require the Assembly to use the properties solely as part of the genocide museum project, subject to plans

approved by the Assembly's planning committee. *Id.* at 3. The letter also proposed that if the Assembly failed to develop the property according to those plans, CFF would be entitled to a return of either the grant funds or the properties. *Id.* The letter also proposed a number of conditions on the grant, including relief from several other financial pledges made by CFF, as well as the reissuance of the $500,000 promissory note to CFF that had been executed on March 17, 2000. *Id.* at 3-4. Following the draft grant agreement language, Cafesjian wrote:

> We need to keep this entire project moving forward. Our efforts to date have been less than adequate. Every time I think about the time value of money invested in this project, the incomprehensible daily waste of the money saddens me. We simply cannot afford to keep throwing it away. I think we should move immediately to retain the services of the various consultants recommended by John [Waters] and Ross [Vartian]. The professionals at Concord Partners, Martinez & Johnson, etc., have the expertise that should be able to help us move this project forward.

*Id.* at 5. Cafesjian also recommended hiring someone with museum experience to serve as director for the museum project. *Id.* at 5-6. He noted that Ross Vartian had worked hard, but everyone's lack of experience in museum planning had hindered the Assembly's ability to make progress. *Id.* Cafesjian explained at trial that he was frustrated with the lack of progress that had been made and that he wanted to see the genocide museum built during his lifetime. 11/18 PM Tr. at 48.

Cafesjian's proposal was generally well received at the Assembly, although the Assembly never responded in writing to Cafesjian's letter. *See* 11/19 PM Tr. at 99; PX-19 at 4. Ross Vartian testified that he was delighted that the genocide museum would be getting three additional properties to expand and fulfill a greater vision. 11/19 PM Tr. at 99. However, there was no meaningful progress throughout the rest of 2001. In a memorandum to Robert Kaloosdian and Rouben Adalian dated December 18, 2001, Ross Vartian wrote that "[i]n

essence, 2001 has been lost time which must be more than made up in 2002." DX-34 at 1.

Vartian felt that the lack of progress could be attributed to six different factors: (1) ambiguity

over the footprint for the museum site and the entities that would occupy it; (2) lack of agreement

by the planning committee on budget, footprint, and how to proceed; (3) changes in leadership on

the planning committee, with Edele Hovnanian's resignation and Kaloosdian's increased

involvement; (4) lack of finances; (5) failure to implement a community outreach campaign; and

(6) Vartian's increasing Assembly responsibilities taking up more time. *Id.* at 1-3.

On January 8, 2002, a few select members of the Assembly's Board of Trustees met in

Miami to discuss several issues of concern to Cafesjian. *See* PX-308. One of those issues was

the Turkish Armenian Reconciliation Commission ("TARC"), an effort at reconciling

contentious issues of dispute between Turkey and Armenia such as the Armenian Genocide and

other contemporary issues. *See id.*; 11/19 PM Tr. at 101. TARC was controversial within the

Armenian community, and the Assembly supported it notwithstanding objections from a number

of its members. Hovnanian and Krikorian were the strongest supporters of TARC, whereas

Cafesjian was highly critical of it. 11/19 PM Tr. at 101; 11/18 PM Tr. at 49-50. During the

meeting, Hovnanian expressed regrets on behalf of the Assembly that Cafesjian did not have an

opportunity to express his objections before the Assembly supported it. 11/18 PM Tr. at 50; PX-

308 at 1.

The museum project was also discussed extensively at the meeting. Cafesjian expressed

his concerns regarding the progress over the past two years. *See* PX-308 at 2. Cafesjian also

discussed his belief that the museum should be a "signature building" in Washington, D.C. and

indicated that he thought the funding requirements could increase substantially to between $50

and $100 million.  *Id.*  Cafesjian explained at trial that he thought the Bank Building alone, as a repository for books and pictures, lacked the "emotional factor" that would be critical to attract public interest.  11/18 PM Tr. at 52.  After some discussion, the Assembly Board agreed to proceed with a proposal put forward by Waters and Vartian to commission Concord Partners to conduct a space utilization/feasibility study.  *See* PX-308 at 2.  There were also serious discussions about how best to structure the management and operation of the museum.  Ross Vartian and John Waters were tasked with analyzing the options for a formal structure and by-laws for the project.  *See* DX-39.  On February 28, 2002, Vartian and Waters drafted a confidential memorandum to Cafesjian and Hovnanian discussing three possible options: (1) formalizing the museum as a subsidiary of the Assembly; (2) making the museum a component of ANI; and (3) establishing the museum as an independent entity.  *See* DX-39.  They recommended that the museum continue to be a subsidiary of the Assembly until the opening of the museum, after which they believed it should be spun off as an independent entity.  *Id.*

Following the meeting in Miami, Ross Vartian contacted Concord Partners to solicit a revised proposal for the space utilization/feasibility study.  *See* PX-17 at 1.  Much had changed since Concord Partners submitted its proposal back in April 2001, and Vartian wanted to ensure that the project team, which included architects Martinez & Johnson and exhibit design firm Gallagher & Associates, was adequately prepared.  As a property developer, Concord Partners had the expertise necessary to coordinate the development of the properties.  *See* 11/22 PM Tr. at 17-18.  Martinez & Johnson was an architecture firm which had created a design for the Bank Building in 1998 for a client that was interested in using the property for its headquarters.  11/12 PM Tr. 58-59.  Gallagher & Associates was a museum planning and design firm with a long list

of illustrious clients such as the Smithsonian Institution and the National Archives.  11/12 PM

Tr. at 7-8.  On February 4, 2002, Vartian sent Concord Partners a project description explaining

that the project consisted of the Bank Building and the three adjacent properties donated by

Cafesjian; Vartian also noted that Cafesjian was considering the acquisition of a fourth adjacent

property at 1334-36 G Street.  *See* PX-17 at 2.  Vartian further explained that they planned to

clear the adjacent properties after the leases had expired and build a new structure with up to

80,000 square feet of space.  *Id.* at 2.  It was anticipated that the memorial would be housed

within the new construction and occupy between 1000 and 1500 square feet.  *Id.* at 3.  The

Concord team prepared and submitted a feasibility study proposal in late February 2002.  Stip.

Facts ¶ 46.

On March 16, 2002, the Assembly Board of Trustees held its annual meeting in Boca

Raton, Florida.  Hovnanian began the meeting by acknowledging that the past six or seven

months had been a very difficult time for the Assembly due to controversy over the TARC issue,

among other things.  *See* DX-40 at 1.  After a discussion of other Assembly business, Robert

Kaloosdian and Rouben Adalian gave a report on the status of ANI.  *See id.* at 3-4.  Edele

Hovnanian, who by this point had returned to the Assembly as Treasurer, reported that the

Assembly was depleting its cash reserves and the principal in its endowment.  *Id.* at 4.  After

lunch, Ross Vartian gave a report on the progress of the museum project.  *Id.* at 5; DX-41.

Vartian told the crowd that "all of the museum experts advise that it takes 5 to 7 years to create a

museum from scratch" and that "the clock is ticking."  DX-41 at 6.  Vartian announced for the

first time to those not on the museum planning committee that Cafesjian had agreed to donate the

Adjacent Properties for the museum project.  *See id.* at 3-4.  He also announced that the

Assembly, together with ANI and CFF, intended to create an independent entity to oversee the museum project "as soon as it is prudent and responsible to do so." *Id.* at 4. The primary reason for creating an independent entity was community buy-in, to ensure that donors from all Armenian advocacy organizations would be willing to contribute and not see the museum as an Assembly-focused project. 11/22 AM Tr. at 19. In light of the controversy surrounding the TARC issue, there were concerns that the Assembly could not raise the funds on its own to cover the cost of the museum. 11/15 AM Tr. at 104-05. In addition, the museum planning committee began to realize that the museum project would overwhelm the Assembly in size and scope and detract from the Assembly's core mission. *Id.* Waters testified that one other concern animating the need for an independent entity was the museum planning committee's inability to make binding decisions and get funding and authorization from the Assembly. 11/15 AM Tr. at 89-90.

In addition to the establishment of an independent entity, several other agreements were reached during the discussions in Boca Raton. It was agreed that CFF would donate the Adjacent Properties to the museum, with conditions, and the Assembly would donate the Bank Building and adjacent vacant lot, with conditions. *See* PX-19 at 2. It was further agreed that CFF and the Assembly would combine their conditions with prior gifting commitments, which the newly-formed independent entity would be obliged to honor. *Id.* CFF and the Assembly agreed to jointly design and approve the governing documents for the new entity, and that CFF, the Assembly, and ANI would each be represented on all levels of governance for the new entity. *Id.* Following the meeting, Ross Vartian outlined these agreements, along with a list of unresolved issues that remained outstanding. *See id.* Among the unresolved issues were the status of ANI, the budget for 2002, and selection of an experienced museum director. *Id.* at 3-4.

It was also agreed during the Boca Raton meeting that the museum planning committee would not proceed with the space utilization/feasibility study as planned. *See* PX-19 at 3. Instead, the parties agreed to hire Concord Partners to select an architect and exhibit design firm through a request for qualifications (RFQ) process. *Id.*[17] There were tradeoffs involved with this decision: a feasibility study could give greater definition for the project and help with budget and fundraising planning, but selecting an architect first would allow the planning to be tailored to the chosen architect. 11/22 AM Tr. at 20. Concord Partners told Ross Vartian that the RFQ process—including solicitation of candidates, requesting proposals from finalists, and final selection—would take approximately four months, with an additional six months needed thereafter to conduct a site study. *See* PX-352.

The museum planning committee held its next meeting in Naples, Florida on May 2, 2002. *See* DX-49. The meeting focused primarily on analyzing the consequences of the decisions made at the Assembly's meeting in March. It was agreed that the Armenian Genocide Museum & Memorial would be incorporated as a 501(c)(3) organization as soon as it was possible to do so responsibly and sustainably. *See id.* at 2. It was further agreed that the Assembly offices would not be housed within any portion of the museum complex. *Id.* at 3. This decision was made in part to keep the museum independent from any advocacy organization and in part because it was thought that there would not be adequate space in the complex for the Assembly. 11/22 AM Tr. at 22-23. To ensure that the Assembly would get sufficient credit for launching the museum (and to combat the perception that the Assembly was abandoning the

---

[17] Although Martinez & Johnson had previously been engaged to consult on architectural issues, Cafesjian did not think that the functional designs they had proposed were adequate to live up to his vision for the project. 11/19 AM Tr. at 121-22.

project), Cafesjian and Hovnanian agreed to channel their contributions through the Assembly. *Id.* at 23-24; DX-49 at 3. The committee agreed to hire a museum director by August 1, 2002 to replace Ross Vartian, who was planning to retire and return to Michigan. DX-49 at 3. However, no director was hired, at least in part for budgetary reasons. 11/22 AM Tr. at 24-25. In fact, the museum project was having significant cash flow problems, and Cafesjian agreed after the Naples meeting to advance funds necessary to complete the work that was scheduled for 2002. DX-49 at 4. Ross Vartian testified that this was a constant problem because the museum project was asset-rich but cash-poor. 11/22 AM Tr. at 25.

Progress was being made, but the pace was deliberate. Robert Kaloosdian warned Ross Vartian that he should not take major action until the parties had reached a "comprehensive agreement," which Vartian understood to mean formalization of the gifting conditions for the Assembly and CFF, agreement on the status of ANI, and a set of by-laws and articles of incorporation for the new entity. *See* DX-56. The new entity would ultimately become the Armenian Genocide Museum & Memorial, Inc. ("AGM&M").[18]

The museum planning committee met again in New York on August 22, 2002. *See* DX-58. It was agreed that AGM&M should be overseen by a committee of major donors who agree to make a minimum contribution (somewhere between $1 and $15 million), each of whom would have a veto over "major decisions." *See id.* at 1; 11/22 PM Tr. at 97-98. CFF also provided a revised draft grant agreement letter, which was discussed at length during the meeting. *See* DX-58 at 1; 11/18 AM Tr. at 29; Krikorian Dep. Tr. at 114. Like the previous draft grant agreement

---

[18] For the sake of clarity, the Court shall use the term "AGM&M" to refer only to the corporation that is a party to this litigation, not to the museum project more generally.

sent in October 2001, it contained a reversion clause stating that if the three adjacent properties were not developed in accordance with a plan approved by the AGM&M (with the necessary approval of CFF), CFF would be entitled to a return of either the adjacent properties or the funds used to purchase them. *See* DX-59 at 4. There was some discussion at the meeting that such an open-ended reversion clause would not be appropriate. *See* 11/22 PM Tr. at 99. The committee also discussed the architect selection process and the status of ANI in relation to AGM&M. DX-58 at 1-2.

John Waters and Ross Vartian proceeded to work with Concord Partners on the RFQ process. Jeffrey Arnold, co-owner of Concord Partners, testified that he worked primarily with Waters and Vartian during this period. *See* 11/22 PM Tr. at 18. Kaloosdian was concerned that decisions about the RFQ process were being made without total agreement from the planning committee. *See* PX-27. On October 8, 2002, Cafesjian, Waters, Adalian, and several professionals held a conference call with Concord Partners to discuss the RFQ and make decisions about the architect selection process. *See* PX-29. Based on Concord Partners's recommendations, they decided to send the RFQ to top-tier architects identified by Concord and all interested Armenian architects. *Id.* They also revised the RFQ documents to better reflect the mission statement for the museum and agreed to forward them to the full museum planning committee for approval. *Id.*

Around this same time, several members of the museum planning committee began to meet with Gallagher & Associates to discuss exhibit design and content. Although there is some evidence in the record that the Assembly planned to select an exhibit design firm through an RFQ process, it appears that Gallagher & Associates was chosen fairly early in the process

without competition from other firms. Patrick Gallagher, the principal of Gallagher & Associates, worked primarily with Rouben Adalian in developing plans for the content of the museum. 11/12 PM Tr. at 10. Gallagher & Associates was tasked with creating a conceptual master plan for the museum that identified a storyline and described the functional requirements for the museum, such as office and storage space, archives, libraries, etc. *Id.* at 11. The purpose of this work was to create a plan that could be used to engage an architect to design the building for the museum. *Id.* A brainstorming meeting was held on October 28, 2002, with representatives from Concord Partners, Gallagher & Associates, and several members of the planning committee, including Kaloosdian, Adalian, Vartian, and Waters. *See* PX-31 at 20-26.[19]

On October 19, 2002, the Assembly held its annual gala meeting for its members in Philadelphia. *See* DX-305. The Assembly honored Cafesjian for his donations to the Assembly, his multi-million-dollar investments in Armenia through CFF, and his generosity toward the museum project. *See id.* Speaking at the meeting, Hovnanian called Cafesjian a "trusted colleague" and a "dear friend" who believes that "time is a precious commodity that cannot be wasted." *Id.* Cafesjian did not appear in person to receive the honors but instead prepared a biographical video narrated by Waters that described Cafesjian's Armenian advocacy efforts and expressed his appreciation to the Assembly. *See id.*

A week later, on October 25, 2002, the museum planning committee convened a meeting in New York. *See* DX-67; 11/10 PM Tr. at 4. Attendees included Hovnanian, Kaloosdian,

---

[19] Although Patrick Gallagher testified that he did not begin working on the museum project until 2003, *see* 11/12 PM Tr. at 11, 24, the record shows that there were substantive meetings involving Gallagher & Associates in the fall of 2002, with initial sketches prepared as early as August 2002. *See* PX-31; PX-61; 11/12 PM Tr. at 46-47.

Adalian, Krikorian, Vartian, Waters, Carolyn Mugar, and Peter Vosbikian, a life trustee who also served as Chairman of the Assembly's Board of Directors in 2002 and 2003. *See* DX-67 at 1. The meeting began with an extensive discussion of finances for the project. *Id.* Hovnanian expressed his concern that they would be unable to raise enough money to fund a project with a $100 million budget, and he raised the possibility of phasing in the project, with later expansion tied to better economic circumstances. *Id.* Hovnanian also reaffirmed his pledge of $5 million to the project but expressed disappointment that his recent $200,000 donation had been spent on architect selection efforts and other expenses. *Id.* Others also expressed concerns about the operating deficit. *Id.* Vartian, who by this time had relocated to Michigan but continued to work on the project, did not share Hovnanian's concerns about fundraising. 11/22 AM Tr. at 27. Waters told the committee that Cafesjian was optimistic that the funds could be raised from the community and that, if necessary, Cafesjian was prepared to donate $50-75 million to ensure that the project was completed.[20] DX-67 at 1; DX-68 at 2. The rest of the committee was elated to hear this news; Kaloosdian testified that "it was like a message from heaven." 11/10 PM Tr. at 7. Based on this reaction, Waters feared that he had overpromised and that the rest of the members of the committee would assume they were relieved of any further obligations to bring funds into the project. 11/15 AM Tr. at 95. According to one draft summary of the meeting, "[a]ll felt that G. Cafesjian's commitment, characterized as a 'safety net,' alleviated the fiscal concerns." DX-67 at 2. Everyone agreed that the safety net should be kept confidential so as not to deter

---

[20] Waters denies that he gave the figure $50-75 million, contending that he only stated that Cafesjian would contribute "some additional funds." *See* 11/15 AM Tr. at 93-96. However, those numbers appear in two separate written accounts of the meeting, which the Court finds more credible than Waters's testimony. *See* DX-67 at 1; DX-68 at 2.

fundraising.  *Id.*  During a break in the meeting, Waters telephoned Cafesjian to convey his fear, and Cafesjian instructed Waters to clarify that he was not making any firm commitment or guarantee.  11/15 AM Tr. at 100.  Waters then told the committee that Cafesjian was confident that the community could raise the full amount of funds required to support the project and that if there were shortfalls, Cafesjian was prepared to donate additional funds.  *Id.* at 101-02; DX-67 at 3.

During the meeting, Waters commented on the slow pace of the project.  *See* DX-67 at 2. Kaloosdian called for a "comprehensive understanding" on all major aspects of the initiative before launching any significant element.  *Id.*; 11/15 AM Tr. at 30-31.  Vartian testified that he believed Kaloosdian's emphasis on consensus decision-making prolonged the planning process. 11/22 AM Tr. at 30-31.  The museum planning committee ultimately reached a series of agreements during the meeting.  It was agreed that the Board of Trustees for AGM&M should consist of $5 million donors, making an exception for Anoush Mathevosian based on her founding efforts, with decisions made by consensus.  DX-67 at 2-3; DX-68 at 1.  It was further agreed that a single professional museum director be appointed and empowered to drive the project forward.  DX-67 at 2; DX-68 at 1.  The committee also approved the RFQ.  DX-67 at 2; DX-68 at 1.  There was still no agreement about the future status of ANI.  DX-67 at 2-3.

Concord Partners sent the RFQ to a group of selected architects on November 15, 2002. *See* PX-31 at 28-35; PX-25; PX-26.  The timeline called for responses to be submitted to Concord Partners by December 13, 2003, a short list of architects to be chosen to interview in late January 2003, a design competition to be held among the finalists with presentations in mid-April 2003, and final selection to be made by May 2003.  *See* PX-31 at 31.  It was anticipated

that as many as five firms would participate in the design competition, with each firm receiving $30,000 compensation for their design. *Id.* The RFQ described the project as consisting of the Bank Building and a new building on the Adjacent Properties[21] of approximately 60,000 square feet, with a total estimated project cost of $76 million. *Id.* at 30. Concord received between thirty and thirty-five responses to the RFQ. 11/22 PM Tr. at 23. Among the responses received was an unsolicited proposal from a young Armenian American architect named Edgar Papazian. *See* PX-215. After the responses were received, the RFQ process "died on the vine." 11/23 AM Tr. at 56; 11/22 PM Tr. at 24-25. Waters testified that this was due to a lack of finances and a lack of agreement by the committee on how to select an architect. 11/23 AM Tr. at 56. In an internal memorandum dated May 6, 2004, Concord Partners attributed the delay in selecting an architect to several factors, including the acquisition of the Adjacent Properties, the lack of a single decision-maker to shepherd the process, and indecision about whether to recruit a "name" architect. *See* PX-35 at 4.

On January 16, 2003, Assembly Treasurer Gail O'Reilly sent a memorandum to the executive committee of the Assembly Board of Trustees regarding operational spending for the museum project. *See* DX-75. Her memorandum indicated that the Assembly had received a total of $7,239,835.49 in unrestricted donations for the museum, plus the $500,000 loan from Cafesjian, and there was an additional $519,966 in restricted funds. *Id.* at 1. As of November 2002, the Assembly had spent $7,918,865.12, exhausting the unrestricted funds, the entirety of the loan from Cafesjian, and $179,030.03 of the restricted funds. *Id.* The memorandum does not

---

[21] Although it had not yet been acquired, it was contemplated at this time that the Families U.S.A. building would be added to the footprint. *See* PX-31 at 33.

indicate the nature of the restrictions on the funds, but it states that "[i]n the past the assumption has been made that the purposes for which these restricted funds have been donated, as well as the loan, will be fulfilled with future operating receipts." *Id.* O'Reilly wrote, "What I need from the EC [Executive Committee] of the BOT [Board of Trustees] is a 'yes' vote to continue to spend down the restricted funds to '0' or a 'no' vote to stop the practice immediately." *Id.*[22] The record does not reflect what action was taken with respect to this request.

On January 21, 2003, Peter Vosbikian sent a memorandum to Cafesjian, Hovnanian, and Carolyn Mugar entitled "Time for Action." *See* DX-77. "I believe the Armenian Assembly of America has reached a point of crisis," he wrote. *Id.* at 1. "I further believe that the downward spiral that we are faced with began March of 2000 when we announced our AGM&M initiative. Although the news of this great new project was exhilarating, it resulted in certain decisions that have negatively impacted our organization." *Id.* Vosbikian felt that Ross Vartian's departure from the position of Executive Director to become the planning director for the museum project had left the Assembly as a "rudderless ship." *Id.* Vosbikian proposed bringing Vartian back as Executive Director for the Assembly with the understanding that he would mentor and train his replacement. *Id.* He also stated his belief that the failure to bring the museum to market, combined with the TARC fiasco, had damaged the Assembly's position as a leading advocacy organization. *Id.* He urged the Assembly to act quickly to spin off AGM&M and ANI. *Id.* at 2. Ultimately, Vartian reached an agreement with Vosbikian that he would come back to the

---

[22] Gail O'Reilly testified that she did not recall this memorandum or asking the Board of Trustees about spending restricted funds for the museum. 11/10 AM Tr. at 126-27. She testified that the Assembly's staff likely prepared the language in this memorandum and that O'Reilly would have approved it. *Id.* at 123-24. The Court finds that the memorandum is credible evidence of the state of the finances of the museum in early 2003.

Executive Director position for two years, with one year devoted to getting the Assembly back on track, and the second year focusing on mentoring the Assembly's future Executive Director. 11/22 AM Tr. at 33-35.

On January 22, 2003, CFF sent a revised draft grant letter to the Assembly for review. *See* DX-78. As with the previous drafts, the letter contained a reversion clause, but this time it contained a triggering date: if the three donated adjacent properties were not developed according to plans approved by AGM&M by December 31, 2008, then those properties (or the cash used to acquire them) would revert to CFF. *See id.* at 2. The letter also provided that a new $500,000 promissory note would be issued to CFF by the Assembly to replace the previous one, and that the obligation may be transferred to AGM&M. *Id.* at 3. The letter proposed that decisions of the AGM&M Board of Trustees be decided by an 80% affirmative vote. *Id.* at 5. This draft letter was discussed at a meeting in Delray, Florida, where Hovnanian, Vartian, Kaloosdian, and Adalian were present. 11/22 PM Tr. at 106-07. Hovnanian suggested a series of changes to the agreement, including making the transfer of the promissory note to AGM&M mandatory. *See* DX-80 at 1. He also suggested changing the 80% vote requirement to a unanimity requirement. *Id.* at 2.

In February 2003, Gallagher & Associates completed its Draft Museum Program. *See* PX-31. This document contained an outline of themes for the exhibits and described the basic requirements for the museum's operations. The program called for approximately 25,000 square feet of exhibit space, with a total of 89,000 square feet for the museum, including underground parking. *Id.*; 11/12 PM Tr. at 13, 41, 48. Rouben Adalian helped prepare the Draft Museum Program. *See* 11/15 PM Tr. at 94. Adalian presented the program to the ANI Board of

43

Governors at a meeting on February 27, 2003. *See* PX-31 at 39; 11/16 AM Tr. at 39. When

Hovnanian saw the program, he became upset that he was not consulted about it. 11/16 AM Tr.

at 35, 39-41. Hovnanian also criticized ANI's performance and the pace with which it had

accomplished its objectives. 11/16 AM Tr. at 42-43; DX-623N at 6. Gallagher & Associates did

not perform any further work for the project after the Draft Museum Program was completed.

11/12 PM Tr. at 24.

The Assembly Board of Trustees held another annual meeting in Boca Raton on March 1,

2003. *See* DX-82. By the time of this meeting, everyone agreed that AGM&M should be

launched as an independent entity with a budget of around $100 million and a new building

constructed on the three adjacent properties to be donated by Cafesjian. *See id.* at 1-2.

Hovnanian announced this decision to the attendees at the meeting, approximately a hundred

people. *See id.*; 11/24 AM Tr. at 37. The reaction to this announcement was uniformly positive,

and Vartian felt that this was a significant milestone after years of intense deliberations. 11/22

AM Tr. at 37, 94. Vartian delivered a report in his renewed role of Executive Director. *See* DX-

82 at 4. Kaloosdian and Adalian each gave reports on the work that had been performed by ANI,

and it was announced that ANI would be transferred to the control of AGM&M. *Id.* at 5-6.

Ultimately, it was agreed that ANI would retain its status as an independent 501(c)(3)

organization, but that it would become a subsidiary of the new museum entity. 11/22 AM Tr. at

21. John Waters, who was now the primary staff person working on the museum project,

delivered a report on the status of the museum. DX-82 at 9. Waters briefly described the history

of the project and expressed his appreciation for the hard work of those involved, saying, "I am

happy at how well this project is moving along and moving forward." *Id.* Those words were

mostly tactful; the truth was that Waters and Cafesjian were dismayed at the sluggishness with which the project had evolved over the previous three years.  11/15 AM Tr. at 52-53; 11/19 AM Tr. at 82.  At this point, however, it was clear that the project was entering a new phase.  While the details still had to be finalized, everyone was optimistic that the creation of AGM&M would finally enable the project to become a reality.

     E.     *Final Negotiation of the Grant Agreements and the Creation of AGM&M*

It took seven months following the March 2003 meeting to finalize the agreements and governing documents that would create AGM&M.  One reason for the delay was the acquisition of the fourth adjacent property, the Families U.S.A. building.  Through TomKat, Cafesjian entered into a purchase agreement to buy the property for $6.5 million on September 22, 2003.  DX-502N; Stip. Facts ¶ 52.  The closing date was scheduled for October 30, 2003.  DX-502N.

The draft grant agreement from Cafesjian continued to be discussed and negotiated.  Because Cafesjian had agreed to channel his donations to AGM&M through the Assembly, it was decided that Cafesjian would enter a grant agreement with the Assembly (hereinafter, the "Grant Agreement"), and the Assembly would transfer all of the museum-related assets and obligations to AGM&M in a separate agreement, to be known as the "Transfer Agreement."  The law firm of Caplin & Drysdale was hired to draft the Transfer Agreement as well as the organic documents for AGM&M, including the Articles of Incorporation, the By-Laws, and a Unanimous Written Consent agreement signed by all of the initial trustees of AGM&M.  11/23 AM Tr. at 12-13.

The record shows that the language in the Grant Agreement was reviewed by most of the major figures involved in AGM&M during the months leading up to its execution on November

1, 2003. On October 13, 2003, Waters emailed an updated draft of the Grant Agreement, which included the donation of the Families U.S.A. building, to Hovnanian, Vartian, Kaloosdian, and Vosbikian. *See* PX-330. The revised draft also included a new trigger date of December 31, 2010 for the reversion clause; it was felt that seven years was a reasonable timeline for the completion of the project. *See id.* at 3; 11/22 PM Tr. at 119. Because the Families U.S.A. building transaction was scheduled to close on October 30, Waters urged everyone to act quickly so that title to the building could be transferred directly to AGM&M, eliminating the need to transfer the property from TomKat to AGM&M and saving hundreds of thousands of dollars in transfer and recordation fees. *Id.* at 1; 11/22 PM Tr. at 117-18. On October 28, 2003, a conference call was held with, *inter alia*, Hovnanian, Cafesjian, Vosbikian, Kaloosdian, Waters, and Vartian to discuss the four key documents: the Grant Agreement, the Articles of Incorporation for AGM&M, the AGM&M By-Laws, and the Unanimous Written Consent agreement. *See* DX-94. During this meeting, Kaloosdian suggested that the language in the reversion clause in the Grant Agreement be clarified so as to avoid ambiguity about when the right of reversion might be triggered. *Id.* at 1-2. The final language of these documents was approved shortly after this conference call.

Kaloosdian testified, rather incredibly, that he did not recall being involved in any of these discussions relating to the Grant Agreement and that he was unaware of the document until years later. *See* 11/12 AM Tr. at 11-14, 21. Hovnanian also remarkably testified that he was not aware of the reversion clause in the Grant Agreement until years later and that he trusted Cafesjian so much that he did not read the agreements that were being made at the time. *See* 11/9 AM Tr. at 99. Similarly, Peter Vosbikian testified that he did not recall being involved in

46

the conference call discussing the Grant Agreement and that he signed the agreement on behalf of the Assembly without reading it. 11/15 PM Tr. at 79-80. It appears to the Court that these individuals' convenient lack of memory is an attempt (conscious or otherwise) to minimize their involvement in an agreement that turned out badly for the Assembly. It also appears, however, that despite their involvement in the process, these individuals did not take the time to fully understand the terms and conditions of the agreements.

The Articles of Incorporation for AGM&M were signed on October 29, 2003, and AGM&M officially became incorporated as a nonprofit corporation in the District of Columbia. *See* PX-121; Stip. Facts ¶ 53. The Articles of Incorporation and the By-Laws for AGM&M were ratified and adopted, respectively, pursuant to the Unanimous Written Consent agreement, which was executed on October 30, 2003. Stip. Facts ¶ 54. The Grant Agreement and Transfer Agreement were signed on November 1, 2003 during an Assembly gala in Palm Desert, California. 11/22 PM Tr. at 124. Because the content of these documents is critically important to disputed issues in this litigation, the Court shall review each of these documents in some detail.

1.     The Grant Agreement

The Grant Agreement was signed by Cafesjian on behalf of himself and CFF and by Hovnanian and Vosbikian on behalf of the Assembly. *See* DX-2 (hereinafter, "Grant Agreement").[23] The eleven-page document sets forth the terms and conditions of the grants made by Cafesjian and CFF to the Assembly for the museum project and obligates the Assembly to

---

[23] A duplicate copy of this exhibit with some handwriting on the second page was admitted as PX-112.

comply with those terms and conditions.

Pursuant to the Grant Agreement, Cafesjian and/or CFF (jointly defined as the "Grantor") agreed to donate $10.3 million for the purchase of the Adjacent Properties from TomKat and any related transaction costs. Stip. Facts ¶ 60; 11/23 AM Tr. at 32. In addition, Cafesjian and/or CFF agreed to make the annual $150,000 payments under the installment agreement for 1340 G Street and the final balloon payment of $1.5 million due in March 2011. *See* Grant Agreement §§ 2(D)-(E). The amounts paid under the Grant Agreement were calculated based on the purchase price paid by TomKat for the Adjacent Properties, plus the holding costs paid by TomKat pending transfer minus any rents earned during this period, plus the legal costs associated with the transfer. 11/23 AM Tr. at 35-36.

For purposes of this litigation, the most critical feature of the Grant Agreement is the reversion clause. Under § 3.1 of the Grant Agreement, the "Grant Property"—defined as the Bank Building and the Adjacent Properties—"may only be used as part of the AGM&M,[24] subject to plans for the AGM&M approved by the Board of Trustees of the American Genocide Museum & Memorial, Inc. (the 'Plans') . . . ." Grant Agreement § 3.1(A). The next section reads as follows:

> If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:
> (i)     in the event any portion of the Grants has not been funded, this Agreement terminates;
> (ii)    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the

---

[24] As used in this context, "AGM&M" refers to the museum project, not the corporate entity.

Grant funds or transfer to the Grantor the Grant Property.

*Id.* § 3.1(B).  Cafesjian testified that the purpose of the reversion clause was to provide an

incentive to complete the museum expeditiously, so that it might be built before Cafesjian died.

11/19 AM Tr. at 10-11; 11/15 AM Tr. at 113.  Waters testified that the reversion clause was most

likely his idea; he explained that CFF often inserted reversion clauses into its grant agreements.

11/15 AM Tr. at 113; 11/22 PM Tr. at 88-89.

The Grant Agreement also obligates the Assembly to make available a space, not less

than 1200 square feet or 40,000 cubic feet, for a memorial to be named the "Gerard L. Cafesjian

Memorial" or another name approved by CFF.  Grant Agreement § 3.2.  It provides that the

Assembly shall "cooperate with the design firms, artists and others selected by [CFF] to design

and ensure the successful completion of the Memorial" and "permit [CFF] to participate in all

material decisions regarding the Memorial."  *Id.*  Moreover, the Grant Agreement obligates the

Assembly to operate and maintain the Memorial in perpetuity and be solely responsible for the

costs of maintaining it.  *Id.*  The Grant Agreement also provides that neither CFF nor Cafesjian

have any obligation to provide additional funding to the Assembly or to AGM&M.  *Id.* § 3.8.

The Grant Agreement also contains a breach clause:

(A)     If the Assembly fails to use the Grants solely for the purposes set out in this
        Agreement or if the Assembly fails to satisfy any of the conditions of this
        Agreement, Grantor is released from any remaining obligation under this
        Agreement to provide funds or property to the Assembly.

(B)     If the Assembly uses any portion of the Grants either for a purpose other than
        those set out in this Agreement or for a purpose other than those described in
        Section 501(c)(3) of the [Internal Revenue] Code, as amended, the Assembly
        shall repay the portion of the Grants so spent to Grantor, plus interest.

(C)     The remedies set out in this Section 3.9 are in addition to any other remedies
        that may be available to the Grantor at law or equity.

Grant Agreement § 3.9.

The Grant Agreement also contains conditions relating to the creation of AGM&M. It requires that AGM&M be created as a nonprofit entity; that it be governed by a Board of Trustees appointed by individuals and organizations that contribute at least $5 million to the museum project; that each such donor be entitled to receive at least one vote for each $5 million contributed; that Anoush Mathevosian be ensured at least one vote on the Board of Trustees; that the Assembly accept only one vote; that decisions of the Board of Trustees require an 80% vote to carry; and that the initial Board of Trustees consist of Anoush Mathevosian, Hirair Hovnanian, Robert Kaloosdian, and Gerard Cafesjian. *See* Grant Agreement § 5.2. The Grant Agreement also required the Assembly to enter into a Transfer Agreement with AGM&M to transfer all of its interest in all cash, pledges, property, and other assets being held by the Assembly for the museum project. *Id.* § 5.3(A). The Transfer Agreement would obligate AGM&M to honor all existing donor requirements at the time of transfer and to assume all obligations in the Grant Agreement relating to the Memorial. *Id.* § 5.3(B)-(C).

The Grant Agreement also required that the Assembly issue a new promissory note to replace the previous promissory note issued in March 2000 to CFF for $500,000. Grant Agreement § 5.4(A). The new note was to be interest free and mature on December 31, 2005. *Id.* § 5.4(B). Along with the other museum-related obligations, the Assembly was required to transfer the promissory note to AGM&M. *Id.* § 5.4(C). The Grant Agreement also provided that the Assembly would assign its right to appoint the Trustees of the Armenian National Institute to AGM&M. *Id.* § 5.5.

2.      The Transfer Agreement

The Transfer Agreement was executed on November 1, 2003 by the Assembly and the newly-incorporated AGM&M.  *See* PX-114 (hereinafter, the "Transfer Agreement").  The agreement is signed by Hovnanian and Vosbikian on behalf of the Assembly and Waters on behalf of AGM&M.  *See id.* at 8.  The Transfer Agreement requires the Assembly to contribute to AGM&M "all of its rights, title and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the [Assembly] and/or held by the [Assembly] for the development, renovation, and construction of the AGM&M."  *Id.* § 1.1.  The approximate aggregate value of the grant was listed as $27.8 million, including $7.25 million in property, over $19 million in pledges, and approximately $670,000 in cash and other assets.  *Id.* § 1.1(C).

Pursuant to § 1.2 of the Transfer Agreement, "AGM&M, Inc. must honor all of the [Assembly]'s donor requirements existing at time of transfer, or in the alternative, obtain donor consent to the transfer and any modification of donor terms."  Transfer Agreement § 1.2(A).  The agreement also explicitly requires AGM&M to comply with the obligation to construct a memorial as set out in the Grant Agreement.  *Id.* § 1.2(B).  The Transfer Agreement also requires the Assembly to transfer the promissory note (either the original or the replacement note, if issued) to AGM&M.  *Id.* § 1.2(D).  The agreement also requires AGM&M to use the funds and property transferred "solely to develop, construct and operate" the Armenian Genocide Museum & Memorial.  *Id.* § 1.3.

The Transfer Agreement also contains provisions relating to the governance of AGM&M that are substantively identical to those contained in the Grant Agreement.  The agreement also

contains an arbitration clause.  *See* Transfer Agreement § 5.3.  However, none of the parties is presently seeking to enforce that arbitration clause.

### 3. The AGM&M Articles of Incorporation

The Articles of Incorporation for AGM&M were executed on October 29, 2003.  *See* PX-121.  The Articles provide that AGM&M is a nonprofit corporation organized for charitable purposes within the meaning of § 501(c)(3) of the Internal Revenue Code.  *Id.*, Art. IV(A).  The purpose of the corporation is defined as, *inter alia*, "to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide."  *Id.*  The Articles provide that AGM&M has no members and that the board of directors for the corporation shall be referred to as the Board of Trustees.  *See id.*, Arts. V-VI.  The manner of election or appointment to the Board of Trustees is to be set forth in the By-Laws of the corporation.  *Id.*, Art. VI.  The Board of Trustees must have at least three trustees at all times, and the initial trustees are defined to be Gerard L. Cafesjian, Hirair Hovnanian, Anoush Mathevosian, and Robert Kaloosdian.  *Id.*, Art. IX.

The Articles provide that in the event of dissolution or final liquidation of the corporation, none of the property of the corporation shall be distributed to or divided among any trustees or officers or inure to the benefit of any individual.  *Id.*, Art. VII(C)(1).

### 4. The AGM&M By-Laws

The By-Laws of AGM&M provide that the corporation shall conduct its programs and activities under the name of the Armenian Genocide Museum and Memorial.  *See* PX-122 (hereinafter, "By-Laws") § 1.2.  Under the By-Laws, the term of office of each of the initial trustees (i.e., Cafesjian, Mathevosian, Hovnanian, and Kaloosdian) "shall be perpetual."  By-

Laws § 2.4.  Each donor that elected an initial trustee (CFF, Mathevosian, Hovnanian, and the Assembly) is entitled to appoint a successor trustee in the event that the initial trustee is unable to serve for any reason.  *Id.*  Additional trustees may be elected to the Board of Trustees by making a contribution of $5 million to AGM&M, provided that the Board of Trustees has accepted the contribution by an 80% affirmative vote and the donor has appointed a successor.  *Id.* § 2.5. Each donor (including initial donors) is entitled to one vote on the Board of Trustees for each $5 million contributed.  *Id.* §§ 2.4-2.5.

The By-Laws provide that "[u]nless otherwise provided herein or in the Articles of Incorporation, all questions shall be decided by an 80 percent affirmative vote of the Trustees present at a meeting where a quorum is present."  By-Laws § 2.7.  A quorum is defined as persons representing one-half of the aggregate eligible votes.  *Id.* § 2.6.  "Any action required or permitted to be taken at any meeting of the Trustees may be taken without a meeting if all Trustees then in office consent to the action in writing and the written consents are filed with the records of meetings of Trustees."  *Id.* § 2.8.  The By-Laws call for at least annual meetings of the Board of Trustees, and notice of each meeting must be delivered to each trustee at least five days prior to the meeting.  *Id.* §§ 2.12, 2.14.  The By-Laws provide that the Board of Trustees shall elect from among its members a Chairman, a President, one or more Vice Chairmen, a Treasurer, and a Secretary.  *Id.* § 2.15.

The By-Laws provide that a trustee may be removed without cause by the unanimous affirmative vote of the trustees present at a meeting where a quorum is present, not counting the vote or votes of the trustee whose removal is voted upon.  By-Laws § 2.17.  The By-Laws also provide that Robert's Rules of Order shall govern in matters of parliamentary procedure not

otherwise prescribed by law, the Articles of Incorporation, or the By-Laws. *Id.* § 3.1. The By-Laws may be amended by a unanimous affirmative vote of the trustees present at a meeting where a quorum is present. *Id.* § 3.2.

The By-Laws also include an indemnification clause providing that AGM&M shall indemnify any current or former trustee or officer of the corporation against any and all expenses and liabilities incurred in connection with any claims brought against him or her as a result of his or her position with AGM&M, unless he or she is determined to be liable to the corporation for damages as a result of negligence or breach of a duty. *See* By-Laws § 4.1.

### 5. The Unanimous Written Consent Agreement

On October 30, 2003, each of the four initial trustees of AGM&M signed a document titled Unanimous Written Consent in Lieu of the Organization Meeting of the Board of Trustees of AGM&M. *See* DX-1 (hereinafter, "UWC"). By unanimous written consent, the Board of Trustees adopted a series of resolutions. First, the actions of the incorporators were ratified and the By-Laws were approved. *See* UWC at 1. Second, the initial donors (and their appointed trustees) were recognized to be CFF (Cafesjian), Hirair Hovnanian (himself), Anoush Mathevosian (herself), and the Assembly (Kaloosdian). *Id.* at 1-2. Cafesjian was appointed Chairman and President, Hovnanian was appointed Vice Chairman, and John Waters was appointed Secretary and Treasurer.[25] *Id.* at 2.

Through the Unanimous Written Consent agreement, the AGM&M Board of Trustees

---

[25] John Waters's appointment as Secretary and Treasurer appears to violate the requirement in the By-Laws that those offices be appointed from within the Board of Trustees. *See* By-Laws § 2.15. However, none of the parties ever raised this issue, and apparently no one ever questioned the validity of Waters's appointment. Accordingly, the Court shall not consider this as a factor in making its findings of fact or conclusions of law.

authorized the officers to pay all of the organizational expenses of the corporation.  *See* UWC at

2.  The actions of the Chairman (Cafesjian) and the Secretary/Treasurer (Waters) in negotiating

the purchase of the Adjacent Properties were ratified and approved, and the Secretary/Treasurer

was authorized "to enter into and execute any and all documents necessary to effect the

purchase" of the Adjacent Properties and "to take such other action as deemed necessary or

desired to effect such transactions."  *Id.* at 3.  The AGM&M Board also approved and ratified the

negotiation of grant agreements with donors and the Assembly, and the Secretary/Treasurer was

authorized to negotiate further grant agreements with donors.  *Id.*  The Board also accepted from

the Assembly control over the Armenian National Institute.  *Id.*

6.    <u>The Hovnanian Grant Agreement</u>

A separate grant agreement was created to memorialize Hirair Hovnanian's $5 million

pledge.  *See* DX-4.  Hovnanian's grant agreement provides that he shall grant the Assembly $5

million, which shall be used solely to support the development, renovation, and construction of

the museum project.  *See* DX-4 §§ 1.1, 1.2.  According to Waters, Hovnanian asked that a

reversion clause be included in his grant agreement.  11/23 AM Tr. at 7.  The reversion clause in

Hovnanian's grant agreement provides that if the museum is not developed prior to December

31, 2010 in accordance with plans approved by the AGM&M Board of Trustees, Hovnanian is

entitled to a return of the grant funds.  DX-4 § 2.1.  Hovnanian does not recall signing this

agreement, but he confirmed at trial that it bears his signature.  11/9 PM Tr. at 89.

F.    *The Transfer of Assets to AGM&M*

The transfer of control over the museum project from the Assembly to AGM&M was a

gradual process that took several months.  11/23 AM Tr. at 20-21.  In the weeks following the

execution of the Grant and Transfer Agreements and the organic documents creating AGM&M, Cafesjian and CFF transferred $10.3 million to the Assembly to cover the purchase of the Adjacent Properties. *See* DX-196, DX-197, DX-198. During November and December, AGM&M engaged in a series of transactions in which it acquired title to all of the Adjacent Properties from TomKat, except for the Families U.S.A. building, with respect to which AGM&M obtained TomKat's rights under the Installment Purchase and Sale Agreement. Stip. Facts ¶¶ 64-70.[26]

The funds being held by the Assembly for AGM&M consisted largely of pledges and contributions memorialized in grant letters, some restricted for specific uses, which were kept in the Assembly's endowment account. 11/23 AM Tr. at 20. As of November 1, 2003, the estimated amount of funds being held in the Assembly's endowment for AGM&M was approximately $860,000. *Id.* at 21. Waters explained that it took several months of reconciling the books with the Assembly to determine which of these funds could be immediately spent on operations and which funds needed to be held for future use. *Id.* at 20-21. During this reconciliation process, the Assembly continued to fund operations for AGM&M, drawing down some of these funds. *Id.* at 21-23. Sometime in 2004, it was agreed that the Assembly was holding $565,000 for AGM&M and $411,000 for ANI in its endowment account. *Id.* However, the Assembly did not formally transfer these funds out of its endowment account into the control of AGM&M. *Id.* at 23.

Another issue that was unresolved during the initial transfer period was the reissuance

---

[26] The details of these transactions are described more thoroughly in the parties' Undisputed/Stipulated Facts, but they need not be repeated here.

and transfer of the promissory note. 11/22 PM Tr. at 133. There is no record that the promissory note was reissued or transferred to AGM&M, and Waters testified that to the best of his knowledge, the Assembly never reissued the note. *See id.* However, at some point, the parties operated under the assumption that the note was transferred. AGM&M's tax return for 2003 reflects a $500,000 interest-free loan from Cafesjian as an obligation of the corporation. *See* PX-380 at 3, 15. However, CFF's 2004 tax return shows that the obligation transferred from the Assembly to AGM&M at some point during 2004. *See* PX-360 at 25; 11/15 PM Tr. at 51-52. Based on the fact there is no evidence of any reissued note in the record, the Court finds that the Assembly did not reissue the promissory note as required by the Grant Agreement.

Throughout the trial there were questions about whether Cafesjian ever agreed to forgive the promissory note. Cafesjian and Waters both denied that the note was ever forgiven. *See* 11/18 PM Tr. at 45; 11/19 AM Tr. at 35-36; 11/22 PM Tr. at 134. Waters testified that there may have been discussions about using the note to offset a grant obligation, but no setoff was ever agreed upon. 11/22 PM Tr. at 134-35. The only evidence in the record suggesting that the note might have been forgiven was testimony from Hovnanian that Cafesjian and Waters told him at various Assembly meetings that the note had been forgiven. *See* 11/9 AM Tr. at 68; 11/10 AM Tr. at 65-66. However, Hovnanian was unable to remember any details about the circumstances under which these statements were allegedly made, and the Court does not find this testimony to be credible. Kaloosdian testified that he never heard Cafesjian say he would forgive the note but that he had heard Hovnanian say during discussions prior to November 1, 2003 that he expected Cafesjian to forgive the note. 11/12 AM Tr. at 122-25. Based on this record, the Court finds that Cafesjian never forgave the promissory note.

G.      *Cafesjian and Waters's Early Efforts to Manage AGM&M*

Upon the creation of AGM&M in November 2003, the organization was largely run by John Waters as Secretary/Treasurer. Although Cafesjian was formally the Chairman and President of the new entity, he preferred not to be involved in the "nitty-gritty" details of management and delegated those tasks to Waters, his trusted confidant. *See* Cafesjian Dep. Tr. at 241-42.[27] Hovnanian, despite accepting the role of Vice Chairman, had said that he did not want to be closely involved in the decision-making process. *See* 11/9 AM Tr. at 69, 83, 88. And Anoush Mathevosian's involvement was seriously limited by health issues—between 2003 and 2005, she suffered a stroke, a heart attack, and a collapsed lung. Mathevosian Dep. Tr. at 69; 11/22 AM Tr. at 80. With no employees on staff or professionals hired to move the project forward, it fell to Waters to move the project forward. Waters enlisted Rouben Adalian to assist with museum preparation and made it clear to him that ANI would be servicing AGM&M until the museum opens. *See* DX-621N. Cafesjian bought Adalian a library of books for research purposes. 11/16 AM Tr. at 29. An email from Adalian to Kaloosdian in December 2003 described the transition in the following manner:

> In any case what is shaping as AGMM is likely to be a highly decentralized process managed by the principal founder . . . . Right now the AGMM complex involves a series of properties, a development firm under contract in Washington steering the architect selection process [Concord Partners], probably a new museum design firm, an architectural consulting firm in New York, the Cafesjian Family Foundation out of Minnesota, and John is hiring staff and bringing in people as he goes, all of its [sic] under the CFF or the GLC umbrella. ANI is just one piece of this growing network that is working on AGMM, and an architect has not even been selected.

---

[27] Cafesjian surprisingly testified at his deposition that he did not even remember that he held the title of Chairman and President of AGM&M, *see* Cafesjian Dep. Tr. at 231, although he had no problems recalling his involvement during his trial testimony.

DX-621N. As the transition from the Assembly was completed, the administrative affairs of AGM&M were handled through Cafesjian's offices in Minnesota. 11/19 AM Tr. at 113. During the first several months of 2004, Waters was focused on the transition of assets from the Assembly to AGM&M. 11/23 AM Tr. at 63. In addition, he worked on collecting resumes and identifying candidates for the position of executive director. *Id.* at 63-64.

The AGM&M Board of Trustees held its first meeting on June 9, 2004, following a meeting of the Assembly Board of Trustees. *See* DX-102. There are no minutes of this meeting in the record, nor are there official minutes from any of the meetings held while Waters was Secretary/Treasurer. *See* 11/24 AM Tr. at 34-35.[28] As with the planning committee, the AGM&M Board of Trustees operated by consensus with few formal votes ever taken. *Id.* In fact, there is no firm record of any votes being taken during the time that Cafesjian and Waters were officers (through September 2006), although the AGM&M Board clearly did make some decisions by consensus. Waters testified that votes were taken on financial/budget issues during each meeting, *see* 11/23 PM Tr. at 46-47, but others testified that no votes were ever taken. 11/9 PM Tr. at 103; 11/16 AM Tr. at 66. The Court finds that even if no formal votes were taken, the Board of Trustees did authorize Waters to pay the operating expenses for AGM&M.

During the June 2004 meeting, the first item on the agenda was a review of the formation documents. *See* DX-102. There was a discussion about how the By-Laws might be amended, but otherwise no one raised any concerns about the documents. 11/23 AM Tr. at 8. There was also a discussion of the appointment of successor trustees. *See* DX-102 at 1. Following this

---

[28] There are, however, some records of meeting agendas that appear to have been followed in whole or in part.

meeting, Anoush Mathevosian designated Rouben Adalian as her successor. *See* DX-104.

Waters also gave a status report as to the finances, during which he discussed the reconciliation

with the Assembly over the amounts in the endowment account owed to AGM&M and ANI.

11/23 AM Tr. at 64. Next, there was a discussion about hiring an executive director. Waters had

placed an advertisement and identified four candidates, each of whose resumes were presented to

the AGM&M Board for review before the meeting. *Id.* at 65. One of these candidates was a

woman named Deborah Devedjian. 11/15 AM Tr. at 132-33. The Board decided that Waters

and Kaloosdian should contact each of these candidates for an interview. 11/23 AM Tr. at 65.

However, after Kaloosdian and Waters discussed the issue, they decided they should not proceed

with hiring an executive director because they did not have funds in the budget to do that. *Id.*[29]

   The last issue discussed at the June 2004 meeting was selection of an architect. The

Board discussed how they should proceed with selecting an architect, whether they should

continue the RFQ process or conduct a competition for architects. 11/23 AM Tr. at 63.

However, no agreement was reached. The Board also heard a presentation from the architect

Edgar Papazian.

   1.   Edgar Papazian

   Edgar Papazian was selected by Cafesjian from among the architects who responded to

the RFQ because Papazian's conceptual vision and preliminary sketches demonstrated a strong

emotional attachment to the project. *See* Cafesjian Dep. Tr. at 232, 262. As a young, unproven

---

[29] Waters's testimony on this issue was inconsistent; he initially testified that the Board
was unable to obtain agreement at this meeting on how to proceed with the hiring of an executive
director. 11/15 AM Tr. at 132-33. Whether the result of indecision or lack of funds, none of the
candidates were interviewed.

architect, Papazian's initial proposal invoked the spirit of Maya Lin, the young architect whose controversial yet striking design for the Vietnam Veterans Memorial on the National Mall was an inspiration to Cafesjian. Papazian Dep. Tr. at 21-22; 11/18 PM Tr. at 56-57. Waters had flagged the proposal because it had more emotion than the other responses and was the only submission that actually included a discussion of the conception for the project along with some sketches. 11/23 AM Tr. at 58. Although the RFQ process had been formally halted, Cafesjian privately encouraged Papazian to develop his ideas further so that they could be more carefully considered by the AGM&M Board. Cafesjian and Waters met with Papazian in 2003 and discussed his ideas with another architect, David Hotson, who was also impressed with Papazian's designs. Papazian Dep. Tr. at 25; Cafesjian Dep. Tr. at 263; 11/19 AM Tr. at 13. Papazian later met with Rouben Adalian and toured the museum site. Papazian Dep. Tr. at 26.

In March 2004, Papazian wrote to Cafesjian renewing his interest in the project and describing a plan for further design work that could be performed if underwritten. *See* PX-218. Cafesjian agreed to support Papazian as he continued to work on the project, using his own funds. On April 19, 2004, Waters arranged for Papazian to meet with Concord Partners, David Hotson, Adalian, and a few other individuals to discuss specific details for the project such as zoning and historic preservation requirements and demolition/construction issues. *See* PX-226. Papazian's recollection of this meeting was that his proposal would not conflict with the zoning regulations governing the Bank Building and the Adjacent Properties (together, the "Properties"). Papazian Dep. Tr. at 30-33.

Papazian's grand vision for the project was to construct a "husk" within the new building, a void space that would represent the cultural annihilation of the Armenian Genocide and act as a

memorial to the victims. Papazian Dep. Tr. at 23-24. Subsequent sketches showed the husk as the dominant architectural feature of the building, extending from the new construction on the Adjacent Properties over the Bank Building and clearly visible from the street. *See* PX-248 at 36-45. According to Cafesjian, Rouben Adalian loved the design and embraced its symbolism. 11/18 PM Tr. at 48.

Papazian gave a "very preliminary" presentation to the AGM&M Board of Trustees at its June 2004 meeting, consisting of a few sketches and basic themes. 11/15 PM Tr. at 21-22; Papazian Dep. Tr. at 34. The reaction to the presentation was mixed. Hovnanian did not like Papazian's design and was somewhat dismissive of the proposal. 11/19 AM Tr. at 13. Kaloosdian was impressed by Papazian's design but was skeptical that it would appeal to "Joe Six-Pack," the average man on the street. Papazian Dep. Tr. at 35; 11/19 AM Tr. at 13-14; 11/10 PM Tr. at 26-29. Cafesjian told the other trustees that Papazian could be hired cheaply and that Cafesjian had already spent about $5000 to support him. 11/10 PM Tr. at 25; 11/12 AM Tr. at 53.

Shortly after this meeting, Papazian emailed Waters with his reflections on the comments that the museum design should be accessible to the general public. *See* PX-235. "I think that above and beyond immersive Disney exhibits, this museum needs to be an emotive, powerful building, making a grave statement at an urban scale." *Id.* In the following months, Cafesjian supported Papazian's further development of his ideas. Cafesjian told Papazian not to be intimidated by the criticism and to defend his vision for the project. 11/19 AM Tr. at 15. In late 2004, Cafesjian sent Papazian to Armenia with David Hotson to become better acquainted with Armenian architecture and history. *See* Papazian Dep. Tr. at 37-38; PX-240. Cafesjian

ultimately spent approximately $100,000 of his own funds to support Papazian's development of plans for the museum. 11/23 AM Tr. at 68-69.

After refining his designs to address some of the concerns raised at the July 2004 meeting, Papazian delivered a more extensive presentation at the second AGM&M Board of Trustees meeting, held on February 10, 2005. *See* PX-247. He came to the meeting with schematics of his updated design, and some of the materials had "Cafesjian Family Foundation" written in small print at the bottom because CFF had paid for his work. 11/19 AM Tr. at 15-16; 11/23 AM Tr. at 74-75; Papazian Dep. Tr. at 47. Hovnanian became extremely upset when he saw this, saying that if it was a Cafesjian project, then perhaps Cafesjian ought to pay for the entire thing. 11/19 AM Tr. at 16.[30] Cafesjian asked Hovnanian what design he preferred, but Hovnanian just repeated his persistent refrain: he did not want to be involved in the details. *Id.* at 17. Hovnanian was critical of Papazian's presentation and interrupted it several times. Papazian Dep. Tr. at 40-42.

After the meeting, Cafesjian asked Papazian to revise his designs to address Hovnanian's criticisms. Papazian Dep. Tr. at 43. Papazian complied, reigning in the more exuberant aspects of his design and creating a more restrained model in the hopes that it would be more palatable to the AGM&M Board. *Id.* at 43-44. It was Papazian's understanding that Cafesjian supported his vision for the museum but that they had to galvanize the support of the Board in order to make it a reality. *Id.* at 54. Papazian believed that he had been selected as the architect for the museum and that there would not be competition from anyone else. *Id.* at 54-55. Papazian created a

---

[30] Papazian did not recall this incident in his deposition testimony, *see* Papazian Dep. Tr. at 47, but he may have been out of the room when this occurred or simply forgotten about it.

spiral-bound booklet with his refined proposals, which was presented at the next AGM&M Board meeting in July 2005. *See* PX-248; 11/12 AM Tr. at 52-54. However, the Board did not agree to move forward with Papazian at this time. *See* DX-125. After this, Papazian began to work on other projects. *See* PX-254.

2.    Deborah Devedjian

John Waters first met Deborah Devedjian at an Assembly outreach event in Philadelphia in 2002. 11/15 AM Tr. at 131. She attended the Assembly's 2002 gala in Philadelphia and was reintroduced to Hovnanian.[31] *Id.* at 131-32. Kaloosdian described Devedjian as "a very brilliant woman" who was articulate and had a background in business consulting. *See* 11/10 PM Tr. at 29-32. When Waters posted the advertisement to hire an executive director for AGM&M, he asked Devedjian if she was interested in submitting her resume. 11/15 AM Tr. at 132. After the AGM&M Board failed to move forward with hiring a candidate after the July 2004 meeting, Waters contacted Devedjian separately to see if she would be interested in presenting a business plan to the Board. *Id.* at 133. Waters then invited her to give a presentation at the February 2005 Board meeting. *Id.*

Devedjian made a good impression at the meeting, and the AGM&M Board agreed to hire her for a four-month trial period to prepare a preliminary business plan. 11/10 PM Tr. at 29-32; 11/16 AM Tr. at 81-82; 11/23 AM Tr. at 73-74; PX-340. Over the next four months, Devedjian conducted a series of focus groups and written surveys, interviewed over a hundred experts on various issues, and visited dozens of museums and galleries. *See* DX-115 at 3.

_____

[31] Hovnanian testified that he had previously known Devedjian when she attended an Armenian school. 11/9 PM Tr. at 95.

The product of Devedjian's diligence was a forty-four page business plan, which she presented to the AGM&M Board of Trustees at its third meeting on July 26, 2005. *See* DX-115. Devedjian believed the project should be marketed as "The Bank of Moral Courage & Armenian Memorial," tying the historic Bank Building to the overall theme of the museum as a tribute to the survivors of the first genocide of the twentieth century. *See id.* Devedjian believed that the museum should focus on educating the public about the horrors of genocide and incorporate information about contemporary atrocities such as the Rwandan genocide and ethnic cleansing in Bosnia. *See id.* at 14. Rather than make the Bank a "collections museum," Devedjian proposed an "experiential center." *Id.* at 15. The overall cost for the museum was estimated at $215 million, including a $50 million endowment. *Id.* at 29. Devedjian's plan called for a competition to be held among five internationally-renowned architects, with each architect offered $50,000 for submission of a proposal. *Id.* at 26-27.

The "Bank of Moral Courage" plan met with strong disapproval. Cafesjian thought the concept "was so much of a gimmick that [he was] ashamed to have any association with it." 11/19 AM Tr. at 123. The only part of the plan that appealed to the AGM&M Board was the educational component. 11/23 AM Tr. at 80-81. The trustees were particularly shocked at the $215 million cost estimate, which they thought was far too high. 11/10 PM Tr. at 34; 11/15 AM Tr. 134-35. After some discussion, Devedjian revised the budget and reduced it to $185 million, but that figure was still perceived as excessive by the Board. 11/10 PM Tr. at 34; 11/15 AM Tr. at 134-35. There was no vote taken on Devedjian's plan or continuing her engagement into a second phase. *See* 11/23 AM Tr. at 84.

According to Devedjian, she continued to work on the project for the next few months,

developing a six-month work plan and traveling to Armenia to conduct research and interviews. *See* PX-342. It is unclear whether anyone at AGM&M authorized this work. Hovnanian testified that he and Cafesjian took Devedjian to Armenia to meet with Armenian architects, but it is unclear when this occurred. 11/9 AM Tr. at 87. Waters believed that the AGM&M Board had decided after the July 2005 meeting that Devedjian should not be kept on the project. 11/23 AM Tr. at 84. AGM&M paid Devedjian a $50,000 retainer and made two additional payments of $50,000 each for her services. *See* PX-340. Devedjian did not work under a written contract, and ultimately there was a dispute over how much money AGM&M had agreed to pay her.[32] Devedjian believed that she had been engaged at a rate of $50,000 per month for an initial four-month engagement and two months of follow-up work. *See* PX-342. Including expenses, Devedjian believed she was owed a total of $342,380.66. *Id.* Waters believed that AGM&M had agreed to pay Devedjian only $120,000 plus expenses for her initial four-month engagement and never authorized additional work. *See* DX-124. AGM&M never paid Devedjian the extra amount she believed she was owed. 11/17 PM Tr. at 13.

3. <u>Financial Problems</u>

Even before AGM&M could hire an architect or executive director, the cost of insurance and taxes on the Properties and other basic operating expenses were a significant drain on the corporation's bank accounts. In addition, AGM&M took over from the Assembly the payment of bills for ANI, including office space and the salary for Rouben Adalian. *See* 11/16 AM Tr. at 28-

---

[32] The record does not allow the Court to determine the terms of AGM&M's agreement with Devedjian or whether she was fully paid for her services. These are not issues that are properly before the Court, and therefore the Court makes no findings relating to these issues as it is not necessary to do so in deciding the claims before the Court.

29; 11/23 AM Tr. at 28.  In September 2004, the chief financial officer for GLC Enterprises, whom Waters and Cafesjian had charged with keeping track of AGM&M's finances, sent a formal request to the Assembly's finance director asking that the money being held for AGM&M be transferred so that tax bills could be paid.  *See* DX-105; 11/23 AM Tr. at 69-70.  According to its general ledger, AGM&M ended 2004 with just under $200,000 in its operating account, with net spending that year at nearly $750,000.  *See* PX-401.

There were no real fundraising initiatives ongoing during this period.  There were discussions about fundraising during the early museum planning committee meetings, and those discussions continued after the formation of AGM&M.  11/15 AM Tr. at 137; Vartian Dep. Tr. at 214-15.  The basic concept for the fundraising plan remained fairly constant throughout these discussions: start with a "quiet" campaign targeted at major donors to secure a large percentage of the fundraising goal, then launch a public campaign.  Vartian Dep. Tr. at 214-15.  Before such a plan could be implemented, however, the Board had to agree on a development plan they could sell to donors.  Therefore, without a decision by the Board about the size and scope of the museum and memorial, the fundraising plan had no traction.

Without new donors to replenish the coffers, AGM&M had to rely on existing donors to fulfill their existing pledges or agree to commit additional funds.  Cafesjian had committed approximately $17 million in the Grant Agreement, but that money was tied up in the purchase of the Properties and did not provide additional cash for operating expenses.  Anoush Mathevosian's $3.5 million contribution had similarly been spent in the acquisition of the Bank Building.  Hovnanian had pledged a total of $5 million to the project but had only partially fulfilled his pledge.

On December 21, 2004, Hovnanian's foundation sent a $500,000 check to AGM&M to be used toward his $5 million commitment, bringing his total contribution to that point up to $1.25 million. *See* PX-504.[33] The letter accompanying the donation stated that the contribution "shall not be used for operating costs but be set aside to earn interest and be reserved for use in future capital improvements." *See id.* at 1. That language was more restrictive than Hovnanian's grant agreement, which required only that the funds be used "solely to support the development, renovation, and construction of the AGM&M." *See* DX-4 at 1. Because of this inconsistency, Waters initially treated the check as a new restricted donation by Hovnanian. 11/23 AM Tr. at 16-17. But at the next AGM&M Board of Trustees meeting in February 2005, Waters questioned Hovnanian about it, and Hovnanian told him not to treat it as a new grant but to credit it towards his $5 million pledge. 11/23 AM Tr. at 17; *see also* 11/15 PM Tr. at 42-43. Accordingly, Waters treated the check as restricted based only on the grant agreement and used it to defray operating costs. 11/23 AM Tr. at 17-18; 11/15 PM Tr. at 43. By September 2007, Hovnanian had contributed less than half of his $5 million pledge. *See* DX-544N.

H.     *Tensions Increase Between Hovnanian and Cafesjian*

Whatever tensions existed between Hovnanian and Cafesjian over Assembly affairs had sharply increased by the middle of 2005. The first sign of heightened tensions arose in May and June of 2005, when the Assembly and CFF co-sponsored a trip to Armenia for Minnesota Senator Norm Coleman. 11/23 AM Tr. at 89-91. Cafesjian had previously underwritten a series of congressional delegation trips to Armenia, and Cafesjian knew Senator Coleman from his

_____

[33] Waters testified that this donation was booked in January 2005, and this is reflected in AGM&M's general ledger for 2005. *See* 11/15 PM Tr. at 41; PX-402 at 5.

long-time home state of Minnesota. *Id.* at 89-90. The Assembly worked with CFF to prepare for the trip and issued a press release. *Id.* at 90. Cafesjian asked Hovnanian to participate in the trip, but Hovnanian declined and also refused to allow Ross Vartian to attend in his place, sending a lower-level staff person instead. *Id.* Following the trip, Hovnanian felt that the Assembly had not been properly recognized during the trip and refused to issue a press release afterwards. *Id.* The tensions were so great that the Assembly did not even invite Senator Coleman to an advocacy event it held on Capitol Hill in the fall of 2005, and when Senator Coleman happened to stop by the event, he was not even introduced. *Id.* at 89-92.

But the most sensitive issue sparking tensions in 2005 was Cafesjian's hiring of Ross Vartian. As noted above, Vartian had returned to the Assembly as Executive Director with the aim of grooming a replacement from the next generation who could serve the Assembly for a long period of time. By March of April 2005, his replacement had arrived in the form of Bryan Ardouny, who had previously worked for the Assembly as director of government affairs and who had extensive experience on Capitol Hill. *See* 11/17 AM Tr. at 67-71, 117. As Vartian transitioned out of the role of Executive Director, Vartian began to have discussions with the Assembly in late spring of 2005 about his departure. *Id.* at 117; 11/22 AM Tr. at 41-42. Vartian sent a memorandum to Anthony Barsamian, who was then the Chairman of the Assembly's Board of Directors, discussing various options, including staying with the Assembly in some capacity until he reached retirement age. 11/22 AM Tr. at 42. But there was no response to this memorandum, and Vartian concluded that Barsamian did not want to retain Vartian at the Assembly. *Id.*

The Assembly did ultimately offer Vartian other positions to stay on in another capacity,

but Vartian had decided that it was time to move on. 11/22 AM Tr. at 122. There were other factors involved in the decision as well. Vartian was not without detractors at the Assembly, and his leaving would allow the organization to have a fresh start with new leadership. *See* DX-126.[34] Vartian was also interested in seeking new opportunities after spending nearly the entirety of his career with the Assembly. *Id.* at 44. At the same time, Vartian was dealing with a potential medical problem that made him desire a return to Michigan to be with his extended family. *Id.* Vartian informed Barsamian of his final decision on July 18, 2005. *See* DX-114. Vartian announced that his last day would be July 31, and he declined an offer from the Assembly to pay him the rest of his salary for 2005. *Id.* Vartian explained that he knew the Assembly had limited resources and that he would not accept something for nothing from a charity that he loved. *Id.* Vartian also indicated that he hoped to secure another position within six weeks. *Id.*

As he had anticipated resigning, Vartian reached out to Waters to see if there were any opportunities with CFF and its activities in Armenia. 11/22 AM Tr. at 45. Waters had previously extended Vartian an open invitation to work for Cafesjian should he ever leave the Assembly. *See* DX-169. Vartian also considered working for other Armenia-focused advocacy organizations. 11/22 AM Tr. at 46. Cafesjian liked Vartian and felt that his services would be beneficial to his advocacy efforts, so he instructed Waters to offer him a job after Vartian had decided to resign from the Assembly. *See* PX-271 at 3; 11/19 AM Tr. at 18-19. Waters negotiated with Vartian, and by July 28, 2005, Waters told Vartian they were "99% committed"

---

[34] There is also some evidence to suggest that one of Vartian's detractors was Hirair Hovnanian. *See* 11/19 AM Tr. at 18.

to hiring him.  *See* PX-440 at 1-2.  During the third AGM&M Board of Trustees meeting on July

26, Hovnanian had asked Cafesjian if he was trying to hire Vartian, but Cafesjian denied it since

no formal offer had been made.  *See* DX-169.

After leaving the Assembly, Vartian was formally offered a job with Cafesjian and

became an employee of GLC Enterprises effective October 1, 2005.  Vartian Dep. Tr. at 202;

11/22 AM Tr. at 49.  Vartian was hired in part to engage in advocacy and develop a fundraising

database for Cafesjian.  11/22 AM Tr. at 133-34.  Vartian would also have responsibilities for

media, politics, and strategic planning relating to the museum project.  Vartian Dep. Tr. at 202;

11/22 AM Tr. at 49.

On August 19, 2005, Cafesjian wrote a letter to Hovnanian informing him that he had

hired Vartian.  *See* PX-265.  Cafesjian wrote that he hoped that Vartian would remain actively

involved with the Assembly in his new position.  *See id.*  When Hovnanian found out that

Cafesjian had hired Vartian, he was outraged.  11/19 AM Tr. at 19.  Hovnanian accused

Cafesjian of stealing Vartian away from the Assembly and cancelled a $30,000 bonus that was to

be paid to Vartian ($10,000 of which would have been paid by Cafesjian).  *Id.* at 19-20; PX-267.

Hovnanian also informed Cafesjian that "[a]s the [Assembly] and the CFF will continue to have

an institutional relationship, whenever required, Ross may continue to interact with the

[Assembly] only through our Executive Director, Brian [sic] Ardouny.  In light of all of the

circumstances, Ross must not be 'actively engaged' with the [Assembly] as you stated."  PX-267.

It was also announced to Assembly staff that they should not communicate with Vartian.  *See*

11/22 PM Tr. at 43.

Van Krikorian testified that the Assembly was upset because Ross Vartian had been the

face of the Assembly for decades, and Hovnanian felt that Cafesjian had been dishonest about his intentions. 11/18 AM Tr. at 40, 126. Bryan Ardouny testified that it was somewhat awkward having Vartian leave the Assembly to work for one of its trustees. 11/17 AM Tr. at 82. Vartian testified that no one had raised any concerns about his departure while he was still at the Assembly. 11/22 AM Tr. at 45; 11/22 PM Tr. at 62. Vartian testified that he left the Assembly voluntarily and was not coerced to leave by Waters or Cafesjian. Vartian Dep. Tr. at 200.

Waters met with Bryan Ardouny in October to discuss the mounting tensions between Cafesjian and Hovnanian. *See* DX-169. In a file memorandum summarizing the meeting, Ardouny wrote:

> In terms of tension between Gerry and Hirair, John indicated that this has been mounting for years—when we [Cafesjian and Waters] first joined [the Assembly], they liked our money but didn't want to listen to our ideas—we didn't have a seat at the table. Hirair tells the story how he used to have VIP treatment in Armenia and now when he meets with President Kocharian he is asked why can't you be like Gerry. I indicated that Hirair refuses to pay bribes and thus will not invest in projects/business ventures in Armenia. John indicated that Hirair had tried on two separate occasions and failed miserably. John also indicated that there were tensions with the AGMM project.
>
> John indicated that it was too bad that Gerry and Hirair are at this point—because they are very similar individuals and in his entire career, John has never seen Gerry work closer with anyone. This was my opening to, per Anthony, tell John that Gerry should give Hirair a call directly. John was not sure if that would resolve anything and went on further to say that both Gerry and Hirair operate in the same field and if for the good of the cause Gerry has to leave that playing field than [sic] so be it.

DX-169.

Following this meeting, Cafesjian sent Hovnanian a letter in an effort to ease the tensions. *See* PX-268. Cafesjian wrote that he had been motivated to become involved in the Assembly in large part due to Hovnanian. *Id.* at 1. Cafesjian said that he did not know why Vartian had

72

decided to leave the Assembly and said that neither he nor Waters ever encouraged him to leave the Assembly, and that Vartian was not offered a position until after he had resigned.  *Id.* at 2-3.

On January 19, 2006, the Assembly's Board of Trustees/Board of Directors (now merged into one board) held a meeting in New York.  Waters attended the meeting, but Cafesjian did not attend.  *See* PX-271.  After Hovnanian was appointed chairman of the merged Assembly Board of Trustees and other officers were appointed, there was a discussion about the Assembly's conflicts of interest policy.  11/23 AM Tr. at 88.  All Board members were asked to ensure that they had reviewed and signed the conflicts of interest policy.  *Id.* at 88-89.  The Assembly's conflicts of interest policy, which was admitted into evidence, requires all trustees to disclose any involvement in transactions or projects in which the Assembly has an interest.  *See* PX-263.  During the discussion, Waters felt that there were insinuations that he and Cafesjian had not complied with this policy.  11/23 AM Tr. at 88-89.  Waters assured the Assembly Board that from the perspective of the Cafesjian Family Foundation, there were no conflicts and therefore nothing to disclose.  *Id.* at 89.  Waters left the meeting after a break.  Cafesjian Dep. Tr. at 281; 11/23 AM Tr. at 89.  Waters believed that Hovnanian was using the Assembly's conflicts of interest policy as a means to attack Cafesjian personally.  11/23 AM Tr. at 98.

After learning of the accusations that had been made at the meeting, Cafesjian sent a letter to Hovnanian and the other members of the Assembly's merged Board dated January 27, 2006.  *See* PX-271.  Cafesjian said that the insinuations about his motivations toward the Assembly are "outrageous and offensive."  *Id.* at 1.  Cafesjian professed his belief that the Assembly "should be the most important organization in the Armenian community."  *Id.* at 2.  Cafesjian then defended his involvement in Senator Coleman's trip to Armenia and the hiring of

Ross Vartian.  *Id.* at 2-4.  At the end of the letter, Cafesjian wrote, "It is my intention, at this time, to continue to be an advocate of the Assembly.  But this letter will put you on notice that there is a limit to the abuse that I or my designee [Waters] will endure."  *Id.* at 4.

Shortly after this letter was sent, two Assembly Board members contacted Waters to ask how the relationship between Cafesjian and Hovnanian could be repaired.  *See* DX-503N; DX-504N.[35]  One suggested that a meeting be arranged between the two men, but no such meeting occurred, and Waters felt that the onus should be on Hovnanian to extend an olive branch.  DX-504N; 11/23 AM Tr. at 98-99.  In fact, outside the context of settlement relating to this litigation, the July 2005 AGM&M Board meeting was the last time that Hovnanian and Cafesjian appeared in the same room.  11/23 AM Tr. at 84.

Hovnanian finally responded to Cafesjian's letter on March 10, 2006.  *See* PX-273.  "Ever since your letter dated January 27, 2006, I have been trying to respond as clear as I possibly can without hurting your feelings."  *Id.*  Hovnanian expressed disappointment that Waters had walked out of the January 19 meeting and said he would prefer to meet Cafesjian alone in New York City to discuss his letter.  *Id.*  Hovnanian also brought up the issue of Ross Vartian's hiring again.  "The accusation that we let Ross Vartian go is inaccurate."  *Id.*  Hovnanian then suggested that Vartian had been improperly lured away, ending the letter, "I believe an honest review of your own Foundation's behavior during this time is in order."  *Id.*  Cafesjian understood this as an attempt by Hovnanian to drive a wedge between Cafesjian and Waters.  11/19 AM Tr. at 24.

---

[35] Plaintiffs objected to these exhibits as containing hearsay; the Court has not considered the truth of the matters asserted therein.  *See* 11/23 AM Tr. at 96-97.

The following week, Kaloosdian wrote an email to Bryan Ardouny about the conflict-of-interest issues. *See* DX-128. "This is not between Hirair and Gerry dispite [sic] what Anthony [Barsamian] says. It is between Gerry/John and the [Assembly]." *Id.*

On April 3, 2006, Hovnanian sent out a list of proposed committee assignments for the Assembly's merged Board of Trustees. *See* DX-129. Cafesjian and Waters were identified simply as members at large, and they were the only ones (out of 20 members) who did not have either an officer position or a committee assignment. *See id.* at 7-8. Cafesjian and Waters had previously served on Assembly committees. 11/17 AM Tr. at 126.

I.      *Cafesjian and Waters's Final Attempts to Move the Project Forward*

After the first three AGM&M Board meetings ended without agreement on a business plan or an architect, Cafesjian and Waters felt an increased urgency to move the project forward. On September 9, 2005, Waters sent an email to the AGM&M Board members proposing a meeting in late September to discuss the proposals that had been presented to the Board for consideration. *See* DX-120. Waters noted that it was important that the Board reach "agreement on the scope, budget, management, and timing for the next phase." *Id.* Hovnanian replied three days later with the following response:

> I received your memo of September 9, 2005 regarding a proposed AGMM meeting. I personally do not think it is necessary for me to attend to discuss budget, management, and details of the next phase. I have not been involved in those things up to this point and have expressed a desire not to be involved with them. I continue my support and belief in this project.

DX-120. No meeting was held in the fall of 2005.

In October 2005, Waters circulated to the AGM&M Board a draft letter to be sent to Deborah Devedjian regarding her termination. *See* DX-124. Based on the feedback received,

Waters did not send the letter to Devedjian at that time. Waters sent another draft letter to the AGM&M Board in February 2006. *See* DX-124. The language in the letter stated that "I [Waters] have been asked to formally confirm that [the] Board has decided not to continue beyond Phase I of the engagement with [Devedjian's consulting firm]." *Id.* The letter also included language stating that AGM&M's position is that Devedjian had been paid in full for her services. *Id.*

In his email to the AGM&M Board with the draft letter to Devedjian, Waters also implored the Board to focus on fundraising:

> It is important to the Board, the community, and to the success of the project, that there is a solid demonstration of financial commitment to the project before any significant new expenditures are made or committed to. Project expenditures in areas other than fundraising will be postponed until such time that sufficient commitments have been made.

DX-124. Waters indicated that he was in the process of completing a "communication piece" that could be used to target potential major donors. *Id.*

Three days later, Kaloosdian replied to Waters's email, writing, "I must confess that I am having difficulty understanding the position the AGMM is now in as well as the request that you are making." DX-125. Kaloosdian restated several opinions that he had previously raised in telephone conversations with Waters and Cafesjian:

> In those conversations I said that the second phase plan was premature for the projected cost had escalated to $185,000,000 and that it would be unwise to start distributing the plan to an "inner circle" when we ourselves had not determined that the price tag was feasible as well as other considerations which would have cost/budget implications for which I thought the AGMM was not ready to commit.
>
> Further, I stated that I thought that the misunderstanding with Deborah Devedjian must be resolved and that due to her skillful and successful effort in resurrecting the AGMM project and in effect becoming the Face of the project that it would be a

mistake to not have her launch a second phase for the sole purpose to determine the ability of the community to finance such a sum. Further that if she found that a $185,000,000 project was not realistic for her to come back with a figure based upon a critical analysis of specific data and meetings to determine how much we could reasonably afford. That it was our responsibility to determine a doable budget whatever that cost might be. When our calls ended I did not have reason to believe that you disagreed with my recommendations.

Also, you state that you are moving ahead in another direction to target major donors. How are you going to explain Deborah's absence from that effort? Who else now has the credibility to pick where she left off?

DX-125. Kaloosdian said he had received calls from a number of people asking why nothing had happened since Devedjian conducted meetings on the project the previous year. Kaloosdian felt that Devedjian was the key to reviving enthusiasm and excitement for the project, and he wrote, "I do not feel a confrontation with Devedjian is the best way to restart the train." *Id.*

Kaloosdian also expressed his concerns about the design plans submitted by Edgar Papazian:

Also, are you going to show major donors the "Papazian" schematic which if I remember correctly was not approved in NYC? I continue to feel that that plan will have great difficulty being approved by Washington, DC review boards. What assurance do we have that the plan has any chance of being accepted in possibly the strictest review area in the country? What happens if we move ahead and much later that "Papazian" plan is deemed unacceptable? Have other issues such as "Jose Six-Pack", and the name of the complex been resolved? There are other expressed yet unresolved concerns.

*Id.* Kaloosdian ended his letter by asking for copies of minutes or summaries from the most recent AGM&M meetings. Kaloosdian said he did not know what negotiations had occurred between Devedjian and Waters, but he believed that there may have been "some misunderstandings which communication could have resolved. Please understand that I want to be helpful but the AGMM process has not been Board driven to date and more information and

disclosure is needed if it is going to be so." *Id.*

On February 8, 2006, Hovnanian weighed in with this response:

In response to your email dated February 3, 2006 regarding AGM&M and [Devedjian's consulting company]. My position is whatever agreement verbal or in writing that had transpired between Gerry Cafesjian and Deborah Devedjian should be adhered to verbatim.

PX-339.

Hovnanian's email was sent just hours after Cafesjian had formally responded to Kaloosdian's email, copying Hovnanian and Adalian. *See* PX-339; PX-178. "Your frustration is understandable, and shared," he wrote. PX-178 at 1. "It has been difficult to find the right way to move forward." *Id.* Cafesjian agreed with Kaloosdian's opinion that AGM&M is not as "Board driven" as it could be, noting that Mathevosian was not really able to participate (because of her health) and that Hovnanian wanted limited involvement, as did Cafesjian. *Id.* Kaloosdian disagreed with this assessment because he was generally available and Rouben Adalian had been representing Mathevosian's interests. 11/10 PM Tr. at 49-50. Cafesjian continued:

As the major contributor to the project, as chairman of the board and the controlling voting member, I am looked to for leadership. It is not a role that I want, but I have a sense of duty to fulfill and will not shy away from it. My goal is to push the project forward. . . .

We have been looking for an individual, or a team, that could drive this project forward. Deborah Devedjian was tried as one potential or partial solution. The 120-day engagement to produce a preliminary business plan was to be a test of her capabilities, her passion, and her ability to interact and work with the Board. Unfortunately, she has failed the test.

Is Deborah smart? Probably. But she was not smart enough to know that directives from the Board are more important than her opinion. . . . Is Deborah hard working? Perhaps. But do not confuse nervous high energy with hard, effective work. . . . Did her presence and her activity help to rekindle interest in the AGM&M project? Of course. . . . But it would be a mistake to ascribe the communities' enthusiasm to

Deborah. Yes, Deborah became "a Face" for the project, but she is not "the Face." She can be replaced. It would be a serious mistake to allow Deborah to continue forward.

. . .

I listened carefully to your concerns when we spoke in October, and based upon those concerns, delayed sending the proposed letter. We should not, we cannot, wait any longer.

PX-178. Cafesjian went on to discuss the need to focus on fundraising:

I agreed with you in October, and I continue to agree with you, that the next step is to determine what level of financial support there is in the community. The cost of the project, and/or the timing and phasing of the project, can be adjusted to correspond to the level of support.

We propose to start by approaching targeted major donors. I have instructed the staff of the Cafesjian Family Foundation to produce a presentation booklet. I have been in contact with several individuals that I think could provide both leadership and invoke additional confidence in the project. When these are in place, we propose to begin contacting the targeted major donors.

I am endorsing the selection of Papazian as the project design architect. His design is powerful and his passion runs deep. Both more than make up for any lack of experience, which can easily be hired in support. The proposed design may be controversial for DC, but we will not know how difficult it will be to get approval until the design is submitted. If modifications are needed, they can be made later.

*Id.* Cafesjian closed by saying that he would send out a copy of the package once it is prepared.

"Meanwhile, John Waters will be available to answer any questions or discuss options." *Id.*

Kaloosdian testified at trial that Cafesjian often referred inquiries to Waters and that Cafesjian was not always responsive in conversation. 11/10 PM Tr. at 45-46; 11/12 AM Tr. at 149-50.

Kaloosdian described him as "sphinx-like." 11/10 PM Tr. at 45-46.

The record does not reveal any additional discussion about the draft letter to Devedjian.

On April 25, 2006, Waters sent the letter to Devedjian, with very little changed from the previous

draft. *See* PX-340. That same day, Waters distributed materials to the AGM&M Board in advance of a meeting to be held the following day by conference call. *See* PX-182. The materials included a proposed agenda, a draft prospectus to be shown to major donors, a major donor solicitation plan and list of prospects, a proposed structure for the management of the project, a proposal for an honorary committee, a senior staff recruiting proposal, and a financial overview for 2005 and 2006. *Id.* The fundraising plan called for an initial silent phase aimed at $5 million donors with a target of $75 million, followed by a public phase of solicitation with a goal of raising an additional $75 million. *Id.* at 14.

The financial overview distributed by Waters stated that as of April 25, 2006, AGM&M had expended just under $20 million, approximately $17.3 million of which had been used to acquire real estate, with the balance being spent on property maintenance (taxes, insurance, etc.) and operations. *See id.* at 18. In 2005, AGM&M had spent $190,000 on professional fees, $3500 on administration, $37,500 on insurance, $385,000 on property-related expenses, and $215,000 on behalf of ANI, for a total of $831,000. *Id.* In 2006, AGM&M had spent $100 on professional fees, $2500 on administration, $39,000 on insurance, $220,000 on property-related expenses, and $16,500 on ANI, for a total of $278,500.[36] *Id.* Waters estimated that AGM&M would incur an additional $423,500 in expenses during the rest of 2006. *Id.* Waters stated that as of April 24, 2006, AGM&M had approximately $35,000 in its cash account and approximately $556,000 in its endowment account. *Id.* A week before this report was sent, Waters had transferred $50,000 from CFF's account to cover AGM&M's operating expenses. *See* DX-206;

---

[36] The Court notes that the "total" figure is not a correct sum, but it was reported as such by Waters. *See* PX-182 at 18.

DX-207; 11/23 AM Tr. at 120-21.

     *J.*       *The April 26, 2006 Meeting of the AGM&M Board of Trustees*

On April 26, 2006, the AGM&M Board of Trustees held its fourth meeting, via telephone conference.[37] The participants were Cafesjian, Waters, Hovnanian, Kaloosdian, and Adalian, who was representing Anoush Mathevosian. *See* DX-133 at 1. The first issue discussed was composition of the Board, the status of successor trustees, and voting requirements. *Id.* It was agreed that Cafesjian had three votes based on his level of contributions and that 80% approval was required for passage of resolutions. *Id.* Kaloosdian proposed that decisions be reached by consensus[38]; he also suggested that Anoush Mathevosian's representation by Adalian be formalized if necessary. *Id.*

The discussion next turned to the issue of Deborah Devedjian. Kaloosdian asked about the status of relations with her. Waters reported that he had not spoken to her in about a month. DX-133 at 1; PX-183 at 1. Kaloosdian and Hovnanian wanted to resolve the dispute with her to avoid controversy before the fundraising campaign began, although Cafesjian did not want to pay her more than he believed she was owed. PX-183 at 1-2; DX-133 at 1-2. Attention then turned to language Waters used in the letter to Devedjian: Hovnanian wanted to know what Waters

---

[37] The events of this meeting have been reconstructed from a variety of sources: Rouben Adalian drafted a set of minutes (DX-133); Hirair Hovnanian's assistant took notes that are close to a transcript (PX-183); Waters took handwritten notes (DX-132); and the meeting was discussed extensively during the testimony at trial. The Court's findings reflect the facts the Court has credited.

[38] At trial, Kaloosdian denied saying this at the meeting; he testified that "consensus was not a word that was ever used with the AGM&M." 11/12 AM Tr. at 38. The Court finds this testimony conflicts with other credible evidence in the record. For example, Rouben Adalian testified that the AGM&M Board did try to operate by consensus, which is why AGM&M Board meetings often did not have formal votes. 11/16 AM Tr. at 63-66; Adalian Dep. Tr. 205.

meant when he wrote that "the Board decided" to end her services.  PX-183 at 2.  Hovnanian felt

that because Waters and Cafesjian had negotiated with Devedjian that they should not try to

speak on Hovnanian's behalf.  *Id.*  Cafesjian then pointed out that Hovnanian had agreed to

enforce whatever agreement had been reached, but Hovnanian said that because he did not know

what negotiations took place, he did not want to be included in whatever "the Board decided."

*Id.*  Waters then explained what happened during the negotiations with Devedjian and said that

he and Cafesjian had consulted an attorney for guidance.  *Id.* at 2-3.  Kaloosdian said that

Cafesjian could have taken action as the president of AGM&M and made legal decisions with

counsel without stating that the Board had made a decision; Kaloosdian said it was important to

understand when the Board was acting and when Cafesjian was acting in his capacity as

President and Chairman of the Board.  *Id.* at 3.  Kaloosdian proposed that Waters and Devedjian

have a face-to-face meeting; Waters reported that he had made five attempts to contact her and

that she had repeatedly rejected his requests for a meeting.  *Id.*  Hovnanian was still concerned

about the use of the word "Board" to describe actions that he had not approved, and he told

Waters not to include him in that term unless he had explicitly voted for something.  PX-183 at

3.  Cafesjian apologized for the use of the term and offered to send a revised letter to Devedjian,

but Hovnanian said that was unnecessary.  *Id.* at 3-4.

The next topic of discussion was Edgar Papazian.  Hovnanian stated that he liked

Papazian as a person but had a different view of his architectural designs: "I do not like it and

everyone I showed it to thinks it looks like a big penis sticking right out of the middle of the

building." PX-183 at 4.[39] Hovnanian acknowledged that Cafesjian liked Papazian's design but said, "if you are going along with that I am not in favor of that, just let the record show it." *Id.* Waters defended the Papazian proposal, noting that his designs would evolve as the project moved forward and could be scaled back to meet the concerns raised by the Board. *Id.*; DX-133 at 2. Hovnanian asked what had happened to the RFQ process and the monies that were spent on that, and Waters recounted the history, explaining that the only payments that had been made were to Concord Partners to organize the planned competition and to Gallagher & Associates for exhibit design work. PX-183 at 4-5; DX-133 at 2.

The issue of finances was then brought up, with Hovnanian requesting detailed reports from Waters about the finances of AGM&M. *See* PX-183 at 5. Hovnanian said that he had previously indicated a willingness to solicit one major donor he knew but that he refused to show him the Papazian design. *Id.* Kaloosdian added, "I had made my position clear. I have done it twice before and I will do it again and also in writing. I do not think that design has one chance in a thousand of going through the Washington [review] process . . . . and, I repeat, to push that forward at this point and show that to prospective donors, I think it will turn them off." *Id.* "Secondly," he added, "I do not think that plan is subject to modifications. I think it is going to need too drastic of a change and it will be a tremendous negative down the line and allow people to be critics of the project." *Id.*[40] Kaloosdian then hedged slightly, saying to Cafesjian, "if you

_____

[39] All dialogue from this meeting is quoted, with some alterations for clarity and context, from the near-transcript-like notes taken by Hovnanian's assistant. *See* PX-183.

[40] At trial, Kaloosdian denied that he was expressing opposition to the Papazian proposal, saying he was merely offering "24 carat gold advice . . . for Mr. Cafesjian to evaluate." 11/12 AM Tr. at 27.

want to move on it [that is okay], but I just don't buy it."

"You have the votes to block it," Cafesjian replied.

"I do not want to block anything," said Kaloosdian.

"That's not what I mean. I mean, the two of you are against it; it's not going to happen." Cafesjian continued, "The question is, we have a choice now of starting all over again and getting an architect or going ahead with another drawing to get fundraising—take your pick." PX-183 at 5. Frustrated with the lack of agreement, Cafesjian brought up the issue of the reversion clause, noting that they had to make progress on the project or else the property would revert to him. *See id.*; 11/15 AM Tr. at 123-24.

"What property?" Hovnanian asked.

"The ones I paid for," Cafesjian answered. "The other reverts back to the Assembly."

Waters corrected him. "No, the Bank Building goes back to Gerry and Anoush." Hovnanian asked if that was in the original agreement, and Waters responded that it was in the grant agreements. PX-183 at 5. Kaloosdian asked if Waters could put these documents together because he had not been at the gala in 2003 when they were signed and did not have a copy of them. *Id.* at 5-6. Waters then clarified that he did not believe that Mathevosian had a reversionary interest. *Id.* at 6.[41]

Waters then said that it was time to test the appetite of the community, and he wanted to put together a communication piece for that purpose. PX-183 at 6. "Now if we raise $50 million

---

[41] Adalian's minutes from the meeting indicate that "Hovnanian advised that he had not asked for a reversion requirement and Waters reminded that Mathevosian had not asked for a reversion requirement either." DX-133 at 3. Waters denies that he said this during the meeting. 11/15 AM Tr. at 122. In fact, Hovnanian had a reversion clause in his grant agreement, while Mathevosian did not, as she had never requested one.

or $75 million in six months and we build confidence from those pledges that we are in the position to authorize the expenditures of those dollars then we would go forward [with development.]  The timing would be driven by the pledges.  If we spend six months and can't raise $20 million, then we will have to come back and see our options, no project, small project, or—say we raise a smaller amount, same kind of question."  Kaloosdian was pleased with this approach, noting that he was skeptical the community would support a $150 million project.  *Id.*

Cafesjian noted that there was enough friction among the Board members that the project might not go smoothly regardless of the budget.  PX-183 at 6.  Kaloosdian said, "I do not see any friction.  I think we should have honest and candid discussion."  *Id.*  "Good," came Cafesjian's reply.

Hovnanian then went back to the issue of the reversion clause.  He said he thought that the agreements had been signed in a rush and that they had agreed that changes could be made later.  PX-183 at 6-7.  Waters said he did not recall any changes that were supposed to be made.  *Id.* at 7.  Kaloosdian said they should review the original documents to make certain that there were no omissions.  *Id.*  The meeting concluded with a discussion of proposals for an honorary committee of distinguished Armenian Americans to serve the museum.  DX-133 at 3.

The minutes of the meeting taken by Adalian include the discussion about fundraising, during which Hovnanian inquired about a likely fallback position in the event that phase I targets were not reached, and Kaloosdian proposed considering the renovation of only the Bank Building as one option.  DX-133 at 2.  At trial, Kaloosdian did not recall ever suggesting that the museum project be limited to the Bank Building.  11/10 PM Tr. at 74.  However, the Court credits Waters's testimony that whenever the issue of budget was brought up, there was always a

85

discussion about proceeding with a smaller project or smaller museum footprint.  11/23 AM Tr.
at 103.  Kaloosdian also testified that he was surprised to learn during this meeting that
AGM&M was nearly out of money.  11/12 PM Tr. at 143.

On May 5, 2006, Adalian—who had said little during the Board meeting—wrote a letter
to Waters about Anoush Mathevosian's role in the museum project.  *See* PX-185.  Adalian wrote
this letter on his own and not at Mathevosian's request.  11/16 AM Tr. at 62; Mathevosian Dep.
Tr. at 26-28.  "It is my understanding to date that I am not filling in for Anoush as much [as]
attending the Board meetings because she asked me to represent her and to communicate with
her about the AGMM process."  *Id.* at 1.  Adalian noted that Mathevosian's health conditions
limited her ability to contribute meaningfully to the project and that if her health does not
improve, there may need to be further discussion about her representation on the Board.  *Id.*
Adalian also said that "[o]ther than the pace of progress, Anoush has had no reason to be
concerned about AGMM or of her expectations of AGMM."  *Id.* at 2.  Adalian's letter raised the
issue of naming rights for Mathevosian for the interior space in the Bank Building, which
Adalian believed had been agreed to in the early days of the project.  *Id.*  Then, Adalian
addressed one final issue:

> Lastly, since Anoush made her original donations to the Armenian Assembly of
> America, the question of reversion was not an issue.  But as the matter has been
> raised, even in the unlikely possibility of discontinuing the AGMM project, it is only
> proper that Anoush's interest in AGMM be treated with consideration equal to the
> provisions made by other founding donors.

PX-185 at 2.  Adalian explained at trial that he believed, based on the discussion at the April
2006 meeting, that there was a possibility that the project would not come to fruition.  11/16 AM
Tr. at 62-63.  Mathevosian testified that she never asked Adalian to request a reversionary

interest. Mathevosian Dep. Tr. at 27-28. Waters never responded to this letter. 11/15 PM Tr. at 106.

On May 23, 2006, Kaloosdian wrote a brief email to Waters reflecting on the recent meeting. *See* PX-186. He wrote:

> I felt that the AGMM meeting on April 25th [sic] was quite helpful in that it gave all of us a base from which to move forward. I was encouraged by the openness, candor and discussion which occurred. We must strive to continue in the same spirit in order to maintain whatever momentum we acquired during the course of the meeting. Thus, I would like to respectfully request that minutes of the meeting be distributed as soon as possible.

PX-186. Waters disagreed with Kaloosdian's view of the meeting as candid and open. 11/15 PM Tr. at 6.

### K. *"Competing Visions" and the End of Cafesjian and Waters's Tenure as Officers of AGM&M*

Waters and Cafesjian had considered the April 2006 meeting to be an opportunity to bring all of the prior conflicts about the project to a head, but by the end of that meeting, they had concluded that the Board was not likely to ever reach agreement about how to build the museum. 11/15 PM Tr. at 10-11. Although Hovnanian and Kaloosdian had said that Cafesjian was in charge, Cafesjian did not believe he had carte blanche to build the museum to suit his own ideas. 11/23 AM Tr. at 103. Rather, Cafesjian felt constrained by the 80% vote requirement in the By-Laws, and the general disapproval of Hovnanian and Kaloosdian meant that Cafesjian's vision would not prevail. *Id.* at 104. Kaloosdian testified that he never said he would vote against the Papazian proposal if it were put to a vote. 11/10 PM Tr. at 67. But Cafesjian could hardly be faulted for assuming that Kaloosdian would vote against it. Moreover, even if Kaloosdian supported the proposal notwithstanding his own concerns, Hovnanian was clearly opposed, and

therefore Papazian was not the consensus choice of the Board.

Cafesjian believed that the differences between himself and Hovnanian were irreconcilable. As hard as it was to accept, he decided that his position on the AGM&M Board was creating problems and if he was to step aside, the project might progress. Cafesjian Dep. Tr. at 286; 11/19 AM Tr. at 27. Cafesjian knew that he wanted to build a large museum and memorial complex on the entire footprint, and he thought that the other trustees were not willing to spend the money required for such a project. 11/19 AM Tr. at 28-29. Therefore, Cafesjian decided he would leave the project. 11/19 AM Tr. at 98.

Having reached this decision, Cafesjian directed his attorney, William Brody, to send a letter to the other AGM&M trustees. *See* PX-187. Brody explained that Cafesjian had asked him to communicate with them regarding the current state of affairs at AGM&M. *Id.* at 1.

> Gerry has no doubt that all of you as well as himself as Trustees and individually are fully supportive of the purposes of AGM&M as set forth in its organizational documents. That has certainly not been the problem. Rather, it is Gerry's view that the problem has been one of two competing visions for AGM&M neither of which has commanded a consensus among the Trustees. His has been a more ambitious, more expensive and, almost certainly, a more controversial vision. It is certainly a vision difficult to achieve. The other, and doubtless more readily attainable solution, is to confine the effort to the existing National Bank of Washington building with the view that the purposes of AGM&M are best accomplished by the opening of the Museum sooner rather than later.

> The problem of competing visions has been exacerbated by the Trustee voting arrangements. An effective deadlock among the Trustees exists as a result of the requirement that there be an 80 percent affirmative vote of the Trustees in order to take action.

> Given the competing visions among the Trustees and their past unsuccessful efforts to reach a resolution, Gerry has concluded that the differences are irreconcilable. In order for AGM&M to move forward in pursuit of its mission, the existing paradigm must change. Gerry believes that the best possible chance for AGM&M to move forward is for him to end his involvement with AGM&M. Without his involvement,

the Trustees should be able to reach a consensus regarding the vision for AGM&M and the museum development and less demanding fundraising efforts can move forward accordingly.

PX-187 at 1-2.  The letter went on to describe a proposal in which Cafesjian would terminate his involvement with AGM&M completely.  *Id.* at 2.  Under that proposal, Cafesjian would resign from the Board and renounce his right to appoint future trustees.  *Id.* at 2.  In addition, he would expect the outstanding $500,000 promissory note to be repaid by AGM&M.  *Id.*  Furthermore, assuming that AGM&M would no longer be developing the Adjacent Properties as part of the museum, Cafesjian would ask that his reversionary interest in those properties be accelerated and that the properties be returned to CFF immediately.  *Id.*  The letter also states that "Gerry fully expects AGM&M to be successful with respect to the completion of the Museum in the National Bank of Washington Building at 14th and G Street N.W. prior to the end of 2010."  *Id.*  Therefore, Cafesjian's proposal would leave his reversionary interest in the Bank Building unchanged.  *Id.* at 2-3.  However, Cafesjian would eliminate the requirement that a memorial be built as part of the project.  *Id.* at 3.

The letter indicates that "Gerry does not lightly make this proposal.  He believes that it is the only way that AGM&M can effectively pursue its mission as currently conceived by its Trustees."  *Id.* at 3.  The letter then requested that the AGM&M Board consider Cafesjian's proposal at a special meeting without him (or Waters) present.  *Id.*  Waters hoped that this letter could accomplish some kind of amicable resolution to the conflict on the Board, but he thought that reconciliation was unlikely.  11/23 AM Tr. at 115.

The "competing visions" letter caused consternation among the Assembly membership, particularly Hovnanian.  11/18 AM Tr. at 43.  Hovnanian interpreted the letter as a personal

attack on his "lesser" vision for the museum as compared to Cafesjian.  11/19 AM Tr. at 99.

Ross Vartian testified that he thought the phrase "competing versions" would have been more

accurate.  11/22 AM Tr. at 52.  Vartian felt that from the inception of the project up to this point,

there were two versions of the project: one that called for the museum to be housed within the

Bank Building (and its back lot) with a budget of $15-50 million, and another calling for the

museum to be built on the entire footprint with a budget of around $150 million.  *Id.* at 52-53.

### 1.    Request to Transfer Funds to AGM&M

About three weeks after the Brody letter, on June 16, 2006, Waters transferred $25,000

from CFF to AGM&M to cover operating expenses.  *See* DX-208; 11/23 AM Tr. at 121.  A

month later, on July 20, Waters made another transfer of $25,000 to cover operating expenses.

*See* DX-209; 11/23 AM Tr. at 121-22.  This amount was erroneously too high, so AGM&M

transferred $15,000 back to CFF a few days later.  11/23 AM Tr. at 122-23.  Subsequent transfers

from CFF to AGM&M were made in the amounts of $10,000 and $5000 in the following

months.  *Id.* at 123.  Waters treated these as short-term loans on AGM&M's books.  *Id.* at 123-

24.

On July 24, 2006, Michael Shapiro, the Controller for GLC Enterprises, sent a letter to

the Assembly's Director of Finance, Ellen Gordon.  *See* DX-137.  Gordon had worked for the

Assembly for several years earlier in the decade and had recently returned to the Assembly in

June 2006.  11/16 PM Tr. at 33.  In his letter, Shapiro introduced himself and explained that he

was overseeing the accounting for AGM&M and ANI.  *See* DX-137. at 1.  Shapiro provided wire

transfer account information for both corporations and requested that Gordon transfer the funds

being held by the Assembly for AGM&M ($565,000) and ANI ($411,000).  *Id.*  Shapiro copied

Bryan Ardouny on the letter.  *Id.*

Gordon did not transfer the funds as requested by Shapiro.  At trial, Gordon explained that she did not have the authority to transfer them on her own, and she was not instructed by anyone to transfer the funds.  11/16 PM Tr. at 70.  She testified that either Bryan Ardouny, Van Krikorian, or Edele Hovnanian could have instructed her to transfer the funds.  *Id.*  Kaloosdian testified that he believed a transfer would have to have been authorized by either Edele Hovnanian as Treasurer or Hirair Hovnanian.  11/12 AM Tr. at 76.

At trial, Gordon testified that she had performed an analysis of these restricted funds in early 2008 as she was closing out the financial statements for 2007.  *See* 11/16 PM Tr. at 45, 48; 11/17 AM Tr. at 34; DX-566N.  Gordon reviewed the original pledge documents to determine the nature of the restrictions.  11/16 PM Tr. at 49-50.  She determined that out of the $411,000 being held for ANI, slightly more than half of those funds were to be held in perpetuity for the endowment, whereas the remaining balance consisted of earnings off the endowment and could be spent for ANI operations.  11/17 AM Tr. at 7, 18-20; DX-299.  With respect to the funds being held for AGM&M, she found there were three sources for those donations: (1) a donation from Julie Kulhanjian Strauch for $71,603 to be spent on educational components of the museum; (2) a donation from the Alice Ohanesian Irrevocable Trust for $98,335 to be spent on an exhibit dedicated to the people of Van, a region in Armenia; and (3) a donation from the family of Dr. Sarkis Kechejian in the amount of $475,000, restricted to "bricks and mortar" for the museum.  *See* DX-566N; 11/16 PM Tr. at 50-51.  Some of the Kechejian funds had been spent for operations between 2000 and 2003 because the restriction on those funds was "somewhat ambivalent."  *See* DX-566N.  Ellen Gordon testified that the "bricks and mortar"

restriction allowed spending on plans for the building, architectural drawings and exhibits,

surveys, and other pre-construction expenses. 11/16 PM Tr. at 64-65.[42] The general ledger for

AGM&M shows that as of December 31, 2006, there were $556,764.53 in restricted funds being

held by the Assembly for AGM&M. 11/16 PM Tr. at 62; PX-403.

## 2.     Response to the "Competing Visions" Letter

A group of AGM&M and Assembly members held a conference call on July 28, 2006

without Waters or Cafesjian to discuss the Brody letter and how to proceed. *See* DX-505N at 1.

Participating in the call were Hirair and Edele Hovnanian, Kaloosdian, Krikorian, Denise

Darmanian (an attorney representing Anoush Mathevosian), and Haig Der Manuelian, an

attorney who had provided legal advice to the Board members. *Id.*[43] The group discussed the

history of what had transpired during Cafesjian's leadership of AGM&M. *Id.* at 2-3. With

respect to the Grant Agreement, it was noted that Cafesjian had a valid reversionary interest, but

because exhibits referenced in the signed legal documents were either blank or missing, they

could not be certain of the Assembly's legal rights. *Id.* at 3. (For example, the Transfer

Agreement refers to a "Schedule A" of transferred assets, but the schedule is missing from the

record, if it ever existed. *See* PX-112 at 10.) The group also discussed the recent letter from

Shapiro, and the minutes state that "given the current track record, it was agreed that the

[Assembly] will not transfer funds at this time." DX-505N at 3. Krikorian explained at trial that

---

[42] At some later point, the Assembly spent all of the Kechejian donation because it learned that the restrictions had been released. 11/17 AM Tr. at 38-41.

[43] It appears that Bryan Ardouny also participated in the call and drafted the minutes that are contained in the record at DX-505N, although he testified that he had no recollection of it. 11/17 AM Tr. at 111-12.

the group was unwilling to transfer the funds to Cafesjian because the group was unsure of how

AGM&M's funds had been spent with Cafesjian in charge.  11/18 AM Tr. at 133.  Everyone

agreed that an amicable solution was preferred to litigation, and it was also agreed that a joint

response to the Brody letter would be drafted.  DX-505N at 4.

> On August 1, Brody sent another letter to the AGM&M trustees.  *See* DX-138.

> It is imperative that the important issues facing the AGM&M project be addressed
> as soon as possible.  The project must have a mutually agreed upon vision that will
> allow the project to be presented to the community with a coherent message.
> Without that, it will not be practicable to raise funds to advance the project or to even
> maintain the operations of AGM&M.

DX-138 at 1.  Brody went on to give the trustees an update on "the current cash flow issues

impacting AGM&M."  *Id.*  Brody stated that "AGM&M has exhausted its currently available

cash reserves."  *Id.*[44]  Brody then explained that Cafesjian had recently advanced funds to cover

operating expenses, and advised that "[i]t seems only fair for another Trustee to meet this need in

the current cycle."  *Id.* at 2.  Brody mentioned that if the Assembly did not transfer the funds

being held for AGM&M by August 3, AGM&M would not have sufficient funds to meet payroll

unless someone else advanced funds to cover the short-term cash needs.  *Id.*  Brody

acknowledged, however, that the funds being held by the Assembly could only cover perhaps an

additional year of operations, and therefore he urged the trustees to "resolve the effective

deadlock among the Trustees with respect to the vision for AGM&M while funds are still

available to continue operations and to pursue the necessary fundraising to achieve the intended

vision."  *Id.*  Brody called the situation grave and urged the trustees to respond to his earlier

---

[44] Brody also indicated that he had had prior discussions with the AGM&M trustees and
provided them with information relating to AGM&M's finances.  DX-138 at 1.

letter. *Id.*

Brody did not have to wait long. The next day (August 2), Kaloosdian wrote a letter to Brody on behalf of himself, Hovnanian, and Mathevosian. *See* PX-190. Kaloosdian began by noting that although they had received some information from Brody, they felt they were not fully apprised of everything that had taken place. *Id.* at 1. Kaloosdian went on:

> In all candor, we were quite surprised to receive the [May 24, 2006] letter and Mr. Cafesjian's assertion of two competing visions for AGM&M. There have not been two competing visions.
>
> In fact, Mr. Cafesjian has acted as the chief executive officer of the project. We encouraged that. He alone decided whom to engage as the architect. We did not object. He also decided to lean heavily upon Deborah Devedjian and worked with her both before and after he engaged her to be heavily involved in moving the project. We did not object. Although we were not kept advised or consulted before the fact in a number of instances, never received any quarterly reports as we were supposed to receive, and still do not know his financing plans, we continued to express our confidence in him and at no time stood in the way of any of his decisions. Yet we expressed some concerns about the projected costs of the project. That does not mean we deviated from his vision. At no time did we insist on any material change from the course he charted and ran. Hence it is difficult for us to understand his statement in your letter about "two different visions." In fact, we approve his vision and we would like him to continue.

PX-190 at 1-2. Kaloosdian then stated that if Cafesjian did not wish to continue with the project, they should schedule a meeting to effect a complete separation on mutually agreeable terms. *Id.* at 2. Both Cafesjian and Waters testified at trial that they thought this letter was insincere and drafted to make it appear as though Hovnanian and Kaloosdian had been completely supportive. *See* Cafesjian Dep. Tr. at 295; 11/15 PM Tr. at 9; 11/19 AM Tr. at 29; 11/23 AM Tr. at 116-17. In the Court's view, it would be difficult to conclude that Kaloosdian and Hovnanian had been supportive of Cafesjian's proposals.

On August 4, Mike Shapiro wrote an email to Ellen Gordon following up on his request

that the funds be transferred to AGM&M.  *See* DX-139 at 1.  On the morning of August 8, Gordon replied, stating that she was not authorized to comply with it at that time, and she would ask Bryan Ardouny to bring it up at the next Assembly Board meeting.  *See* PX-192 at 1.

Brody arranged a conference call with Waters, Kaloosdian, and Krikorian on August 8. *See* PX-193.  Brody presented two options: (1) proceed based on the proposal set forth in the May 24, 2006 letter; or (2) if the remaining trustees did not wish to pursue a museum, to dissolve AGM&M.  *Id.* at 1.  Brody stated that Cafesjian did not want to stay with the project and attempt to achieve his grand vision.  *Id.*  Kaloosdian expressed surprise to hear this; he expected Brody to say that Cafesjian wanted to continue.  *Id.*  Kaloosdian thanked Brody for arranging the call and expressed his continued shock at how things had turned out.  *Id.* at 2.  Kaloosdian asked Brody to revise the "competing visions" language in the May 24 letter, as Kaloosdian thought it was incorrect that there were competing visions, and a correction would help everyone move forward. *Id.* at 2.[45]  Kaloosdian also asked Brody to provide copies of the transfer deeds for the Properties. *Id.*  Kaloosdian explained at trial that he asked for this in part to see if Cafesjian's reversionary interest had been recorded in the land records.  11/12 AM Tr. at 128-29.

Brody sent out a revised letter to the AGM&M trustees on August 29, 2006.  *See* PX-194. Brody's letter noted that Cafesjian disagreed with many of the facts set forth in Kaloosdian's letter.  *Id.* at 1.  Brody then restated the proposal from the May 24 letter and the alternative, dissolution of AGM&M, noting that Cafesjian would accede to either of these options.  *Id.* at 1-2. Brody also stated that no funds had been transferred to AGM&M and that Cafesjian had again

---

[45] Kaloosdian also testified that he had called Brody prior to this teleconference and informed him that there were not "competing visions."  11/10 PM Tr. at 83-84.

advanced funds to meet payroll and keep the account balance from going negative. *Id.* at 2. "This is the last time that Mr. Cafesjian or CFF will advance funds to meet AGM&M's cash flow needs," he wrote. *Id.*

There was no immediate response to Brody's letter. During an Assembly Board of Trustees meeting held on September 8, Waters, Hovnanian, and Kaloosdian met separately to discuss the Brody letters. 11/23 AM Tr. at 117. Hovnanian expressed his anger to Waters and asked that Cafesjian write him a letter of apology. *Id.* at 117-18. Hovnanian clearly felt that his commitment to the Armenian cause was being challenged, and he did not appreciate that it was being done by someone who had only become active in Armenian advocacy within the last ten years. "No Johnny-come-lately Armenian going to tell me he's more Armenian than I am," Hovnanian told Waters. "I'll spend every last nickel that I have to destroy him and his foundation." *See* 11/23 AM Tr. at 118. After this conversation, Hovnanian asked that Waters be excluded from the Assembly's discussion of museum-related issues due to a conflict of interest. *Id.* Waters resisted this, suggesting that Hovnanian and Kaloosdian should also be excluded because they are AGM&M trustees. *Id.* at 118-19. Ultimately, Waters left the meeting without returning. *Id.* at 119.

On September 13, 2006, Cafesjian sent a letter to the AGM&M trustees announcing his resignation as Chairman and President of AGM&M, effective immediately. *See* PX-195 at 1. His letter also indicated that Waters intended to resign as Secretary/Treasurer. *Id.* Cafesjian explained that he hoped "that this change will break the current impasse and ultimately provide AGM&M with the greatest opportunity to achieve its specific purposes." *Id.* Cafesjian stated that he intended to serve directly (or appoint a designee) on the AGM&M Board of Trustees. *Id.*

The following day, Waters called Rouben Adalian to inform him about what was going on; Adalian had not been fully aware of what was occurring during the summer of 2006. *See* DX-506N; 11/16 AM Tr. at 9. Waters told him that "the cash position of AGMM and ANI is zero to negative." *See id.* Waters explained that CFF had been advancing funds to cover operating expenses but that Cafesjian would no longer do so in light of the Assembly's refusal to turn over funds being held for AGM&M and ANI. *Id.* at 2. Waters told Adalian that payroll would not be met (meaning Adalian would not get paid), and ANI would have to start paying its own rent to stay in its current offices, which were in a building owned by Cafesjian. 11/15 PM Tr. at 107. Adalian was shocked. *Id.* In a confidential memorandum to Kaloosdian, Adalian summarized what Waters had told him:

> It was never Mr. Cafesjian's interest not to move forward. He will let go of the project and has instructed Mr. Waters to make peace. Mr. Cafesjian has washed his hands and wants to prevent anything bad from happening, but he is done making any further suggestions. From Mr. Cafesjian's perspective he has no further obligations to do anything. Whether on a pro-active basis or due course basis the current project is expected to dissolve.

DX-506N at 2.[46]

A few weeks later, Hovnanian responded to Cafesjian's resignation letter. *See* PX-197. Hovnanian first stated that he could not make a substantive response to his proposals until he had received the minutes from all AGM&M meetings and detailed financial records. *Id.* (The record shows that some financial records had been produced, but there were no official meeting minutes because Waters never kept minutes.) Hovnanian then expressed his surprise at Cafesjian's

---

[46] At trial, Waters denied that Cafesjian had washed his hands of the project and denied that he had told Adalian that he would need to vacate the ANI offices. *See* 11/15 PM Tr. at 41-45. However, the Court finds that Adalian's contemporaneous account, while biased, is generally more credible.

decision to "abandon" the project. *Id.* Hovnanian said that Cafesjian's "abrupt" decision to stop funding ANI had distressed him and others in the community. *Id.* Hovnanian stated that the Assembly would house ANI and its employees in its offices and "lend ANI the funds to cover the expenses and payroll left unpaid during your tenure of leadership." *Id.* Hovnanian also indicated that he was in the process of hiring legal counsel to review the case and represent both his interests and the interests of the Assembly. *Id.*

### 3. The Recording of the Memorandum of Agreement

Once Cafesjian decided to resign from AGM&M, he and Waters reviewed the status of the Properties and realized that Cafesjian's reversionary interest was not recorded. 11/15 AM Tr. at 120. When Kaloosdian asked questions about the land records at the August 8, 2006 conference call, Cafesjian became suspicious about Kaloosdian's motives. Cafesjian Dep. Tr. at 304. This and other conversations made Cafesjian suspect that there was an interest in selling the Adjacent Properties. *See* 11/15 PM Tr. at 34-35. He asked Waters to record his reversionary interest to protect the Properties and ensure that he would find out if the other trustees tried to sell any of the Properties. *Id.*; 11/19 AM Tr. at 108-09. Cafesjian expressed a strong emotional attachment to the properties and wanted to protect his reversionary interest. 11/15 PM Tr. at 35-36. Waters testified that Cafesjian also wanted to protect his vision for the museum using the whole footprint. 11/15 AM Tr. at 121.

Waters enlisted his father, a real estate attorney, to assist him in preparing a document that could be filed with the recorder of deeds. 11/15 PM Tr. at 28. Ultimately, Waters created a "Memorandum of Agreement Reserving Rights" (hereinafter, "MOA") between AGM&M and CFF that memorialized AGM&M's obligations under the Transfer Agreement to honor the

Assembly's agreement with CFF. *See* PX-199. The MOA noted that AGM&M had certain development obligations with respect to the Properties and that if these obligations were not performed, CFF had reversionary interests in the Properties. *Id.* Waters executed the MOA on behalf of both AGM&M and CFF, signing in his capacities as Secretary/Treasurer of AGM&M and Vice President of CFF. *See id.* at 2. The document was executed on October 23 and recorded on October 27, 2006. Waters did not intend for the MOA to create any new obligations for AGM&M; he understood the recording of the MOA as simply providing public notice of the existing obligations. 11/23 PM Tr. at 4.

Waters never informed the AGM&M Board about the MOA. 11/10 PM Tr. at 96-97. Waters testified that he considered notifying the other trustees, but he decided not to because he did not trust them. 11/15 PM Tr. at 34. He and Cafesjian thought they were making plans to try to sell the Adjacent Properties. 11/19 AM Tr. at 111. Moreover, Waters believed he was authorized by the Unanimous Written Consent to execute the MOA and therefore did not need permission from the other trustees. 11/23 AM Tr. at 125.

4.      Waters's Resignation

Waters's resignation as Secretary/Treasurer became official on October 24, 2006, when the AGM&M Board held a conference call to discuss the transition of leadership. *See* PX-201. Participating in the call were Cafesjian, Waters, Denise Darmanian (on behalf of Mathevosian), Edele Hovnanian (on behalf of her father), and Kaloosdian. *Id.* at 2. The Board unanimously appointed Hirair Hovnanian as Chairman and Kaloosdian as Secretary/Treasurer on an "interim" basis. *Id.* It was also agreed that all of AGM&M's documents and files would be boxed up and sent to Ellen Gordon at the Assembly, with Michael Shapiro as a point of contact. *Id.* The Board

also discussed the status of ANI, and it was noted that the AGM&M had not made any changes to the governance of ANI since its inception in November 2003. *Id.* Kaloosdian inquired about whether title for all of the Adjacent Properties had transferred to AGM&M; he wanted to know whether or not Cafesjian had three votes on the AGM&M Board of Trustees based on the value of the properties that had been transferred. *Id.* Waters indicated that all titles had been transferred to AGM&M save the title to 1340 G Street, which was being held in escrow for AGM&M pending final payment on the installment contract. *Id.*

### L. The Formation of USAPAC

A few weeks after the "competing visions" letter was sent, the Assembly fired its director of congressional relations, Rob Mosher. Mosher had worked for the Assembly for three years after several years' experience on Capitol Hill. 11/22 PM Tr. at 40. On June 23, 2006, Mosher was called into Bryan Ardouny's office and told that he was being terminated because he had violated a rule of the Assembly. *Id.* at 43. The rule in question prohibited any Assembly staff (except Ardouny) from talking to Ross Vartian about Assembly business. *Id.* at 63. Mosher had talked to Vartian about the Assembly's legislative agenda. *Id.* at 43; *see also* PX-283. Mosher knew about the rule but thought it was appropriate to talk to Vartian because Vartian worked for Cafesjian and Waters, who were both Assembly trustees. 11/22 PM Tr. at 43-44. Mosher was not allowed to resign amicably, and he was not allowed to return to collect personal belongings from his office. *Id.* at 44-45. The Assembly requested that he sign a formal separation agreement, but Mosher rejected the terms as unreasonable. *Id.* at 45.

After learning he had been fired, Mosher contacted Ross Vartian to tell him what had happened. 11/22 PM Tr. at 45-46. Vartian was saddened and angry about this, and he

subsequently asked Mosher if he would be interested in consulting for Cafesjian. *Id.* at 46. Mosher agreed, and in August 2006, he entered into a three-month consulting agreement with Cafesjian to research options to expand and strengthen the Armenian lobby. *Id.* at 44, 47. In conjunction with Ross Vartian, he performed a "gap analysis" and determined that both the Assembly and another advocacy group, the Armenian National Congress of America ("ANCA") had limited capabilities. *Id.* at 47; 11/22 AM Tr. at 57-58. Mosher and Vartian concluded that it would be advantageous for the lobby to create a new entity that included a political action committee ("PAC") and branches organized under sections 501(c)(3), 501(c)(4), and 527 of the Internal Revenue Code. 11/22 PM Tr. at 47; 11/22 AM Tr. at 57-58. As a result, Cafesjian decided to launch the United States-Armenia Political Action Committee ("USAPAC"). 11/22 PM Tr. at 48. Mosher began working full-time for Cafesjian in October 2006, focusing on USAPAC. *Id.*

When Hovnanian heard that Cafesjian was creating a new Armenian advocacy organization, he immediately wrote him a letter asking about his intentions. *See* PX-291. "[W]e are concerned that multiple organizations in Washington, D.C. will not be in the best interest of our community and since many of your recent hires are from the Assembly itself, we would like to cut off the opportunity for confusion," he wrote. *Id.* "While we certainly understand that we cannot prevent those from conducting advocacy in their own name, it does raise conflict of interest issues with the Armenian Assembly." *Id.* Hovnanian went on to state that Cafesjian did not share information about the creation of USAPAC with the Assembly's conflicts officer as required by Assembly guidelines. *Id.* Hovnanian then asked Cafesjian to explain himself to the Assembly Board before it considers taking action against him. "We respectfully believe that the

time has come for an honest review of your obligations and responsibilities to the Armenian Assembly." *Id.*

On December 4, 2006, Ross Vartian sent a memorandum to the Assembly, ANCA, and a variety of other Armenian organizations formally announcing the creation of USAPAC. *See* PX-292. Vartian's memorandum surveyed the Armenian community's advocacy efforts and concluded that "Armenian-American advocacy and electioneering efforts must dramatically increase." *Id.* at 2. "In brief, we have integrated the best elements of four types of public-policy friendly entities into a powerful matrix of linked organizations that together takes full advantage of all advocacy and electioneering laws and regulations." *Id.* Vartian further stated that USAPAC was eager to work with both the Assembly and ANCA. *Id.* at 3. He wrote that beyond those two organizations, "there is also room for a new civic action effort that is both different from and compatible with these organizations." *Id.* at 2.

USAPAC was publicly launched on December 8, 2006. *See* PX-293. That same day, Cafesjian responded to Hovnanian's letter. *See* PX-294. Cafesjian explained, "I firmly believe that political advocacy is the most important activity that the Armenian-American community engages in." *Id.* at 1. Cafesjian stated that he believed the Armenian American community should model itself on the Jewish lobby, which has a diverse array of national and local advocacy groups. *Id.* "I expect that USAPAC's efforts will be both complimentary [sic] and additive to the existing mix of advocacy efforts." *Id.* Cafesjian stated that the reaction from the community had thus far been positive and that if Hovnanian had any concerns, he should contact USAPAC directly. *Id.* at 2. He reiterated his view that USAPAC intended to work closely with other advocacy groups, including the Assembly. *Id.* Cafesjian testified that he did not create

USAPAC with the intent to compete with the Assembly. 11/19 AM Tr. at 34-35.

USAPAC focused on a variety of advocacy issues, such as relocating Iraqi Armenian refugees, garnering foreign assistance for Armenia through the Millenium Challenge Corporation,[47] and a free trade agreement between the United States and Armenia. 11/22 PM Tr. at 48-49. Although some staffers on Capitol Hill questioned whether a third major advocacy group would dilute rather than strengthen the voice of the Armenian community, *see* PX-295, that concern was not shared by all. 11/22 AM Tr. at 152. Ross Vartian acknowledged that USAPAC necessarily competed for hearts and minds within the Armenian community, but it was primarily targeting individuals not affiliated with either the Assembly or ANCA. 11/22 AM Tr. at 145-46. Rob Mosher explained that USAPAC provided a platform for Assembly members who were interested in electioneering activity, which could not be done through the guise of the Assembly. 11/22 PM Tr. at 57-58.

ANCA was collaborative with USAPAC from its inception. 11/22 PM Tr. at 52. However, the Assembly did not respond to USAPAC's initial overtures, and the relationship between the two organizations was essentially nonexistent. *Id.* Vartian was reluctant to contact Assembly staff after the Mosher firing incident, and as a result, USAPAC did not do much direct outreach to the Assembly. 11/22 AM Tr. at 156-58. However, the Assembly went out of its way to avoid working with USAPAC. For example, the Assembly refused to attend joint meetings on Capitol Hill when USAPAC was in attendance. 11/22 AM Tr. at 61. Bryan Ardouny testified that the Assembly was not hostile to USAPAC but that working with USAPAC was complicated

---

[47] The Millennium Challenge was a foreign aid program developed during the Bush administration to enter into compacts with foreign nations to set goals for the utilization of American assistance. *See* 11/23 AM Tr. at 106.

because of the Assembly's conflicts with Cafesjian and the subsequent litigation. 11/17 AM Tr. at 94-95. Ardouny also noted that USAPAC had upset the Assembly by taking a trip to Armenia with members of the American Jewish Committee, a group with which the Assembly had previously traveled. 11/17 AM Tr. at 100-01; DX-619N. By 2009, it was clear that the Assembly was working to marginalize USAPAC in its congressional relations. *See* DX-602N.

There is no evidence in the record—or very little, if any—that USAPAC harmed the Assembly. Bryan Ardouny testified that USAPAC "complicated" things because there were now three major groups instead of two. 11/17 AM Tr. at 82-83. But USAPAC did not compete with the Assembly either for "members, contracts, financial donations, or otherwise." 11/23 PM Tr. at 75. There is evidence in the record demonstrating that USAPAC aspired to be the dominant Armenian lobbying organization. *See* 11/22 AM Tr. at 154-55; PX-298. But the record does not support a conclusion that USAPAC diminished the Assembly's influence in any meaningful way or otherwise harmed the Assembly.

As of the time of trial, USAPAC was no longer operating. Ross Vartian's retirement in May 2010 and Rob Mosher's decision to return to employment on Capitol Hill both contributed to the end of USAPAC's operations. 11/22 AM Tr. at 142-43.

M. *The Transition to Assembly Control over AGM&M*

Following Cafesjian and Waters's resignation as officers of AGM&M and the interim appointment of Hovnanian and Kaloosdian, AGM&M was effectively controlled by the leadership of the Assembly.

1. AGM&M Finances

With the Assembly in control, Ellen Gordon took over the responsibility for maintaining

the books and records of AGM&M around October 2006. 11/16 PM Tr. at 34. When Gordon

took over the books, AGM&M only had about $2000 in its accounts. 11/16 PM Tr. at 37. In

addition, there were several outstanding unpaid bills from September 2006, and payroll for ANI

had not been met since September 20, 2006. *Id.* at 36-37. The outstanding bills primarily

consisted of property taxes, with interest and penalties, in excess of $200,000. *See* PX-456. The

Assembly paid the payroll immediately, and it paid the property tax bills in the spring of 2007.

11/16 PM Tr. at 37-38; PX-456. Ultimately, AGM&M reimbursed the Assembly for covering

those payments, using money contributed by Hirair Hovnanian. 11/17 AM Tr. at 20-21, 55.

Hovnanian contributed approximately $3 million to AGM&M after Cafesjian and Waters

resigned. *Id.* at 55. Gordon conceded at trial that the payroll for ANI could have been paid using

the funds that the Assembly had refused to transfer to AGM&M. 11/17 AM Tr. at 20.[48]

At the end of November 2006, Mike Shapiro of GLC Enterprises emailed Gordon to

begin the process of transferring the books. *See* DX-141. The transfer of records took several

months, and the last of the records was transferred on March 26, 2007. *See* DX-145. Gordon

testified that she did not receive the "adjusting journal entries" that would have been made by

Deloitte & Touche when it prepared the tax returns for AGM&M. 11/16 PM Tr. at 41.[49] Gordon

testified that she asked Mike Shapiro for them, but she did not ask Waters and did not recall if

she contacted Deloitte to inquire about them. 11/17 AM Tr. at 22. Waters testified that he

---

[48] Gordon testified that, according to analysis she performed in 2008, approximately $200,000 out of the $411,000 being held for ANI was earnings on the endowment that could be spent for operations. 11/17 AM Tr. at 7.

[49] Gordon explained that the journal entries in question pertained to adjustments on interest calculations with respect to the loan receivable from CFF for 1340 G Street. 11/17 AM Tr. at 48-49.

believed that the entries were provided to Gordon along with the rest of the books and records. 11/23 PM Tr. at 28. Waters further testified that they provided all of the information that would have been necessary to create the adjusting journal entries, but Waters was never asked for assistance with that task. *Id.* at 28-29. Waters also explained that the tax-related entries made by Deloitte would have been based on pledge agreements that were transferred to the Assembly. *Id.* at 30-33. Deloitte had not been paid for its 2005 tax-year preparation for AGM&M and ANI, and its bills for those services came due on January 24, 2007. *See* PX-456. The Assembly did not pay those bills because there was no money to do so. 11/16 PM Tr. at 39; 11/17 AM Tr. at 22.

On March 2, 2007, the D.C. Office of Tax and Revenue sent a letter to Ellen Gordon indicating that the applications for real property tax exemptions for the Properties were incomplete. *See* PX-374.[50] Those applications had been submitted in December 2003 during Waters and Cafesjian's leadership of AGM&M. Waters explained that Caplin & Drysdale had advised AGM&M in late 2003 that they had two options with respect to the property tax exemptions: (1) they could pay upfront and receive a refund if the exemption application was approved; or (2) they could defer payment and then accept interest and penalties if the application was denied. 11/24 AM Tr. at 12-13. They elected to pay the real estate taxes up front but defer payment on recordation taxes. *Id.* at 14. In the letter to Gordon, the D.C. Office of Tax and Revenue asked for copies of permits relating to demolition and construction and a timeline of

---

[50] Waters had received an email from attorneys at Caplin & Drysdale in August 2006 indicating that the District of Columbia wanted additional information about AGM&M's applications. *See* DX-247. Waters did not substantively respond to this email, but he testified that he passed it along to Ellen Gordon along with the transfer of books and records. 11/24 AM Tr. at 15.

actions taken since December 2003 to bring the properties into compliance with D.C. Code. *See* PX-374. The letter stated that if the requested information was not received within 30 days, the exemption application may be denied. *Id.* Gordon did not respond to this letter—perhaps because there were no construction or demolition permits to be provided—but she forwarded it to Rouben Adalian. 11/17 AM Tr. at 23, 57-59.

The Assembly did not respond to the letter, and on August 10, 2007, the D.C. government sent another, nearly identical letter to Gordon requesting additional information. *See* PX-375. Gordon did not respond to this letter. 11/17 AM Tr. at 24. On September 25, 2007, the D.C. government sent a final letter indicating that the applications for exemption had been denied because the requested information had not been provided. *Id.* at 25; PX-377. As a result of the denial, the recordation taxes (along with interest and penalties) became due. *Id.* at 25-26. The Assembly did not pay these taxes until June 2010, after the District of Columbia placed a tax lien on the properties. *Id.* at 25; DX-251; DX-252.

### 2. Conflicts of Interest with the Assembly

On January 9, 2007, Ellen Gordon and Rouben Adalian discovered the MOA filed in the D.C. recorder's office.[51] *See* DX-510N. This discovery alarmed everyone at the Assembly, who began wondering what else Waters and Cafesjian had done without their knowledge. Three days later, the Assembly Board of Trustees held a meeting, and Cafesjian and Waters's actions were a major topic of discussion. *See* PX-279. Assembly members questioned whether Cafesjian and Waters had breached the conflicts of interest policy by forming USAPAC and hiring Ross

---

[51] Adalian testified that he began compiling records relating to AGM&M around this time because there were a lot of unanswered questions about Cafesjian and Waters's tenure as officers. 11/16 AM Tr. at 70-73.

Vartian.  *Id.* at 1-2; 11/23 PM Tr. at 7-8, 10.[52]  Waters defended USAPAC as an effort to strengthen the community's voice and said that USAPAC had repeatedly offered to work with the Assembly.  PX-279 at 2.  Waters was asked to leave the meeting so that a vote could be taken.  11/23 PM Tr. at 8.  Then, based on advice of legal counsel, it was agreed that Cafesjian and Waters be suspended from the Assembly Board while the conflict of interest issues (and disputes relating to management of AGM&M) remained unresolved.  *See* PX-279 at 1.  It was further agreed at this meeting that the Assembly would obtain an appraisal of the Properties.  *Id.*

Waters and Cafesjian did not find out about the vote to suspend them until February 6, 2007, when the Assembly's legal counsel, Richard Sills, wrote a letter to William Brody.  *See* PX-280.  Sills explained that his firm (Holland & Knight LLP) had been retained by the Assembly to represent it with respect to the alleged conflict of interest issues that had arisen as well as issues related to AGM&M.  *Id.* at 1.  Sills stated that since Hovnanian had notified Cafesjian of the potential conflict of interest issues in his November 2006 letter, Cafesjian and Waters "ha[d] not demonstrated to the Assembly that no conflict of interest exists."  *Id.*  Sills also noted that additional developments had created additional concerns, such as the discovery of the recordation of the MOA.  *Id.*

On February 22, 2007, Ellen Gordon wrote a memorandum to Bryan Ardouny regarding a

---

[52] During this discussion, one of the Assembly members mentioned that he had heard someone on Capitol Hill say that USAPAC "was essentially trashing the [Assembly] behind [its] back."  *See* PX-279 at 1.  Another Assembly member noted that this was hearsay and that they could not be sure what Ross Vartian or other USAPAC staff members had said about the Assembly.  *Id.* at 1-2.  The Court makes note of this only to provide context and help explain why the Assembly was concerned about USAPAC; the Court does not rely on any hearsay statements from this meeting in assessing whether Defendants acted improperly through USAPAC.

meeting that was held with The Staubach Company, a real estate appraiser, discussing the

AGM&M properties. *See* 11/16 PM Tr. at 84-87; DX-513N at 2-3. According to rough

estimates provided during the meeting, the Adjacent Properties had a present market value of

approximately $20 million but could be worth as much as $40 million if sold to a developer. *Id.*

One option discussed in the memorandum was selling the Adjacent Properties and reimbursing

Cafesjian for his contributions to AGM&M. *Id.* Ellen Gordon stated that valuation information

would be helpful in negotiating with Cafesjian. *Id.* at 3. Bryan Ardouny forwarded this

information to Hovnanian, Kaloosdian, Krikorian, and other key Assembly figures. *Id.* at 1.

Adalian explained at trial that the Assembly never had any intention of selling the Adjacent

Properties behind Cafesjian's back. 11/16 PM Tr. at 19. Van Krikorian testified that the reason

for obtaining an appraisal was to ensure that the Assembly did not return appreciated property to

Cafesjian. 11/18 AM Tr. at 72-73. Although no firm decision had been made or steps taken to

market the Adjacent Properties, it is clear to the Court that some consideration was given to this

option by the Assembly leaders managing AGM&M.

3.    Late Payment on the Installment Contract for 1340 G Street

The annual payment to the Ana Sherman Trust for 1340 G Street, NW was due on March

19, 2007. *See* DX-515N. Under the Grant Agreement, either Cafesjian or CFF had an obligation

to make that payment, and Waters had always ensured that it was paid on time. 11/23 AM Tr. at

34. This year, however, Waters's check did not arrive at the Assembly until March 21, 2007.

11/16 PM Tr. at 56; DX-515N. Not wanting to make a late payment, Ellen Gordon had already

paid the $150,000 owed using funds provided by Hovnanian. 11/16 PM Tr. at 55; DX-515N.

The installment agreement would have allowed 30 days to cure a default, but Gordon did not

check this.  *See* DX-624N; 11/17 AM Tr. at 11-12.  Since Gordon had already paid the bill, she

asked Bryan Ardouny what to do with the $150,000 check sent by Waters.  *See* DX-515N.

Ardouny felt that payment after the deadline was a breach of the Grant Agreement and so advised

Hovnanian, Kaloosdian, Krikorian, and others.  *See* DX-516N; 11/17 AM Tr. at 108.

On April 5, Waters wrote a letter to Ellen Gordon criticizing her for making the payment

with funds provided by Hovnanian.  *See* PX-40.  Waters said "[t]here was no reason for the

AGM&M to doubt that the payment would be tendered" and noted that there was no risk of

incurable default.  *Id.*  Waters continued:

> The AGM&M's use of other funds . . . to make the contract for deed payment was
> completely inappropriate. . . . Any attempt to prevent our $150,000 pledge from
> being used as intended by the Grant Agreement shall not be tolerated.  The
> contribution must be credited to the 1340 G Street annual payment.  The so-called
> restricted contribution that was inappropriately sent to the contract for deed holder
> can either be returned to the donor or unrestricted.  Whichever way the AGM&M
> proceeds regarding that donation is of no moment to the Cafesjian Family
> Foundation.

PX-40.  Ellen Gordon testified that she likely forwarded this letter to Bryan Ardouny.  11/16 PM

Tr. at 57.

The Assembly (acting for AGM&M) could easily have cashed the check and refunded

Hovnanian's contribution (or credited it toward his still outstanding pledge to AGM&M).  11/16

PM Tr. at 90.  In fact, doing so would have aided AGM&M as it was low on operating funds.  *Id.*

But instead, they rejected Waters's demand that the check be credited toward CFF's obligation.

On April 20, Gordon responded to Waters:

> As you are aware, the payment was due on March 19th and a letter having been sent
> in advance advising of this and having received no response or even a phone call by
> the due date, we proceeded in a prudent manner.  Your check came after the due date
> and after the payment due was paid.

> At this stage it seems to me that this in the lawyers' hands. If you would like the check back in the meantime, though, let me know.

DX-200. Receiving no further instructions from Waters, Gordon shredded the check. 11/16 PM Tr. at 57; 11/17 AM Tr. at 52-53.

The Court finds no fault with the Assembly's decision to pay the $150,000 bill on its due date rather than wait for a check from Waters. However, there does not appear to have been any legitimate basis for refusing to cash the check and credit CFF with meeting its obligation under the Grant Agreement.

Since 2007, Cafesjian or CFF has sent its check directly to the Ana Sherman Trust to pay its annual obligation. 11/23 AM Tr. at 35.

### 4. The Assembly Accuses Cafesjian and Waters of Mismanagement

Following the initial letter from the Assembly's lawyer, Richard Sills, to Cafesjian and Waters, there was discussion among the parties' counsel about negotiating a resolution to the various disputed issues. On March 15, 2007, Sills sent a lengthy letter to Cafesjian's lawyer in response to a settlement proposal that the two had been discussing. *See* DX-144.[53] Sills's letter accused Cafesjian of, among other things: spending restricted funds while managing AGM&M, neglecting AGM&M in favor of other projects, creating USAPAC to compete against the Assembly, failing to turn over the books and records of AGM&M, and mismanaging AGM&M funds. *See id.* at 1-3. Sills also accused Waters of breaching his fiduciary duties by filing the

---

[53] Defendants' Exhibits 144 and 146 are letters exchanged between counsel during settlement negotiations. As the Court explained in its Pretrial Conference Memorandum Opinion and Order, the Court has considered these exhibits only for the limited purposes of assessing Defendants' motivation and good faith for filing a lawsuit and establishing Plaintiffs' awareness of Cafesjian's litigating position. *See* Docket No. [149].

MOA without authorization.  *Id.* at 2.  Sills also stated that with respect to the outstanding promissory note to CFF for $500,000, he had been advised by his clients that the note had been forgiven as part of Cafesjian's takeover of AGM&M.  *Id.* at 3.  Sills went on to state that the statute of limitations for collecting on the note had expired in May 2006.  *Id.*

Cafesjian was surprised at the hostility of this letter and the inaccuracies (as he perceived them) of the claims that were asserted.  11/19 AM Tr. at 36.  Cafesjian also did not understand why this letter came from the Assembly's lawyer rather than from the other AGM&M trustees, since it dealt primarily with issues relating to AGM&M.  *Id.* at 31.  Waters thought that this letter made it clear there was no chance of reconciliation between the two sides.  11/23 PM Tr. at 12. Vartian's reaction to the letter was that this was "game over"—the differences between the parties were so great as to be irreconcilable.  11/22 AM Tr. at 55.

Cafesjian's attorney responded with a detailed letter on April 9, 2007.  *See* DX-146. After setting forth Cafesjian's version of the facts, he concluded, "[t]he Assembly is now in breach of its obligation to have issued Cafesjian a new [promissory] note.  As a result of that failure no note was or could be transferred to the AGM&M.  Recourse to remedy this transgression is both available and timely."  *Id.* at 10.  The letter further notes that "if there ever were any hope for project success, this brewing dispute reduces the chances of the AGM&M being developed by 2010 to just about zero."  *Id.*  The letter ended by stating that Cafesjian had no choice but to review and pursue his legal options.  *Id.*

N.     *The Filing of the First Lawsuit*

On April 26, 2007, Cafesjian and CFF filed a lawsuit against the Assembly in the U.S.

District Court for the District of Minnesota. *See* PX-202.[54]  The complaint alleged that the

Assembly had failed to reissue the promissory note as required by the Grant Agreement and

asserted claims for breach of contract and breach of the implied covenant of good faith and fair

dealing. *See id.*  The complaint sought damages in the amount of $500,000, a declaration that the

breach was material, and rescission of the Grant Agreement and restitution of all donations made

pursuant to that agreement. *Id.* ¶¶ 25-27.

Cafesjian felt that he had to file the lawsuit to protect his rights with respect to the

promissory note after the March 15 letter from Sills made clear that the note would not be repaid.

11/15 PM Tr. at 49-50; 11/23 PM Tr. at 14.  Waters explained that the reason they sued the

Assembly was that they believed the Assembly, not AGM&M, held the promissory note, and

they did not want to involve AGM&M in the litigation.  11/15 PM Tr. at 46-47.  Waters testified

that they demanded rescission in order to preserve their rights with respect to their breach of

contract claim.  11/23 PM Tr. at 17.  He also said that the rescission demand was like a "big

hammer for a baby issue," and the hope was that the Assembly's response to the lawsuit would

be to simply reissue the note. *Id.* at 18-19.  Cafesjian clearly hoped that the Grant Agreement

would be rescinded; he wanted to get the properties back so that he could get the museum built in

his lifetime.  11/19 AM Tr. at 37, 94.  He disclaims any intent to damage AGM&M, which the

---

[54] One issue raised at trial concerned whether the Assembly contemplated filing a lawsuit before Cafesjian filed this action.  Although the Assembly likely considered legal action against Waters and Cafesjian during this period as one option, the record does not show that the Assembly was planning to sue Cafesjian or Waters before the first lawsuit was filed. *See, e.g.*, 11/10 PM Tr. at 101 (Kaloosdian denying an intent to file a lawsuit first); DX-535N (Krikorian's notes discussing negotiations leading up to the lawsuit); 11/18 AM Tr. at 54 (Krikorian denying that a decision was made to commence proceedings against Cafesjian).  Ultimately, the Court finds this is not relevant to the adjudication of the claims before the Court.

Court credits.  *Id.* at 37.

O.      *The May 7, 2007 Meeting of the AGM&M Board of Trustees*

At some point in April 2007, for reasons unclear from the record, Robert Kaloosdian resigned his position as the Assembly's designated trustee of AGM&M.  11/10 PM Tr. at 101-02. Van Krikorian was designated as his replacement.  11/17 AM Tr. at 145.  On May 2, 2007, Cafesjian resigned as a trustee of AGM&M and named John Waters as the designated trustee of the Cafesjian Family Foundation.  *See* PX-203.  Cafesjian stated that Waters would control all three of CFF's votes on the AGM&M Board.  *Id.*  Cafesjian also designated Ross Vartian as the successor to Waters.  *Id.*

The AGM&M Board of Trustees held a meeting on May 7, 2007, in the kitchen of Anoush Mathevosian's house in Great Neck, New York.  Attending the meeting were Mathevosian and her attorney, Denise Darmanian, Hovnanian, Krikorian, and Adalian.  *See* PX-207 at 1; 11/16 AM Tr. at 82-83.  Waters participated by telephone.  PX-207 at 1.  Adalian recorded the meeting by tape and later transcribed it at the request of Van Krikorian.  11/16 AM Tr. at 83.  Although the audio tape is not in the record, Adalian's transcript is, albeit in several drafts.  *See* PX-206 (draft transcript); DX-521N (earlier draft).  Adalian also took minutes, which were revised several times after the meeting, again at Krikorian's request.  *See* PX-207; PX-208; DX-526N; DX-528N.[55]  The discrepancies between the minutes and the transcript, as well as the history of the revisions to those documents, greatly illuminate what transpired during the meeting.  The Court also heard a great deal of testimony, much of it conflicting, over what

---

[55] Van Krikorian also testified that there was a draft agenda for this meeting that was followed, which he discussed during his testimony, but the agenda was not admitted as an exhibit.  *See* 11/17 PM Tr. at 111-12.

occurred during that meeting. The account that follows is the Court's reconstruction of events as it finds and credits them to have occurred based on the record as a whole.

1. "Part One" of the Meeting

The meeting began with Van Krikorian asking Waters a series of questions about what had transpired over the last several years while he and Cafesjian were in charge. Krikorian asked if there were any approved minutes from the AGM&M meetings. *See* PX-206 at 1. Waters answered that they (i.e., he and Cafesjian) had sent everything in their possession. *Id.* Krikorian said he had not seen any signed records except for those relating to the execution of the Grant and Transfer Agreements and the establishment of the corporation in October and November 2003. *Id.* Krikorian then asked about Waters's recording of the MOA. *Id.*

"You know, I am not going to answer any of those questions in this context," Waters replied. *Id.*

"It is a board meeting and you acted on behalf of AGMM," Krikorian said. "I think you kind of have to." *Id.* at 2.

"No, I don't have to," Waters shot back. *Id.* He said that the letters exchanged by the lawyers had addressed this issue, and anything else said would have to be on advice of legal counsel. *Id.* Krikorian was frustrated by Waters's nonresponsiveness and asked what CFF's position was with respect to the future of AGM&M. *Id.* Waters did not take the bait. "You want to ask me that question," he said. "I want to ask you the same question. So . . . ." *Id.*

"But you haven't filed a lawsuit," Krikorian said. *Id.* "Our position, I am representing the Assembly, the Assembly's position, we want to develop the museum, we want to exercise our fiduciary duties properly, be faithful to the donations that were made, and build a museum. We

115

want to use all the properties that were donated and be faithful to all of that. We see a need for it. So, I answered your question and I think Anoush and Hirair are agreeing with me for their part, even though they are not talking right now. What's yours? What's the story?" *Id.*

Waters answered that Cafesjian was still open to listen to suggestions, but that the events of the last few months made resolution seem unlikely. *Id.* Krikorian then asked Waters if there was Board authorization for the filing of the MOA. *Id.* Waters resisted. "You know if you want to take a deposition at some point, let's go ahead with that. You're not going to conduct one in the context of this meeting." *Id.*

Krikorian then moved on to other subjects. He asked Waters if he prepared any reports to the AGM&M Board as Secretary/Treasurer, and Waters responded that he had not done so. *Id.* at 3. He asked Waters what fundraising efforts had been conducted, and there was further discussion about whether Waters could answer that question. *See id.* at 3-4. Krikorian said that CFF had been managing the project, and after Waters disputed that characterization, Krikorian launched into a diatribe:

> OK. Gerry Cafesjian was chairman and president. John Waters was the secretary/treasurer, recently appointed as a trustee. Under any circumstance you owe a report to the board. Any board has the right to ask its officers what they did and that officer has to respond with a report that is not, "I am not going to answer," but is, "here's what we did," because you have fiduciary duties to the AGMM. I can ask anyone else what they did, any corporate board, any officer, it is quite regular to get those reports. These are basic issues, John. Tax returns were filed without board approval, [without] the board seeing them. A lien was recorded on properties belonging to AGMM. A considerable donation [of rugs] was made and we don't have any record of it, and we don't know where it is. You apparently know where it is. I haven't seen any correspondence on it, but as I recall those rugs were valued at a million dollars. You got to give reports on this stuff. We did get a letter from your attorney saying that the Cafesjian Foundation donated in excess of $14.5 million to the project. This affects how many votes people are entitled to. Is that accurate? Can you tell me how much you guys have donated so far?

PX-206 at 4.  Waters said the $14.5 million figure was approximately correct, and then there was a dispute about whether Waters was entitled to three votes.  *Id.* at 5.  Krikorian then returned to the MOA issue, asking if Waters would remove it from the records.  *Id.*  Waters said he would not do so.  *Id.*  Krikorian asked Waters about some tax issues, and Waters said that Ellen Gordon should have all of the relevant records in question.  *Id.* at 5-6.

Seeing that Krikorian's questioning was not leading anywhere, Hovnanian took the lead. He asked Waters to provide some information about which donors had been contacted so that they would know who to approach in the future, and Waters said he would look into it.  *Id.* at 7. Hovnanian then asked Waters how he and Cafesjian planned to move forward.  *Id.*  Waters repeated that they had tried to move forward, but he went on to say, "I will suggest if there is a desire to move forward, I place a greater degree of that burden on you [Hovnanian] and Anoush and Van and the current members of the board, to make a recommendation on how to move forward."  *Id.*  Hovnanian then asked some questions about finances, and Waters again said that he had provided all of the documentation and that there were no unusual expenditures.  *Id.* at 7-8.

Krikorian then spoke up and returned to the issue of the lawsuit.  PX-206 at 8.  Krikorian asked why Cafesjian was seeking rescission of the Grant Agreement, and the discussion devolved into back-and-forth arguments about who was in the wrong.  *Id.*  Krikorian blamed Waters and Cafesjian for leaving AGM&M in poor financial shape, letting the properties deteriorate, and failing to make progress on the project.  *Id.* at 9-10.  Krikorian concluded that Waters had a serious conflict of interest because he was seeking a return of the Properties at the same time he wanted input on how to develop the museum.  *Id.*  Waters tried to move the discussion toward the meeting agenda, but Krikorian did not feel comfortable discussing those issues with Waters

still participating in the meeting. *Id.* at 10-11. "I think it is a conflict of interest for you to be present when we discuss those things," he said. *Id.* at 11.

Waters disagreed with Krikorian's assessment and said he thought Krikorian needed a court order to exclude Waters from participating. *Id.* at 11. Krikorian said he thought that Waters had a clear conflict of interest and that he should be excluded from participating. *Id.* "I think that the action that we would take would be to ask you not to participate in those discussions on proposals on how to go forward or the votes, and then bring you back when we're done with those," Krikorian said. *Id.*

"Well, no, I am not going to allow that to happen," Waters said.

"How are you not going to allow that to happen?" Krikorian asked.

"Well, I exercise six votes, I mean three out of the six votes," Waters replied.

"Well, you are not allowed to vote on this because you got a conflict on voting on your own situation."

"That's your own interpretation," Waters said to Krikorian. "I say *you're* conflicted out." PX-206 at 11. Waters and Krikorian continued back and forth for another thirty seconds, and then Krikorian decided to break the stalemate. "I'm going to make a motion that the Cafesjian Foundation be precluded from participating in discussions on proposals on how to develop the museum or have them lift the liens that have been placed on the properties because it filed a lawsuit seeking rescission of the Grant Agreement, restitution of all donations made pursuant to the agreement, and have also for a year asked for those properties back, which have appreciated in value. Is there a second?" Krikorian asked. *Id.* at 12.

Hovnanian spoke up. "I second. Anoush?"

118

Before Mathevosian could respond orally, Waters interjected. "All opposed? You have got three votes against that motion." *Id.* The parties disagree about whether Anoush Mathevosian actually voted on Krikorian's motion before Waters spoke. Waters testified that he thought Mathevosian had voted in favor of the motion. 11/23 PM Tr. at 15. Rouben Adalian initially said at his deposition that Mathevosian had expressed her agreement with Krikorian's proposal, but he later said he was confused and changed his deposition testimony. *See* 11/16 AM Tr. at 88-93. At trial, Adalian testified that no vote was taken and that Mathevosian did not vote. *Id.* at 86-87. Adalian also testified that he had listened to the tape recording of the meeting and that the transcript accurately reflects that Waters spoke immediately after the question was raised. 11/16 PM Tr. at 13. Krikorian gave similar testimony. *See* 11/17 AM Tr. at 155. Mathevosian was repeatedly asked at her deposition whether she voted on this motion, but her recollection was so limited and inconsistent that her testimony is unreliable. Ultimately, the Court finds the transcript to be the most reliable evidence on this issue, and the Court can only assume that if the tape recording contradicted the transcript, it would have been played for the Court. Accordingly, the Court finds that no formal vote was taken on Krikorian's motion.

"You are not allowed to vote on that because it affects you," Krikorian said in response to Waters's interjection.

"No, I am allowed to vote on it," Waters said.

"You know what? You're not, though, John," shot back Krikorian.

"What? OK. I really think this meeting for all intents and purposes is over," Waters said. "I hereby move to adjourn." Hovnanian then said he would like to discuss several other issues before ending the meeting. PX-206 at 12. Krikorian then stated that he would not vote to

adjourn the meeting. "We got a stalemate for all intents and purposes," Waters said. *Id.* at 13.

"We don't got a stalemate actually because I think it's very clear that you can't vote on a motion to disqualify yourself," Krikorian responded. *Id.* "You just can't. It's basic parliamentary procedure. It's basic law. You cannot do that." Waters and Krikorian bickered back and forth for a few more seconds, and then Waters said he was going to hang up the phone.

"I am going to be leaving the meeting under protest," he said. *Id.* "Anything that you do from this point forward, you can consider it to be a quorum if you like because it says that it is. Anything you vote on, you can do whatever you want, but . . . . Anyway, my participation in this meeting is over." With that, Waters hung up the phone and left the meeting. *Id.* Waters testified that he did not mean his words literally, and he did not intend to give his blessing for the meeting to continue but was leaving under protest. 11/23 PM Tr. at 16.

But continue it did. "Let's proceed with the meeting because we're entitled to proceed," Krikorian said. PX-206 at 13. The others agreed, and the meeting proceeded to "part two." The minutes drafted by Adalian and signed by Krikorian for "part one" of the meeting show that Waters left voluntarily. *See* PX-207 at 3.

### 2.    "Part Two" of the Meeting

After Waters hung up the phone, the group decided to take a coffee break. It is unclear whether any substantive discussion occurred during the coffee break.[56] Following the break,

---

[56] Adalian testified that the tape recorder remained on throughout the meeting and that part two of the meeting continued without the tape recorder being turned off. 11/16 AM Tr. at 97. However, Krikorian testified that the recorder was not working for a period of time and was turned back on at some point after the coffee break. 11/17 PM Tr. at 108; 11/18 AM Tr. at 13-14. Adalian stated in an email a week after the meeting that "a short portion of the second half of the meeting went unrecorded for some reason," but he refers to a later portion of the meeting well after the coffee break. *See* DX-521N at 1. The Court concludes that the tape recorder was most

Hovnanian proposed moving forward with development on the Bank Building. *See* DX-521N at 5. "I don't care what Gerry Cafesjian wants," Hovnanian said. "Even if we lose the case we could still keep the Bank Building and do that now." *See* PX-206 at 14. Mathevosian and Krikorian concurred. *Id.*

Krikorian then made another proposal. "I think what we should do is, as a practical matter, authorize sort of a planning, building, management, fundraising, and operations committee," he said. "I think we should authorize that committee to do the planning, the building, the management, the development, the fundraising, the financial, the operations, all aspects involved in bringing the museum into being and then operating thereafter." *See* DX-521N at 5. Hovnanian and Mathevosian agreed with Krikorian's proposal, and they immediately began discussing who should serve on the committee. *See id.* at 5-6; PX-206 at 15-16. It was agreed that Krikorian would serve as chairman of the committee.

The group then discussed the election of new officers to the AGM&M Board of Trustees. *See* DX-521N at 6-7. It was agreed that Hovnanian would serve as Chairman, Mathevosian would serve as Vice-Chairman, and Krikorian would serve as Secretary/Treasurer. *Id.* They then discussed a variety of other issues relating to the management of AGM&M and planning for the museum. *See id.* at 8-18. Among other things, the trustees agreed that the Assembly and ANI would be housed in offices adjacent to the museum. *Id.* at 3. The meeting then adjourned.

       3.       <u>The Minutes of the Meeting</u>

Following the meeting, Rouben Adalian distributed draft minutes of the meeting,

---

likely working during the coffee break but that Adalian chose not to transcribe whatever conversation occurred during the break, suggesting that nothing important was discussed.

separating the two parts of the meeting into separate documents.  *See* PX-207 (Part One); DX-521N (Part Two).  The minutes from part one of the meeting describe the various issues that were discussed but do not reflect any votes taken.  *See* PX-207.  Regarding his draft of the minutes for part two of the meeting, Adalian wrote that the minutes "summariz[e] the specific authorizations issued by the Board."  DX-521N at 1.  Adalian's minutes identified sixteen separate items that were discussed and/or voted on during the second part of the meeting.  *See* DX-521N at 2-4; PX-208.

The draft transcripts of the meeting prepared by Adalian demonstrate that, consistent with its standard practice, the Board made decisions by consensus and did not take any formal votes on any of the resolutions agreed upon in the second half of the meeting.  *See* DX-521N; PX-206.  However, Adalian's first draft of the minutes for part two of the meeting showed that formal motions were made, seconded, and approved.  *See* DX-521N at 2-4.  The second item listed on Adalian's first draft is described as "[a]uthorization to form a building and operations committee," and it is summarized as follows:

> Krikorian moved that a committee be authorized by the Board to assume responsibility for planning, building management, development, fund raising and operations, inclusive of all aspects involved in bringing the museum into being and operating it thereafter.  Hovnanian seconded.  Motion approved.

DX-521N at 2.  Adalian's description is taken nearly verbatim from the words spoken by Krikorian in the transcript, except that the transcript does not reflect that there was either a motion, a second, or a vote taken on the issue.  *See id.* at 5.

Krikorian then asked Adalian to revise the minutes to add to some language regarding the scope of the building and operations committee's authority.  11/17 PM Tr. at 100.  At

Krikorian's request, Adalian added the phrase, "as well as selling property, disposing assets, raising funds, and spending funds." *Id.*; DX-526N at 1. Therefore, the revised minutes now reflected that the building and operations committee would have the authority to sell some or all of the Adjacent Properties. Although this was not explicitly discussed at the meeting, Krikorian testified that he believed this power was implied in the language "all aspects involved in bringing the museum into being." 11/17 PM Tr. at 101-02.

Krikorian later asked Adalian to make another revision to the minutes. 11/17 PM Tr. at 102-03. This time, at Krikorian's behest, Adalian added the following sentence in brackets at the beginning of the minutes: "Before the recorder was turned, motions 1, 2, and 3 prepared by Krikorian were reviewed and approved." *See* DX-528N. In other words, the minutes now reflected that the motion to create a building and operations committee ("motion 2") was not actually captured by the recorder, contrary to the prior drafts of the minutes. *See* 11/17 PM Tr. at 105-06. At trial, Krikorian testified that the motions were formally made during break in the recording and that the discussion on the transcript was simply "follow-up discussion." *Id.* at 106. However, this testimony is uncorroborated and contradicted by the other evidence in the record. Accordingly, the Court finds that the changes to the first draft of the minutes do not reflect what actually transpired during the second part of the meeting. It appears that Krikorian sought to have the minutes amended to increase the authority of the building and operations committee and cover up the discrepancy between the language in the transcript and the authorization in the minutes. Ultimately, the Court finds that these post-meeting changes are inconsequential because AGM&M did not subsequently try to place the Properties on the market for sale.

The final version of the minutes for part two of the meeting (with the two alterations

proposed by Krikorian) were signed by all three participating trustees. *See* PX-208. The document is titled "Minutes of Meeting and Consents to Action." *Id.* Krikorian testified that because the resolutions agreed upon were drafted as "consents to action," it does not matter if there was no formal vote taken during the meeting. 11/17 PM Tr. at 116-17; 11/18 AM Tr. at 8-10. Krikorian testified that this was standard corporate practice and that it complied with Robert's Rules of Order. 11/17 PM Tr. at 117; 11/18 AM Tr. at 14. However, when asked at trial what provision of Robert's Rules authorized him to use "consents to action" to formalize informal discussions into approved motions, Krikorian could not identify one. *See* 11/18 AM Tr. at 17-18.[57] Krikorian did not try to justify the use of "consents to action" under the provision in the By-Laws relating to unanimous consent in lieu of a meeting (which would have required the approval of Waters). *Id.* at 10-11.

On May 17, 2007, Waters wrote a letter to the AGM&M Board requesting a copy of the minutes and the transcript from the entire meeting. *See* PX-209. Waters condemned the actions of the other trustees in seeking to exclude him from discussions relating to the museum, and he declared that any decisions taken without his input were invalid and should be set aside. *Id.* Waters also demanded that no further AGM&M Board meetings take place without representation from CFF. *Id.* Waters was ultimately provided with a copy of the minutes from the first half of the meeting, but he was not given a record of the second half of the meeting

---

[57] At first, Krikorian testified that the version of Robert's Rules of Order shown to him at trial was different than the one he relies on. 11/18 AM Tr. at 17-18. Later, he pointed to a provision stating that the minutes should contain a record of what occurred at the meeting, but that does not address the use of "consents to action." *See id.* at 22. One passage that was identified allowed for consent approval on "routine business and on questions of little importance," but Krikorian testified that none of the motions approved at the May 7 meeting qualified as either routine business or questions of little importance. *Id.* at 23-25.

based on advice from AGM&M's legal counsel. 11/23 PM Tr. at 21. Waters ended his letter as follows:

> Finally, the trustees now seem to be hopelessly deadlocked. While the three non-Cafesjian trustees ordain that I must have a conflict of interest, at least two of the three other board members are equally conflicted. The impasse cannot be gainsaid. Under the circumstances dissolution seems to be the only available course of action. When can we negotiate that process in order to avoid judicial involvement?

PX-209. Krikorian wrote back to Waters and rejected his proposal for dissolution. 11/17 PM Tr. at 8.

### P.    The Progress of the Litigation

The lawsuit filed in Minnesota on April 26, 2007, was only the first in a series of legal actions that followed. On June 7, 2007, AGM&M filed suit against CFF in the Superior Court of the District of Columbia to have the MOA removed and AGM&M's title to the Properties cleared. That action was subsequently removed to this Court on July 16, 2007. *See Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, Civ. A. No. 07-1259. Then, on September 28, 2007, CFF filed a lawsuit in this district against AGM&M and the AGM&M trustees to enjoin them from further developing the museum without proper notice and input from CFF. *See* PX-211; *Cafesjian Family Found., Inc. v. Armenian Genocide Museum & Mem'l, Inc.*, Civ. A. No. 07-1746.

Because of the arbitration clause in the Transfer Agreement, the Assembly and AGM&M filed a demand for arbitration with the American Arbitration Association relating to the first Minnesota lawsuit on September 13, 2007. *See* DX-268. On October 10, 2007, Waters, Cafesjian, CFF, and TomKat filed a lawsuit in Minnesota to enjoin the arbitration on the grounds that they were not parties to the Transfer Agreement and therefore did not consent to the

arbitration.  *See* PX-212.

On February 14, 2008, Cafesjian, Waters, CFF, and TomKat LP filed suit for declaratory relief against the Assembly and AGM&M in federal court in Minnesota.  That lawsuit was subsequently transferred to this Court on July 24, 2008.  On February 15, 2008, the Assembly and AGM&M filed another lawsuit against Cafesjian, CFF, and Waters.  *See Armenian Assembly of Am., Inc. v. Cafesjian*, Civ. A. No. 08-255.  In that action, the Assembly and AGM&M brought claims for breach of fiduciary duty, misappropriation of trade secrets, breach of contract, and claims for equitable and injunctive relief.   On July 17, 2008, Cafesjian, Waters, and CFF filed counterclaims against the Assembly and AGM&M for breach of contract, unjust enrichment, and defamation.

On March 31, 2008, the first Minnesota lawsuit was dismissed without prejudice for failure to join AGM&M as a necessary party.  *See Cafesjian v. Armenian Assembly of Am., Inc.*, Civ. No. 07-2079, 2008 WL 906194 (D. Minn. Mar. 31, 2008).  In August 2008, the parties stipulated to the dismissal of the lawsuit filed in September 2007, leaving three actions pending before this Court.  The Court shall discuss the parties' remaining claims in the second part of this opinion.

Q.      *Competing Press Releases and the* Armenian Reporter

Following the filing of the lawsuit in Minnesota and the events at the May 2007 AGM&M Board meeting, the Assembly determined a need to write a letter to its members.  Sent on July 18, 2007, the letter explained the Assembly's position with respect to the lawsuit and provided a status report on the museum project.  *See* DX-149.  The letter stated that Cafesjian had filed suit against the Assembly "seeking to terminate the museum project and gain

126

distribution to himself of the appreciated real estate." *Id.* at 1. One Assembly leader had wanted to eliminate any reference to Cafesjian gaining financially, thinking it was a mistake to question Cafesjian's motives, but his objection was overruled. *See* DX-530N. The letter also denied that the Assembly had rejected Cafesjian's vision for the museum. *See* DX-149 at 1-2. In drafting the letter, Assembly leaders made a distinction between rejecting Cafesjian's "vision" and rejecting his "design." *See* DX-535N at 1-2. The letter concluded by affirming the Assembly's intentions to build the museum on the site, and it was signed by Hirair Hovnanian and Carolyn Mugar. DX-149 at 2.

The accusation that Cafesjian was seeking to profit financially from the lawsuit was repeated in other Assembly press releases. 11/16 AM Tr. at 103. Cafesjian also testified that there was a whispering campaign in both the United States and Armenia that Cafesjian was holding up the museum project in order to get the properties back for his own interests. 11/19 AM Tr. at 129-30. Waters believed that "there was a constant and ongoing campaign by the Assembly to attack Mr. Cafesjian and to discredit him and his Foundation." 11/15 PM Tr. at 55. Waters testified that there were at least a few newspaper articles published in the general press that were unfavorable to Cafesjian. *Id.* at 56. Cafesjian felt it was important to tell his side of the story. 11/19 AM Tr. at 130. Therefore, he directed that a series of articles be written in the *Armenian Reporter*, a community newspaper he had purchased with a business partner in 2006. *See* Cafesjian Dep. Tr. at 38, 84; 11/17 PM Tr. at 82.[58] The Assembly had once been interested in purchasing the *Armenian Reporter* during the early 2000s, but they were no longer interested

---

[58] Although Waters testified that Cafesjian purchased the *Armenian Reporter* in 2005, Van Krikorian testified that Cafesjian purchased the paper on May 19, 2006. *See* 11/17 PM Tr. at 82. The Court accepts Krikorian's more detailed testimony as determinative on this issue.

when Cafesjian purchased the paper.  *See* 11/24 AM Tr. at 8-9.

The first article about the museum was published on September 29, 2007.  *See* PX-43. The article, titled "Hirair Hovnanian and others are sued over Genocide museum," was accompanied by a graphic spanning four columns that read as follows:

|  |  |
| --- | --- |
| TRUSTEE CONTRIBUTIONS | |
| Gerard Cafesjian and CFF | $14,400,000 |
| Anoush Mathevosian | $3,500,000 |
| Hirair Hovnanian | $1,500,000 |
| John Waters | $25,000 |
| Robert Kaloosdian | $100 |
| Van Krikorian | $0 |
| Total Board of Trustee | |
| Member Contributions | $19,425,100 |

PX-43 at 2.  The caption on the graphic read, "Financial contributions by former and current members of the Board of Trustees of AGMM for the benefit of AGMM as of September 2006." *Id.*  This graphic, which became known as "the scorecard," was published roughly every week in the *Armenian Reporter* for over a year; it appeared (with or without an accompanying article) over 50 times.[59]  Kaloosdian considered the scorecard unfair and believed that the articles published about him "smeared [his] name."  11/10 AM Tr. at 68-70; 11/10 PM Tr. 98-99. Waters conceded at trial that the continuous publication of the scorecard likely had the effect of embarrassing those depicted in it.  11/15 PM Tr. at 57.  Cafesjian, however, denied that his intent was to belittle or embarrass anyone.  11/19 AM Tr. at 127-28.

Waters wrote a four-part series of articles published in fall 2007 that chronicled the development of the museum project from his perspective.  *See* 11/15 PM Tr. at 53; DX-152.

---

[59] Evidence of each of these publications was introduced into the record.  *See* Plaintiffs' Exhibits 43-46, 51, 52-56, 59, 61-74, 77-109.

Waters testified that as far as he is aware, everything in the articles was accurate, and no one has told him that anything he wrote was inaccurate. 11/24 AM Tr. at 10. On January 2, 2008, the editor for the *Armenian Reporter* emailed Waters and Vartian because he was concerned that the paper's lawsuit- and controversy-focused coverage might have the effect of turning the community against the museum project. *See* PX-57. Waters agreed that this was a legitimate concern. 11/15 PM Tr. at 59.

After the hiring of Ross Vartian, the Assembly became concerned that Cafesjian was using Assembly mailing lists to distribute the *Armenian Reporter*. The Assembly maintained a database containing approximately 50,000 names, and the Assembly also had a paid membership directory containing approximately 1800 names. 11/10 AM Tr. at 103-04. The Assembly maintained these lists on its computers and sought to protect their integrity so that they would not be used for non-Assembly purposes. *Id.* at 107-09. The Assembly had a formal mailing list policy adopted in 1999 prohibiting Board members and staff from distributing the list outside the organization without formal approval from the Assembly's Board of Directors. *See* PX-304; PX-305. The Assembly never gave the *Armenian Reporter* a copy of its mailing list. 11/17 PM Tr. at 74. Ross Vartian had access to the Assembly's mailing list and database while he worked for the Assembly. Vartian Dep. Tr. at 204. Vartian also had copies of the Assembly's membership directory, which the Assembly used to showcase its donors. *Id.* at 207; 11/22 AM Tr. at 137; PX-307.

At trial, Plaintiffs admitted into evidence a mailing list from the *Armenian Reporter* that contains the notation "Assembly List 2002" next to a number of entries. *See* PX-314A. Krikorian confirmed in his testimony that the entries with this notation were duplicates of entries

on the Assembly's 2002 mailing list. 11/17 PM Tr. at 70-72. However, the record does not

indicate when the names may have been copied from the Assembly's list to the *Armenian*

*Reporter*'s database. Plaintiffs urge the Court to conclude that Waters or Vartian copied these

names after Cafesjian purchased the newspaper in 2006. However, the record does not support

such a finding. Vartian testified that, to his knowledge, none of the Assembly's mailing lists

were ever used for building Cafesjian's database or used by the *Armenian Reporter*. 11/22 AM

Tr. at 138-42. The Court finds Vartian's testimony credible and uncontroverted.

R.      *The Assembly's Progress on the Museum Project*

After the May 7, 2007 meeting, Van Krikorian took his position as chairman of the

Building & Operations Committee and immediately began working on developing the museum.

The newly formed committee included Denise Darmanian, Edele Hovnanian, and Zaven

Tachdjian, another Assembly member who had experience in building and development. 11/17

PM Tr. at 9. One early issue that had to be resolved was AGM&M's tax status, which was up for

review; Krikorian worked with Ellen Gordon and Edele Hovnanian to ensure that AGM&M

retained its status as a 501(c)(3) organization. *Id.* at 14-15. Ultimately, they decided to

consolidate AGM&M's tax returns with the Assembly, which resolved the IRS's concerns. *Id.* at

15.

The Building & Operations Committee sought to re-engage Gallagher & Associates to

work on the project as the exhibit designer. 11/16 AM Tr. at 13. In fact, Rouben Adalian had

met with Randy Anderson and other representatives from Gallagher & Associates in April 2007

to discuss a proposal for designing the museum. *See* DX-517N. In a letter to Adalian following

that meeting, Anderson said they were "astonished" at Adalian's work effort over the past four

years and that the amount of material Adalian had assembled would be vital to the design team. *Id.* at 1. On May 18, 2007, Adalian wrote a confidential memorandum to the Building & Operations Committee with a status report on the project. *See* DX-525N. Adalian indicated that "the AGMM project, as approved by the current Board, is limited to the NBW building and the adjoining vacant lot which is part of the bank parcel." *Id.* at 1.

Gallagher & Associates was officially hired by AGM&M on July 13, 2007. *See* PX-148. The agreement was signed by Van Krikorian in his role as Chairman of the Building & Operations Committee. *See id.* at 7. AGM&M paid Gallagher & Associates $65,000 to produce, *inter alia*, a project schedule, a preliminary budget, and four-color concept exhibit renderings. Patrick Gallagher reviewed the work that his firm had previously done and reconceptualized it for the new space. 11/12 PM Tr. at 26. The result was the creation of a Master Planning Document. *See* PX-131; PX-132.

The Building & Operations Committee also recruited Martinez & Johnson to consult on the architecture for the new construction that would be required to house the museum. 11/17 PM Tr. at 21. Martinez & Johnson sent a work proposal to Zaven Tachdjian in late June 2007, and a formal agreement was signed on October 1, 2007. *See* PX-130; PX-149. Under the agreement, Martinez & Johnson was to provide services through a series of stages: schematic design, design development, construction documents, bidding or negotiation, and finally, construction. 11/12 PM Tr. at 70-72. Martinez & Johnson also consulted with Gallagher & Associates on the creation of the Master Planning Document. AGM&M issued a press release announcing the hiring of these firms on August 31, 2007. *See* DX-151. Cafesjian wrote a letter to Hovnanian on September 4, 2007, complaining that he had no notice of these actions and denouncing them as

131

ultra vires. *See* PX-210. There is no record of any response to this letter. On September 28, 2007, CFF filed a lawsuit seeking to enjoin AGM&M from developing the museum without proper notice and input from CFF. *See* PX-211. However, the Building & Operations Committee continued to take steps to develop the museum.

The Master Planning Document was completed on October 10, 2007. *See* PX-131; PX-132. The budget for the exhibition space (not including the costs of new construction or other spaces) was estimated at just over $9 million. *See* PX-131 at 22. The projected opening date for the museum was April 24, 2010; April 24 is the date on which the Armenian Genocide is annually remembered. 11/16 PM Tr. at 6. Both retained firms continued to work diligently through the fall of 2007. On November 12, 2007, AGM&M signed another agreement with Gallagher & Associates to provide a series of deliverables relating to schematic design, design development, construction documents, and construction administration. *See* PX-150.

The design put forward by Martinez & Johnson called for a glass building to be built as an annex to the Bank Building on the adjacent vacant lot that was part of the same parcel. A preliminary design estimate put the cost of construction and renovation at just under $20 million. *See* PX-397. Building the annex on the vacant back lot required approval from the Board of Zoning Adjustments, so the Building & Operations Committee hired a real estate attorney to help with the process. 11/17 PM Tr. at 23-25. The Board of Zoning Adjustments approved the AGM&M's request for an adjustment in July 2008. *See* PX-147.[60] Martinez & Johnson also worked closely with the Historic Preservation Review Board ("HPRB") to ensure that its design

_____

[60] The Board of Zoning Adjustment's approval was only valid for two years, but AGM&M was later granted a two-year extension. *See* PX-147; PX-365; PX-367; 11/17 PM Tr. at 40-45.

would be approved.  They submitted their preliminary designs for review in January 2008, and

HPRB granted approval for the general concept in March 2008.  *See* PX-143; PX-390.  A press

release was issued the following day, *see* DX-157, which prompted Waters to write a letter to the

HPRB asking them to suspend approval of the plans while litigation was pending.  *See* PX-127.

Cafesjian wanted to ensure that AGM&M did not proceed with plans to develop only the Bank

Building.  11/19 AM Tr. at 134.

By November 21, 2007, AGM&M had officially changed the name of the project to the

"Armenian Genocide Museum of America" ("AGMA").  *See* DX-154.  The Building &

Operations Committee worked furiously through late 2007 and early 2008.  On February 7, 2008,

they hired Regan Associates, a project management firm, to help select a general contractor.  *See*

PX-151; 11/17 PM Tr. at 33-34.  They interviewed candidates and selected Whiting-Turner to do

the construction.  11/17 PM Tr. at 48.  The committee had also identified a number of other

contractors by February 2008.  *See* PX-394.  In addition, the committee hired a tax attorney to

challenge the D.C. government's classification of the property as vacant, ultimately obtaining a

24-month exemption based on the pending litigation.  *See* 11/17 PM Tr. at 49; PX-376; PX-

439A.  The attorney also challenged the assessed value of the Properties.  *See* PX-439A.

The Building & Operations Committee did not plan to use the Adjacent Properties for the

construction of a museum.  However, Martinez & Johnson did prepare some sketches that would

use the first three of the Adjacent Properties (in between the Bank Building and the Families

U.S.A. building) for a memorial garden structure.  *See* PX-140.  Martinez & Johnson was told

that the design should include a labyrinth, and they made that a central feature and incorporated a

water element.  *See* 11/12 PM Tr. at 92-95.  Neither Cafesjian nor CFF had any direct input into

the design of this memorial.[61]

At the end of the design development phase of its contract, around April 4, 2008, Gallagher & Associates produced a "100% Schematic Design Presentation Draft." *See* PX-144. This elaborate document contains a detailed outline for the story of the museum, with vivid descriptions and sketches of each aspect of the exhibition space. It is a significant step toward the creation of a museum, and it is the culmination of extensive work by the team at Gallagher & Associates with the assistance of Rouben Adalian. The main themes of the museum as laid out in the document are to remember and honor the victims and survivors and to recognize the American relief workers who were rescuers. 11/16 AM Tr. at 20. Unfortunately, Gallagher & Associates never reached the next phase of its contract.

By March 2008, it was becoming apparent that the Building & Operations Committee was facing a fundraising problem. During a committee meeting on March 28, 2008, Edele Hovnanian warned that the project would run out of funds by the end of the summer. *See* DX-156 at 1-2. She also raised concerns about "the Catch-22 dilemma created by the ongoing litigation," meaning that the project faced difficulties raising funds while the litigation was pending. *Id.* During a committee meeting on June 12, 2008, Krikorian suggested that they "pause" the project because fundraising was not keeping up with planning expenses. 11/17 PM Tr. at 59; DX-159. Shortly after this meeting, Gallagher & Associates and Martinez & Johnson were told to stop working on the project. 11/17 PM Tr. at 59. Work was halted while the Building & Operations Committee sought ways to raise money. In 2009, AGM&M ran out of

---

[61] There was some question at trial about whether Cafesjian had input into the memorial design in the context of settlement discussions. Ultimately, however, the parties agreed that the Court should not consider anything said in the context of settlement. *See* 11/17 PM Tr. at 26-30.

money entirely and could not pay its subcontractors, resulting in liens being filed. *See* 11/17 AM Tr. at 60-61; DX-586N; DX-616N.

On June 15, 2008, a *lis pendens* was filed in the records for the Properties. *See* PX-214. The MOA was subsequently released and effectively removed from the records on July 16, 2008. *See* DX-160.

Around this period of time, a number of contractors who had been involved with the museum project in its early days contacted Waters to ask about the status of the project. On April 30, 2008, Waters responded to an email from Jeffrey Arnold (who had worked for Concord Partners), informing him that "[t]he project is mired in litigation" and calling the current activity on the project a "public relations stunt." *See* PX-129. Arnold testified that he did not understand what the litigation was about and that nothing in Waters's email prevented him from working on the project. 11/22 PM Tr. at 27-28. A few months later, Waters sent a similar email to William Herman, a real estate professional who had inquired about the project. *See* PX-128. Waters noted that "they [AGM&M] have signed baby contracts with our former friends at Martinez and Johnson, and Gallagher and Associates. All of that will be meaningless going forward. When we prevail in the litigation, all those that have worked with the other side will be dismissed." *Id.*

S.       *AGM&M Formally Votes to Exclude Waters and CFF*

Although the Building & Operations Committee had met numerous times since its creation in May 2007, the AGM&M Board of Trustees did not hold its next formal meeting until February 6, 2009. *See* PX-364; 11/18 AM Tr. at 94. In attendance were Hirair and Edele Hovnanian, Van Krikorian, Zaven Tachdjian, Denise Darmanian, Rouben Adalian, and Waters (attending with counsel); Anoush Mathevosian participated by phone. PX-364 at 1. The

135

development plans for the museum were shown to the trustees, although neither Hovnanian nor Mathevosian had seen/heard these plans or voted on them before the meeting. 11/23 PM Tr. at 24-25; PX-364 at 27-29. A few weeks after this meeting, Waters sent a letter to the AGM&M Board demanding a copy of all minutes and proceedings relating to the Building & Operations Committee. *See* DX-162. Waters cited a provision of the D.C. Code entitling him to a copy of such records. *See id.* (citing D.C. Code § 29-301.26).

On March 19, 2009, the AGM&M Board of Trustees held a special meeting by telephone for the purpose of considering the removal of John Waters as a trustee and any future CFF-designated trustees. *See* PX-152. Waters was not given notice of this meeting. 11/17 PM Tr. at 80. According to the minutes of the special meeting, the trustees had a discussion of the conflict of interest problems that CFF had created, referencing the filing of the MOA and the subsequent lawsuits filed against AGM&M, CFF's abandonment of the project, and the failure of Waters and Cafesjian to account for and provide minutes and records from meetings held during their tenure as officers. *See* PX-152 at 3-4. Then, Krikorian made the following motion:

> To remove the Gerard Cafesjian and/or the Cafesjian Family Foundation designated Trustee John Waters, Jr. and any of his/its appointed successors as trustees of the Armenian Genocide Museum & Memorial Inc. and to terminate all of Cafesjian's and/or CFF's rights as an Initial Donor and/or trustee, including but not limited to the right to appoint any successor trustee(s), as set out in the By-Laws of the AGMM for cause, including but not limited to conflicts of interest, breaches of fiduciary duty and activities impeding and frustrating the purposes of the museum, pursuant to District of Columbia Nonprofit Corporation Act § 29-301.19 and Section § [sic] 2.17 of the By-Laws of the AGMM.

PX-152 at 4-5. The motion was seconded by Mathevosian, and, after substantial discussion, the motion was approved. *Id.* at 5.

On April 10, 2009, Cafesjian wrote a letter to the AGM&M Board of Trustees

designating three new trustees to represent CFF on the Board: Dennis Doyle, Meghan Doyle, and Father Dennis Dease. *See* DX-163. There is no evidence in the record that the AGM&M Board has permitted these designees to attend any AGM&M meetings.

T. *The Assembly Tries to Raise Money, Moves into the Families U.S.A. Building*

The Assembly tried to solicit major donors for large contributions to keep the museum project going forward, but the dispute with Cafesjian had somewhat poisoned the donor well. Peter Vosbikian, who had been Chairman of the Assembly's Board of Directors in the early 2000s, had the financial wherewithal to make a large donation and wanted to do so. 11/15 PM Tr. at 69. He initially decided to make a $1 million donation, but he withheld the money once the litigation began. *Id.* at 70, 76-77. In an email to Van Krikorian on Christmas day in 2008, Vosbikian wrote that he was "certain there are many Armenians (I being one of them) waiting, with their hand on their checkbooks, for a resolution to this conflict." *See* PX-160.[62] Vosbikian testified that he was not willing to donate to the project if Cafesjian was in charge. 11/15 PM Tr. at 80-81.

Other donors were similarly unwilling to make a large contribution while a cloud of uncertainty loomed over the project. For example, Harry Mangurian told Hirair Hovnanian that he planned to make a $10 million donation to the museum project at some time in 2007. *See* 11/9 AM Tr. at 105; PX-156. However, he did not make that contribution before his death in 2008, and the Mangurian Foundation told the Assembly through legal counsel that any grant

---

[62] Defendants objected to the admission of PX-160 to the extent it purports to show vindictiveness by Defendants. However, the Court considers it only for the purpose of showing that as of December 25, 2008, Peter Vosbikian expressed an intent to donate to the museum once the litigation is over. *See* 11/15 PM Tr. at 75.

would be conditioned on the resolution of the litigation. *See* PX-159. Krikorian testified that he is not certain that they are going to receive a donation from the Mangurian Foundation after the litigation is over. 11/18 AM Tr. 80.

Another potential donor, Sara Chitjian, testified at trial that she planned to donate her house, which is valued at over $1 million, to the museum project. 11/16 PM Tr. at 99. However, she explained that she did not want to make the donation until the museum has been completed. *Id.* at 100. She did not mention the litigation as dissuading her from donating. Ms. Chitjian also possesses a number of historical artifacts that she plans to loan to the museum for exhibition purposes. *Id.* at 95-98. Ultimately, the large donor fundraising efforts were unsuccessful. The only donor to contribute more than $1 million since 2007 is Hirair Hovnanian, who has given approximately $6 million in that period of time. 11/17 PM Tr. at 54-55.

The Building & Operations Committee also tried to raise funds by leasing space in the Families U.S.A. building. 11/18 AM Tr. at 88-89. However, when they could not find any tenants, ANI and the Assembly moved into the building. *Id.* On May 1, 2009, AGM&M entered into a lease agreement with the Assembly, which automatically renews for a five-year period. *See* DX-165. At present, the lease term expires in December 2015. 11/17 AM Tr. at 131. The annual rent due under the lease varies each year between approximately $113,000 and $128,000. *See* DX-165 at 3. The Assembly paid its rent on September 1, 2009, but it is unclear whether the Assembly has been paying rent since that time by check to AGM&M or by reimbursing AGM&M for other expenses. 11/17 AM Tr. at 132-34. Bryan Ardouny testified that he was unsure of how the Assembly was meeting its rent obligations, but there is no contradictory evidence in the record to show that the Assembly has been delinquent in making payments. *See*

138

*id.*

On April 22, 2010, ANI opened a research library in the Families U.S.A. building. *See* PX-368. Adalian oversees the library, and it is open to the public and has been used by researchers. 11/16 AM Tr. at 24. On July 1, 2010, the Assembly extended a $2.5 million line of credit to AGM&M to cover legal bills and other expenses. 11/18 AM Tr. at 111. AGM&M issued a promissory note to the Assembly. *See* DX-617N.

### III. THE PARTIES' LEGAL CLAIMS

Having thoroughly reviewed the evidence in the record produced at trial, the Court now turns its attention to the parties' legal claims. The Court notes at the outset that its role is limited to deciding the merits of the claims and counterclaims asserted in these consolidated actions. Although the parties have presented arguments concerning who is better suited to build an Armenian Genocide museum and who has better managed AGM&M, those questions are not properly before the Court. The Court's role is to determine the legal rights and obligations of the parties, not to issue public pronouncements on the propriety of every decision made by the parties. Accordingly, the Court focuses solely on the legal and equitable claims asserted by the parties.

*A.    Plaintiffs' Claims Against Defendants*

Plaintiffs assert four claims against Defendants in their Consolidated Complaint. In Count One, they claim that Cafesjian and Waters breached their fiduciary duties as officers and trustees of AGM&M by mismanaging the project, placing their own interests ahead of the project, acting in bad faith, and engaging in multiple acts of self-dealing. *See* Compl. ¶¶ 295-98. In Count Two, they claim that Cafesjian and Waters breached their fiduciary duties as trustees of

the Assembly by acting in bad faith, engaging in conflicts of interest, placing their own interests ahead of the Assembly's, and engaging in acts of self-dealing. *See id.* ¶ 303. In Count Three, Plaintiffs contend that Cafesjian has breached the duty of good faith and fair dealing to the Assembly implied in the Grant Agreement by mismanaging the museum project and then abandoning the project and obstructing AGM&M's attempts to move forward with the museum. *See id.* ¶ 310. Finally, in Count Four, Plaintiffs claim that Cafesjian and Waters misappropriated the Assembly's trade secrets by integrating confidential Assembly mailing lists into the database for the *Armenian Reporter*. *Id.* ¶ 317. Plaintiffs pray for damages, a declaration that the reversion clause in the Grant Agreement is unenforceable, a declaration to quiet title to the Properties, a declaration that CFF has been properly removed as an initial donor entitled to appoint trustees to the AGM&M Board of Trustees, and an order to return any and all Assembly mailing lists within Defendants' control. *Id.* at 68-69. The Court shall examine each of these claims.

      1.   <u>Count One: Breach of Fiduciary Duty to AGM&M (by Cafesjian and Waters)</u>

          a.    Legal Standard

Count One asserts a claim for breach of fiduciary duty. To establish its claim for breach of fiduciary duty, AGM&M must show that (1) Cafesjian and Waters owed AGM&M a fiduciary duty; (2) Cafesjian and Waters breached that duty; and (3) the breach was the proximate cause of an injury to AGM&M. *See Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 5-6 (D.D.C. 2008). Under District of Columbia law,[63] directors and officers of nonprofit corporations owe a fiduciary

---

[63] Both the Assembly and AGM&M are incorporated in the District of Columbia; therefore, D.C. law governs the breach of fiduciary duty claims relating to these entities. *See*

duty to the corporation. *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1210 (D.C. 2002) (citing Fletcher Cyc. Corp. § 844.10). This duty requires directors and officers to "act in the utmost good faith, and this good faith forbids placing themselves in a position where their individual interest clashes with their duty to the corporation." *Id.* (quoting Fletcher Cyc. Corp. § 837.50). Directors and officers' "fiduciary obligation to a corporation means that they must manage the corporation solely in its best interest, not as a vehicle for promoting their personal beliefs or causes." *Id.*; *see also* 3 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 837.50 (perm. ed., rev. vol. 2010) ("In other words, a director or officer of a corporation owes the corporation complete loyalty, honesty, and good faith."). Fiduciaries must not engage in self-interested transactions and must disclose potential conflicts of interest to the persons charged with approving such transactions. *See Stern v. Lucy Webb Hayes Nat'l Training Sch. for Deaconesses & Missionaries*, 381 F. Supp. 1003, 1015 (D.D.C. 1974). "The duty of loyalty is transgressed when a corporate fiduciary, whether director or officer, uses his or her corporate office to promote, advance or effectuate a transaction between the corporation and such person, and that transaction is not substantively fair to the corporation." *Willens v. 2720 Wis. Ave. Co-Op. Ass'n, Inc.*, 844 A.2d 1126, 1136 n.13 (D.C. 2004).

As the Court noted at the summary judgment stage, "a fiduciary may enforce validly obtained legal rights against his or her firm, even if that transaction results in a profit for the fiduciary at the firm's expense." *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008). However, the trustee must properly balance his own interests with those of the corporation. *See*

Restatement (Second) of Conflicts of Law § 309 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation . . . .")

*Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 994, 1004, 1008 (Md. 2007).  Accordingly, a director may file a lawsuit against a corporation in order to protect his own interests without breaching his fiduciary duty as long as he acts in good faith.  *See Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d at 37; 3 Fletcher, *supra*, § 907 ("A director or other corporate officer may . . . sue the corporation as a creditor just as if he or she were not a director.").

Directors and officers of a nonprofit corporation may also breach their fiduciary duties by failing to exercise "a reasonable amount of diligence and care." *Lucy Webb*, 381 F. Supp. at 1003; *see also* 3A Fletcher, *supra*, § 1029 ("In addition to their duty of loyalty, . . . directors and officers of a corporation are required by law to perform their obligations in accordance with a minimum standard of care.").  The District of Columbia courts have adopted the business judgment rule, which is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Behradrezaee v. Dashtara*, 910 A.2d 349, 361 (D.C. 2006) (quoting *Willens*, 844 A.2d at 1137).  Where the rule applies, the business judgment of the fiduciary will be respected by the courts absent an abuse of discretion.  *See id.*  However, the business judgment rule does not apply where the officers or directors "lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available." *Id.* (quoting *Willens*, 844 A.2d at 1137).

In this case, because Cafesjian had a reversionary interest in the Properties, he had a personal financial stake in the development of the museum that is potentially adverse to

142

AGM&M.  Waters had a similar interest as an agent of Cafesjian and of CFF, which shared the reversionary interest with Cafesjian under the Grant Agreement.  Because of this interest, the business judgment rule does not apply to the decisions made by Cafesjian and Waters.  *See Willens*, 844 A.2d at 1138 ("It is, in short, black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply.") (quotation marks and citation omitted).  Where the business judgment rule does not apply, D.C. courts apply a less deferential standard of reasonableness.  *Id.*  "The reasonableness standard is not overly restrictive in its application; a decision is not unreasonable simply because a judge happens to disagree with it."  *Bolandz v. 1230-1250 Twenty-Third Street Condo. Unit Owners Ass'n*, 849 A.2d 1010, 1014-15 (D.C. 2004).  Rather, in applying a reasonableness standard, "a court may have to undertake a potentially wide-ranging, fact-intensive inquiry into 'both substantive and procedural aspects' of a decision."  *Id.* at 1015 (quoting *Johnson v. Hobson*, 505 A.2d 1313, 1317 (D.C. 1986)).

"[B]reach of fiduciary duty is not actionable unless injury accrues to the beneficiary or the fiduciary profits thereby."  *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 709 (D.C. 2009) (quoting *Beckman v. Farmer*, 579 A.2d 618, 651 (D.C. 1990)).  Accordingly, even if the Court finds that Waters or Cafesjian breached their duties of care or loyalty by some action or inaction, there is no liability unless the Court finds that the breach was the proximate cause of some injury to the corporation.

b.      Waters and Cafesjian Owed Fiduciary Duties to AGM&M

The parties agree that Cafesjian owed a fiduciary duty to AGM&M during his tenure as President and Chairman of the Board of Trustees (from October 30, 2003 through September 13,

2006) and as a trustee[64] (from October 30, 2003 through May 2, 2007). *See* Answer to Consol.

Compl. ¶¶ 291-92. The parties also agree that Waters owed a fiduciary duty to AGM&M during

his tenure as Secretary/Treasurer of AGM&M (from October 30, 2003 through October 24,

2006). *See id.* ¶ 293. Waters was appointed as the CFF-designated trustee on May 2, 2007, but

the parties disagree about whether he continued to owe fiduciary duties to AGM&M after he was

effectively shut out of the May 7, 2007 meeting. Plaintiffs contend that Waters left the meeting

voluntarily and therefore retained his position as a trustee until he was formally removed on

March 19, 2009. *See* Pls.' Concls. ¶¶ 9-10.

"When a corporate officer ceases to act as such, either because of his or her resignation or

removal from office, or because of the insolvency of the corporation, the fiduciary relationship

ceases." 3 Fletcher, *supra*, § 860. In this case, although Waters was not formally removed as a

trustee until March 2009, he was effectively forced out of the May 7, 2007 meeting and was not

allowed to participate in the affairs of AGM&M thereafter. With the exception of a February

2009 Board of Trustees meeting, which Waters attended with counsel and during which no

formal votes were taken, Waters was not able to effectively participate as a trustee. However,

"[i]t is not possible to limit the fiduciary duty of a director of a corporation to the time while he

or she is acting as a director under any special delegation of power or is in attendance at meetings

of the board." 18B Am. Jur. 2d Corp. § 1461. Although Waters testified that he felt as though

he had been voted off the AGM&M Board during the May 2007 meeting, *see* 11/23 PM Tr. at

15, he continued to assert his rights as a trustee and never severed his relationship with the

---

[64] Pursuant to the governing documents for AGM&M, the "trustees" are the directors of
the corporation. *See* PX-121, Arts. V-VI.

organization. Accordingly, the Court finds that Waters retained his fiduciary duties to AGM&M until he was formally removed on March 19, 2009.

The Court also notes that because of the three-year statute of limitations for breach of fiduciary actions in the District of Columbia, *see* D.C. Code § 12-301(8), AGM&M's claims for breach of fiduciary duty against Waters and Cafesjian are premised upon conduct and omissions taking place in or after February 2005. *See* Pls.' Concls. ¶ 8.

c.      Specific Allegations of Breach

Plaintiffs generally argue that Cafesjian and Waters breached their fiduciary duties by mismanaging AGM&M and then, after failing to make meaningful progress, abandoning the museum project and acting in bad faith to prevent AGM&M from substantially completing the project before the reversion date of December 31, 2010. Plaintiffs also argue that Cafesjian and Waters put their own interests ahead of the project and engaged in multiple acts of self-dealing. Before addressing each of the specific allegations in Plaintiffs' Complaint, the Court makes the following general observations.

One of the central themes of Plaintiffs' case has been an attack on Cafesjian and Waters for failing to make substantial progress in developing the museum project between October 2003 and September 2006. Plaintiffs contend that Cafesjian and Waters were "in control" of AGM&M during this period and that they should be blamed for failing to accomplish more to make the museum project a reality. However, the record shows that AGM&M was not set up to be ruled by fiat: the By-Laws require that all questions be decided by an 80% affirmative vote of the trustees present at any meeting, and the founders shared a commitment to consensus decision-making. The task of governing AGM&M was further complicated by the limitations of the

initial trustees: Anoush Mathevosian's ability to participate was limited by illness, Hirair Hovnanian did not want to be more than minimally involved in the project, and Robert Kaloosdian insisted on unanimity before taking any major action. Moreover, AGM&M constantly faced budget shortfalls—a situation aggravated by the Assembly's failure to transfer funds being held for AGM&M and by Hovnanian's failure to immediately fulfill his $5 million pledge. These obstacles might have been overcome if everyone had agreed on a fundraising plan and how to design, build, and develop an Armenian Genocide Museum and Memorial. But the AGM&M Board of Trustees did not reach agreement on these issues; personal relationships deteriorated over time; and the project stagnated. The other trustees hoped that Cafesjian would take care of the project so that they would not have to do so. However, every trustee owed a fiduciary duty to AGM&M. Although Cafesjian must accept responsibility for his leadership as President and Chairman, all of the trustees shared the responsibility to make AGM&M a success.

Plaintiffs also attack Cafesjian for withdrawing from the project and taking actions to protect his contractual rights. However, Cafesjian's fiduciary duties to AGM&M did not forever bind him to the corporation; he was free to make proposals to withdraw from or dissolve AGM&M. The fact that the other trustees found his proposals abhorrent does not make them unlawful. Although Plaintiffs view Cafesjian's acts as manifestations of naked self-interest, the record as a whole does not establish that Cafesjian (or Waters) acted in bad faith. Cafesjian's actions may have offended the other trustees, but they did not unfairly injure AGM&M.

Having stated these general conclusions, the Court shall now address the specific allegations in the Complaint.

146

i.    Failure to utilize already-involved professionals.

Plaintiffs claim that Cafesjian and Waters mismanaged AGM&M by failing to utilize already-involved professionals and build on the progress that had been made on the project from 2003. *See* Compl. ¶¶ 127-28, 295(a). Plaintiffs argue that they should have continued to work with Concord Partners, Martinez & Johnson, and Gallagher & Associates on the timelines and budgets for the project that had already been prepared. *See id.* ¶¶ 127-28.[65] However, the record shows that there was significant disagreement among the AGM&M founders over how to proceed with the architect selection and planning well before AGM&M was incorporated in October 2003. By that time, the footprint for the project had been expanded to its maximum size, and Cafesjian decided that the prior plans that had been discussed would not be adequate to transform the Properties into a successful museum and memorial complex. The AGM&M Board never authorized the hiring of Concord Partners, Gallagher & Associates, or Martinez & Johnson during this time period, and the record shows that there would not have been money to pay them in any event. Waters explained that he did not keep in contact with these professionals because he knew there was neither money nor authorization to hire them. 11/15 PM Tr. at 40. Therefore, the Court finds that the failure to utilize already-involved professionals was a reasonable business decision and does not constitute a breach of a fiduciary duty.

ii.    Architect selection.

Plaintiffs claim that Cafesjian and Waters breached their fiduciary duties by abandoning

_____

[65] Plaintiffs also allege in their Complaint that Cafesjian and Waters failed to work with three other professionals. *See* Compl. ¶ 127(d)-(f). However, these individuals—who were designated as potential witnesses at trial—did not testify, and the Court finds that there is insufficient evidence in the record to establish that they were involved in the project between 2000 and 2003.

the RFQ process and promoting Edgar Papazian as the architect for the project despite significant concerns about the feasibility of Papazian's plans. *See* Compl. ¶¶ 129-46, 295(b)-(d). The record shows, however, that the RFQ process was halted before AGM&M was incorporated, and there was a longstanding disagreement among the trustees as to how to select an architect. The Court finds that Cafesjian's decision to engage Papazian with his own funds and present him to the AGM&M Board as a leading candidate was made in good faith based on the inspirational nature of Papazian's designs and the fact that his services were relatively inexpensive— important criteria for a cash-strapped charitable organization. Plaintiffs contend that Cafesjian and Waters should have done a better job of addressing the Board's concerns about the feasibility of Papazian's design and should have secured a feasibility study to ensure that Papazian's plans could be approved by the relevant zoning and historic preservation authorities. But Cafesjian and Waters believed in good faith that Papazian's plans could be approved despite being bold and contemporary. The other trustees' concerns about the feasibility of Papazian's plans were speculative; there is nothing in the record demonstrating that Papazian's preliminary designs for the museum were impractical. Plaintiffs fault Cafesjian and Waters for not submitting Papazian's designs to the HPRB for preliminary approval, as Martinez & Johnson did. But unlike Martinez & Johnson, Papazian was never formally hired as an architect by the AGM&M Board, and the Board never authorized Cafesjian to conduct a feasibility study. In fact, the record shows that Cafesjian invested a significant amount of his own money to develop Papazian's plans in response to the concerns raised by the other trustees. But several of the trustees clearly disliked the aesthetics of Papazian's design and thought they could not raise money to support it. The Board's failure to approve Papazian was a personal failure for

148

Cafesjian, but it did not constitute a breach of his fiduciary duties to the corporation.

Plaintiffs also claim that Cafesjian should have called for a formal vote on the hiring of Papazian. However, it was clear from the discussions at various meetings that Kaloosdian and Hovnanian were opposed to the proposal. Cafesjian cannot be faulted for deciding not to proceed with a formal vote in the face of such opposition. Notwithstanding Kaloosdian's assertion at the April 2006 Board meeting that he would not block any proposal put forward, Hovnanian had made it clear that he was not willing to sell Papazian's design to donors. Cafesjian decided that AGM&M should not move forward with its major donor trustees at loggerheads over the design and scale of the museum, and the Court cannot conclude that his decision was unreasonable.

### iii. Failure to make meaningful progress.

Plaintiffs argue that Cafesjian and Waters mismanaged AGM&M by failing to retain a project manager, create a detailed budget, retain a museum planner, draft a museum program, establish a detailed timeline, retain professionals to address issues such as zoning and historic preservation, develop a fundraising plan, and put forward proposals for a vote by the AGM&M Board of Trustees. *See* Compl. ¶¶ 147-55, 295(e)-(j), (p). As noted above, however, the lack of meaningful progress on the project from 2003 to 2006 was largely the product of a lack of funds and disagreement among the trustees over how to move forward. The record shows that Cafesjian and Waters tried to make progress on the museum by cultivating Papazian's designs and soliciting Deborah Devedjian to create a business plan. Moreover, Cafesjian and Waters did try to develop a fundraising plan in 2006, but Kaloosdian objected to the solicitation of donors using the Papazian designs. Therefore, the Board's inability to reach agreement over an architect

149

prevented the implementation of any fundraising initiatives. In light of the infrequent Board meetings and Hovnanian's reluctance to get involved at even a basic level, it is hardly surprising that Cafesjian and Waters were unable to get the museum up and running during their three years at the helm.

As for the failure to call for formal votes, the record shows that AGM&M meetings were routinely conducted on an informal basis with a preference for consensus decision-making. The 80% vote requirement in the By-Laws reinforced this practice. Although formal voting is generally good corporate practice, the Court is not persuaded that any of the AGM&M proceedings during Cafesjian and Waters's tenure as officers would have turned out differently if formal votes had been taken. The record shows that there was significant disagreement over how to advance the museum project, and on a board of only four trustees, a vote would not be needed in order to determine the level of agreement. Had a vote been necessary, any trustee could have called for one, so it does not make sense to blame Cafesjian for the lack of formality.

Ultimately, it is unfortunate that Cafesjian and Waters were unable to build consensus and make more substantial progress on the museum between October 2003 and September 2006. However, Cafesjian and Waters's lack of success in moving the project forward does not amount to a breach of their duties of loyalty and care.

                iv.     Spending down the assets of AGM&M and spending restricted funds.

Plaintiffs contend that Cafesjian and Waters breached their fiduciary duties to AGM&M by depleting the corporation's cash reserves[66] and spending restricted funds without notice to or

_____

[66] Plaintiffs refer in their Complaint to the spending down of "assets," but it is more appropriate to say that AGM&M's cash reserves were spent down, since AGM&M retained the

approval from the Board. *See* Compl. ¶¶ 156, 295(k), (m). However, Plaintiffs do not identify any specific expenditures that they claim were improperly made by Cafesjian or Waters. The record shows that most of the AGM&M expenditures during Cafesjian and Waters's tenure as officers went toward operations for ANI, insurance, and expenses related to the maintenance of the Properties. Other major expenses included the consulting contract for Deborah Devedjian, which was explicitly authorized by the AGM&M Board of Trustees. Waters and Cafesjian were authorized by the Unanimous Written Consent agreement to pay all of the "organizational expenses" of AGM&M, and the Court finds that Cafesjian and Waters did not make any unauthorized expenditures on behalf of AGM&M. There is also no evidence that they spent AGM&M funds unwisely; in fact, the record shows that Cafesjian and Waters's spending was relatively restrained and limited to basic operations for the museum project. The fact that few funds were raised to replenish the corporation's coffers does not mean that it was a mistake to spend down AGM&M's cash reserves. In fact, Cafesjian repeatedly warned the Board that AGM&M was in a negative cash position and he advanced his own funds to keep the organization operating while he remained as President. Accordingly, the Court finds that Cafesjian and Waters did not breach their fiduciary duties to AGM&M by spending most of the corporation's cash reserves on operating expenses.

Plaintiffs also argue that Cafesjian and Waters improperly spent restricted funds in violation of the donors' restrictions. The evidence presented at trial on this claim was limited, and Defendants moved for judgment on partial findings of fact at the close of Plaintiffs' case-in-chief. In a [186] Notice of Supplemental Authority filed explaining the basis for their claim,

_____

Properties (worth approximately $20 million) as well as any restricted funds held the Assembly.

Plaintiffs argue that Cafesjian and Waters improperly spent the $500,000 restricted donation made by Hovnanian through his foundation in December 2004 and recorded on AGM&M's books in January 2005. *See supra* § II.G.3. Plaintiffs argue that Waters's testimony that Hovnanian released the restriction on this donation is not credible in light of the fact that the AGM&M general ledger for 2005 lists the donation as restricted. *See* PX-402 at 5, 35. However, Hovnanian did not testify about this donation, and the Court finds Waters's testimony on this issue to be credible. Hovnanian's donation was intended to fulfill part of his $5 million pledge, which was restricted only to "the development, renovation, and construction of the AGM&M." *See* DX-4. Accordingly, the Court finds that Hovnanian's $500,000 donation was not spent in violation of any restriction by the donor. Even if Hovnanian's donation had remained restricted, however, the record shows that the Board (including Hovnanian) would have had notice that Waters and Cafesjian were spending those funds. Waters presented financial reports and discussed the budget at AGM&M Board meetings, and Cafesjian or Waters repeatedly warned the Board that the corporate account balances were low. If the other trustees were unaware that Hovnanian's donation was being spent, it was because they chose to be ignorant.

Plaintiffs have not identified any other restricted donations that Cafesjian and Waters allegedly spent.[67] Even if there were other restricted donations spent by Cafesjian and Waters, the record does not reveal the nature of the restrictions imposed by the donors. Therefore, the

---

[67] Plaintiffs' counsel suggested during argument at trial that some of the restricted donations by the Kechejian family may have been spent by Cafesjian and Waters. *See* 11/18 AM Tr. at 180. However, Plaintiffs abandoned this argument in their Notice of Supplemental Authority, and it appears from the record that it was the Assembly rather than Cafesjian and Waters that spent the funds donated by Kechejian. *See supra* § K.1.

Court cannot conclude that Cafesjian and Waters spent funds in violation of donors' restrictions.

v.      Failure to maintain adequate records.

Plaintiffs contend that Waters and Cafesjian did not maintain adequate records of financial transactions they made, particularly with respect to payments made from AGM&M to Cafesjian or CFF. *See* Compl. ¶¶ 157-159, 295(l). Plaintiffs point to the short-term loans made by Cafesjian (or CFF) to AGM&M to cover operating expenses. These loans are documented in the AGM&M general ledger, and records of these loans were introduced as trial exhibits. Plaintiffs allege in their Complaint that Defendants' lack of clear recordkeeping created the perception of self-dealing, *see* Compl. ¶ 159, but Plaintiffs failed to establish at trial that records were poorly kept, and they do not allege any actual self-dealing. Plaintiffs further complain that these loans were made without prior notice or authorization from the Board of Trustees, and there is no evidence in the record that the Board authorized these loan transactions. It is unclear from the record whether these loans were repaid or subsequently forgiven by AGM&M.[68] Even if these loans were unauthorized, the Court finds that these transactions were fair to the corporation because they were used to defray critical operating expenses, and there is no evidence that AGM&M was injured in any way by the transactions.

Plaintiffs also argue that Cafesjian and Waters failed to keep certain "adjusting journal entries" in the books of AGM&M. *See* 11/18 AM Tr. at 179-80. However, the Court finds that Cafesjian and Waters did, at the very least, keep the underlying records necessary to create the

---

[68] AGM&M's 2006 general ledger (which only contains entries through September 15, 2006) shows $50,000 in short-term liabilities to CFF. *See* PX-403 at 21. However, the 2007 general ledger does not show any short-term liabilities to CFF, *see* PX-404 at 9, suggesting that the loans were either repaid or forgiven in late 2006.

adjusting journal entries. Ellen Gordon failed to ask Waters or Deloitte & Touche (which likely had access to the information) for information regarding these journal entries. Moreover, Plaintiffs have not identified any harm resulting from Defendants' alleged failure to keep these records. Therefore, the Court finds no breach of fiduciary duty with respect to this claim.

Plaintiffs also argue that Waters breached his fiduciary duties by failing to keep minutes of the AGM&M Board meetings. Given the uncertainty that later arose regarding what had transpired at various meetings, it certainly would have been prudent for Waters to have kept official minutes. But Waters did not completely abdicate his responsibility to keep records, and he did provide the Board with less formal reports and financial accounts during his tenure as Secretary/Treasurer. Moreover, Plaintiffs have not shown that AGM&M was harmed in any way as a result of Waters's failure to keep minutes. Plaintiffs argue that the failure to keep adequate records could have jeopardized AGM&M's status as a 501(c)(3) organization, *see* Pls.' Concls. ¶ 22(m)(i), but they presented no evidence at trial that AGM&M's tax status was ever in jeopardy as a result of poor recordkeeping. The record shows that Waters did present some financial reports at meetings, and while those financial reports may not have been as comprehensive or detailed as the other trustees would like, there is no evidence that Waters ever misled the Board about any financial transactions or that the failure to keep records actually caused any injury to the corporation. Accordingly, the Court finds that Waters and Cafesjian did not breach their duty of care to AGM&M by failing to keep adequate records.

vi.    Failure to secure beneficial tax treatment.

Plaintiffs argue that Cafesjian and Waters failed to secure the most beneficial tax treatment for AGM&M by leaving the Properties vacant and failing to investigate all possible tax

154

exemptions or challenge the assessed values for the Properties. *See* Compl. ¶¶ 160-174, 295(n). Plaintiffs contend that Defendants' failure to develop the Properties in a reasonable time period rendered AGM&M ineligible for a real property tax exemption. *See id.* ¶¶ 162-63. As the Court has explained above, the delays in the development of the museum were not caused by Defendants' mismanagement but rather by the Board's failure to reach agreement. Moreover, Plaintiffs failed to show that AGM&M would have secured a tax exemption if the Properties had been occupied. The record shows that the District of Columbia denied AGM&M's application because Ellen Gordon failed to provide the additional information requested by the city. Although the information requested related to the development of the properties, the Court has no basis for concluding that the city would have granted a tax exemption even if AGM&M could have shown it was occupying the Properties.[69]

Plaintiffs next argue that Cafesjian and Waters should have explored whether all or part of the Properties could have been eligible for another type of real property tax exemption, as either a church, art gallery, or library. *See* Compl. ¶ 164. Because the purpose of AGM&M as stated in its By-Laws is to serve as a museum, it was reasonable for Waters and Cafesjian not to try and develop the project as a church, art gallery, or library. Cafesjian and Waters did not have an obligation to develop the project in a way that would maximize the probability of favorable tax treatment, particularly where such development would be inconsistent with the purpose of the museum project. The record shows that Cafesjian and Waters took reasonable steps to secure favorable tax treatment for AGM&M by filing applications for property tax exemptions in late

---

[69] Plaintiffs might have presented expert testimony to this effect, but they failed to designate any expert witnesses.

2003. They reasonably believed at that time that they would secure an exemption, and therefore no further steps were taken. Plaintiffs argue that Cafesjian and Waters should have hired a tax specialist to conduct an analysis to determine what other tax treatments were possible. But the Board never authorized them to conduct such an analysis, and an analysis may have cost more money than the tax savings it might yield. Moreover, there is no evidence in the record that there were more favorable tax treatments available that would have benefitted the museum project.

Plaintiffs also argue that Cafesjian and Waters should have appealed the tax assessments on the Properties because they are overvalued. However, Plaintiffs have not pointed to any evidence in the record that either Cafesjian or Waters knew that the properties were assessed at too high a rate. In fact, there is hardly any evidence in the record establishing the value of the Properties at any given time, and Plaintiffs did not present any expert testimony regarding the value of the Properties. Moreover, it would have cost AGM&M money to hire a professional to challenge the assessments, and money was scarce. Accordingly, the Court finds that Cafesjian and Waters did not breach their fiduciary duties to AGM&M by failing to take additional actions to secure beneficial tax treatment for AGM&M.

vii.        Failing to properly retain Deborah Devedjian.

Plaintiffs argue that Cafesjian and Waters breached their fiduciary duties by failing to secure a written contract with Deborah Devedjian, enabling her to later claim that she was owed an additional $200,000 and threaten legal action against AGM&M. *See* Compl. ¶ 175. This case is certainly a lesson in the dangers of relying on unwritten agreements. However, there is no requirement that all contracts be in writing, and the record does not establish that a written contract would have prevented Devedjian from asserting her claim for additional payment.

Moreover, the AGM&M trustees were aware that there was no written contract with Devedjian and did not raise any objections until after she asserted her claim for additional payment. Whether or not Devedjian has a valid claim against AGM&M (an issue that is not before the Court), Waters and Cafesjian did not breach their fiduciary duties by deciding to negotiate an oral agreement with her.

viii.    Abandoning the project and requesting a return of the Adjacent Properties before the reversion date.

Plaintiffs contend that Cafesjian and Waters acted in bad faith by "abruptly announcing Cafesjian's abandonment" of the project in 2006 and requesting a return of the Adjacent Properties before the December 31, 2010 reversion date. *See* Compl. ¶¶ 182-89, 297(a)-(c). However, the record shows that Cafesjian's announcement was not exactly "abrupt." There were signs as early as October 2005 that Cafesjian was contemplating leaving the project to help it move forward. From late 2005 through the April 2006 AGM&M Board of Trustees meeting, the tensions among the trustees increased, and the other trustees should not have been surprised when Cafesjian decided that he did not want to continue with the project. Plaintiffs argue that there were not in fact "competing visions" for the project as stated in the Brody letter. But overall, the record supports Cafesjian's conclusion that there was a significant difference of opinion over how to proceed. Cafesjian wanted to hire Edgar Papazian to design a bold, dramatic building on the entire footprint with a budget of over $100 million, while Hovnanian and Kaloosdian consistently criticized Papazian's plans and expressed skepticism that the community would support that large a project. Under the circumstances, it was reasonable for Cafesjian to conclude that he could not continue to work with the other trustees to try to achieve

157

his vision for the project.

Accordingly, Cafesjian made a proposal to separate from the project. The fact that Cafesjian *proposed* a premature return of the Adjacent Properties is not a breach of his fiduciary duties to AGM&M; the other trustees were free to reject this proposal, and they did. Plaintiffs argue that Cafesjian should have structured his proposal so that he would not receive a windfall due to an alleged increased value of the Adjacent Properties or reimbursement of carrying costs paid to TomKat during the property transactions. *See* Compl. ¶ 297(b), (c). Plaintiffs argue that such a windfall could have threatened AGM&M's tax status. The record shows that the funds pledged by Cafesjian and CFF in the Grant Agreement covered TomKat's carrying costs, so Cafesjian would not have received a windfall with regard to those payments. Moreover, Plaintiffs' argument is moot because Cafesjian's proposal was rejected. Had AGM&M seriously entertained Cafesjian's offer, it might have negotiated these issues with Cafesjian if there was a real threat to AGM&M's tax status. But there is no evidence that AGM&M was actually harmed by Cafesjian's proposals.

ix.    Resigning without an orderly transition.

Plaintiffs argue that Cafesjian and Waters breached their fiduciary duties by resigning without ensuring that their replacements were named and by failing to make any effort to ensure an orderly transition plan for AGM&M. *See* Compl. ¶¶ 190-97, 297(d)-(f). The record shows that Cafesjian resigned in September 2006, nearly four months after the "competing visions" letter first announced that he was contemplating resigning his position. Waters's resignation was announced on September 13, more than a month before he formally resigned on October 24, 2006—the same day that successors for Cafesjian and Waters were appointed on an "interim"

158

basis. Although there was no transition plan immediately in place upon their resignation, they did gradually transfer the books and records of AGM&M to Ellen Gordon. Although the transition occurred gradually over a series of months, there is no evidence that Defendants were dilatory in their efforts, and the Court finds that Cafesjian and Waters acted in good faith in transferring control.

Plaintiffs also claim that Cafesjian and Waters breached their fiduciary duties by leaving AGM&M with almost no cash and unpaid tax bills. *See* Compl. ¶ 297(g), (h). However, as the Court explained above, *see supra* § III.A.1.c.iv, Waters and Cafesjian did not breach their fiduciary duties by spending down AGM&M's cash reserves. The tax bills that were due in September were left unpaid because there was no money to pay them. Cafesjian had repeatedly told the other trustees (through Brody) during the summer of 2006 that the financial situation was dire, and he asked the other trustees to contribute money and asked the Assembly to transfer the funds being held for AGM&M, to no avail. Accordingly, the Court finds that Plaintiffs' claim lacks merit.

x.      Filing the MOA.

Plaintiffs argue that Cafesjian and Waters breached their fiduciary duties by filing the MOA without any notice to or approval from the AGM&M Board. *See* Compl. ¶¶ 198-208; 298(a). The record shows that Cafesjian did direct Waters to file the MOA without notifying the AGM&M Board. Cafesjian explained that he felt the need to do so out of concern that the other trustees were considering selling the Adjacent Properties. Plaintiffs argue that the record does not support Cafesjian's explanation because there was no evidence that anyone was trying to sell the Properties. But Cafesjian did have legitimate reason to be concerned because Kaloosdian had

159

inquired about the title to the Properties and whether Cafesjian's reversionary interest was recorded. Whether or not there was any pending risk of sale, Cafesjian and CFF had a right to ensure that the public had notice of their reversionary interest.

However, the record shows that Cafesjian and Waters executed the MOA in secret without notice to the Board either before or after it was recorded, and they did so because they did not trust the other AGM&M trustees. Defendants argue that the filing of the MOA was authorized by the Unanimous Written Consent agreement. *See* Defs.' Concls. ¶ 79; 691 F. Supp. 2d at 149-51. However, the Court is not persuaded that either the "Purchase of Real Estate" provision or the "Negotiation of Grant Agreements" provision in that agreement authorized Waters to record the MOA three years after the Grant Agreement was executed. *See* 691 F. Supp. 2d at 149-51. Therefore, the Court finds that the MOA was executed without proper authorization from the AGM&M Board of Trustees. Regardless of whether there was authorization for the MOA, however, Cafesjian and Waters's failure to provide notice to the Board constituted a violation of their duty of candor to AGM&M.

In order for this breach to be actionable, AGM&M must establish that it was injured by the recordation of the MOA. Plaintiffs argue that the filing of the MOA violated the condition of Anoush Mathevosian's donation that the Bank Building not be encumbered. However, even assuming that Mathevosian's condition is binding on AGM&M (despite never being formally acknowledged by the Assembly), Plaintiffs have failed to prove that the MOA did anything other than record AGM&M's already existing obligations under the reversion clause in the Grant Agreement, made binding on AGM&M through the Transfer Agreement. Plaintiffs characterize the MOA as a lien on the Properties, but Cafesjian's reversionary interest in the Properties was

160

created in November 2003, not when the MOA was executed. Plaintiffs do not dispute that the Grant and Transfer Agreements were binding legal documents when they were executed on November 1, 2003. Moreover, Mathevosian ratified and approved the Grant Agreement through the Unanimous Written Consent agreement, *see supra* § II.E.5, so Cafesjian's reversionary interest cannot be said to violate her condition that the Bank Building not be encumbered. Accordingly, Plaintiffs have failed to show that AGM&M was in any way injured by the recordation of the MOA. Although Plaintiffs took efforts—including legal action—to clear the MOA from the title to the Properties, their legal expenses are not recoverable as damages because the MOA did not improperly cloud AGM&M's title. Therefore, the Court finds that Defendants are not liable to AGM&M for recording the MOA.

> xi. Filing an "unsubstantiated lawsuit" and demanding rescission while asserting the right to participate in the development of the museum project.

Plaintiffs contend that Defendants breached their fiduciary duties to AGM&M by filing the April 2007 lawsuit seeking rescission of the Grant Agreement while at the same time asserting a right to participate in AGM&M's affairs. *See* Compl. ¶¶ 209-22, 297(i), 298(b). Plaintiffs argue that the lawsuit was baseless because AGM&M's books showed that the promissory note had been transferred by the Assembly. *See id.* ¶ 213. However, as the Court found above, *see supra* § II.F, the promissory note was not reissued or transferred by the Assembly as required by the Grant and Transfer Agreements, and the note was never forgiven. Cafesjian filed the lawsuit shortly after the Assembly claimed the promissory note was unenforceable. In light of these circumstances and the record as a whole, the Court is not persuaded that the lawsuit was a sham or that Cafesjian filed it in bad faith. Rather, the record

161

demonstrates that Cafesjian filed the lawsuit to protect his contractual rights, which he was entitled to do. *See Clancy v. King*, 954 A.2d at 1106 ("[A] fiduciary may enforce validly obtained legal rights against his or her firm, even if that transaction results in a profit for the fiduciary at the firm's expense."). Moreover, the fact that Cafesjian included a demand for rescission in his prayer for relief does not mean that he was necessarily entitled to rescission; litigants have a right to preserve their rights by demanding alternative forms of relief. Although the record shows that Cafesjian favored rescission as a remedy, he had a good faith basis for pursuing that relief, and AGM&M cannot claim any harm merely because Cafesjian asserted a right to rescission.

Plaintiffs nonetheless argue that Cafesjian should not have asserted a continued right to take part in AGM&M's affairs at the same time he was demanding rescission of the Grant Agreement through the lawsuit. Plaintiffs' position—which was asserted by Van Krikorian during the May 2007 meeting—is that it was a conflict of interest for John Waters (or any CFF-designated trustee) to participate in the AGM&M Board's discussions regarding the museum while the lawsuit was pending. But it is not clear how exactly the rescission demand affected the conflict of interest analysis. If the concern was that CFF would have voting power over the use of the Properties at the same time it had an interest in recovering the Properties for its own use, then the lawsuit did not materially change the position of the parties because CFF already had a reversionary interest in the Properties through the Grant and Transfer Agreements. In fact, CFF's claim for rescission actually created less of a purported conflict of interest for CFF than the reversion clause because if the Grant Agreement had been rescinded, the Bank Building would have remained an AGM&M asset, whereas the reversion clause calls for the Bank Building to be

returned to CFF along with the Adjacent Properties.

Cafesjian's reversionary interest in the Properties was not fundamentally incompatible with his fiduciary duties to AGM&M. The purpose of a reversion clause in any donor agreement is to create an incentive for the donee to honor the donor's wishes in a timely fashion. Where the donor is also a trustee of the donee organization and owes a fiduciary duty to that organization, the donor has an obligation to act in good faith and not take steps that make it more difficult for the organization to comply with donor's wishes and thereby facilitate the reversion of the gift. Cafesjian's fiduciary duties to AGM&M did not require him to forfeit his legal right to participate in the corporation. The By-Laws provide that CFF, as an institutional donor, "shall retain the right to elect Trustees and to appoint successors in perpetuity." *See* By-Laws § 2.5. AGM&M remains a corporate entity regardless of whether it owns the Properties, and Cafesjian's demand for rescission does not have any legal effect on CFF's rights as an institutional donor. Accordingly, Defendants did not breach their fiduciary duties by filing the April 2007 lawsuit or continuing to assert their rights to participate in the affairs of AGM&M.

xii.     Launching attacks in the *Armenian Reporter*.

Plaintiffs argue that Defendants breached their fiduciary duties to AGM&M by launching personal attacks on the other AGM&M trustees through the publication of articles in the *Armenian Reporter*. *See* Compl. ¶¶ 224-33, 298(c).[70] Plaintiffs do not argue that the articles were libelous; rather, they argue that the articles were published in bad faith to prevent AGM&M from developing the museum project. As an initial matter, the Court finds that Plaintiffs have

_____

[70] Although only Waters remained a trustee when the articles in the *Armenian Reporter* were published, Plaintiffs argue that CFF is vicariously liable for Waters's breach as the CFF-designated trustee. The Court declines to reach this question because it is unnecessary to do so.

failed to show that AGM&M was injured by the publication of the "scorecard" or any of the other articles published in the *Armenian Reporter*. The fact that individual trustees may have been embarrassed or had their feelings hurt by the articles does not give AGM&M a cause of action, and there is no evidence in the record that any of the published statements were inaccurate or defamatory (nor have Plaintiffs claimed them to be). Cafesjian and Waters plausibly explained at trial that the articles were published to defend Cafesjian's reputation from attack by others. Although the record establishes that there was animosity between Cafesjian and some of the other trustees (particularly Hovnanian) at this point in time, the Court does not find that the articles were published in bad faith to harm AGM&M.

xiii. Undermining AGM&M's development efforts by dissuading the HPRB and building professionals from working on the project.

Plaintiffs also claim that Waters breached his fiduciary duties as a trustee of AGM&M by seeking to prevent the HPRB from considering AGM&M's architectural plans and trying to dissuade interested professionals from working on the museum project. *See* Compl. ¶¶ 234-39; 298(d), (e). The record shows that Waters contacted the HPRB to notify it of the pending litigation and request that it suspend consideration of AGM&M's application. *See* PX-127. The letter was sent in April 2008, nearly a year after Waters was first excluded from discussions relating to the development of the museum, and there is no evidence that Waters sent the letter in bad faith. Moreover, there is no evidence that the HPRB took any adverse actions against AGM&M's submission as a result of Waters's communications. Therefore, the Court finds that Plaintiffs' claim that Waters improperly interfered with the HPRB is without merit.

The record shows that Waters communicated with two professionals previously involved

in the museum project, Jeffrey Arnold and William Herman. However, Waters's communications with those individuals essentially informed them of the litigation and the ongoing dispute over the project, and there is no evidence that either of these individuals were being considered by AGM&M to do work for the museum, so AGM&M has not shown that it was injured by Waters's actions. In addition, Arnold testified at trial that Waters had not dissuaded him from getting involved with the project. Therefore, the Court finds Plaintiffs' claim that Waters improperly dissuaded professionals from working on the project to be without merit.

### d. Allegations of Injury

Even if the Court were to find that Cafesjian and Waters breached their fiduciary duties to AGM&M, Plaintiffs must show that their breach is the direct and proximate cause of some injury. Plaintiffs generally claim that Cafesjian and Waters's actions caused the museum project to be substantially delayed (thus risking loss of the Properties under the reversion clause), increased tax burdens for AGM&M, frustrated fundraising efforts, and required AGM&M to incur legal expenses. *See* Compl. ¶¶ 240-43, 299; Pls.' Concls. ¶ 27.

Plaintiffs argue that Waters and Cafesjian caused the project to be substantially delayed, making it impossible for AGM&M to substantially complete the project by December 31, 2010 as required to avoid the reversion of the Properties. However, the record shows that even after Cafesjian and Waters resigned as officers, the Building & Operations Committee made significant progress and projected an opening date of April 2010, well before the deadline in the reversion clause. The record further shows that the reason the Building & Operations Committee put a "pause" on the development was a lack of funding to continue the project. Plaintiffs blame

Cafesjian and Waters for their inability to fundraise, but that claim is speculative—the record does not clearly show that any actions by Cafesjian or Waters caused AGM&M to lose donors. Although the ongoing litigation may have dampened donor enthusiasm for the project, the parties' good faith decisions to litigate cannot provide the basis for a damages claim.

Plaintiffs argue that Defendants' conduct caused donors to either choose not to donate to AGM&M or to delay their donations. The Court ruled before trial that such damages may be recoverable if Plaintiffs can establish that Defendants' improper conduct caused specific donors to cancel or delay planned donations. *See* Pretrial Conf. Mem. Op. & Order at 14-17 (citing *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227 (D.C. Cir. 1997)). However, the evidence at trial did not establish that any donors changed their decisions to donate based on Defendants' conduct. At most, the evidence showed that donors chose to withhold their donations until the litigation was resolved and/or the museum was opened. As the Court has explained, however, Defendants pursued the litigation in good faith and cannot be penalized for pursuing valid claims against AGM&M. Moreover, the April 2007 lawsuit filed by CFF was only the first in a series of lawsuits filed by both parties, so donors's concerns about "the litigation" cannot be attributed solely to Defendants.

With respect to AGM&M's claim that it faces higher taxes as a result of Defendants' conduct, the Court finds that Plaintiffs failed to present sufficient evidence regarding the taxes paid by AGM&M to enable the Court to draw any conclusion on that question. Although some of AGM&M's tax records are in evidence, Plaintiffs failed to explain which taxes allegedly increased or demonstrate that such increases were causally connected to Defendants' conduct. Accordingly, the Court finds that AGM&M has not suffered any injury from Defendants'

conduct in the form of increased taxes.

AGM&M also claims it is entitled to reimbursement of its legal fees for defending the lawsuits brought in bad faith by Defendants. *See generally Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975) (allowing courts to assess attorneys' fees when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons") (citation omitted). However, because the Court finds that the lawsuits were not pursued in bad faith, Plaintiffs are not entitled to attorneys' fees.

AGM&M's various other damages claims, such as the required return of misspent restricted donations or the increased costs of building the museum at a later date, are unsupported by the record.

For the foregoing reasons, the Court concludes that Defendants are entitled to judgment on Count One of Plaintiffs' Consolidated Complaint.

> 2.     <u>Count Two: Breach of Fiduciary Duty to the Assembly (by Cafesjian and Waters)</u>

In Count Two of their Consolidated Complaint, Plaintiffs claim that Cafesjian and Waters breached their fiduciary duties to the Assembly by, among other things, acting in bad faith, engaging in conflicts of interest, putting their own interests ahead of the Assembly, and engaging in multiple acts of self-dealing. The Court shall address each of their specific allegations below.

> a.     Cafesjian and Waters's Fiduciary Duties to the Assembly

The parties agree that Cafesjian and Waters joined the Assembly as trustees in 1998. *See* Answer to Consol. Compl. ¶ 40. Plaintiffs contend that Cafesjian continues to serve as a trustee of the Assembly to the present day and that Waters served as a trustee until December 31, 2007.

*See* Compl. ¶¶ 301-02.  Cafesjian and Waters dispute this, claiming they were expelled from the Assembly in January 2007.  *See* Answer to Consol. Compl. ¶ 229.  The record shows that the Assembly voted to suspend Cafesjian and Waters in January 2007 until the asserted conflict of interest issues had been resolved.  Unlike Waters's exclusion from AGM&M affairs in May 2007, the Assembly's suspension of Cafesjian and Waters was presumptively valid, and Cafesjian and Waters did not assert their rights to participate in Assembly business following their suspension.  Because the Assembly's purpose in suspending Cafesjian and Waters was to excuse them from official service as trustees, the Court finds that Cafesjian and Waters did not owe fiduciary duties to the Assembly after their suspension on January 12, 2007.  Accordingly, the Assembly's claim must fail with respect to actions taken by Cafesjian and Waters after this date.  However, the Court shall also make alternative rulings based on the assumption that Cafesjian and Waters continued to owe fiduciary duties after this date.

b.      Specific Allegations of Breach

Plaintiffs allege that Cafesjian and Waters breached their fiduciary duties to the Assembly by acting in bad faith, engaging in conflicts of interest, putting their own interests ahead of those of the Assembly, and by engaging in multiple acts of self-dealing.  *See* Compl. ¶ 303.  The Court shall review each of Plaintiffs' specific allegations below.

i.      Luring away Assembly employees.

Plaintiffs claim that Cafesjian and Waters breached their fiduciary duties to the Assembly by luring away Assembly employees to work for Cafesjian's organization.  *See* Compl. ¶ 303(c).  However, the record shows that Cafesjian and Waters hired Ross Vartian and Rob Mosher after

168

they had either been fired or decided to leave the Assembly's employ.[71]  Even if Cafesjian and

Waters had made offers to these employees to leave the Assembly, the employees were employed

at will and had a right to entertain other offers.  Therefore, the Court finds that Cafesjian and

Waters acted in good faith and did not breach their fiduciary duties to the Assembly by hiring

former Assembly employees.

ii.      Forming USAPAC to compete with the Assembly.

Plaintiffs contend that Cafesjian and Waters breached their fiduciary duties to the

Assembly by taking advantage of their contacts in the organization to create USAPAC and

compete against the Assembly.  *See* Compl. ¶¶ 275-84, 303(a).  Although District of Columbia

law is not clear on this point, the general rule is that corporate officers and directors, "so long as

they act in good faith toward their company and its associates, are not precluded from engaging

in a business similar to that carried on by their corporation, either on their own behalf or for

another corporation of which they are likewise directors or officers."  3 Fletcher, *supra*, § 856;

*see also* Joseph Warren Bishop, *Law of Corporate Officers & Directors: Indemnification &

Insurance* § 3:11 ("As a general rule, the corporate opportunity doctrine does not preclude

corporate fiduciaries from engaging in a business similar to that of the corporation they serve,

provided they act in good faith, avoid hindering the corporation's activities, and do not violate

any fiduciary duty owed to the corporation or its shareholders.").  However, direct competition

against the corporation is prohibited by the duty of loyalty.  *See Mercer Mgmt. Consulting, Inc. v.

Wilde*, 920 F. Supp. 219, 233 (D.D.C. 1996); *Md. Metals, Inc. v. Mentzer*, 382 A.2d 564, 567-68

---

[71] There is also some evidence that Cafesjian hired a third former Assembly employee, but Plaintiffs failed to demonstrate that Cafesjian or Waters acted improperly with respect to that employee's hiring.

(Md. 1978) ("A direct corollary of this general principle of loyalty is that a corporate officer or other high-echelon employee is barred from actively competing with his employer during the tenure of his employment, even in the absence of an express covenant so providing.").

The record does not establish that Cafesjian created USAPAC to compete with the Assembly. Although USAPAC certainly operated in the same advocacy sphere as the Assembly, the Court is persuaded that Cafesjian founded USAPAC to fulfill unmet needs within the Armenian advocacy community and to engage in more direct political advocacy through the use of a linked PAC and 527 organization, the kind of direct advocacy which the Assembly was prohibited from engaging in due to its 501(c)(3) status. Moreover, USAPAC offered to work with the Assembly, but the Assembly did not want to cooperate. Although there is evidence that USAPAC aspired to be the dominant Armenian American advocacy organization, Plaintiffs have failed to establish that the Assembly was actually harmed in any way by the creation of USAPAC. Bryan Ardouny merely testified that its existence made things more complicated, and there is no evidence that the two organizations competed for donors, members, or anything else. Nor is there any nonspeculative evidence that USAPAC harmed the Assembly's lobbying efforts. Therefore, because USAPAC did not "compete" against the Assembly in any meaningful sense, the Court finds that Cafesjian and Waters did not breach their fiduciary duties to the Assembly by forming and operating USAPAC.

### iii. Violating the Assembly's conflicts of interest policy.

Plaintiffs argue that Cafesjian and Waters breached their fiduciary duties to the Assembly by failing to notify the Assembly in advance about USAPAC in violation of the Assembly's conflicts of interest policy. *See* Compl. ¶ 303(b). The Assembly's conflicts of interest policy

required Cafesjian and Waters to disclose any involvement with a project or other matter in which the Assembly has an interest. *See* PX-263. The record shows that the Assembly was notified in December 2006 of Cafesjian's involvement in USAPAC, but such notice may not have been in technical compliance with the conflicts of interest policy, which requires disclosure to the Assembly's Legal Affairs Committee. *See id.* Although it is unclear whether USAPAC was an entity in which the Assembly would have an interest as defined by the conflicts of interest policy, the Court need not make that determination because a violation of internal Assembly policy does not constitute a *per se* breach of fiduciary duty. Such a violation may be evidence of bad faith, but the Court has already concluded that Cafesjian and Waters did not intend to compete with the Assembly by creating USAPAC. Moreover, there is no evidence that the Assembly was injured in any way by the failure to receive advance notice about USAPAC's formation. Therefore, the Court finds that Cafesjian and Waters did not breach any fiduciary duties to the Assembly by failing to comply with the conflicts of interest policy.

iv.    Misappropriating Assembly mailing, membership, and database lists.

Plaintiffs claim that Cafesjian and Waters breached their fiduciary duties to the Assembly by misappropriating Assembly mailing, membership, and database lists. *See* Compl. ¶ 303(d). However, as the Court explained above, *see supra* § II.Q, the record does not support Plaintiffs' allegations that Cafesjian or Waters took proprietary information from the Assembly. Therefore, Plaintiffs' misappropriation claim fails.

v.    Purchasing the *Armenian Reporter* and publishing articles disparaging Assembly members.

Plaintiffs claim that Cafesjian and Waters breached their duties to the Assembly by

171

acquiring the *Armenian Reporter* with the knowledge that the Assembly was also interested in acquiring it and subsequently publishing articles aimed at disparaging the Assembly. *See* Compl. ¶ 303(e). However, the record shows that the Assembly was no longer interested in acquiring the *Armenian Reporter* when Cafesjian purchased it. As the Court explained above with respect to AGM&M's claim, *see supra* § III.A.1.c.xii, the Court finds that Cafesjian and Waters published the articles in the *Armenian Reporter* in good faith, and there is no evidence that the articles were defamatory or in any way harmed the Assembly. Therefore, the Court finds that the Assembly has failed to establish that Cafesjian and Waters breached any fiduciary duties to the Assembly by acquiring the *Armenian Reporter* and publishing articles relating to the Assembly.

vi.      Filing a vexatious lawsuit against the Assembly.

Plaintiffs contend that the April 2007 lawsuit filed against the Assembly was unsupported and vexatious. *See* Compl. ¶ 303(f). As the Court explained above, *see supra* § III.A.1.c.xi, Cafesjian and CFF had a good faith basis for filing that lawsuit. Therefore, this claim also fails.

c.      Damages to the Assembly

The Assembly contends that it suffered damages from Defendants' conduct in the form of lost goodwill in the Armenian community and resources that it had to divert to support AGM&M and defend its lawsuits. However, Plaintiffs have not established that any of these alleged damages were proximately caused by any of Defendants' actions. There is no concrete evidence of the Assembly's lost goodwill in the record, and the Assembly was not obligated to pay AGM&M's bills from its own accounts once it took over the responsibility for managing AGM&M. Furthermore, the Assembly's legal expenses in defending the lawsuits are not recoverable because Defendants litigated in good faith. Accordingly, the Assembly has failed to

satisfy the third element of its breach of fiduciary claim against Defendants.

For the foregoing reasons, the Court concludes that Defendants are entitled to judgment on Count Two of Plaintiffs' Consolidated Complaint.

3. Count Three: Breach of the Duty of Good Faith and Fair Dealing to the Assembly Implied in the Grant Agreement (by Cafesjian)

In Count Three of their Consolidated Complaint, Plaintiffs argue that Cafesjian breached his duty of good faith and fair dealing implied in the Grant Agreement by mismanaging the museum project and then abandoning AGM&M and obstructing its progress. *See* Compl. ¶¶ 305-11. Although this duty is based on the Grant Agreement rather than Cafesjian's fiduciary relationship to the Assembly and AGM&M, the Court understands this claim to be duplicative of the claims asserted in Counts One and Two, which the Court has already addressed. The Court finds that Cafesjian did act in good faith in managing the museum project and subsequently seeking to negotiate his withdrawal from the project. Therefore, the Court finds that Cafesjian did not breach his duty of good faith and fair dealing to the Assembly implied in the Grant Agreement.

Although the Assembly does not expressly state a claim for breach of contract, Plaintiffs do allege in their Complaint that Defendants' failure to make a timely installment payment for the 1340 G Street Property was a breach of their obligations under the Grant Agreement. *See* Compl. ¶ 289. The record shows that Cafesjian missed the March 2007 deadline for payment but tendered the payment within the next few days. Therefore, although Cafesjian technically breached his obligation to make a timely payment, the breach was not material, and the Assembly could have mitigated its damages completely by cashing the check that was sent by Waters.

Because the Assembly failed to do so, it cannot prevail on any claim for breach relating to the late payment.

For the foregoing reasons, the Court concludes that Defendants are entitled to judgment on Count Three of the Consolidated Complaint.

### 4. Count Four: Misappropriation of Trade Secrets of the Assembly (by Cafesjian and Waters)

In Count Four of their Consolidated Complaint, Plaintiffs contend that Cafesjian and Waters misappropriated the Assembly's trade secrets by utilizing the Assembly's confidential mailing and database lists without permission. *See* Compl. ¶¶ 312-18. "To establish a trade secret misappropriation claim, [the plaintiff] must demonstrate (1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose." *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007) (citing D.C. Code § 36-401). However, as the Court explained above, *see supra* § II.Q, the record does not support Plaintiffs' allegations that Defendants appropriated Assembly mailing lists for use by the *Armenian Reporter*, USAPAC, or any other Cafesjian organization. Therefore, even assuming *arguendo* that the Assembly's mailing lists qualify as trade secrets under D.C. law, Plaintiffs have not established that Defendants are liable for misappropriation. Accordingly, the Court concludes that Defendants are entitled to judgment on Count Four of the Consolidated Complaint.

### 5. Requests for Equitable Relief Relating to the Reversion Clause

In addition to the four claims discussed above, Plaintiffs ask the Court to declare that the reversion clause in the Grant Agreement is unenforceable as a matter of law, or, in the

alternative, that the reversion date should be extended as a result of Defendants' purposeful delay and obstructionism. *See* Compl., Prayer for Relief ¶ b. Plaintiffs also seek a declaration that Defendants' interest in the Properties are invalid and that AGM&M has clear title to the Properties. *See id.*, Prayer for Relief ¶ c. However, because the Court finds that Defendants are entitled to judgment with respect to each of Plaintiffs' claims, there is no basis for the Court to declare Defendants' reversionary interest in the Properties to be invalid or modified. Plaintiffs also argue that Defendants should be equitably estopped from enforcing the Grant Agreement because (a) Cafesjian and Waters told Plaintiffs that the terms in the Grant Agreement could be revised at a later date and then failed to revise the terms; and (b) Cafesjian and Waters told Plaintiffs that they would provide funds necessary to complete the project and then failed to provide the necessary funds. *See* Pls.' Concls. ¶¶ 43-44. However, the Court finds no evidence in the record that Cafesjian and Waters made any such promises. Even if they had, the Court would not find such promises to provide a basis to equitably estop Defendants from enforcing the reversion clause.

Accordingly, the Court finds that the reversion clause in the Grant Agreement is valid and enforceable. During their closing argument, Plaintiffs suggested that the Court could conclude that the museum had been developed in substantial compliance with plans approved by the AGM&M Board of Trustees by the reversion date, thereby eliminating Cafesjian and CFF's reversionary interest. *See* 11/29 AM Tr. at 54. However, the record clearly shows that the museum is nowhere near completion, and therefore Cafesjian and CFF's reversion rights are now vested. At trial, Defendants indicated that CFF would exercise its right of reversion over the Properties. Therefore, the Court shall declare that as of December 31, 2010, CFF and Cafesjian

175

have a right to enforce their reversionary interest in the Properties under the Grant Agreement, and CFF may be said to have exercised that right as of December 31, 2010.

        6.      <u>Declaratory Relief Relating to the Removal of CFF as an Institutional Donor</u>

Plaintiffs seek a declaration from the Court affirming that CFF was properly removed as an institutional donor during the March 2009 meeting of the AGM&M Board of Trustees. *See* Compl., Prayer for Relief ¶ d. The removal of trustees from AGM&M is governed by the By-Laws, which contain specific provisions relating to removal. Although the By-Laws provide that individual trustees may be removed without cause by the unanimous affirmative vote of the trustees present at a meeting where a quorum is present (excluding the vote of the removed trustee), *see* By-Laws § 2.17, there is no removal provision for institutional donors. In fact, the By-Laws explicitly state that "[a]n institutional donor shall retain the right to elect Trustees and to appoint successors *in perpetuity* . . . ." *Id.* § 2.5. Therefore, although the AGM&M Board had authority to remove Waters as a trustee, it did not have authority to strip CFF of its perpetual right to appoint trustees. Such an act would have required an amendment to the By-Laws, and there is no evidence in the record that the By-Laws were ever so amended. Accordingly, the Court finds that CFF remains an institutional donor with the right to appoint trustees to the AGM&M Board.

        B.      *Defendants' Counterclaims Against Plaintiffs*

In their Streamlined Answer and Counterclaims, Cafesjian, Waters, and CFF assert seven claims against Plaintiffs. Counts I through VI generally claim that the Assembly and AGM&M breached their obligations in the Grant and Transfer Agreements, respectively, by (1) failing to

repay the promissory note, (2) excluding CFF and Cafesjian from participation in the planning and design for the memorial, (3) failing to include a memorial in the design for the museum, and (4) failing to use the Properties solely for the museum project. Because the factual bases for Counts I through VI are the same, the Court shall address each of these four factual issues separately with respect to all six counts. Count VII asserts a claim for indemnification under the AGM&M By-Laws for Cafesjian and Waters's legal expenses in defending claims that they breached their duties to AGM&M.

Defendants assert claims for both breach of contract (Counts I & II) and breach of the implied duty of good faith and fair dealing (Counts III & IV). Under D.C. law, "all contracts contain an implied duty of good faith and fair dealing, which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000) (quoting *Hais v. Smith*, 547 A.2d 986, 987 (D.C. 1988)). Because Defendants are not parties to the Transfer Agreement, their claims against AGM&M are premised on their rights as third party beneficiaries (Count V). "District of Columbia law recognizes that one who is not a party to a contract may nonetheless sue to enforce the contract's provisions if the contracting parties intend the third party to benefit directly thereunder." *Monument Realty LLC v. Wash. Metro. Area Transit Auth.*, 535 F. Supp. 2d 60, 70 (D.D.C. 2008). Because the Transfer Agreement specifically requires AGM&M to honor the Assembly's donor requirements and explicitly references the obligations to Cafesjian and CFF with respect to the memorial and the promissory note, the Court concludes

that the parties intended Cafesjian and CFF to benefit directly from the Transfer Agreement.[72]

Therefore, Defendants may assert their claims against AGM&M for breach of the Transfer

Agreement.

To prevail on a breach of contract claim, a party must demonstrate that a contract existed,

that the party performed his contractual obligations, that the other party breached the contract,

and that the party suffered damages due to the breach.  *Dorsey v. Am. Express Co.*, 680 F. Supp.

2d 250, 254 (D.D.C. 2010).  The Court finds, and the parties do not dispute, that the Assembly

and AGM&M were bound by the Grant and Transfer Agreements.[73]  The Court also finds that

Cafesjian and CFF have performed their obligations under the Grant Agreement by making all of

the required payments.[74]  Accordingly, the Court shall focus on whether the Assembly and

AGM&M have breached their contractual obligations and whether such breaches have caused

damage to Defendants.

1.    Failure to Reissue the Promissory Note

Defendants claim that the Assembly has breached the Grant Agreement by failing to

reissue the promissory note and repay the $500,000 owed to CFF.  *See* Countercls. ¶ 60.  CFF

cannot enforce the original promissory note issued in March 2000 because that note is governed

by Minnesota's six-year statute of limitations, and CFF did not bring suit to enforce the note until

---

[72] The Court also notes that Plaintiffs do not seriously argue that Cafesjian and CFF have no rights as third party beneficiaries of the Transfer Agreement.  *See* Pls.' Concls. ¶¶ 143-44.

[73] Plaintiffs do contend that AGM&M is not bound by all of the restrictions to which the Assembly agreed to in the Grant Agreement.  *See* Answer to Streamlined Countercls. ¶ 91.

[74] Cafesjian and CFF do have one outstanding obligation, which is to make a balloon payment of $1.5 million on the 1340 G Street installment agreement in March 2011.

April 2007. However, the Assembly agreed in the Grant Agreement to reissue the note, and as the Court found above, *see supra* § II.F, it failed to do so. The Court does not find that Cafesjian or CFF ever forgave the note. Therefore, the Court finds that the Assembly breached its contractual obligation to CFF by failing to reissue the note.

Plaintiffs argue, however, that CFF's claim for breach of contract is itself barred by the statute of limitations. *See* Pls.' Concls. ¶ 89. The Grant Agreement is governed by District of Columbia law, *see* Grant Agreement § 7.2, and the statute of limitations for contract claims is three years, *see* D.C. Code § 12-301(7). Because Defendants did not take legal action to enforce the promissory note until April 26, 2007, their claim is untimely unless the cause of action accrued on or after April 26, 2004.[75] A cause of action for breach of contract accrues at the time of the breach, which occurs when a party fails to perform when performance is due. *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 319-20 (D.C. 2008). "When a contract fails to specify a time for the performance of an act, 'the law implies that it must be done within a reasonable time.'" *Id.* at 320 (quoting *Independence Mgmt. Co. v. Anderson & Summers, LLC*, 874 A.2d 862, 869 (D.C. 2005)). "What constitutes a reasonable time for performance depends on the circumstances of each case." *Id.* Here, the Grant Agreement does not specify a time within which the Assembly was required to reissue the promissory note. Therefore, the Court must determine whether the parties reasonably expected the Assembly to reissue the note prior to April 26, 2004.

The requirement in the Grant Agreement that the promissory note be reissued was

---

[75] Although the April 2007 lawsuit was ultimately dismissed and the claim reasserted in these consolidated actions, the Court assumes that the statute of limitations would be equitably tolled as of the filing of the lawsuit in April 2007.

coupled with the requirement that it be transferred to AGM&M as part of the Transfer Agreement. The record shows that the transfer of assets from the Assembly to AGM&M was a gradual process that took several months, and it is reasonable to assume that the parties intended the promissory note to be reissued and transferred within this transition period. Moreover, because Cafesjian and Waters were running the operations of AGM&M during this time period, they should have been aware that the Assembly had not reissued and transferred the note within a few months after the Grant Agreement was signed on November 1, 2003. Although the parties likely did not expect the Assembly to reissue the promissory note immediately, the Court finds that the Grant Agreement required the Assembly to reissue the note sometime before April 2004. Therefore, Defendant's claim for breach of the Grant Agreement is time-barred with respect to the Assembly's failure to reissue the promissory note.

Defendants also assert a claim against AGM&M for failing to repay the promissory note. However, the record shows that the Assembly never reissued or transferred the promissory note to AGM&M. The Transfer Agreement does not create any obligations for AGM&M with respect to the promissory note (other than to accept the transfer from the Assembly). Therefore, Defendants' claim against AGM&M fails independently of whether it is barred by the statute of limitations.

Because Defendants' breach of contract claims fail on this ground, their breach of implied duty of good faith and fair dealing claims also fail.

  2. Failure to Allow Cafesjian and CFF to Participate in and Approve the Planning and Design of the Museum and Memorial

Defendants claim that the Assembly and AGM&M have breached their contractual

obligations by failing to allow Cafesjian and CFF to exercise their ongoing right to participate in and approve the planning and design of the museum and memorial. *See* Countercls. ¶¶ 61, 70, 77, 86. The Grant Agreement requires that the Assembly permit CFF "to participate in all material decisions regarding the memorial," *see* Grant Agreement § 3.2(C), and this obligation was transferred to AGM&M via the Transfer Agreement. Defendants argue that Plaintiffs have breached this requirement because Waters has been excluded from all museum planning activity since the May 2007 AGM&M Board meeting.

It is clear from the record that Waters, the CFF-designated trustee, was not allowed to participate in the planning discussions with Gallagher & Associates and Martinez & Johnson that occurred in 2007 and 2008. However, the Grant Agreement does not explicitly require that CFF be involved in all aspects of the museum planning; the requirement is only that CFF be allowed to participate in *material* decisions regarding the *memorial*. Despite the fact that the Building & Operations Committee did a substantial amount of work on the design for the project generally and asked Martinez & Johnson to produce a sketch for a memorial garden, the record does not show that the Building & Operations Committee made any formal decision about the memorial. Moreover, there is no evidence in the record that the AGM&M Board (acting without notice to Waters) ever adopted any of the plans created by the Building & Operations Committee or made any specific decisions about the memorial. Because the Building & Operations Committee never advanced its work beyond the basic planning stages, the Court finds that no material decisions regarding the memorial were made by AGM&M during this time period. Therefore, the exclusion of Waters from participation did not constitute a breach of this provision of the Grant Agreement.

### 3. Failure to Include a Memorial in the Plans for the Museum

Defendants claim that the Assembly and AGM&M have breached their contractual duties by failing to include a memorial in the design for the museum project. *See* Countercls. ¶¶ 62, 71, 78, 87. As the Court noted in the previous section, however, AGM&M did not approve or complete any designs relating to the memorial before halting progress on the museum. Because AGM&M never broke ground on new construction or approved final plans relating to the memorial, there has been no violation of the requirement in the Grant Agreement that space be made available for a memorial on the Properties. *See* Grant Agreement § 3.2(A). Accordingly, the Court shall deny Defendants' claims relating to this provision of the Grant Agreement.

### 4. Failure to Use All of the Properties "As Part of the AGM&M"

Defendants contend that the Assembly and AGM&M have breached their contractual duties by failing to use all of the Properties "as part of the AGM&M" as defined in the Grant Agreement. *See* Countercls. ¶¶ 63, 72, 79, 88. Specifically, Defendants argue that the Assembly's leasing of space in the Families U.S.A. building is not part of the museum project and therefore should be considered to be a violation of the Grant Agreement.

The Grant Agreement provides that the Properties "may only be used as part of the AGM&M, subject to plans for the AGM&M approved by the Board of Trustees . . . ." *See* Grant Agreement § 3.1(A). The Court is not persuaded that the lease of space in the Families U.S.A. building to the Assembly in an effort to raise funds for the project constitutes a violation of this provision. The requirement that the Properties be used "as part of" the Armenian Genocide Museum & Memorial is rather broad, and because construction on the museum has not yet started, it is premature to conclude that the Properties have not been used as part of the museum

project.  The record shows that AGM&M leased space to the Assembly in an effort to support the project financially, and therefore it can be said to be a "part of" the museum project.

Moreover, the record shows that the Assembly's lease in the Families U.S.A. building was approved by the Building & Operations Committee, which was delegated authority to manage the Properties by the AGM&M Board after Waters left the May 2007 meeting.  Although there is much in dispute about that meeting, the Court finds that Waters left the meeting voluntarily and that the remaining quorum of trustees unanimously agreed to delegate "building management" authority to the Building & Operations Committee.  Therefore, by virtue of the Board of Trustees' delegation of authority, the requirement that the Properties be used subject to plans approved by the Board of Trustees has been satisfied.

Accordingly, the Court shall deny Defendants' claims with respect to this provision of the Grant Agreement.  Because the Court finds that Defendants failed to establish that Plaintiffs breached their contractual obligations to Defendants under any of the factual bases asserted in their Streamlined Counterclaims, the Court finds that Plaintiffs are entitled to judgment on Counts I, II, III, IV, and V.

### 5.    Unjust Enrichment

In Count VI of their Streamlined Counterclaims, Defendants assert an unjust enrichment claim against Plaintiffs for keeping the conditionally-donated Properties without giving Defendants a voice in the affairs of the museum development.  *See* Countercls. ¶¶ 94-97.  "Under District of Columbia law, unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  *Nevius v. Africa Inland Mission Int'l*, 511 F.

Supp. 2d 114, 122 (D.D.C. 2007). However, "there can be no claim for unjust enrichment when an express contract exists between the parties." *Schiff v. Am. Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997). Because the Grant and Transfer Agreements are express contracts between the parties that govern the conduct at issue, Defendants' claim for unjust enrichment must fail. Accordingly, the Court concludes that Plaintiffs are entitled to judgment on Count VI of the Streamlined Counterclaims.

Cafesjian also argues that he is entitled to a return of the $1.05 million donation he made to the Assembly because the Assembly has denied him the benefits of membership. *See* Countercls. ¶¶ 97, Prayer for Relief ¶ 3; Defs.' Concls. ¶¶ 106-09. However, Defendants conceded that this damages claim was not disclosed during discovery and therefore the Court struck this claim in its pretrial order issued on October 22, 2010.

### 6. Indemnification Under the AGM&M By-Laws

In Count VII of their Streamlined Counterclaims, Defendants assert a claim for indemnification under the AGM&M By-Laws. Section 4.1 of the AGM&M By-Laws explicitly provides that AGM&M shall indemnify any current or former trustee or officer of the corporation against any and all expenses and liabilities incurred in connection with any claims brought against him as a result of his position with AGM&M, unless he is determined to be liable to the corporation for damages as result of negligence or breach of a duty. *See* By-Laws § 4.1. Because the Court has not found Cafesjian or Waters to be liable to the corporation for damages, AGM&M shall be required to indemnify Waters and Cafesjian for expenses related to their defense of claims brought by Plaintiffs. However, they are not entitled to indemnification with respect to affirmative claims that they have litigated against the Assembly or AGM&M.

Plaintiffs argue that the amount of indemnification is limited to the maximum amount of insurance coverage maintained by AGM&M. *See* Pls.' Concls. ¶ 152. Plaintiffs rely on D.C. Code § 29-301.113, which provides that volunteer corporate officers are immune from civil liability—except for wilful misconduct, criminal activity, self-dealing, and ultra vires actions taken in bad faith—as long as the corporation maintains liability coverage, in which case the corporation may be liable but only to the extent of the insurance coverage. However, this section does not apply to a corporation's agreement to indemnify its officers.

Accordingly, the Court concludes that Cafesjian and Waters are entitled to judgment on Count VII of their Streamlined Counterclaim. Defendants introduced uncontroverted evidence showing that Cafesjian and Waters had incurred $3,012,182.45 in attorneys' fees and costs defending the breach of fiduciary duty claims made against them. *See* DX-258; 11/19 AM Tr. at 38-39. However, the Court stated before trial that it would resolve issues relating to attorneys' fees in posttrial proceedings. Accordingly, the Court shall determine the amount of indemnification in a subsequent proceeding.

## IV. REMEDIES & EQUITABLE RELIEF

Having reached the conclusions stated above, the Court must now consider the ramifications of these rulings and address the parties' requests for equitable relief. The Court has found that the reversion clause in the Grant Agreement is valid and enforceable. Defendants indicated at trial that CFF, rather than Cafesjian, will enforce the reversion clause and take possession of the Properties. Defendants further indicated that CFF planned to use the Properties to continue the museum project. While the Court hopes that the Properties can be used for that purpose, the Court recognizes that CFF is not legally obligated to use the Properties to build a

museum, and none of the Court's decisions are based on the assumption that the Properties will

be used for that purpose.  The return of the Properties to CFF renders moot Defendants' request

that the Court impose a constructive trust on AGM&M's assets.  *See* Countercls., Prayer for

Relief ¶ 7.

However, Plaintiffs have raised questions about whether returning the Properties to CFF

violates the rule that no part of AGM&M's net earnings inure to the benefit of any trustee.  This

rule is contained in the By-Laws as well as the Articles of Incorporation and is a requirement for

corporations organized under § 501(c)(3) of the Internal Revenue Code.  Plaintiffs are concerned

that Cafesjian or CFF will profit from the reversion because the Properties may have appreciated

in value and because Cafesjian or CFF will recover the Bank Building despite having donated

only about half of the funds used to acquire it.  Therefore, Plaintiffs argue that it may be

inequitable to enforce the reversion clause without requiring that CFF reimburse AGM&M for

any increased value over the amount of funds originally donated by CFF or Cafesjian.  In light of

the context in which the reversion clause was drafted around the formation of AGM&M and the

alternative cash option—which, if exercised, would guarantee that CFF does not realize a profit

through the reversion—it may have been the intent of the contracting parties for any such

reversion to be a nonprofit transaction.  However, the Court cannot make such a determination

without further briefing from the parties.  Therefore, the Court shall order the parties to address

this issue in further proceedings.

Defendants also seek a declaration that CFF is entitled to exercise three votes on the

AGM&M Board based on the amount of its donations to the corporation.  However, with the

reversion clause enforced, the net contributions of CFF appear to be less than $5 million.

Accordingly, CFF would be entitled to appoint only a single trustee with a single vote on the AGM&M Board of Trustees. At the end of trial, Defendants indicated that they expected that there would be continued deadlock on the AGM&M Board of Trustees whether CFF exercises one vote or three, and in the event of deadlock, Defendants indicated they would seek dissolution of AGM&M pursuant to District of Columbia law. *See* 11/29 AM Tr. at 126. The Court shall not address this hypothetical at this time.

Defendants also seek an order enjoining the AGM&M trustees and the Building & Operations Committee from making any further decisions without the participation and approval of CFF's designated trustee. *See* Countercls., Prayer for Relief ¶ 4. However, Defendants have not significantly addressed the propriety of injunctive relief in their filings with the Court, and therefore Defendants have not established that injunctive relief is necessary to enforce CFF's rights under the AGM&M By-Laws. *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("According to well-established principles of equity, a plaintiff seeking a permanent injunction . . . must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."). The Court expects the parties to comply with the legal rulings of this Court without the need for injunctive relief. Defendants also ask the Court to "[n]ullify, to the extent reasonably possible, all conduct by AGM&M that was done without proper authority from Cafesjian, CFF's appointed Trustees, or AGM&M." *Id.* ¶ 5. Because the Court finds that Waters was wrongfully excluded from the AGM&M Board following the May 2007 AGM&M Board of Trustees meeting, the

Court agrees with Defendants that certain actions may have been taken without authority. However, the Court does not have a complete record of what transpired during this period of time, and it is unclear whether the requested relief is necessary in light of the Court's other findings.

## V.  CONCLUSION

The Court has made the foregoing findings of fact and conclusions of law based on the pleadings, the parties' proposed conclusions of law, and the record created at trial.  As explained above, the Court finds that Cafesjian and Waters did not breach their fiduciary duties to AGM&M or the Assembly, Cafesjian did not breach his duty of good faith and fair dealing implied in the Grant Agreement, and Cafesjian and Waters did not misappropriate trade secrets of the Assembly.  Accordingly, Defendants are entitled to judgment on all of the claims asserted by Plaintiffs in their Consolidated Complaint.

The Court also finds that neither the Assembly nor AGM&M breached the Grant and Transfer Agreements or their corresponding implied duties of good faith and fair dealing, and the Court further finds that Defendants' claim for unjust enrichment is barred by the existence of written agreements.  Accordingly, Plaintiffs are entitled to judgment on Counts I-VI of Defendants' Streamlined Counterclaims.  However, the Court finds that Cafesjian and Waters are entitled to indemnification from AGM&M for legal expenses and costs associated with defending the claims asserted against them in their capacity as trustees and former officers of AGM&M; accordingly, the Court shall enter judgment for Defendants on Count VII of their Streamlined Counterclaims, in an amount to be determined by the Court in further proceedings.

The Court further finds that the reversion clause in the Grant Agreement is valid and

enforceable, and therefore the Court shall declare that CFF or Cafesjian may exercise their rights under that clause effective December 31, 2010. The Court shall consider in further proceedings whether CFF or Cafesjian should be required to reimburse AGM&M for profits earned from the reversion, if any.

Furthermore, the Court finds that CFF was improperly removed as an institutional donor of AGM&M by the AGM&M Board of Trustees, and therefore the Court shall declare that CFF is entitled to appoint a single representative to the AGM&M Board of Trustees, who may exercise one vote. The Court shall schedule a hearing to address the outstanding remedial issues that must be addressed before final judgment can be entered.

* * *

This litigation began as an attempt by Defendants to collect on an unpaid promissory note and quickly escalated into an unfortunate exchange of accusations and allegations grounded in suspicion and mistrust. Ultimately, the Court finds that Defendants' claim on the promissory note is time-barred and that the parties' other allegations are unfounded—except for Defendants' claim for indemnification for legal expenses and costs under the AGM&M By-Laws, which could have been avoided had the parties not engaged in this protracted litigation. CFF shall take possession of the Properties and be entitled to a single vote on the AGM&M Board of Trustees. Although the Court is aware that the parties' prior efforts to resolve their differences have been unsuccessful, the Court strongly encourages the parties to work amicably to settle their remaining disputes. The Court sincerely hopes that after years of fighting legal battles, the parties can put aside their differences and accomplish the laudable goal of creating an Armenian Genocide museum and memorial.

An appropriate Order accompanies this Memorandum Opinion.


Date: January 26, 2011

                                        _____/s/_____
                                        **COLLEEN KOLLAR-KOTELLY**
                                        United States District Judge