# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ARMENIAN ASSEMBLY OF AMERICA, INC., *et al.*, | |
| Plaintiffs/Counter-Defendants, | |
| v. | Civil Action Nos. 07-1259, 08-255, 08-1254 (CKK) |
| GERARD L. CAFESJIAN, *et al.*, | |
| Defendants/Counter-Plaintiffs. | |

## MEMORANDUM OPINION
(May 9, 2011)

The above-captioned consolidated actions involve a series of claims and counterclaims relating to the parties' attempts to create a museum and memorial in Washington, D.C. devoted to the Armenian Genocide. Following a twelve-day bench trial in November 2010, the Court issued a Memorandum Opinion setting forth its findings of fact and conclusions of law on January 26, 2011. *See* [193][1] Mem. Op. (Jan. 26, 2011). The Court found that none of the parties' substantive claims were meritorious and dismissed all of the claims save one, holding that Defendants Gerard L. Cafesjian and John J. Waters were entitled to indemnification from the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") for legal expenses incurred in defending claims asserted against them in their capacities as former officers of AGM&M. The Court also affirmed the validity of a Grant Agreement that provides Cafesjian and the Cafesjian Family Foundation, Inc. ("CFF") with a reversionary interest (now vested) in certain properties owned by AGM&M. Since the Court's ruling, the parties have filed a variety of motions with

---

[1] All docket numbers refer to Civil Action No. 08-255.

the Court relating to unresolved remedial issues and enforcement of the Court's judgment. This Memorandum Opinion addresses only one of those motions, the [208] Motion for New Trial filed by The Armenian Assembly of America, Inc. (the "Assembly") and subsequently joined by AGM&M (collectively, "Plaintiffs"). Defendants Cafesjian Family Foundation, Inc. ("CFF"), John J. Waters Jr. ("Waters"), and Gerard L. Cafesjian ("Cafesjian") (collectively, "Defendants") have filed an opposition to Plaintiffs' motion, and Plaintiffs have filed a reply. Accordingly, the motion is ripe for adjudication.

The primary basis for Plaintiffs' motion for a new trial is an alleged "mutual interest and beneficial relationship" between the Court and Defendant Gerard L. Cafesjian based on an allegedly shared cultural and financial interest in modern glass art, which Plaintiffs believe may have biased the outcome of the bench trial. Plaintiffs also suggest that there is a political connection between the Court and Cafesjian based on allegedly mutual connections to former President William J. Clinton. Although Plaintiffs have not filed a formal motion for disqualification pursuant to 28 U.S.C. § 144, they argue that the Court should disqualify itself pursuant to 28 U.S.C. § 455 and reassign this matter to a new judge for retrial.

The Court finds that there is no substantive basis for a new trial because no reasonable observer would question the Court's impartiality based on the evidence produced by Plaintiffs: a shared interest in glass art alone does not suggest partiality, and the alleged political connection is far too attenuated to be suggestive of bias. In addition to lacking merit on substantive grounds, the Court finds that Plaintiffs' attempt to disqualify the Court is procedurally untimely because it was not raised until long after Plaintiffs should have learned the facts that form the basis for their motion. Accordingly, the Court shall DENY Plaintiffs' Motion for New Trial.

# I. BACKGROUND

*A.      Factual and Procedural Background*

The Court set out its factual findings thoroughly in its Memorandum Opinion issued on January 26, 2011, and the Court assumes familiarity with that opinion here. *See Armenian Assembly of Am., Inc. v. Cafesjian*, ___ F. Supp. 2d ___, 2011 WL 229354 (D.D.C. Jan. 26, 2011). Relatively few facts from that opinion are relevant to Plaintiffs' Motion for New Trial, and they are summarized below.

In the late 1990s, Cafesjian and several individuals involved with the Assembly joined forces in an effort to create a museum devoted to memorializing the Armenian Genocide. In 2000, the Assembly purchased a prominent building in downtown Washington, D.C. (the "Bank Building") for the purpose of housing the genocide museum. This Bank Building was purchased using money donated by Cafesjian (through CFF and another organization affiliated with Cafesjian) and another philanthropist, Anoush Mathevosian. One of the conditions for Cafesjian's donation was the creation of a memorial as part of the genocide museum project. On March 30, 2000, the Assembly sent Cafesjian a letter confirming his donations and its obligation to build a memorial. This letter noted that Cafesjian's proposed design for the memorial had not been finalized but that his concept consisted of a "walk-in, contemplative, chapel-like space, with interior walls of native Armenian stone and a glass sculpture by Stanislav Libensky as the focal point." The memorial was expected to take up approximately 1200 square feet of floor space and 40,000 cubic feet of overall volume. The Assembly agreed to cooperate with the design firm or artist chosen by CFF to complete the memorial, and CFF agreed to make contributions to the Assembly to finance the memorial. Cafesjian had to abandon his plan for the glass sculpture

when Libensky died a few years later, long before this litigation began.

Once the Bank Building was acquired by the Assembly, Cafesjian began to acquire properties adjacent to the Bank Building. Cafesjian initially planned to use the adjacent properties to build a contemporary art museum that would also draw more visitors to the genocide museum. Ultimately, Cafesjian abandoned that plan and instead decided to build a contemporary art museum in Yerevan, Armenia. At that point, in late 2001, he decided to donate the adjacent properties to the Assembly for purposes of expanding the footprint of the genocide museum project, and his donation was secured through a Grant Agreement which obligated the Assembly to make a space available within the museum for a memorial to be constructed with input from CFF. In late 2003, AGM&M was formed as a new organization to manage the properties and create the genocide museum.

The genocide museum project stalled after years of disagreement over its size and scope, ultimately resulting in a series of lawsuits, the first of which was filed in April 2007. One of the claims raised by Defendants in the lawsuits before the Court was that the group controlling AGM&M had not let Cafesjian participate in the design for the memorial as required by the Grant Agreement. The record at trial indicated that the group controlling AGM&M had considered building the memorial as a garden on the site. However, the Court found that the plans for the memorial were never finalized, and the Court ruled against Defendants on this claim. The parties did not present any evidence at trial regarding Cafesjian's plans for the memorial after 2000, and there was no indication in the record that Cafesjian still intended to use glass sculpture in the design after Libensky died.

B.    *Allegations Relating to the Motion for New Trial*

Plaintiffs' motion for a new trial is premised upon evidence of an alleged "shared interest" between Cafesjian and the Court relating to glass art, as well as an alleged political connection between the Court and Cafesjian through former President William J. Clinton. That evidence, which is attached in the form of exhibits to Plaintiffs' motion and reply brief, consists of the following.

In 1999, the undersigned and her husband, identified as "Mr. and Mrs. John T. Kotelly," contributed to the purchase of a glass sculpture called *Vestment II* by Stanislav Libensky and Jaroslava Brychtova for the collection of the Metropolitan Museum of Art in New York City. *See* Pl.'s Ex. F (Metropolitan Museum of Art web page for *Vestment II*). The other donors who are listed as contributing to the acquisition, which was a gift from the Heller Gallery in New York, are Drs. Myra and J. and Harold Weiss, George F. Russell Jr., Geoffrey J. Isles, and Gerard L. Cafesjian. *Id.* This piece is also described in an exhibition catalogue published in 2002 by the Museum of Glass in Tacoma, Washington called *The Inner Light: Sculpture by Stanislav Libensky and Jaroslava Brychtova*; the undersigned and her husband are listed among the "Catalogue Sponsors," while Gerard L. Cafesjian is listed among the "Lenders" to the exhibition, which featured both *Vestment II* and several works from Cafesjian's own collection. *See* Pl.'s Reply Ex. A.

According to an article published on a website affiliated with the Smithsonian American Art Museum, the undersigned and her husband began collecting art in 1978, and their love of glass was sparked in 1984 at an exhibition of studio glass art at the Renwick Gallery, a branch of the Smithsonian American Art Museum. *See* Pl.'s Ex. D ("Collectors' Roundtable: Glass Acts").

John T. Kotelly is quoted in that article as saying, "People who are collectors have a special gene, and we can't help ourselves." *Id.* John Kotelly is a past president of the James Renwick Alliance, a nonprofit organization dedicated to American craft art. *See id.* He is presently among 44 individuals who serve on the Advisory Board of the Art Alliance for Contemporary Glass, a not-for-profit organization whose mission is to further the development and appreciation of art made from glass. *See* Pl.'s Ex. E (Art Alliance for Contemporary Glass List of Officers, Board of Directors, Advisory Board). According to an oral history by two collectors, the undersigned and her husband were described as part of a long-range planning committee for the Art Alliance for Contemporary Glass in 2001. *See* Pl.'s Ex. K (Oral History Interview with Dale and Doug Anderson). In 2004, they offered a tour of their home collection as part of an auction sponsored by the James Renwick Alliance. They are also listed in the acknowledgments section of the book *Fire and Form: The Art of Contemporary Glass*, published in 2003, where they are described by the author as "friends and fellow collectors." *See* Pl.'s Reply Ex. B. One of the sources listed in the bibliography for that book is a catalogue from an exhibition of glass works from Cafesjian's collection. *See id.* John Kotelly is also mentioned in an April 2004 bulletin as being part of the creation of the Founders' Circle for the Mint Museum of Craft and Design in Charlotte, North Carolina, which has a permanent collection that includes works by Libensky and Brychtova and Chihuly. *See* Pl.'s Ex. H (Founders' Circle Bulletin).[2]

Cafesjian testified at trial that he was an avid art collector and collector of glass art in

---

[2] In their reply brief, Plaintiffs refer to an alleged grant by the Art Alliance for Contemporary Glass to the Museum of Contemporary Arts and Design for a "Libensky and His Students" exhibition in which Cafesjian allegedly participated. However, Plaintiffs have not identified what evidence in the record, if any, supports this claim.

particular.  *See* Pl.'s Ex. B (Cafesjian Trial Tr.) at 137-38.  Cafesjian also testified that he

initially planned for Stanislav Libensky to design something for the chapel-like memorial space

in the genocide museum but that Libensky died before that could come to fruition.  *Id.* at 138.

Cafesjian testified that his art museum in Armenia contains several pieces by Libensky, Dale

Chihuly, and Arshile Gorky.  *See* Pl.'s Ex. A (Cafesjian Trial Tr.) at 60.  According to the

website for his museum in Armenia, Cafesjian has over one hundred pieces by Libensky and

Brychtova in his collection, and there have been several exhibitions featuring their work at the

museum in Armenia.  *See* Pl.'s Ex. G.  Another artist whose works have been exhibited at

Cafesjian's museum in Armenia is Sidney Hutter.  *See* Pl.'s Ex. I (List of Hutter Exhibitions).

Hutter's works have also been exhibited at the Renwick Gallery.  *Id.*  Plaintiffs have also

produced evidence suggesting that another artist, Ginny Ruffner, has had works exhibited at the

Renwick Gallery as well as at the Scottsdale Museum of Contemporary Art as part of Cafesjian's

collection.  *See* Pl.'s Ex. J (List of Ruffner Exhibitions).

Plaintiffs also contend that there is a political connection between Cafesjian and the

Court.  Plaintiffs have produced a published interview with Dwight Opperman, one of

Cafesjian's former colleagues,[3] indicating that he knew President Clinton and once offered him a

place to sleep in his office during Clinton's presidency.  *See* Pl.'s Ex. L ("Dwight Opperman:

The Q&A").  Plaintiffs argue that this connects Cafesjian to the Court because the undersigned

was appointed to the federal judiciary by President Clinton.  There was no evidence at trial

relating to any connection between Cafesjian or Opperman and President Clinton.

_____

[3] The record at trial indicated that Opperman was the Chairman and President of West
Publishing while Cafesjian served as one of two Executive Vice-Presidents.

In support of their motion, Plaintiffs have provided a declaration from Van Krikorian, an attorney who is a member of the Assembly's Board of Trustees and who served as the Assembly's corporate representative at trial. *See* Decl. of Van Krikorian ¶ 1. Krikorian avers that when the Assembly decided to waive its right to a jury trial and proceed with a bench trial, the Assembly was unaware of the Court's allegedly shared interests with Cafesjian. *Id.* ¶ 6. Krikorian further avers that it was not until after the trial opinion was issued that the Assembly first learned of the joint donation relating to *Vestment II* and the other allegedly shared interests between the Court and Cafesjian. *Id.* ¶ 8. Krikorian avers that after the trial opinion was issued, several Assembly members familiar with Cafesjian recalled him boasting of connections with judges. *Id.* Based on these comments, Krikorian performed web searches for the name of the undersigned and her husband, producing the information that forms the basis for Plaintiffs' motion for a new trial. *Id.* ¶ 9.

In opposition to Plaintiffs' motion, Defendants have presented two declarations from Cafesjian. *See* Decl. of Gerard L. Cafesjian ("Cafesjian Decl."); Suppl. Decl. of Gerard L. Cafesjian ("Suppl. Cafesjian Decl."). Cafesjian states that he has long held an interest in promoting the arts, and he has donated to many museum acquisitions over the years. Cafesjian Decl. ¶ 2. Cafesjian explains that in 1999, the Heller Gallery in New York City asked him if he wished to make a donation to the Metropolitan Museum of Art to fund the acquisition of a new work by Stanislav Libensky. *Id.* Cafesjian explains that he agreed to provide a donation, but he did not know the identities of any other donors to that acquisition. *Id.* ¶ 3. Cafesjian avers that he was unaware that the undersigned and her husband had made a contribution to the Libensky

acquisition until the Assembly filed its motion for a new trial.  *Id.* ¶ 4.  Cafesjian also avers that

prior to the day he testified in Court, he had never met or communicated with the undersigned.

*Id.*  Cafesjian further states that he has never met or communicated with John T. Kotelly.  *Id.*

Cafesjian further explains that before the case was assigned to this Court, he was not familiar

with the undersigned in any way and was not aware of any interest by the undersigned or her

husband in glass art.  Suppl. Cafesjian Decl. ¶ 5.

## II.  LEGAL STANDARD

### A.    *Motions for a New Trial Under Rule 59*

Federal Rule of Civil Procedure 59(a) provides that "[t]he court may, on motion, grant a

new trial on all or some of the issues—and to any party—as follows: . . . after a nonjury trial, for

any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."

Fed. R. Civ. P. 59(a)(1)(B).  "The decision to grant or deny such a motion lies within the sound

discretion of the court."  *In re Lorazepam & Chlorazepate Antitrust Litig.*, 467 F. Supp. 2d 74,

87 (D.D.C. 2006) (citations omitted).  "[J]udicial misconduct may serve as a ground for granting

a motion for new trial."  *Colunga v. Young*, 722 F. Supp. 1479, 1489 (W.D. Mich. 1989), *aff'd*,

914 F.2d 255 (6th Cir. 1990).  "Misconduct may consist of actual bias or hostility on the trial

judge's part, or creation by the judge of an appearance of bias or hostility."  *Id.*

### B.    *Motions for Disqualification*

Federal law provides that "[a]ny justice, judge, or magistrate judge shall disqualify

h[er]self in any proceeding in which [her] impartiality might reasonably be questioned."  28

U.S.C. § 455(a).  "The question is whether a reasonable and informed observer would question

the judge's impartiality."  *United States v. Microsoft*, 253 F.3d 34, 114 (D.C. Cir. 2001).

Disqualification is also required "[w]here [the judge] has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b)(1), or where the judge "knows that [she], individually or as a fiduciary, or [her] spouse or minor child residing in [her] household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding," *id.* § 455(b)(4); *see also id.* § 455(b)(5)(iii).[4] "[B]ecause judges are presumed to be impartial, the Court must begin its analysis of the allegations supporting . . . a request [for recusal] with a presumption against disqualification." *SEC v. Bilzerian*, 729 F. Supp. 2d 19, 22 (D.D.C. 2010) (quotation marks and citation omitted); *accord Am. Prairie Constr. Co. v. Hoich*, 594 F.3d 1015, 1021 (8th Cir. 2010) ("A judge is presumed to be impartial, and the party seeking disqualification bears the substantial burden of proving otherwise.") (citations and quotation marks omitted).

Litigants may compel a judge to consider whether disqualification is warranted by complying with 28 U.S.C. § 144, which provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

---

[4] Section 455(b) also describes other circumstances requiring recusal, but they are not relevant here. *See* 28 U.S.C. § 455(b).

28 U.S.C. § 144.  "The motion and affidavit must be timely filed, show a true personal bias, and

must allege specific facts and not mere conclusions or generalities."  *Bhd. of Locomotive*

*Firemen & Enginemen v. Bangor & Aroostook R.R. Co.*, 380 F.2d 570, 576-77 (D.C. Cir. 1967)

(citations omitted).  In deciding whether to grant a motion to disqualify under § 144, the court

"must accept the affidavit's factual allegations as true even if the judge knows them to be false."

*Loving Spirit Found.*, 392 F.3d at 496.  "[D]isqualification is not automatic upon submission of

affidavit and certificate; rather, the judge must review these submissions for legal sufficiency and

construe them strictly against the movant to prevent abuse."  *United States v. Miller*, 355 F.

Supp. 2d 404, 405 (D.D.C. 2005) (internal citations omitted).  Furthermore, "it is the duty of the

judge not to permit the use of a motion or affidavit of prejudice as a means to accomplish delay

and otherwise defeat the orderly administration of justice."  *United States v. Hall*, 424 F. Supp.

508, 534 (W.D. Okla. 1975), *aff'd*, 536 F.2d 313 (10th Cir. 1976).

 The "bias or prejudice" ground for disqualification under § 144 is covered by § 455(b)(1).

*See* 28 U.S.C. § 455(b)(1) (requiring disqualification "[w]here [the judge] has a personal bias or

prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the

proceeding.").  The "catchall" provision of § 455(a) also covers the "bias or prejudice" ground

but broadens its scope to cover the objective *appearance* of bias or prejudice.  *Liteky v. United*

*States*, 510 U.S. 540, 548 (1994).  Accordingly, the Court shall analyze Plaintiffs' "bias or

prejudice" claim through the broader lens of § 455(a).[5]

---

 [5] Plaintiffs imply in their reply brief that the standard for disqualification under § 455
should be heightened in cases such as this one where the Court serves as the finder of fact at trial.
However, Plaintiffs cite no authority in support of this proposition, and the recusal statutes do not
make any distinction between a judge's impartiality for purposes of presiding over a jury trial and
a judge's impartiality for purposes of finding facts following a bench trial.  Although this

Although the Court must accept as true any specific facts alleged in a § 144 affidavit, "the facts alleged in the papers submitted by a person relying on section 455 [need not] in every case be accepted as true, whether the papers be a verified memorandum or are in some other form." *United States v. Heldt*, 668 F.2d 1238, 1271 (D.C. Cir. 1981). For purposes of deciding Plaintiffs' motion, the Court shall accept the facts presented by Plaintiffs as true. In addition, and in the alternative, the Court shall accept as true the facts averred by Cafesjian in his declarations to the extent that they are not contradicted by the evidence presented by Plaintiffs.

### III. DISCUSSION

Plaintiffs contend, based on the facts presented in their Motion for New Trial, that the impartiality of the Court in making its findings of fact and conclusions of law might reasonably be questioned, and therefore the Court should stay all further proceedings and refer the matter to another judge for a new trial. Plaintiffs insist in their papers that their motion for a new trial is filed pursuant to Rule 59(a) and that it is not filing a separate motion for disqualification pursuant to 28 U.S.C. § 144. *See* Pls.' Reply at 1 n.1. However, Plaintiffs also rely in part on § 144 in their motion and purport to have complied with its provisions. Therefore, out of an abundance of caution, the Court shall first consider Plaintiffs' motion for a new trial as if it were a motion filed under § 144. Then, the Court shall independently consider whether the Court should have disqualified itself under 28 U.S.C. § 455 and whether a new trial is appropriate on that basis.

---

distinction might be relevant in determining an appropriate remedy for a failure to disqualify, the Court need not and does not decide that issue.

Whether Plaintiffs' motion is considered under § 144 or § 455, the Court must consider whether the motion was timely filed.  "Crucial to the integrity of the judicial process, the timeliness requirement [in § 144] ensures that a party may not wait and decide whether to file based on 'whether he likes subsequent treatment that he receives.'"  *SEC v. Loving Spirit Found., Inc.*, 392 F.3d 486, 492 (D.C. Cir. 2004) (quoting *In re United Shoe Mach. Corp.*, 276 F.2d 77, 79 (1st Cir. 1960)).  "[W]hile section 455(a) contains no express timeliness provision, most circuits considering the matter have concluded that a litigant must raise the disqualification issue within a reasonable time after the grounds for it are known."  *United States v. Barrett*, 111 F.3d 947, 951 (D.C. Cir. 1997) (citations omitted); *accord Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, Civil Action Nos. 00-1401, 00-2089, 2010 WL 4116858, at *2-3 (D.D.C. Oct. 19, 2010) (ruling that recusal motion under § 455 was untimely when filed three and a half years after events supposedly justifying recusal).  Importantly, "[t]he rule has been applied when the facts upon which the motion relies are public knowledge, even if the movant does not know them."  *United States v. Siegelman*, 561 F.3d 1215, 1243 (11th Cir. 2009) (per curiam) (citing *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 957-59 (2d Cir. 1978)), *vacated on other grounds*, 130 S. Ct. 3542 (2010); *accord Universal City Studios, Inc. v. Reimerdes*, 104 F. Supp. 2d 334, 349 & n.88 (S.D.N.Y.) ("For purposes of timeliness, the applicant is charged with knowledge of all facts 'known or knowable, if true, with due diligence from the public record or otherwise.'") (quoting *Hirschkop v. Va. State Bar Ass'n*, 406 F. Supp. 721, 724 (E.D. Va. 1975)).

In this case, Van Krikorian states in his declaration that the information which forms the

basis for the new trial motion was obtained from an internet search of the names "Mrs. John T. Kotelly" and "John T. Kotelly" that Krikorian conducted based on suggestions from Assembly members after the trial opinion was issued. *See* Krikorian Decl. ¶ 9. Although the Court cannot doubt that Krikorian waited until after the Court issued its trial opinion to perform such a search, Plaintiffs could have and should have discovered any relevant facts long before the trial was held in these actions. Information about the acquisition of *Vestment II* by the Metropolitan Museum of Art in 1999 was publicly available long before the trial began in November 2010, as were other facts relating to the interest of the undersigned and her husband in glass art. Information about Cafesjian's interest in glass art has been known to the Assembly since at least 2000 when it confirmed Cafesjian's initial plans for the memorial, and additional information about Cafesjian's investments in art were produced in pretrial discovery. Indeed, one of Plaintiffs' arguments at trial was that Cafesjian had shirked his duties to AGM&M by focusing all his energy on his art museum in Armenia. Therefore, there is no reason why Plaintiffs could not have performed a simple internet search and discovered the alleged "connection" between the Court and Cafesjian before the parties devoted substantial resources trying the case before the undersigned.[6]

Based on Van Krikorian's declaration, it appears that the filing of the motion was motivated by the fact that Plaintiffs received a largely adverse decision from the Court rather than by the sudden discovery of an alleged bias. *Cf. Siegelman*, 561 F.3d at 1243 ("[Party's] recusal

---

[6] It is unclear whether the information relating to the alleged political connection between Cafesjian and the Court through Dwight Opperman and President Clinton was publicly available long before Plaintiffs filed their motion for a new trial; the interview upon which Plaintiffs rely appears to have been published in 2011. Therefore, to the extent Plaintiffs' motion is based on this connection, it appears to be timely.

motion . . . has all the earmarks of an eleventh-hour ploy based upon his dissatisfaction with the jury's verdict and the judge's post-trial rulings.").  Because Plaintiffs did not promptly bring their concerns to the attention of the Court, the Court finds that Plaintiffs' challenge to the Court's qualifications based on §§ 144 and 455 is untimely and may be denied on that basis alone.  However, the Court shall proceed in the alternative and consider the merits of Plaintiffs' arguments.

B.      *Plaintiffs' Motion Does Not Comport with 28 U.S.C. § 144*

Although Plaintiffs disclaim that they are filing a motion for disqualification pursuant to § 144, Plaintiffs have provided a certificate of counsel that purports to comply with the statute. "[T]o guard against the removal of an unbiased judge through the filing of a false affidavit, the statute requires the attorney presenting the motion to sign a certificate stating that both the motion and declaration are made in good faith."  *Loving Spirit Foundation*, 392 F.3d at 496 (internal citations omitted).  The certificate submitted by Plaintiffs' counsel states that "Plaintiff's request for the disqualification of Judge Kollar-Kotelly is made in good faith," *see* Decl. of Eric I. Abraham ¶ 2, but it does not state that the declaration of Van Krikorian was submitted in good faith.  Therefore, Plaintiffs' motion is not supported by a valid certificate of counsel pursuant to § 144.  Accordingly, the motion may be denied to the extent it is based on § 144.

C.      *A Reasonable Observer Would Not Question the Court's Impartiality Based on the Evidence Produced By Plaintiffs*

Plaintiffs contend that the Court and Cafesjian have a "mutual interest and beneficial relationship" that was not disclosed and may have biased the outcome of the bench trial.

Plaintiffs rely on the standard for disqualification under § 455(a), arguing that the connection between the Court and Cafesjian rises to the level where the Court's "impartiality might reasonably be questioned." Plaintiffs also argue that disqualification is required under § 455(b) because the undersigned or her husband has an "interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5)(iii). The Court shall evaluate each of these claims.

1.    A Shared Interest in Glass Art Does Not Suggest Partiality

The evidence presented by Plaintiffs indicates that: (1) both Cafesjian and the undersigned, along with several other donors, contributed to the acquisition of a piece of art by the Metropolitan Museum of Art in New York City in 1999; (2) both Cafesjian and the undersigned have an interest in collecting works of glass art by certain artists; and (3) both Cafesjian's name and the names of the undersigned and her husband appear in certain publications relating to glass art collections, predominantly museum collections. Plaintiffs insinuate that these "connections" between the Court and Cafesjian imply to the reasonable observer that the Court had a preexisting relationship or "familiarity" with Cafesjian that was undisclosed to the parties. Even setting aside Cafesjian's declarations explicitly disavowing any connection between himself and the undersigned and her husband or any knowledge of a shared interest in glass art, none of the evidence cited by Plaintiffs indicates that the Court actually knew who Cafesjian was prior to this litigation. The fact that the Court and Cafesjian both donated funds for the acquisition of *Vestment II* does not demonstrate that they acted in concert. At most, Plaintiffs' evidence could give rise to an inference that the undersigned may have been aware of Cafesjian as a fellow patron of glass art. But that inference would not lead a reasonable observer

16

to question the Court's impartiality.

Plaintiffs imply that the Court was trying to hide its connection to Cafesjian when it "exhibited particular sensitivity to the cross-examination of Mr. Cafesjian by trial counsel for the Assembly on the subject of his relationship with members of the federal judiciary, sustaining an objection by Mr. Cafesjian's counsel." Pl.'s Mot. at 3 n.1. A review of the trial transcript reveals that the Assembly's trial counsel asked Cafesjian a series of questions relating to Cafesjian's personal relationships with Supreme Court justices and other judges and whether Cafesjian was proud of those relationships. *See* Trial Tr. (11/19 AM) at 70-71. After the Assembly's counsel asked with whom Cafesjian was personally friendly on the Supreme Court, the Court asked counsel why this information was relevant to the case. *See id.* at 71. The subject had arisen in the context of Cafesjian's work on rule-of-law initiatives in Armenia, when Cafesjian noted that former Justice Sandra Day O'Connor had helped him with that issue. *See id.* at 69-70. The Assembly's counsel explained that he was trying to demonstrate that Cafesjian was "an egomaniac." *Id.* at 72. The Court noted that counsel was free to make that argument but that the Court was capable of making its own credibility determinations, and knowing which justices on the Supreme Court Cafesjian knew would not help the Court decide the relevant issues in the case. *Id.* at 72-73. Therefore, the Court's comments during the cross-examination of Cafesjian had nothing to do with any alleged relationship between Cafesjian and the undersigned; they were focused on limiting the scope of testimony to issues that were relevant. There was no indication from the record that Cafesjian was going to testify about any connection with federal judges based on his art collecting activities.

Even assuming arguendo that the Court was aware of Cafesjian based on their mutual

interest in glass art, such a familiarity or shared interest does not "raise the appearance of prejudice in the mind of a reasonable person who is familiar with all the facts." *Heldt*, 668 F.2d at 241-42. Judges need not disqualify themselves under § 455 simply because they have a prior relationship with a litigant. For example, judges are not automatically required to recuse themselves in cases involving their former clients. *See* 28 U.S.C. § 455(b)(2) (requiring disqualification only where the judge or a lawyer with whom the judge practiced "served as lawyer in the matter in controversy")[7]; *David v. City and County of Denver*, 101 F.3d 1344, 1351 (10th Cir. 1996) ("[U]nder § 455(a), a judge's prior representation of a witness or a party in an unrelated matter does not automatically require disqualification."); *Nat'l Auto Brokers Corp.*, 572 F.2d at 958 ("The prior representation of a party by a judge or his firm with regard to a matter unrelated to litigation before him does not automatically require recusal.").

In considering whether a judge's relationship with an interested party raises a reasonable question as to the judge's impartiality, courts look to the nature of the relationship and its relevance to the proceedings before the judge. *See, e.g.*, *United States v. Cole*, 293 F.3d 153, 164 (4th Cir. 2002) (holding that recusal was not required in a criminal case where defendant was the son of the judge's deceased godparents and the judge had not had any contact with the defendant for over ten years); *United States v. Lovaglia*, 954 F.2d 811, 816-17 (2d Cir. 1992) (holding that judge's past social relationship with family whose businesses were victimized by defendants' RICO violations did not require recusal where relationship ended seven or eight years before sentencing and the judge had no knowledge of contested facts as a result of the relationship).

---

[7] The Supreme Court has explained that although § 455(a) has a "broader reach" than § 455(b), the two subsections should be construed so as to be consistent with each other. *Liteky*, 510 U.S. at 552-53 & n.2.

The only documented "connections" between the Court and Cafesjian date back to 1999 and 2002, long before the lawsuits now pending before the Court were filed, and Cafesjian explicitly denies that he knew the undersigned before this litigation.

The fact that the Court appears to share a cultural interest in glass art with Cafesjian would not lead a reasonable person to question the Court's impartiality. Judges are not soulless automatons; they are permitted to have social and cultural interests outside the courtroom. *Cf. Sexson v. Servaas*, 830 F. Supp. 475, 478 (S.D. Ind. 1993) ("In taking the oath of office as a judge, a person does not agree to be a hermit removed from the world."). The fact that a judge's interests overlap with those of a litigant does not ordinarily raise questions about her ability to act impartially in her capacity as a judge. *See, e.g.*, *Hoatson v. N.Y. Archdiocese*, 280 F. App'x 88, 90-91 (2d Cir. 2008) (holding that involvement by judge and his wife in Catholic community organizations did not require recusal in case involving the Catholic Church).

It is generally recognized, for example, that a judge need not recuse herself from a case involving her alma mater, even where the judge's past activities might reasonably suggest that she has an affinity for the institution. *See, e.g.*, *Lunde v. Helms*, 29 F.3d 367, 370-71 (8th Cir. 1994) (finding no basis for recusal where the judge was an alumnus of the defendant university, had made financial contributions to the university, and had been involved in the university's educational programs), *and Wu v. Thomas*, 996 F.2d 271, 274-75 & n.7 (11th Cir. 1993) (no recusal required where judge made past contributions to the university defendant and held position as unsalaried adjunct professor), *both cited with approval in District of Columbia v. Doe*, 611 F.3d 888, 899 (D.C. Cir. 2010). *But see Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864-68 (1988) (requiring recusal where judge served on the board of trustees of a

19

university that had a financial interest in the litigation).

Similarly, a judge's past membership in organizations that advocate for positions advanced by a party does not necessarily require recusal. *See Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1117-18 (4th Cir. 1988) (holding that judge's past membership in Sierra Club before appointment to the bench more than a decade earlier did not require recusal from case where the Sierra Club was a party); *Wessman ex rel. Wessman v. Bos. Sch. Comm.*, 979 F. Supp. 915, 916-18 (D. Mass. 1997) (rejecting argument that disqualification was required based on judge's past activities as a civil rights lawyer and membership in the Lawyer's Committee for Civil Rights of the Boston Bar Association). The claim that the undersigned would be biased in favor of Cafesjian because she shares his affinity for glass art is astonishing, for it suggests that the Court is incapable of separating personal interests from the performance of judicial duties. A reasonable observer must assume that judges are ordinarily capable of setting aside their own interests and adhering to their sworn duties to "faithfully and impartially discharge and perform all the duties" incumbent upon them. *See* 28 U.S.C. § 453 (judicial oath of office).

In their motion for a new trial, Plaintiffs exaggerate the extent to which Cafesjian's interest in glass art was actually relevant to the issues at trial. Plaintiffs imply that Cafesjian's desire to build a memorial with a Libensky centerpiece was critical to his vision and that the Court would have been influenced by this in deciding the merits of the case. But the record at trial indicated only that this was Cafesjian's initial plan for the memorial in 2000, after which Libensky died. There was little, if any, evidence in the record about Cafesjian's plans for the memorial after Libensky died, and there was no evidence that glass art was a part of Cafesjian's future plans. Cafesjian's plans for the memorial were relevant to Defendants' claims that the

Assembly and AGM&M had breached their contractual obligations by failing to allow CFF to exercise its right to participate in and approve the design of the memorial, but the focus at trial was not on the substance of Cafesjian's plans but rather on the extent to which Cafesjian was allowed to participate in the design and construction of the memorial. Because the entire genocide museum project never got past the planning stages, the Court ultimately found that the Assembly and AGM&M had not breached their contractual obligations.[8] *See* [193] Mem. Op. at 179-82. Therefore, Cafesjian's initial desire to include glass art in the memorial was not relevant to the Court's decision on these issues. Indeed, Plaintiffs recognize this in their reply brief, arguing somewhat ironically that the Court's decision to include the details about Cafesjian's initial plans for the memorial in its Memorandum Opinion demonstrates its bias. *See* Pl.'s Reply at 2-3 ("The mere reference to the identity of the sculptor proves the point: whether or not Libensky created the sculpture had no relevance to the issues of breaches of fiduciary and other duties that the Judge was deciding. The Judge seized upon this detail precisely because it was of particular interest to her."). While it is true that Cafesjian's intent to work with Libensky was ultimately irrelevant to the merits of the parties' claims, the Court's decision to include this historical fact about the genesis of the memorial for context—on the fourth page of a recitation of background facts that spanned 127 pages—can hardly be seen as evidence of bias by the Court.[9]

Plaintiffs do *not* claim that the Court has any financial interest that would require

---

[8] That the Court ruled in favor of Plaintiffs on this issue should undermine any claim that the Court was or is biased in favor of Cafesjian.

[9] The Court also finds it significant that Plaintiffs have not pointed to any other aspects of the Court's Memorandum Opinion that purport to show bias in favor of Cafesjian based on an alleged mutual interest.

disqualification. *See* 28 U.S.C. § 455(b)(4) (requiring disqualification where a judge or her spouse or minor child residing in her household "has a financial interest the subject matter in controversy or in a party to the proceeding . . . ."). Instead, Plaintiffs argue that disqualification is proper under § 455(b)(5)(iii), which requires recusal where the judge or her spouse or minor child "[i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." "Where a case . . . involves remote, contingent, indirect or speculative interests, disqualification is not required." *Lovaglia*, 954 F.2d at 815. For example, a judge generally need not recuse in cases where his or her child is a partner at a law firm that represents one of the parties in other matters not before the judge; the child's financial interest in his client's well-being is typically considered too remote to influence the judge. *See, e.g.*, *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (statement of Rehnquist, C.J.) (holding that recusal was not required where son of Chief Justice was partner at a law firm that represented one of the parties in matters pending before another court); *In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*, 601 F. Supp. 2d 1120, 1124-28 (D. Minn. 2009) (same), *aff'd*, 623 F.3d 1200 (8th Cir. 2010). Similarly, a judge who owns stock in a company is usually not required to recuse in cases involving that company's competitor, since any impacts on the market are likely to be speculative and attenuated. *See In re Kan. Pub. Emps. Retirement Sys.*, 85 F.3d 1353, 1362 (8th Cir. 1996) ("[A] judge holding stock in General Motors should not have to recuse from a case involving Ford Motor Company because some ruling he may make might be used as persuasive authority in a case against GM."); *In re Placid Oil Co.*, 802 F.2d 783, 786-87 (5th Cir. 1986) (finding no basis for recusal where judge had large investment in a bank and judge's rulings might have dramatic impact on banking industry as a whole). Therefore, the fact

22

that there may be *some* remote connection between a judge's interests and the case over which she presides is insufficient to require disqualification under § 455.

Plaintiffs contend that "Cafesjian's interest in glass art and his intent to include such art in the [genocide] museum would further the interest of Judge Kollar-Kotelly and her husband in raising the profile, and value, of this type of art." Pl.'s Mot. at 4. Plaintiffs further claim that "a decision by the Judge that facilitated the accomplishment of Mr. Cafesjian's intentions . . . might also have the effect of increasing the value of the collection owned by the Judge and her husband." Pl.'s Reply at 3. No matter how Plaintiffs characterize the "interest" at issue, there is no support for the conclusion that this interest could be "substantially affected" by the outcome of this litigation. The consolidated actions before the Court involve allegations of breach of contract and breach of fiduciary duty relating to the management of AGM&M; there is no glass art actually at issue in the litigation, and there is not a scintilla of evidence in the record indicating that Cafesjian presently plans to use glass art as part of the design of the museum or memorial. Plaintiffs appear to be arguing that any decision that favors Cafesjian financially will enable him to spend more money on glass art, either as part of the genocide museum and memorial or as part of his independent collection, and this will raise the profile and value of glass art, thereby providing value to the undersigned or her husband. Such an argument is entirely speculative, and the causal connection between the Court's rulings and its alleged interest is far too attenuated to warrant recusal under § 455. "[W]here an interest is not direct, but is remote, contingent, or speculative, it is not the kind of interest which reasonably brings into question a judge's impartiality." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988).

Therefore, the Court finds that the interest in glass art that the undersigned and her

husband allegedly share with Cafesjian is not an interest that could be substantially affected by the outcome of the proceedings pending before the Court, and it does not provide a basis from which the Court's impartiality might reasonably be questioned.

2. The Alleged Political Connection Between the Court and Cafesjian Does Not Provide a Basis for Recusal

Plaintiffs argue in their motion for a new trial that the Court's "impartiality is further questioned based on nexus [sic] between Mr. Cafesjian, former President Clinton, and Judge Kollar-Kotelly." Pl.'s Mot. at 4. The Court's only link to this alleged "political connection" is the fact that the undersigned was appointed to the federal bench by President Clinton. Plaintiffs appear to back off this argument in their reply brief. *See* Pl.'s Reply at 7 ("Plaintiffs are not complaining that Judge Kollar-Kotelly should be disqualified because she shares a racial or political background with Mr. Cafesjian."). The case law is clear that recusal is not warranted where a judge is alleged to be biased based solely on political connections to the President who appointed her. *See Karim-Panahi v. U.S. Congress*, 105 F. App'x 270, 274-75 (D.C. Cir. 2004) (affirming district court's denial of motion for recusal based on allegations that the judge was "biased because of her 'political-religious connections' and her alleged loyalty to those who selected, confirmed, and appointed her"); *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998) (rejecting plaintiff's allegation that "a judge is not impartial solely because an attorney is embroiled in a controversy with the administration that appointed the judge"). Indeed, courts have held that recusal is not warranted even when the President responsible for nominating the judge is actually a party to the litigation. *See, e.g.*, *In re Exec. Office of the President*, 215 F.3d 25, 25 (D.C. Cir. 2000) (order of Tatel, J.). Accordingly, the Court finds that

there is no basis for recusal based on an alleged "political connection" to Cafesjian through former President Clinton.

Because neither the Court's alleged political connection to Cafesjian nor its allegedly shared interest in glass art warrants disqualification under § 144 or § 455, the Court shall deny Plaintiffs' motion for a new trial. For that reason, it is unnecessary to address Defendants' alternative argument that a new trial would not be warranted even if disqualification were required.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs have failed to present a valid basis for ordering a new trial. The Court finds that the evidence presented by Plaintiffs of a shared interest in glass art or a political connection between the Court and Cafesjian through former President Clinton would not lead a reasonable person to question the Court's impartiality. Simply put, the Court's affinity for a particular art form would not influence the outcome of a case that revolves around the parties' largely unsuccessful efforts to build a museum that would commemorate the Armenian Genocide and exhibit the culture, journey, and suffering of those who perished and those who survived. Furthermore, the Court finds that Plaintiffs' attempt to disqualify the Court is procedurally untimely because it is based on facts that were either known to Plaintiffs or should have been discovered well before trial, not after the Court issued its findings of fact and conclusions of law. The Court also finds that Plaintiffs' motion cannot be considered under 28 U.S.C. § 144 because Plaintiffs' counsel has not certified that the declaration of Van Krikorian was made in good faith. Accordingly, the Court shall DENY Plaintiffs' [208] Motion for New Trial. An appropriate Order accompanies this Memorandum

Opinion.

Date: May 9, 2011
                                    _____/s/_____
                                    **COLLEEN KOLLAR-KOTELLY**
                                    United States District Judge