**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| THE ARMENIAN ASSEMBLY OF AMERICA, INC., *et al.*, |
| Plaintiffs/Counter-Defendants, |
| v. |
| GERARD L. CAFESJIAN, *et al.*, |
| Defendants/Counter-Plaintiffs. |

Civil Action Nos. 07-1259, 08-255, 08-1254 (CKK)

**MEMORANDUM OPINION**
(May 9, 2011)

The above-captioned consolidated actions involve a series of claims and counterclaims relating to the parties' attempts to create a museum and memorial in Washington, D.C. devoted to the Armenian Genocide.[1]  Following a twelve-day bench trial in November 2010, the Court issued a Memorandum Opinion setting forth its findings of fact and conclusions of law on January 26, 2011.  *See* [193][2] Mem. Op. (Jan. 26, 2011).  The Court found that none of the parties' substantive claims were meritorious and dismissed all of the claims save one, holding that Defendants Gerard L. Cafesjian ("Cafesjian") and John J. Waters ("Waters") were entitled to indemnification from the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") for legal expenses incurred in defending claims asserted against them in their capacities as former officers of AGM&M.  The Court also upheld the validity of a reversion clause in a Grant

---

[1] As the Court has previously noted, the use of the term "genocide" to describe the atrocities that befell the Armenians between 1915 and 1923 is not without controversy.  The Court employs the term used as by the parties, and the Court expresses no opinion on the propriety of that label.

[2] All docket numbers refer to Civil Action No. 08-255.

Agreement executed between Defendants Cafesjian and the Cafesjian Family Foundation, Inc. ("CFF") and Plaintiff Armenian Assembly of America, Inc. (the "Assembly"), ruling that CFF and Cafesjian may exercise their rights under that clause effective December 31, 2010. The Court asked the parties to submit additional briefing regarding two issues left unresolved by the Court's prior Memorandum Opinion: (1) whether CFF should be required to reimburse AGM&M for part of the value of properties that shall be transferred to CFF under the terms of the Grant Agreement; and (2) the amount of legal expenses for which Cafesjian and Waters are entitled to be indemnified. The parties have now completed the additional briefing on these issues as ordered by the Court, and these issues are ripe for the Court's resolution. This Memorandum Opinion contains the Court's final findings of fact and conclusions of law with respect to these issues. The parties have also filed a series of papers with the Court regarding the terms on which the properties must be transferred to CFF. The Court shall address these filings in the context of addressing the reimbursement issue.

Pending also before the Court are several additional motions filed by Defendants Cafesjian, Waters, and CFF (collectively, "Defendants"). First, Defendants have filed a [198] Petition for Involuntary Dissolution asking the Court to initiate procedures to involuntarily dissolve AGM&M under D.C. law. Second, Defendants have filed a [221] Motion Requesting Attorneys' Fees for Vexatious Litigation. Third, Defendants have filed a [214] Request for Order to Show Cause as to Why Plaintiffs Should Not Be Held In Contempt for allegedly violating one of this Court's orders. The Assembly and AGM&M (collectively, "Plaintiffs") have filed oppositions to each of these motions, and Defendants have filed replies. In addition, Plaintiffs' former counsel, K&L Gates LLP, has intervened and filed a brief opposing Defendants' motion

for attorneys' fees for vexatious litigation. Accordingly, these motions are all ripe for resolution.

For the reasons explained below, the Court finds that the Grant Agreement does not impose any obligation on CFF to reimburse AGM&M for the excess value of the properties over the amount of the funds originally donated. Therefore, the Court shall enter final judgment on this issue and order AGM&M to transfer the properties to CFF without further delay. With respect to the amount of legal fees and expenses subject to the indemnification clause covering Cafesjian and Waters, the Court shall refer this issue to a magistrate judge for a report and recommendation. The Court shall deny-in-part Defendants' motion requesting attorneys' fees for vexatious litigation because Defendants have mostly failed to demonstrate that Plaintiffs or their counsel acted recklessly or in bad faith; however, the Court shall hold in abeyance Defendants' motion with respect to Plaintiffs' untimely production of documents on the eve of trial. The Court shall decline to exercise supplemental jurisdiction over Defendants' petition for involuntary dissolution of AGM&M, as this is a new claim asserted after trial that is best left to be adjudicated by the Superior Court of the District of Columbia. Finally, the Court shall deny Defendants' request for a show cause order because Defendants have not shown that Plaintiffs violated one of this Court's orders.

## I. BACKGROUND

The Court set out its factual findings thoroughly in its Memorandum Opinion issued on January 26, 2011, and the Court assumes familiarity with that opinion and incorporates it here. *See Armenian Assembly of Am., Inc. v. Cafesjian*, ___ F. Supp. 2d ___, 2011 WL 229354 (D.D.C. Jan. 26, 2011). The Court shall summarize the facts previously found by the Court to the extent they are relevant to the issues remaining to be decided.

In the late 1990s, Cafesjian and several individuals involved with the Assembly joined

forces in an effort to create a museum devoted to memorializing the Armenian Genocide.  On or

about April 1, 1996, Hirair Hovnanian ("Hovnanian"), one of the Assembly's founders, made a

pledge of about $1.6 million to establish the Armenian National Institute ("ANI") for the study,

research, and affirmation of the Armenian Genocide.  Dr. Rouben Adalian ("Adalian"), a

historical researcher, was hired to become the director of ANI.  Inspired by Hovnanian's pledge,

Anoush Mathevosian ("Mathevosian") decided in 1996 to pledge $3 million to be used for the

purpose of constructing a permanent museum in Washington, D.C. dedicated to the victims and

survivors of the Armenian Genocide.  In 1996, the Assembly began to explore properties in

Washington, D.C. that would be suitable for a museum.  Around this same time, Cafesjian was

independently planning to build a memorial to the Armenian Genocide.  Through his trusted

associate Waters, Cafesjian contacted the Assembly and expressed an interest in potentially

associating his planned memorial with the Assembly's museum project.  Because Cafesjian had

not been involved in the Assembly, he invited Hovnanian, Adalian, and Robert Aram Kaloosdian

("Kaloosdian"), another of the Assembly's founders, to meet with him and discuss the museum

project and the Assembly's advocacy efforts.  Cafesjian officially joined the Assembly as a

trustee in August 1998.  At that point in time, Cafesjian and Waters continued to search

separately for a location for a memorial.

In or about late 1999, the Assembly identified the National Bank of Washington, located

at 619 14th Street, NW, Washington, D.C., as a possible site for the museum.  Although it was

much larger than the properties they had been looking at to date, everyone involved in the search was impressed by the National Bank of Washington building (the "Bank Building"). The Bank Building has a prime location—just blocks from the White House—and its exterior and part of the interior have been designated as historic landmarks in the D.C. Inventory of Historic Sites and the National Register of Historic Places. The property on which the Bank Building is located also includes a vacant back lot which would allow for the construction of an annex. Cafesjian was very interested in the Bank Building, and he dispatched Waters to do due diligence on the property. Because there was another interested buyer, Cafesjian directed Waters to work quickly to arrange the purchase. Cafesjian agreed to donate $3.5 million to the Assembly to create a consolidated location at which the genocide museum, the genocide memorial, and offices for ANI could be located. Anoush Mathevosian agreed to increase her pledge to $3.5 million to acquire the property.

The Assembly closed on the Bank Building on February 16, 2000, purchasing the building for $7.25 million. The funds for the purchase were comprised of a $3.5 million pledge from Mathevosian, a $2.5 million grant from CFF, and a $1 million grant from Cafesjian's Vanguard Charitable Endowment Program - Cafesjian Family Foundation Charitable Trust. Because Mathevosian could not access funds in sufficient time to wire them to the Assembly prior to the closing, CFF provided the Assembly with a $4 million interest-free bridge loan to cover Mathevosian's pledge and to complete the transaction. On March 8, 2000, after the Assembly had received Mathevosian's pledged donation, the Assembly repaid CFF $3.5 million by wire transfer. On March 17, 2000, the Assembly executed a promissory note produced by and for the benefit of CFF for the remaining $500,000.

After the closing, on February 28, 2000, Anoush Mathevosian wrote a letter to the Assembly restating the purpose of her pledge. The letter stated that the purpose of her gift was to foster the development of an Armenian Genocide museum with educational exhibits, and Mathevosian expressed her desire that the Bank Building be used solely for the Assembly, ANI, the museum, and the memorial. She wrote:

> To be certain that future generations remain true to the intent of our donations, it should be clear that no changes will be made to the purpose and usage of the Museum; that no mortgages are taken against the property and that the Museum's perpetuation is not jeopardized as such or encumbered in any way; and that there will be no subsequent changes to the name of the museum.

PX-110. At her deposition, Mathevosian explained that she wanted to ensure that they paid for the property in full so that it would not be mortgaged or sold in the future. Mathevosian asked that these understandings be incorporated into the permanent records of the organization. However, there is no evidence that Mathevosian's expressed desires were ever formally incorporated by the Assembly into a binding obligation. Mathevosian testified that Hovnanian agreed to her conditions, but she did not recall whether he had done so orally or in writing. John Waters testified that he did not see Mathevosian's letter until several years later, in late 2003. In any case, Mathevosian did not ask for a reversionary interest in her donation, and therefore she does not have one.

The parties agreed that as a condition of Cafesjian's donation of funds for the purchase of the Bank Building, the Assembly was required to include a memorial named after Cafesjian as part of the project. On March 30, 2000, the Assembly sent Cafesjian a letter confirming his donations and its obligation to build a memorial. The Assembly agreed to cooperate with the design firm or artist chosen by CFF to complete the memorial. The anticipated completion date

for the project was March 2002, and CFF agreed to make contributions to the Assembly to finance the memorial.  Because of the size of the Bank Building (34,000 sq. ft) and the property on which it sits, it was contemplated that the Assembly and ANI would move out of their existing offices when their lease expired in March 2002 and occupy space on the new site. Accordingly, it was agreed that the development of suitable office space on the property would be a priority.  Ross Vartian, then-Executive Director for the Assembly, testified at trial that in retrospect, they were naïve to think that the museum, the memorial, and offices for the Assembly and ANI could all be housed within the Bank Building.

B.     *Acquisition of the Properties Adjacent to the Bank Building*

Once the Bank Building was acquired by the Assembly, Cafesjian began to acquire properties adjacent to the Bank Building.  Ultimately, Cafesjian decided to donate the properties to the Assembly for the purpose of expanding the footprint of the museum project.

Cafesjian acquired four parcels adjacent to the Bank Building: (1) 1342 G Street, NW; (2) 1340 G Street, NW; (3) 1338 G Street, NW; and (4) 1334-36 G Street, NW (collectively, the "Adjacent Properties").  Each of the properties was acquired in an arms-length transaction by one of Cafesjian's entities, TomKat Limited Partnership ("TomKat").  TomKat executed an agreement to purchase 1338 G Street for $1.2 million on March 10, 2000 and closed on May 15, 2000.  TomKat purchased 1342 G Street for $1.2 million on March 16, 2000 and closed on September 30, 2000.  On October 24, 2000, TomKat entered into an Installment Purchase and Sale Agreement to purchase 1340 G Street for a total of $3 million.  Under the installment agreement, payments of $150,000 were due each year for a period of ten years, with a final

balloon payment of $1.5 million due in March 2011.[3]  The final adjacent property, 1334-46 G

Street, NW, also known as the "Families U.S.A." building, was acquired later by TomKat, which

purchased the building from a third-party seller for $6.5 million in September 2003.

C.    *Initial Efforts to Develop the Museum and Memorial*

A planning committee was formed to handle the task of developing the Bank Building

into a museum and memorial.  The planning committee operated largely by consensus, and there

were about a dozen different individuals who became involved to varying degrees in the planning

for the project.  Although the committee held several meetings in the spring of 2000 to discuss

development plans and fundraising, there was no dedicated staff to shepherd the project along,

and the lack of a central decision maker slowed the pace of progress considerably.  In 2001, Ross

Vartian took on the position of planning director for the project, but the committee was unable to

agree on critical decisions such as how to go about hiring professionals to work on the building

and how to raise funds to cover the costs of construction and operation.  The biggest obstacle was

disagreement over the size and scope of the project, including uncertainty over how Cafesjian's

acquisition of the Adjacent Properties would affect the development of the museum.

It was around late summer 2001 when Cafesjian agreed to donate the Adjacent Properties

to be used for the genocide museum project.  No official proposal was made to the Assembly

until October 15, 2001, when Cafesjian wrote a letter to Hovnanian outlining the terms of a

proposed grant of the three properties that had been acquired.  This letter was the first in a series

of draft grant agreements that would ultimately be exchanged between Cafesjian and the

---

[3] In a Status Report filed on May 5, 2011, Defendants indicated that all payments had
been made under the installment agreement and that title had been transferred to CFF.

Assembly. The letter proposed that Cafesjian and/or CFF donate $5.8 million to the Assembly to purchase the properties from TomKat. The proposed grant agreement would require the Assembly to use the properties solely as part of the genocide museum project, subject to plans approved by the Assembly's planning committee. The letter also proposed that if the Assembly failed to develop the property according to those plans, CFF would be entitled to a return of either the grant funds or the properties. Cafesjian expressed his frustration with the lack of progress that had been made, and he explained at trial that he wanted to make certain that the museum was built during his lifetime.

Cafesjian's proposal was generally well received at the Assembly, although the Assembly never responded in writing to Cafesjian's letter. However, there was no meaningful progress throughout the rest of 2001. In 2002, the parties continued to discuss various development proposals and there was some progress. In March 2002, the Assembly determined that an independent entity should be created to develop and operate the museum project. CFF and the Assembly also agreed to combine their conditions with prior gifting commitments, which the newly-formed independent entity would be obliged to honor. CFF and the Assembly agreed to jointly design and approve the governing documents for the new entity, which would become known as the Armenian Genocide Museum & Memorial, Inc. ("AGM&M"). It was agreed that AGM&M would be incorporated as a 501(c)(3) organization as soon as it was possible to do so responsibly and sustainably. The parties also decided that the Assembly offices would not be housed within any portion of the museum complex, in part to keep the museum independent from any advocacy organization and in part because it was thought that there would not be adequate space in the complex for the Assembly. To ensure that the Assembly would get sufficient credit

for launching the museum (and to combat the perception that the Assembly was abandoning the project), Cafesjian and Hovnanian agreed to channel their contributions through the Assembly.

In August 2002, the planning committee met and discussed a revised draft grant agreement letter from CFF. Like the previous draft grant agreement sent in October 2001, it contained a reversion clause stating that if the three adjacent properties were not developed in accordance with a plan approved by the AGM&M (with the necessary approval of CFF), CFF would be entitled to a return of either those adjacent properties or the funds used to purchase them. There was some discussion at the meeting that such an open-ended reversion clause would not be appropriate.

The museum project was facing significant cash flow problems over the course of 2002, and Cafesjian had agreed to advance funds necessary for work to be completed in that year. In October 2002, the museum planning committee convened a meeting in New York and engaged in an extensive discussion about the finances for the project. Hovnanian expressed his concern that they would be unable to raise enough money to fund a project with a $100 million budget, and he raised the possibility of phasing in the project, with later expansion tied to better economic circumstances. Others also expressed concerns about the operating deficit. Waters told the committee that Cafesjian was optimistic that the funds could be raised from the community and that, if necessary, Cafesjian was prepared to donate $50-75 million to ensure that the project was completed. According to one draft summary of the meeting, "[a]ll felt that G. Cafesjian's commitment, characterized as a 'safety net,' alleviated the fiscal concerns." DX-67 at 2. The planning committee members did reach some agreements about how best to move forward, but the committee remained focused on consensus-based decision-making.

On January 22, 2003, CFF sent a revised draft grant letter to the Assembly for review. As with the previous drafts, the letter contained a reversion clause, but this time it contained a triggering date: if the three donated adjacent properties were not developed according to plans approved by AGM&M by December 31, 2008, then those properties (or the cash used to acquire them) would revert to CFF. The letter also provided that a new $500,000 promissory note would be issued to CFF by the Assembly to replace the previous one, and that the obligation may be transferred to AGM&M. The letter proposed that decisions of the AGM&M Board of Trustees be decided by an 80% affirmative vote. This draft letter was discussed at a meeting in Delray, Florida, where Hovnanian, Vartian, Kaloosdian, and Adalian were present. The Assembly Board of Trustees held another annual meeting in Boca Raton on March 1, 2003. By the time of this meeting, everyone agreed that AGM&M should be launched as an independent entity with a budget of around $100 million and a new building constructed on the Bank Building and the three adjacent properties to be donated by Cafesjian. It was also agreed that ANI would retain its status as an independent 501(c)(3) organization, but that it would become a subsidiary of the new museum entity.

D.    *Final Negotiation of the Grant Agreements and the Creation of AGM&M*

It took seven months following the March 2003 meeting to finalize the agreements and governing documents that would create AGM&M. One reason for the delay was the acquisition of the fourth adjacent property, the Families U.S.A. building. Through TomKat, Cafesjian entered into a purchase agreement to buy the property for $6.5 million on September 22, 2003. The closing date was scheduled for October 30, 2003.

The draft grant agreement from Cafesjian continued to be discussed and negotiated.

Because Cafesjian had agreed to channel his donations to AGM&M through the Assembly, it was decided that Cafesjian would enter a grant agreement with the Assembly (hereinafter, the "Grant Agreement"), and the Assembly would transfer all of the museum-related assets and obligations to AGM&M in a separate agreement, to be known as the "Transfer Agreement." The law firm of Caplin & Drysdale was hired to draft the Transfer Agreement as well as the organic documents for AGM&M, including the Articles of Incorporation, the By-Laws, and a Unanimous Written Consent agreement signed by all of the initial trustees of AGM&M.

The record shows that the language in the Grant Agreement was reviewed by most of the major figures involved in AGM&M during the months leading up to its execution on November 1, 2003. On October 13, 2003, Waters emailed an updated draft of the Grant Agreement, which included the donation of the Families U.S.A. building, for review. The revised draft also included a new trigger date of December 31, 2010 for the reversion clause; it was felt that seven years was a reasonable timeline for the completion of the project. The reversion clause was also expanded to cover the Bank Building in addition to the four Adjacent Properties. Because the Families U.S.A. building transaction was scheduled to close on October 30, Waters urged everyone to act expeditiously so that title to the building could be transferred directly to AGM&M, eliminating the need to transfer the property from TomKat to AGM&M and saving hundreds of thousands of dollars in transfer and recordation fees. On October 28, 2003, a conference call was held with, *inter alia*, Hovnanian, Cafesjian, Kaloosdian, Waters, and Vartian to discuss the four key documents: the Grant Agreement, the Articles of Incorporation for AGM&M, the AGM&M By-Laws, and the Unanimous Written Consent agreement. During this meeting, Kaloosdian suggested that the language in the reversion clause in the Grant Agreement

be clarified so as to avoid ambiguity about when the right of reversion might be triggered. The final language of these documents was approved shortly after this conference call.

The Court noted in its prior Memorandum Opinion that several individuals involved in these discussions, including Kaloosdian and Hovnanian, had a convenient lack of memory with respect to what transpired. Therefore, the Court relied heavily on documents that were submitted as exhibits to determine the events in question. The Court also noted that it appeared as if these individuals did not take the time to fully understand the terms and conditions of the agreements. Any claim that these individuals had certain intentions with regard to these documents is disingenuous and belied by the language of the documents themselves.

The Articles of Incorporation for AGM&M were signed on October 29, 2003, and AGM&M officially became incorporated as a nonprofit corporation in the District of Columbia. The Articles of Incorporation and the By-Laws for AGM&M were ratified and adopted, respectively, pursuant to the Unanimous Written Consent agreement, which was executed on October 30, 2003. The Grant Agreement and Transfer Agreement were signed on November 1, 2003 during an Assembly gala in Palm Desert, California. Because the content of these documents is critically important to disputed issues in this litigation, the Court shall review each of these documents in some detail.

1.    The Grant Agreement

The Grant Agreement was signed by Cafesjian on behalf of himself and CFF and by Hovnanian and Peter Vosbikian on behalf of the Assembly. *See* DX-2 (hereinafter, "Grant

Agreement").[4]  The eleven-page document sets forth the terms and conditions of the grants made by Cafesjian and CFF to the Assembly for the museum project and obligates the Assembly to comply with those terms and conditions.

Pursuant to the Grant Agreement, Cafesjian and/or CFF (jointly defined as the "Grantor") agreed to donate $10.3 million for the purchase of the Adjacent Properties from TomKat and any related transaction costs.  In addition, Cafesjian and/or CFF agreed to make the annual $150,000 payments under the installment agreement for 1340 G Street and the final balloon payment of $1.5 million due in March 2011.  *See* Grant Agreement §§ 2(D)-(E).  The amounts paid under the Grant Agreement were calculated based on the purchase price paid by TomKat for the Adjacent Properties, plus the holding costs paid by TomKat pending transfer minus any rents earned during this period, plus the legal costs associated with the transfer.

For purposes of this litigation, the most critical feature of the Grant Agreement is the reversion clause.  Under § 3.1 of the Grant Agreement, the "Grant Property"—defined as the Bank Building and the Adjacent Properties—"may only be used as part of the AGM&M,[5] subject to plans for the AGM&M approved by the Board of Trustees of the American Genocide Museum & Memorial, Inc. (the 'Plans') . . . ."  Grant Agreement § 3.1(A).  The next section reads as follows:

> If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction,

---

[4] A duplicate copy of this exhibit with some handwriting on the second page was admitted as PX-112.

[5] As used in this context, "AGM&M" refers to the museum project, not the corporate entity.

renovation, installation and other phases detailed in the Plans, then:

> (i)    in the event any portion of the Grants has not been funded, this Agreement terminates;
>
> (ii)    to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.

*Id.* § 3.1(B). The phrase "Grant funds" as referenced in the reversion clause includes both the initial grant of $4 million that was used to acquire the Bank Building as well as the $12.85 million pledged to acquire the Adjacent Properties. Cafesjian testified that the purpose of the reversion clause was to provide an incentive to complete the museum expeditiously, so that it might be built before Cafesjian died. Waters testified that the reversion clause was most likely his idea; he explained that CFF often inserted reversion clauses into its grant agreements. Section 3.3 of the Grant Agreement requires the Assembly to use the "Grant funds only for purposes described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended." *Id.* § 3.3.

The Grant Agreement provides that the Assembly shall make available a space for a memorial to be named the "Gerard L. Cafesjian Memorial" or another name approved by CFF, which shall be operated and maintained in perpetuity by the Assembly at its own cost. Grant Agreement § 3.2. The Grant Agreement also provides that neither CFF nor Cafesjian have any obligation to provide additional funding to the Assembly or to AGM&M. *Id.* § 3.8. The Grant Agreement also contains a breach clause:

> (A)    If the Assembly fails to use the Grants solely for the purposes set out in this Agreement or if the Assembly fails to satisfy any of the conditions of this Agreement, Grantor is released from any remaining obligation under this Agreement to provide funds or property to the Assembly.
>
> (B)    If the Assembly uses any portion of the Grants either for a purpose other than those set out in this Agreement or for a purpose other than those described in

Section 501(c)(3) of the [Internal Revenue] Code, as amended, the Assembly shall repay the portion of the Grants so spent to Grantor, plus interest.

(C)   The remedies set out in this Section 3.9 are in addition to any other remedies that may be available to the Grantor at law or equity.

Grant Agreement § 3.9.

The Grant Agreement also required the Assembly to enter into a Transfer Agreement with AGM&M to transfer all of its interest in all cash, pledges, property, and other assets being held by the Assembly for the museum project. *Id.* § 5.3(A). The Transfer Agreement would obligate AGM&M to honor all existing donor requirements at the time of transfer and to assume all obligations in the Grant Agreement relating to the Memorial. *Id.* § 5.3(B)-(C). The Grant Agreement also provided that the Assembly would assign its right to appoint the Trustees of the Armenian National Institute to AGM&M. *Id.* § 5.5.

## 2.   The Transfer Agreement

The Transfer Agreement was executed on November 1, 2003 by the Assembly and the newly-incorporated AGM&M. *See* PX-114 (hereinafter, the "Transfer Agreement"). The Transfer Agreement requires the Assembly to contribute to AGM&M "all of its rights, title and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the [Assembly] and/or held by the [Assembly] for the development, renovation, and construction of the AGM&M." *Id.* § 1.1. The approximate aggregate value of the grant was listed as $27.8 million, including $7.25 million in property, over $19 million in pledges, and approximately $670,000 in cash and other assets. *Id.* § 1.1(C).

Pursuant to § 1.2 of the Transfer Agreement, "AGM&M, Inc. must honor all of the [Assembly]'s donor requirements existing at time of transfer, or in the alternative, obtain donor

consent to the transfer and any modification of donor terms." Transfer Agreement § 1.2(A). The agreement also explicitly requires AGM&M to comply with the obligation to construct a memorial as set out in the Grant Agreement. *Id.* § 1.2(B). The Transfer Agreement also requires AGM&M to use the funds and property transferred "solely to develop, construct and operate" the Armenian Genocide Museum & Memorial. *Id.* § 1.3. The agreement also contains an arbitration clause. *See* Transfer Agreement § 5.3. However, as the Court noted in its prior Memorandum Opinion, none of the parties is presently seeking to enforce that arbitration clause.

3.    The AGM&M Articles of Incorporation

The Articles of Incorporation for AGM&M were executed on October 29, 2003. *See* PX-121. The Articles provide that AGM&M is a nonprofit corporation organized for charitable purposes within the meaning of § 501(c)(3) of the Internal Revenue Code. *Id.*, Art. IV(A). The purpose of the corporation is defined as, *inter alia*, "to own, operate, and maintain a permanent museum and memorial to the victims and survivors of the Armenian Genocide." *Id.* The Articles provide that AGM&M has no members and that the board of directors for the corporation shall be referred to as the Board of Trustees. *See id.*, Arts. V-VI. The manner of election or appointment to the Board of Trustees is to be set forth in the By-Laws of the corporation. *Id.*, Art. VI. The Board of Trustees must have at least three trustees at all times, and the initial trustees are defined to be Gerard L. Cafesjian, Hirair Hovnanian, Anoush Mathevosian, and Robert Kaloosdian. *Id.*, Art. IX. The Articles also provide that "[n]o part of the net earnings of the Corporation shall inure to the benefit of or be distributed to any trustee, employee or other individual, partnership, estate, trust or corporation having a personal or private interest in the Corporation." *Id.*, Art. IV(C).

4. <u>The AGM&M By-Laws</u>

The By-Laws of AGM&M set out rules that govern the operation of the Board of Trustees. *See* PX-122 (hereinafter, "By-Laws"). The By-Laws provide that the term of office of each of the initial trustees (i.e., Cafesjian, Mathevosian, Hovnanian, and Kaloosdian) "shall be perpetual." By-Laws § 2.4. Each donor that elected an initial trustee (CFF, Mathevosian, Hovnanian, and the Assembly) is entitled to appoint a successor trustee in the event that the initial trustee is unable to serve for any reason. *Id.* Additional trustees may be elected to the Board of Trustees by making a contribution of $5 million to AGM&M, provided that the Board of Trustees has accepted the contribution by an 80% affirmative vote and the donor has appointed a successor. *Id.* § 2.5. Each donor (including initial donors) is entitled to one vote on the Board of Trustees for each $5 million contributed. *Id.* §§ 2.4-2.5.

The By-Laws prohibit AGM&M from engaging in any activities or conduct that would not be permitted to a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code. *See* By-Laws § 3.3. Similarly, the By-Laws provide that "[n]o part of the net earnings shall inure to the benefit of, or be distributable to, the Trustees, officers or others except that the Trustees shall be authorized and empowered, if they so elect, to pay to Trustees, officers or others reasonable compensation for service rendered and to make payments and distribution in furtherance of the purposes set forth in these By-Laws." *Id.*

Pursuant to § 4.1 of the By-Laws,

Unless otherwise prohibited by law or sections 4.3 and 4.4 of these By-Laws, the Corporation shall indemnify any Trustee or officer of the Corporation, any former Trustee or officer of the Corporation, or any person who may have served at its request as a trustee, director or officer of another corporation or entity, whether for profit or not for profit, and may, by resolution of the Board of Trustees, indemnify

18

any employee or agent of the Corporation against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit or proceeding (whether actual or threatened, civil, criminal, administrative or investigative, including appeals) in which he or she is or may be made a party by reason of having been such Trustee, officer, person, employee or agent, subject to the limitation, however, that there shall be no indemnification in relation to matters as to which he or she shall be adjudged in such claim, action, suit or proceeding to be guilty of a criminal offense or liable to the Corporation for damages arising out of his or her own negligence or misconduct in the performance of a duty to the Corporation.

The By-Laws provide that indemnification shall include, but not be limited to, counsel fees and other costs. Section 4.3 of the By-Laws provides that if AGM&M is ever deemed a private foundation within the meaning of Section 509 of the Internal Revenue Code, no indemnification shall be paid if such payment would constitute an act of self-dealing or a taxable expenditure as defined in Sections 4941(d) or 4945(d) of the Internal Revenue Code, respectively. *Id.* § 4.3.

5. The Unanimous Written Consent Agreement

On October 30, 2003, each of the four initial trustees of AGM&M signed a document titled Unanimous Written Consent in Lieu of the Organization Meeting of the Board of Trustees of AGM&M. *See* DX-1 (hereinafter, "UWC"). By unanimous written consent, the Board of Trustees adopted a series of resolutions. First, the actions of the incorporators were ratified and the By-Laws were approved. Second, the initial donors (and their appointed trustees) were recognized to be CFF (Cafesjian), Hirair Hovnanian (himself), Anoush Mathevosian (herself), and the Assembly (Kaloosdian). Cafesjian was appointed Chairman and President, Hovnanian was appointed Vice Chairman, and John Waters was appointed Secretary and Treasurer.

Through the Unanimous Written Consent agreement, the AGM&M Board of Trustees authorized the officers to pay all of the organizational expenses of the corporation. The actions

of the Chairman (Cafesjian) and the Secretary/Treasurer (Waters) in negotiating the purchase of

the Adjacent Properties were ratified and approved, and the Secretary/Treasurer was authorized

"to enter into and execute any and all documents necessary to effect the purchase" of the

Adjacent Properties and "to take such other action as deemed necessary or desired to effect such

transactions." UWC at 3. The AGM&M Board also approved and ratified the negotiation of

grant agreements with donors and the Assembly, and the Secretary/Treasurer was authorized to

negotiate further grant agreements with donors. The Board also accepted from the Assembly its

power to appoint trustees for the Armenian National Institute.

     *E.*    *Efforts to Develop An Armenian Genocide Museum Through AGM&M*

     The facts surrounding what happened after AGM&M was formally created were

thoroughly discussed in the Court's prior Memorandum Opinion and need not be repeated herein.

The AGM&M Board of Trustees was unable to reach consensus on the proper size and scope of

the project, and tensions between Cafesjian and Hovnanian increased over a series of

disagreements about the museum project and other policies of the Assembly. By 2006, relations

between the parties had completely broken down, prompting Cafesjian to propose that AGM&M

be dissolved. Cafesjian ultimately resigned from the AGM&M Board of Trustees, designating

Waters as his successor. After Cafesjian sued the Assembly for payment on the promissory note,

the other AGM&M Trustees voted to exclude Waters from participation on all matters relating to

the museum project. This resulted in a series of lawsuits filed by the parties fighting for control

of AGM&M and alleging mismanagement of the corporation. The three other AGM&M trustees

attempted to move forward with the project without Waters's involvement, but they were unable

to raise the funds necessary to implement a development plan. Accordingly, the museum was not

developed by December 31, 2010, thus triggering the reversion clause in the Grant Agreement.

## II.  DISCUSSION

A.      *Findings of Fact and Conclusions of Law Regarding CFF's Obligation to Reimburse AGM&M for the Value of Properties that Revert Under the Grant Agreement*

The Court ruled in its prior Memorandum Opinion that the reversion clause in the Grant Agreement was valid and enforceable and that CFF and Cafesjian may exercise their rights under that clause effective December 31, 2010.  Cafesjian informed the Court that only CFF will exercise its rights under the reversion clause and that CFF will elect to have the properties transferred in lieu of the grant funds.  The Court indicated, however, that Plaintiffs had raised questions about whether returning the properties to CFF violates the rule—stated in the AGM&M By-Laws and Articles of Incorporation—that no part of AGM&M's net earnings shall inure to the benefit of any trustee.  The Court asked the parties to address in further briefing whether it would be inequitable to enforce the reversion clause without requiring CFF to reimburse AGM&M for any potential increased value over the amount of funds originally donated by CFF or Cafesjian, and to address whether it was the original intent of the contracting parties that the reversion would be a nonprofit transaction.  Through supplemental briefing, the parties have clarified their positions on these issues.

Plaintiffs argue that the reversion clause in the Grant Agreement, when read in context with the other provisions of the Grant Agreement and the terms of the AGM&M By-Laws and Articles of Incorporation, should be construed as requiring that CFF not realize a profit from the reversion.  Plaintiffs contend that CFF will profit from the reversion because the value of the properties being transferred exceeds the value of the donation that CFF and Cafesjian made as

21

part of the Grant Agreement. Furthermore, Plaintiffs argue that a reversion without some form of reimbursement would violate federal tax laws applicable to nonprofit organizations under § 501(c)(3) of the Internal Revenue Code. Defendants, by contrast, claim that the language in the Grant Agreement is unambiguous and places no restrictions on the right of CFF to elect a reversion of the properties rather than the grant funds. They also dispute Plaintiffs' claim that the reversion runs afoul of the tax laws. The Court shall address these arguments below.

### 1. The Grant Agreement

Ultimately, the issue before the Court is a straightforward question of contract interpretation: does the Grant Agreement require CFF to reimburse AGM&M for the extent to which the value of the properties to be transferred exceeds the value of the grant funds donated to acquire them?

The District of Columbia adheres to an "objective" law of contracts, meaning that "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake." *Dyer v. Bilaal*, 983 A.2d 349, 354-55 (D.C. 2009) (citation omitted; brackets in original). "If the court finds that the contract has more than one reasonable interpretation and therefore is ambiguous, then the court–after admitting probative extrinsic evidence–must determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Tillery v. D.C. Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006) (quoting *In re Bailey*, 883 A.2d 106, 118 (D.C. 2005)). "Ambiguity exists only if the court determines that the proper interpretation of the contract cannot be derived from

the contractual language exclusively, and requires consideration of evidence outside the contract itself." *Steele Foundations, Inc. v. Clark Constr. Grp., Inc.*, 937 A.2d 148, 153 (D.C. 2007). "[C]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction." *Id.* In determining whether a contract is ambiguous, courts examine the document on its face and give the language its plain meaning. *Tillery*, 912 A.2d at 1176.

The first step in interpreting a contract is to determine "what a reasonable person in the position of the parties would have thought the disputed language meant." *Steele Foundations*, 937 A.2d at 154 (quoting *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1092 (D.C. 1988)). "The meaning must be ascertained in light of all the circumstances surrounding the parties at the time the contract was made," and "[t]he writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984) (internal citations omitted).

The language in the Grant Agreement is unambiguous: if the conditions triggering the reversion are met, "at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property." It is clear from this language that the Grantor (CFF and Cafesjian) may choose between a return of the funds donated and a transfer of the properties. There is no language in the reversion clause or anywhere else in the Grant Agreement that restricts the Grantor's right to receive the Grant Property. The Court presumes that if the parties had intended to place any restrictions of the Grantor's right to elect a transfer of the Grant Property, they would have memorialized that intent in the Grant Agreement itself, particularly in light of the fact that the Grant Agreement contains an integration clause. *See Luther Williams, Jr., Inc. v. Johnson*, 229 A.2d 163, 165 (D.C. 1967) ("[I]t has always been

presumed that a written contract is the final repository of the agreement of the parties. . . . [A]n integration clause merely strengthens this presumption.") (internal citation omitted).

Plaintiffs argue that the two options in the reversion clause, "when read together and with the balance of the Grant Agreement, signify that the exercise of the reversion would be a nonprofit transaction." *See* Pls.' Br. Regarding Reimbursement at 3. However, that is not a natural construction of the plain language of the Grant Agreement. All parties knew at the time they entered into the agreement that the value of the Grant Property, which included the Bank Building and the Adjacent Properties, would be potentially much greater than the value of the Grant funds, which covered the purchase of the Adjacent Properties and only about half the cost of the Bank Building (the other half being covered by Anoush Mathevosian). Therefore, even at the outset, the Grantor's choice was not between two options that were equal in value. It is implausible that the parties would have intended the options to be equal seven years later on the reversion date of December 31, 2010, for this would effectively eliminate the Grantor's right to elect the most valuable remedy.

It is even more inconceivable that the parties would have intended for the transfer of the Grant Property to be a nonprofit transaction without specifying any provisions for determining the value of the Grant Property at the time of transfer. Valuing property in the absence of an arms-length market transaction is inherently uncertain, and the record at trial indicated that there were widely varying appraisals of the properties depending on whether they would be used to build a museum or sold to a commercial developer, with no definite valuation. *See* Trial Tr. (11/16 PM) at 85-87; DX-513N. Any valuation offered by the parties at this time would be speculative. Since the Court has determined that there are no "strings" attached to CFF's use of

the properties once transferred, how would the Court decide what method of valuation was appropriate to ensure that CFF did not realize a profit? Such uncertainty over how to implement a "nonprofit" transfer is a significant reason to assume that this was not what the parties intended.

Plaintiffs argue that their interpretation of the options as equal in value is supported by the limiting phrase in the reversion clause: "to the degree any portion of the Grants has been funded . . . ." They argue that this phrase must be read as limiting the Grantor's right of reversion to the extent that the Grants have actually been funded, and they argue that Defendants' construction "would allow the grantors to take back the entire grant properties even if they had not fulfilled their payment obligations under the pledge." Pl.'s Br. Regarding Reimbursement at 7. But Plaintiffs overlook the fact that under the Grant Agreement, the Grant funds had to be used to purchase the Grant Property, meaning that if Cafesjian and CFF had not fulfilled their pledges, AGM&M would never have acquired all of the properties that now must be transferred. Therefore, there was never any risk that Cafesjian and CFF would receive a windfall, for example, by paying for the acquisition of only one of the Adjacent Properties and then receiving all four of them under the reversion clause. Ultimately, the Court is not persuaded that the phrase "to the degree any portion of the Grants has been funded" places any restriction on the Grantor's right to elect a transfer of the Grant Property, particularly where the record demonstrates that Cafesjian and CFF have fulfilled their obligations under the Grant Agreement.[6]

---

[6] The record at trial indicated that the Assembly, acting on behalf of AGM&M, refused to cash CFF's check for its annual payment of $150,000 for the 1340 G Street property in 2007. The Court found that although the payment was made a few days late, there was no reason that the Assembly could not have cashed the check and credited CFF with the payment. Accordingly, the Court finds that CFF and Cafesjian satisfied their obligation to make the annual payment in

Plaintiffs also argue that the requirement in § 3.3 of the Grant Agreement that the Grant funds be used "only for purposes described in Section 501(c)(3) of the Internal Revenue Code" supports their position. By its own terms, this provision acts as a limitation only on the use of the Grant funds; it says nothing about transferring the Grant Property. Even assuming that § 3.3 applied to the transfer of the Grant Property, the general language in § 3.3 cannot be fairly read to implicitly restrict the more specific language contained in the reversion clause. Therefore, the Court finds that § 3.3 does not impose any reimbursement requirement on the transfer of the Grant Property.

Plaintiffs complain that without a reimbursement requirement, CFF will be allowed to retain the benefit of the appreciated value of the properties, Anoush Mathevosian's $3.5 million donation, and more than seven years of carrying costs, taxes, and insurance that were paid for the properties, with the result being that AGM&M is stripped of nearly all its assets. Plaintiffs argue that the parties could not have intended such an inequitable result. But this was a foreseeable consequence at the time the parties entered into the agreement. The reversion clause in the Grant Agreement was intended to create a meaningful incentive for the parties to substantially complete the museum project by December 31, 2010. Since the parties failed to reach that milestone, Plaintiffs must live with the consequences of their bargained-for agreement. The Court cannot reform the plain terms of the Grant Agreement simply because Plaintiffs belatedly realized how dire those consequences would be.

---

2007, and there was no other evidence at trial suggesting that CFF and Cafesjian did not perform their funding obligations under the Grant Agreement.

2. The AGM&M By-Laws and Articles of Incorporation

Plaintiffs argue that the Court should look beyond the four corners of the Grant Agreement to the AGM&M By-Laws and Articles of Incorporation in determining the meaning of the reversion clause. However, the Court has no occasion to search beyond the text of the Grant Agreement because the terms of the reversion clause are clear and unambiguous. *See 1010 Potomac Assocs.*, 485 A.2d at 205 ("Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous."). Although the Court may consider these documents as part of the circumstances surrounding the formation of the Grant Agreement, *see id.*, the execution of these documents does not alter the Court's interpretation of the Grant Agreement. Plaintiffs contend that the adoption of the AGM&M Articles of Incorporation and By-Laws around the same time as the Grant Agreement and Transfer Agreement demonstrates that the parties intended for the private inurement restrictions contained in the By-Laws and the Articles to apply to the Grant Agreement. Again, however, the specific and direct language in the reversion clause is the best evidence of the parties' intent. The Court is not persuaded that the parties would have intended to restrict the Grantor's reversion rights through more general language contained in entirely separate documents. *See Washington Automotive Co. v. 1828 L Street Assocs.*, 906 A.2d 869, 880 (D.C. 2006) ("[It is] a familiar principle of contract interpretation[] that 'specific terms and exact terms are given greater weight than general language.'") (quoting Restatement (Second) of Contracts § 203(c) (1981)). The lack of any explicit restriction on the transfer in the Grant Agreement strongly suggests that the parties did not intend to subject the transfer to any private inurement regulations.

Plaintiffs argue that the Court should not construe the reversion clause in a manner that

could result in adverse tax consequences for AGM&M, suggesting that the parties would not have intended such a result. However, there is no reason to assume that the parties expected AGM&M to survive if the reversion clause was exercised; to the contrary, it is reasonable to assume that the parties expected the reversion of either the Grant funds or the Grant Property to be the death knell for the organization. The parties in this litigation created AGM&M for the express purpose of creating a museum and memorial devoted to the Armenian Genocide on the site of the Bank Building and the Adjacent Properties. Without those properties, it is unclear how AGM&M could be expected to fulfill its mission and survive as an organization. Therefore, the Court is not persuaded that the parties intended to spare AGM&M from any adverse tax consequences that might result from the transfer of the Grant Property.

Plaintiffs claim that construing the reversion clause as requiring no reimbursement for appreciated value would create "a vehicle for tax fraud" because it would allow wealthy donors to put cash into a charity for the acquisition of real estate, wait for the value of that real estate to increase over time, and then seek the return of the appreciated real estate pursuant to some unmet condition, thereby gaining the appreciated property without any consequence. *See* Pls.' Br. Regarding Reimbursement at 7. It is unclear why Plaintiffs believe there would be no tax consequences to the donor in this hypothetical, and Plaintiffs cite no authority to explain their theory of this "vehicle for tax fraud." In any event, the collection and recovery of federal taxes is the sole responsibility of the United States government; Plaintiffs cannot compel Defendants to comply with the tax code through this litigation. *See* 26 U.S.C. § 7401 ("No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary [of the Treasury] authorizes or sanctions the proceedings and the Attorney General

or his delegate directs that the action be commenced.").  Furthermore, the Court has no power to change the terms of the Grant Agreement merely because enforcing the reversion clause can be expected to have adverse tax consequences for the parties.

3.      Tax Regulations Prohibiting Private Benefit

Plaintiffs have presented the Court with a rather complicated set of arguments as to why they believe that allowing CFF to profit from the transfer of the Grant Property will violate federal tax laws pertaining to tax-exempt organizations.  As the Court has explained, these arguments are essentially irrelevant because the Grant Agreement clearly and unambiguously requires AGM&M to transfer the properties without regard to the tax consequences of the transfer.  In any event, the Court is not persuaded that the transfer of the properties to CFF violates the tax laws as Plaintiffs claim.

Plaintiffs' central argument is that by transferring the Grant Property to CFF, AGM&M will be violating regulations that require § 501(c)(3) organizations to be operated exclusively for tax-exempt purposes.  Pursuant to 26 C.F.R. § 1.501(c)(3)-1(c)(2), "[a]n organization is not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals."  A private shareholder or individual is defined as a person having a personal and private interest in the activities of the organization.  26 C.F.R. § 1.501(a)-1(c).  The purpose of the inurement provision is "to prevent the siphoning of charitable receipts to insiders of the charity."  *United Cancer Council, Inc. v. Comm'r*, 165 F.3d 1173, 1176 (7th Cir. 1999); *see also* I.R.S. Priv. Ltr. Rul. 201047033 (Nov. 3, 2010) ("Inurement is any transfer of charitable assets to the organization's insiders for which the organization does not receive adequate consideration.  Inurement can take many forms.").

29

Defendants argue that there can be no violation of the inurement provision because the property is being transferred to CFF, another 501(c)(3) organization which is neither a shareholder of AGM&M nor a private individual. Because CFF itself must operate exclusively for tax-exempt purposes, Defendants argue that there will be no "private" benefit from the transfer of property that would frustrate the purposes of § 501(c)(3). Plaintiffs do not directly respond to this argument in their briefing, and they have cited no cases in which it was determined that a 501(c)(3) organization was a private shareholder or individual for purposes of the inurement provision. In fact, Plaintiffs' counsel essentially conceded the point during a Status Hearing on February 24, 2011, noting that "by designating the actual acquiring entity as CFF, that . . . avoids some of the limitations in the private inurement law." 2/24/11 Hr'g Tr. at 16. Accordingly, the Court is not persuaded that the transfer of the properties to CFF will violate the prohibition on private inurement as stated in the federal tax laws and incorporated into the By-Laws and Articles of Incorporation of AGM&M.[7]

Moreover, based on a review of the substance of the transaction as a whole, the Court is not persuaded that the transfer of the property under the Grant Agreement qualifies as private inurement. Contrary to Plaintiffs' characterization, this is not a case where a wealthy donor gave money to an organization to buy property and then the corporation gave the property back to the donor after it had substantially appreciated. This is a case where a donor made a conditional gift of funds to be used for a specific purpose, and after AGM&M was unable to fulfill the required

---

[7] Plaintiffs suggested during the February 24, 2011 Status Hearing that because the Grant Agreement defines the "Grantor" as Cafesjian *and* CFF, there must be a private benefit to Cafesjian. However, Cafesjian has relinquished his right to receive the property in favor of CFF, and Plaintiffs have not demonstrated how Cafesjian will benefit from the transfer.

conditions, it was compelled to allow the donor to recover the properties acquired with the gifted funds. Defendants rely heavily on *Underwood v. United States*, 461 F. Supp. 1382 (N.D. Tex. 1978), which also involved the return of a conditional gift. In *Underwood*, the plaintiff had agreed to donate $1 million to the Southern Methodist University School of Law through a charitable foundation with the understanding that all of his donations would be deductible for federal income tax purposes. *See id.* at 1384. After the IRS disallowed some of Underwood's deductions to the charitable foundation, Underwood reached an agreement with the foundation to return his donations so that he could give the money directly to the law school. *Id.* at 1385. The IRS determined that the return of funds from the foundation amounted to self-dealing in violation of 26 U.S.C. § 4941, which imposes a tax on any act of self-dealing between a private foundation and any "disqualified person" such as a substantial contributor to the foundation. *See* 26 U.S.C. §§ 4941, 4946(a)(1).[8] However, the *Underwood* court held that the return of funds by the foundation was not an act of self-dealing because it was simply the return of a conditional gift. 461 F. Supp. at 1389.

*Underwood* is distinguishable from this case, primarily because the donor in that case received an exact refund of the amount he had donated. By contrast, CFF is going to receive properties that were purchased for $3.5 million more than CFF and Cafesjian donated to acquire them (the amount of Mathevosian's contribution) and that may or may not have appreciated in value since then. Therefore, it could be argued that CFF will "profit" from the transfer of the

---

[8] Plaintiffs argue that AGM&M is now a private foundation and therefore may be subject to this tax if it transfers the Grant Property to CFF. As explained below, the Court does not believe that the transfer can be characterized as an act of self-dealing within the meaning of § 4941. Furthermore, Plaintiffs assume without discussion that CFF falls within the definition of "disqualified person" under the statute, but this is not clear.

properties. However, pecuniary gain does not automatically equate to inurement; the question is whether the profit is reasonable in light of the benefits to AGM&M. *Cf. Church By Mail, Inc. v. Comm'r*, 765 F.2d 1387, 1392-93 (9th Cir. 1985) (noting that payment of excessive salaries to employees may constitute inurement to the benefit of a private person). The circumstances surrounding the Grant Agreement and the formation of AGM&M demonstrate that the reversion clause was an essential part of the bargain that enabled AGM&M to obtain the funds necessary to acquire the properties. Cafesjian and CFF were unwilling to donate additional millions of dollars to the genocide museum and memorial project unless they could be reasonably assured that the project would be substantially completed in a timely manner. Therefore, they demanded a reversion clause that would enable them to get control of the properties in case AGM&M was unsuccessful. This was not a sham transaction for AGM&M to shelter assets for Cafesjian and CFF; it was an agreement that gave AGM&M a financial incentive to be successful with the money donated by Cafesjian and CFF. The Court has already found that Cafesjian and the CFF-designated trustees of AGM&M acted in good faith to try to develop the genocide museum and memorial before the reversion date of December 31, 2010. In that regard, it is unfair and without support to characterize the Grant Agreement as an act of self-dealing or to state that AGM&M was operating for the private benefit of Cafesjian or CFF.[9]

---

[9] Plaintiffs erroneously claim that Cafesjian was entitled to four votes on the AGM&M Board of Trustees by virtue of his pledge of more than $15 million. *See* Pls.' Reimbursement Br. at 14. At most, Cafesjian would have been entitled to three votes under the AGM&M By-Laws. However, because of the 80% vote requirement, Cafesjian would have had veto power over the Board's decisions even if he were only recognized as having one vote. In any event, the Court has already rejected Plaintiffs' argument that Cafesjian acted in bad faith through his management of AGM&M.

### 4. Implementing the Transfer

For all of the aforementioned reasons, the Court finds that the Grant Agreement clearly and unambiguously requires AGM&M to transfer the Grant Property to CFF without regard to any tax consequences that flow therefrom. To date, AGM&M has failed to transfer the Grant Property, citing concerns about the tax consequences of the transfer and demanding that several restrictions be placed on the transfer.[10] Now that the Court has addressed Plaintiffs' arguments relating to the tax consequences of the transfer, there should be no reason for further delaying the transfer of the properties. Defendants have asked the Court to order the trustees of AGM&M to sign certain documents prepared by Defendants to complete the transfer. The Court declines at this time to order the trustees to sign the specific documents drafted by Defendants' counsel. Instead, the Court shall order the AGM&M trustees to transfer the property to CFF in accordance with D.C. law by no later than May 23, 2011.

### B. Findings of Fact and Conclusions of Law Regarding AGM&M's Indemnification of Cafesjian and Waters

The Court ruled in its prior Memorandum Opinion that Defendants Cafesjian and Waters were entitled to indemnification under § 4.1 of the AGM&M By-Laws for expenses actually and necessarily incurred by them in defense of claims brought against them by Plaintiffs. The indemnification requirement extends only to claims that arose out of Cafesjian's or Waters's duties as officers or directors of AGM&M, which are asserted in Count One of the Consolidated Complaint. Expenses relating to the Assembly's claims against Cafesjian and Waters for breach

---

[10] Among the conditions that the AGM&M trustees seek to impose is an agreement that CFF will forfeit the Grant Property to the Assembly if a permanent museum and memorial devoted to the Armenian Genocide is not constructed within five years. *See* [212] Pls.' Status Report at 4.

of fiduciary duty or misappropriation of trade secrets are not covered by the indemnification clause in the AGM&M By-Laws. The Court previously indicated that it would determine the amount of indemnification in post-trial proceedings. Cafesjian and Waters have submitted a brief with supporting documentation that sets forth the amount of their expenses. Plaintiffs have filed an opposition contesting the reasonableness and validity of those expenses, and Defendants have filed a reply. Plaintiffs raise a series of objections to Defendants' request for indemnification, and the Court shall address each below.

"[O]nce a contractual entitlement to attorney's fees has been ascertained, the determination of a reasonable fee award is for the trial court in light of the relevant circumstances." *Ideal Electronic Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 150 (D.C. Cir. 1997). "[T]he reasonableness of an attorney's fees award is within the sound discretion of the trial court and is reviewed only for abuse of discretion." *Id.* The Court has discretion to determine the nature and amount of proof necessary to determine reasonableness and may fix the amount of the fee without hearing any evidence at all. *FDIC v. Bender*, 127 F.3d 58, 64 (D.C. Cir. 1997).

    1.   <u>Self-Dealing</u>

Although they did not raise this argument before the Court issued its Memorandum Opinion, Plaintiffs now contend that indemnification is not required under the By-Laws because AGM&M has been deemed a private foundation within the meaning of § 509 of the Internal Revenue Code and the payment of legal expenses to Cafesjian and Waters would amount to an act of self-dealing under § 4941(d) of the Internal Revenue Code. *See* By-Laws § 4.3 ("[I]f at any time the Corporation is deemed to be a private foundation within the meaning of Section 509

34

of the Code then, during such time, no payment shall be made under this Article if such payment would constitute an act of self-dealing or a taxable expenditure, as defined in Section 4941(d) or Section 4945(d), respectively, of the Code.").  Defendants dispute whether AGM&M has been "deemed to be a private foundation," since there is no evidence that the IRS has yet made such a determination.  Plaintiffs have submitted financial documents to the Court under seal purportedly showing that AGM&M lost its status as a public charity in fiscal year 2010, when its public support fraction dropped below the level required to maintain public charity status.  *See* [217] Pls.' Status Report to the Court at 3-5.  However, there is no evidence before the Court indicating that the IRS has made any determination that AGM&M qualifies as a private foundation. Section 4.3 provides that indemnification shall not be paid "during such time" that "the Corporation is deemed to be private foundation," suggesting that until a determination is made by the IRS, indemnification must be paid.

Even assuming that AGM&M is deemed a private foundation, however, Treasury regulations provide that indemnification of former officers does not amount to an act of self-dealing for purposes of § 4941(d).  Pursuant to 26 C.F.R. § 53.4941(d)-2(f)(3),

> section 4941(d)(1) shall not apply to the indemnification by a private foundation of a foundation manager, with respect to the manager's defense in any civil judicial or civil administrative proceeding arising out of the manager's performance of services (or failure to perform services) on behalf of the foundation, against all expenses (other than taxes, including taxes imposed by chapter 42, penalties, or expenses of correction) including attorneys' fees, judgments and settlement expenditures if—
>> (A) Such expenses are reasonably incurred by the manager in connection with such proceeding; and
>> (B) The manager has not acted willfully and without reasonable cause with respect to the act or failure to act which led to such proceeding or to liability for tax under chapter 42.

Therefore, the By-Laws provision precluding payment of indemnification where it constitutes

self-dealing does not preclude the Court from ordering AGM&M to pay Cafesjian and Waters for the reasonable expenses they incurred in defending their claims.

2.    Arbitration

Plaintiffs next argue that the Court should reject Defendants' request for indemnification because the legal expenses associated with this litigation could have been avoided had Cafesjian and Waters agreed to arbitrate this dispute. Plaintiffs had filed a demand for arbitration with the American Arbitration Association on September 13, 2007 relating to the first lawsuit filed by Cafesjian and CFF against the Assembly in Minnesota. On October 10, 2007, Cafesjian and Waters, *inter alia*, filed a lawsuit in Minnesota to enjoin the arbitration. The parties ultimately stipulated to the dismissal of that lawsuit in September 2007. Therefore, Plaintiffs have long since abandoned any attempt to compel arbitration of the issues contested in these actions, and there is nothing in the arbitration provisions of the AGM&M By-Laws that requires Cafesjian and Waters to agree to arbitration. Most significantly, the indemnification provision in the AGM&M By-Laws does not require Cafesjian or Waters to submit to arbitration. Accordingly, there is no basis for concluding that Cafesjian's and Waters's legal expenses are unreasonable or unnecessary based on their decision to litigate in federal court. The Court also notes that Plaintiffs did not include this argument in their proposed conclusions of law or otherwise present this argument to the Court during the trial; this is an independent reason for rejecting Plaintiffs' argument.

3.    Expenses Incurred by CFF

Plaintiffs next claim that CFF has paid the legal expenses for this litigation on behalf of Cafesjian and Waters, and since CFF is not subject to indemnification under the AGM&M By-

Laws, they claim that no indemnification is owed. In response to Plaintiffs' claim, Defendants

state that they have removed any expenses paid by CFF from their request for indemnification,

leaving only expenses paid by Cafesjian.[11] Defendants have produced a declaration with

supporting documentation demonstrating that Cafesjian personally paid for the legal expenses

that were not covered by CFF. *See* Defs.' Reply in Support of Br. Quantifying Attorneys' Fees

for Indemnification, Ex. E (Suppl. Decl. of William G. Laxton, Jr.). Accordingly, the Court shall

consider only these expenses that were incurred by Cafesjian in determining the amount of

indemnification required under the AGM&M By-Laws.

4.     Identification of Expenses Subject to Indemnification

Because the scope of indemnification under the AGM&M By-Laws is limited to the

expenses incurred by Cafesjian and Waters in defending the claims asserted against them as

former officers and trustees of AGM&M, Defendants must identify which expenses are related to

these claims and separate any expenses that they incurred asserting counterclaims against

Plaintiffs or defending against separate claims asserted by the Assembly. In order to accomplish

this task, Defendants have identified three categories of expenses: (1) those that are clearly

related to the defense of claims asserted against Waters and Cafesjian in their capacities as

fiduciaries of AGM&M; (2) those that are clearly related to other claims asserted in the litigation;

and (3) those expenses that cannot easily be separated between these two categories of claims

("blended expenses"). Defendants seek indemnity for the amount of expenses in the first

category and 67% of the blended expenses, based on Defendants' estimate of the proportion of

_____

[11] Waters testified at trial that he had not paid for any legal expenses. *See* Trial Tr. (11/15 AM) at 36-37.

those expenses that can be fairly attributed to the defense of claims that are subject to indemnification. Plaintiffs do not take issue with Defendants' decisions about which expenses belong in each category. However, Plaintiffs argue that none of the blended expenses should be awarded because they cannot clearly be linked to the claims that must be indemnified. Alternatively, Plaintiffs argue that Defendants' proposed percentage is too high and should be greatly reduced to 19%.

The parties have cited only a few cases to support their arguments regarding the proper allocation of attorneys' fees, all of which involve application of a fee-shifting statute rather than a contractual indemnification clause. In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court addressed how fees should be awarded to a prevailing party where the party prevailed on only some of the claims asserted in the litigation. The Court noted that in such cases, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis," and therefore courts "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." 461 U.S. at 435; *accord Thomas v. Nat'l Football League Players Ass'n*, 273 F.3d 1124, 1128-29 (D.C. Cir. 2001). The most analogous case cited by the parties is *Alpo Petfoods, Inc. v. Ralson Purina Co.*, No. Civ. A. 86-2728, 1991 WL 1292963 (D.D.C. Dec. 4, 1991), in which the court awarded attorneys' fees that were limited to the costs of prosecuting successful aspects of the prevailing party's case-in-chief. *See id.* at *12-13. In that case, the party seeking an award undertook a three-step methodology to calculate the time attributable to its successful counterclaim: first, it excluded time clearly unrelated to the successful claim; then, it segregated the remaining legal fees into various subject matter categories based on the nature

of the relationship to the successful claim; and finally it estimated the percentage of time in each category that could fairly be attributed to a successful result. *Id.* at *12. The court accepted this methodology as a valid means of proving the amount of fees that should be awarded. *Id.*

These cases are somewhat in tension with the D.C. Court of Appeals's decision in *Safeway Stores, Inc. v. Chamberlain Protective Services, Inc.*, 451 A.2d 66 (D.C. 1982). In that case, the court affirmed the denial of attorneys' fees and expenses to a party where the court determined that it was impossible to allocate the fees and expenses among three claims, only one of which was subject to indemnity. *Id.* at 72-73. However, in that case, the party's right to indemnification was based on the limited exception to the American Rule that allows a party wrongfully involved in litigation with a third party to recover the expenses of such litigation from the wrongdoer. *See id.* at 68-69. It is therefore unclear whether *Safeway Stores* controls beyond its core holding that "an indemnitee may be denied recovery of attorney's fees from his codefendant indemnitor where the fees incurred in establishing his right to indemnity are considered inseparable from those incurred in defending the alleged negligence." *Id.* at 73.

The Court finds that it is unnecessary to resolve this issue at this time because Defendants may be able to break down many of their "blended" expenses in a manner that more clearly identifies whether the costs incurred or the work performed were actually related to the claims subject to indemnification. Moreover, beyond criticizing Defendants' approach to calculating a percentage for the blended expenses, Plaintiffs also contend that many of the expenses claimed by Defendants are unreasonable. Plaintiffs complain that Defendants' legal bills are bloated by excessive time devoted to ordinary tasks, appearances by multiple attorneys where only one was necessary, and other unnecessary expenses. In order to expedite resolution of these disputes over

the necessity of particular expenses, the Court shall refer this issue to a magistrate judge for a report and recommendation pursuant to Federal Rule of Civil Procedure 72(b) and Local Civil Rule 72.3(a).  The magistrate judge may review Defendants' categorization of "blended" expenses and determine whether there is a more appropriate methodology for separating which expenses should be indemnified and which should not.  The magistrate judge may also review Plaintiffs' objections to particular expenses and make decisions about which expenses were "actually and necessarily incurred" within the meaning of the indemnification provision of the AGM&M By-Laws.  Upon review of the magistrate judge's report and recommendation, the Court shall determine, if necessary, whether Defendants' proposed blended expenses approach is appropriate and what percentage should be applied to those expenses.

C.    *Defendants' Motion for Attorneys' Fees for Vexatious Litigation*

Apart from their claim for indemnification, Defendants have filed a [221] Motion Requesting Attorneys' Fees for Vexatious Litigation.  Defendants argue that the Court should award attorneys' fees under its inherent authority to sanction parties for vexatious conduct or, alternatively, under 28 U.S.C. § 1927, which provides that "[a]ny attorney or other person . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  Defendants contend that they should be awarded attorneys' fees based on: (1) Plaintiffs' pursuit of a claim for equitable disgorgement of Cafesjian's investments in Armenia that was ultimately withdrawn before trial; (2) Plaintiffs' refusal to disclose its theories of damages during discovery; (3) Plaintiffs' use of allegedly obstructive tactics during discovery; (4) Plaintiffs' filing unnecessary motions in the course of the litigation; and (5) Plaintiffs' failure

to produce a substantial number of documents until the eve of trial. Plaintiffs have filed an opposition to Defendants' motion, and Plaintiffs' trial counsel, K&L Gates LLP, have intervened for the purpose of filing an opposition to Defendants' motion. Defendants have responded to both of these oppositions, and the motion is now ripe for adjudication.

Although the American Rule generally provides that each party must bears its own legal costs, the federal courts have inherent power to assess attorneys' fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)). "As old as the judiciary itself, the inherent power enables courts to protect their institutional integrity and to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys' fees, and such other orders and sanctions as they find necessary." *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1472 (D.C. Cir. 1995). To support a sanction under this inherent authority, "the court must make a finding by clear and convincing evidence that [the [sanctioned party] committed sanctionable misconduct that is tantamount to bad faith." *Ali v. Tolbert*, ___ F.3d ____, 2011 WL 691364, at *5 (D.C. Cir. Mar. 1, 2011).

The Court may also award attorneys' fees based on vexatious conduct pursuant to 28 U.S.C. § 1927. The purpose of § 1927 is to allow the Court "to assess attorney's fees against an attorney who frustrates the progress of judicial proceedings." *United States v. Wallace*, 964 F.2d 1214, 1218 (D.C. Cir. 1992). Before imposing sanctions on an attorney, the Court must evaluate whether the attorney's conduct was "*at least* reckless[.]" *Id.* at 1217. Recklessness is a "high threshold . . . and in general requires deliberate action in the face of a known risk, the likelihood or impact of which the actor inexcusably ignores." *Id.* at 1219-20. "The power to assess costs on

the attorney involved is a power which the courts should exercise *only* in instances of serious and studied disregard for the orderly process of justice." *Id.* at 1220 (quotation marks and citations omitted). "[U]nintended, inadvertent, and negligent acts will not support an imposition of sanctions under section 1927." *Id.* at 1219 (quoting *Cruz v. Savage*, 896 F.2d 626, 631 (1st Cir. 1990)).

The Court notes at the outset that the majority of Defendants' requests for fees relate to disputes that arose in the course of discovery over what evidence should be produced in relation to particular claims asserted by Plaintiffs. The Federal Rules of Civil Procedure provide a mechanism for awarding expenses to parties who incur expenses as a result of unnecessary discovery, and that is the preferred approach for awarding expenses as a result of misconduct during discovery. *See* Fed. R. Civ. P. 26(c)(3) & 37(a)(5). Defendants did not seek expenses during the course of discovery, and Defendants do not rely on the Federal Rules in asking the Court to award fees for vexatious litigation.

1. Plaintiffs' Pursuit of a Claim for Disgorgement of Cafesjian's Investments

Defendants argue that they should be awarded the fees they incurred in defending a claim asserted by the Assembly for disgorgement of Cafesjian's business interests based on his failure to disclose those interests to the Assembly under its conflicts of interest policy. The Assembly did not explicitly assert such a claim in its original complaint in Civil Action No. 08-255. However, the Assembly did pursue discovery based on a disgorgement theory of damages in connection with its claims for breach of fiduciary duty and violation of the conflicts of interest policy. Defendants refused to respond to the Assembly's requests for discovery on relevancy grounds, and the Court denied the Assembly's motion to compel this discovery. The Assembly

42

ultimately dropped this claim prior to trial. Defendants complain that they were forced to investigate the Assembly's disgorgement theory and devote resources to defeating it during the course of the litigation. Defendants essentially argue that the disgorgement claim was frivolous and that Plaintiffs were asserting it for the improper purpose of harassing Cafesjian with improper discovery requests.

Although the legal basis for the Assembly's disgorgement claim has never been clear to the Court and the claim was ultimately dropped as lacking merit, the Court is not persuaded that Plaintiffs' pursuit of that theory demonstrates recklessness or bad faith. It is often the case that the contours of a party's claims evolve throughout the discovery process, particularly with respect to damages and remedies. The fact that Plaintiffs propounded overbroad discovery requests related to this claim does not warrant imposition of sanctions for vexatious litigation, even though it may have been sufficient to justify an award of expenses under Rule 26(c) if Defendants had moved for a protective order. *See* Fed. R. Civ. P. 26(c)(3) & 37(a)(5) (providing that expenses may be awarded if a motion for protective order is granted). The fact that Defendants did not move for discovery sanctions suggests that Plaintiffs' efforts to pursue their disgorgement claim were not more vexatious than their pursuit of other claims that were ultimately found to be meritless. In fact, the record shows that Plaintiffs' attempts to litigate a disgorgement claim were limited to identifying disgorgement as a potential remedy in their answers to interrogatories, requesting discovery relating to Cafesjian's business interests (which the Court denied), and asserting this argument during the deposition of Edele Hovnanian. While Defendants complain that they were forced to conduct legal research to determine the viability of Plaintiffs' theory, that is part of the ordinary costs of civil litigation. Accordingly, the Court

declines to exercise its discretion to award legal expenses to Defendants based on Plaintiffs' attempts to pursue a disgorgement claim.

2.    <u>Plaintiffs' Failure to Disclose Theories of Damages During Discovery</u>

Defendants contend that they should be awarded expenses as a result of Plaintiffs' failure to disclose various theories of damages during discovery. The Court previously granted Defendants' motion to strike any theories of damages that were not sufficiently disclosed during discovery. *See* Pretrial Conference Mem. Op. & Order (Oct. 22, 2010) at 13-27. However, Defendants ask for the additional sanction of attorneys' fees, arguing that Plaintiffs vexatiously avoided their obligations to disclose their theories of damages. Defendants rely on the fact that Plaintiffs failed to provide a computation of their damages at the outset of discovery as required by Rule 26(a)(1)(A)(iii), instructed Dr. Rouben Adalian not to answer questions relating to damages during his deposition, and provided incomplete or vague responses to Defendants' interrogatories about damages. Defendants also rely on the fact that Plaintiffs' Rule 30(b)(6) witness, Van Krikorian, was unable to answer questions relating to the calculation of damages during his deposition. Krikorian testified during that deposition that Plaintiffs would produce an expert witness to address the subject of damages, but Plaintiffs never designated any expert witnesses.

It is clear from the record that Plaintiffs were less than forthcoming about their theories of damages during discovery, and that is the basis upon which the Court granted Defendants' motion to strike those claims. However, the Court is not persuaded that Plaintiffs' conduct amounts to recklessness or bad faith sufficient to justify a sanction under § 1927 or the Court's inherent authority. The record indicates that Plaintiffs did supplement their disclosures with

44

estimates of their damages, and it appears that they may have had a good faith basis for asserting those claims at the time. Ultimately, Plaintiffs were unable to come up with evidence in support of those claims, and therefore they were unable to give satisfactory responses to Defendants' discovery demands. The Court is not convinced that Plaintiffs were acting vexatiously by asserting their damages claims during discovery and then being caught without evidence to support them. Therefore, the Court finds that its pretrial sanction precluding Plaintiffs from proceeding based on undisclosed damages was sufficient, and it declines to award attorneys' fees based on this conduct.

3.      Plaintiffs' Alleged Gamesmanship During Discovery

Defendants next argue that they should be awarded fees as a result of what they call "unnecessary discovery and obstructive tactics" by Plaintiffs relating to two depositions taken during discovery. First, Defendants complain about the fact that Plaintiffs' counsel instructed Adalian not to answer questions about damages during his deposition, since this was not a proper instruction. *See* Fed. R. Civ. P. 30(c)(2) ("A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3).") Second, Defendants complain about the fact that two days prior to Anoush Mathevosian's scheduled deposition, Plaintiffs filed an emergency motion for a protective order to proceed with the deposition by written questions in lieu of an oral examination pursuant to Rule 31. Although Plaintiffs based their motion on Mathevosian's poor health, Defendants argue that it was made for purely strategic reasons because Plaintiffs needed additional time to prepare Mathevosian to testify regarding the May 7, 2007 meeting of the AGM&M Board of Trustees.

With respect to deposition of Adalian, the Court granted Defendants' motion to compel his testimony on the subject of damages. *See* [59] Order (May 7, 2009). Plaintiffs' counsel had instructed Adalian not to answer questions about damages because a Rule 30(b)(6) witness was being designated for that purpose. During a telephone conference on the record with the Court, Plaintiffs' counsel agreed that this was an inappropriate basis upon which to instruct Adalian not to answer questions. Accordingly, the Court ordered that Dr. Adalian's deposition be continued so that Defendants could ask him questions relating to damages. Defendants did not request any sanctions at the time, and the Court did not award any sanctions.

With respect to the deposition of Mathevosian, the Court denied Plaintiffs' emergency motion to proceed upon written questions rather than by oral examination. *See* [64] Order (June 23, 2009). The Court held that Defendants had established that it was important to depose her and that Plaintiffs had not substantiated their claims that she was too ill to be deposed. Defendants ultimately deposed Mathevosian at her home, and the videotape of that deposition was presented to the Court as part of the record at trial. It is apparent from that video that she was in poor health, and given the limited scope of the questioning from Defendants during that deposition, it was reasonable for Plaintiffs to ask the Court to limit the method of questioning.

Defendants have seized upon these two incidents during discovery as evidence of Plaintiffs' vexatiousness. However, the Court is not persuaded that Plaintiffs' counsel acted recklessly or in bad faith in taking these actions. Accordingly, the Court declines to award a sanction of attorneys' fees based on this conduct.

### 4. Unnecessary Motions Practice

Defendants next argue that they should be awarded expenses because Plaintiffs filed

several unnecessary "motions" during the course of the litigation. First, Defendants complain about a request for entry of default that was filed 35 days after Defendants failed to file an answer to Plaintiffs' Second Amended Complaint in Civil Action No. 07-1259. The Court denied Plaintiffs' request for entry of default, agreeing with Defendants that default was inappropriate in light of their participation in the lawsuit and the related actions pending before the Court. Defendants argue that Plaintiffs filed their request only for the purpose of delay and harassment, but they concede that Plaintiffs' action was allowed by Rule 55. The Court declines to sanction Plaintiffs for taking an action that is explicitly authorized by the Federal Rules of Civil Procedure.

Defendants next complain about Plaintiffs' reference to Rule 11 in a footnote of their reply brief in support of summary judgment. *See* [79] Pls.' Reply Mem. at 5 n.5. In that footnote, Plaintiffs suggested that Defendants had improperly cited Delaware case law and secondary sources in support of their breach of fiduciary duty claims. With leave of the Court, Defendants filed a surreply to respond to Plaintiffs' suggestion. *See* [82] Defs.' Surreply. The Court agrees with Defendants that the reference to Rule 11 was unnecessary, but Defendants also did not need to file a surreply to respond to Plaintiffs' footnote.[12] The Court shall not sanction Plaintiffs for asserting a legal argument that Defendants' cited sources are not controlling authority.

Finally, Defendants complain about a motion filed by Plaintiffs on the eve of trial asking

---

[12] Plaintiffs did not file a motion for sanctions under Rule 11, and the Court did not construe Plaintiffs' footnote as requesting that sanctions be imposed. In any event, it was obvious to the Court that Defendants' citation of persuasive authority was not sanctionable conduct.

Defendants to certify that they had complied with certain discovery obligations.  *See* [152] Pls.'

Mot. for Order Requiring Defs.' Confirmation of Compliance with Discovery Obligations.

Plaintiffs were seeking confirmation that Defendants had searched all of Cafesjian's email

addresses for discoverable information in light of new evidence of additional email accounts that

surfaced before trial.  Defendants argue that Plaintiffs' motion was unnecessary and vexatious

because the parties were engaged in discussion about producing any outstanding materials before

trial.  The Court ultimately denied the motion without prejudice after the parties appeared to have

resolved the dispute through negotiation.  While Plaintiffs should have been able to resolve their

disagreement with Defendants before filing a motion with the Court, the Court does not find that

Plaintiffs' motion was vexatious.  The parties had legitimate disputes about last-minute discovery

obligations, and Plaintiffs' decision to file a motion with the Court was not clearly inappropriate.

Therefore, the Court shall not sanction Plaintiffs based on this conduct.

     5.    <u>Production of Documents on the Eve of Trial</u>

Defendants' final request for attorneys' fees is based on the fact that Plaintiffs produced a

large number of documents—some 12,000 pages of emails—less than two weeks before the start

of the trial.  Plaintiffs' late production is troubling because these emails—many of which were

ultimately used by Defendants as important exhibits at trial—should have been produced prior to

the close of discovery pursuant to the Court's scheduling order and prior rulings relating to the

consolidated discovery in these actions.  By producing these documents on the eve of trial,

Plaintiffs forced Defendants to spend a significant amount of time and resources reviewing these

materials instead of preparing their witnesses, rehearsing their arguments, and otherwise

preparing for a lengthy bench trial.  Ultimately, it is unclear what impact Plaintiffs' late

production had on Defendants' ability to prepare for trial. Defendants did not ask for a continuance based on Plaintiffs' late production, but it was not in Defendants' interest to delay the trial, so the Court cannot assume that Defendants were not prejudiced by the untimely disclosures.

Based on the damning contents of many of the documents, Defendants speculate that Plaintiffs acted in bad faith and abused the discovery process by waiting until before trial to produce them. Plaintiffs indicated to the Court that a computer problem had inadvertently caused these documents to be omitted from its prior production of documents during discovery. *See* [170] Pls.' Resp. to Defs.' Mot. to Amend the Joint Pretrial Stmt. at 2. Plaintiffs' former counsel has presented the Court with a declaration indicating that he was unaware until October 2010 that additional emails existed that had not been produced. *See* Decl. of Arnold E. Rosenfeld ¶ 11. While the Court is willing to accept the declaration of Plaintiffs' former counsel as an officer of the Court that documents were not deliberately withheld until the eve of trial by legal counsel, it is unclear whether Plaintiffs acted recklessly or otherwise breached their obligation to timely supplement their discovery responses. Therefore, the Court shall require Plaintiffs to provide the Court with a more specific explanation as to why they did not produce these documents during discovery. The Court may order payment of reasonable expenses caused by Plaintiffs' untimely production pursuant to Rule 26(c)(1) if the Court is not satisfied with Plaintiffs' response. The Court shall hold in abeyance Defendants' motion for attorneys' fees with respect to the untimely production of these documents.

D. *Defendants' Petition for Involuntarily Dissolution*

On February 16, 2011, Defendants filed a [198] Petition for Involuntary Dissolution

asking this Court to begin the involuntarily dissolution of AGM&M pursuant to the procedures in

the District of Columbia Nonprofit Corporation Act, D.C. Code §§ 29-301.01 to 301.114.

Pursuant to D.C. Code § 29-301.55, the Act provides in pertinent part:

> The court shall have full power to liquidate the assets and affairs of a corporation:
>
> (1) In any action by a member or director when it is made to appear:
>
> > (A) That the directors are deadlocked in the management of the corporate affairs and that irreparable injury to the corporation is being suffered or is threatened by reason thereof, and either that the members are unable to break the deadlock or there are no members having voting rights;
> >
> > (B) That the acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent;
> >
> > (C) That the corporate assets are being misapplied or wasted; or
> >
> > (D) That the corporation is unable to carry out its purposes[.]

D.C. Code § 29-301.55(a). The Nonprofit Corporation Act sets out specific procedures for

liquidation proceedings. *See id.* §§ 29-301.55 to 301.60.

As the Court explained in a Memorandum Opinion and Order issued on February 17,

2011, following passage of the District of Columbia Court Reform and Criminal Procedure Act,

Pub. L. No. 91-358, 84 Stat. 473 (1970), all powers over nonprofit corporation liquidation are

vested in the Superior Court of the District of Columbia. *See* [202] Mem. Op. & Order at 5-6.

The Court suggested, however, that it might be appropriate to exercise supplemental jurisdiction

over Defendants' petition for involuntary dissolution, and the Court asked the parties to submit

briefing on this issue. Defendants filed a response to the Court's order addressing the issue of

jurisdiction, and Plaintiffs have filed an opposition to Defendants' petition, to which Defendants

filed a reply. Therefore, the issue is ripe for the Court's resolution.

The supplemental jurisdiction statute, 28 U.S.C. § 1367, provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, the statute provides that a court may decline to exercise supplemental jurisdiction where (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. *Id.* § 1367(c).

Many federal courts have recognized that claims for corporate dissolution involve special state interests that may be disrupted or frustrated by the exercise of federal jurisdiction, and the existence of state procedures for dissolution may require federal courts to abstain from exercising jurisdiction. *See, e.g.*, *Pennsylvania v. Williams*, 294 U.S. 176, 185 (1935) ("It has long been accepted practice for the federal courts to relinquish their jurisdiction in favor of the state courts, where its exercise would involve control of or interference with the internal affairs of a domestic corporation of the state."); *Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 661-65 (6th Cir. 2002) (affirming district court's abstention from jurisdiction over corporate dissolution claim under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)); *Friedman v. Revenue Mgmt. of N.Y., Inc.*, 38 F.3d 668, 671 (2d Cir. 1994) (recognizing that the comprehensive regulation of corporate governance and existence by the state may warrant abstention under *Burford*); *In re English Seafood (USA) Inc.*, 743 F. Supp. 281, 288-89 (D. Del. 1990) ("We find that abstention is required in this case. The state of Delaware has a strong interest in the formation and termination of corporations

51

under its laws and in the uniform development and application of the statutory scheme that the state legislature and courts have created to regulate those corporations."); *see also Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 271 (S.D.N.Y. 2008) (citing cases). Although there is some question whether similar principles should apply to the District of Columbia, *see Silverman v. Barry*, 727 F.2d 1121, 1123 n.4 (D.C. Cir. 1984), there is some basis for considering the Superior Court's expertise in resolving these local issues, *see Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 351-52 (D.C. Cir. 2003). Accordingly, the Court is reluctant to assert jurisdiction over a matter that is nearly always handled exclusively by the local courts of the District of Columbia.

Defendants argue that the Court should exercise supplemental jurisdiction over the petition because the Court has already invested a substantial amount of time in this litigation and is familiar with the problems facing AGM&M. However, while the Court may be familiar with some of the facts that are relevant to Defendants' petition, Defendants did not assert this claim for relief in their Streamlined Counterclaims or any of their pretrial briefs, and this claim was not litigated by the parties at trial.[13] Resolution of Defendants' petition would require additional findings of fact by the Court following "a hearing had upon such notice as the court may direct to be given to all parties to the proceedings and to any other parties in interest designated by the court."[14] D.C. Code § 29-301.56(b). Such proceedings would likely occur after the Court has

---

[13] By contrast, the plaintiffs in *Miller v. Up In Smoke, Inc.*, 738 F. Supp. 2d 878 (N.D. Ind. 2010), upon which Defendants rely, pled their alternative claim for judicial dissolution in the complaint. *See id.* at 866.

[14] The Court notes that none of the present trustees of AGM&M were parties to this litigation during the trial. Hirair Hovnanian was dismissed as a party at the summary judgment stage. Anoush Mathevosian and Van Krikorian have never been parties, although Van Krikorian

52

finally disposed of the parties' original claims, which is an additional reason to decline the exercise of supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3). It is one thing to have the Court exercise supplemental jurisdiction over a claim in the interest of judicial economy; it is another thing entirely to seek to extend the Court's jurisdiction by adding a completely new claim after the trial has been held.

For the foregoing reasons, the Court declines to exercise supplemental jurisdiction over Defendants' [198] Petition for Involuntary Dissolution. Defendants should seek appropriate relief from the Superior Court for the District of Columbia.

      E.    *Defendants' Motion for Order to Show Cause as to Why Plaintiffs Should Not Be Held in Comtempt*

On March 21, 2011, Defendants filed a [214] Request for Order to Show Cause as to Why Plaintiffs Should Not Be Held in Contempt. Defendants contend that Plaintiffs have violated one of this Court's orders by relocating certain materials maintained by the Armenian National Institute ("ANI") off the premises of the Families U.S.A. building. Plaintiffs do not dispute that ANI has moved its materials out of the Families U.S.A. building, but they contend that they should not be held in contempt because ANI is a separate legal entity that is not a party to this litigation and the Court did not expressly order it to keep its belongings in the Families U.S.A. building. The Court agrees with Plaintiffs that there is no basis for finding them in contempt.

Following the completion of closing arguments at trial, the Court asked the parties if they

---

attended the trial as the corporate representative of the Assembly. According to Defendants, the CFF-designated trustee of AGM&M is now John Williams, Defendants' trial counsel. It is unclear whether Mr. Williams could continue to represent Defendants through any dissolution proceedings in light of his present status as a trustee.

would agree not to take any actions with respect to the properties pending the Court's ruling. Because the reversion date of December 31, 2010 was approaching soon after trial, the Court wanted assurances that the parties would not attempt to enforce the Grant Agreement or change the status quo while the Court was in the process of deciding the case. Plaintiffs agreed that they would wait until the Court's ruling before taking action. Defendants also agreed that they would not take any actions with respect to the buildings, but they raised a concern about "the ANI situation," referring to the materials being stored in the Families U.S.A. building and the staff working there. *See* Trial Tr. (11/29) at 168. In response, the Court stated:

> I would hope that while we await my decisions that nothing happens to them or they get moved or anything else. I'd prefer not to enter an order because I'm sure—unless you can reach an agreement about what both sides need to do. If you can reach some stipulation or some sort of consent order, I'd be happy to sign something until I make a decision.

*Id.* at 168-69. Defendants complained about the lack of an enforcement mechanism and asked for a right of inspection. *See id.* at 170-71. The Court then inquired as to whether there was inventory of the materials kept by ANI, and Plaintiffs' counsel informed the Court (after conferring with Dr. Rouben Adalian, who was present in the courtroom), that there was not a precise inventory. *Id.* at 171. Plaintiffs' counsel told the Court that nothing had happened to the materials for a long time since the litigation began, and Plaintiffs agreed that nothing should happen to them pending the Court's decision. The Court then told the parties several times that they should try to reach an agreement about this issue before asking the Court to enter an order:

> Let me make the suggestion, in order to enter some sort of order you either have to agree to it or you need to file something in terms of what my authority would be. ANI, technically, is not a party, although they are under you, it's under the umbrella of [AGM&M], I'd have to take a look at that more carefully. So, I'm just saying that this is not something I would do off the top of my head. If you can reach some

agreement that just simply says nothing gets moved by anybody that relates to this until I make this decision, that would be helpful. Once I make a decision, I will bring you back to have some discussion further.

. . .

[I]f you can agree to something, that would be most helpful. Just leave everybody with nobody moving or doing anything, that would be helpful. If you can't do that and you still feel strongly, then file something and then I'll take a look at it. I prefer not to put my resources into that. But why don't you have a discussion about it.

. . .

As I said, I would prefer that you have discussion about it, see if you can resolve something. If you want me to sign something, fine. Reach a stipulation, however you want to do it. If you can't, then you need to file something. I'm not going to do it today without your filing something in writing.

. . .

[W]hat I'm asking is nobody move anything. I mean, in other words, we've been—you've been on pause while we've been waiting for this for at least—at least for a couple of years at the end [of the] year. So, don't change anything. I mean, you can accept new donations, but don't move the property or make changes to the thing. To the extent that you want to put something—stipulate that nobody—either side is going to do anything, then that would be helpful. But I'll do this as fast as I can. But if you're not satisfied, then file something in writing and I'll litigate it. But I would suggest that you talk and see whether you can do it on a more amicable basis.

*Id.* at 171-75. The parties did not present any stipulation or agreement to the Court for ratification, nor did the parties file any motions asking the Court to enter an Order.

Defendants argue that the removal of the ANI materials from the Families U.S.A. building, which apparently occurred after the Court issued its Memorandum Opinion on January 26, 2011, violated the Court's oral admonition that "nobody move anything." However, as should have been clear from the context, the Court's statement was not intended to constitute a

binding order on ANI.[15]  Even if the Court had intended to impose a binding obligation, ANI's actions would not justify a finding of contempt.  The record presented by Plaintiffs demonstrates that ANI waited until after the Court issued its January 26, 2011 Memorandum Opinion before moving its materials to an offsite storage facility, where they remain under the supervision of Dr. Adalian.  *See* Decl. of Dr. Rouben Adalian ¶¶ 3-6, 11, 14.  Therefore, there is no basis to conclude that ANI's assets have been wasted.

For these reasons, the Court finds that there is no basis for holding Plaintiffs in contempt, and the Court shall deny Defendants' request for a show cause order.

### III. CONCLUSION

For the foregoing reasons, the Court finds that the Grant Agreement clearly and unambiguously requires AGM&M to transfer the Bank Building and the Adjacent Properties to CFF without any reimbursement requirement and without regard to any tax consequences that might result from the transfer.  Therefore, the Court shall order AGM&M to effect the transfer of the properties without further delay in compliance with D.C. law.  The Court reaffirms its ruling that Cafesjian and Waters are entitled to indemnification from AGM&M for their attorneys' fees in defending the claims asserted against them for breaching their fiduciary duty to AGM&M, but the Court shall refer this issue to a magistrate judge for a report and recommendation.  The magistrate judge shall review the expenses submitted by Defendants and make recommendations as to which of the claimed expenses should be subject to indemnification; the Court shall review the magistrate judge's report and recommendation and make a final ruling as to the amount of the

---

[15] This Court has never determined that ANI is a party to this litigation or that AGM&M or the Assembly has control over ANI.  The record at trial indicated only that the AGM&M Board of Trustees had the right to appoint the Board of Governors of ANI.

indemnification.  The Court shall also deny-in-part Defendants' [221] Motion Requesting

Attorneys' Fees for Vexatious Litigation because Defendants have mostly failed to demonstrate

that Plaintiffs or their counsel acted recklessly or in bad faith.  However, the Court shall hold in

abeyance Defendants' motion with respect to Plaintiffs' untimely production of documents on the

eve of trial and require Plaintiffs to more clearly explain why they did not produce these

documents during discovery.

The Court shall decline to exercise supplemental jurisdiction over Defendants' [198]

Petition for Involuntary Dissolution of AGM&M, as this is a new claim asserted after trial that is

best left to be adjudicated by the Superior Court of the District of Columbia.

Finally, the Court shall deny Defendants' [214] Request for Order to Show Cause as to

Why Plaintiffs Should Not Be Held In Contempt because Defendants have not shown that

Plaintiffs violated one of this Court's orders.

Because the Court has now finally disposed of all the parties' claims except for

determining the amount of indemnification, the Court shall direct entry of final judgment

pursuant to Rule 54(b) as to all claims except for Defendants' claim for legal fees and expenses

under the indemnification provision of the AGM&M By-Laws (Count VII of their Streamlined

Counterclaims).  An appropriate Order accompanies this Memorandum Opinion.


Date: May 9, 2011                                    _____/s/_____
                                                     **COLLEEN KOLLAR-KOTELLY**
                                                     United States District Judge