**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE ARMENIAN ASSEMBLY OF AMERICA, INC., *et al.*,<br><br>Plaintiffs/Counter-Defendants,<br><br>v.<br><br>GERARD L. CAFESJIAN, *et al.*,<br><br>Defendants/Counter-Plaintiffs. | Civil Action Nos. 07-1259, 08-255, 08-1254 (CKK) |

**MEMORANDUM OPINION**
(September 12, 2011)

The above-captioned consolidated actions involve a series of claims and counterclaims relating to the parties' attempts to create a museum and memorial in Washington, D.C. devoted to the Armenian Genocide.[1] Following a twelve-day bench trial in November 2010, the Court issued a Memorandum Opinion setting forth its findings of fact and conclusions of law on January 26, 2011. *See* [193][2] Mem. Op. (Jan. 26, 2011). The Court found that none of the parties' substantive claims were meritorious and dismissed all of the claims save one, holding that Defendants Gerard L. Cafesjian ("Cafesjian") and John J. Waters ("Waters") were entitled to indemnification from the Armenian Genocide Museum and Memorial, Inc. ("AGM&M") for legal expenses incurred in defending claims asserted against them in their capacities as former officers of AGM&M. The Court also upheld the validity of a reversion clause in a Grant

[1] As the Court has previously noted, the use of the term "genocide" to describe the atrocities that befell the Armenians between 1915 and 1923 is not without controversy. The Court employs the term used as by the parties, and the Court expresses no opinion on the propriety of that label.

[2] All docket numbers refer to Civil Action No. 08-255.

Agreement executed between Defendants Cafesjian and the Cafesjian Family Foundation, Inc. ("CFF") and Plaintiff Armenian Assembly of America, Inc. (the "Assembly"), ruling that CFF and Cafesjian may exercise their rights under that clause effective December 31, 2010. On May 9, 2011, the Court held that the Grant Agreement did not impose any obligation on CFF to reimburse AGM&M for the excess value of the properties over the amount of funds originally donated to acquire them. *See* [241] Mem. Op. (May 9, 2011). The Court entered final judgment pursuant to Federal Rule of Civil Procedure 54(b) on all of the parties' claims and counterclaims except for Defendants' counterclaim for indemnification of attorneys' fees and costs, which the Court referred to a magistrate judge for a report and recommendation.[3] The Court also held in abeyance Defendants' motion for attorneys' fees based on Plaintiffs' untimely production of documents on the eve of trial.

Presently pending before the Court is Defendants' [250] Motion to Enforce Judgment and for Amended Findings and Judgment. Defendants ask the Court to amend its findings or alter its judgment to clarify that the leasehold interest given to the Assembly by AGM&M is extinguished by virtue of CFF's exercise of its reversion rights under the Grant Agreement. For the reasons explained below, the Court declines to amend its findings or enforce the judgment as requested by Defendants. The Court also shall deny Defendants' motion for attorneys' fees based on Plaintiffs' late production of documents before trial.

[3] As of the date of this Memorandum Opinion, this matter remains referred to Magistrate Judge Alan Kay.

# I. BACKGROUND

## *A. Factual and Procedural Background*

The Court set out its factual findings thoroughly in its prior memorandum opinions issued on January 26 and May 9, 2011, which have been published at 772 F. Supp. 2d 20 and 772 F. Supp. 2d 129, respectively. Relatively few facts from those opinions are relevant to Defendants' Motion to Enforce Judgment and for Amended Findings and Judgment, and they are summarized below.

In the late 1990s, Cafesjian and several individuals involved with the Assembly joined forces in an effort to create a museum devoted to memorializing the Armenian Genocide. In 2000, the Assembly purchased a prominent building in downtown Washington, D.C. (the "Bank Building") for the purpose of housing the genocide museum. This Bank Building was purchased using money donated by Cafesjian (through CFF and another organization affiliated with Cafesjian) and another philanthropist, Anoush Mathevosian. Once the Bank Building was acquired by the Assembly, Cafesjian acquired four parcels adjacent to the Bank Building: (1) 1342 G Street, NW; (2) 1340 G Street, NW; (3) 1338 G Street, NW; and (4) 1334-36 G Street, NW (collectively, the "Adjacent Properties"). Each of the properties was acquired in an arms-length transaction by one of Cafesjian's entities, TomKat Limited Partnership ("TomKat"). The first three of the Adjacent Properties were acquired by TomKat in 2000. The final adjacent property, 1334-46 G Street, NW, also known as the "Families U.S.A." building, was acquired by TomKat from a third-party seller in a purchase agreement on September 22, 2003. Several of the Adjacent Properties were taken subject to leases.

Cafesjian ultimately decided to donate the Adjacent Properties to the Assembly for

purposes of expanding the footprint of the genocide museum project. Cafesjian and the others involved with the museum project agreed that a new entity, the Armenian Genocide Museum and Memorial, Inc. ("AGM&M"), should be created to develop and manage the museum. The Articles of Incorporation for AGM&M were signed on October 29, 2003, and AGM&M officially became incorporated as a nonprofit corporation in the District of Columbia. The Articles of Incorporation and the By-Laws for AGM&M were ratified and adopted, respectively, pursuant to a Unanimous Written Consent agreement that was executed on October 30, 2003. Cafesjian agreed to channel his donations to AGM&M through the Assembly, so it was decided that Cafesjian would enter into a grant agreement with the Assembly (the "Grant Agreement"), and the Assembly would transfer all of the museum-related assets and obligations to AGM&M in a separate agreement, to be known as the "Transfer Agreement." The Grant Agreement and Transfer Agreement were signed on November 1, 2003 during an Assembly gala in Palm Desert, California.

The Grant Agreement is an eleven-page document that set forth the terms and conditions of the grants made by Cafesjian and CFF to the Assembly for the museum project and obligated the Assembly to comply with those terms and conditions. Pursuant to the Grant Agreement, Cafesjian and CFF (jointly defined as the "Grantor") agreed to donate $10.3 million for the purchase of the Adjacent Properties from TomKat and any related transaction costs.[4] The amounts paid under the Grant Agreement were calculated based on the purchase price paid by TomKat for the Adjacent Properties, plus the holding costs paid by TomKat pending transfer

[4] Cafesjian and CFF also agreed to make annual payments under the installment agreement for 1340 G Street that had been negotiated by TomKat.

minus any rents earned during this period, plus the legal costs associated with the transfer.

For purposes of this litigation, the most critical feature of the Grant Agreement is the "reversion clause." Under § 3.1(A) of the Grant Agreement, the "Grant Property"—defined as the Bank Building and the Adjacent Properties—"may only be used as part of the AGM&M,[5] subject to plans for the AGM&M approved by the Board of Trustees of the American Genocide Museum & Memorial, Inc. (the 'Plans') . . . ." The next paragraph, § 3.1(B), reads as follows:

> If the Grant Property is not developed prior to December 31, 2010 in accordance with the Plans, or if the Grant Property is not developed in substantial compliance with the Plans including with respect to the deadlines for completion of the construction, renovation, installation and other phases detailed in the Plans, then:
>
> (i) in the event any portion of the Grants has not been funded, this Agreement terminates;
>
> (ii) to the degree any portion of the Grants has been funded, at the Grantor's sole discretion, the Assembly shall return to the Grantor the Grant funds or transfer to the Grantor the Grant Property.

The Grant Agreement also obligated the Assembly to make available a space for a memorial to be named after Cafesjian and to operate and maintain the memorial in perpetuity. The Grant Agreement also provided that neither CFF nor Cafesjian had any obligation to provide additional funding to the Assembly or to AGM&M.

The Grant Agreement also contained conditions relating to the creation of AGM&M. Among other things, it required that AGM&M be created as a nonprofit entity; that it be governed by a Board of Trustees appointed by individuals and organizations that contribute at least $5 million to the museum project; and that each such donor be entitled to receive at least one vote for each $5 million contributed. The Grant Agreement also required the Assembly to

[5] As used in this context, "AGM&M" refers to the museum project, not the corporate entity.

enter into a Transfer Agreement with AGM&M to transfer all of its interest in all cash, pledges, property, and other assets being held by the Assembly for the museum project. The Transfer Agreement would obligate AGM&M to honor all existing donor requirements at the time of transfer and to assume all obligations in the Grant Agreement relating to the Memorial.

The Transfer Agreement was executed on November 1, 2003 by the Assembly and the newly-incorporated AGM&M. The Transfer Agreement required the Assembly to contribute to AGM&M "all of its rights, title and interest in and to all cash, pledges, real property, tangible property, intangible property, and other assets contributed to the [Assembly] and/or held by the [Assembly] for the development, renovation, and construction of the AGM&M." The approximate aggregate value of the grant was listed as $27.8 million, including $7.25 million in property, over $19 million in pledges, and approximately $670,000 in cash and other assets.

Pursuant to § 1.2 of the Transfer Agreement, "AGM&M, Inc. must honor all of the [Assembly]'s donor requirements existing at time of transfer, or in the alternative, obtain donor consent to the transfer and any modification of donor terms." The agreement explicitly required AGM&M to comply with the obligation to construct a memorial as set out in the Grant Agreement. The agreement also required AGM&M to use the funds and property transferred "solely to develop, construct and operate" the Armenian Genocide Museum & Memorial. The Transfer Agreement also contained provisions relating to the governance of AGM&M that are substantively identical to those contained in the Grant Agreement.

The transfer of control over the museum project from the Assembly to AGM&M was a gradual process that took several months. In the weeks following the execution of the Grant and Transfer Agreements and the organic documents creating AGM&M, Cafesjian and CFF

transferred $10.3 million to the Assembly to cover the purchase of the Adjacent Properties. During November and December 2003, AGM&M engaged in a series of transactions with TomKat to acquire title to all of the Adjacent Properties. In the case of 1340 G Street, AGM&M obtained TomKat's rights under the installment agreement that TomKat had negotiated. In the case of the Families U.S.A. building, TomKat assigned AGM&M its rights under the purchase agreement, and AGM&M took the title directly from the third-party seller.

The facts surrounding what happened after AGM&M was formally created were thoroughly discussed in the Court's January 26, 2011 Memorandum Opinion and need not be repeated herein. The AGM&M Board of Trustees was unable to reach consensus on the proper size and scope of the project, and tensions between Cafesjian and other Assembly leaders increased over a series of disagreements about the museum project and other policies of the Assembly. By 2006, relations between the parties had completely broken down, prompting Cafesjian to propose that AGM&M be dissolved. Cafesjian ultimately resigned from the AGM&M Board of Trustees, designating Waters as his successor. After Cafesjian sued the Assembly for payment on an outstanding promissory note, the other AGM&M Trustees voted to exclude Waters from participation on all matters relating to the museum project. This resulted in a series of lawsuits filed by the parties fighting for control of AGM&M and alleging mismanagement of the corporation. The three other AGM&M trustees attempted to move forward with the project without Waters's involvement, but they were unable to raise the funds necessary to implement a development plan. Accordingly, the museum was not developed by December 31, 2010, thus triggering the reversion clause in the Grant Agreement.

In May 2007, AGM&M created a Building & Operations Committee to manage the

development of the museum. The Building & Operations Committee tried to raise funds by leasing space in the Families U.S.A. building. However, when they could not find any tenants, the Assembly moved into the building, along with the Armenian National Institute ("ANI"), a research entity affiliated with the Assembly and AGM&M. On May 1, 2009, AGM&M entered into a lease agreement with the Assembly, which automatically renewed for a five-year period, expiring in December 2015. In its January 26, 2011 Memorandum Opinion, the Court found that the lease did not violate the terms of the Grant Agreement. After the Court declared the reversion clause valid and enforceable, Defendants asked the Assembly to vacate the Families U.S.A. building. The Assembly has declined to vacate, arguing that it maintains a valid leasehold interest in the property.

## II. LEGAL STANDARD

Defendants move to enforce the Court's judgment under Federal Rule of Civil Procedure 70 and for amended or additional findings under Rule 52(b) and/or Rule 59(e). Federal Rule of Civil Procedure 70 provides in pertinent part:

> If a judgment requires a party to convey land, to deliver a deed or other document, or to perform any other specific act and the party fails to comply with the time specified, the court may order the act to be done—at the disobedient party's expense—by another person appointed by the court. When done, the act has the same effect as if done by the party.
>
> . . .
>
> If the real or personal property is within the district, the court—instead of ordering a conveyance—may enter a judgment divesting any party's title and vesting it in others. That judgment has the effect of a legally executed conveyance.

Fed. R. Civ. P. 70(a)-(b).

Federal Rule of Civil Procedure 52(b) provides that "[o]n a party's motion filed no later

than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed. R. Civ. P. 52(b). Rule 59(e) states that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e).[6] "A Rule 59(e) motion is discretionary and need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam) (internal quotation marks omitted). A motion to reconsider under Rule 59(e) "is [neither] . . . an opportunity to reargue facts and theories upon which a court has already ruled nor a vehicle for presenting theories or arguments that could have been advanced earlier." *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010) (internal quotation marks and citations omitted). "Such motions are disfavored and relief from judgment is granted only when the moving party establishes extraordinary circumstances." *Harrison v. Fed. Bureau of Prisons*, 681 F. Supp. 2d 76, 84 (D.D.C. 2010) (internal quotation marks and citations omitted).

## III. DISCUSSION

### *A. Defendants' Motion to Enforce Judgment or for Amended or Additional Findings*

Defendants ask the Court to issue an order declaring that the Assembly's leasehold interest in the Families U.S.A. building is null and void following the transfer of the property to CFF under the reversion clause in the Grant Agreement. This Court's prior rulings did not specifically address the ongoing validity of the Assembly's lease following the transfer of the

[6] Plaintiffs argue that Defendants' motion was not filed within 28 days of the entry of judgment and therefore is untimely. However, the record clearly shows that Defendants' motion was filed on June 6, 2011, which is 28 days after the Court entered its May 9, 2011 judgment.

Families U.S.A. building to CFF. However, Defendants argue that the lease is necessarily void as a result of the Court's rulings.

Defendants' argument is based on the fundamental principle of property law that "[a] lessor cannot create any greater interest in the lessee than the lessor has." 49 Am. Jur. 2d, Landlord and Tenant § 3. Defendants argue that because AGM&M's interest in the Families U.S.A. building was subject to the reversion clause in the Grant Agreement, its interest was extinguished upon the exercise of the reversion, thereby terminating the leasehold interest of the Assembly. Plaintiffs argue that the lease was validly entered between AGM&M and the Assembly and that the reversion clause in the Grant Agreement did not require that the property be kept free of all liens and encumbrances; therefore, CFF took title to the property subject to the Assembly's lease.

The Court agrees with Defendants' basic proposition that if AGM&M's property interest in the Families U.S.A. building was defeasible, then the Assembly's leasehold interest was extinguished when AGM&M transferred the property to CFF. Defendants have assumed without discussion that the reversion clause in the Grant Agreement created a defeasible estate. However, based on the structure of the transactions through which AGM&M acquired title, the Court cannot conclude that AGM&M's interest in the property was defeasible by CFF's exercise of the reversion clause.

The Court must begin by noting that although the parties and the Court have referred to § 3.1 of the Grant Agreement as the "reversion clause," it does not, strictly speaking, effect a reversion of real property interests. The Grant Agreement is a contract, not a deed that conveys real property. *See Schooler v. Schooler*, 173 F.2d 299, 301 (D.C. Cir. 1948) ("A deed is a written

expression of the act of granting or creating an estate or use in land. It bespeaks a present act, rather than a promise for future action. The distinction readily appears between a deed to land and a contract to sell the same.") (internal citations omitted). As memorialized in the Grant Agreement, CFF and Cafesjian agreed to give millions of dollars to the Assembly for the acquisition of the Bank Building and the Adjacent Properties; the Assembly, in turn, agreed that if these properties were not substantially developed into a museum by December 31, 2010, then CFF and Cafesjian would receive either the funds they donated or the properties that were acquired with the funds.

The record demonstrates that title to the Adjacent Properties was conveyed to AGM&M (which, through the Transfer Agreement, had accepted the Assembly's obligations under the Grant Agreement) by TomKat or third-party sellers, not by Cafesjian and CFF. Since Cafesjian and CFF never had any direct interest in the Adjacent Properties before they were conveyed to AGM&M, they could not retain any reversionary interest in the properties. At most, Cafesjian and CFF could have an executory interest in the properties. However, any defeasible fee interest subject to an executory interest would have to be created by deed under D.C. law. *See* D.C. Code § 42-306(b) (2001) ("[N]o estate of inheritance, or for life, or for a longer term than 1 year, in any real property, corporeal or incorporeal, in the District of Columbia, or any declaration or limitation of uses in the same, for any of the estates mentioned, shall be created or take effect, except by deed signed and sealed by the grantor, lessor, or declarant, in person or by power of attorney or by will."); 26A C.J.S. Deeds § 298 ("A defeasible fee, an estate in fee subject to be defeated on the happening of some future event or contingency or subject to an executory interest which operates upon the occurrence of the stated event to divest the fee, may be created by

deed.”). Although the Grant Agreement conferred upon CFF a contractual right to receive the properties if the museum was not substantially completed, it was not sufficient to vest CFF with an executory interest in the properties subject to that condition.

Although it was not introduced as an exhibit at trial, the deed conveying title to the Families U.S.A. building to AGM&M was provided to the Court as an exhibit during the parties' summary judgment briefing. *See* [66] Pls.' Mot. for Partial Summ. J., Ex. 14. That deed conveyed the property from the third-party seller to AGM&M in fee simple, with no reference to any conditions that would make the fee interest defeasible. Therefore, AGM&M took a fee simple absolute interest in the Families U.S.A. building, and that interest was *transferred*, not extinguished, when CFF exercised its rights under the reversion clause in the Grant Agreement. Accordingly, the leasehold interest conveyed by AGM&M to the Assembly is also transferred.

For these reasons, the Court shall deny Defendants' request for an order under Rule 70 compelling the Assembly to vacate the Families U.S.A. building. Based on the Court's ruling, there is no need to amend the Court's prior findings or alter its judgment; therefore, the Court shall deny Defendants' motion for relief under Rules 52(b) and 59(e).

*B. Defendants' Motion Requesting Attorneys' Fees for Vexatious Litigation*

In its May 9, 2011 Memorandum Opinion and Order, the Court held in abeyance Defendants' motion seeking attorneys' fees for vexatious litigation with respect to fees created by Plaintiffs' untimely production of documents on the eve of trial. The Court ordered Plaintiffs to provide a detailed explanation as to why they did not produce these documents during discovery, and on May 31, 2011, both Plaintiffs and Plaintiffs' former counsel, K&L Gates LLP, filed supplemental statements with the Court regarding the late document production. Plaintiffs have

provided a declaration from the Assembly's information technology consultant of more than twenty years, who states that he cannot explain why certain additional emails that were produced in 2010 were not produced at an earlier date. *See* Decl. of Michael Stinnette ¶ 7. One of the attorneys from K&L Gates LLP explains that for unknown reasons, it appears that email for certain custodians after 2006 were omitted from the original document production. *See* Decl. of Jennifer J. Nagle ¶ 16. In response, Defendants contend that these explanations are inadequate and ask the Court to conduct a more searching inquiry into Plaintiffs' discovery practices. However, the Court is satisfied that Plaintiffs' counsel did not act vexatiously or in bad faith in a manner that justifies an award of attorneys' fees. The Court also notes that although many documents were produced on the eve of trial, Defendants were able to review them and introduce the relevant documents as exhibits at trial, and the expense of reviewing the documents would have been incurred by Defendants regardless of when they were produced. Accordingly, the Court declines to award attorneys' fees based on Plaintiffs' late production of documents.

## IV. CONCLUSION

For the foregoing reasons, the Court shall DENY Defendants' [250] Motion to Enforce Judgment and for Amended Findings and Judgment and DENY Defendants' [221] Motion Requesting Attorneys' Fees for Vexatious Litigation based on the production of documents on the eve of trial. An appropriate Order accompanies this Memorandum Opinion.

Date: September 12, 2011

/s/
**COLLEEN KOLLAR-KOTELLY**
United States District Judge